```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF LOUISIANA
 2                     SHREVEPORT DIVISION

 3   UNITED STATES OF AMERICA,          )
                                        )
 4            Plaintiff,                )
                                        )  Case No:
 5                                      )  16-cr-00048-DEW-PJH
         vs.                            )
 6                                      )  Volume I
     LOUIS ACKAL,                       )  Pages 1 - 86
 7                                      )
              Defendant.                )
 8   _____    )

 9

10           TRANSCRIPT OF JURY TRIAL PROCEEDINGS
            BEFORE THE HONORABLE DONALD E. WALTER
11
             MONDAY, OCTOBER 31, 2016; 9:00 A.M.
12                   SHREVEPORT, LOUISIANA

13   APPEARANCES:
     (Continued on Page 2.)
14
     FOR THE UNITED STATES:
15
         Mark Blumberg
16       Tona Cartwright-Boyd
         U.S. DEPARTMENT OF JUSTICE CIVIL RIGHTS DIVISION
17       950 Pennsylvania Avenue N W
         Washington, DC 20530
18
         Joseph G. Jarzabek
19       U.S. ATTORNEY'S OFFICE
         WESTERN DISTRICT OF LOUISIANA
20       300 Fannin Street, Suite 3201
         Shreveport, Louisiana 71101-3068
21

22          ******************************

23              GAYLE WEAR, RPR, CRR
            Federal Official Court Reporter
24               800 Lafayette Street
            Lafayette, Louisiana 70501
25                   337.593.5222
```

(Continued on Page 2.)

```
1    APPEARANCES OF COUNSEL:
     (Continued from Page 1.)
2

3    FOR THE DEFENDANT ACKAL:

4         John S. McLindon
          WALTERS, PAPILLION, THOMAS, CULLENS, LLC
5         12345 Perkins Road, Building 2, Suite 202
          Baton Rouge, Louisiana 70810
6

7

8

9                          *    *    *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2   PROCEEDINGS:                              PAGE:

 3

 4   GOVERNMENT WITNESSES:

 5   ALPHONS BURRELL

 6        Direct examination by Ms. Boyd          4
          Cross-examination by Mr. McLindon      50
 7        Redirect examination by Ms. Boyd       78

 8

 9

10                    *     *     *

11

12                 E X H I B I T S

13

       (Master Index to be provided at trial conclusion.)
14

15                    *     *     *

16

17   (Court Reporters Note:  Daily copy transcript begins
     with the first witness of the trial:  Alphons Burrell.)
18

19

20

21

22

23

24

25
```

```
1    OCTOBER 31, 2016                              2:52 P.M.

2                        ---o0o---

3                   P R O C E E D I N G S

4                        ---o0o---

5         THE COURT:  Call your first witness.

6         MS. BOYD:  The Government calls Alphons

7    Burrell to the stand.

8                    ALPHONS BURRELL,

9     first having been duly sworn by the Courtroom Deputy,

10           testifies under oath as follows:

11        THE WITNESS:  Yes, ma'am.

12        THE COURTROOM DEPUTY:  Can you please spell

13   your first and last name for the Court Reporter.

14        THE WITNESS:  A-L-P-H-O-N S, B-U-R-R-E-L-L.

15        THE COURTROOM DEPUTY:  Thank you.

16

17                 DIRECT EXAMINATION

18   BY MS. BOYD:

19   Q.   Good afternoon.

20   A.   Good afternoon.

21   Q.   Please introduce yourself to the jury.

22   A.   Good afternoon.  My name is Alphons Burrell.

23   Q.   How far did you go in school, Mr. Burrell?

24   A.   Twelfth grade.

25   Q.   Where do you currently work?
```

1    A.    Franklin Police Department.

2    Q.    What is your position with the Franklin Police

3    Department?

4    A.    K-9 officer/patrol officer.

5    Q.    How long have you been with Franklin?

6    A.    Three years and eight months.

7    Q.    Did you work for the Iberia Parish Sheriff's

8    Office jail in April of 2011?

9    A.    Yes, ma'am.

10   Q.    How old were you back in April of 2011?

11   A.    21.

12   Q.    On April 29th, 2011, while you were working at

13   the jail, did you witness IPSO officers striking

14   inmates with batons while those inmates were restrained

15   and compliant?

16   A.    Yes, ma'am.

17   Q.    Did you do anything to stop those officers who

18   were hitting the inmates who were restrained and

19   compliant?

20   A.    No, ma'am.

21   Q.    Why not?

22   A.    Um, the sheriff was there, and nothing was being

23   done.

24   Q.    I'm going to ask you more questions about that,

25   but first I want to ask you a little bit more about

1    your law enforcement background; okay?

2    A.    Yes, ma'am.

3    Q.    When did you decide that you wanted to be a law

4    enforcement officer?

5    A.    October of 2008.

6    Q.    How old were you back then?

7    A.    18.

8    Q.    When did you first go to the Iberia Parish

9    Sheriff's Office?

10   A.    Um, June 21st of 2010.

11   Q.    What part of the sheriff's office did you work

12   for back in June of 2010?

13   A.    Um, the jail.

14   Q.    What other divisions are in the Iberia Parish

15   Sheriff's Office aside from the jail?

16   A.    Patrol, traffic, detective, narcotics, IMPACT,

17   the jail, marines -- water patrol, I mean.  Motor pool.

18   Q.    You mentioned a unit named IMPACT.  Can you

19   explain what that unit was at the sheriff's office?

20   A.    Basically what it was, it was similar like

21   patrol, but it wasn't like patrol.  They don't answer

22   complaints.  Like if you needed something to get done,

23   you would call IMPACT.

24   Q.    You started off in the jail.  Where did you hope

25   to end up in the Iberia Parish Sheriff's Office?

```
 1    A.    Eventually on the road.
 2    Q.    What was the first position that you had while
 3    you were at the jail?
 4    A.    Internal in the jail.
 5    Q.    What does it mean to be internal in the jail?
 6    A.    Basically, what you do is you -- if you're a
 7    shift lieutenant or a shift sergeant or -- the warden,
 8    on patrol -- not on patrol, the Warden or Assistant
 9    Warden asks you to do something, basically your job is
10    to go get the inmates.  You feed them, take them to the
11    recs, make sure they get their hair cut, basically
12    get -- maintain order inside the jail.
13    Q.    How long were you in that position at the jail?
14    A.    Five and a half months.
15    Q.    What was the next position that you held?
16    A.    Intelligence and investigator.
17    Q.    Was that a promotion for you?
18    A.    Yes, ma'am.
19    Q.    How did you get that promotion?
20    A.    I reckon it was due to my hard work.  I started
21    liking law enforcement even more after I got promoted,
22    by me taking pride in my job, searching inmates, doing
23    shakedowns, finding contraband.  And basically, if they
24    need me to go to work, I'll go to work.
25    Q.    What were your new responsibilities or duties at
```

```
 1    your new job when you got promoted at the jail?
 2    A.   Um, basically, my new job was to ride around,
 3    oversee trusties, make sure they ain't bringing in any
 4    contraband, go to work sites where the trusties worked
 5    at.  If a guard was bringing in contraband, see if I
 6    could find out what kind of contraband he was bringing
 7    in, where -- pie, they was bringing it in -- and listen
 8    to phone calls.
 9    Q.   You mentioned trusties at the jail.  Can you
10    explain to the jury what it means to be a trusty at the
11    jail?
12    A.   Yes, ma'am.  Basically, what a trusty is, it's a
13    privilege.  Instead of you being locked down in your
14    cell like 24-7, you go out when your work site goes.
15    So maybe -- you may be locked down maybe like eight
16    hours or maybe four.  You go off premises.
17         You got the kitchen trusties.  You got
18    housekeeping trusties that does laundries, maintain
19    cleanliness of the jail.  You got motor pool trusties
20    that fix on your unit, paint.  You got farm crews that
21    actually plant like seeds, fruits.  Then you got the
22    parish barn that ride around in the parish and
23    basically fix whatever.
24         So it's like a privilege.  Instead of you
25    being locked down 24-7, you actually got a leeway.
```

```
 1    Q.    So you mentioned that you worked with trusties

 2    while you were on the intelligence unit?

 3    A.    Yes, ma'am.

 4    Q.    How long did you serve on the intelligence unit

 5    at the jail?

 6    A.    From 2010 until sometime in 2012.

 7    Q.    When did you ultimately leave the Iberia Parish

 8    Sheriff's Office?

 9    A.    March 21st, 2013.

10    Q.    What made you leave the sheriff's office?

11    A.    Um, they say I had to do another evaluation to

12    get put on patrol.  Basically, you had to do 40 hours

13    on your off time to do -- to go on patrol.  Where every

14    day that I was off, I was riding with the patrol, not

15    getting paid.

16              And I went and talked to the Warden and said,

17    all right, I want to work patrol.  And then he told me

18    I had to do another 90-day evaluation, but I can go

19    apply for transportation officer.

20    Q.    So you ultimately left because you were unable to

21    achieve the position that you wanted?

22    A.    Yes, ma'am.

23    Q.    Where did you go after you left the sheriff's

24    office?

25    A.    Franklin Police Department.
```

1    Q.    Is that where you're currently working today?

2    A.    Yes, ma'am.

3    Q.    I would like to turn your attention now to April

4    of 2011 when you worked at the Iberia Parish Sheriff's

5    Jail.  What was your position back in April of 2011?

6    A.    Intelligence.

7         MS. BOYD:  If I could ask Mr. Harrell to

8    please pull up what's been marked as Government's

9    Exhibit 1 for identification.  And just pull it up,

10   please, for the witness.

11   BY MS. BOYD:

12   Q.    Mr. Burrell, do you recognize what's in

13   Government's Exhibit 1?

14   A.    Yes, ma'am.

15   Q.    Can you tell us what it is?

16   A.    It's a layout of the Iberia Parish jail.

17   Q.    Does the layout that you see in Government's

18   Exhibit 1 accurately and fairly reflect what the jail

19   layout was back in April of 2011?

20   A.    Yes, ma'am.

21        MS. BOYD:  The Government would move that

22   Government's Exhibit 1 be admitted into evidence and

23   published to the jury.

24        MR. MCLINDON:  I have no objection, Your

25   Honor.

```
 1              THE COURT:  Without objection, it is received
 2    and may be displayed.
 3              MS. BOYD:  And may I walk forward to provide
 4    and tender this to the Court, or is it --
 5              THE COURT:  I'm sorry?
 6              MS. BOYD:  May I walk forward to tender this
 7    to the Court?
 8              THE COURT:  I have it here.
 9              MS. BOYD:  Oh, you have it here already?
10              THE COURT:  Yeah, I have it here.  Let's cut
11    down on the lights a little bit.
12              MS. BOYD:  May I proceed, Your Honor?
13              THE COURT:  Yes.
14    BY MS. BOYD:
15    Q.   Looking at the layout, Mr. Burrell, can you tell
16    the jury where on Government's Exhibit 1 inmates were
17    housed at the jail back in 2011?  And if you would for
18    me -- just a moment -- please circle those areas.
19    A.   Yes, ma'am.  (Witness complied.)
20    Q.   Okay.  So I see that you have just circled an
21    area on Government's Exhibit 1.  What is that area
22    called?
23    A.   Med/Max.
24    Q.   Okay.  And what dorms or housing units are
25    located in the Med/Max area?
```

```
1    A.    E pod, F pod, G pod, H pod, J pod and K-1.

2              MS. BOYD:  May I approach the stand to move

3    the microphone closer to the screen, Your Honor, for

4    the witness so he may be heard?

5              THE COURT:  Yes.

6    BY MS. BOYD:

7    Q.    Thank you, Mr. Burrell.

8              Can you identify another housing unit at the

9    jail back in April of 2011?

10   A.    Yes, ma'am. (Witness complied.)

11   Q.    Okay.  I see you circled another area.  Can you

12   identify that area and tell us who was housed there or

13   what dorms are housed there?

14   A.    Periodics.  You got K2, K3, K4, K5, K6 and K7 and

15   K8.

16   Q.    Are there any other housing units at the jail

17   that you can identify on Government's Exhibit 1?

18   A.    Yes, ma'am.  (Witness complied.)

19   Q.    Okay.  And what area is that that you've just

20   circled?

21   A.    That's the female pod.

22   Q.    Okay.  And then are there any other areas of

23   housing at the jail that you can identify?

24   A.    (Witness complied.)

25   Q.    What area is that, Mr. Burrell?
```

1    A.    Booking.

2    Q.    Are there any other housing units at the jail?

3    A.    (Witness complied.)

4    Q.    Okay.  You've just circled another area.  What

5    area have you identified there?

6    A.    OP.

7    Q.    Okay.  And who is housed in the OP area?

8    A.    Trusties.

9    Q.    All right.  You mentioned before in identifying

10   the various housing units that they contain different

11   designated pods.  Can you explain to the jury what a

12   pod is?

13   A.    Basically, what a pod is, is you got maybe

14   between 20 to 30 inmates in one pod.  You got the

15   floor, day bunks with maybe 18 racks, beds, lined up

16   next to one another.  And then you got cells.  You got

17   your bottom cells, and you got top cells.

18   Q.    You've identified here, it looks like, five

19   housing units at the jail.  How are those different

20   units monitored by jail staff?

21   A.    Well, each area got a booth, and they got a guard

22   inside of it.  The female got a female officer to watch

23   the females.  Booking got a male and a female officer

24   there to watch both males and -- periodics or Med/Max

25   may have -- are either a female or a male watching the

1    dormitory, the pods.

2    Q.    And can you identify where those officers, let's

3    say, for example, in the periodics area, where they

4    would monitor the area from?

5    A.    (Witness complied.)

6    Q.    Okay.  So you've just circled in the center of

7    one of your circles.  What's that area called?

8    A.    Periodics.

9    Q.    Okay.  And what's the area that you just circled

10   in the center of periodics called?

11   A.    That's the booth, the central booth -- not

12   central booth, but the pod where the guards be at.

13   Q.    Okay.  Is there an area at the jail where all of

14   those units can be monitored by staff?

15   A.    Yes, ma'am.

16   Q.    What is that area of the jail called?

17   A.    Central control.

18   Q.    Can you identify on Government's Exhibit 1

19   central control and where that's located?

20   A.    (Witness complied.)

21   Q.    Okay.  Is there a jail -- is there an area of the

22   jail, Mr. Burrell, where inmates are able to congregate

23   in their free time that would not be in one of their

24   pods where the bunks are?

25   A.    Yes, ma'am.

1    Q.    Where are those areas, or what are they called?

2    A.    Recreation.

3    Q.    Recreation?

4    A.    Yes, ma'am, rec yard.

5          MS. BOYD:  If there are no objections, may I

6    clear these markings, Your Honor?

7          THE COURT:  Beg your pardon?

8          MS. BOYD:  If there are no objections, may I

9    clear the markings so that Mr. Burrell may further

10   identify?

11         MR. MCLINDON:  I have no objection.

12         THE LAW CLERK:  She didn't offer the printed

13   version.

14         THE COURT:  Okay.

15         THE LAW CLERK:  Do you want that?

16         MS. BOYD:  No, ma'am.

17         THE COURT:  Copy it anyway, and we'll call it

18   Court 1.  Now you can erase.

19         THE LAW CLERK:  Wait.  Not yet.  Sorry.  I

20   think I got it.

21         MS. BOYD:  Thank you.

22   BY MS. BOYD:

23   Q.    Okay.  Mr. Burrell, you mentioned that there are

24   rec yards or rec areas where the inmates can gather.

25   Can you identify on Government Exhibit 1 where the rec

1   areas of the jail were?

2   A.    (Witness complied.)

3   Q.    Thank you.

4         You talked about the pods or housing units

5   being monitored by jail staff.  Did the jail also have

6   a video surveillance system back in April of 2011?

7   A.    Yes, ma'am.

8   Q.    What was the purpose of the video surveillance

9   system at the jail?

10  A.    Basically it's good intel, like if an inmate get

11  inside -- get into a fight, you can find out who the

12  inmate was involved in the fight with.  Or even if a

13  guard like says they drop something off inside the

14  cell, you can always go back and replay what time and

15  seeing the video.

16  Q.    Why is it useful to have the video surveillance

17  system at the jail?

18  A.    It keeps both guards and inmates safe.

19  Q.    Were there any areas of the jail that were not

20  monitored by the jail's video surveillance system?

21  A.    Yes, ma'am.

22  Q.    What areas were not monitored by the surveillance

23  system?

24  A.    You got the chapel, visiting, A, B, C, and the

25  library.

```
 1    Q.    I want to turn your attention now to April 29th,

 2    2011.  On April 29th, 2011, who was your direct

 3    supervisor?

 4    A.    Um, Sheriff Ackal.

 5    Q.    Was there a supervisor that you would report to

 6    between Sheriff Ackal and yourself?

 7    A.    Yes, ma'am.

 8    Q.    Okay.  Who was that supervisor that you would

 9    report to first?

10    A.    Lieutenant Dan Bourque.

11    Q.    Who was Lieutenant Daniel Bourque's supervisor?

12    A.    Wesley and Jesse Hayes -- Warden Wesley and Jesse

13    Hayes.

14    Q.    And who did Warden Wesley and Jesse Hayes then

15    report to?

16    A.    Savoy and Sheriff Ackal.

17    Q.    Do you see Louis Ackal here in the courtroom

18    today?

19    A.    Yes, ma'am.

20    Q.    Can you point him out and identify him by an

21    article of clothing that he is wearing?

22    A.    He wearing glasses and a black tie and a brownish

23    suit jacket.

24          MS. BOYD:  Your Honor, may the record reflect

25    that the witness has identified the defendant.
```

```
 1              THE COURT:  It will so reflect.
 2   BY MS. BOYD:
 3   Q.    What brought the defendant to the jail on
 4   April 29, 2011, Mr. Burrell?
 5   A.    A massive shakedown.
 6   Q.    Can you tell the jury what a shakedown is and
 7   what it entails?
 8   A.    Usually when we do a shakedown, it consists of an
 9   off shift; it will be A, B or A, B, C or D shift.  We
10   will get like the off shift to come do a shakedown.  We
11   may hit -- do a shakedown between in the morning or in
12   the afternoon.  Basically when we're doing a shakedown,
13   we're looking for contraband, anything that you are not
14   supposed to have or extras like tobacco, weed, cell
15   phone, shanks and so forth.
16   Q.    You mentioned that you would get an off shift.
17   Does that involve calling in extra officers who work
18   for the jail to assist?
19   A.    Yes, ma'am.
20   Q.    Okay.  What are the routine policies that you
21   have in place when you do shakedowns?  How do they
22   actually work?
23   A.    Usually when we do a shakedown, we got to
24   announce ourselves.  So we were running inside a cell,
25   get on the ground, get on the ground, get on the
```

1    *ground.  Shakedown, get on the ground.*  And usually

2    like if you do it in the morning, the inmates would be

3    asleep, so it will take like a couple of seconds to

4    maybe for them to like, *Oh, snap, you're doing a*

5    *shakedown.  I got a shakedown coming.*  So they'll

6    comply, but they wouldn't comply right then and there.

7            Like I said, we would do it throughout the

8    nights or in the morning.  And we will get like -- if C

9    and D shift was working, we would get A and B shift to

10   come and do a shakedown with us.  And we will get

11   patrol.  Basically what patrol would do is sit back and

12   let us do the shakedown.  Every now and then, we will

13   have some officers that came from the jail that went on

14   patrol would help because they know what we're looking

15   for when we do a shakedown.  But other than that, they

16   will sit back and just watch us do shakedowns.

17   Q.    When you are having a typical shakedown, who

18   typically supervises and runs the shakedown at the

19   jail?

20   A.    It was either me or Lieutenant Bourque at that

21   time.

22   Q.    Was it routine policy and procedure for the

23   defendant, the sheriff, to be present during

24   shakedowns?

25   A.    No, ma'am.

1    Q.    On April 29, 2011, who was running the shakedown

2    at the jail that day?

3    A.    Sheriff Ackal.

4    Q.    You mentioned that you go into the pods and tell

5    the inmates to get down and you start to search for

6    contraband?

7    A.    Yes, ma'am.

8    Q.    Where are the inmates typically taken while those

9    searches are being conducted?

10   A.    Usually -- in the pods they got a shower area

11   along the wall and we would bring them inside the

12   shower, strip search them inside there, make them turn

13   around, squat and cough, look for the private part,

14   arms, open your mouth, check the bottom of your feet.

15          And after we do a shakedown, I would take

16   them to the rec yard or the chapel.  And usually when

17   we take them to the rec yard, they run freely until we

18   actually done with our shakedown.

19   Q.    On April 29, 2011, where were the inmates taken

20   while the pods were being searched at the jail?

21   A.    To the rec yard.

22          MS. BOYD:  Could I have the Government's

23   Exhibit 1 cleared down now?  Okay.  And can I ask

24   Mr. Harrell to pull up Government's Exhibit 9 just for

25   the witness?  Okay.  And can I ask Mr. Burrell to pause

```
1    it -- I mean, Mr. Harrell to pause it.  Thank you.
2    BY MS. BOYD:
3    Q.    Mr. Burrell, do you recognize what's depicted on
4    your screen in Government's Exhibit 9?
5    A.    Yes, ma'am.
6    Q.    Have you seen it before?
7    A.    Yes, ma'am.
8    Q.    What is it?
9    A.    Rec yard.
10   Q.    And is it a video depicting the rec yard?
11   A.    Yes, ma'am.
12   Q.    Okay.  Have you seen this video before in its
13   entirety?
14   A.    Yes, ma'am.
15   Q.    Does the video fairly and accurately reflect the
16   rec yard as it was on April 29th of 2011?
17   A.    Yes, ma'am.
18         MS. BOYD:  The Government would move
19   Government's Exhibit 9 into evidence, Your Honor.
20         MR. MCLINDON:  No objection.
21         THE COURT:  Without objection, it will be
22   received and it may be displayed.
23         MS. BOYD:  And, Your Honor, should I tender
24   the exhibit to the courtroom deputy at this time?
25         THE COURT:  Yes.
```

```
 1    BY MS. BOYD:

 2    Q.    Okay, Mr. Burrell, can you identify for the jury

 3    what rec yard is depicted in Government's Exhibit 9?

 4    A.    Periodics.

 5    Q.    Okay.

 6          MS. BOYD:  And I'll ask Mr. Harrell to please

 7    press play.

 8    BY MS. BOYD:

 9    Q.    Can you describe for the jury what's happening

10    here as it's playing?

11    A.    You're seeing inmates being escorted by IMPACT to

12    the rec yard, placed on their knees.

13    Q.    Do you know who that first IMPACT officer was

14    that walked into the rec yard there?

15    A.    Yes, ma'am.

16    Q.    Who was that?

17    A.    Eric Segura.

18    Q.    You mentioned that Mr. Segura was part of the

19    IMPACT squad; is that correct?

20    A.    Yes, ma'am.

21    Q.    Okay.  What was that squad known as at the

22    sheriff office?

23    A.    Elite squad.

24          MS. BOYD:  And I'll ask Mr. Harrell to pause

25    for a moment here.
```

```
 1    BY MS. BOYD:
 2    Q.    Were there -- what was the IMPACT squad known as?
 3    Were they known as anything else aside from being an
 4    elite squad?
 5    A.    Basically some ones that are bad asses.
 6    Q.    What do you mean when you say that?
 7    A.    If you need something done, they would do it.
 8    Q.    Do they have any other reputation at the
 9    sheriff's office?
10    A.    Um-hum.
11    Q.    What was that reputation?
12    A.    Get compliance one way or the other.
13    Q.    I'm sorry.  Can you repeat the last portion of
14    your statement?
15    A.    Get compliance one way or the other.
16    Q.    You've described that the inmates in Government's
17    Exhibit 9 were being brought into the rec yard and
18    placed on their knees.  Is that typical how you would
19    handle the inmates during a shakedown?
20    A.    No, ma'am.
21    Q.    How is it different?
22    A.    We would bring them in, and we would let them
23    walk around.
24    Q.    So what was the difference between how the IMPACT
25    officer or officers are handling the inmates that day
```

1    and how you as a jailer typically would handle them?

2    A.    Basically they got them on their knees, which we

3    wouldn't do as a shakedown.  It's all concrete, so...

4    We would do -- we would just let them walk around

5    freely.

6    Q.    At this point, as you can see, the inmates there

7    kneeling on their knees with their faces against the

8    wall, how would you describe the inmates in terms of

9    their level of compliance in the rec yard that day?

10   A.    Basically they're in compliance with whatever the

11   officer is telling them to do.

12   Q.    Based on your training that you have received as

13   a law enforcement officer, do you observe any reason

14   why anyone should be using any force on those inmates

15   in the rec yard?

16   A.    No, ma'am.

17   Q.    Had you been trained in use of force when you

18   were working at the jail back on April 29, 2011?

19   A.    Yes, ma'am.

20   Q.    What were you taught or trained regarding using

21   force on inmates that are compliant?

22   A.    You don't use force on -- inmates that -- inmates

23   or people that's compliant.

24   Q.    What about inmates that are restrained or under

25   control?

1    A.    You still don't use force on them.

2    Q.    On April 29th, did you see officers at the jail

3    using force on inmates who were handcuffed and

4    compliant?

5    A.    Yes, ma'am.

6    Q.    Where did you see that force being used?

7    A.    In the chapel.

8    Q.    How would you describe the type of force that you

9    saw being used in the chapel?

10   A.    Cruel.  There was handcuffs and beat with batons.

11   Q.    What were you trained to do when you see a fellow

12   officer using force on somebody who's restrained with

13   handcuffs?

14   A.    Immediately stop them and then report to your

15   supervisors.

16   Q.    Did you actually stop those officers that day

17   when you were in the chapel?

18   A.    No, ma'am.

19   Q.    Why didn't you stop those officers?

20   A.    Their immediate supervisor was there.

21   Q.    Who was their immediate supervisor there?

22   A.    Sheriff Ackal and Savoy.

23   Q.    Can you tell the Jury who Savoy is?

24   A.    Um, like the third or second in command at the

25   sheriff's office.

1  Q.    Were you involved in taking inmates to the chapel

2  that day?

3  A.    Yes, ma'am.

4        MS. BOYD:   Can I ask for Government's

5  Exhibit 9 to be taken down?

6  BY MS. BOYD:

7  Q.    Who was the first inmate, Mr. Burrell, that you

8  took to the chapel?

9  A.    Inmate Guidry.

10 Q.    Who was Inmate Guidry?

11 A.    Federal inmate.

12 Q.    How did Mr. Guidry come to your attention on that

13 particular day?

14 A.    Basically what he was doing, he was writing to

15 the federal telling them about the living condition of

16 the jail.

17 Q.    And who was it, your understanding, that he was

18 telling about the living conditions at the jail?

19 A.    To the marshals or federal.

20 Q.    And what did you understand Mr. Guidry was saying

21 to the marshals about the conditions at the jail?

22 A.    It was unfit, that certain things should have

23 been done proper and in a better way.

24 Q.    So who told you about Mr. Guidry that day?

25 A.    Um, it was the one of the Hayeses, the Wardens.

1    Q.    Where were you when you were told about

2    Mr. Guidry?

3    A.    I was in the Med/Max area right by the nursing

4    station, right by the booth.

5    Q.    Okay.

6            MS. BOYD:   And can I have Mr. Harrell put up

7    Government's Exhibit 1 again and publish that for the

8    Jury?

9            Mr. Harrell, are you able to zoom in on the

10   Med/Max area, starting with the rec yard and going all

11   the way down?  Yes.  Thank you.

12   BY MS. BOYD:

13   Q.    Okay, Mr. Burrell, where were you when one of the

14   Hayeses, Warden Hayeses, brought Mr. Guidry to your

15   attention that day?

16   A.    (Witness complied.)

17   Q.    Okay.  And what was it that you were told by one

18   of the Hayes brothers or one of the Wardens that day?

19   A.    Go grab the inmate that was writing to the US

20   Marshals.

21   Q.    What was one of the Warden's demeanor when they

22   told you to go grab the inmate writing to the marshals?

23   A.    *Bring him to the sheriff*.

24   Q.    Okay.  That's what they said to you?

25   A.    Yeah.  *Go get him.*

1    Q.    And how did they say that?  What was their tone?

2    A.    Like a mean tone.

3    Q.    Was there anyone else standing with you when the

4    warden said to go grab the inmate and bring him to the

5    sheriff?

6    A.    Yes, ma'am.

7    Q.    Who else was standing with you?

8    A.    The -- Sheriff Ackal.

9    Q.    Did you go and comply with that order?

10   A.    Yes, ma'am.

11   Q.    What happened when you went to get Mr. Guidry?

12   A.    I immediately did what I was told and brought him

13   to the sheriff.

14   Q.    When you brought Mr. Guidry to the sheriff, what

15   was the sheriff's tone or demeanor at the time?

16   A.    Angry, mad.

17   Q.    How could you tell that?

18   A.    Due to the body posture and his tone of voice.

19   Q.    Had you seen the sheriff at the jail before that

20   moment when you brought in Mr. Guidry?

21   A.    Yes, ma'am.

22   Q.    And what had the sheriff's tone or attitude been

23   then?

24   A.    Same.  Angry, mad.

25   Q.    What kinds of things did you hear the sheriff say

1    when you saw him at the jail that day?

2    A.    This is his jail.  He going to get respect one

3    way or the other.

4    Q.    So when you brought Mr. Guidry to the defendant,

5    what did he say?

6    A.    *Bring him to the chapel.*

7    Q.    What was his tone of voice when he said that?

8    A.    Mad tone.

9    Q.    I'm sorry?

10   A.    An angry tone.

11   Q.    Why did you think that the defendant wanted

12   Mr. Guidry to be brought to the chapel at that moment?

13   A.    Teach him a lesson.

14   Q.    What made you think that?

15   A.    Due to the prior, what happened in the chapel

16   before.

17   Q.    What had happened in the chapel before you

18   brought Mr. Guidry to the sheriff?

19   A.    It was brought to my attention that an inmate by

20   the name of Scott was beaten with a baton for telling

21   the sheriff to suck his...

22   Q.    And you just moved your head to the side.  Can

23   you say exactly what he said?

24   A.    Suck his dick.

25   Q.    And what was your understanding of what happened

```
 1    to the Inmate Scott after that?

 2    A.    He was beaten, and he was told to suck the baton.

 3    Q.    So when you brought Mr. Guidry to the defendant

 4    and told the defendant that he was the one writing the

 5    letters, how did the defendant respond?

 6    A.    Bring him to the chapel.

 7    Q.    Did you follow that command?

 8    A.    Yes, ma'am.

 9    Q.    Pointing your attention to Government's

10    Exhibit 1, can you highlight the path that you took

11    from where you were with the defendant and Mr. Guidry?

12    A.    (Witness complied.)

13    Q.    Did anyone else join you on that path from the

14    Med/Max area to the chapel with Mr. Guidry?

15    A.    Yes, ma'am.

16    Q.    Who else joined you?

17    A.    Sheriff Ackal and Savoy.

18    Q.    Once you got to the chapel, what did you do?

19    A.    I immediately brought him inside the chapel, by

20    hand.

21    Q.    And when you got inside the chapel, was there

22    anyone else in the chapel?

23    A.    Yes, ma'am.

24    Q.    Who was inside the chapel?

25    A.    You had K-9 Officer Burns, you had IMPACT, and
```

```
 1    SWAT.

 2    Q.    Did anyone else go inside the chapel with you

 3    when you brought Mr. Guidry?

 4    A.    Yes, ma'am.

 5    Q.    Who else went into the chapel with you?

 6    A.    The sheriff and Savoy.

 7          MS. BOYD:  I'm going to ask Mr. Harrell to

 8    please pull up Government's Exhibit 10 just for the

 9    witness.

10    BY MS. BOYD:

11    Q.    Okay, Mr. Burrell.  Do you see Government's

12    Exhibit 10 there?

13    A.    Yes, ma'am.

14    Q.    Do you recognize it?

15    A.    Yes, ma'am.

16    Q.    What is it?

17    A.    It's the chapel.

18    Q.    Does -- is it a picture or a video of the chapel?

19    A.    A picture.

20    Q.    A picture of the chapel.

21          Does that picture of the chapel accurately

22    reflect the way that it looked back in April of 2011

23    when you went in with the sheriff?

24    A.    Yes, ma'am, aside the picture.

25    Q.    When you say *aside the picture*, what are you
```

1   referring to?

2   A.    The picture on the right-hand side.

3   Q.    That was not there when you went into the chapel

4   on April 29th with the sheriff?

5   A.    No, ma'am.

6   Q.    But other than that, does it accurately reflect

7   the chapel?

8   A.    Yes, ma'am.

9          MS. BOYD:  Your Honor, I would move

10  Government's Exhibit 10 into evidence.

11         MR. MCLINDON:  No objection.

12         THE COURT:  Without objection, it's received.

13         MS. BOYD:  And I'll tender it forward to the

14  deputy.

15         THE COURTROOM DEPUTY:  Thank you.

16  BY MS. BOYD:

17  Q.    Okay, Mr. Burrell, can you tell us what we're

18  looking at from this angle of the chapel?

19  A.    The entrance of the chapel.

20  Q.    And when you came into the chapel, can you

21  identify where you came into?

22  A.    The front door.

23  Q.    And where did you go once you got in?

24  A.    In between two stools next to the wall by the

25  glass.

1    Q.    Okay.  And where was the sheriff when you came

2    in?

3    A.    Same, but at an angle.

4    Q.    And you noted that you were standing by the

5    windows there of the chapel; is that right?

6    A.    Yes, ma'am.

7    Q.    Were those windows clear and able to be viewed

8    through when you went into the chapel that day?

9    A.    No, ma'am.  Usually we would bring inmates inside

10   the area and search them, and they have bars on top of

11   the window.  Excuse me.  Basically, we will put like

12   curtains on top of them, and it will stop anybody from

13   seeing outside or inside of the chapel.  And then on

14   that day the curtains was up.

15          MS. BOYD:  Okay.  I'm going to ask if

16   Mr. Harrell can turn the angle just slightly.  Oh.  Can

17   you go back one -- one more?  Are you able to zoom out,

18   Mr. Harrell?  Okay.  Thanks.

19   BY MS. BOYD:

20   Q.    Mr. Burrell, can you identify where you brought

21   Mr. Guidry when you came into the chapel?

22   A.    (Witness complied.)

23   Q.    Okay.  And when you brought Mr. Guidry to that

24   spot, was there anyone else there with him?

25   A.    Yes, ma'am.

1  Q.    Who else was with him?

2  A.    Oh, we had IMPACT and SWAT over there, inside

3  there --

4  Q.    Okay.

5  A.    -- along with the K-9 officer, Burns.

6  Q.    You identified the K-9 officer as an Officer

7  Burns?

8  A.    Yes, ma'am.

9  Q.    Did he have a K-9 or dog with him that day?

10 A.    Yes.  It was K-9 Reddick.

11 Q.    Okay.  Were you able to identify any of the other

12 officers who were there with Officer Burns in the

13 chapel?

14 A.    No, ma'am.

15 Q.    What happened when you brought Mr. Guidry to that

16 spot in the chapel next to the pew?

17 A.    They commenced beating on him.

18 Q.    When you say *they commenced beating on him*, what

19 do you mean?

20 A.    With batons.  He was handcuffed, and they started

21 beating him with batons.

22 Q.    Where was Mr. Guidry when they started beating

23 him?  Was he on the pew or on the floor?

24 A.    On the floor.

25 Q.    You said that the officers started to beat him

1    with batons?

2    A.    Yes, ma'am.

3    Q.    What type of baton was used?

4    A.    Straight and collapsible batons.

5    Q.    Can you describe the type of strikes that the

6    officers were using as they hit Mr. Guidry?

7    A.    Um, in training, we -- we taught on -- taught

8    where to hit people with batons.  We got green, red and

9    yellow spots.  On that particular day, they was hitting

10   all over.  They was bypassing the areas where to hit

11   him at.

12   Q.    How did Mr. Guidry respond to being struck?

13   A.    He was in pain.  You could hear him, *ooh*,

14   hollering.  Slumped over, *ooh, ah, stop*.

15   Q.    Where was the defendant as Mr. Guidry was slumped

16   over and asking the officers to stop?

17   A.    Standing right where the table is at, where the

18   TV, around that area.

19   Q.    At the time that those officers were striking

20   Mr. Guidry with their batons, what was Mr. Guidry

21   doing?

22   A.    Nothing.  Just hollering.

23   Q.    Was he making any moves to threaten anyone or to

24   harm anyone?

25   A.    No, ma'am.

1  Q.    You described that there was a K-9 officer

2  present.  What was he doing?

3  A.    Basically, he was giving the dog commands to

4  bark, hyping the dog up, agitating him, making him mad

5  and with the command to bark.

6  Q.    Based on what you observed there in the chapel

7  and based on your training that you have received, did

8  you see any reason for those officers to be striking

9  Mr. Guidry or for the dog to be intimidating

10  Mr. Guidry?

11  A.    No, ma'am.

12  Q.    What were you trained to do when you see officers

13  striking someone who doesn't warrant being struck?

14  A.    Immediately stop, try to stop -- stop the officer

15  from beating on inmates and immediately report to your

16  supervisor.

17  Q.    Did you stop those officers from beating on

18  Mr. Guidry?

19  A.    I stated that that's a federal inmate, and

20  nothing was done.

21  Q.    So you stated it was a federal inmate.  Why did

22  you say that?

23  A.    He's a federal inmate, and somebody will go to

24  jail.

25  Q.    And what was the response when you said that?

1    A.    They just looked.

2    Q.    Did they actually stop beating Mr. Guidry?

3    A.    No, ma'am.  They continued beating on him.

4    Q.    Was the defendant standing there when you said,

5    *That's a federal inmate*?

6    A.    Yes, ma'am.

7    Q.    How did the defendant respond?

8    A.    Nowhere -- nothing.  He just looked.

9    Q.    Did you do anything further to try to stop those

10   officers from assaulting Mr. Guidry?

11   A.    No, ma'am.

12   Q.    Why didn't you?

13   A.    If the sheriff didn't do nothing, why should I do

14   something?

15   Q.    Did you want to stop those officers from beating

16   Mr. Guidry?

17   A.    Yes, ma'am.

18   Q.    But you didn't?

19   A.    Yes, ma'am.

20   Q.    Did the defendant ever try to stop those officers

21   from striking Mr. Guidry?

22   A.    No, ma'am.

23   Q.    What did the defendant do?

24   A.    Just stood there and watched.

25   Q.    What was his attitude as he was watching that?

1    A.    Like a happy sort of *I don't care* attitude.

2    Q.    What did he say?

3    A.    Nothing.  Just stood there and watched.

4    Q.    You said that the sheriff was present when

5    Mr. Guidry was being struck.  Were there any other

6    supervisors present in the chapel when that occurred?

7    A.    Yes, ma'am.

8    Q.    Who else was present?

9    A.    Savoy.

10   Q.    Who did Savoy supervise?

11   A.    Basically, patrol, IMPACT, SWAT, K-9, marines,

12   traffic.

13   Q.    What was Mr. Savoy's reaction to what was

14   happening to Mr. Guidry in the chapel?

15   A.    The same thing.

16   Q.    When you say *the same thing*, what was that?

17   A.    He didn't stop it.  He just watched.

18   Q.    Did you ever ask the sheriff to try to stop those

19   officers from beating Mr. Guidry?

20   A.    No, ma'am.

21   Q.    Why not?

22   A.    Um, I needed a job, so I felt if I were to say

23   something, I would have got fired.

24   Q.    Why did you think that?

25   A.    I'm trying to do something good and stop them,

1   but I felt that if I were to say something, I would

2   have been jobless.

3   Q.    How did it make you feel as you stood there

4   wanting to stop that but feeling like you weren't able

5   to do that?

6   A.    I felt bad.  After the shakedown was over with, I

7   immediately told my grandma.

8   Q.    What happened after you stood with the defendant

9   as those officers were hitting Mr. Guidry with batons

10  while he was handcuffed?

11  A.    I don't know who said it, but Anthony Daye's name

12  got brought up.

13  Q.    And what happened after Anthony Daye's name got

14  brought up?

15  A.    I was told to go get him and bring him to the

16  chapel.

17  Q.    Who was Anthony Daye?

18  A.    He was in -- locked up for drugs and conspiracy

19  to murder for Cliff DeBarber.

20  Q.    Who told you to go get Daye?

21  A.    I don't remember.

22  Q.    Did you comply with that order?

23  A.    Yes, ma'am.

24  Q.    Based on what you had seen happen and based on

25  what you understood happened earlier in the day in the

1    chapel, what did you think was going to happen to

2    Mr. Daye?

3    A.    He was going to get beaten, too.

4    Q.    So why did you go get him?

5    A.    I was doing what I was told.

6    Q.    Was the defendant present when you were told to

7    go and get Mr. Daye?

8    A.    Yes, ma'am.

9    Q.    Did you bring Mr. Daye to the chapel?

10   A.    Yes, ma'am.

11   Q.    When you got back to the chapel with Mr. Daye,

12   who was there?

13   A.    Um, the same, the IMPACT, K-9 Burns, SWAT, the

14   sheriff, Savoy.

15   Q.    When you brought Mr. Daye into the chapel, did he

16   have any visible injuries to him?

17   A.    No, ma'am.  Usually when I'm escorting someone, I

18   handcuff them from the back, zip tie them from the

19   back.  He walked -- complied to my orders, and I

20   brought him in the chapel.

21   Q.    Did he have any trouble walking into the chapel

22   with you?

23   A.    No, ma'am.  He went in the chapel -- he walked in

24   the chapel by himself fine.

25   Q.    What happened when you brought Mr. Daye into the

1   chapel?

2   A.    I was told that *Oh, so you* -- it was stated

3   that -- I don't know who stated -- that *You don't want*

4   *to kill Cliff DeBarber*.  And they immediately started

5   beating.

6   Q.    When you say *they immediately started beating*,

7   what were the officers doing?

8   A.    Beating him with batons.

9   Q.    Based on what you saw, was there any reason to

10  strike Mr. Daye in the chapel?

11  A.    No, ma'am.

12  Q.    Was he threatening or moving to threaten anyone

13  there?

14  A.    No, ma'am.

15  Q.    When those officers started striking Mr. Daye in

16  the chapel, where was the defendant?

17  A.    Right there.

18  Q.    How did Mr. Daye respond when he was struck with

19  those batons?

20  A.    He was in pain.  Um, hollering *ooh, ah*.

21  Q.    Where was Mr. Guidry as Mr. Daye was being struck

22  in the chapel?

23  A.    He was there getting beaten.

24          THE COURT:  I'm sorry.  He was what?

25          THE WITNESS:  Still getting beaten.

```
 1              THE COURT:  Counselor and the witness, both
 2    of you speak up a little bit louder.
 3              MS. BOYD:  Yes, Your Honor.
 4    BY MS. BOYD:
 5    Q.    What was the defendant's reaction to those
 6    officers striking Mr. Daye?
 7    A.    He didn't stop him.  He just stood there and
 8    watched.
 9    Q.    What did he say?
10    A.    You're going to learn a lesson.
11    Q.    Were there any other supervisors present when
12    Mr. Daye was being struck?
13    A.    Yes, ma'am.
14    Q.    Who else was present?
15    A.    Savoy.
16    Q.    Did Mr. Savoy do anything to try to stop the
17    officers from striking Mr. Daye?
18    A.    No, ma'am.
19    Q.    What was his reaction?
20    A.    He just stood there and watched.
21    Q.    Did you ever do anything to try to stop those
22    officers from striking Mr. Daye?
23    A.    No, ma'am.
24    Q.    Why not?
25    A.    I stated that was a federal inmate before and got
```

```
 1   done.  And, once again, if the sheriff didn't stop it,
 2   who am I to stop it?
 3   Q.    How did the beating end?
 4   A.    Um, with both inmates getting helped out.
 5   Q.    And when you say helped out, what do you mean?
 6   A.    Like they couldn't walk.  They was slumped over,
 7   holding their side, complaining.
 8   Q.    What was Mr. Daye's condition at the end of the
 9   beating?
10   A.    He was hurting, in pain.
11   Q.    And how could you tell that?
12   A.    He was complaining about his side, slumped over.
13   Q.    Was he able to walk out of there on his own?
14   A.    No, ma'am.  He had to get helped out.
15   Q.    What was Mr. Guidry's condition --
16   A.    The same.
17   Q.    -- at the end of the beating?
18   A.    The same.
19   Q.    Where were Mr. Guidry and Mr. Daye taken after
20   they were taken out of the chapel?
21   A.    Immediately to lockdown, to J pod.
22   Q.    Were they taken to medical at all?
23   A.    No, ma'am.
24   Q.    How do you know that?
25   A.    They bypassed medical.  Usually if an inmate get
```

 1    hurt, they go directly to medical, and medical take

 2    records of what kind of injuries they have and report

 3    it if it's something serious.

 4    Q.    So did you see that happen with Mr. Daye or

 5    Mr. Guidry?

 6    A.    No, ma'am.

 7    Q.    You've now described watching two beatings with

 8    your own eyes in the chapel and hearing about another

 9    one.  Did you learn of any other beatings that took

10    place in the chapel that day?

11    A.    No, ma'am.  That -- no.

12    Q.    Did you observe any other beatings that took

13    place in the chapel that day?

14    A.    Yes, ma'am.

15    Q.    Can you describe what you saw for the jury?

16    A.    When I was walking past the chapel, the door was

17    slightly open.  It had an inmate getting beat.

18    Q.    Was that before or after you had been in the

19    chapel with Mr. Guidry and Mr. Daye?

20    A.    After.

21    Q.    And who was beating the inmate at that point?

22    A.    The same.  IMPACT or SWAT, one of them.

23    Q.    Mr. Burrell, this isn't the first time that you

24    have been asked questions about what happened back in

25    April of -- April 29th of 2011, is it?

```
 1    A.     No, ma'am.

 2    Q.     When you first met with the Federal Bureau of

 3    Investigation, were you upfront with them about

 4    everything you saw and did that day?

 5    A.     No, ma'am.

 6    Q.     Why not?

 7    A.     Um, I was afraid of my career.  So I felt that if

 8    I told what happened, I can possibly lose my job.  And

 9    if I decided to go anywhere and they found out I worked

10    at Iberia Parish jail and I was in connection of what

11    took place, they wouldn't hire me.

12    Q.     Did you have any concerns when you met with the

13    FBI about talking about what you saw the defendant

14    doing that day?

15    A.     Yes, ma'am.

16    Q.     What were your concerns?

17    A.     Once they find out that I had participated or I

18    told what took place, I would go to jail.

19    Q.     Did you get in trouble for having not been

20    upfront with the FBI about what you saw?

21    A.     No, ma'am.

22    Q.     Why didn't you get into trouble?

23    A.     I told the truth.

24    Q.     You've described having wanted to stop what was

25    happening that day and not doing it.  Did you ever
```

```
1    think about complaining to the sheriff about it?

2    A.   Um, no, ma'am.  I --

3    Q.   Why not?

4    A.   He was there.  If I -- um, I'm 21.  I'm -- just

5    started.  I'm loving law enforcement, and they

6    recognize me in the jail.  So I thought if I would have

7    told something, I would have got demoted or got fired,

8    one of those.

9              MS. BOYD:  Thank you, Mr. Burrell.  No

10   further questions.

11             THE COURT:  Okay.  Let's take an afternoon

12   break.  Do you mind?  Fifteen minutes, ladies and

13   gentlemen.

14             THE CSO:  All rise.

15             (The Jury exits the courtroom.)

16             THE COURT:  I would like to correct something

17   I put in the record.  I said that the jury consisted of

18   three -- two blacks.  Actually, there are three blacks

19   on the jury, not two.

20             MR. BLUMBERG:  Yes, Your Honor.

21             THE COURT:  Okay?  Fifteen-minute recess.

22             (Recess taken.)

23

24

25
```

```
 1              MR. BLUMBERG:  Would the Court be inclined --
 2   I can put it in writing later -- would the Court give a
 3   limiting instruction to the jurors?  We have a lot of
 4   testimony related to uses of force training, and I
 5   think a limited instruction can be offered for the
 6   purposes of knowledge of the people involved rather
 7   than actually the law, which the Court gives at the
 8   end.
 9              THE COURT:  So give me a limiting instruction
10   and I'll say -- what do you want me to say?
11              MR. BLUMBERG:  That there will be testimony
12   regarding the training and knowledge of officers and
13   it's being -- as to appropriate uses of force, and it
14   is being offered to establish their knowledge but at
15   the end of the case, the law comes from you.
16              THE COURT:  All right, fine.
17              MR. MCLINDON:  You want us to draft something
18   up, Judge, and give it to you tomorrow?
19              THE COURT:  I would rather.  Otherwise, I
20   would say the law comes from me and not anybody else.
21              MR. BLUMBERG:  Okay.  We'll draft something
22   up tonight that we agree on, Your Honor.
23              THE COURT:  All right.
24              MR. JARZABEK:  Your Honor.
25              THE COURT:  Yes.
```

```
 1                MR. JARZABEK:  Do we -- I'm just asking.

 2                THE COURT:  I haven't bitten anybody's head

 3      off in years.

 4                MR. JARZABEK:  Wait a minute.  Are we going

 5      to instruct them about note-taking or do you feel the

 6      need?

 7                THE COURT:  Note what?

 8                MR. JARZABEK:  Note-taking?  Are you going to

 9      instruct the Jury?  I don't remember you talking about

10      note-taking to the Jury.

11                THE COURT:  I'm not following your last word.

12                MR. JARZABEK:  Note-taking.

13                THE COURT:  Oh, note-taking.  I thought you

14      said notating.  Sorry.  Maybe I ought to have my ears

15      checked.

16                MR. JARZABEK:  I don't see anybody taking

17      notes.

18                THE COURT:  I'll let them.  Tonight when they

19      leave, I'll say if you want to take notes tomorrow,

20      we'll provide the material.

21                (The Jury enters the courtroom.)

22                THE COURT:  All right.  All be seated.  Thank

23      you.  Your witness, counselor.

24                MR. MCLINDON:  Thank you, Your Honor.

25                THE COURT:  Mr. Burrell, you understand you
```

1    are still under oath.  And speak up, please, a little

2    bit.

3              THE WITNESS:  Yes, sir.

4                        CROSS-EXAMINATION

5    BY MR. MCLINDON:

6    Q.    Good afternoon.

7    A.    Good afternoon.

8    Q.    Let me ask you a couple of questions about your

9    chain of command.  As I understand it, when you were a

10   deputy jailer, you reported to Mary Davis; is that

11   right?

12   A.    Yes, sir.

13   Q.    And above her was Debra Celestine; is that right?

14   A.    Debra Celestine, then Ms. Davis.

15   Q.    It's Celestine first and then Ms. Davis?

16   A.    It goes from sergeant and lieutenant.

17   Q.    But by name instead of rank, it would be you

18   reported to whom first?

19   A.    The sergeant.

20   Q.    Celestine or Davis?  Somebody else?

21   A.    Yeah.  When -- at that time one of them was a

22   sergeant, one of them was a lieutenant.  It goes from

23   sergeant, lieutenant and then so forth.

24   Q.    And then what, the Warden?

25   A.    The Warden, yes.

1    Q.    Okay.  And then were you ever a supervisor of

2    trusties?

3    A.    Yes, sir.

4    Q.    Okay.  And you had your chain of command was

5    Danny Bourque.  Was he in the chain?  You reported up

6    to him?

7    A.    Yes, sir.

8    Q.    And Perry Shaw?

9    A.    Yes, sir.

10   Q.    And Adam Fitch, is he in your chain of command?

11   A.    No, sir.

12   Q.    He's not.  And Wesley Hayes?

13   A.    Yes, sir.

14   Q.    Okay.  So you had several people to report to

15   before you ever got to the sheriff; right?

16   A.    Yes, sir.

17   Q.    Is that correct?  Yes?

18   A.    Yes, sir.

19   Q.    Okay.  So any of the things that you saw that

20   day, the beatings that you saw, you've already

21   testified you never reported them to the sheriff; did

22   you?

23   A.    No, sir.

24   Q.    Okay.  Did you report them to anybody else in

25   your chain of command?

1    A.    No, sir.

2    Q.    Let me ask you about shakedowns.  If I

3    understand, a shakedown is you take the inmates out of

4    their cells, of their pods so you can search for

5    contraband, drugs, shanks, things like that?

6    A.    Yes, sir.

7    Q.    And tell the Jury what a shank is.

8    A.    It's a homemade -- you can take a spoon, shave it

9    down into a sharp pointed item.

10   Q.    It can kind of be used like a knife?

11   A.    Yes, sir.

12   Q.    Okay.  So you take all of the inmates out of the

13   pod and you put them in that rec yard, that video that

14   we saw; is that right?

15   A.    Yes, sir.

16   Q.    And they're not handcuffed because their hands

17   are on their heads; is that right?

18   A.    When we do a shakedown?  Are you talking about

19   when we do a shakedown?

20   Q.    Yeah.  When you do a shakedown, you don't

21   handcuff inmates 'cause we saw in that video their

22   hands on their heads; right?

23   A.    Are you talking about on that particular day or

24   are you talking about a regular shakedown?

25   Q.    Well, let's talk about both.  How about that

1   particular day?

2   A.    Yes, they were brought into the rec yard on top

3   of their heads.

4   Q.    Hands on their heads.  And if we watch that

5   entire video, it would eventually show -- we just saw a

6   few inmates, but it would show inmates all the way

7   lined up; is that right?

8   A.    Yes, sir.

9   Q.    That rec yard is full of inmates?

10  A.    Yes, sir.

11  Q.    That can sometimes be a dangerous situation;

12  right?  The inmates outnumber the guards; do they not?

13  A.    Yes, sir.

14  Q.    So you have to be very careful?

15  A.    Yes, sir.

16  Q.    Do you happen to know how many total inmates

17  there are or there were in the jail in 2011?

18  A.    No, sir.

19  Q.    You have no idea?

20  A.    No, sir.

21  Q.    Okay.  Am I correct, Mr. Burrell, that while you

22  are employed there, you only saw Sheriff Ackal at the

23  jail two or three times in your entire term of

24  employment there?

25  A.    Shakedown wise, yes, sir.

1    Q.    Okay.  You only saw him two or three times?

2    A.    Doing a shakedown?

3    Q.    Yeah.  Or at any time?

4    A.    No.  I saw him outside of the jail.

5    Q.    Okay.  But at the jail, in the jail, how many

6    times did you see him there?

7    A.    We had a hostage situation, he was there.

8    Q.    Okay.

9    A.    The shakedown, the major shakedown, he was there.

10   Q.    Okay.  Two or three times?

11   A.    Yes, sir.

12   Q.    Okay.  Now, am I correct, Mr. Burrell, that

13   sometimes inmates will claim they've been roughed up

14   when they really have not been roughed up?

15   A.    Yes, sir.

16   Q.    Sometimes they just don't tell the truth?

17   A.    Yes, sir.

18   Q.    Now, you met with the FBI.  I know you're

19   probably not going to remember this date, but about

20   April of 2015, do you remember you met with the FBI and

21   some federal prosecutors?

22   A.    Yes, sir.

23   Q.    Okay.  And then you came back later in January of

24   2016 of this year, and you met with them again; is that

25   right?

1  A.    Yes, sir.

2  Q.    And at that point -- well, let me back up.

3        In the first interview, were you told the

4  importance of telling the truth?

5  A.    Yes, sir.

6  Q.    Okay.  And you were told that actually lying to a

7  federal agent is a crime.  You were told that; right?

8  A.    Yes, sir.

9  Q.    Okay.  So when you came back in January of 2016,

10  they pretty much told you, *Hey, you lied to us the*

11  *first time*; right?

12  A.    Yes, sir.

13  Q.    And you apologized.  You admitted that you were

14  dishonest to these people when you interviewed with

15  them?

16  A.    Yes, sir.

17  Q.    Okay.  Have they -- has the Government offered

18  you any deals saying, *Okay, look, we're not going to*

19  *prosecute you, even though it's a federal crime to lie*

20  *to a federal agent* -- let me ask it this way.  Are you

21  being charged with that?

22  A.    Um, no, sir.

23  Q.    No?  Do you know why?

24  A.    I told the truth.

25  Q.    You told the truth eventually.  But you did lie

```
 1   to them back in April; right?
 2   A.    Yes, sir.
 3   Q.    Okay.  And they've just decided they are not
 4   going to prosecute you for that?
 5   A.    Because I told the truth, yes, sir.
 6   Q.    Because you then started to tell the truth.
 7   A.    Yes, sir.
 8   Q.    Okay.  Now, in January of 2016 of this year --
 9   that's your second interview with the FBI, did you tell
10   the FBI that in the chapel during the inmate beatings
11   were Wesley Hayes, Jesse Hayes and Captain Boudreaux?
12   A.    I don't recall.
13   Q.    You don't recall that?  Okay.
14              MR. MCLINDON:  I would like to show a
15   document to the witness, please, on the Elmo.
16              MS. BOYD:  Objection, Your Honor.
17              MR. MCLINDON:  I'm sorry.  Go ahead.  What's
18   your ground?
19              THE COURT:  What's your objection?
20              MR. MCLINDON:  Nothing has been offered.
21              MS. BOYD:  I believe he is going to show him
22   the 302.  I am not sure if that's what you have in
23   mind.
24              MR. MCLINDON:  Yes, I am.
25              MS. BOYD:  I would object.  The witness is
```

1    not familiar with this document.

2              MR. MCLINDON:  Your Honor, it's a writing

3    used to refresh his memory.  I can use any writing in

4    the world to refresh his memory.

5              THE COURT:  You want to refresh his memory?

6              MS. BOYD:  I don't believe the witness has

7    said that he doesn't remember.

8              MR. MCLINDON:  May I ask the question again?

9              THE COURT:  You may.

10   BY MR. MCLINDON:

11   Q.   Mr. Burrell, when you met with the FBI in January

12   of 2016, do you remember telling them that during the

13   inmate beatings, present in the chapel were Wesley

14   Hayes, Jesse Hayes and Captain Boudreaux?  Do you

15   remember telling them that?

16   A.   No, sir.

17             MR. MCLINDON:  All right.  Thank you.  I

18   would like to show a writing to this witness, please.

19   It's not going to be introduced into evidence, Your

20   Honor.

21             THE COURT:  All right.  Any objection?

22             MS. BOYD:  Your Honor, I don't think he's

23   laid the foundation to show him this writing.

24             THE COURT:  Show the part that you -- I

25   gather you said something -- never mind.  Show counsel

1    what you intend for him to read to refresh his memory.

2              (Pause in the proceedings.)

3    BY MR. MCLINDON:

4    Q.    Mr. Burrell, let's go back to that meeting in

5    January of 2016.  You were in the room when you were

6    talking to them.  This is the meeting where they said,

7    *Look, you weren't honest with us.  Now you need to come*

8    *clean and be truthful.*  Do you remember that?

9    A.    (Nodding.)

10   Q.    The second meeting.  And do you remember in the

11   room there being several people from the federal

12   government?

13   A.    Yes, sir.

14   Q.    Okay.  Do you remember Ms. Boyd was in there?

15   A.    Yes, sir.

16   Q.    Do you remember Mr. Blumberg was in there?

17   A.    Yes, sir.

18   Q.    Okay.  Did you see anybody taking notes and

19   writing things down?

20   A.    Yes, sir.

21   Q.    Okay.  I would like to -- do you think if I

22   showed you a writing, it might refresh your memory as

23   to what was said?

24   A.    Yes, sir.

25   Q.    Is that possible?

```
 1              MR. MCLINDON:  I would like to show this
 2      document to -- this writing to this witness.
 3              THE COURT:  All right.
 4      BY MR. MCLINDON:
 5      Q.    Now, you'll see my number three there.  I just
 6      want to ask you to read this little short paragraph to
 7      yourself.  And just let us know when you're finished
 8      reading it.
 9      A.    Yes, sir.
10      Q.    Have you finished reading it?
11      A.    Three, yeah.
12      Q.    Yes.  Do you remember now, when I ask you did you
13      tell these federal agents during this interview that in
14      the chapel during the beatings were Wesley Hayes, Jesse
15      Hayes and Captain Boudreaux?
16      A.    Yes, sir.
17      Q.    Yes, you did?  Yes?  I'm having trouble hearing
18      you, sir.
19      A.    You lost me with your question.
20      Q.    Did -- during this interview, did you tell these
21      federal agents that in the chapel during the inmate
22      beatings were Wesley Hayes, Jesse Hayes and Captain
23      Boudreaux?
24      A.    Yes, sir.
25      Q.    Okay.  And this was after being admonished to be
```

```
1   truthful, being warned about being truthful; right?
2   A.    Yes, sir.
3   Q.    There were dogs in the chapel when you were
4   there?
5   A.    Yes, sir.
6   Q.    More than one?
7   A.    Just one.
8   Q.    Just one dog.  Was the dog barking?
9   A.    Yes, sir.
10  Q.    The whole time?
11  A.    Yeah.  Yes, sir.
12  Q.    Okay.  Do you remember the name of the handler
13  who held that dog?
14  A.    Yes, sir.
15  Q.    What's his name?
16  A.    Robert Burns.
17  Q.    Robert Burns.  Did you ever see Officer Hatley in
18  there?
19  A.    No, sir.
20  Q.    Do you know Officer Hatley?
21  A.    No, sir.
22  Q.    Okay.  So you saw one dog, and he was barking; is
23  that correct?
24  A.    Yes, sir.
25  Q.    Okay.  Now, I'm going to go a little bit out of
```

1    order here, Mr. Burrell.  I'm going to order -- you

2    then -- after your January 2016 meeting, you then went

3    and appeared before a grand jury; is that correct?

4    A.    Yes, sir.

5    Q.    Okay.  And you swore to tell the truth; is that

6    right?

7    A.    Yes, sir.

8    Q.    Okay.  I want to ask you some questions about

9    that.  First of all, you got demoted while you were at

10   the Iberia Parish Sheriff's Office; is that right?

11   A.    Yes, sir.

12   Q.    And then did you ultimately quit on your own, or

13   were you terminated?

14   A.    Quit on my own.

15   Q.    Okay.  Were you unhappy with being demoted?  Did

16   you think that was fair?

17   A.    I guess.  I don't know.

18   Q.    You thought it was fair?

19   A.    At first, no, sir, I thought it wasn't fair.

20   Q.    When did you change your mind and think it was

21   fair?

22   A.    Not -- that it wasn't fair.

23   Q.    You don't think it's fair?

24   A.    No, sir.

25   Q.    Are you mad at the sheriff for that?

1   A.    No, sir.

2   Q.    Even though you were unfairly demoted, you're

3   not -- you don't have any anger towards him?

4   A.    No, sir.

5   Q.    Let me take you back to the day of the shakedown.

6   Do you know what a bean bag shotgun is?

7   A.    Yes, sir.

8   Q.    Is that a shotgun that shoots out of a bean bag

9   to stop people without actually killing them like a

10  regular shotgun might?

11  A.    Yes, sir.

12  Q.    Is that how that works?  Is it used in the Iberia

13  Parish jail?

14  A.    No, sir.

15  Q.    Okay.  Is it used by the Iberia Parish deputy

16  sheriffs?

17  A.    That particular day, it was, but, obviously, not.

18  Q.    It was used that day by Jason --

19        THE COURT:  Don't testify.  Just ask

20  questions.

21        MR. MCLINDON:  I'm sorry.

22  BY MR. MCLINDON:

23  Q.    It was -- the shotgun -- did you see the bean bag

24  shotgun used that day?

25  A.    Yes, sir.

1    Q.    Okay.  Did you see it being used by Jason

2    Comeaux?

3    A.    Yes, sir.

4    Q.    Okay.  Can you describe what he did?  Did he

5    shoot it at an inmate?

6    A.    Yes, sir.

7    Q.    Did you think that was justified?

8    A.    No, sir.

9    Q.    Okay.  What was the inmate doing when Jason

10   Comeaux shot him with that?

11   A.    Basically, he was just getting out of his cell.

12   They ran him out of his cell -- he ran out of his cell,

13   and the command was, *Shakedown, get on the ground, get*

14   *on the ground.*  And like I said prior, due to the

15   circumstances of the times of the hour, an inmate -- he

16   was startled, like shocked.  And he didn't move right

17   then and there, and he was shot with a bean bag gun.

18   Q.    And that was Officer Comeaux that shot him?

19   A.    Yes, sir.

20   Q.    Okay.  I'm going to ask you about Harold Guidry.

21   Let me ask you another question first.

22          The chapel is sometimes used to do strip

23   searches; is that right?

24   A.    Yes, sir.

25   Q.    Okay.  And we saw a picture of it.  So they will

```
1    take an inmate in there, and pull the blinds, and
2    they'll strip search him to make sure he's not hiding
3    any contraband anywhere; is that right?
4    A.    They'll put the blinds up.  They will place the
5    blinds over the window.
6    Q.    Okay.  Do the strip search and then -- so it can
7    be used for strip searches; is that right?
8    A.    Yes, sir.
9    Q.    Okay.  Now, let me ask you about Harold Guidry.
10              MR. MCLINDON:  And I was wondering if we
11   could pull up Government Exhibit 1, the diagram of the
12   prison, please.
13   BY MR. MCLINDON:
14   Q.    Okay.  If you could -- can you point either with
15   a finger or a pen and tell us where -- you went to go
16   get Harold Guidry, if I understand it; is that right?
17   A.    Yes, sir.
18   Q.    Okay.  Where was he?  Where did you go get him?
19   A.    He was in Med/Max E-Pod.
20   Q.    Okay.  And can you show us on there?  Can you
21   show us where that is?  Just touch it right there.  And
22   then can you touch the chapel, as well?
23   A.    (Witness complied.)
24   Q.    All right.  So you walked -- where were you when
25   you got the order to go get Mr. Guidry?
```

1    A.    (Witness complied.)

2    Q.    You were right there.  So you walked to where he

3    was, and then you escorted him to the chapel; is that

4    right?

5    A.    Yes, sir.

6    Q.    Okay.  And then you went in the chapel?

7    A.    Yes, sir.

8    Q.    Okay.  Do you know the names of the guards that

9    were beating Mr. Guidry?

10    A.    No, sir.

11    Q.    You don't?  Even to this day, you don't know who

12    it was?

13    A.    No, sir.

14    Q.    How many?

15    A.    Um, about two or three.

16    Q.    Okay.  And were some of the guys wearing IMPACT

17    T-shirts, T-shirts that say IMPACT on them?

18    A.    IMPACT and SWAT, yes, sir.

19    Q.    Okay.  Is the writing *IMPACT* on the front of the

20    shirt, the back of the shirt?

21    A.    It was on the back of the shirt.

22    Q.    Okay.  And one of the guys -- am I correct that

23    one of the guys who was striking Mr. Guidry was wearing

24    an IMPACT T-shirt?

25    A.    Yes, sir.

```
 1    Q.    That's correct?

 2    A.    Yes, sir.

 3    Q.    Okay.  Was Eric Segura in the room?

 4    A.    I don't recall.  No, sir.

 5    Q.    You don't recall him being there?

 6          Mr. Burrell, you testified earlier that you

 7    went in front of a grand jury and testified and

 8    answered some questions; is that right?

 9    A.    Yes, sir.

10    Q.    Okay.  Do you remember being asked a question

11    about whether or not Eric Segura was inside of the

12    chapel?

13    A.    Yes, sir.

14    Q.    Okay.  Do you remember what your answer was?

15    A.    I don't recall.

16    Q.    Did you tell the grand jury that Yes, Eric Segura

17    was in the chapel?

18    A.    Yes, sir -- I don't recall.

19    Q.    Okay.

20    A.    If I see it, I can remember.

21          MR. MCLINDON:  Okay.  I would like to show

22    this to the witness, not to be published to the jury.

23    I guess I'm going to have to switch to Elmo, please.

24    BY MR. MCLINDON:

25    Q.    I will point with my pen and just ask you to read
```

1    this.  Starting on line 19, could you just read to the
2    bottom of the page.
3              (Pause in the proceedings.)
4              THE WITNESS:  Yes, sir.
5    BY MR. MCLINDON:
6    Q.    So am I correct that -- well, is your testimony
7    today that Eric Segura was in the chapel?
8    A.    Yes, sir.
9    Q.    Okay.  But -- well, your testimony to the grand
10   jury was he was in the chapel, but your testimony
11   earlier today was that he was not?
12   A.    Yes, sir.
13   Q.    Do you know why your testimony is different?
14   A.    I don't know.  I don't recall, no, sir.
15   Q.    You can't remember everyone that was in the
16   chapel?
17   A.    No, sir.
18   Q.    Now, at some point when Mr. Guidry is being
19   beaten, did you yell, *Stop, stop, stop*?
20   A.    Yeah, *that's a federal inmate*.
21   Q.    Okay.  So you said, *Stop, stop, stop, he's a*
22   *federal inmate*?
23   A.    Yeah.  I said, *That's a federal inmate*, yes, sir.
24   Q.    But you yelled to stop, stop, stop, too, didn't
25   you?

1   A.    I don't recall.  I know I definitely said, *That's*

2   *a federal inmate*.

3   Q.    And -- and no one did anything?

4   A.    No, sir.

5   Q.    And when you yelled that, to stop, *he's a federal*

6   *inmate*, was Mr. Guidry in there by himself or was

7   Anthony Daye there, as well?

8   A.    He was by himself.

9   Q.    He was by himself.  Okay.

10         MR. MCLINDON:  If we could go to page 36 of

11   the same deposition -- I'm sorry, the grand jury

12   testimony.

13   BY MR. MCLINDON:

14   Q.    I'm going to ask you again, sir, do you remember

15   testifying in front of the grand jury and being asked a

16   lot of these same questions?  Do you remember that?

17   A.    Yes, sir.

18   Q.    I would like to show you something.  If you would

19   start on line 20.  If you would just read that to the

20   bottom of the page.  Yeah, from line 20 down.

21         (Pause in the proceedings.)

22   BY MR. MCLINDON:

23   Q.    Have you read that?

24   A.    Yes, sir.

25   Q.    So I'm going to ask you a question again.  When

1    you yelled this *Stop*, *stop*, *stop*, your testimony just

2    now was that it was just Mr. Guidry.  That's not

3    correct, is it?

4    A.    I read that it was after Mr. Daye --

5            THE COURT:  Wait.  I didn't understand you.

6    Say that again.

7            MR. MCLINDON:  My question?

8            THE COURT:  No, no.  The answer.

9            MR. MCLINDON:  The Judge wants you to answer.

10           THE WITNESS:  Oh.  I read -- it was after

11   Mr. Daye was in.

12   BY MR. MCLINDON:

13   Q.    Okay.  So let's see if we can keep this straight.

14   Mr. Guidry is in the chapel, and you're watching him

15   being beat; is that right?

16   A.    Yes, sir.

17   Q.    And then you leave, and you go get Anthony Daye;

18   right?

19   A.    Yes, sir.  Yes, sir.

20   Q.    Okay.  Now, your first testimony was that you

21   yelled, *Stop, he's a federal inmate* when he was in

22   there by himself, right?  That's what you just said

23   today?

24   A.    Yes, sir.

25   Q.    But that's not what you told the grand jury.  You

1  told the grand jury that you did it later after

2  Mr. Daye was in there; right?

3  A.    Yes, sir.

4  Q.    Okay.  Why is there a discrepancy in your

5  testimony?

6  A.    Um, it's still the same.  It's possible.

7  Q.    You're saying it's the same?

8  A.    Yes, sir.

9  Q.    Okay.  Well, my first question was, was Guidry by

10  himself when you yelled *Stop*?  And I believe your

11  answer was, *Yeah, he was by* -- I mean, *by himself*.  I

12  mean, there was no other inmates in there?

13  A.    Yes, sir.

14  Q.    But in your grand jury, didn't you say that that

15  was after you went and got Mr. Daye and brought him in

16  there?

17  A.    Yes, sir.

18  Q.    That's what you told the grand jury?

19  A.    Yes, sir.

20  Q.    I'm trying to figure out why your testimony is

21  changing.

22  A.    No, it's -- I probably didn't understand the

23  question at the grand jury, so...

24  Q.    Okay.  Well, were you told at the beginning of

25  the grand jury that if he didn't understand a question,

1    that to bring it up and say, *Hey, look, I don't*
2    *understand the question*?
3    A.    Yes, sir.
4    Q.    Okay.  And you didn't do that at the time, did
5    you?
6    A.    No, sir.
7    Q.    Are you having trouble remembering who all was in
8    and out of the chapel?
9    A.    Um, yes, sir.  I know the sheriff definitely was
10   inside.
11   Q.    You're positive the sheriff was there, but you're
12   not sure about Eric Segura being in or out, and you're
13   not sure about when Mr. Daye got there and what you
14   saw?  Is that what you're telling us?
15   A.    Can you repeat that?
16   Q.    My question is:  You're positive the sheriff was
17   there --
18   A.    Yes, sir.
19   Q.    -- no mistake about that, but you've made
20   mistakes about Mr. Segura being there, and you've made
21   mistakes about when Anthony Daye got there.  Is that
22   your testimony?
23   A.    Yes, sir.
24   Q.    So you bring Mr. Guidry there.  What prompted you
25   to go get Mr. Daye?

1    A.    It was brought up.

2    Q.    Somebody told you to do it?

3    A.    Yes, sir.

4    Q.    Okay.  It wasn't the sheriff, was it?

5    A.    I don't recall --

6    Q.    Okay.

7    A.    -- how it was brought up.

8    Q.    Do you remember the reason you were supposed to

9    go get him?

10   A.    No, sir.

11   Q.    So when you go get Anthony Daye, you bring him

12   back to the chapel; is that right?

13   A.    Yes, sir.

14   Q.    Okay.  And when you bring him back, is it your

15   testimony that Mr. Guidry was still being beaten by

16   these officers?

17   A.    Yes, sir.

18   Q.    Okay.  And then Mr. Daye is brought in.  And

19   where is he placed in relation to Mr. Guidry?

20   A.    Um, not too far away from Mr. Guidry, like on a

21   pew behind.

22   Q.    Okay.

23           MR. MCLINDON:  Can we pull up the chapel?  I

24   think it's No.  9 or 10.  Ten, please.

25   BY MR. MCLINDON:

```
 1    Q.    From that picture, can you tell us where -- I
 2    think you already said -- why don't you tell us where
 3    Mr. Guidry was and where Mr. Daye was.  We might need
 4    to go out on it a little bit.  Yeah.  Can you just
 5    point with your finger on the screen or touch it, can
 6    you touch it with that --
 7    A.    Who was there?
 8    Q.    How about Mr. Guidry first.  Where was he?
 9    A.    Go to the left a little bit more.
10          THE COURT:  Can you see on that picture where
11    Guidry was?
12          THE WITNESS:  Yeah, yeah.  Go to the left
13    some more.  Some more.  Some more.
14          (Witness complied.)
15    BY MR. MCLINDON:
16    Q.    That's Guidry?
17    A.    Yes, sir.
18    Q.    And where was Mr. Daye?
19          THE WITNESS:  Go to the right.
20          THE COURT:  Swing back.
21          THE WITNESS:  (Witness complied.)
22    BY MR. MCLINDON:
23    Q.    I know that swatch moved.  But we know Mr. Guidry
24    was up against the wall; is that right?
25    A.    Yes, sir.
```

1    Q.    And Mr. Daye was out in the middle, more or less;

2    is that right?

3    A.    Yes, sir.

4    Q.    And they're both being beaten at the same time?

5    A.    Yes, sir.

6    Q.    Do you remember how many officers were beating

7    Mr. Guidry and how many were beating Mr. Daye?

8    A.    Don't recall, no, sir.

9    Q.    Did any of the officers beat both of them?  In

10   other words, did one of them hit Daye and then go and

11   hit Guidry?

12   A.    I don't recall, no, sir.

13   Q.    You don't recall?

14   A.    No, sir.

15   Q.    And if we can pull out one more time, if you

16   could tell me where the sheriff was standing?

17   A.    (Witness complied.)

18   Q.    Right up against that computer monitor right

19   there?

20   A.    That table probably wasn't inside there.

21             THE COURT:  I'm sorry?

22             THE WITNESS:  The table.

23             THE COURT:  Can you keep your voice up

24   please, sir, so everybody can hear you.

25             THE WITNESS:  Yes, sir.

```
1              MR. MCLINDON:  Can we rotate it a little bit

2    so I can see the entrance.

3    BY MR. MCLINDON:

4    Q.    So if you walk in the entrance, am I correct that

5    your testimony is that the sheriff was to the right in

6    front of the windows; is that correct?

7    A.    Yes, sir.

8    Q.    Do you know Jason Comeaux?

9    A.    Yes, sir.

10   Q.    Was he in the chapel that day?  Beating either

11   Guidry or Daye?

12   A.    I don't recall.  Probably.

13   Q.    You don't recall?

14   A.    No, sir.

15   Q.    Do you remember when you left Mr. Guidry to go

16   get Mr. Daye, do you remember about how long it took

17   you to go get Mr. Daye and come back?

18   A.    No, sir.

19   Q.    Could you even estimate?  Was it two minutes?

20   Three minutes?  Do you even know?

21   A.    Probably wasn't that long.  To estimate, probably

22   like a minute, 30 seconds, 40 seconds.

23   Q.    Okay.  And where are you employed right now,

24   Mr. Burrell?

25   A.    Franklin Police Department.
```

1    Q.    Did you ever work for the St. Mary Parish

2    Sheriff's Office?

3    A.    Yes, sir.

4    Q.    Were you fired from there?

5    A.    Yes, sir.

6    Q.    For what?

7    A.    Personal reasons.

8    Q.    Stealing money?

9    A.    Yes, sir.

10   Q.    Did you escort Anthony Daye out of the chapel?

11   A.    Yes, sir.  I helped him out, yes, sir.

12   Q.    Okay.  Back to the pod?

13   A.    Lockdown.

14   Q.    Okay.

15         MR. MCLINDON:  If I could please have the

16   jail map, Exhibit 1, one more time.

17   BY MR. MCLINDON:

18   Q.    What I would like you to do is show me the path

19   that you took to escort Anthony Daye back to the pod.

20   If you can clear those, maybe.  Do I need to do it?

21         THE COURTROOM DEPUTY:  Yes.

22         MR. MCLINDON:  Okay.  There.

23   BY MR. MCLINDON:

24   Q.    Now, can you show me -- go ahead and touch the

25   chapel again with your finger.  Now just draw a line of

```
1    where you escorted Anthony Daye.
2    A.    (Witness complied.)
3    Q.    Do you remember while escorting him, Mr. Daye
4    talking to Sheriff Ackal?
5    A.    No, sir.
6    Q.    Do you remember if they ever talked?
7    A.    No, sir.
8    Q.    Okay.
9    A.    I don't know.
10   Q.    And you were with him the whole time?
11   A.    Who?
12   Q.    You were with Mr. Daye from the chapel back to
13   the pod; is that right?
14   A.    Yes, sir.
15   Q.    Okay.  And he did not talk to the sheriff?
16   A.    No, sir.
17   Q.    Okay.  Now, you mentioned Scott Spears, and
18   that's a young man that was -- you know, the baton was
19   put in his mouth.  Do you remember that?
20   A.    Yes, sir.
21   Q.    You were not there when that happened?
22   A.    (Witness nodding in the negative.)
23   Q.    You really don't know anything about that; do
24   you?
25   A.    No, sir.
```

```
 1   Q.    Other than what was told to you?

 2   A.    Yes, sir.

 3           MR. MCLINDON:  Just give me one second, Your

 4   Honor.

 5           THE COURT:  Yes.

 6           (Pause in the proceedings.)

 7           MR. MCLINDON:  I have no further questions,

 8   Your Honor.  Thank you.

 9           THE COURT:  All right.  Counselor, redirect?

10           MS. BOYD:  Yes, Your Honor.

11                   REDIRECT EXAMINATION

12   MS. BOYD:

13   Q.    Okay, Mr. Burrell, you were asked a lot of

14   questions about your chain of command; is that right?

15   A.    Yes, ma'am.

16   Q.    And you mentioned that Mary Davis and Debra

17   Celestine were in your chain of command at some point?

18   A.    Yes, ma'am.

19   Q.    Okay.  But they weren't in your chain of command

20   on April 29th, 2011?

21   A.    No, sir.  No, ma'am.

22   Q.    Did you ever report to Mary Davis or Debra

23   Celestine what you saw happen in the chapel?

24   A.    Yes, ma'am.

25   Q.    When did you do that?
```

```
1    A.    About a week or two weeks later.

2    Q.    Why did you report that to them?

3    A.    I don't know.  I look at them like a mom or a

4    grandma, like a wise person I can talk to.

5    Q.    And why did you want to talk to them about what

6    happened in the chapel that day?

7    A.    It was on my mind, that's why I did it.

8    Q.    Why was it on your mind?

9    A.    Due to what happened, inmates getting beat.

10   Q.    You talked about seeing the inmates on the rec

11   yard that day?

12   A.    Yes, ma'am.

13   Q.    You were asked questions about whether or not the

14   rec yard was full of inmates that day?

15   A.    Yes, ma'am.

16   Q.    When you saw the inmates on the rec yard on

17   April 29, 2011, did you see any inmate posing a risk of

18   harm to any of those officers?

19   A.    No, ma'am.

20   Q.    You were asked about how many times you

21   interacted with Sheriff Ackal in the jail?

22   A.    Yes, ma'am.

23   Q.    Do you know about how many times you saw him

24   present at the jail?

25   A.    That day?
```

1    Q.    Over the course of the time that you worked for

2    the Iberia Parish Sheriff's Office.

3    A.    No, ma'am.

4    Q.    Could you estimate how many times you saw the

5    sheriff?

6    A.    Throughout the three years -- two years I was

7    over there?  Several times.

8    Q.    Was it a normal occurrence for the sheriff to be

9    present for shakedowns?

10   A.    No, ma'am.

11   Q.    Is that something that was out of the ordinary

12   for your experience when you worked there?

13   A.    Yes, ma'am.

14   Q.    When Sheriff Ackal did come to the jail to

15   participate in shakedowns, was that something that

16   stood out to you?

17   A.    Yes, ma'am.

18   Q.    You talked about being at the shakedown and

19   seeing Jason Comeaux with a beanbag shotgun?

20   A.    Yes, ma'am.

21   Q.    And you described seeing him discharge that gun

22   against an inmate?

23   A.    Yes, ma'am.

24   Q.    What did you believe about whether or not it was

25   appropriate to do that?

1    A.    The inmate wasn't posing a threat.  It was a

2    shocking moment.  We run in all at once, telling,

3    *shakedown*, screaming, yelling.  *Get on the ground, get*

4    *on the ground*.  I guess it was a shocking moment for

5    the inmate.  So he didn't know how to react at that

6    time.  Usually it take a couple of seconds for an

7    inmate to react due to the amount of people running

8    through the cell hollering, *shakedown*.

9    Q.    From your perspective, did you think that the

10   force that Jason used on that inmate was necessary in

11   order to get him to comply?

12   A.    It wasn't necessary.  No, ma'am.

13   Q.    Were there any supervisors present when Jason

14   Comeaux discharged the shotgun in that way?

15   A.    Yes, ma'am, there were several.

16   Q.    Who was present?

17   A.    During the shakedown, the sheriff, other

18   high-ranking officers, lieutenants, sergeants from

19   patrol.

20   Q.    Was the defendant present and did the defendant

21   witness Jason Comeaux discharge the shotgun against

22   that inmate?

23   A.    Yes, ma'am.

24   Q.    You saw the defendant present there when that

25   occurred?

1   A.    Yes, ma'am.

2   Q.    Did the defendant do anything to discipline

3   Mr. Comeaux at that time?

4   A.    No, ma'am.

5   Q.    Or say anything to suggest that that had been

6   inappropriate?

7   A.    No, ma'am.

8   Q.    You indicated that the chapel was a place that

9   could be used for strip searches during shakedowns?

10  A.    Yes, ma'am.

11  Q.    Was that how the chapel was being used on

12  April 29th, 2011?

13  A.    No, ma'am.

14  Q.    What was the chapel being used for?

15  A.    Punishment and beating.

16  Q.    You were asked a lot of questions about who was

17  present in the chapel on April 29th, 2011.  I'm going

18  to ask you some questions about that, okay?

19  A.    Yes, ma'am.

20  Q.    You described seeing IMPACT officers present; is

21  that right?

22  A.    Yes, ma'am.

23  Q.    Do you know who all the IMPACT -- did you know at

24  the time who all the IMPACT officers were?

25  A.    No, ma'am.

```
1    Q.    Did you know who all of the narcotics officers
2    were?
3    A.    No, ma'am.
4    Q.    Did you know who all of the SWAT team members
5    were?
6    A.    No, ma'am.
7    Q.    Could you identify them at that time?
8    A.    No, ma'am.
9    Q.    Is it fair to say that there were a lot of people
10   coming and going in the chapel that day?
11   A.    Yes, ma'am.
12   Q.    You testified that the defendant was present that
13   day in the chapel.
14   A.    Yes, ma'am.
15   Q.    How do you know that?
16   A.    The higher-ups, lieutenant -- like talking to him
17   prior with Lieutenant Perry Shaw, Captain Hazelwood
18   outside the jail prior for that day happening.
19   Q.    Can you explain what you mean about how you knew
20   the defendant was present in the chapel that day?
21   A.    He will come by the motor pool and talk with
22   Captain Hazelwood and Lieutenant Perry Shaw at that
23   time, and I ran into him across at the SugArena.  So
24   that's how I knew he was there.  And he's the higher-up
25   and he didn't say nothing about it.
```

1    Q.    Okay.  So you described having seen the sheriff

2    on multiple occasions prior to this day?

3    A.    Yes, ma'am.

4    Q.    Okay.  So did you have any confusion on that day

5    who the sheriff was?

6    A.    No, ma'am.

7    Q.    Why was it significant for you that the sheriff

8    was present in the chapel when those inmates were being

9    beaten?

10   A.    You don't usually see him on shakedowns, so it

11   was kind of unusual or a strange appearance to see a

12   sheriff there with a shakedown.  So it was just that

13   moment right there.

14   Q.    What was significant about the fact that the

15   sheriff was standing next to you and did not stop those

16   beatings?

17        MR. MCLINDON:  Your Honor, I object.  We're

18   beyond cross.

19        THE COURT:  I'm going to sustain.

20   BY MS. BOYD:

21   Q.    You were asked a question about whether or not

22   Anthony Daye spoke to the sheriff when you were walking

23   with him from the chapel to the J pod; is that right?

24   A.    Yes, ma'am.

25   Q.    Do you know whether or not Anthony Daye spoke to

```
1    the sheriff while he was in the chapel or being
2    escorted outside of the chapel?
3    A.    No, ma'am.
4    Q.    You don't know whether or not he did that?
5    A.    No, ma'am.
6    Q.    You were asked about speaking to the FBI back in
7    January of 2016.  Do you remember those questions?
8    A.    Yes, ma'am.
9    Q.    And you were asked about who you told the FBI was
10   in the chapel; is that right?
11   A.    Yes, ma'am.
12   Q.    When you met with the FBI in 2016, did you -- in
13   January, did you tell them that Louis Ackal was in the
14   chapel?
15   A.    Yes, ma'am.
16            MS. BOYD:  I have no further questions, Your
17   Honor.
18            THE COURT:  All right.  Well, it's -- do you
19   have anything you can use 20 minutes toward?
20            MR. BLUMBERG:  One witness is prepared to go,
21   but he's more than 20 minutes, Your Honor.
22            THE COURT:  So are we better off quitting
23   now?
24            MR. BLUMBERG:  (Nodding in the affirmative.)
25            THE COURT:  All right.  Ladies and gentlemen,
```

1    again, please do not watch, read, listen to any

2    accounts about this.  Don't do any independent

3    research.  Don't discuss it with your nearest and

4    dearest or anyone else, and please be here at 9 o'clock

5    tomorrow and we'll try and start promptly at 9:00.

6              All rise for the jury.

7              (The jury exits the courtroom.)

8              THE COURT:  Okay.  You may be seated.

9    Anything?

10             MR. MCLINDON:  No.

11             MR. BLUMBERG:  Only may the witness be

12   excused and released from his subpoena?  We don't

13   intend to call him again.

14             MR. MCLINDON:  Yes.  And I don't need him.

15             THE COURT:  You are free to go.  Thank you.

16             MR. BLUMBERG:  Nothing else from the

17   Government, Your Honor.

18             THE COURT:  Can we pick it up a little bit

19   maybe?  Hopefully?

20             MR. BLUMBERG:  Yes, Your Honor.

21             THE COURT:  Recess until tomorrow at 9:00.

22             (Recess taken at 4:42 p.m.)

23

24                  *    *    *    *    *

25

```
 1              C E R T I F I C A T I O N

 2

 3          I, Gayle Wear, Federal Official Court

 4    Reporter, in and for the United States District Court

 5    for the Western District of Louisiana, do hereby

 6    certify that pursuant to Section 753, Title 28 United

 7    States Code, that the foregoing is a true and correct

 8    transcript of the stenographically reported proceedings

 9    held in the above-entitled matter and that of the

10    regulations of the Judicial of the United States.

11

12                    Dated this 31st day of October 2016.

13

14                    /s/ Gayle Wear
                      Gayle Wear, RPR, CRR
15                    Federal Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```