```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF LOUISIANA
 2                    SHREVEPORT DIVISION

 3   UNITED STATES OF AMERICA,          )
                                        )
 4           Plaintiff,                 )
                                        )  Case No:
 5           vs.                        )  16-cr-00048-DEW-PJH
                                        )
 6   LOUIS ACKAL,                       )  Volume 2
                                        )  Pages 87 - 430
 7           Defendant.                 )
     _____   )
 8

 9

                 TRANSCRIPT OF JURY TRIAL PROCEEDINGS
10            BEFORE THE HONORABLE DONALD E. WALTER

11            TUESDAY, NOVEMBER 1, 2016; 9:03 A.M.
                     SHREVEPORT, LOUISIANA
12

13   APPEARANCES:
     (Continued on Page 2.)
14
     FOR THE UNITED STATES:
15
          Mark Blumberg
16        Tona Cartwright-Boyd
          U.S. DEPARTMENT OF JUSTICE CIVIL RIGHTS DIVISION
17        950 Pennsylvania Avenue N W
          Washington, DC 20530
18
          Joseph G. Jarzabek
19        U.S. ATTORNEY'S OFFICE
          WESTERN DISTRICT OF LOUISIANA
20        300 Fannin Street, Suite 3201
          Shreveport, Louisiana 71101-3068
21

22           ******************************

23              GAYLE WEAR, RPR, CRR
            Federal Official Court Reporter
24               800 Lafayette Street
            Lafayette, Louisiana 70501
25                 337.593.5222
```

```
1    APPEARANCES OF COUNSEL:
     (Continued from Page 1.)
2

3    FOR THE DEFENDANT ACKAL:

4        John S. McLindon
         WALTERS, PAPILLION, THOMAS, CULLENS, LLC
5        12345 Perkins Road, Building 2, Suite 202
         Baton Rouge, Louisiana 70810
6

7

8

9

10                       *     *     *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2   PROCEEDINGS:                              PAGE:
     (Continued on page 90.)
 3

 4   GOVERNMENT WITNESSES:

 5   ERIC SEGURA

 6        Direct examination by Mr. Blumberg     94
          Cross-examination by Mr. McLindon     129
 7        Redirect examination by Mr. Blumberg  142

 8

 9   AQUILLA THOMAS

          Direct examination by Ms. Boyd       145
10        Cross-examination by Mr. McLindon     166

11

     DEBRA CELESTINE
12
          Direct examination by Mr. Jarzabek    179
13        Cross-examination by Mr. McLindon     193
          Redirect examination by Mr. Jarzabek  199
14

15   KIM LAWSON

16        Direct examination by Mr. Jarzabek    202

17

     JASON COMEAUX
18
          Direct examination by Mr. Blumberg    219
19        Cross-examination by Mr. McLindon     300
          Redirect examination by Mr. Blumberg  343
20

21   MONICA BRUNO

22        Direct examination by Ms. Boyd        345
          Cross-examination by Mr. McLindon     350
23        Redirect examination by Ms. Boyd      355

24

25
```

```
1                    I N D E X

2      PROCEEDINGS:                            PAGE:
       (Continued from page 89.)
3

4      GOVERNMENT WITNESSES:

5

6      ROBERT BURNS

           Direct examination by Mr. Blumberg     356
7          Cross-examination by Mr. McLindon      391
           Redirect examination by Mr. Blumberg   409
8

9      BYRON LASSALLE

10         Direct examination by Mr. Blumberg     413

11

12

13                       *    *    *

14

15

16
                         E X H I B I T S
17

18
          (Master Index to be provided at trial conclusion.)
19

20

21                       *    *    *

22

23

24

25
```

```
 1    November 1, 2016                           9:03 a.m.

 2                         ---o0o---

 3                  P R O C E E D I N G S

 4                         ---o0o---

 5         THE COURT:  You may be seated.  The 14th

 6    juror just got to the building and will be up here in a

 7    few minutes.  You can sit down.  I gave -- well,

 8    Caroline gave them notepads and pens, and I told them

 9    they could take notes if they wanted to.  And then I'll

10    give them the usual instruction about notes or the ace

11    trumps.  And I think that's all.  Anything from the

12    Government?

13         MR. BLUMBERG:  Nothing.

14         THE COURT:  Have you got your witness queued

15    up?

16         MR. BLUMBERG:  We do have our witness queued

17    up.  There are two very -- just to alert the Court, the

18    video that we are going to play, which is the same

19    video that we played yesterday, Number 9, there is a

20    small portion of it that has some strip searches of

21    inmates.

22         THE COURT:  Has some what?

23         MR. BLUMBERG:  Strip searches of inmates.

24         THE COURT:  Yeah, okay.

25         MR. BLUMBERG:  The inmates are not -- it only
```

1   showed them from the rear, but I wanted to alert the

2   Court.

3           THE COURT:  Okay.  Anything else?

4           MR. BLUMBERG:  The only other issue is that

5   this afternoon Jason Comeaux is expected to testify,

6   and we expect to use as demonstrative exhibits, which

7   counsel has already seen and does not object to, two

8   batons, which we will have in the courtroom.  The

9   witness has already identified them, and counsel does

10  not object.

11          THE COURT:  I'm sorry.  Come up to the

12  microphone.

13          MR. BLUMBERG:  I'm sorry.

14          THE COURT:  Apparently, I'm kind of hard of

15  hearing.

16          MR. BLUMBERG:  I apologize.

17          THE COURT:  What?

18          MR. BLUMBERG:  There are two demonstrative

19  exhibits.

20          THE COURT:  I got that.  They don't object

21  to.

22          MR. BLUMBERG:  Right.  They're batons.  We

23  are not leaving them in the courtroom.  But when Jason

24  Comeaux comes to testify this afternoon, we will have

25  them at counsel table, and I wanted to alert the Court

1    that they're there.

2              THE COURT:  Okay.  That's no problem.

3              MR. BLUMBERG:  Okay.  That's all I have.

4              THE COURT:  Anything else?

5              MR. MCLINDON:  No, sir.

6              THE COURT:  Ready?  Bring them in, please.

7              Bring your witness in, please.

8              (The jury entered the courtroom.)

9              THE COURT:  You may all be seated.  Good

10   morning, ladies and gentlemen.  We are going to start

11   with our first witness of the morning.

12             If you will raise your right hand, sir, and

13   be sworn or affirm.

14                        ERIC SEGURA,

15    first having been duly sworn by the Courtroom Deputy,

16             testifies under oath as follows:

17             THE COURTROOM DEPUTY:  Could you please spell

18   your first and your last name for the court reporter.

19             THE WITNESS:  First name, Eric, E-R-I-C.

20   Last name Segura, S-E-G-U-R-A.

21             THE COURTROOM DEPUTY:  Thank you.

22             THE COURT:  Ladies and gentlemen, I gave you

23   all notepads and pens.  You have don't have to use

24   them.  If you want to, though, they're there for you to

25   use.  Okay?

```
 1              Mr. Blumberg, proceed.
 2                    DIRECT EXAMINATION
 3    BY MR. BLUMBERG:
 4    Q.   Good morning, Mr. Segura.
 5    A.   Good morning.
 6    Q.   Sir, will you please tell us how old you are?
 7    A.   46.
 8    Q.   What do you currently do for a living?
 9    A.   Police officer.
10    Q.   Where do you live?
11    A.   New Iberia, Louisiana.
12    Q.   And where are you a police officer?
13    A.   In Youngsville.
14    Q.   What are your responsibilities there?
15    A.   Patrol.
16    Q.   What does that mean?
17    A.   Protect, drive, take initial reports, anything
18    else that occurs, speeding tickets.
19    Q.   Who do you live there with?
20    A.   I live with my wife and my oldest -- my youngest
21    son.
22    Q.   How long have you been in law enforcement?
23    A.   Going on 16 years.
24    Q.   Where did you begin your law enforcement career?
25    A.   IPSO, Iberia Parish.
```

```
 1    Q.    What were your responsibilities when you first
 2    began?
 3    A.    Jailer.
 4    Q.    What did that entail?
 5    A.    Making sure the inmates were served, making sure
 6    they were protected, making sure that they behaved,
 7    making sure that everything ran like it was supposed to
 8    be.
 9    Q.    What year did you begin at IPSO?
10    A.    2000.
11    Q.    And how long were you a jailer?
12    A.    Roughly, about six months.
13    Q.    After you finished your time in the jail, were
14    you still employed at the IPSO?
15    A.    No, sir.
16    Q.    Where did you go?
17    A.    I went to Abbeville PD.
18    Q.    And what were your responsibilities there?
19    A.    Patrol officer.
20    Q.    Again, what did that involve?
21    A.    Patrolling, making sure to deter crime, stuff
22    like that.
23    Q.    All right.  How long were you in Abbeville?
24    A.    Roughly, about a year.
25    Q.    Where did you go after Abbeville?
```

1   A.    New Iberia City Police Department.

2   Q.    And how long were you there?

3   A.    I was there four years until the sheriff's office

4   took over, and then I went to the sheriff's office.

5   Q.    What were your responsibilities in New Iberia?

6   A.    Patrol.

7   Q.    Same kind of responsibilities?

8   A.    Yes, sir.

9   Q.    All right.  When you went to the -- what year did

10  you go to the IPSO when they took over the police

11  department?

12  A.    2008.

13  Q.    Was that before or after Louis Ackal became

14  sheriff?

15  A.    Right after.

16  Q.    What were your responsibilities in 2008 at the

17  IPSO?

18  A.    I was on -- when I first got hired, I was on as

19  criminal patrol unit.

20  Q.    Again, what did that involve?

21  A.    I was working out of the City of Jeanerette,

22  making sure the -- helping the Jeanerette City Police

23  Department out because they weren't fully staffed.  I

24  was helping them out with their patrol duties and

25  traffic.

```
1    Q.    How long did you have those responsibilities?

2    A.    Roughly, about six to seven months.  Then I was

3    transferred back to the actual patrol.

4    Q.    Right.  And how long were you in patrol that

5    second time around?

6    A.    Till I quit.

7    Q.    Till you quit.  When did you quit?

8    A.    I think it was December of 2015, when I went to

9    Youngsville PD.

10   Q.    All right.  Do you know the defendant, Louis

11   Ackal?

12   A.    Yes, sir.

13   Q.    How do you know him?

14   A.    He was my boss at one time.

15   Q.    You are, because you worked there, familiar with

16   the Iberia Parish jail.  Is that a fair statement?

17   A.    Yes, sir.

18   Q.    Do you remember being there in April of 2011?

19   A.    Yes, sir.

20   Q.    What brought you to the jail in April of 2011?

21   A.    To help out with the jail because they were

22   understaffed and they needed help.

23   Q.    What were they needing help with?

24   A.    The jail at one point -- we had a hostage

25   situation, which they needed help.  And then there was
```

1    a couple of fights and stuff like that.  So it was

2    actually to go in there and help out.

3    Q.    Okay.  I'm going to direct your attention

4    specifically to April 29, 2011.  There was no hostage

5    situation that day, was there?

6    A.    Correct.

7    Q.    Was that just a more routine shakedown?

8    A.    Yes, sir.

9    Q.    Very quickly, please describe what a shakedown is

10   to the jury.

11   A.    A shakedown is when we get everybody out of their

12   beds, their cells, and put them in the hall, and we

13   search their bunks and their chests for any illegal

14   contraband or weapons.

15   Q.    Who was in control of the jail on the day of the

16   shakedown on April 29th of 2011?

17   A.    The sheriff.

18   Q.    How do you know that?

19   A.    Because he was the one giving orders.

20   Q.    What kind of orders was he giving?

21   A.    Telling us what to do and how to do it.

22   Q.    Who was he giving orders to?

23   A.    Upper chain of command, and chain of command

24   would give it to us.

25   Q.    The jail has a Warden; right?

```
1    A.    Correct.

2    Q.    At the time, that Warden was a man named Wesley

3    Hayes?

4    A.    Yes, sir.

5    Q.    Who was giving orders between the Warden and the

6    sheriff?

7    A.    The sheriff.

8    Q.    Is the sheriff higher in command?

9    A.    Yes, sir.

10   Q.    Did you at any time during the day on April 29th,

11   2011 get a sense that anybody else was in control of

12   the jail that day?

13   A.    No, sir.

14   Q.    Why is that?

15   A.    Because everything that happened, the sheriff was

16   there and made sure it got done.

17   Q.    Have you been on arrest scenes or crime scenes

18   with the sheriff in the past?

19   A.    Yes, sir.

20   Q.    Was that typical of how the sheriff acted when he

21   arrived on scene?

22   A.    Yes, sir.

23   Q.    Could you give some examples to the members of

24   the jury, please.

25   A.    If we had a crash or a homicide or whatever, the
```

1    sheriff showed up.  If the sheriff told you to do

2    something, you did it.

3    Q.    What if there were other commanders on the scene?

4    A.    It doesn't matter.

5    Q.    Now, there are many units in the IPSO, aren't

6    there?

7    A.    Yes, sir.

8    Q.    There is a narcotics unit; right?

9    A.    Correct.

10   Q.    A SWAT unit?

11   A.    Correct.

12   Q.    Sex offender unit?

13   A.    Correct.

14   Q.    And they all have their own command structure?

15   A.    Yes, sir.

16   Q.    But when the sheriff is on the scene, who takes

17   control of the scene?

18   A.    The sheriff.

19   Q.    Is that the way it was on April 29th, 2011?

20   A.    Yes, sir.

21   Q.    Now, did you find yourself in a rec yard with the

22   sheriff on that particular day?

23   A.    Yes, sir, I did.

24   Q.    I'm going to show you what has been previously

25   admitted as Government's Exhibit 1.

1            MR. BLUMBERG:  And I ask that it be brought

2    up, Steven, please.  If we can go to Number 1, I think,

3    Steven.  I need the diagram.

4    BY MR. BLUMBERG:

5    Q.    Okay, sir.  Government's Exhibit Number 1 looks

6    familiar to you, doesn't it?

7    A.    Yes, sir.

8    Q.    What is it?

9    A.    It's an outline of the jail.

10   Q.    Now --

11   A.    A part of the jail.

12   Q.    Do you see on the diagram that there is an area

13   that is outlined in green?

14   A.    Yes, sir.

15   Q.    What is that?

16   A.    Inside the rec yard.

17   Q.    Based on your experience at the jail, what's the

18   rec yard typically used for?

19   A.    Inside basketball or for the guys to hang out.

20   Q.    On the day in question, April 29th, 2011, what

21   was that rec yard being used for?

22   A.    To hold the inmates there so they can get

23   haircuts.

24   Q.    Is that the place where you first saw Sheriff

25   Ackal that day?

1    A.    Not the first time, but I did see him there.

2    Q.    Where did you see him the first time?

3    A.    In the jail itself.

4    Q.    Doing what?

5    A.    Walking around.

6    Q.    Okay.  Did you see him in that rec yard?

7    A.    Yes, sir.

8    Q.    Was there a name for that rec yard?  Do you

9    remember?

10   A.    No, sir, I don't remember.

11   Q.    All right.  What did you see Sheriff Ackal doing

12   in the rec yard on April 29th, 2011, when you were

13   there?

14   A.    Arguing with an inmate.

15   Q.    Do you know the name of the inmate he was arguing

16   with?

17   A.    No, sir.

18   Q.    What was he arguing about?

19   A.    They were going back at it, back and forth.  They

20   were both cursing at each other.

21   Q.    Who else was in the rec yard at the time?

22   A.    A few deputies, a couple of deputies.

23   Q.    Any other inmates?

24   A.    Yes, sir.

25   Q.    What was the condition of the rec yard?  Was it

1   under control?

2   A.    Yes, sir.

3   Q.    Describe for the members of the jury what the rec

4   yard looked like.

5   A.    It was a cement slab with brick walls.  All the

6   inmates came in and they were -- hands behind their

7   heads, and they were kneeled up against the wall,

8   facing the wall.

9   Q.    Were the inmates compliant at the time?

10  A.    Yes, sir.

11  Q.    Were the inmates posing any risk of harm to the

12  deputies at the time?

13  A.    No, sir.

14  Q.    Was anybody trying to get up and run away at the

15  time?

16  A.    No, sir.

17  Q.    Was anybody trying to attack any officers at the

18  time?

19  A.    No, sir.

20  Q.    Was any inmate trying to attack another inmate at

21  the time?

22  A.    No, sir.

23  Q.    Were you having personally any difficulties

24  controlling any of the inmates in that rec yard at the

25  time?

1    A.    No, sir.

2    Q.    Could you tell whether any other deputies were

3    having any trouble?

4    A.    No, sir.

5    Q.    What did you hear Louis Ackal say to this

6    particular inmate?

7    A.    After they argued a few times, I heard the

8    sheriff point -- asked me who said something to him,

9    and I pointed to the inmate.  The sheriff told me, he

10   said, *You take that fucking nigger, put him on the*

11   *ground and put him in handcuffs*.

12   Q.    Did you?

13   A.    Yes, sir.

14   Q.    Why?

15   A.    That's what I was ordered to do.

16   Q.    Was the inmate posing any risk to Louis Ackal at

17   the time?

18   A.    No, sir.

19   Q.    Did you see any need to put him in handcuffs?

20   A.    I didn't at the point, no, sir.

21   Q.    Have you been trained on uses of force as an

22   officer in the state of Louisiana and at the Iberia

23   Parish Sheriff's Office?

24   A.    Yes, sir.

25   Q.    What is your understanding of when you can use

```
 1   force against somebody within the custody of law
 2   enforcement --
 3   A.    Somebody who is resisting.
 4   Q.    I'm going to ask you to wait until I'm done, and
 5   I'm going to work real hard so that I wait until you're
 6   done, and that way she won't yell at me.
 7   A.    Yes, sir.
 8   Q.    I appreciate it.
 9          Describe again.  When are you allowed to use
10   force as a law enforcement officer in the state of
11   Louisiana?
12   A.    Resisting arrest or resisting an officer.
13   Q.    Did you see any reason to be using force against
14   anybody in that rec yard on April 29th, 2011?
15   A.    No, sir.
16   Q.    What happened after you put handcuffs on the man?
17   A.    I kneeled down on him, made sure I had control of
18   him and then a few minutes later I went to the other
19   side, to his right side of his body and kneeled down
20   next to him, put my legs propped up against him.
21   Q.    Why did you put your -- why did you kneel down on
22   him?
23   A.    The first time I did to gain control to make sure
24   he understood that, you know, don't cause any more of a
25   problem.
```

Q.    Did you need to gain control of him?

A.    Not necessarily, no, sir.

Q.    Was it a situation where he was trying to get up?

A.    No, sir.

Q.    Okay.  Why did you kneel down on him?

A.    Just to show him that we was in charge.

Q.    Okay.  What did the sheriff say at the time that you kneeled down on him?

A.    He bent down and told the inmate that *This is my jail.  I'm in charge.  You're going to do what I tell you to do or else.*

Q.    Was he saying it like that?

A.    He was cursing with the "N" word.

Q.    Okay.

A.    Do you want me to tell you exactly?

Q.    I want you to tell us exactly what he said.

A.    He said, *This is my motherfucking jail.  You're going to do what the fuck I tell you to do or else.*

Q.    Did he order anything else directed towards that inmate at that time?

A.    Not to where I heard.

Q.    Why did you move to the other side of the inmate?

A.    Because there was a dog, a K-9 dog behind me.

Q.    How did the dog arrive there?

A.    He was there whenever the inmates were brought

1    in.

2    Q.    Did the sheriff give any orders regarding the

3    dog?

4    A.    I didn't hear.

5    Q.    Okay.  I'm going to show you now what has been

6    previously admitted as Government's Exhibit Number 9.

7    It's the video that we previously admitted.

8         While this is playing -- there is no audio,

9    Mr. Segura.  What is that?  Is that the same rec yard

10   we just identified on Exhibit 1?

11   A.    Yes, sir.

12   Q.    Who is that walking in with the inmate?

13   A.    Me.

14   Q.    What are you doing?

15   A.    Transporting an inmate.

16   Q.    Okay.

17         MR. BLUMBERG:  And, Your Honor, this clip is

18   only about ten minutes long.

19         (Video playing.)

20   BY MR. BLUMBERG:

21   Q.    Again, Mr. Segura, what's the purpose of bringing

22   people into the rec yard as you walk?

23   A.    They were in the hall waiting to get haircuts and

24   stuff.

25   Q.    Why haircuts?

```
 1   A.    There was an outbreak of -- I think it was
 2   bedbugs and lice at the time.  And there also was -- I
 3   think there was a shakedown going on at this time.
 4   Q.    Have you ever heard the phrase Ackal cuts?
 5   A.    Yes, sir.
 6   Q.    What is that?
 7   A.    Everybody got their hair -- their hair shaved.
 8   Q.    Why?
 9   A.    Couldn't tell you.  That's what he wanted.
10   Q.    Okay.  Now, I would like you to tell us when you
11   see the sheriff enter the video, if you would, please.
12              (Pause in the proceedings.)
13   BY MR. BLUMBERG:
14   Q.    Do you know who the man is swinging the stick in
15   the video?
16   A.    I think his named is Cody Vaughn.
17   Q.    Okay.  As this process is taking place, did you
18   have enough deputies to handle bringing those inmates
19   in against the wall?
20   A.    Yes, sir.
21   Q.    At the time that these inmates were being brought
22   in, did you have any concerns that any of them were
23   going to get up and run away?
24   A.    No, sir.
25   Q.    Why not?
```

1    A.    They can't go anywheres.  They can just run

2    around in circles in the jail.

3    Q.    By the way, how many officers responded to the

4    request for assistance with the shakedown that day?

5    A.    Anywheres between 30 to 50 at any given time.

6    Q.    Is that a lot for a shakedown?

7    A.    Yes, sir.

8    Q.    Who is the man with the dog?

9    A.    Robert Burns.

10   Q.    Do you know that dog?

11   A.    Yes, sir.

12   Q.    How do you know that dog?

13   A.    Um, through Robert and through K-9 training.

14   He's a very aggressive dog.

15   Q.    What does that mean, to be an aggressive police

16   dog?

17   A.    He bites anything that moves.

18   Q.    Does that dog scare you?

19   A.    Yes, sir.  He's bit several deputies.

20   Q.    How good is Mr. Burns at controlling that dog?

21   A.    Only as good as he can control him.

22   Q.    Do you know the purpose of having a dog in the

23   rec yard like that?

24   A.    No, sir.

25   Q.    I want you to tell us when you see the inmate

```
1    brought in who was mouthing off with the defendant;
2    okay?
3    A.    Yes, sir.  I think that's him.
4    Q.    Okay.  And you don't know his name, do you?
5    A.    No, sir.
6    Q.    All right.  Now, as that person is being brought
7    in, what happens to him?
8    A.    He knelt down on the wall just like everybody
9    else.
10   Q.    Did he try to get up and leave?
11   A.    No, sir.
12   Q.    Any concerns that he is reaching for a weapon?
13   A.    No, sir.
14   Q.    Does it appear to you that any of the officers
15   were worried about him reaching for a weapon?
16   A.    No, sir.
17              (Pause in the proceedings.)
18   BY MR. BLUMBERG:
19   Q.    Ultimately how many dogs were in that rec yard?
20   Do you remember?
21   A.    At any given time, I think two.
22              (Pause in the proceedings.)
23   BY MR. BLUMBERG:
24   Q.    Mr. Burns appear to be on the telephone in that
25   clip of the video, about 4:43 on the time stamp?
```

A.    Yes, sir.

Q.    What's a strip search?

A.    When you take all their clothes off and make them bend down, squat, cough.

Q.    What's the purpose of that?

A.    Make sure they're not hiding any contraband.

Q.    Are we going to see strip searches on this video?

A.    Yes, sir, you will.

Q.    At the time that you were in there on that day, did anybody resist doing the strip searches?

A.    No, sir.

Q.    Is that you in the middle of the video there at 5:22?

A.    Yes, sir.  That's the defendant there.

Q.    By *the defendant*, for the record, you mean the man in the top left entered with a light blue shirt and a cap on?  Is that a fair characterization?

A.    Yes, sir.

Q.    Now, I want you to describe what you just did.

A.    Pointing to the sheriff who was making the comments.

Q.    Did he direct his attention to that person?

A.    Yes.

Q.    Why?

A.    Because he actually said it.

```
1    Q.    Did he ask that as soon as he walked --

2    A.    Yes, sir.

3    Q.    -- into the rec yard?

4    A.    Yes, sir.

5    Q.    You really have to wait until I'm done.

6    A.    I'm sorry.

7    Q.    She's going to kill us.

8          Why did you answer the defendant?

9    A.    Because he asked who said it.

10   Q.    Okay.  What was his attitude like at the time?

11   A.    I guess mad, upset.

12   Q.    You don't have to guess.  You were there.  Tell

13   us.

14   A.    Mad, upset.

15   Q.    Did he appear to be frightened?

16   A.    No, sir.

17   Q.    Did he appear to be worried?

18   A.    No, sir.

19   Q.    How do you know he was mad or upset?

20   A.    His demeanor, the way he was talking.

21   Q.    Describe it.

22   A.    He was hostile, barking orders, telling people

23   what to do and how to do it.  It wasn't his normal --

24   normal voice.

25   Q.    What's he doing now?  And by *he*, I mean the
```

1    defendant.  And I'm looking at the time stamp

2    approximately 6:40 on Exhibit 9.

3    A.    He's talking to the subject with the dark shorts,

4    with the no shirt on.

5    Q.    Okay.  What's he saying?

6    A.    I really wasn't paying attention word for word,

7    but basically they were arguing back and forth.  They

8    were calling each other names.

9    Q.    The inmate was calling the sheriff names?

10   A.    Yes.

11   Q.    Was that smart?

12   A.    No, sir.

13   Q.    Now, what happens at time stamp 7:10?

14   A.    That's when the sheriff said, *put that fucking*

15   *nigger in handcuffs and put him on the ground.*

16   Q.    At the time that you do that, was that inmate

17   posing any risk of harm to anybody in that rec yard?

18   A.    No, sir.

19   Q.    Did he resist you when you put him on the ground?

20   A.    No, sir.

21   Q.    Did you put handcuffs on him?

22   A.    Yes, sir.

23   Q.    What did you do with his legs?

24   A.    I grabbed his -- you can see his legs were

25   flinging against, kicking the wall, so I just grabbed

```
 1   one leg and held the leg while I was kneeling down on

 2   the other side of him.

 3   Q.    Do you know what a hogtie position is, sir?

 4   A.    A hogtie, yes, sir.

 5   Q.    Was that effectively a hogtie position?

 6   A.    It could basically be called a hogtie.

 7   Q.    Because the legs are up and --

 8   A.    Correct.

 9   Q.    What's going on now that the inmate's on the

10   ground and the defendant appears to be within four feet

11   or so?

12   A.    The sheriff is hollering at him right now, this

13   is my fucking jail.  I'm going to do what the fuck I

14   want and you're going to do what I tell you to fucking

15   do or else.

16   Q.    Was he also using racial slurs?

17   A.    Yes, sir.

18   Q.    Now what's happening at time stamp 8:10?

19   A.    The dog is barking at the inmate.

20   Q.    Did the dog move closer to the inmate?

21   A.    Yes, sir.

22   Q.    Is that when you moved to the other side of the

23   inmate?

24   A.    Yes, sir.

25   Q.    Why is the dog barking at the inmate?
```

1    A.    Couldn't tell you, sir.

2    Q.    Did you hear any orders or instructions about the

3    dog barking?

4    A.    No, sir.

5    Q.    Did you see any reason at that time, based on

6    your training, for the dog to engage with the inmate?

7    A.    No, sir.

8    Q.    Were you frightened?

9    A.    Yes, sir.

10   Q.    Of what?

11   A.    A dog.

12   Q.    Why?

13   A.    Because he's bit several other deputies.

14   Q.    Were you worried that dog was going to bite that

15   inmate?

16   A.    Bite the inmate or bite me.

17   Q.    Did you say anything to the sheriff about, *this*

18   *doesn't need this, sheriff; this guy's under control*?

19   A.    No, sir.

20   Q.    Could you tell what the purpose of the dog being

21   by that inmate was?

22   A.    Terrorize him.

23   Q.    Did that trouble you?

24   A.    Yes, sir.

25   Q.    Why didn't you object?

1   A.    It wasn't my place.

2   Q.    Why wasn't it your place --

3   A.    Because the sheriff is in charge.

4   Q.    But you are a sworn law enforcement officer;

5   right?

6   A.    Yes, sir.

7   Q.    Weren't you trained to take care and -- of the

8   people within your custody and control?

9   A.    Yes, sir.

10  Q.    Why not say something to Louis Ackal that you

11  were troubled by the conduct of the dog?

12  A.    Because he didn't care what you said.  He's in

13  charge.

14  Q.    Did you have that experience with him in the

15  past?

16  A.    Yes, sir.

17  Q.    Is there another dog in that yard now?

18  A.    Yes, sir.

19        THE COURT:  Mr. Blumberg, would you mind

20  getting a little closer to the mic.

21        MR. BLUMBERG:  I'm sorry, Your Honor, yes.

22  BY MR. BLUMBERG:

23  Q.    There is another dog in the yard?

24  A.    Yes, sir.

25  Q.    Okay.

1           MR. BLUMBERG:  Steven, you can stop that,

2      please, and let's go to the clip 3 that we talked

3      about.

4      BY MR. BLUMBERG:

5      Q.    I'm going to show you another portion of what has

6      been previously admitted as Government's Exhibit

7      Number 9, Mr. Segura, and ask whether you see that same

8      inmate at some point getting strip searched.  Okay.

9      You tell me when.

10          Do you see yourself in the video?

11     A.    Yes.

12     Q.    And I'm looking at a time stamp on clip number 3

13     at 17, 18 seconds.  Where are you?

14     A.    I am at the bottom right-hand corner.  I just

15     told him to get up to go get strip searched.

16     Q.    Same inmate who was terrorized by the dog?

17     A.    Correct.

18     Q.    Any issues about him complying?

19     A.    No, sir.

20     Q.    Did you even follow him?

21     A.    No, sir.

22     Q.    Once he's strip searched, what's the significance

23     for officers?  Any concerns about weapons once he's

24     strip searched?

25     A.    Not once he's strip searched, no.

1   Q.    Okay, thank you.  I'm done with the video.  You

2   can turn the lights on.  Thank you.

3          Was that the last time you had seen Louis

4   Ackal in the jail that day?

5   A.    No, sir.

6   Q.    By the way, there was another man in there.  Did

7   you see a man named Richard Hazelwood?

8   A.    Yes, sir.

9   Q.    What rank did he have at the time in the Iberia

10  Parish Sheriff's Office?

11  A.    I'm not a hundred percent sure.  I think he was a

12  captain.

13  Q.    Was he a senior --

14  A.    Yes, sir.

15  Q.    Was he deferring to Louis Ackal?  Who was in

16  charge between the two of them?

17  A.    Louis.

18  Q.    All right.  Now, had you heard Louis Ackal use

19  slurs like that before toward African-American people

20  in his custody?

21  A.    Yes, sir.

22  Q.    What was the impact of hearing that on you?

23  A.    Sometimes it was, I guess, racist, derogatory

24  towards me.  I don't -- not all people are bad.

25  Q.    Did it give you a sense of what -- of how he felt

1  about the people that were in his custody who were

2  African-American?

3           MR. MCLINDON:  Objection, Your Honor.  That

4  calls for speculation.

5           THE COURT:  Sustained.

6  BY MR. BLUMBERG:

7  Q.   What were the contexts in which you heard him say

8  those things?

9  A.   Whenever there was an ongoing problem.

10 Q.   Give me an example.

11 A.   We had a deputy that got runned [sic] over by a

12 car one day and drug, and we got in a foot pursuit of

13 the suspect and --

14          THE COURT:  You had a deputy?

15          THE WITNESS:  There was a deputy that got

16 runned [sic] over by a vehicle, and we chased the

17 suspect.  Once we caught the suspect and he was in

18 handcuffs, he was brought back to a unit.  And there

19 was a crowd of people around the car and the sheriff

20 was so upset at what happened that he turned around and

21 he said, *all you fucking niggers belong in cages*.  And

22 somebody said *what*?  And he says, *all you animals*

23 *belong in cages*.

24          And a short time after that, I guess a month

25 or two months later, the -- what we call the J-pod in

1    the jail was painted pink.

2    BY MR. BLUMBERG:

3    Q.    What was the purpose of painting a jail pod pink?

4    A.    They said the pink color would calm people down.

5    Q.    Okay.  Was there another incident in which he

6    used those slurs that had a significant impact on you?

7    A.    Yes, sir.

8    Q.    Something about a helicopter ride?

9    A.    Yes, sir.

10   Q.    Why don't you describe for the members of the

11   Jury what impact that had on you and what the

12   circumstances were?

13   A.    We had a manhunt for a suspect that we were

14   chasing by the name of Paul Collins.  I was chosen to

15   ride in the helicopter in the air to do the aerial

16   search for the suspect.  When I got in the helicopter,

17   Louis -- Sheriff Ackal approached me, grabbed me by the

18   back of my head and leaned in toward me and told me, *if*

19   *I seen that fucking nigger, he doesn't come out the*

20   *woods alive*.

21   Q.    What did you understand that to mean?

22   A.    Kill him.

23   Q.    In a legal way?

24   A.    No, sir.

25   Q.    Was that upsetting to you at the time?

```
 1   A.    Yes, sir.

 2   Q.    Did you complain about it to anybody?

 3   A.    Yes, sir.

 4   Q.    Who did you complain about it to?

 5   A.    Bert Berry.

 6   Q.    Who was Bert Berry at the time in the IPSO?

 7   A.    He was the major or the chief.

 8   Q.    What was Bert Berry's response?

 9   A.    Mind your fucking business.  I'll take care of

10   it.

11   Q.    Did you tell the sheriff that you thought that

12   killing somebody from a helicopter would be an

13   excessive use of force?

14   A.    No, sir.

15   Q.    Why not?

16   A.    I was scared.

17   Q.    Scared of who?

18   A.    The sheriff.

19   Q.    Why?

20   A.    Because if you order -- if you ordering me to

21   take someone else's life, then how do I know he's not

22   going to do the same thing to me?

23   Q.    The rec yard was not the last time you saw Louis

24   Ackal on April 29th, 2011, was it?

25   A.    No, sir.
```

1  Q.    Did you overhear a conversation between him and

2  other staff later on that day?

3  A.    Yes, sir.

4  Q.    Describe for members of the Jury what

5  conversation you heard.

6  A.    I was in the hall by the H-pods and there was a

7  conversation going on, there was about 20 to 30 people,

8  and I overheard the Warden, Wesley Hayes, say there's

9  no cameras in the chapel.

10  Q.    Was the sheriff present during the course of that

11  conversation?

12  A.    Yes.

13  Q.    What did you understand that conversation to

14  mean?

15         MR. MCLINDON:  Objection.  Calls for

16  speculation.  He's asking him what did he --

17         THE COURT:  I'm going to permit the answer.

18  BY MR. BLUMBERG:

19  Q.    What did you understand that conversation, that

20  comment to mean between Wesley Hayes, the Warden, and

21  Louis Ackal?

22  A.    That there was no cameras; that whatever would

23  happen, you can do whatever in the chapel.

24  Q.    Do you know what was intended at the time?

25  A.    No, sir.

1    Q.    Did you later come to find out or at least

2    believe you know what happened at the time?

3    A.    Yes, sir.

4    Q.    How did that take place?

5    A.    Later on during the day, myself and 20 or 30

6    other deputies were standing by the office, which is

7    called the central control center of the jail.

8    Q.    Let me stop you for one second.

9          MR. BLUMBERG:  And, Steven, if you could

10   bring up Exhibit Number 1 again, please?

11   BY MR. BLUMBERG:

12   Q.    Just directing your attention to Government's

13   Exhibit Number 1, you see in this almost dead center of

14   the diagram there is a yellow outline of a shape.

15         Is that the central control unit?

16   A.    To the left of the yellow block.

17   Q.    Yes.

18   A.    Yes, sir, that's central.

19   Q.    And the yellow block is what?

20   A.    The chapel.

21   Q.    Describe for the members of the Jury where you

22   were standing at the time that you were about to

23   describe.

24   A.    By the yellow outline to the left of the yellow

25   block.

Q.    Okay.  And it's marked *central command* on the --

A.    Yes.

Q.    -- the control center?

A.    Yes, sir.

Q.    Describe for the Jury what you saw and heard.

A.    I was standing in the hall and a deputy came out
by the name of Ben Lassalle, and stated that he needed
an inmate to clean up some blood, and somebody asked
why, and then --

Q.    Excuse me.  Where did he come out from?

A.    The chapel.

Q.    Could you see the chapel from the central command
unit?

A.    Yes.

Q.    Approximately how far is it?

A.    25, 30 feet.

Q.    Okay.  Do you know Ben Lassalle?

A.    Yes, sir.

Q.    What was Ben Lassalle's reputation in the
department?

A.    Being a rough, tough suspect.  He was narcotics
agent and he was known to do things that -- beat up
people.

Q.    Did he explain why he needed an inmate to clean
up the blood in the chapel?

```
 1   A.    He stated that someone got their issue.

 2   Q.    What does that mean to you?

 3   A.    It means somebody just got their ass kicked.

 4   Q.    Is that phrase someone got their issue or their

 5   issue a common phrase in the IPSO?

 6   A.    Yes, sir.

 7   Q.    Is it commonly understood to mean somebody got

 8   their ass kicked?

 9   A.    Yes, sir.

10   Q.    Have you heard it before?

11   A.    Yes, sir.

12   Q.    Have you heard it from narcotics agents before?

13   A.    Yes, sir.

14   Q.    Do you have any doubt in your mind what is meant

15   by that phrase?

16   A.    No, sir.

17         THE COURT:  Just to avoid confusion, IPSO is

18   the Iberia Parish Sheriff's Office.

19         MR. BLUMBERG:  Thank you, sir.

20   MR. BLUMBERG:

21   Q.    What was your reaction to hearing that comment?

22   A.    Oh, shit.

23   Q.    Why?

24   A.    Why would you bring somebody in the jail and beat

25   them up for unknown reasons?
```

1   Q.   What was the reaction of the people around you?

2   A.   *Oh, shit.*

3   Q.   Did people actually say that out loud?

4   A.   Pretty much, yes, sir.

5   Q.   Did you run to find the sheriff to explain to him

6   what Ben Lassalle just said?

7   A.   No, sir.

8   Q.   Why not?

9   A.   The sheriff was in there.

10  Q.   How do you know?

11  A.   I seen him coming out.

12  Q.   Describe for the members of the jury who came out

13  of that chapel behind Ben Lassalle.

14  A.   Sheriff Ackal, Gerald Savoy, Bret Broussard, Ben

15  Lassalle, Jason Comeaux; and then I seen Robert Burns

16  go in and out.

17  Q.   Do you have any doubt that whatever happened in

18  that chapel, that Louis Ackal saw it?

19  A.   Yes, sir.

20  Q.   You have a doubt?

21  A.   No, sir.

22  Q.   Why didn't you run to tell Louis Ackal about what

23  Ben Lassalle just said?

24  A.   Because he came out of the room, and the

25  sheriff's in charge.  And if you went against or said

1    anything against narcotics, you got retaliated against.

2    Q.    What do you mean *you got retaliated against*?

3    A.    Um, they would either write you up for not

4    minding your business, or down the road, they would

5    move you off your shift and just make things bad for

6    you.

7    Q.    Now, Mr. Segura, this is not the first time

8    you've talked about these matters in front of members

9    of the federal government, have you?

10   A.    No, sir.

11   Q.    Were you always honest about these topics?

12   A.    No, sir.

13   Q.    Have you always explained what you heard about

14   Ben Lassalle saying somebody got their issue and Louis

15   Ackal coming out of that chapel behind him?

16   A.    No, sir.

17   Q.    Why not?

18   A.    Because I was scared.

19   Q.    Scared of what?

20   A.    Sheriff Ackal and his -- his group.

21   Q.    Mr. Segura, you're a sworn law enforcement

22   officer; right?

23   A.    Yes, sir.

24   Q.    Do you carry a gun?

25   A.    Yes, sir.

```
 1    Q.    Do you carry other weapons?

 2    A.    Yes, sir.

 3    Q.    Do you have access to the FBI?

 4    A.    Yes, sir.

 5    Q.    The U.S. Attorney's Office?

 6    A.    Yes, sir.

 7    Q.    Lawyers?

 8    A.    Yes, sir.

 9    Q.    Courts?

10    A.    Yes, sir.

11    Q.    Why didn't you just go and tell one of those

12    agencies that there were problems in the Iberia Parish

13    Sheriff's Office that started with Louis Ackal?

14    A.    I was afraid for my life.

15    Q.    Why would you think that other law enforcement

16    officers would harm you?

17    A.    Because they've harmed other people.  I was

18    afraid for the comments that were made to me before.

19    And if you're ordering -- if you're ordering me to kill

20    somebody, how do I know you're not ordering somebody to

21    do the same thing to me?  Or if you send a deputy to

22    somebody's house to beat them up and put charges on

23    them, false charges, how do I know he's not going to do

24    the same thing to me?

25              MR. BLUMBERG:  That's all the questions I
```

```
 1    have for Mr. Segura, Your Honor.
 2              THE COURT:  Your witness, Counselor.
 3                       CROSS-EXAMINATION
 4    BY MR. MCLINDON:
 5    Q.    Mr. Segura, you first spoke to the FBI in
 6    November of 2015; is that correct?
 7    A.    I'm not sure if it was November or October.
 8    Q.    It was sometime in late 2015?
 9    A.    Yeah.
10    Q.    Okay.  And you were asked a lot of questions?
11    A.    That's right.
12    Q.    Is that correct?
13    A.    Yes, sir.
14    Q.    Okay.  You were told how important was to tell
15    the truth?
16    A.    Yes, sir.
17    Q.    Okay.  Were you told that it was a crime to lie
18    to the FBI?
19    A.    Yes, sir.
20    Q.    I'm sorry?
21    A.    Yes, sir.
22    Q.    Okay.  Let me ask you something about the
23    narcotics unit.  You were never on the narcotics unit?
24    A.    No, sir.
25    Q.    Okay.  Did you ever see occasions where narcotics
```

```
1    would show up at a house to carry out whatever search

2    or arrest they were going to do, but they would use the

3    IMPACT officers as security around the house?

4    A.    Correct.

5    Q.    Okay.  And what the narcotics agents would do is

6    they would never let them in the house --

7    A.    Correct.

8    Q.    -- because they didn't want them to see what they

9    were doing --

10   A.    Correct.

11   Q.    -- is that correct?

12   A.    Right.

13   Q.    You've seen that happen before?

14   A.    Yes, sir.

15   Q.    Narcotics was kind of like a special club or

16   clique, wasn't it?

17   A.    Yes, sir.

18   Q.    Okay.  Very exclusive?

19   A.    Yes, sir.

20   Q.    Very secretive?

21   A.    Yes, sir.

22   Q.    In fact, their -- their building was not anywhere

23   near where the sheriff's office was, was it?

24   A.    No, sir.

25   Q.    Did they have their own separate key to get in
```

1    their building?

2    A.    Yes, sir.

3    Q.    Did you have one of those keys?

4    A.    At one point, yes.

5    Q.    Okay.  Do most patrol officers have keys to their

6    building?

7    A.    No, sir.

8    Q.    Now, you came back and you spoke to the FBI about

9    a year later, in October of 2016 --

10   A.    Yes, sir.

11   Q.    -- is that right?

12   A.    Yes.

13   Q.    Now, did your memory get better during the year?

14   Did you do something to make your memory better about

15   what happened in the chapel and these other incidents

16   you've talked about?

17   A.    When I seen the video that I was asked about,

18   yes, sir.

19   Q.    Okay.  When did you see that video?

20   A.    The last time I went.

21   Q.    Okay.  But -- well, let me ask you some specific

22   questions.  You didn't -- you used some -- you quoted

23   some pretty foul language that you said the sheriff

24   used.  He said *fuck*.  He said *nigger* and things like

25   that.

1   A.   Yes, sir.

2   Q.   You never said that to the FBI back in November

3   of 2015, did you?

4   A.   No, sir.

5   Q.   Okay.  I mean, those are pretty shocking words.

6   That would be something that you would remember; right?

7   A.   Not necessarily.

8   Q.   Not necessarily?

9   A.   I just -- in my mind -- I tried to put it to the

10  back of my mind because I didn't want to be involved

11  with it.

12  Q.   So the sheriff of Iberia Parish said, *Put that*

13  *fucking nigger on the ground*.  And when you're

14  interviewed by the FBI, you never tell them that in

15  November of '15?

16  A.   Yes, sir.

17  Q.   And yet, a year later, somehow you remember that

18  word --

19  A.   Yes, sir.

20  Q.   -- or those phrases?

21  A.   (Nodding in the affirmative).

22  Q.   How did that happen?

23  A.   Because I was looking at the video and I

24  remembered.

25  Q.   The video triggered those graphic words for you?

1    A.    A lot of stuff, yes, sir.

2    Q.    Well, let me ask you this.  Did you talk to any

3    other officers between November of 2015 and October of

4    2016?  Any other officers.

5    A.    There's a hundred officers I speak to every day.

6    Q.    About this case.

7    A.    No, sir.

8    Q.    No one suggested that you use those phrases or

9    words?

10   A.    No, sir.

11   Q.    Did anyone from the federal government suggest

12   that you use those phrases or words?

13   A.    No, sir.

14   Q.    They just came to you?

15   A.    Yes, sir.

16   Q.    In the rec yard, you never saw Sheriff Ackal lay

17   a hand on that inmate, did you --

18   A.    No, sir.

19   Q.    -- or any inmate?

20   A.    No, sir.

21   Q.    Okay.  In the rec yard in the video we saw,

22   you're pretty much outnumbered by the inmates.  There's

23   more inmates than there are guards; right?

24   A.    Yes, sir.

25   Q.    Okay.  And that's why you have dogs there; is

```
1    that right?

2    A.    I guess so.

3    Q.    Okay.  The dog never bit anybody?

4    A.    No, sir.

5    Q.    Okay.  And this particular inmate had been

6    mouthing off and kind of causing a confrontation; is

7    that right?

8    A.    Yes, sir.

9    Q.    Okay.  And you've certainly -- you've worked in

10   the jail; right?

11   A.    Yes, sir.

12   Q.    You don't -- you need to make sure the inmates --

13   you keep them under control?

14   A.    Yes, sir.

15   Q.    I mean, because sometimes inmates will throw

16   things at you, attack you, and things like that?

17   A.    Yes, sir.

18   Q.    Okay.  And when you control -- if you let one

19   inmate know that you're controlling him, does that not

20   send a message to everyone else, all the other inmates

21   in there, that, *hey, we're not messing around here*?

22   A.    Yes, sir.

23   Q.    Okay.  And none of them are handcuffed?

24   A.    No, sir.

25   Q.    Did you tell the FBI in your first interview that
```

```
 1    you have never seen excessive force used by officers?
 2    A.    I'm not sure.
 3    Q.    Okay.  Well, is that true?  Have you ever seen
 4    excessive force used by officers?
 5    A.    Yes, sir.
 6    Q.    Okay.  Where?  In the jail?
 7    A.    Everywhere.
 8    Q.    Okay.  So when you -- well, if you told the FBI
 9    that you had not seen excessive force, were you lying
10    to the FBI?
11    A.    Yes, sir.
12    Q.    Okay.  In fact, you've pretty much admitted on
13    direct that you did lie to the FBI.
14    A.    Yes, sir.
15    Q.    Okay.  Are you being prosecuted for that?
16    A.    No, sir.
17    Q.    Do you know why?
18    A.    I have no idea.
19    Q.    And you never testified before a grand jury, did
20    you?
21    A.    No, sir.
22    Q.    Let me ask you a question.  You told a story
23    about the helicopter incident where the sheriff gave
24    you what you considered to be a kill order; is that
25    right?
```

1    A.    Yes, sir.

2    Q.    Was the guy you were chasing killed?

3    A.    No, sir.

4    Q.    Was he shot?

5    A.    No, sir.

6    Q.    He was apprehended?

7    A.    Yes, sir.

8    Q.    Okay.  That was just talk by the sheriff, tough

9    talk, wasn't it, *Get that guy*?

10   A.    I'm not sure.

11   Q.    Do you know if anybody attempted to kill that

12   guy?

13   A.    No, sir.

14   Q.    You didn't attempt to kill him?

15   A.    No, sir.

16   Q.    Okay.  So the sheriff gave you -- you're telling

17   us the sheriff gave you an order to kill this guy, but

18   you didn't do it?

19   A.    Right.

20   Q.    You never took that seriously when he said *Kill*

21   *this guy*, did you?

22   A.    Oh, I did.  It's not my place to kill an

23   innocent -- an unarmed man.

24   Q.    So the sheriff told you to kill him.  You have

25   said you took it very seriously, but you made no

```
 1    attempts to do that, and you didn't see anyone else do

 2    it?

 3    A.    No, sir.

 4    Q.    Do you know who the guy was that they were

 5    chasing?

 6    A.    Yes, sir.

 7    Q.    Who?

 8    A.    Paul Collins.

 9    Q.    Why were they chasing him?

10    A.    I think he was wanted for murder.

11    Q.    Pretty dangerous fella?

12    A.    Yes, sir.

13    Q.    You said the sheriff often comes to crime scenes,

14    doesn't he?

15    A.    Yes.

16    Q.    He's a very hands-on type of sheriff, isn't he?

17    A.    Yes, sir.

18    Q.    He doesn't just sit in his office and push paper

19    all day?

20    A.    No, sir.

21    Q.    He likes to get out there and see what his

22    deputies are doing --

23    A.    Yes, sir.

24    Q.    -- is that right?

25          He'll come at nighttime, too, won't he?
```

1   A.   Yes, sir.

2   Q.   On the incident in the -- that we saw on the

3   video, did you ever hear the sheriff say *Beat the hell*

4   *out of that guy*?

5   A.   No, sir.

6   Q.   Did you ever hear the sheriff say *Take a baton*

7   *and shove it in his mouth*?

8   A.   No, sir.

9   Q.   You heard him say *Take care of him.*  Is that what

10  you -- what did you hear the sheriff say about that

11  inmate?

12  A.   He told me to *take the fucking nigger and put him*

13  *on the ground*.

14  Q.   Okay.  That's all you ever heard?

15  A.   No, sir.  I heard him say to the guy that was on

16  the ground that *I'm in charge.  I'm the boss.  You're*

17  *going to do what I tell you to do*.

18  Q.   So you heard nothing about that inmate going to

19  the chapel or anything like that?

20  A.   No, sir.

21  Q.   Now, Mr. Segura, certainly you can use some force

22  against inmates and people; is that right?

23  A.   Yes, sir.

24  Q.   Okay.  Example:  An inmate won't get out of bed

25  during a shakedown.  You're allowed to grab him and

```
 1    pull him out of that bed; is that right?

 2    A.    Yes, sir.

 3    Q.    And if you're confronting somebody on the street,

 4    you can do a pat-down search; right?

 5    A.    Yes, sir.

 6    Q.    That's called a Terry pat-down search; is that

 7    right?

 8    A.    Yes, sir.

 9    Q.    And if there is any type of resisting or the guy

10    looks like he might be reaching for something, you can

11    grab him, twist his arm behind his back and do things

12    like that; right?

13    A.    Yes, sir.

14    Q.    So you can use some force on inmates?

15    A.    Yes, sir.

16    Q.    The guy that we saw swinging a stick, Cody

17    Vaughn, what was he saying?

18    A.    Nothing.  I wasn't paying attention, if he was.

19    Q.    Okay.  Was he using any racial slurs?

20    A.    I couldn't tell you.  I wasn't paying attention

21    to him.

22    Q.    Did you use any racial slurs?

23    A.    No, sir.

24    Q.    You do -- in the past, you have used racial

25    slurs?
```

1   A.    I probably have, yes, sir.

2   Q.    Okay.  A lot of people in Iberia Parish use

3   racial slurs?

4   A.    Yes, sir.

5   Q.    Racism is alive and well in --

6   A.    I wouldn't call it racism.  A lot of people do --

7           THE COURT:  Wait.  You can't talk over each

8   other.

9           THE WITNESS:  I'm sorry.

10  BY MR. MCLINDON:

11  Q.    My question is, would you agree that racism is

12  alive and well in Iberia Parish?

13  A.    I wouldn't say *racism*.

14  Q.    What would you call it?

15  A.    I don't know.  I wouldn't say it's racism.

16  Q.    Well, your friends use the N-word; right?

17  A.    Yes, sir.

18  Q.    Did you ever go into the chapel on the day of

19  this shakedown?

20  A.    No, sir.

21  Q.    Never?

22  A.    Never.

23  Q.    Did you ever see an inmate get struck or beat on

24  the day of that shakedown?

25  A.    No, sir.

1    Q.    You talked about the phrase *get his issue*.   Do

2    you know the name of the inmate that they were

3    referring to?

4    A.    No, sir.

5              MR. MCLINDON:   Just give me one second, Your

6    Honor.

7              THE COURT:   Yes, sir.

8              (Pause in the proceedings.)

9    BY MR. MCLINDON:

10   Q.    Officer Segura, has there -- have you ever used

11   excessive force on citizens?

12   A.    Not that I recall, no, sir.

13   Q.    That would be something that would be pretty easy

14   to recall.   You don't recall?

15   A.    (Witness nodding in the negative.)

16   Q.    Okay.

17   A.    I've arrested hundreds of people in 16 years.

18   Q.    Has anyone ever filed a complaint against you?

19   A.    I think one, maybe.

20   Q.    Okay.

21   A.    She said it was excessive force, but it really

22   wasn't.

23   Q.    It was a pregnant lady?

24   A.    No, sir.

25   Q.    Okay.   Do you remember an incident with a

1  pregnant lady?

2  A.    No, sir.

3  Q.    Okay.  The one that complained you used excessive

4  force, there was an investigation and there was a

5  finding of no excessive force?

6  A.    Correct.

7  Q.    Does that happen pretty often?

8  A.    That was my only one.

9  Q.    Okay.  Were you at the Iberia Parish Sheriff's

10  Office before Louis Ackal became sheriff?

11  A.    Yes, sir.

12  Q.    How long?

13  A.    One time in 2000, and then when the sheriff's

14  office took over the city.

15          MR. MCLINDON:  Okay.  Thank you very much.

16          THE COURT:  Redirect?

17          MR. BLUMBERG:  Yes, sir.

18                  REDIRECT EXAMINATION

19  BY MR. BLUMBERG:

20  Q.    Mr. Segura, does having an inmate beaten also

21  send a message to other inmates?

22  A.    Yes, sir.

23  Q.    What's that message?

24  A.    Don't mess around, and you won't get the same.

25  Q.    Do you know whether you're being prosecuted for

1  your false statements to the FBI?

2  A.   I have no idea.

3  Q.   Is it possible that you will be?

4  A.   Probably.

5  Q.   Is it possible that you might actually see jail

6  time as a result?

7  A.   Yes, sir.

8  Q.   Has anybody told you one way or the other what's

9  going to happen to you?

10  A.   No, sir.

11  Q.   Now, the issues about your memory versus not

12  being honest, to be honest, you consciously withheld

13  some things from these folks over here, didn't you?

14  A.   Yes, sir.

15  Q.   Why?

16  A.   Because I was scared.

17  Q.   The words Mr. McLindon asked you about, did you

18  remember those, the words that Louis Ackal said?

19  A.   Some I probably did, but most I didn't until I

20  actually started watching the video, and I could

21  remember.

22  Q.   But what you really withhheld originally was this

23  issue about getting the issue within the --

24          MR. MCLINDON:  Leading, Your Honor.

25  Objection.

```
 1              THE COURT:  Sustained.  Don't lead.

 2              MR. BLUMBERG:  Yes, sir.

 3    BY MR. BLUMBERG:

 4    Q.    What was the thing you really wanted to make sure

 5    that the FBI didn't know about when you first met with

 6    them?

 7    A.    Everything that happened because, like I said, I

 8    was afraid for my life, because he's done things and

 9    he's ordered people to do things, and I didn't know

10    what he was going to do to me if he found out that I

11    was talking to y'all.  I was let go of my job.  I

12    was -- I lost my retirement.  I stopped -- I got in an

13    accident while on duty.  Stopped paying my medical

14    bills.  Stopped paying my son's medical bills.  I lost

15    my wife.  I lost my house.  I lost my vehicles.

16    Q.    Let me stop you.  Were you worried about the

17    defendant?

18    A.    Yes, sir.

19              MR. BLUMBERG:  Thank you, sir.  That's all.

20              THE COURT:  All right.  Is the witness

21    excused?

22              MR. BLUMBERG:  From the Government's

23    perspective, Your Honor.

24              MR. MCLINDON:  Yes, Your Honor.

25              THE COURT:  You're excused, sir.  Thank you.
```

```
 1              Call your next witness.

 2              MS. BOYD:  The Government calls Aquilla

 3    Thomas to the stand.

 4              THE COURTROOM DEPUTY:  Please raise your

 5    right hand.  Do you swear that the testimony you will

 6    give in this case shall be the truth, the whole truth,

 7    and nothing but the truth, so help you God?

 8              THE WITNESS:  Yes, ma'am.

 9                      AQUILLA THOMAS,

10     first having been duly sworn by the Courtroom Deputy,

11               testifies under oath as follows:

12              THE COURTROOM DEPUTY:  Can you please spell

13    your first and last name for the Court Reporter.

14              THE WITNESS:  A-Q-U-I-L-L-A.  Last name,

15    T-H-O-M-A-S.

16              THE COURTROOM DEPUTY:  Thank you.

17                    DIRECT EXAMINATION

18    BY MS. BOYD:

19    Q.   Good morning.  You can have a seat.

20    A.   Good morning.

21    Q.   Could you please tell the jury your name?

22    A.   Aquilla Thomas.

23    Q.   How far did you go in school, Mr. Thomas?

24    A.   Fifth grade.

25    Q.   Are you trained in a trade?
```

1    A.    You could say that, yes, ma'am.

2    Q.    What trade are you trained in?

3    A.    Mechanic.

4    Q.    Where were you living on April 29th, 2011?

5    A.    I was currently incarcerated at the Iberia Parish

6    jail.

7    Q.    Were you taken to a place at the jail without

8    cameras on April 29th, 2011?

9    A.    Yes, ma'am.

10   Q.    Where was that place?

11   A.    The chapel.

12   Q.    How would you describe what happened to you in

13   the chapel that day?

14   A.    Well, it was very, very brutal and uncalled for.

15   Q.    Okay.  I want to ask you more questions about

16   that, but before I do that, I want to get some

17   information from you about how you got to the sheriff's

18   office jail.  Okay?

19   A.    Yes, ma'am.

20   Q.    On April 29th in 2011, when you were staying at

21   the jail, had you been convicted of a crime, or were

22   you waiting to go to court on a charge?

23   A.    I was waiting to go to court on a charge.

24   Q.    Were you ultimately convicted of that charge?

25   A.    No, ma'am.

```
 1    Q.    Were you ultimately convicted of a felony charge

 2    related to that?

 3    A.    Yes, ma'am.

 4    Q.    What was that felony charge?

 5    A.    It was simple criminal damage to property.

 6    Q.    When were you convicted of that charge?

 7    A.    In New Iberia.

 8    Q.    And when was that?

 9    A.    It was 2015.

10    Q.    Did you have a felony conviction prior to that

11    conviction, sir?

12    A.    Yes, ma'am.

13    Q.    What was that conviction?

14    A.    I had two, actually.  I had simple robbery and

15    second offense possession of marijuana.

16    Q.    Do you know about when those convictions were,

17    sir?

18    A.    I would say the first one was about 2007, and the

19    second was around 2009.

20    Q.    I want to turn your attention back to

21    April 29thth of 2011.  Who was in charge of the Iberia

22    Parish Sheriff's Office back in April 2011?

23    A.    Sheriff Louis Ackal.

24    Q.    Did you see or hear the defendant, Sheriff Louis

25    Ackal, at the jail on that day, April 29th, 2011?
```

A.    Yes, ma'am.

Q.    Where did you first encounter the defendant that day?

A.    On the rec yard.

          MS. BOYD:  I'm going to ask Mr. Harrell to pull up Government's Exhibit 9.  It's already been admitted.

BY MS. BOYD:

Q.    Mr. Thomas, do you recognize the place that's depicted in Government's Exhibit 9?

A.    Yes, ma'am.

Q.    Where is that?

A.    That's the rec yard.

Q.    Is that the rec yard where you saw the defendant?

A.    Yes, ma'am.

Q.    What rec yard does this pertain to?

A.    The K pods.

Q.    And were you housed in the K pod back on April 29th?

A.    Yes, ma'am.

Q.    What pod were you housed in?

A.    K4.

Q.    Were you eventually brought on to this rec yard that's depicted here?

A.    Yes, ma'am.

```
 1   Q.    Okay.  I want you to make sure you identify

 2   yourself when you come into the video.  And if there

 3   are other inmates that you recognize, can you identify

 4   them as well?

 5   A.    Yes, ma'am.

 6             MR. BLUMBERG:  Can we play it?

 7             MS. BOYD:  Can we play it, Mr. Harrell?

 8             (Video playing.)

 9   BY MS. BOYD:

10   Q.    Do you recognize any of those folks that are just

11   being brought in?

12   A.    Yes, ma'am.

13   Q.    Okay.

14             MS. BOYD:  Can you pause it, Mr. Harrell?

15   BY MS. BOYD:

16   Q.    Who did you recognize that was brought on to the

17   yard there?

18   A.    Him and him.

19   Q.    Okay.  The first person that you circled there,

20   who are you circling?  The officer or the inmate?

21   A.    The inmate.

22   Q.    Okay.  Who was that inmate, the first person that

23   you circled?

24   A.    That's myself.

25   Q.    The first one that you circled?
```

1    A.     No.   The first one is Scotty Spears.

2    Q.     Okay.   Is that the white inmate that you circled

3    on this video?

4    A.     Yes, ma'am, that's another inmate.

5    Q.     And the second person that you circled?

6    A.     That's myself.

7              MS. BOYD:   Can you continue to play,

8    Mr. Harrell?

9    BY MS. BOYD:

10   Q.     What was happening at the jail that day?   Why

11   were you being brought on to the rec yard?

12   A.     They had a shakedown.

13   Q.     Okay.   And what happens when the officers come

14   and shake down normally?

15   A.     They take everybody out the dorm, you know, go

16   search through the dorm and things like that.   And

17   after they finish searching, they put you back in the

18   dorm.

19   Q.     Was this the normal position that you would be

20   put in when a shakedown was occurring at the jail?

21   A.     No, ma'am.

22   Q.     How would you normally be handled during a

23   shakedown?

24   A.     You normally stand up against the wall or

25   something like that.

```
 1   Q.    Can you describe the position that you were put

 2   in on that day that's being depicted in the video?

 3   A.    It was painful for so many hours standing like

 4   that, you can't put your hands down.  You put your

 5   hands down -- they clearly say if you put your hands

 6   down, then there is going to be trouble.

 7   Q.    Okay.  So how were you positioned there?

 8   A.    On my knees, with my hands behind my head.

 9   Q.    Did you know those officers who were in the rec

10   yard with you?

11   A.    No, ma'am.

12   Q.    Did you know what kind of officers they were?

13   A.    Yes, ma'am.

14   Q.    What type of officer?

15   A.    IMPACT.

16   Q.    Did you know who the IMPACT officers were at the

17   time?

18   A.    Yes, ma'am.

19   Q.    What -- how did you know them?

20   A.    The street cops.

21   Q.    Can you describe what kind of officer just came

22   on to the rec yard at about two minutes and 22 seconds?

23   A.    The K-9 unit.

24   Q.    Was that normal to be present during the

25   shakedowns?
```

1    A.    Yes, ma'am.

2    Q.    Were those officers saying anything to you as

3    you-all were kneeling there?

4    A.    No, ma'am.

5    Q.    You identified an inmate by the name of Scott

6    Spears.  How did you know him?

7    A.    He was in the same pod with me, and we was close

8    friends.

9    Q.    Is there going to be another inmate who is going

10   to come on to the rec yard whom you recognize from your

11   pod as well?

12   A.    Yes, ma'am.

13   Q.    Okay.  When he walks on to the rec yard, would

14   you please let us know and I'll ask Mr. Harrell to

15   pause it?

16   A.    Yes, ma'am.  He's right there.

17   Q.    Okay.

18         MS. BOYD:  Mr. Harrell, will you pause?

19         (Pause in the proceedings.)

20   BY MS. BOYD:

21   Q.    Will you circle the inmate that you recognize

22   that's been walked on?

23   A.    (Witness complied.)

24   Q.    Okay.  Who was that inmate?

25   A.    Curtis Ozenne.

```
 1    Q.    How did you know Mr. Ozenne?

 2    A.    We had close friends as well, and we was in the

 3    same pod.

 4              MS. BOYD:  Mr. Harrell, will you advance the

 5    video to about five minutes?

 6              (Pause in the proceedings.)

 7              MS. BOYD:  Can you advance it to five minutes

 8    on the bottom counter, Mr. Harrell?  Okay.  Thank you.

 9              (Video playing.)

10    BY MS. BOYD:

11    Q.    Mr. Thomas, can you identify who has just come on

12    to the rec yard in the blue cap and the blue shirt?

13    A.    Sheriff Louis Ackal.

14    Q.    When you were on the rec yard that day, how did

15    you know that he came on to the rec yard?

16    A.    I know his voice.

17    Q.    Was he talking to you?

18    A.    No.  He was talking to all of us.

19    Q.    What was he saying?

20    A.    He clearly said *you motherfuckers going to make*

21    *me get out of my bed to come see about you*

22    *motherfuckers, you motherfucking low lifes.  You going*

23    *to make me* --

24    Q.    What else did the sheriff say?

25    A.    That's about it.  That's what I remember clearly.
```

Q.    Did he refer to you or to any of the other
inmates with any other names?

A.    Yeah.  *Niggers*.

Q.    Was there a certain time that a particular inmate
caught the defendant's attention on the rec yard?

A.    Yes, ma'am.

Q.    Can you describe for the jury what happened?

A.    When he came -- when he was coming on the rec
yard, one of the deputies pointed to him and let him
know that's the guy who said whatever he said.  And
that's when his attention went on that fellow right
there.

Q.    And who was the fellow that caught the
defendant's attention?

A.    Curtis Ozenne.

Q.    Do you know what the defendant and that officer
were talking about in terms of the comments?

A.    No, ma'am.

Q.    Had there been any comments that you heard
Mr. Ozenne make that day?

A.    Not pretty sure.

Q.    Was there ever any comments that you heard
Mr. Ozenne make prior to going on to the rec yard?

A.    Yes, ma'am.

Q.    Can you tell the Jury what happened?

```
1    A.    Prior to coming out to the rec yard, they led us

2    into the hallway procedures, and prior to that,

3    Mr. Ozenne told him suck his motherfucking dick.

4    Q.    Who did Mr. Ozenne direct that comment towards?

5    A.    He was just speaking in general.

6    Q.    Okay.  So what happened when you got on to the

7    rec yard in relation to those comments?

8    A.    They put everybody in formation and when -- they

9    waited until the sheriff came and they directed the

10   sheriff to Mr. Ozenne.

11   Q.    Okay.  And when the sheriff was directed to

12   Mr. Ozenne, what happened?

13   A.    He basically said that he was going to deal with

14   him and he said a lot of stuff after that and after he

15   left, they dealt with him.

16   Q.    Okay.  So can you describe for the Jury what the

17   sheriff said when he approached Mr. Ozenne on the rec

18   yard?

19   A.    I'm not too sure.  I'm not too sure.

20   Q.    Okay.  Mr. Thomas, is it -- how do you feel

21   coming in here to testify today?

22   A.    A little -- I would say a little shaky, a little

23   scared a little bit.

24   Q.    What are you shaking or scared about?

25   A.    Because I live around Iberia, the parish, and who
```

1    is to say the sheriff don't have connections because

2    he's a big figure and I can be messed with or anything

3    like that.

4    Q.    So is that bothering you as you sit here

5    testifying today?

6    A.    Yes, ma'am.

7    Q.    Okay.  We've spoken about this day on the rec

8    yard before, haven't we?

9    A.    Yes, ma'am.

10   Q.    And we've talked about specifically what the

11   sheriff said in relation to Mr. Ozenne, didn't we?

12   A.    Yes, ma'am.

13   Q.    Okay.  What did the sheriff say to Mr. Ozenne on

14   the rec yard?

15   A.    *Bring his motherfucking ass to the chapel.*

16   Q.    Did you hear the defendant say that?

17   A.    I heard him say that.

18   Q.    Did you see what happened to Mr. Ozenne or where

19   Mr. Ozenne went after the sheriff said that?

20   A.    No, ma'am.

21   Q.    Do you know about how long you were on the rec

22   yard that day?

23   A.    Not really, but the -- was daylight and after we

24   was leaving, it was starting to get dark.

25   Q.    Now, where were you taken when you left the rec

1    yard?

2    A.    Back to the pod.

3    Q.    When you got back to the pod, did you have an

4    occasion to see Mr. Ozenne again?

5    A.    When he was -- it's in the pod again.

6    Q.    Okay.  Had he gone back to the pod with you from

7    the rec yard?

8    A.    No, ma'am.

9    Q.    When Mr. Ozenne came back to the pod, who was he

10   with?

11   A.    He was with the deputy.

12   Q.    And what was happening between Mr. Ozenne and the

13   deputy when they came back to your pod?

14   A.    The deputy was pointing out people and asking

15   Mr. Ozenne, *is that -- is he the one?  Is he the one*?

16   *Is he the one*?  And as he was asking, he pointed to

17   Mr. Spears, and Mr. Ozenne said, *yes, that's the one.*

18   Q.    So Mr. Ozenne identified for the guard who

19   Mr. Spears was?

20   A.    Yes, ma'am.

21   Q.    What was Mr. Ozenne's condition when he came back

22   to the pod?

23   A.    He was severely bruised.

24   Q.    Did you see his bruises?

25   A.    Yes, ma'am.

Q.    Where were they?

A.    On his upper arm and on his upper thigh.

Q.    When Mr. Ozenne identified Mr. Spears in the pod, what happened with Mr. Spears?

A.    He took Mr. Spears out.

Q.    Did you see Mr. Spears come back to the pod that day?

A.    Yes, ma'am.

Q.    What was Mr. Spears's condition when he came back to the pod?

A.    He was, as well, severely bruised.

Q.    What happened when Mr. Spears got back to the pod?

A.    When he got back, they called my name, calling me out.

Q.    And what happened?

A.    They took me to the chapel.  And when I got in the chapel -- before I went to the chapel, they placed fisticuffs on me.  And I went to the chapel and they placed me on my knees, told me to get on my knees and started talking to me aggressively, cursing me out and asking was it me who told this deputy to suck my dick. And I'm telling him, *no, it wasn't me.  It wasn't me.* And he asked me that about two times.

          And the third time while he was asking me,

1    until the third time, the deputy on this side struck me

2    with a baton.  And after that he asked me about two

3    more times and then he struck me again; and he asked me

4    about two more, three more times and then he struck me

5    again.

6    Q.   Okay.  I want to back up to when you first were

7    brought to the chapel.  Who was it that took you to the

8    chapel?  Did you know that officer?

9    A.   No, ma'am.

10   Q.   Was there anyone else with him?

11   A.   No, ma'am.  Just him.

12   Q.   When you got to the chapel, who was inside the

13   chapel?

14   A.   I recognized just one of the officers, and that

15   was Jason Comeaux.  And they had the K-9-unit, he was

16   at the back over here in the chapel; and they had two

17   over here; and they had the one who had the baton that

18   was striking me over here; and they had the one who was

19   saying everything on my left side.

20   Q.   Okay.

21          MS. BOYD:  Mr. Harrell, can you pull up

22   Government's Exhibit 10?

23   BY MS. BOYD:

24   Q.   Mr. Thomas, can you identify what Government's

25   Exhibit 10 is?

1    A.    The chapel.

2    Q.    Is that how it appeared when you were brought

3    there that day?

4    A.    No, ma'am.

5    Q.    What's different about it?

6    A.    It didn't have the table and the TV right there.

7    Q.    Okay.

8          MS. BOYD:  Mr. Harrell, are you able to turn

9    it to the corner slightly and zoom out?  Thank you.

10   BY MS. BOYD:

11   Q.    When you were brought into the chapel by that

12   officer, where were you taken?

13   A.    I was by the pulpit.  The pulpit.  But it wasn't

14   there.  It was on the other side.

15   Q.    Okay.

16          MS. BOYD:  Mr. Harrell, can you turn

17   slightly?  And are you able to zoom out one?

18   BY MS. BOYD:

19   Q.    Okay.  So you said you were by the pulpit.  Where

20   was the pulpit positioned when you were brought in?

21   A.    It was in the corner right there.

22   Q.    Okay.  And you've made a mark there where it was

23   in that corner?

24   A.    Yes, ma'am.

25   Q.    Okay.  When you were brought into the chapel, you

1   said you could identify one officer; is that right?

2   A.   Yes, ma'am.

3   Q.   That was Jason Comeaux?

4   A.   Yes, ma'am.

5   Q.   Where was Jason Comeaux in the chapel?

6   A.   He was sitting on the second -- the second stool,

7   whatever, he was sitting there.

8            MS. BOYD:  Okay.  Mr. Harrell, if you could

9   turn it sideways to display the pews.

10  BY MS. BOYD:

11  Q.   Okay.  So he was sitting on one of those pews?

12  A.   He was sitting about right here.

13  Q.   Okay.  And who else did you see in the chapel?

14  A.   Had the K-9-unit and it had two other deputies.

15  Q.   Two other deputies?

16  A.   That were sitting on the pews, and they had a

17  deputy right here that struck me with the baton, and I

18  was about right here and they had a deputy about right

19  here.

20  Q.   Okay.  So there was a deputy on either side of

21  you?

22  A.   Yes, ma'am.

23  Q.   All right.  What happened when you were initially

24  brought into the chapel and placed on your knees?

25  A.   He started talking to me, but not normally just

1    talking, talking aggressively, talking and cursing me

2    out and asking me if I told his deputies to suck my

3    dick.  And I told him, *no, it wasn't me*.  And I'm

4    actually pleading with him and I'm telling him it

5    wasn't me because I know it wasn't me.  I didn't say

6    anything.  So the reason he was hitting me was -- I

7    didn't understand that.

8           So as he asking me prior to going in the

9    third time, the deputy on this side, he struck me with

10   the baton, and that was -- it was very, very painful

11   and it was mentally painful because I didn't understand

12   how people that are supposed to protect and serve is

13   abusing us like this.

14   Q.   Okay.  Can you describe where it was that he hit

15   you with the baton?

16   A.   On my upper thigh.

17   Q.   Did you react to it in any way, make any noises?

18   A.   Yes, ma'am.

19   Q.   What kind of noise did you make?

20   A.   A big gash (ph), like *huh*.  But it was louder

21   than that.

22   Q.   Okay.  And what did the deputy do in response to

23   your responding in that way and yelling out?

24   A.   Showed no remorse whatsoever.  Just kept saying

25   what he was saying, cursing me out and asking me did I

1    tell his deputies to suck my dick.

2    Q.    At the time that the deputy struck you, were you

3    restrained in any way?

4    A.    Yes, ma'am.

5    Q.    How were you restrained?

6    A.    I had my hands behind my back in flexicuffs.

7    Q.    Could you defend yourself in any way?

8    A.    No, ma'am.

9    Q.    Protect yourself?

10   A.    No, ma'am.

11   Q.    Did you ever try to strike or grab or harm any of

12   the deputies in the chapel?

13   A.    No, ma'am.

14   Q.    Did anyone in the chapel try to stop the deputy

15   from hitting you with a baton?

16   A.    No, ma'am.

17   Q.    So after the officer struck you the first time,

18   what happened?

19   A.    He started asking me again the same questions.

20   And about the second time he asked me, he struck me

21   again and he started asking me the same questions

22   again.   And about the second or third time, he struck

23   me.

24   Q.    And where were those second and third strikes?

25   A.    The same spot.

Q.    How did it ultimately end?

A.    After they finished doing what they was doing, told me get my fucking ass up, brought me back to the dorm and led me in the dorm and that was it.

Q.    Did you have any physical injuries based on what happened to you in the chapel?

A.    Yes, ma'am.

Q.    What type of injuries did you have?

A.    I had severely bruising.

Q.    How long did your injuries last?

A.    About a week.

Q.    Did you have any difficult -- any difficulty moving after that?

A.    Yes, ma'am.  I had to -- when I went in the dorm, one of my fellow inmates helped me in the rack.  I had the top rack, and he helped me in the rack.  And at certain point in times in the morning and stuff like that, my leg would be hurting very bad, so they'd get my chow and things like that.  So they was looking out for me.

Q.    Did you ever get medical attention for your injuries?

A.    Yes, ma'am.

Q.    When was that?

A.    The next day.

Q.    What type of medical treatment did you get?

A.    They looked at it and gave me some IBUs.

Q.    Okay.  *IBUs*, is that Ibuprofen?

A.    Ibuprofen.  Yes, ma'am.

Q.    Okay.  Did you ever file a grievance related to what happened to you?

A.    No, ma'am.

Q.    Did you ever report it to somebody at the jail to tell someone what happened to you?

A.    No, ma'am.

Q.    Why not?

A.    Because I didn't want to make my stay there more worse than it already was.  And they doing this to me, and I go and tell on them and say anything about it, my stay there is going to be very, very tragic.  So I didn't want to make matters worse than they already was for myself.

Q.    Did you think about telling the sheriff and reporting to him what happened to you?

A.    No, ma'am.

Q.    Why not?

A.    Because it wasn't going to do no good.  I figured, okay, if he's not showing no remorse here and doing this right here, what good is it going to do even telling him or showing him some type of concerns?

1    Because he wasn't showing any.

2              MS. BOYD:  Thank you, Mr. Thomas.  No further

3    questions.

4              THE COURT:  Your witness, Counselor.

5              MR. MCLINDON:  Thank you, Your Honor.

6                        CROSS-EXAMINATION

7    BY MR. MCLINDON:

8    Q.    Good morning, Mr. Thomas.

9    A.    Good morning.

10   Q.    Let me back up a little bit.  On the day of the

11   shakedown, earlier that day you got in a fight; is that

12   right, with Jason Daye [sic]?

13   A.    No, sir.

14   Q.    Anthony Daye?

15   A.    I don't recall.

16   Q.    What about the day -- do you remember getting in

17   a fight with Anthony Daye?

18   A.    I don't know who that is.

19   Q.    Okay.  You don't -- you have no recollection of

20   getting in a fight while in the pod on the day of the

21   shakedown?

22   A.    No, sir.

23   Q.    Okay.  On the day of the shakedown, isn't it true

24   that a lot of the inmates kind of were resisting or

25   barricading the door or refusing to cooperate?

```
 1   A.    No, sir.

 2   Q.    You have no recollection of that at all?

 3   A.    No, sir.

 4   Q.    Do you know why so many deputy sheriffs were

 5   brought out to the jail for a shakedown?

 6   A.    No, sir.

 7   Q.    It was more than usual; right?

 8   A.    Yes, sir.

 9   Q.    Okay.  You don't know why?

10   A.    No, sir.

11   Q.    You have no information about any of the inmates

12   causing an uproar or anything like that?

13         MS. BOYD:  Objection, Your Honor.  Asked and

14   answered.

15   BY MR. MCLINDON:

16   Q.    You don't know anything about it?

17         THE COURT:  You may answer it.

18         THE WITNESS:  No, sir.

19         THE COURT:  And then let's move on.

20   BY MR. MCLINDON:

21   Q.    So let me ask you about -- you are good friends

22   with Curtis Ozenne?

23   A.    Yes, sir.

24   Q.    Are you good friends with Scott Spears, too?

25   A.    Yes, sir.
```

```
 1    Q.    Are you good friends with him outside of jail or
 2    inside of jail?
 3    A.    Inside.
 4    Q.    Inside.  Do you all remain friends today?
 5    A.    I never talked to him later.
 6          THE COURT:  I'm sorry.  I didn't understand
 7    you.
 8          THE WITNESS:  I never talked to him later.
 9    BY MR. MCLINDON:
10    Q.    What about Mr. Ozenne?
11    A.    No, sir.
12    Q.    Now, let's talk about the ugly comment that was
13    made by Mr. Ozenne.  If I understood, what you said was
14    it was while they're in the hallway walking to the rec
15    yard.
16    A.    Yes, sir.
17    Q.    And he said something about suck my whatever;
18    right?
19    A.    Yes, sir.
20    Q.    Okay.  And then he's taken into the rec yard; is
21    that right?
22    A.    Yes, sir.
23    Q.    And then you come in a little bit after him?
24    A.    No.
25    Q.    You were already there?
```

```
 1    A.    I came in before him.

 2    Q.    Okay.  So you're there before him.  And then did

 3    you say that the sheriff then said something to Curtis

 4    Ozenne?

 5    A.    Yes, sir.

 6    Q.    And -- but at that point, Curtis didn't make any

 7    ugly remarks back to the sheriff, did he?

 8    A.    No, sir.

 9    Q.    He did everything out in the hallway?

10    A.    Yes, sir.

11    Q.    They weren't jawing back and forth then, were

12    they?

13    A.    No, sir.

14    Q.    Did you hear the sheriff -- I want to make sure I

15    heard.  You heard the sheriff say, Take him to the

16    chapel?

17    A.    Yes, sir.

18    Q.    Let me ask you about -- now, kind of separate and

19    apart from that, after that incident, you go back to

20    your pod; right?

21    A.    Yes, sir.

22    Q.    And then sometime later a guard shows up with

23    Curtis Ozenne?

24    A.    Yes, sir.

25    Q.    Okay.  What is the time gap between when you left
```

```
1    that rec yard and when you saw that guard with Curtis
2    Ozenne in your pod?
3    A.   He was gone a good -- a pretty good minute.
4    Q.   A minute?
5    A.   Yes, sir.
6    Q.   So let me see if I got this right.  We saw the
7    video of the rec yard.
8    A.   Um-hum.
9    Q.   You're all on your knees; right?
10   A.   Um-hum.
11   Q.   They do a strip search.  And then you go back --
12   well, let me ask you this.  Curtis Ozenne left the rec
13   yard while you're still in there; right?
14   A.   No, sir.
15   Q.   He's still there?
16   A.   Um-hum.
17   Q.   You leave?
18   A.   Um-hum.
19   Q.   You go back to the pod?
20   A.   Um-hum.
21   Q.   And within a minute, a couple of minutes, you
22   said?
23   A.   No.  I was paraphrasing.
24   Q.   All right.  Well, give me -- give me an estimate.
25   A.   I would say about 30 to 35 minutes.
```

```
 1   Q.    But what was the one minute?  I didn't understand
 2   that.
 3   A.    I was paraphrasing.
 4   Q.    What does that mean?
 5   A.    A minute, yes.
 6   Q.    Oh, okay.  So it was about 30 minutes?
 7   A.    About.
 8   Q.    Thirty minutes later, you see Curtis Ozenne come
 9   out to the pod with a guard --
10   A.    Yes, sir.
11   Q.    -- and they point out Scott Spears?
12   A.    Yes, sir.
13   Q.    And they leave Curtis there, and they take
14   Spears?
15   A.    Yes, sir.
16   Q.    Okay.  And then Spears comes back?
17   A.    Yes, sir.
18   Q.    And how long was that gap between the time they
19   took Spears and the time he came back?
20   A.    Spears was gone about 10 or 15 minutes.
21   Q.    Ten or 15 minutes.  Okay.  And then they came and
22   they got you?
23   A.    Yes, sir.
24   Q.    Was it Spears told him to get you?
25   A.    No.
```

```
 1   Q.    They just grabbed you --

 2   A.    Yes, sir.

 3   Q.    -- for no reason?

 4   A.    Yes, sir.

 5   Q.    And who was it that grabbed you?

 6   A.    I'm not sure of the deputy's name.

 7   Q.    Okay.  Then you were taken to the chapel --

 8   A.    Yes, sir.

 9   Q.    -- is that right?

10         Okay.  And you go into the chapel.  Sheriff

11   Ackal is not there?

12   A.    No, sir.

13   Q.    Okay.  In fact, at no time that day did Sheriff

14   Ackal ever lay a hand on you?

15   A.    No, sir.

16   Q.    He never even talked to you, did he?

17   A.    No, sir.

18   Q.    And in the chapel they have windows, but they

19   cover them with blinds; right?

20   A.    Yes, sir.

21   Q.    And they shut the door?

22   A.    Yes, sir.

23   Q.    Was there a dog in there?

24   A.    Yes, sir.

25   Q.    Was he barking?
```

1   A.   No, sir.

2   Q.   Just one dog or two?

3   A.   Just one.

4   Q.   Was Jason Comeaux in there?

5   A.   Yes, sir.

6   Q.   Did he beat you?

7   A.   No, sir.

8   Q.   Who beat you?

9   A.   I'm not sure of the deputy's name.

10   Q.   Was it more than one deputy?

11   A.   Just one who beat me.

12   Q.   Okay.  You don't know his name?

13   A.   No, sir.

14   Q.   And then after that, you're taken back to the

15   pod?

16   A.   Yes, sir.

17   Q.   And then you and Curtis and Spears got together

18   and talked about it?

19   A.   No, not at that moment.

20   Q.   But y'all did eventually; right?

21   A.   Yes, sir.

22   Q.   Okay.  Now, how long have you been out of jail --

23   what's your most recent stay in jail?

24   A.   I just came home May 24th.

25   Q.   Of this year?

```
 1    A.    Of this year.

 2    Q.    Okay.  And you're living in Iberia Parish?

 3    A.    No.  I'm living in Broussard.  I left out of

 4    Iberia Parish.

 5    Q.    But you just told this jury that you feel like

 6    you have some fear; right?

 7    A.    Um-hum.

 8    Q.    So you don't actually live in Iberia Parish?

 9    A.    Um-um.

10    Q.    Okay.  And have you seen or heard anything that

11    has put you in fear that the sheriff is going to try

12    and do something to you?

13    A.    The reason for the fear is what is going on in

14    the world right now --

15    Q.    Right.

16    A.    -- and all family and things I have to take care

17    of is in New Iberia, and that's not -- like five

18    minutes away.

19    Q.    Okay.  My question is, do you have any specific

20    incident you can tell us about that you think the

21    sheriff is orchestrating or trying to get to you?

22    A.    Um, no, sir.

23    Q.    Nothing?

24    A.    No, sir.

25    Q.    You can't think of anything?
```

1    A.    No, sir.

2    Q.    In fact, since -- when did you leave the Iberia

3    Parish jail?  If this shakedown was in 2011 --

4    A.    Um-hum.

5    Q.    -- did you leave shortly after that?

6    A.    Um-um.

7    Q.    You were there for a while?

8    A.    Um-hum.

9    Q.    When did you get out?

10   A.    I left Iberia Parish -- I got shipped to Tensas.

11   Q.    Okay.

12   A.    That's in Waterproof, Louisiana.  I got shipped

13   there after I got convicted of my charge, and I got

14   shipped there about 2015.

15   Q.    Okay.  So from 2011 to 2015, you were in the

16   Iberia Parish jail?

17   A.    Yes, sir.

18   Q.    Was that the last of your three felonies?

19   A.    Yes, sir.

20   Q.    Okay.  So you had two felonies --

21   A.    Prior to that one.

22   Q.    Prior to that one?

23   A.    Um-hum.

24   Q.    And the third felony is what got you the time in

25   Tensas?

1    A.    Yes, sir.

2    Q.    Okay.  At any time since 2011, since this

3    incident, can you point to or tell us anything that you

4    think the sheriff has done to try and intimidate you or

5    get to your family or anything like that?

6    A.    No, sir.

7    Q.    Okay.  In fact, you've met with federal officers

8    more than one time; right?

9    A.    Yes, sir.

10   Q.    Okay.  And if you felt like there was anything

11   wrong, you would go right to these guys and say, *Hey, I*

12   *need some help.  I'm scared.  You know, the sheriff is*

13   *trying to get me*?

14   A.    Yes, sir.

15   Q.    And you haven't done that?

16   A.    No, sir.  Because prior to that, he hasn't had no

17   recollection that I was even involved in anything

18   because I didn't take no time out to report it or

19   anything like that.

20   Q.    Well, you met -- you met with the federal

21   authorities in April of 2015; right?

22   A.    Um-hum.

23   Q.    So we know from then --

24   A.    No, sir.  No, sir.  No, sir, not April 2015,

25   because I was still in Iberia Parish.  When I met with

1    the officials, it was 2016.  I was in Tensas then.

2    Q.    Were you in the Tensas Detention Center in April

3    of 2015?

4    A.    No, sir.  April of 2016.

5    Q.    Is it possible that you are mistaken on the date,

6    or is it possible --

7    A.    It's possible.

8    Q.    -- it could have been 2015?

9    A.    It's possible.

10   Q.    Okay.  But the point is since that day or 2011 or

11   since you've been out, you can't point to anything that

12   you feel like the sheriff's done to try and intimidate

13   you or scare you?

14              THE COURT:  I think that's asked and

15   answered.

16              MR. MCLINDON:  Thank you, Your Honor.  I'm

17   sorry.

18              (Pause in the proceedings.)

19              MR. MCLINDON:  I would just like one second,

20   Your Honor.

21              THE COURT:  Yes, sir.

22              (Pause in the proceedings.)

23              MR. MCLINDON:  That's all I have, Your Honor.

24              THE COURT:  Redirect?

25              MS. BOYD:  No, Your Honor.

```
 1              THE COURT:  The witness is excused?

 2              MS. BOYD:  Yes, Your Honor, for the

 3   Government.

 4              MR. MCLINDON:  Yes, we can release him.

 5              THE COURT:  You're free to go, sir.  Thank

 6   you very much.

 7              THE WITNESS:  Okay.  Thank you very much.

 8              THE COURT:  Let's take our 15-minute morning

 9   recess.  All rise for the Jury.

10              (The Jury exits the courtroom.)

11              THE COURT:  Fifteen minutes.

12              (Recess taken.)

13              THE COURT:  All rise for the Jury.

14                (The Jury enters the courtroom.)

15              THE COURT:  All right.  Be seated.  If you

16   will raise your right hand, please, ma'am, and be sworn

17   or affirm.

18                    DEBRA CELESTINE,

19    first having been duly sworn by the Courtroom Deputy,

20               testifies under oath as follows:

21              THE COURTROOM DEPUTY:  Please spell your

22   first and last name for the court reporter.

23              THE WITNESS:  Debra, D-E-B-R-A, Celestine,

24   C-E-L-E-S-T-I-N-E.

25              THE COURTROOM DEPUTY:  Thank you.
```

```
 1                        DIRECT EXAMINATION

 2   BY MR. JARZABEK:

 3   Q.    Ms. Celestine, where do you live?

 4   A.    New Iberia, Louisiana.

 5   Q.    And are you currently employed?

 6   A.    Yes, sir, I am.

 7   Q.    Where?

 8   A.    With the Iberia Parish Correctional Facility.

 9   Q.    And what is your position there?

10   A.    I am the supervising sergeant over housekeeping.

11   Q.    How long have you been employed by the Iberia

12   Parish Sheriff's Office?

13   A.    Fourteen years.

14   Q.    If I say IPSO, you'll recognize that --

15   A.    Yes.

16   Q.    -- as the Sheriff's Office?

17             Okay.  How many years, 14?

18   A.    Fourteen.

19   Q.    So somewhere around 2002, you joined the --

20   A.    Yes.

21   Q.    And has all that time been in the jail?

22   A.    Yes.

23   Q.    Have you held various positions in the jail?

24   A.    Yes.

25   Q.    Could you briefly go through them for us, please?
```

1    A.    I started off as a booth controller deputy, then

2    I became a booking officer.  Then I became a sergeant

3    in -- over shift.  Then I became a lieutenant over

4    shift.

5    Q.    And currently you're in charge of housekeeping?

6    A.    That's correct.

7    Q.    All right.  You indicated you were a booth deputy

8    at one point.

9              MR. JARZABEK:  Could I have Government's

10   Exhibit 1, please?

11   BY MR. JARZABEK:

12   Q.    Ms. Celestine, do you recognize this as a diagram

13   of the jail that you work at?

14   A.    Can he enlarge it a little bit?

15   Q.    Yes, ma'am.

16             MR. JARZABEK:  Could you, the central part,

17   Mr. Harrell?

18   BY MR. JARZABEK:

19   Q.    You see this part marked over here as *Central*

20   *Control*?

21   A.    Yes.

22   Q.    Is that one of the booths you were talking about?

23   A.    Oh, when I started in the different sections of

24   the jail.

25   Q.    Okay.  For example, is there an -- over here at

1    Med/Max, is there a separate booth there?

2    A.    Yes.

3    Q.    And would you point it out, please?

4    A.    Med/Max (Witness complied.)

5    Q.    Right there, okay.  So that would be a separate

6    independent booth separate from Central Control;

7    correct?

8    A.    That's correct.

9    Q.    Am I correct that these booths basically control

10   the areas around them?

11   A.    That's correct.

12   Q.    Central Control, however, has control over the

13   whole jail?

14   A.    That is correct.

15   Q.    Okay.  So you started off a roaming deputy and

16   then wound up as a booth operator; is that correct?

17   A.    I started off as a booth operator.

18   Q.    Okay.  Now --

19         MR. JARZABEK:  Thank you, Mr. Harrell.

20   BY MR. JARZABEK:

21   Q.    And you've been there for 12 years; is that

22   correct?

23   A.    Fourteen.

24   Q.    Fourteen.  And your position at the time of 2011

25   was what?

1    A.    A shift lieutenant.

2    Q.    You were in charge of basically the shifts;

3    correct?

4    A.    That's correct.

5    Q.    Are you familiar with the various paperwork that

6    goes around and involved at the jail?

7    A.    Yes.

8            MR. JARZABEK:  Approach the witness, Your

9    Honor?

10            THE COURT:  You may.

11   BY MR. JARZABEK:

12   Q.    Ma'am, I am showing you what's been marked for

13   identification purposes as Government's Exhibit 41

14   through 45 and 47 through 48 and ask you if you

15   recognize those as documents associated with the Iberia

16   Parish jail.

17   A.    Yes.

18   Q.    And we've reviewed these documents before; have

19   we not?

20   A.    Yes, we have.

21   Q.    In fact, you're involved in several of those

22   documents; are you not?

23   A.    Yes, I am.

24            MR. JARZABEK:  Move Government's Exhibit 41

25   through 45 and 47 through 48 into evidence.

```
 1              MR. MCLINDON:  I have no objection pursuant

 2    to our stipulation about the authenticity.  If we get

 3    into hearsay, I may object at that point.  But we'll

 4    see how that goes.

 5              THE COURT:  Is there an objection?

 6              MR. MCLINDON:  Is she going to testify from

 7    the document, Mr. Jarzabek?

 8              MR. JARZABEK:  Yes.

 9              MR. MCLINDON:  Again, I had an agreement as

10    to authenticity.  I'm sorry.  My objection would be if

11    there is going to be statements to this document from a

12    third person other than her, then we may get into some

13    hearsay problems.

14              THE COURT:  Well, right now I've got this

15    witness.  She has identified it.  The exhibits have

16    been offered into evidence.  Do you have an objection

17    to their admission?  Subsequent objections about when

18    somebody is testifying, I'm not doing anything about

19    that.

20              MR. MCLINDON:  Fair enough.  Then I have no

21    objection at this time.

22              THE COURT:  Without objection, they are

23    received.

24              MR. JARZABEK:  Approach the witness, Your

25    Honor?
```

1          THE COURT:  You may.  And you need not ask

2     each time.

3          MR. JARZABEK:  Thank you, Your Honor.

4          If we could have the Government's Exhibit 43,

5     please, Mr. Harrell.

6     BY MR. JARZABEK:

7     Q.   And do you recognize that document, ma'am?

8     A.   Yes, I do.

9     Q.   Okay.  And that is a document indicating that

10    it's a medical request form; correct?

11    A.   That's correct.

12    Q.   And it's in the name of Curtis Ozenne?

13    A.   Yes, it is.

14    Q.   And on 4/30 of 2011 is the date on that form for

15    Mr. Ozenne; correct?

16    A.   Yes.

17         MR. MCLINDON:  Objection.  That's three

18    leading questions in a row.

19         THE COURT:  Don't lead.

20         MR. JARZABEK:  Yes, Your Honor.

21    BY MR. JARZABEK:

22    Q.   And what is the date at the bottom, ma'am, at the

23    very bottom of the document?

24    A.   4/30/2011.

25    Q.   And under the *Comments* section?

1    A.    5/1/11.

2    Q.    Do you have a recollection of seeing Mr. Ozenne

3    on this date?

4    A.    Yes, I do.

5    Q.    And what was the nature and how did you encounter

6    him?

7    A.    I was doing a check in the area.  And when I

8    passed by his cell, he hollered out to me that -- he

9    said, *Ms. Celestine,* he said*, I'm hurt*.  So I asked him

10   what -- what was his problem.

11         MR. MCLINDON:  Objection.  Hearsay as to what

12   Mr. Ozenne said.

13         MR. JARZABEK:  And I'm only asking -- not for

14   the --

15         THE COURT:  Just a second.  I'm going to take

16   that as non-hearsay.  It's not offered for the truth

17   thereof, it's merely offered as this is what he said.

18   Proceed.

19         MR. JARZABEK:  Can we have this published to

20   the Jury, Mr. Harrell?  Madam Clerk?

21         THE COURT:  It's in evidence.  Put it up.

22         MR. JARZABEK:  Enlarge it so that the Jury

23   can read it.  You can expand that middle part.

24         THE COURT:  Thank you.

25   * * *

1    BY MR. JARZABEK:

2    Q.    So this is a request form given by Mr. Ozenne;

3    correct?

4    A.    Yes, it is.

5    Q.    And you had seen him on that day; correct?

6    A.    Yes, sir.

7    Q.    Did he complain of the injuries that are noted on

8    this form?

9    A.    Not the top part.

10   Q.    Okay.

11   A.    He spoke to me about -- he say he was hurting.

12   He said, *they beat me*.  And --

13   Q.    Did you see any indications of that beating?

14   A.    I saw bruises.

15   Q.    Okay.  Where did you see bruises?

16   A.    They were on his upper thigh part, his legs, and

17   right around this area (indicating).

18   Q.    You're indicating your right upper side?

19   A.    Yes.

20   Q.    Okay.  Now --

21          MR. JARZABEK:   G-42, Madam Clerk,

22   Mr. Harrell.

23   BY MR. JARZABEK:

24   Q.    Do you recognize these as medical notes

25   associated with Mr. Ozenne?

1   A.   Yes.  Can he enlarge it, please?

2          MR. JARZABEK:  Please.

3   BY MR. JARZABEK:

4   Q.   And again, these are nurses' notes; is that

5   correct?

6   A.   Yes, sir, it is.

7   Q.   All right.  Now, did he indicate -- you indicated

8   that he had bruises --

9          THE COURT:  Excuse me.  *He*.  Which *he*?

10          MR. JARZABEK:  Thank you, Your Honor.

11   BY MR. JARZABEK:

12   Q.   Mr. Ozenne indicated to you he had bruises on

13   several parts of his body?

14   A.   Yes, sir.

15   Q.   And you went through the description, correct,

16   that you saw?

17   A.   Yes, sir.

18   Q.   Did he show you every bruise that you are aware

19   of?

20   A.   Yes, sir.

21   Q.   Now, in his conversations with you, other than

22   saying *they beat me*, did he identify anybody?

23   A.   All he said was IMPACT.

24   Q.   Okay.  Now, as a result of your discussions with

25   Mr. Ozenne, did you take him to the medical unit?

1    A.    Yes, I did.

2    Q.    And what happened after he was taken to the

3    medical unit?

4    A.    Um, I was called by the nurse and say they needed

5    to send him out, they needed to send him to the

6    hospital.

7           MR. JARZABEK:  If we could highlight the

8    bottom of this page, Mr. Harrell.  Yes.

9    BY MR. JARZABEK:

10   Q.    Does that show you that on the same day -- 19:20

11   is 7:20 at night.  Is that not correct, ma'am?

12   A.    7:20 at night.

13   Q.    19:20, is that the time?

14   A.    I'm trying to see it.  Yes.

15   Q.    Okay.  Am I correct that that's 7:20 at night?

16   A.    Yes.

17   Q.    All right.  Does that indicate him returning from

18   the medical unit?

19          MR. MCLINDON:  Your Honor, again, I've let a

20   lot of leading questions go.  I just think the question

21   should be *what does it indicate*, not does that indicate

22   and then testifying.

23          THE COURT:  Don't suggest an answer,

24   Mr. Jarzabek.

25          MR. JARZABEK:  Thank you, Your Honor.

1    BY MR. JARZABEK:

2    Q.    What does the notation on 5/1/11 at 7:20

3    indicate, ma'am?

4    A.    That Mr. Ozenne returned from UMC, the hospital.

5    Q.    What is UMC?

6    A.    It's a hospital.

7    Q.    Okay.  Is it also the University Medical Center?

8    Is that --

9    A.    Yes, it is.

10            MR. JARZABEK:  Um, now, if I could have

11   Government's Exhibit 41, please.

12   BY MR. JARZABEK:

13   Q.    And this, ma'am, appears to be what?

14   A.    Can he enlarge it?

15            MR. JARZABEK:  The top of the page, please,

16   Mr. Harrell.

17            THE WITNESS:  It appears to be prescriptions.

18   BY MR. JARZABEK:

19   Q.    Okay.  And up at the top left-hand corner, what

20   does that indicate?  At the very top, this section

21   right here.

22   A.    Okay.  That came from the hospital.

23   Q.    Okay.  LSU being the UMC; right?

24   A.    Yes, sir.

25   Q.    Now -- and does that indicate a date of 5/1/11 on

1   the form?

2   A.   Yes, sir, it does.

3            MR. JARZABEK:   Thank you.

4   BY MR. JARZABEK:

5   Q.   Now, was Mr. Ozenne the only person that you took

6   to medical on that day?

7   A.   No, sir.

8   Q.   Who else did you take to medical on that day?

9   A.   I took Anthony Daye.

10  Q.   And how did you come to take Mr. Daye to the

11  medical unit?

12  A.   I continued my walk-around of the jail, my

13  security check of the jail.  And when I got into

14  Mr. Daye's area, he called out to me.

15  Q.   Okay.  Do you remember what area that was --

16  Mr. Daye was in at that time?

17  A.   He was in G-pod.

18  Q.   And after he called out to you, did he complain

19  of any injuries?

20  A.   Yes, sir, he did.

21  Q.   What kind of injuries did he complain of?

22  A.   He told me that his legs and his arms hurt, that

23  he couldn't move.

24  Q.   Okay.  And did he indicate how he had received

25  those injuries?

```
 1   A.    Yes, sir, he did.

 2   Q.    And how was that?

 3   A.    He told me that IMPACT beat him.  And I asked him

 4   who, and he said --

 5              MR. MCLINDON:  Objection.  Hearsay as to what

 6   Mr. Daye told her.

 7              MR. JARZABEK:  Withdraw the question, Your

 8   Honor.

 9              THE COURT:  Yeah, okay.

10   BY MR. JARZABEK:

11   Q.    So Mr. Daye did complain of injuries and that he

12   had been beaten; is that correct?

13   A.    Yes, sir.

14   Q.    Okay.  And did you, in fact, take him to medical?

15   A.    Yes, sir, I did.

16   Q.    Was he able to walk on his own power?

17   A.    No, sir.

18   Q.    Did you go get the wheelchair?

19   A.    I went and got him a wheelchair.

20   Q.    Did you personally escort him and take him to

21   medical?

22   A.    Yes, sir, I did.

23   Q.    Did you -- were you able to observe the same --

24   were you able to observe the injuries Mr. Daye

25   complained of?
```

1    A.    When I took Mr. Daye, I left and went to Central.

2    Q.    After -- I'm sorry?

3    A.    I brought him to medical, and then I left and

4    went to Central.

5    Q.    All right.  Now, do you remember a name of an

6    inmate by the name of Mr. Spears?

7    A.    I recall that name.

8    Q.    Okay.  Do you remember taking him to medical on

9    that date?

10   A.    I don't recall.  I don't recall taking

11   Mr. Spears.

12         MR. JARZABEK:  Could I have G-47, the top,

13   please.

14   BY MR. JARZABEK:

15   Q.    These again --

16         MR. JARZABEK:  Before you do that,

17   Mr. Harrell --

18   BY MR. JARZABEK:

19   Q.    These again are nurses' notes; correct?

20   A.    That's correct.

21   Q.    All right.

22         MR. JARZABEK:  Top of the page, please.

23   BY MR. JARZABEK:

24   Q.    Do you see that top line?

25   A.    Yes, I do.

```
 1    Q.    If the nurse noted that, do you have any reason
 2    to doubt it?
 3    A.    No.
 4    Q.    Okay.  And this indicates possibly that you
 5    brought Mr. Spears into the medical unit on that day?
 6    A.    That's correct.
 7              MR. JARZABEK:  A moment, Your Honor?
 8              THE COURT:  Yes.
 9              MR. JARZABEK:  Thank you, Mr. Harrell.
10    BY MR. JARZABEK:
11    Q.    Do you have a vivid memory of Mr. Ozenne's
12    injuries?
13    A.    Yes, I do.
14    Q.    Were they extensive?
15    A.    Yes.
16              MR. JARZABEK:  No further questions.
17              THE COURT:  Your witness, Counselor.
18              MR. MCLINDON:  Thank you, Your Honor.
19              Could I see Government Exhibit 1, the layout
20    of the prison, please.
21                        CROSS-EXAMINATION
22
23    BY MR. MCLINDON:
24    Q.    Good morning.
25    A.    Good morning.
```

1    Q.    You've been employed with the jail for 14 years;

2    is that right?

3    A.    That's correct.

4    Q.    Okay.

5           MR. MCLINDON:  If we could blow up what

6    she -- the Central Command, right there.

7    BY MR. MCLINDON:

8    Q.    Now, if you could touch Central Control with your

9    finger.

10   A.    (Witness complied.)

11   Q.    Okay.  So in that, that's -- am I correct that

12   that's how you open and close doors and gates

13   throughout the whole prison?

14   A.    We can.

15   Q.    Okay.  Is there another way to do it?

16   A.    Yes.

17   Q.    What's that?  With a key?

18   A.    Yes, sir.  But we have -- each booth has a

19   control that they can control the openings of the

20   doors.

21   Q.    So the way that works, if I'm a guard and let's

22   say I walk up to a door, there is a little like

23   micro -- a little intercom there, and you push a button

24   and you say *Gate 6*, or whatever it is, and then Central

25   Command hears it and then looks on the screen; right?

1    There's like monitors?

2    A.    It's not Central Command that would do it.

3    Q.    Okay.  It would be each of the individual --

4    A.    Booths --

5    Q.    -- booths?

6    A.    -- in the area.

7    Q.    So if they get a request to open door number 6,

8    the person in the command would look at the monitor and

9    see that it's an inmate and then hit a button and it

10   opens the gate?

11   A.    No.

12   Q.    Okay.  Then explain it to us.  How does that

13   work?

14   A.    We won't open it for an inmate.

15   Q.    I meant the guard.

16   A.    We only open it for the deputies.

17   Q.    That's right.  But if a deputy is escorting -- if

18   a deputy is escorting an inmate, you would open it for

19   them?

20   A.    That's correct.

21   Q.    Okay.  And if you have attorney visits to a jail,

22   you would open it for attorney visits?

23   A.    Central Control will.

24   Q.    Central Control.  Okay.

25            And am I correct that there are monitors

```
 1    there in each of the booths where you can look and make

 2    sure that -- and you can see who it is that wants to

 3    come through the gate?

 4    A.    We look through the windows --

 5    Q.    Okay.

 6    A.    -- around the booth.

 7    Q.    Right.

 8    A.    Full of windows.

 9    Q.    But are there also monitors there?

10    A.    Yes.

11    Q.    Okay.  And those monitors are just basically --

12    it's a camera and then -- wherever the location is, and

13    then a monitor?

14    A.    Yes.

15    Q.    Okay.  Now, would the same be true for the door

16    to the chapel?  You have to have it opened by somebody

17    in the control booth?

18    A.    In Central Control.

19    Q.    Central Control.  So it's not a door you just

20    open and walk in and shut behind you.  You have to

21    have -- it has to be opened and closed by somebody in

22    Central Control?

23    A.    That's correct.

24    Q.    Okay.  And is that true if you're -- that's

25    definitely true if you're outside the chapel and you
```

1   say, *Hey, I want to get in the chapel,* and you hit the

2   little intercom button and say, *Open the chapel door;*

3   right?

4   A.   Um-hum, that's correct.

5   Q.   What if you're inside the chapel and you want to

6   get out?  Same thing?

7   A.   Same thing.

8   Q.   Were you aware that there was a shakedown back in

9   April of 2011?

10  A.   Yes, I was.

11  Q.   Okay.  You were not there that day?

12  A.   I was there that day.

13  Q.   You were there that day?

14  A.   Um-hum.

15  Q.   Okay.  Did you see anything, abuses or anything

16  like that?

17  A.   No, sir, I did not.

18  Q.   You didn't see anything?

19  A.   No, sir.

20  Q.   No excessive use of force or anything like that?

21  A.   No, sir.

22  Q.   Where were you?

23  A.   In Central Control.

24  Q.   With all the monitors and the cameras and

25  things -- I mean, with all the monitors?

```
 1    A.    Working?  Yes.

 2    Q.    Okay.

 3    A.    Operating.  Um-hum.

 4    Q.    Did you ever find out or hear or get stories that

 5    there were abuses going on that day?

 6    A.    Not that day, no, sir.

 7    Q.    But did you ever find -- eventually, did you ever

 8    get stories that there were abuses going on?

 9    A.    Yes, sir.

10    Q.    Okay.  Well, and you saw the bruises of Curtis

11    Ozenne; right?

12    A.    That's correct.

13    Q.    And they were pretty bad?

14    A.    Yes, sir.

15    Q.    Okay.  And did you ever tell the sheriff about

16    that?

17    A.    No, sir.

18    Q.    Okay.  Do you have any information -- well, let

19    me phrase it this way.

20          On the shakedown, it was the IMPACT officers

21    that came in to do that; is that right?

22    A.    That's correct.

23    Q.    Okay.  And no one else, just IMPACT?  I mean,

24    other than the regular guards that were there, that

25    work there every day, they brought in officers off the
```

1    street to help with the shakedown?

2    A.    That's correct.

3    Q.    Do you know why they were brought in, the IMPACT

4    officers?

5    A.    Why IMPACT was brought in?

6    Q.    Right.

7    A.    From my understanding, the Warden at that time

8    called them in because of a ruckus in one of the pods.

9    Q.    They were trying to -- am I correct they were

10   trying to do a shakedown, and the inmates were kind of

11   rebelling a little bit and causing a ruckus?

12   A.    Before they came in, yes.

13   Q.    So he called in the IMPACT people?

14   A.    Yes, sir.

15   Q.    Okay.

16          MR. MCLINDON:  Okay.  Thank you very much.

17   That's all I have.

18          THE COURT:  Redirect?

19          MR. JARZABEK:  Yes, Your Honor.

20                REDIRECT EXAMINATION

21    BY MR. JARZABEK:

22   Q.    Mr. McLindon asked you about reporting this.  Did

23   you, in fact, call somebody about the injuries you

24   observed?

25   A.    Yes, I did.

```
 1   Q.    Who did you call?

 2   A.    Warden Wesley Hayes.

 3   Q.    Did you tell him what you had observed?

 4   A.    Yes, sir.

 5   Q.    Both for -- and did you also tell him about

 6   Mr. Daye?

 7   A.    Yes, sir.

 8   Q.    Okay.  Did anything happen?

 9   A.    Not to my knowledge.

10   Q.    There are other places in the jail that have

11   access by keys as well as by buzzer; is that correct?

12   A.    That's correct.

13   Q.    Including the chapel; correct?

14   A.    That's correct.

15   Q.    And during a shakedown, many of these doors are

16   not locked.  They're actually held open while the

17   inmates -- to allow --

18             MR. MCLINDON:  Objection.  It's a leading

19   question.

20   BY MR. JARZABEK:

21   Q.    Are some of the doors frequently left open for

22   free access?

23   A.    Not for shakedowns, no.

24   Q.    Throughout the prison?

25   A.    No.
```

```
1    Q.    Okay.

2    A.    Always locked.

3    Q.    Do you remember -- or do you have any idea who

4    had keys to the chapel?

5    A.    No.

6    Q.    There was a key, though?

7    A.    There are keys to every door.

8              MR. JARZABEK:  Okay.  Thank you, ma'am.

9              THE COURT:  The witness is excused?

10             MR. JARZABEK:  Yes, Your Honor, from the

11   Government.

12             THE COURT:  Thank you, ma'am.  You are free

13   to go.  You may go.  Thank you, ma'am.

14             (Pause in the proceedings.)

15             THE COURTROOM DEPUTY:  Please raise your

16   right hand.  Do you solemnly swear that the testimony

17   you will give in this case will be the truth, the whole

18   truth, and nothing but the truth, so help you God?

19             THE WITNESS:  I do.

20                    KIM LAWSON,

21    first having been duly sworn by the Courtroom Deputy,

22            testifies under oath as follows:

23             THE COURTROOM DEPUTY:  Could you please spell

24   your first and last name for the Court Reporter?

25             THE WITNESS:  K-I-M, L-A-W-S-O-N.
```

```
 1              THE COURTROOM DEPUTY:  Thank you.
 2                        DIRECT EXAMINATION
 3   BY MR. JARZABEK:
 4   Q.    Where do you live, ma'am?
 5   A.    In Broussard, Louisiana.
 6   Q.    Are you currently employed?
 7   A.    Yes, I am.
 8   Q.    And as what and where?
 9   A.    I work as an LPN, and I work at Consolata Nursing
10   Home in New Iberia.
11   Q.    And how long have you been an LPN?
12   A.    33 years.
13   Q.    Licensed practical nurse; right?
14   A.    Yes.
15   Q.    And previously, have you -- one of your jobs been
16   at the Iberia Parish Sheriff's Office?
17   A.    At the Iberia Parish jail.
18   Q.    Okay.  Were you an employee of the sheriff's
19   office during that time?
20   A.    No.
21   Q.    Who were you an employee of?
22   A.    Southern Health Partners and Emerald Health Care.
23   Q.    Okay.  And what was their relationship with the
24   jail?
25   A.    They hired the contract nurses.  They supplied
```

1    the contract nurses.

2    Q.    And you were?

3    A.    I was a contract nurse.

4    Q.    Okay.  And how long did you work at the Iberia

5    Parish jail as a contract nurse?

6    A.    Six years.

7    Q.    Okay.  Do you remember the last year you worked

8    there?

9    A.    2011.

10   Q.    And you're familiar with the records kept by the

11   medical unit there; correct?

12   A.    Yes.

13          MR. JARZABEK:  Could I have G-43,

14   Mr. Harrell.

15          MR. HARRELL:  What number?

16          MR. JARZABEK:  G-43, and the body.  Thank

17   you, sir.

18   BY MR. JARZABEK:

19   Q.    Now, this is a medical request form; correct?

20   A.    Yes.

21   Q.    Okay.  It's filled out by the inmate; is that

22   correct?

23   A.    Yes.

24   Q.    And this name contains the name Curtis Ozenne;

25   correct?

```
 1   A.    Yes.

 2         MR. MCLINDON:  Objection, Your Honor.  That

 3   is three leading questions in a row.  I just don't want

 4   to establish a pattern here when we start to get --

 5         THE COURT:  I don't need a speech.  Just

 6   object to the leading question, and then I'll rule.

 7         MR. MCLINDON:  Object.  Leading.

 8         THE COURT:  Sustained.

 9   BY MR. JARZABEK:

10   Q.    Whose handwriting is that at the bottom?

11   A.    Mine.

12   Q.    And would you read it, please.

13   A.    Just at the bottom or the whole thing?

14   Q.    Just the bottom, ma'am.

15   A.    *Comments:  5/1/11.  Seen.  Refer to nurses'*

16   *notes.  Kim.*

17   Q.    And what is that in relation to the other dates

18   on that form?

19   A.    He filled out the sick-call request on 4/30/2011.

20   Q.    Now, you say -- at the bottom it says -- you just

21   said it refers to nursing notes?

22   A.    Yes.

23   Q.    Those are your nursing notes?

24   A.    Yes.

25         MR. JARZABEK:  Could I have Government's
```

1    Exhibit 42, please.  The top part, please.

2    BY MR. JARZABEK:

3    Q.    Can you identify this?

4    A.    That's my nurses' notes.

5    Q.    Okay.  And there's a lot of abbreviations on this

6    form; is there not?

7    A.    Yes.

8    Q.    Would you read this form, interpreting for the

9    Jury out loud the abbreviations as they occur?  I may

10   stop you at points.

11   A.    Okay.  *5/1/11.  Inmate claims was beaten up by*

12   *IMPACT deputy --*

13              THE COURT:  Just a little -- slowly, please,

14   ma'am.  The court reporter has to keep up.

15              THE WITNESS:  Oh, I'm sorry.

16              THE COURT:  That's all right.

17              THE WITNESS:  *Inmate claims was beaten up by*

18   *IMPACT deputies on Friday, 4/29/11.  Inmate complains*

19   *of busted lower lip.  Abrasion noted inside left-lower*

20   *lip with slight swelling to lower lip.  Hit on left*

21   *forearm with baton with small abrasion at 5-centimeter*

22   *bruised, discolored area.*

23              *Also claims hit with baton on back of left*

24   *upper arm with 18-centimeter wide by 12-centimeter long*

25   *bruised, swollen area.*

1    BY MR. JARZABEK:

2    Q.   Could I interrupt you for a second?

3         Let's go back to the first one.  It says,

4    *Inmate complained of a busted lip and abrasion.*  Okay.

5    That's his complaint to you?

6    A.   The busted lip was his complaint to me, yes.

7    Q.   And your -- your observation based on that

8    complaint was --

9    A.   Was the abrasion noted on the inside of his left

10   lower lip.

11   Q.   Is that the same pattern that follows throughout

12   this?

13   A.   Yes.

14   Q.   You note the complaint?

15   A.   Right.

16   Q.   And then you put your observation in relation to

17   that complaint; is that correct?

18   A.   Correct.

19   Q.   Okay.  If we could go back to the 18-centimeter,

20   please.

21   A.   *Back of left upper arm with 18-centimeter wide by*

22   *12-centimeter long bruise.  Swollen area.*

23   Q.   Now, that's your observation?

24   A.   Yes.

25   Q.   How much -- how big is 18 centimeters and

1   12 centimeters?

2   A.    18, maybe about that big (indicating).

3   Q.    About the length of this speaker --

4   A.    Yes.

5   Q.    -- in front of you?  Okay.

6   A.    Yes.

7   Q.    So 12 would be two-thirds of that --

8   A.    Um-hum.

9   Q.    -- correct?

10  A.    Yes.

11  Q.    Keep going, please.  *Swollen area was --*

12  A.    *Claims was kicked on left upper hip with*

13  *11-centimeter wide by 5-centimeter long bruise.  Also*

14  *claims was hit with baton several times on back -- on*

15  *back right upper thigh with 20-centimeter wide by*

16  *21-centimeter long bruise with swelling.*

17  Q.    If I can interrupt you.  So we're talking about a

18  bruise that is a square bigger than that, a square

19  formed by two sides of that speaker in front of you;

20  correct?

21  A.    Correct.

22  Q.    Keep going, please.

23  A.    *Also claims was hit with baton on left knee with*

24  *5-centimeter long by 5-centimeter wide swollen area to*

25  *the left and below the kneecap.  Also claims was hit*

1  *with baton on left calf with 7-centimeter long by*

2  *10-centimeter wide bruise noted.  Good capillary refill*

3  *all fingers of left hand.  Fingers and hand cool and*

4  *dry to touch.  Strong pedal pulses.  Abrasions noted*

5  *left side of upper and inner lips.  Can make partial*

6  *first with left hand.  PEARL.*

7  Q.   What does that mean?

8  A.   Pupils equal and reactive to light.

9       *Informed Lieutenant Celestine and T. Romero*

10  *inmate should be checked at UMC.  Transfer summary done*

11  *and brought to Central.  15:05 inmate transported to*

12  *UMC via patrol car.  K. Lawson, LPN.*

13  Q.   15:05, what time is that?

14  A.   Oh, goodness.  I'm not good with the military

15  times.

16  Q.   If you subtract --

17  A.   3:05.

18  Q.   3:05.  So -- and the next note after that is?

19  A.   *5/1/11, 19:20, return from UMC.  X-rays negative*

20  *for fracture.  Multiple contusions.  New order noted.*

21  *K. Lawson, LPN.*

22  Q.   That's, again, you?

23  A.   Yes.

24  Q.   And was it your recommendation that he be

25  treated -- taken to the hospital?

```
 1   A.    Yes.

 2   Q.    Was it your recommendation that X-rays be taken?

 3   A.    Yes.

 4   Q.    Why did you want X-rays taken?

 5   A.    Because of the bruising and swelling, I wanted to

 6   make sure there were no breaks.

 7   Q.    Based on what you observed, was it possible that

 8   an arm had been -- or something else had been broken?

 9   A.    Possibly, yes.

10   Q.    Would it be -- did you -- was this a fairly

11   detailed report on your behalf?

12   A.    Yes, it was.

13   Q.    Had you ever seen injuries to such extent before?

14   A.    No.

15   Q.    Have you seen them in the jail since?

16   A.    No.

17         MR. JARZABEK:  If I could have G-41, please.

18   Wait a minute.  Before we leave, could we have the very

19   bottom of this?  From 6, right.

20   BY MR. JARZABEK:

21   Q.    There is a notation here of June 16th, 2011; is

22   there not?

23   A.    Yes.

24   Q.    That is almost a month and a half since his

25   initial complaint; correct?
```

1  A.    Yes.

2  Q.    Does this indicate whether or not injuries are

3  still apparent to Mr. Ozenne at that time?

4  A.    No.

5  Q.    Okay.

6  A.    Oh, yes.

7  Q.    It does.  So a month and a half later, this

8  indicates that bruises and injuries to Mr. Ozenne were

9  still available -- visible on his body?

10  A.    Yes.

11        MR. JARZABEK:  If we could go to 43 -- or 41,

12  please.   And if we could start at the top.

13  BY MR. JARZABEK:

14  Q.    And what is this, ma'am?

15  A.    This is the discharge paperwork from UMC on this

16  patient.

17  Q.    Okay.  And you would have gotten a copy of this

18  eventually?

19  A.    Yes.

20  Q.    Okay.  And does this basically reflect what was

21  done to him at the University Medical Center?

22  A.    Yes.

23  Q.    Were X-rays taken, according to this form?

24  A.    Yes.

25  Q.    Now, he was returned; correct?

1   A.   Yes.

2   Q.   All right.

3        MR. JARZABEK:   If I could have G-45,

4   Mr. Harrell.

5   BY MR. JARZABEK:

6   Q.   Now, does this appear to be another request?

7   A.   Yes.

8        MR. JARZABEK:   And if we could come down to

9   the bottom, Mr. Harrell.

10  BY MR. JARZABEK:

11  Q.   Do you recognize the handwriting at the bottom of

12  that page, ma'am?

13  A.   Yes, that's mine.

14  Q.   Okay.   And the notation there?

15  A.   *5/1/11, seen, refer to nurses' notes.   Kim.*

16  Q.   Okay.   Basically the same notation you made on

17  the Ozenne form; is that correct?

18  A.   Yes.

19  Q.   Although this, according to what, applies to who?

20  A.   Scott Spears.

21  Q.   Okay.

22        MR. JARZABEK:   If we could go to the top

23  again, Mr. Harrell.

24  BY MR. JARZABEK:

25  Q.   Is that where the complaint by Mr. Spears is

1    made?

2    A.    Yes.

3    Q.    Okay.  Does he indicate when he received these

4    injuries?

5    A.    On April the 29th, 2011.

6    Q.    Does he indicate he was beaten?

7    A.    Yes.

8              MR. JARZABEK:  If I could have

9    Government's 47, please.

10   BY MR. JARZABEK:

11   Q.    Are those your nurses' notes, ma'am?

12   A.    Yes.

13   Q.    And does it indicate who brought Mr. Spears to

14   you on that date?

15   A.    Lieutenant Celestine.

16   Q.    Did you again go through the process of

17   documenting the injuries as you did with Mr. Ozenne?

18   A.    Yes, I did.

19   Q.    Could you pick it up and read -- translate any

20   abbreviations you see there on your notes.

21   A.    *Inmate brought to medical per Lieutenant*

22   *Celestine with complaint of injuries from shakedown on*

23   *4/29/11.  Inmate has X-shaped bruise on upper left*

24   *thigh.  The left leaning bruise is 15 centimeters long*

25   *by 3 centimeters wide.  The right leaning bruise is*

1  *17 centimeters long by 5 centimeters wide.  This is*

2  *only wound visible.  Inmate denies any other physical*

3  *injuries, but did state was emotionally demoralized by*

4  *IMPACT deputy.*

5  *Inmate claims on 1 to 10 scale, pain is 2*

6  *when not being touched; when touched, pain is 8.*

7  *Inmate is currently on Ibuprofen.  Ice pack given.*

8  *K. Lawson, LPN.*

9  Q.   When you indicate a bruise that is 17 meters --

10  17 centimeters long and 5 centimeters wide, again,

11  we're talking about a bruise almost the length of that

12  speaker in front of you?

13  A.   Almost, yes.

14  Q.   Okay.  And about a third of the size wide?

15  A.   5 centimeters is about -- about that much

16  (indicating).

17  Q.   All right.  Now, the injuries appear to be

18  consistent with what he was reporting to you as the

19  cause of the injuries?

20  A.   Yes.

21  MR. JARZABEK:  If I could have G-48, please.

22  Could I have the bottom first?

23  BY MR. JARZABEK:

24  Q.   Do you recognize the handwriting and the

25  signature down below there?

1   A.    Yes, that's Mary Ann Dixon, LPN.

2   Q.    And do you know Ms. Dixon?

3   A.    Yes.

4   Q.    How do you know her?

5   A.    I worked with her.  She was my boss for the first

6   five years.

7   Q.    Okay.  Was she also a contract nurse at the

8   Iberia Parish Sheriff's Office at the same time you

9   were?

10  A.    Yes.

11  Q.    Okay.  Again on this date, 5/12 of 2011?

12  A.    Yes.

13  Q.    Okay.  So we're talking about approximately two

14  weeks after the initial complaint; correct?

15  A.    Yes.

16        MR. JARZABEK:  If we could go back up,

17  Mr. Harrell.

18  BY MR. JARZABEK:

19  Q.    Does this form indicate that the injuries were

20  still visible two weeks after they were inflicted?

21  A.    Yes.

22  Q.    Okay.

23        MR. JARZABEK:  If I could have G-44, page 2,

24  please.  All right.  I'm sorry.  Bottom again, please,

25  Mr. Harrell.

1   BY MR. JARZABEK:

2   Q.   These are again -- do you recognize the

3   handwriting at the bottom of that page?

4   A.   Mary Ann Dixon.

5   Q.   You're familiar with her handwriting and her

6   signature?

7   A.   Yes.

8   Q.   Same answers as I asked before about her

9   association with you?

10   A.   Yes.

11   Q.   Okay.

12         MR. JARZABEK:  Go back to the top, ma'am --

13   sir, Mr. Harrell.

14   BY MR. JARZABEK:

15   Q.   Okay.  Does this appear to be a complaint of

16   injuries on or about 4/30 of 2011?

17   A.   Yes.

18   Q.   Okay.  Does it indicate when the injuries were

19   incurred?

20   A.   It's dated on 4/30/11, and her onset of symptoms

21   is written for last night.

22   Q.   Okay.  Possibly 4/29?

23   A.   4/29.

24   Q.   And she discusses the several bruises, but not in

25   the detail you did; is that correct?

1    A.    Right.  Right.

2          MR. JARZABEK:  Page 3 of G-44, Mr. Harrell.

3    BY MR. JARZABEK:

4    Q.    This is your signature; is it not?

5    A.    Yes.

6    Q.    Okay.  And this is 5/16/11; am I correct?

7    A.    Correct.

8    Q.    All right.

9          MR. JARZABEK:  Could we go to the top?

10   BY MR. JARZABEK:

11   Q.    According to these notes, after -- over two

12   weeks, were there injuries still apparent to Mr. Daye?

13   A.    Yes.

14   Q.    And those are noted by you; is that correct?

15   A.    Yes.

16         MR. JARZABEK:  Page 1 of G-44.  Bottom

17   please, first, Mr. Harrell.

18   BY MR. JARZABEK:

19   Q.    Do you recognize that signature at the very

20   bottom?

21   A.    Next to the patient's name?

22   Q.    No, ma'am -- yeah, next to the patient's name.

23   A.    Dr. Bujard.

24   Q.    Are you familiar with his handwriting and his

25   signature?

A.    Yes.

Q.    Is that his?

A.    At the very bottom and the page next to Anthony Daye, no, that's Mary Ann's handwriting.

Q.    Just indicating who the doctor is; correct?

A.    Right.

Q.    All right.  Is there a signature above that on the top right-hand part that you can see?

A.    Yes.

Q.    Whose signature is that?

A.    That's Dr. Bujard's.

Q.    Okay.

       MR. JARZABEK:  If we can go to the top, please, Mr. Harrell.  No.  With the doctor's signature, please.

BY MR. JARZABEK:

Q.    These are notes; correct?

A.    Yes.

Q.    Do they appear to be all by the doctor?

A.    All of it but the vital signs --

Q.    Okay.

A.    -- to the left.

Q.    Does it indicate -- or what date the doctor saw Mr. Daye?

A.    5/23/11.

```
 1   Q.    Okay.  And on 5/23/11, which is roughly three

 2   weeks after the injuries, does the doctor indicate

 3   whether injuries are still visible and apparent?

 4   A.    Yes.

 5   Q.    Were they?

 6   A.    Yes.

 7   Q.    Extensively?  Several injuries are noted; is that

 8   correct?

 9   A.    Yes, several injuries.

10              MR. JARZABEK:  A moment, please, Your Honor.

11              THE COURT:  Yes, sir.

12              MR. JARZABEK:  No further questions.

13              THE COURT:  Your witness, Counselor.

14              MR. MCLINDON:  I have no questions, Your

15   Honor.

16              THE COURT:  You may step down, ma'am.  Is the

17   witness excused?

18              MR. JARZABEK:  Nothing further from the

19   Government, Your Honor.

20              THE COURT:  You are free to go home.  Thank

21   you.

22              THE WITNESS:  Thank you.

23              (Pause in the proceedings.)

24              THE COURTROOM DEPUTY:  Please raise your

25   right hand.
```

1                           JASON COMEAUX,

2        first having been duly sworn by the Courtroom Deputy,

3                   testifies under oath as follows:

4              THE COURTROOM DEPUTY:  Can you please spell

5    your first and last name for the court reporter.

6              THE WITNESS:  J-A-S-O-N C-O-M-E-A-U-X.

7              THE COURTROOM DEPUTY:  Thank you.

8                        DIRECT EXAMINATION

9    BY MR. BLUMBERG:

10   Q.    Good morning, Mr. Comeaux.

11   A.    Good morning.

12   Q.    Mr. Comeaux, why are you here today?

13   A.    I'm here to testify in the case of Louis Ackal

14   for the crimes that I've committed.

15   Q.    What crimes have you committed?

16   A.    I pled guilty to three different crimes.  One was

17   violating civil rights.  One was -- sorry, I talk fast.

18   Q.    Take a deep breath.

19   A.    One was violating someone's civil rights.  One

20   was perjury and the other one was -- the other one was

21   a -- I'm trying to remember it.  Hang on.

22   Q.    Did it relate to obstruction of justice?

23   A.    Yes.

24   Q.    Okay.  We'll talk about the specific pleadings

25   later.

```
1    A.    Yes, sir.

2    Q.    In general, tell them what you did to bring

3    yourself to this place.

4    A.    One of the crimes that I pled guilty to was

5    beating Anthony Daye.  The other one was lying during a

6    deposition for Anthony Daye.  And --

7    Q.    These are not the only people you have beaten in

8    your career, are they?

9    A.    No, sir.  Ricky Roche.

10   Q.    Before we even get started, roughly, how many

11   people in your career as a law enforcement officer do

12   you think you have used excessive force on?

13   A.    I believe I told you between 30 and 50.

14   Q.    Okay.  Do you know the defendant, Louis Ackal?

15   A.    Yes, sir, I do.

16   Q.    How do you know him?

17   A.    First met Louis Ackal when he bought a house

18   across the street from my parents.

19   Q.    Okay.  When was that?

20   A.    I was still working for the casino.  That was

21   before Hurricane Ike and Gustav.  So it's been several

22   years ago.

23   Q.    Best guess as to the year.

24   A.    2007, 2008?

25   Q.    Okay.  When did you first meet him?
```

1   A.    When he purchased that house.

2   Q.    How did you meet him?  Do you remember?

3   A.    I was at my mom and dad's.  I was still working

4   for the casino at the time, and he was the

5   across-the-street neighbor and he told me he was

6   thinking about running for sheriff.

7   Q.    Were you living at home with your folks?

8   A.    No, sir.  I traveled back and forth.  I would

9   come home every weekend.

10  Q.    Where was the casino?

11  A.    I worked for Harrah's Casino.  At that time I was

12  a corporate IT project manager.

13  Q.    Were you home every weekend?

14  A.    I traveled a lot, so I could fly home every

15  weekend.  If it was hunting season, I was coming home.

16  Q.    How often do you think you saw Louis Ackal during

17  that time period of your life?

18  A.    Probably once a week.  Let's just say three times

19  a month I would see him.

20  Q.    How would you describe your relationship with him

21  at the time?

22  A.    Neighborly.  We would talk, you know, we would

23  drink a beer together.

24  Q.    Did that relationship evolve over time?

25  A.    Yes, sir.

Q.    How?

A.    I mean, I would say it evolved over time.  My parents came to my sister's house in Dallas when I was working for him, and I went to his house and had Christmas dinner.  It was either Christmas or Thanksgiving and they went to my sister's house and I was home alone, I was working, and I had dinner at his house.

Q.    Prior to your meeting with the FBI regarding the allegations that brought you here --

A.    Yes, sir.

Q.    -- how would you describe your relationship with Louis Ackal?

A.    I would say he -- he was a role model to some sort, you know.  He was --

Q.    Describe what that means.

A.    He was in law enforcement for a long time.  You know, I kind of looked up to him.

Q.    How did he treat you?

A.    Oh, I mean, he would tell every -- he would tell people I was like the son he never had.  He called my son his grandson.

Q.    How did you refer to him?

A.    Depended on the company we kept.  There was times when I called him Uncle Louis, Paw-Paw.

```
 1    Q.    Why did you --

 2    A.    Or Sheriff.

 3    Q.    Why did you use those names?

 4    A.    Because I looked at us as more than just friends,

 5    you know.

 6    Q.    Was there anybody else at the Iberia Parish

 7    Sheriff's Office that you called Paw-Paw or Uncle

 8    Louis?

 9    A.    No, sir.

10    Q.    Did those names reflect the nature of your

11    friendship and closeness with Louis Ackal?

12    A.    I would say it did, yes, sir.

13    Q.    How hard is it for you to be here today with him

14    five, ten feet away?

15    A.    It's easier because I'm kind of upset because of

16    what he did to me and the other nine people that I

17    worked with.

18    Q.    What role did Louis Ackal play in getting you to

19    join the Iberia Parish Sheriff's Office?

20    A.    I started out as a reserve.  I talked to him

21    for -- it was either Ike or Gustav.  Whichever.  I

22    started out for the game that was on a Friday night for

23    LSU, 'cause I went to the game, then I came back and

24    got sworn in.  I don't remember which hurricane it was,

25    but it was the first one.  And I got sworn in as a
```

1    reserve, and from there I -- I got on full-time.

2    Q.    Prior to joining the -- and when I say IPSO, you

3    understand I mean the Iberia Parish Sheriff's Office?

4    A.    Oh, yes, sir, by all means.

5    Q.    Prior to joining the IPSO, had you had law

6    enforcement experience?

7    A.    I worked in Kinder, Kinder Police Department,

8    which is by Lake Charles.  Not Kenner by New Orleans.

9    I was a K-9 handler there.

10   Q.    What were your responsibilities as a K-9 handler?

11   A.    I handled the drug detection K-9, and I made

12   traffic stops and located drugs on traffic stops.

13   Q.    How long were you employed by the Kinder Police

14   Department?

15   A.    Three or four years, up until the time of my

16   divorce.

17   Q.    While you were at the Kinder Police Department,

18   did you have any difficulties with you using excessive

19   force?

20   A.    Not at all.

21   Q.    Did you beat anybody up that didn't need getting

22   beaten?

23   A.    No, sir.

24   Q.    Did you violate any internal policies or rules at

25   Kinder?

1    A.    No, sir.

2    Q.    Why did you leave Kinder?

3    A.    I got a divorce and I was working for the casino

4    at the time.  And I had to move to an apartment, and it

5    wasn't going to be good for me and the dog, so I gave

6    up the dog.

7    Q.    So what role did Louis Ackal play in having you

8    get back into law enforcement?

9    A.    The stories before I got back in that we would

10   tell, you know.  I would tell him about my experiences

11   in Kinder.  He would tell me about his experiences at

12   the state police.

13            MR. BLUMBERG:  With the Court's permission,

14   may we approach?

15            THE COURT:  Okay.

16            (Sidebar discussion begins.)

17            THE COURT:  Here we go.

18            MR. BLUMBERG:  This is the first time.  For

19   the record, if asked, Jason Comeaux will testify that

20   one of the reasons why he got into law enforcement and

21   one of the leading forces in how he understood that

22   Louis Ackal meant when he gave certain orders was the

23   information that Louis Ackal provided to him.  While a

24   Louisiana State Police Trooper, he engaged in his own

25   excessive force activities, including one story about

```
 1    killing three black people and hiding them.
 2            THE COURT:  I recognize that it is relevant.
 3    I have a 403 problem, the last part of what you said.
 4    I don't know why it is necessary for you to include
 5    that part about killing three black people.  Tell me
 6    why that's -- can overcome the 403.
 7            I assume you're objecting.
 8            MR. MCLINDON:  Object.  Absolutely.
 9            MR. BLUMBERG:  If asked, Jason Comeaux will
10    testify one of the reasons he understood specifically
11    that Louis Ackal dehumanized people in a way that Jason
12    Comeaux and other people in the narcotics unit knew
13    that whatever they did to black people would not
14    anger --
15            THE COURT:  Okay, stop.
16            (Sidebar discussion concludes.)
17            THE COURT:  Ladies and gentlemen, if you will
18    all step into the small jury room, we'll be with y'all
19    within five minutes.
20            (Jury exits the courtroom.)
21            THE COURT:  You may be seated.
22            MR. MCLINDON:  Your Honor, may my client go
23    to the bathroom?  He'll waive his presence for this
24    argument.
25            THE COURT:  Is that right, Mr. Ackal?
```

```
 1                MR. ACKAL:  Yes, I will.
 2                THE COURT:  Let's have a dress rehearsal.
 3                MR. BLUMBERG:  Mr. Comeaux?
 4                THE WITNESS:  Yes, sir.
 5     BY MR. BLUMBERG:
 6     Q.   What stories did Louis Ackal tell you about his
 7     time at the Louisiana State Police?
 8                THE COURT:  Wait just one second.  Let me see
 9     exactly where we left off.
10                (Pause in the proceedings.)
11                THE COURT:  All right.  He was telling me
12     about his experiences with the state police.  Question,
13     Mr. Blumberg.
14     BY MR. BLUMBERG:
15     Q.   What experiences did he tell you about the time
16     he spent with the Louisiana State Police?
17     A.   He's told me about numerous undercover operations
18     he did buying heroin in New Orleans.  He has told me
19     about when he was a captain in the state police, flying
20     in the helicopter.  They seen a drunk guy that ran off
21     of the road.  They hovered above him in the helicopter,
22     and he got on the mic saying --
23                THE COURT:  You're going too fast.
24                THE WITNESS:  They hovered above the -- I'm
25     sorry.
```

```
 1              They hovered above the guy in the car that
 2    was driving drunk after he crashed.  And he was in the
 3    helicopter, and he said, This is God speaking.  And
 4    they called in a marked unit to come.
 5    BY MR. BLUMBERG:
 6    Q.   Specifically, did he provide you any stories or
 7    information related --
 8              THE COURT:  Okay.  What was the relevance of
 9    that?
10              MR. BLUMBERG:  That is not relevant.
11              THE WITNESS:  Are you wanting me to say the
12    story that you told me to ask you about?
13              MR. BLUMBERG:  The problem, Your Honor, is I
14    told him he is not allowed to tell it unless I gave him
15    permission.  So that's what we're doing.  I apologize.
16              THE COURT:  Okay.
17              MR. BLUMBERG:  With the Court's permission, I
18    will --
19              THE COURT:  We are not going to go into that
20    about the helicopter.
21    BY MR. BLUMBERG:
22    Q.   Now, the story?
23    A.   The story, okay.  The story was he was telling me
24    about an undercover operation that he was working in
25    New Orleans.  They had a crew --
```

Q.    Slowly.

A.    They had a crew of heroin dealers that was meeting people, robbing them and shooting them or killing them.  He told me he met with this crew and set up a meet with them to buy some heroin.  He arrived at the meet location several hours before and hid in a dumpster.  He was waiting in the dumpster.  The bad guys -- the three bad guys got there.  I -- started saying, *I told you he wasn't going to show,* meaning Louis.

        Louis waited a little while, and he popped out the dumpster and he shot two of them, and he shot the third one when he was running away.

Q.    And what's the rest of the story about hiding the event?

A.    The rest of the story is he got called the next day to the state police office by his captain, and his captain said, *Louis, they think you killed three people in New Orleans.  They need your gun.*  Louis gave him his gun.

        And he said his captain was smoking cigarette after cigarette in the break room.  They brought him his gun back, and they told his captain it wasn't his gun.  Louis said he got up, and when he went to walk away, he leaned over and whispered in his captain's ear

1   *I wouldn't shoot him with my own gun, ha, ha, ha, ha,*

2   and walked out.

3   Q.    How did he refer to the people that he shot?

4   A.    As niggers.

5   Q.    How many times has he told that story to you?

6   A.    I've heard him tell it to me once, and I've heard

7   him tell it to several other people numerous times.

8   Q.    Now, what is the impact of that story on you as

9   it relates to the --

10              THE COURT:  Okay, stop.

11              MR. BLUMBERG:  Yes, sir.

12              (Pause in the proceedings.)

13              THE COURT:  Caroline.

14              Turn up the music.  Turn on the music,

15   please.

16              (Pause in the proceedings.)

17              (*Sidebar discussion begins.*)

18              THE COURT:  Let's see if we can clean this up

19   a bit.

20              MR. BLUMBERG:  Yes, sir.

21              THE COURT:  Would it be accurate if you asked

22   the question, what did he tell you about his, Ackal's,

23   tenure with the state police that Ackal described

24   violating the civil rights of some individuals that he

25   referred to as *niggers*?  Would that be a correct -- an

```
1    accurate summary of his testimony?

2            MR. BLUMBERG:  And hiding it.  Lying about

3    it.  Yes.

4            THE COURT:  And lying about it?

5            MR. BLUMBERG:  And lying about it to his

6    authorities.

7            THE COURT:  All right.

8            MR. BLUMBERG:  That would be an accurate

9    summary.

10           THE COURT:  All right.  There's an objection

11   to that summary?

12           MR. MCLINDON:  There is an objection.

13           THE COURT:  And your objection is...

14           MR. MCLINDON:  Approach the microphone.

15   Well, Judge, I briefed this in my motion.  The first

16   thing is we're talking about events that occurred 30 --

17           THE COURT:  Just tell me.  You object to

18   this?

19           MR. MCLINDON:  Yes, sir.

20           THE COURT:  The summary?

21           MR. MCLINDON:  I object to the summary, to

22   any reference to what he did at the Louisiana State

23   Police.

24           THE COURT:  Would you agree that the summary

25   is, in fact, a fairly -- no, not fairly -- an accurate
```

```
 1    summation of the testimony that was described to me on

 2    the side or we just had a rehearsal on?

 3              MR. MCLINDON:  I mean, I don't agree with it,

 4    but it's an accurate summary.

 5              THE COURT:  You don't have to agree with it.

 6    Right.  I have a real 403 problem.  I don't have that

 7    same problem with that summary.  Is it possible that we

 8    can limit it to exactly that?  No more, no less?

 9              MR. BLUMBERG:  Yes, sir.  If I'm permitted to

10    lead him through it.

11              THE COURT:  I'm going to permit you to lead

12    him through it.  And remember, he described it being

13    with the state police.  He described --

14              MR. BLUMBERG:  I'm going to write it down.

15    With the Court's permission, it would be a

16    constitutional violation of --

17              THE COURT:  He admitted to constitutional

18    violations --

19              MR. BLUMBERG:  With the Court's permission,

20    rather than *constitutional violations* --

21              THE COURT:  That's your words.

22              MR. BLUMBERG:  I know.  But it could be a

23    First Amendment violation or something else.  Can I say

24    *excessive force*?

25              THE COURT:  Okay.  He used excessive force --
```

1            MR. BLUMBERG:  Excessive force.

2            THE COURT:  -- against citizens?

3            MR. BLUMBERG:  Against citizens he identified

4    as --

5            THE COURT:  *How did he identify them?*

6    *Answer:  Niggers.*

7            MR. BLUMBERG:  Yes, sir.

8            THE COURT:  And the third question, did he

9    say he covered up for it?

10           MR. BLUMBERG:  Right.  If you'd like, Your

11   Honor, I'll lead him through that so there's no --

12           THE COURT:  I want you to lead him through

13   it.

14           MR. BLUMBERG:  I'm not even going to ask him

15   the open-ended question.  I'll just bullet point the

16   way you said it.

17           THE COURT:  All right.

18           MR. BLUMBERG:  And the follow-up question,

19   Your Honor, would be -- which is the relevance, I

20   think, is -- *what was the impact of that on you*?

21           THE COURT:  That's fair enough.  Thank you.

22           MR. MCLINDON:  So, Your Honor, to make sure

23   my objection is clear for the record...

24           THE COURT:  Go ahead.

25           MR. MCLINDON:  We are talking about an

```
 1    incident that occurred over 30 years ago, and I cited
 2    several cases in my brief that say it is so remote --
 3    it's coming into 404(b).
 4              THE COURT:  No, it's not remote.  It was told
 5    to him then.  We are not talking about whether the
 6    sheriff actually did any of that, but that he told the
 7    story, and that's what makes it relevant.  And I'm
 8    cleaning it up as much as I can under 403.
 9              MR. MCLINDON:  Just one last thing, Judge.
10              THE COURT:  Your objection is noted.
11              MR. MCLINDON:  Just one last thing, Judge.
12    I, obviously, read about this in reports and -- well,
13    I'll tell you what, I will cross-examine him on this.
14              THE COURT:  Thank you.
15              MR. MCLINDON:  Okay.
16              THE COURT:  Don't open any doors.
17              MR. MCLINDON:  I'm comfortable, Judge.
18              THE COURT:  Okay.  Bring them in.
19              (The Jury enters the courtroom.)
20              THE COURT:  You may sit down.
21              Mr. Blumberg --
22              MR. BLUMBERG:  Thank you, sir.
23              THE COURT:  -- you may lead the witness
24    through the next few questions.
25    ***
```

```
 1    BY MR. BLUMBERG:

 2    Q.    Mr. Comeaux, when we broke, we were talking about

 3    some things that Louis Ackal told you about regarding

 4    his time as a Louisiana State Police trooper; correct?

 5    A.    Yes, sir.

 6    Q.    And am I correct that he told you certain stories

 7    about his conduct?

 8    A.    Yes, sir.

 9    Q.    Including one particular story about him using

10    excessive force on certain people within New Orleans?

11    A.    Yes, sir.

12    Q.    That he referred to those people as niggers?

13    A.    That is correct.

14    Q.    That he hid that episode from his supervisors by

15    lying about it to them?

16    A.    Yes, sir.

17    Q.    And that's the story he told you?

18    A.    Yes, sir.

19          THE COURT:  All right.  Now, proceed without

20    leading.

21          MR. BLUMBERG:  Yes, sir.

22    BY MR. BLUMBERG:

23    Q.    Mr. Comeaux, what impact did that story have on

24    you when you were considering going into the IPSO?

25    A.    That anything that you did would be okay as long
```

1     as you covered it up.

2     Q.    Why?

3     A.    He did it.  He was bragging about it to me, that

4     he covered up something that he did that was really

5     bad.

6     Q.    What was the impact of that story in terms of the

7     way he talked about the people who were victimized by

8     the use of force?

9     A.    At that time, it started -- he was talking about

10    them like they weren't human.  And at that time, he

11    started bringing everything down to where you don't

12    feel later on in life that those people are human.

13            THE COURT:  Okay.  Move on now.

14            MR. BLUMBERG:  Yes, sir.

15    BY MR. BLUMBERG:

16    Q.    Did you -- how did you make the decision to go

17    into IPSO?

18    A.    I was working with my father at the time.  My

19    father has his own plumbing business.  I didn't like

20    doing plumbing work.  And the position was offered to

21    me, and I took it.

22    Q.    Did he tell you what to expect or give you any

23    indication of what to expect when you went to the IPSO?

24    A.    No, sir, he didn't.

25    Q.    Did you have -- did you have a place that you

1    wanted to go to in the IPSO?

2    A.    I started out in directing patrol, and I ended up

3    in narcotics.  My career goal was to go into narcotics

4    because I liked working dope.

5    Q.    Okay.  Now, before you got yourself settled in

6    narcotics, did you receive Use of Force training?

7    A.    Yes, sir, when I went through the academy.

8    Q.    What is POST certification in the State of

9    Louisiana?

10   A.    Police Officer Standardized Testing.

11   Q.    What is it?

12   A.    You go to a class for, I believe, three to

13   four months.

14   Q.    What kinds of things are included in POST

15   certification training?

16   A.    They teach you about the amendments.  They teach

17   you about use of force.

18   Q.    Let me caution you on one thing.  Gayle is taking

19   everything down.  If we talk at the same time, she's

20   not going to do it.

21   A.    Yes, sir.  I'm sorry.

22   Q.    You wait, and I'll wait.

23   A.    Okay.

24   Q.    Describe POST certification training.

25   A.    You start out -- physical fitness is included in

1   it, but they teach you about the amendments.  They

2   teach you defensive tactics.  They teach you about when

3   to use those defensive tactics.  When you can and when

4   you can't use deadly force.  It's everything a police

5   officer needs to know in about three to four months.

6   Q.    What amendments do they teach you about?

7   A.    First, Second, Third, Fourth.

8   Q.    Do you mean the amendments to the United States

9   Constitution?

10  A.    Yes, sir.

11  Q.    Do you mean the amendments that relate to the

12  rights of citizens vis-à-vis their police officers?

13  A.    Yes, sir.

14  Q.    Do they talk to you specifically in POST

15  certification training about appropriate uses of force?

16  A.    Yes, sir.

17  Q.    What do they teach you?

18  A.    That you can use the level -- you can use legal

19  force necessary to effect a legal arrest.

20  Q.    A legal or illegal arrest?

21  A.    Legal.

22  Q.    In the state of Louisiana, can you use force to

23  make a illegal arrest?

24  A.    No, sir, you can't.  You can actually resist an

25  illegal arrest in the State of Louisiana.

```
 1   Q.    A person can?

 2   A.    A person can, yes, sir.

 3   Q.    Where did you learn all that?

 4   A.    In the academy.

 5   Q.    Did you get additional training on uses of force

 6   once you finally went and became a member of IPSO?

 7   A.    Yes, sir.

 8   Q.    Describe that for the members of the Jury,

 9   please.

10   A.    Once a year, we have what's called inservice

11   training.  At IPSO, it's during your birthday month you

12   have to attend.  And they go over use of force.  They

13   go over any new laws that came out, CPR, defensive

14   driving.  But use of force is like a four-hour block.

15   Q.    And was there anything different between what you

16   learned at POST certification Use of Force training and

17   what you learned at the IPSO Use of Force training?

18   A.    No, sir.  It was pretty much all the same.

19   Q.    In fact, is it your understanding they're

20   supposed to follow one from the other?

21   A.    They should, yes, sir.

22   Q.    Were you also taught about obligations under

23   use-of-force principles to protect people within your

24   custody as a law enforcement officer?

25   A.    Yes, sir, we were.
```

Q.    What are you taught?

A.    That once you arrest them, they're yours, and you should protect them, whether from bodily harm, bullets flying.

Q.    Who are you obligated to protect them from?

A.    Everyone, including police officers.

Q.    Based on your training, what is your understanding of your obligation in the State of Louisiana and elsewhere about what you're supposed to do if a fellow police officer is committing a constitutional violation of somebody within your custody?

A.    You should stop them.

Q.    Why?

A.    Because you're violating their rights and it's wrong.

Q.    To get a little education about IPSO, how many units were there?

A.    Units as in different divisions?

Q.    Yes.

A.    There is the patrol division, the corrections division.  At the time, the patrol division had IMPACT and patrol.  Then you had BOI, which was narcotics and detectives.

Q.    Are you taught about the applicability of the Use

1    of Force training to all of these units?

2    A.    It's standard for the -- whenever you go to

3    inservice, it's narcotics sitting in there.  It's

4    patrol.  It's jailers.  It's courthouse people.  It's

5    everybody.

6    Q.    Does it apply to uses of force with empty hands

7    by officers?

8    A.    Yes, sir.

9    Q.    Does it apply to uses of force by use of weapons?

10   A.    Yes, sir.

11   Q.    Including and up to deadly force?

12   A.    Yes, sir.

13   Q.    Are you familiar with the use of batons at the

14   IPSO?

15   A.    Yes, sir, I am.

16   Q.    How many batons are you familiar with being used

17   routinely at the IPSO?

18   A.    How many?

19   Q.    Yeah.  What kinds?  What types?

20   A.    They have the collapsible baton and the straight

21   baton.

22   Q.    All right.  I'm going to show you --

23              THE COURT:  Mr. Blumberg, as we approach the

24   noon hour, I'm going to let you pick a place to stop.

25              MR. BLUMBERG:  This is as good as any, Your

1    Honor.

2              THE COURT:  All right.  Ladies and gentlemen,

3    if everybody can be back in the jury room at

4    one o'clock, we'll start at one o'clock.

5              All rise for the jury.

6              (Jury exits the courtroom.)

7    (Lunch break recess at 11:55 a.m.; resuming 12:59 p.m.)

8                         *    *    *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    November 1, 2016                              12:59 p.m.

2                          ---o0o---

3              A F T E R N O O N   S E S S I O N

4                          ---o0o---

5              THE COURT:  You can be seated until the Jury

6    comes in.

7              (Pause in the proceedings.)

8              THE COURT:  Where is Mr. Comeaux?  There he

9    is.  Mr. Comeaux, come back on up.

10             THE WITNESS:  Yes, sir.

11             (The Jury enters the courtroom.)

12             THE COURT:  You may all be seated.

13             Mr. Comeaux, you understand you are still

14   under oath.

15             THE WITNESS:  Yes, sir, I do.

16             THE COURT:  Proceed.

17             MR. BLUMBERG:  Thank you, sir.

18   BY MR. BLUMBERG:

19   Q.   Mr. Comeaux, when we broke, we are talking about

20   your Use of Force training and its applicability.

21             Do you recall that?

22   A.   Yes, I do.

23   Q.   One of the questions that I had was to which

24   divisions does the Use of Force training that you

25   received apply at the IPSO?

1    A.    All POST officers.

2    Q.    What techniques does the use of force principles

3    apply to?

4    A.    It's a rundown of everything that any POST

5    officer would have learned during the academy.

6    Q.    Are they are the same use of force principles

7    whether you're using an empty hand or a weapon?

8    A.    It's specific for empty hands, specific for

9    weapons.

10   Q.    Well, the use of force principles that you had

11   described earlier, if I can paraphrase, was that you

12   were taught you may only use that amount of force

13   reasonably necessary to effectuate an arrest or manage

14   a person in your custody.  Is that a fair statement?

15   A.    Yes, sir, it is.

16   Q.    Does that principle apply if you're using empty

17   hands on a suspect?

18   A.    Yes, sir.

19   Q.    Does that apply whether you're using a K-9 to

20   manage a suspect?

21   A.    Yes, sir.

22   Q.    Does it apply whether you're a SWAT officer?

23   A.    Yes, sir.

24   Q.    Does it at apply whether you're using weapons

25   against a detainee or somebody in your custody?

A.    Yes, sir, it does.

Q.    Have you used weapons in your role as an IPSO

deputy in the past?

A.    I pepper sprayed maybe.  I didn't carry a baton.

Q.    Are you familiar with the batons?

A.    Yes, sir, I am.

Q.    I'm going to show you now, with the Court's

permission, what has been previously marked as

Government's Exhibit Number 53 for identification and

demonstrative purposes only.

        With the Court's permission, if I can

approach the witness?

        THE COURT:  Yes.

BY MR. BLUMBERG:

Q.    Mr. Comeaux, do you know what Government's

Exhibit Number 53 for identification is?

A.    Yes, sir.  That's a straight baton.

Q.    Have you seen that before?

A.    I have seen one before, yes, sir.

Q.    Is it typical of the ones used by IPSO deputies?

A.    Yes, sir.

Q.    Is it your understanding that the use of force

principles that you learned as a deputy apply to the

use of batons at the IPSO?

A.    Yes, sir, it does.

1    Q.    Is there anything different that gives you more

2    license to use a baton than if you were using empty

3    hands?

4    A.    No, sir.

5    Q.    Okay.

6              MR. BLUMBERG:  Return that back, please.

7    BY MR. BLUMBERG:

8    Q.    I'm going to show you now what's been previously

9    marked as Government's Exhibit 54 for identification

10   and demonstrative purposes only, if I may.  I ask to

11   you take a look at that, sir?

12   A.    Yes, sir.  That's a collapsible baton.

13   Q.    Does it have a brand name or go by any other

14   name?

15   A.    Asp, A-S-P.  That's one of the bigger

16   manufacturers of them.

17   Q.    Okay.  We'll refer to it as a *collapsible baton*;

18   okay?

19   A.    Yes, sir.

20   Q.    Do the use of force principles that you described

21   apply to the use of collapsible batons as well?

22   A.    Yes, sir.  Collapsible batons, straight batons

23   all falls under the same category.

24   Q.    Who assigned the ability to use a collapsible

25   baton at the IPSO?

1    A.    Any POST-certified deputy.

2    Q.    What is your training about when you can use a

3    baton?

4    A.    Depending on if the suspect has a weapon, their

5    resistance.  It all -- it's all based off of the

6    suspect's actions.

7    Q.    Have you ever used a baton against a suspect?

8    A.    I carried one when I was in Kinder for a couple

9    of weeks and after that I didn't because working the

10   dog, it would hit me in the ribs.  And in narcotics at

11   IPSO I was in plain clothes, so I didn't carry a baton.

12   Q.    Were you also assigned to SWAT while you were at

13   IPSO?

14   A.    Yes, I was.

15   Q.    Describe for the Jury what the role of SWAT was.

16   A.    The SWAT team is if there is a high-risk warrant,

17   a barricaded subject, a hostage situation where we

18   would get called in to handle the situation.

19   Q.    On April 29th, 2011, which we will come back to,

20   did officers have batons in the IPSO jail?

21   A.    Yes, sir.

22   Q.    Did you see them being used?

23   A.    Yes, sir, I did.

24   Q.    Okay.  Were they of the type that we just

25   described?

1    A.    They were the collapsible baton.

2    Q.    Government's Exhibit 54 for identification --

3    A.    Yes, sir.

4    Q.    -- did you see anybody with straight batons?

5    A.    They had some officers that carried straight

6    batons, but there wasn't many.

7    Q.    Okay, thank you.  So let's take you back now --

8    you learned -- you told us what the use of force

9    principles were.

10          When you got to narcotics, did you find that

11   those use of force principles were being applied?

12   A.    No, sir, they were not.

13   Q.    What year did you go into narcotics at the IPSO?

14   A.    2009.

15   Q.    What was the first instance that you realized

16   that the IPSO -- that the use of force principles that

17   you described were not being followed in narcotics?

18   A.    The instance with Major Barnett.

19   Q.    Why don't you describe that?

20   A.    We had a suspect we arrested and he was brought

21   to the office and he was brought into Major Barnett's

22   office and he was sitting in the chair.

23   Q.    Who was Major Barnett?

24   A.    Major Barnett was Michael Barnett.  He was a

25   major at the time.

1   Q.    What was the rank or the hierarchy or the command

2   structure at the time?

3   A.    It would have been the sheriff, the chief deputy.

4   I don't know who MP3 was at the time.  Major Barnett

5   was MP4.

6   Q.    What's that initial?

7   A.    MP4.

8   Q.    What's that?

9   A.    That's your radio number.

10  Q.    And the numbers you're describing refer to the

11  rank in the department?

12  A.    I would say so under the first 5 or 10.  After

13  that, it's by divisions.

14  Q.    Major was a role that was very senior and oversaw

15  several divisions; is that right?

16  A.    Yes, sir.

17  Q.    Okay.  So describe the circumstances for the

18  Jury.

19  A.    Guy's in the office and we're sitting in there,

20  and there's a stain on the floor by the guy's feet

21  where we're sitting.

22  Q.    So you were with a suspect?

23  A.    I was in Major Barnett's office with a suspect,

24  yes, sir.  And we're sitting in there, and the guy's

25  not saying nothing, and Major Barnett pulls out his

```
 1    weapon, points it at the guy's feet.  He said you see
 2    that blood stain right there.  That's for the last
 3    nigger I shot.  You're going to tell me what I want to
 4    know or your blood will be right there with his.
 5    Q.    The weapon he pulled out was...
 6    A.    Was a Glock.
 7    Q.    A gun?
 8    A.    Yes, sir.
 9    Q.    Did he shoot him?
10    A.    No, he didn't shoot him.
11    Q.    Was there any reason to threaten this suspect
12    with the gun?
13    A.    No, sir.
14    Q.    What was the purpose of it?
15    A.    To try to get him to give us information.
16    Q.    Did you learn about how to conduct interrogations
17    and interviews when you were at POST?
18    A.    Yes, sir, I did.
19    Q.    Did you ever learn about using a gun to threaten
20    somebody to give a confession or a statement?
21    A.    No, sir, I didn't.
22    Q.    What was your impression of what Major Barnett's
23    actions were?
24    A.    That it was -- at that time, I was a rookie narc
25    and I thought it was wrong, and I got up and walked out
```

1    the room.

2    Q.    Did you report it to anybody?

3    A.    No, sir, I didn't.

4    Q.    Now, at that point in time, you were friends with

5    Louis Ackal; weren't you?

6    A.    Yes, sir.

7    Q.    At that point in time, he was still your

8    neighbor?

9    A.    Yes, sir.

10   Q.    Why didn't you go and tell Louis Ackal?

11   A.    Because I actually liked narcotics and I liked

12   doing the work I was doing and I didn't want to get

13   kicked out.

14   Q.    Why would you think you would get kicked out?

15   A.    Because of previous instances that were covered

16   up before I even got into narcotics.

17   Q.    How did you learn about those previous instances?

18   A.    From Louis Ackal.

19   Q.    So before you even went into narcotics, you had a

20   sense from Louis Ackal as to what was going on in

21   narcotics?

22   A.    Yes, sir.

23   Q.    Why don't you explain to the members of the Jury

24   when you first learned about the culture from Louis

25   Ackal.

```
 1    A.    There was three narcotics agents, Troy Willis,

 2    Jacob Huckabay and Wade Bergeron that were at Troy

 3    Willis's house that night drinking, and they went, what

 4    I was later told, nigger knocking.  They went and beat

 5    up one or two young black males, then took off running.

 6    And one of them actually got caught by the police and a

 7    report was made.

 8             And Louis later told me that he had Colette

 9    Voorhies delete the report out the system.  And he was

10    actually pissed off that a report was made about him.

11    Q.    Who was he pissed off at?

12    A.    The patrol deputy that made the report.

13    Q.    Who else was Louis Ackal angry at that he told

14    you?

15    A.    Wait.  Rephrase.  One more time.

16    Q.    Certainly.  I'm sorry.

17             This conversation that you had with Louis

18    Ackal --

19    A.    Yes, sir.

20    Q.    -- did he tell you who he was angry with?

21    A.    He wasn't angry with the narcotics agents.

22    Q.    Was he angry with them about anything?

23    A.    Not that I was aware of.

24    Q.    How about getting caught?

25    A.    Getting caught.  That would have been the only
```

1    thing.

2    Q.    What was the impact of that story on you before

3    you even went into narcotics?

4    A.    That whatever we did, as long as -- he wouldn't

5    have been mad at us.  He was mad because they got

6    caught and that a report was written on it.  He wasn't

7    mad because they went nigger knocking.

8    Q.    By the way, that phrase came from whom?

9    A.    Louis Ackal.

10   Q.    What did that phrase mean to you at the time?

11   A.    They went and beat up some niggers.

12   Q.    What was the impact of hearing that phrase used

13   in that context on you as you went into the narcotics

14   unit?

15   A.    Makes it okay to beat on whoever you want.

16   Q.    Including...

17   A.    Niggers.

18   Q.    Did you have other conversations with Louis Ackal

19   of a similar nature even before you went into

20   narcotics?

21   A.    Yes, sir.

22   Q.    Why don't you describe for the Jury what he told

23   you.

24   A.    For Hurricane Ike and Rita, he told me that on

25   the west end of town, which is predominantly black,

```
 1    that CLECO was going around trying to hook up --
 2    re-hook up the power that was knocked out.
 3    Q.    Mr. Comeaux, CLECO is --
 4    A.    CLECO is the electric company in Iberia Parish.
 5    And they were trying to restore power to homes, restore
 6    the lines that was knocked down by all the tree
 7    branches that fell.  And they called Louis and said
 8    they had people giving them hell.  So Louis had to
 9    assign SWAT team to it.  But also during that same
10    conversation, he said that Bobby Jindal called him and
11    asked him if he needed anything.
12    Q.    Who was Bobby Jindal at the time?
13    A.    He was the governor of Louisiana.  And he told
14    Bobby Jindal that he needed 55-gallon drums of nigger
15    repellant.
16    Q.    What was the impact of that statement on you as
17    you were going into narcotics?
18    A.    That he didn't like black people and whatever we
19    did was what we did and it was all okay.
20          THE COURT:  We've exhausted that topic.
21    Let's move on.
22          MR. BLUMBERG:  Yes, Your Honor.
23    BY MR. BLUMBERG:
24    Q.    When you were in the academy before you actually
25    made it into the role of narcotics --
```

1    A.    Yes, sir.

2    Q.    -- did you have an incident in which you had

3    conversations with Louis Ackal again which had an

4    impact on how you saw the narcotics unit?

5    A.    Yes.  I'm trying to remember the exact

6    conversation I had with you on that.

7    Q.    Was there a conversation that you had about

8    disbanding internal affairs?

9    A.    Oh, yes.  That was the incident when I was in

10   directed patrol, we had a Peeping Tom that was running

11   around New Iberia, two different sections.  And I got

12   called out -- I was still in the academy.  I got called

13   out the academy for an IA investigation.

14   Q.    *IA* stands for ...

15   A.    Internal affairs.  And shortly thereafter, IA was

16   disbanded.  And Louis told me that don't worry about

17   anything, all the IA investigations now go to him.

18   Q.    What did you understand that to mean?

19   A.    That he was going to look at every IA

20   investigation and he would have sole say on whether

21   somebody was terminated or disciplined.

22   Q.    Why would that be -- why would that be important

23   to you as a narcotics agent?

24   A.    Because the sheriff's looking at everything that

25   we're doing and we were his favorite unit, according to

1   him.   That's the words out of his mouth.

2   Q.   Did he approve of the narcotics unit using more

3   force than was reasonably necessary in the course of

4   their business?

5   A.   He knew from times -- from the times that I told

6   him we did, and he didn't say anything about it.

7   Nobody was written up.   Nothing ever happened.

8   Q.   Well, give an example of when you explained to

9   him that you used more force than was reasonably

10   necessary.

11   A.   Ricky Roche would be a good example that I can

12   remember.

13   Q.   Before we even get to Mr. Roche, was there some

14   conversation that you had with Louis Ackal about a DJ

15   who got beaten, or radio announcer?

16   A.   Yes.   That was -- he told me about that one at

17   his house.   David Prejean.   He told me -- I went to his

18   house one morning just to talk.   He told me that David

19   Prejean whipped the radio announcer's ass, which is

20   Jeff Boggs.

21   Q.   What was the significance of that conversation?

22   A.   Jeff Boggs was a radio announcer for KANE, and he

23   did not like Louis.   He would get on the radio and bash

24   Louis.   And when he told me about it, it was like,

25   *yeah, Prejean kicked his ass, ha, ha, ha.*

```
1    Q.    Did he indicate that Mr. Prejean was a deputy at

2    the time?

3    A.    Yes.  He was a K-9 officer.

4    Q.    Would he be under any scrutiny?

5    A.    Not that I was aware of.

6    Q.    Did he indicate there would be any investigation

7    of the use of force by Deputy Prejean?

8    A.    Not that I was aware of.

9    Q.    What was your impression from the way that Louis

10   Ackal told you that story?

11   A.    He was happy that Boggs got his ass kicked.

12   Q.    Now, in narcotics, were you familiar with the

13   phrase got his issue?

14   A.    Yes, sir.

15   Q.    What did that mean to you?

16   A.    That meant that they -- they got beat or they got

17   a couple extra licks.  They had excessive force used on

18   them.

19   Q.    Did you ever have conversations with Louis Ackal

20   about whether you got your issue?

21   A.    Yes, sir.

22   Q.    Describe those conversations.

23   A.    I told him whenever Ricky Roche -- I told him

24   Ricky Roche got his issue.

25   Q.    Describe the Ricky Roche episode to the Jury.
```

A.   Ricky Roche -- Ricky Roche was somebody that was
not on the narcotics radar at the time, and he punched
a captain out one night.  And before he hit him, he
screamed, *you fucking narc*, and he hit Bubba, or Gerald
Savoy.  I got a call that Bubba got hit, and I went and
looked for Ricky Roche.

Q.   What were you going to do when you found him?

A.   I was going to beat his ass.

Q.   Why?

A.   Because I was mad because he hit Bubba.

Q.   Would that have been legal?

A.   No, sir.

Q.   You were going to do it anyway?

A.   I was going to do it anyway.

Q.   Did you find Ricky Roche?

A.   I did.  I found him at the corner of Iberia and
Main Street headed south.

Q.   Did you beat him up?

A.   No.  I punched on his window, it wouldn't break,
and he wouldn't get out the car.

Q.   Did you describe that episode to Louis Ackal?

A.   Yes, I did the next morning because I figured I
better tell him in case somebody filed a complaint, it
would be better on me.

Q.   What was the nature of that conversation?

1    A.    I told him what I did and he said, *y'all need to*
2    *get him, baby*.
3    Q.    Did he indicate to you that you needed to file an
4    arrest warrant?
5    A.    No, sir, he didn't.
6    Q.    Did he indicate that you should conduct an
7    investigation?
8    A.    He indicated that we needed to get Ricky Roche
9    and put him in jail.
10   Q.    Did he indicate to you he should get his issue?
11   A.    He knew I was trying to give him his issue that
12   night and he didn't say, *y'all beat him up*.
13   Q.    How did he know that?
14   A.    Because I told him.
15   Q.    And my question is, what did you tell him?
16   A.    I told him I was beating on his window trying to
17   pull him out the car because I was going to beat his
18   ass.
19   Q.    At some point did Ricky Roche get his issue?
20   A.    Yes, sir.
21   Q.    Describe for the members of the Jury.
22   A.    I was working undercover at another spot in
23   Lafayette Parish, and I got a text or a phone call that
24   they were following Ricky Roche.  They seen him do a
25   hand-to-hand in a parking lot.  Later that night when

```
 1    my undercover operation detail ended, I showed up at
 2    the narcotics office and Ricky Roche was in custody.
 3    He was sitting on a bench that we had at the office,
 4    and there was blood on the back wall.
 5              So I gave him a napkin, put it in his mouth
 6    and told him to clean my wall.  After he got finished
 7    cleaning the wall, I slapped him.
 8    Q.    Did anybody else beat him that night?
 9    A.    Todd Anslum hit him in front of me.
10    Q.    Anybody else?
11    A.    At the office, I don't know.  I wasn't on scene,
12    so I can't say if he was beat up on scene or not.
13    Q.    But did you have conversations with fellow
14    narcotics officers about Ricky Roche?
15    A.    Yes.  I know that Josh Chance (ph) was told not
16    to go back there.
17    Q.    He was a deputy?
18    A.    He was a deputy.  He was either a deputy or a
19    sergeant at the time.  That narcotics was going to
20    handle it.
21    Q.    Based on your conversations with your fellow
22    narcotics agents, did you have a belief that Ricky
23    Roche had been beaten at his arrest?
24    A.    I believe he got his issue that night, yes, sir.
25    Q.    Why would narcotics agents share information
```

1   about beatings with each other?

2   A.    I guess just so we would know what happened.  And

3   it was kind of a, *ha, I beat his ass* thing.

4   Q.    Did it serve a purpose of knowing whether you

5   could be trusted?

6   A.    It did.  I think some of them got shared with me

7   because I was the messenger to Louis.

8   Q.    Why do you think that?

9   A.    Because I lived across the street, and I had a

10  better relationship with Louis than anybody else in

11  narcotics.

12  Q.    Was it also because you actually shared

13  information back and forth between Louis Ackal and

14  narcotics?

15  A.    Yes, sir.  He knew Ricky Roche got his issue.

16  Q.    How did he know that?

17  A.    I told him the next day.

18  Q.    And what was his response?

19  A.    *That's good*.

20  Q.    Let's talk about the way the narcotics unit did

21  business for a moment.

22  A.    Yes, sir.

23  Q.    How is narcotics supposed to work?

24  A.    We conduct narcotics investigations using

25  informants, using undercovers.  Sorry.  We -- a bunch

```
 1    of our stuff came off of tips, our information.  And
 2    you would do surveillance on the house.  You would talk
 3    to the informants and see if they could buy drugs from
 4    that house or that person, and you conduct an
 5    investigation on them.  Knock-and-talks is where you
 6    think they are doing drugs and you got a complaint that
 7    they're doing drugs there, and you exhaust all means,
 8    you use your investigative skills, and the last thing
 9    you do is go knock on the door and talk to the person.
10    Q.    Did you do some of that as a narcotics agent?
11    A.    I did a lot of that as a narcotics agent.
12    Q.    All right.  But you didn't always do it in the
13    right way, did you?
14    A.    No, sir.
15    Q.    In fact, the way we started was frequently you
16    were doing it in the wrong way.
17    A.    Yes, sir.
18    Q.    Generally speaking, describe the general
19    categories for the Jury of how you did it in the wrong
20    way.
21    A.    Driving down the road, they would have three or
22    four people standing on the side of the road.  We would
23    do jump-outs.
24    Q.    What's a jump-out?
25    A.    Pretty much what it sounds like.  You're driving
```

1    down the road, and you throw the car in park and jump

2    out; and if they run, you chase them.

3    Q.    What if they don't run?

4    A.    They usually got tossed to the ground.

5    Q.    What does that mean, they would get tossed to the

6    ground?

7    A.    They would get put on the ground hard.  We'd

8    tackle them, use an arm bar, for no reason.

9    Q.    You would slam people into hard objects?

10   A.    Yes, sir.

11   Q.    Why would you do that?

12   A.    To let them know it was our streets.

13   Q.    Did you do this when -- because you perceived

14   that somebody was a risk to you?

15   A.    No, sir.

16   Q.    Did you do these things because you were worried

17   that evidence was going to be destroyed?

18   A.    No, sir.

19   Q.    Did you do these things in order to protect some

20   citizen from the people you saw on the street?

21   A.    No, sir.  We did them to clear the streets, to

22   get people off the streets.

23   Q.    Why would you feel like you needed to clear the

24   streets?

25   A.    There was times where we were given orders to

1    clear the streets.

2    Q.    Who would give you those orders?

3    A.    They would come down from higher-ups, Savoy.

4    There was times where after my shooting, Louis gave us

5    the order to clear the street, and at 8:30 that night,

6    there was nobody on the roads.  There was nobody

7    sitting on their front porches.  Everybody was in their

8    house.

9    Q.    Because of why?

10   A.    Because we were told to clear the streets and

11   doing jump-outs.  We were getting people off the

12   streets.

13   Q.    By using more force than you were allowed to use?

14   A.    Yes, sir.

15   Q.    What was the effect on the citizens of that?

16         MR. MCLINDON:  Objection.  That calls for

17   speculation.

18         MR. BLUMBERG:  If I may, Your Honor.

19   BY MR. BLUMBERG:

20   Q.    You said the streets were cleared.  Was there a

21   connection between what you were doing and the streets

22   being cleared?

23   A.    Oh, yes, sir, by all means.

24   Q.    What was that?

25   A.    There was nobody on the street.  Everybody was in

1    their house.  It was -- it was odd at 8:30, 9:00 at

2    night to drive down Hopkins Street and not see anybody

3    standing in front of the Red Barn, the One Stop or --

4    there was no cars on the road.  There was nobody out

5    there, because they knew if they got out there, they

6    were going to get stopped and they were going to get

7    dealt with that night.

8    Q.    How many members of your narcotics unit

9    colleagues do you think were engaging in these

10   jump-outs where people would be slammed into hard

11   objects for no reason?

12   A.    Pretty much everybody in narcotics but Tasia

13   Burgess because she was a female at the time.

14   Q.    Did Louis Ackal know about the jump-outs?

15   A.    Oh, yes, sir.

16   Q.    How do you know that?

17   A.    Because he told us that night to go clear the

18   streets.

19   Q.    How would he know what the phrase *clear the*

20   *streets* means?

21   A.    How wouldn't he?  He told us to go clear the

22   streets.  He didn't want anybody on the streets for the

23   home invasions, when we have a rash of home invasions.

24   We were sitting at BOI one night, and he told us to go

25   clear the streets.  And there was nobody on the road

```
1    after that.
2    Q.    Did he ask you to go out and arrest people on the
3    streets?
4    A.    Clear the streets.
5    Q.    Is that different than arrest?
6    A.    Yes, sir.
7    Q.    Did he ask you to go out and investigate
8    narcotics offenses?
9    A.    No, sir.
10   Q.    Clear the streets.
11   A.    Clear the streets.
12   Q.    Did anybody in narcotics object to what you were
13   doing?
14   A.    No, sir.
15   Q.    Did you object to anything that narcotics was
16   doing?
17   A.    No, sir.
18   Q.    What was the supervisor -- what was the
19   supervisory chain for narcotics at the time that we're
20   describing?
21   A.    Bret would have been the lieutenant.  I would
22   have been the sergeant.  Bubba --
23   Q.    Bret Broussard?
24   A.    Bret Broussard would have been the lieutenant.  I
25   was the sergeant.  And Gerald Savoy would have been the
```

1    captain over us.

2    Q.    To be clear, Gerald Savoy often went by the name

3    *Bubba*; is that right?

4    A.    Bubba, yes, sir.

5    Q.    And you're using it interchangeably?

6    A.    Yes.  I want to say *Bubba* more than *Gerald Savoy*,

7    but for the record, I'm trying to say his full name for

8    you.

9    Q.    Did Gerald Savoy ever object to the clearing the

10   streets?

11   A.    No, sir.

12   Q.    Did Bret Broussard ever object to clearing the

13   streets?

14   A.    No, sir.

15   Q.    Were they familiar with what you were doing?

16   A.    Yes, sir.

17   Q.    Did they participate themselves?

18   A.    The night of my shooting, everybody in narcotics

19   had a long gun but me.  And Bret was in the back of the

20   truck with us.  We were in the Nissan.

21   Q.    And what I am asking is, specifically, did

22   Broussard and Savoy also participate in occasionally

23   jumping out, slamming people into hard objects for no

24   reason in order to clear the streets?

25   A.    Yes, sir.

```
 1    Q.    How often?

 2    A.    If there was a high-profile crime, we may get

 3    people off the streets; being a homicide.  You know,

 4    the officer-involved shootings, we had two of them

 5    within like a week period.  The home invasions.  It

 6    wasn't -- I would say, roughly, maybe once a quarter

 7    time frame.

 8    Q.    But now, Mr. Comeaux, these jump-outs didn't

 9    occur just when there was a high-profile matter?

10    A.    No, sir.  The whole clear the streets where we

11    were just cutting corners, making blocks, just getting

12    people off the streets was once a quarter.  We did

13    jump-outs other times, but the whole clear the street

14    thing where there was nobody on the street, once a

15    quarter, once every six months.

16    Q.    So let's just talk about jump-outs.

17    A.    Yes, sir.

18    Q.    Use that phrase for the moment.  Were Savoy and

19    Broussard familiar with what you did on jump-outs?

20    A.    They were with us.

21    Q.    Anybody object to you slamming people into hard

22    objects for no good reason?

23    A.    No, sir.

24    Q.    Did they, as well, participate?

25    A.    Yes, sir.
```

1   Q.    Was that essentially the culture of the narcotics

2   unit?

3   A.    Jump-outs?

4   Q.    (Nodding in the affirmative.)

5   A.    For a while, yes.  Later on, no.

6   Q.    We'll talk about later on for a moment.

7         Did the abuses involving excessive force take

8   any other forms besides just the jump-outs?

9   A.    Oh, there was times where we would chase you and,

10  you know, you got an extra lick or two for running.

11  Q.    What does that mean?

12  A.    We chase you, we catch you, you know, fight you

13  to get you in handcuffs, and you'd catch a knee strike,

14  an elbow.

15  Q.    In your Use of Force training, do you learn a

16  concept of both escalation and deescalation?

17  A.    Yes, sir.

18  Q.    Describe to the jury what that is.

19  A.    Escalation is based off of the suspect, that if

20  they're fighting you, you can use pepper spray or a

21  baton.  If they say, *Hey, I quit* and put their hands

22  behind their back, you just put them in handcuffs.

23  Q.    How often do you think the extra licks were

24  getting made by narcotics units?

25  A.    Two or three times a week.

1   Q.    To be clear for the record, when you say *extra*

2   *licks*, you mean somebody is striking in some fashion

3   somebody who is no longer resisting?

4   A.    Yes, sir.

5   Q.    In an inappropriate way?

6   A.    Yes, sir, a knee strike, an elbow, a baton

7   strike, a flashlight into the ribs.

8   Q.    So altogether, jump-outs, clearing the streets,

9   getting the extra lick in for chasing, the targeted

10  people like Ricky Roche, how often was this excessive

11  force going on amongst the narcotics unit?

12  A.    It would probably average once a week.

13  Q.    For how long?

14  A.    Until about the time that I went to DEA.

15  Q.    Who was principally the object of this abuse?

16  A.    We -- we stayed on the west side more than any,

17  so it would have been African-Americans.

18  Q.    But to be fair, you would beat up anybody,

19  wouldn't you?

20  A.    Yes, sir.  I beat up white people.  I beat up

21  black people.  It didn't matter.

22  Q.    What was the impact of all of the various

23  comments that Louis Ackal made as it relates to your

24  behavior on the west side?

25  A.    They were animals.  You know, they needed to be

1    treated like an animal.

2    Q.   And did you, in fact, do that?

3    A.   Yes, sir.

4    Q.   Was that feeling shared amongst your narcotics

5    colleagues?

6    A.    In general, yes, I would say it was, that that's

7    how they felt also.

8    Q.   How many times have you been sued for using

9    excessive force?

10   A.   Anthony Daye.  The older lady.  Four or five.

11   Q.   Do you even know exactly how many times?

12   A.   No, sir.

13   Q.   Do those lawsuits go to the IPSO?

14   A.   Yes, sir.

15   Q.    In all those lawsuits, have you ever been asked

16   to curb your behavior by anybody at the top of the

17   IPSO?

18   A.   No, sir.

19   Q.   Has Louis Ackal ever come to you and said, *You've*

20   *got a lot of suits, man; you've got to settle down*?

21   A.    No, sir.

22   Q.   Would Louis Ackal be privy and aware of those

23   lawsuits?

24   A.   Yes, sir.

25   Q.   Have you ever been asked to go to additional

```
 1    training because of the lawsuits that you received for

 2    excessive force?

 3    A.    No, sir.

 4    Q.    Have you ever been actually disciplined for

 5    anything at the IPSO?

 6    A.    The only thing I was ever disciplined for at the

 7    IPSO was an improper screen saver on my computer, which

 8    was a picture of a narcotics bust.

 9    Q.    Screen saver?

10    A.    The background image behind the icons, yeah.  I

11    was told it took up too much space on the server.

12    Q.    What was the impact on you of knowing that you

13    were not getting training or disciplined as a result of

14    all your abuses?

15    A.    That everything we were doing that they knew

16    about was okay.

17    Q.    Who is they?

18    A.    Louis.  My lieutenant.  My captain.

19    Q.    Whoever the chief deputy was?

20    A.    Whoever the chief deputy was.

21    Q.    How many chief deputies were there at the time

22    you were in the narcotics unit?

23    A.    One, Toby Herbert.  And then I went to DEA, and

24    it became Bert Berry.  And when I got back from DEA, it

25    was Richard Hazelwood.  It would have been two because
```

1    Hazelwood was the chief deputy when I got back to

2    narcotics from DEA.

3    Q.    Did Louis Ackal ever tell you about how he viewed

4    the narcotics unit?

5    A.    We were his favorite unit.  We were his baby.

6    Q.    What would he say explicitly?

7    A.    He would tell us.  I mean, we had the big bust

8    that I had for my screen saver, and he came to our

9    office that afternoon -- yeah, that afternoon with beer

10   and pizza for us while we were doing evidence.  *Y'all*

11   *my baby.  I'm going to take care of y'all.  Y'all know*

12   *Uncle Lou always take care of y'all.*

13   Q.    What was the impact of hearing that?

14   A.    We were golden.  We were his golden child.  So

15   there was nothing we could do that was wrong.

16   Q.    In fact, did you guys walk through the IPSO kind

17   of with that attitude?

18   A.    Probably so.  Yes, sir.

19   Q.    Were there conflicts between narcotics and the

20   other units within the IPSO?

21   A.    IMPACT.

22   Q.    What was the source of that conflict?

23   A.    One of the guys that got kicked out and moved

24   back into narcotics and kicked out was the sergeant,

25   and he would try to work our informants for us, and he

```
 1   would lie to our informants and tell them we were going
 2   to put them in jail.
 3   Q.    Jacob Huckabay?
 4   A.    Yes, sir.
 5   Q.    Now, Jacob Huckabay had been in narcotics with
 6   you; right?
 7   A.    Uh --
 8   Q.    Before you?  Both?
 9   A.    He was before me, with me, and not with me.
10   Q.    Okay.  So I assume that Louis Ackal and your
11   supervisors could have read your use-of-force reports
12   in order to examine how you were conducting yourself;
13   right?
14   A.    We didn't have any.
15   Q.    What does that mean?
16   A.    We didn't do use-of-force reports.  I couldn't
17   tell you where to find the use-of-force report on the
18   IPSO server.  I don't know where it's at.
19   Q.    Now, your training on use of force in the
20   department says you are obligated to write a
21   use-of-force report, doesn't it?
22   A.    Yes, sir.
23   Q.    Did you ever write a single one while you were a
24   deputy?
25   A.    Never.
```

```
 1   Q.    Did anybody ever come and ask you, Where are your

 2   use-of-force reports?

 3   A.    No, sir.

 4   Q.    Did Louis Ackal ever come and ask you?

 5   A.    No, sir.

 6   Q.    When you would talk to him about jump-outs or

 7   clearing the street or Ricky Roche, did Louis Ackal

 8   ever ask to see your use-of-force reports?

 9   A.    No, sir, he didn't.

10   Q.    Or Toby Hebert?

11   A.    No, sir.

12   Q.    Or Bert Berry?

13   A.    No, sir.

14   Q.    Bubba Savoy?

15   A.    No, sir.

16   Q.    Bret Broussard?

17   A.    No, sir.

18   Q.    What was the impact of the fact people were not

19   looking to check and see how you were describing your

20   use of force?

21   A.    That it was okay.  They didn't care what we did

22   as long as we kept the streets quiet.

23   Q.    Which brings us to April 29th, 2011, the jail

24   shakedown.  Now, you were at the jail on April 29th,

25   weren't you?
```

1    A.    Yes, sir, I was.

2    Q.    In what capacity were you there?

3    A.    SWAT, narcotics.  I was called there for SWAT.

4    Q.    If you get called as SWAT, does it change your

5    command structure at all?

6    A.    Yes, sir.  I had a different lieutenant at the

7    time.

8    Q.    Who would that have been?

9    A.    That would have been the SWAT commander, which

10   was Wendell Rayborn.

11   Q.    Did you have the same relationship with Wendell

12   Rayborn that you had with Gerald Savoy?

13   A.    No, no.

14   Q.    What was the difference?

15   A.    Me and Ricky, we would talk.  It was, you know,

16   casual, but we wouldn't -- Ricky didn't know what we

17   did.  I mean, I'm sorry, I'm saying Ricky because he

18   was the team leader.  Me and Wendell would talk.  But,

19   no, Wendell, he was my SWAT commander, and that was it.

20   He didn't know what we did in narcotics.  All he knew

21   is what we did in SWAT.

22   Q.    Why didn't Wendell Rayborn know what you did if

23   Gerald Savoy knew what you did?

24   A.    Wendell Rayborn was just over me on SWAT.  He

25   wasn't over me in narcotics.

1    Q.    Why not just tell him?  Same thing.  *We engage in*
2    *abuses on a regular basis.  We're happy with it.*  Why
3    not tell Wendell Rayborn?
4    A.    Why tell him?  Then he would know what went on in
5    narcotics.
6    Q.    Is there a problem with telling him?
7    A.    Yeah, that he'd know what went on in narcotics.
8    We wouldn't have told him.
9    Q.    What were you worried about if Wendell Rayborn
10   knew?
11   A.    Him telling somebody else.
12   Q.    Like?
13   A.    The sheriff -- it wouldn't have mattered if he
14   told the sheriff.  It would have been telling the FBI.
15   Q.    What other role did Wendell Rayborn have at the
16   IPSO?
17   A.    He was over training.
18   Q.    He's the one who taught you the use-of-force
19   principles; right?
20   A.    Sometimes, yes.
21   Q.    So at the jail, why are you called there?  Do you
22   know?
23   A.    We were called there for a disturbance.
24   Q.    Did you know the nature of the disturbance when
25   you arrived?

1    A.    When I arrived, it was Anthony Daye; the pod in K

2    2 was trying to start a riot.

3    Q.    Okay.  Was there a riot actually?

4    A.    No, not whenever we got there.

5    Q.    Okay.  What was the nature of the jail when you

6    finally arrived?

7    A.    All the inmates were locked behind their

8    respective doors or pods.

9    Q.    Was there any need for you to use force once you

10   arrived?

11   A.    Not at that time.  No, sir.

12   Q.    And who was in command?  Was Wendell Rayborn in

13   command of you at the time?

14   A.    Of the SWAT team, yes, sir.

15   Q.    Who was in command of the jail at the time?

16   A.    The sheriff was there, so he ultimately was in

17   command of everybody.

18   Q.    Was that typical if the sheriff was on the scene

19   of some issue that the IPSO was responding to?

20   A.    Yes.

21   Q.    Even if there were other commanders around?

22   A.    Yes.

23   Q.    What do you mean?  Describe that.

24   A.    The sheriff, if he was on the scene and he didn't

25   think something was going right, he would start barking

1    orders to whoever.  So they would do what he thought

2    was the right thing to do at the time.

3    Q.    Mr. Comeaux, before we talk about what you did at

4    the jail, you've talked about the role that Louis Ackal

5    played and the abuses that you conducted in the

6    narcotics unit.

7           To be fair, you were a grown man when you

8    were in the narcotics unit?

9    A.    Yes, sir.

10   Q.    Did you understand right from wrong?

11   A.    Yes, sir, I did.

12   Q.    Did you understand the impact of slamming people

13   into hard objects just to hurt them?

14   A.    Yes, sir, I did.

15   Q.    Who was responsible for that?

16   A.    Me.

17   Q.    Why would you do those things?

18   A.    One is I guess I kind of liked it.  And two is to

19   get the approval of Louis.

20   Q.    Why did you need Louis Ackal's approval?

21   A.    He was my boss.  He was at the time a role model.

22   Q.    If Louis Ackal told you to murder somebody, would

23   you have done it?

24   A.    I didn't do it.

25   Q.    Did he ever tell you to do that?

A.     Pretty much.

Q.     What do you mean?

A.     The day of the hostage situation at the jail, he walked in the room and told everybody on the SWAT team, *If the jail is bleeding or if he's dead, all three of them come out in a body bag.*

Q.     My question to you, though, is, you were capable always of making your own decisions, weren't you?

A.     Yes, sir.

Q.     So, again, I'm going to ask you.  How did you justify in your own mind hurting so many people that you described?

A.     Because after you hear that they're animals for so long and you hear the sheriff tell people he's going to slap them if they don't pull their pants up, it all becomes okay in your mind.

Q.     What do you think about it in retrospect?

A.     That I was wrong, and I pled guilty to everything I did because I was wrong, and I have to face the consequences.

Q.     So let's talk about the jail.  At some point you had a conversation with Louis Ackal, didn't you?

A.     Yes, sir.

Q.     Did it relate to Anthony Daye?

A.     Yes, sir, it did.

```
 1    Q.    Who was Anthony Daye to you on April 29, 2011?
 2    A.    Anthony Daye was a midlevel drug dealer, and he
 3    was also a suspect in Cliff Williams' homicide.
 4    Q.    Now, to be fair, at the time, on April 29th, he
 5    hadn't been convicted of any of that, had he?
 6    A.    I don't believe he was convicted of either.
 7    Q.    Okay.  He was a suspect?
 8    A.    He was a suspect.
 9    Q.    What was the nature -- did you know Anthony Daye
10    before that day?
11    A.    I was involved in his drug arrest, yes, sir.
12    Q.    All right.  What other interaction did you have
13    with him?
14    A.    He was brought to the DA's office after his drug
15    arrest and given to a DEA agent to become an informant
16    for them.
17    Q.    So at some point, somebody wanted to use Anthony
18    Daye?
19    A.    Yes, sir.  And he was let out, and he was never
20    used, and that's when the homicide was committed.
21    Q.    All right.  Tell the members of the jury about
22    your conversation with Louis Ackal about Anthony Daye.
23    A.    Anthony Daye was getting removed from the cell,
24    and Louis Ackal said he wanted Anthony Daye taken care
25    of.  And he told me that.  And he said, *I'm the fucking*
```

1   *sheriff.  I want him taken care of.*  And Anthony Daye

2   was then escorted to the chapel and taken care of.

3   Q.    Has Louis Ackal ever used the phrase *you know*

4   *what I want done* with you?

5   A.    Yes, sir.

6   Q.    When did he use that phrase?

7   A.    That day.

8   Q.    With regard to who?

9   A.    Anthony Daye.

10  Q.    Did you have any doubt about what Louis Ackal

11  wanted done?

12  A.    No, sir, I did not.

13  Q.    Because Anthony Daye wasn't actually the only

14  person you participated in beating that day; right?

15  A.    No, sir.  There was one other for sure.

16  Q.    Do you even know how many people you participated

17  in beating that day?

18  A.    No, sir, I don't.

19  Q.    Why did you beat the other person or persons that

20  you are talking about?

21  A.    He was throwing up gang signs, and I removed him

22  from where he was sitting and ran him into the wall.

23  Q.    Were you in the chapel beating anybody else that

24  day?

25  A.    I believe I was, and I can't tell you who it was.

```
 1   Q.    Can you even remember whether there was a reason
 2   for beating up that other person?
 3   A.    No, sir, I can't.
 4   Q.    You didn't beat that other person because Louis
 5   Ackal told you to; did you?
 6   A.    No, sir.  Probably for whatever other reason.
 7   Somebody else may have brought him in there, and I just
 8   joined in.
 9   Q.    Why would you have done that?
10   A.    Because another narc was probably bringing him
11   in.
12   Q.    You didn't need Louis Ackal to tell you to go
13   beat that guy; did you?
14   A.    No, sir, I didn't.
15   Q.    What was the impact of Louis Ackal's words on you
16   about Anthony Daye?
17   A.    Take care of him.  He wanted him taken care of,
18   we're going to take care of him.
19   Q.    Anthony Daye was specifically targeted by the
20   sheriff?
21   A.    Yes, sir.  Anthony Daye was in the pod for the
22   days prior when we went to the jail, was one of the
23   main disturbances in K-2 that day.
24   Q.    Was he handcuffed behind his back when you first
25   approached him?
```

1    A.    Yes, sir.

2    Q.    Was he posing any risk of harm to you?

3    A.    No, sir.  None at all.

4    Q.    Was he trying to escape?

5    A.    No, sir.

6    Q.    What should happen in the jail if there is

7    somebody causing a disturbance?

8    A.    They should be removed and brought to J-pod.

9    Q.    What's the J-pod?

10   A.    J-pod is pretty much solitary confinement, but

11   there may be more than one person in their cell.

12   Q.    It's a security unit?

13   A.    Yes, sir.

14   Q.    What are the possible ways of dealing with the

15   disruptive inmate that would be appropriate in the

16   jail?

17   A.    Put him in J-pod, call another jail and transfer

18   him out.

19   Q.    How about prosecute him for the disruption?

20   A.    Yes, sir.

21   Q.    Are you familiar with disciplinary processes in

22   the jail?

23   A.    No, I'm not.  I never worked in the jail.

24   Q.    Okay.  Is there anything in your IPSO Use of

25   Force training or your POST certification training that

1    lets you beat an inmate in retaliation for something

2    they previously did?

3    A.    No, sir, there isn't.

4    Q.    Are you allowed to beat an inmate because you're

5    angry at them?

6    A.    No, sir, you're not.

7    Q.    Are you allowed to beat an inmate because they

8    got you out of bed and had made you come to the jail?

9    A.    No, sir, you are not.

10   Q.    Under your training, are you allowed to beat an

11   inmate because you're just pissed off?

12   A.    No, sir, you're not.

13   Q.    So what did you do with Anthony Daye?

14   A.    Beat him.

15   Q.    Who beat him?

16   A.    Me, Ben Lassalle and Wade Bergeron.

17   Q.    Who are those two names that you just provided?

18   A.    Two other narcotics agents.

19   Q.    Where did you beat Anthony Daye?

20   A.    In the chapel.

21   Q.    How did you beat Anthony Daye?

22   A.    Me personally, with my hands and knees, and the

23   other two, with batons.

24   Q.    Do you remember who held which baton as Anthony

25   Daye was being beaten?

1   A.    They both had a collapsible baton.

2   Q.    Government's Exhibit Number 54?

3   A.    Yes, sir.

4   Q.    Describe for the members of the Jury how you used

5   your hands on Anthony Daye.

6   A.    I was punching him in his kidneys.  I wouldn't

7   have punched him in his face because that would have

8   left a mark, and that's obvious.  It would have been

9   body shots.

10  Q.    How many times did you beat, hit Anthony Daye?

11  A.    I can't even tell you.  At least 20, 30.

12  Q.    How long do you think it went on?

13  A.    Two, three minutes.

14  Q.    How many times do you think that the other

15  officers beat Anthony Daye with the batons?

16  A.    Just as many as me.

17  Q.    At any point in time did either you or Bergeron

18  or Lassalle tell each other to stop it?

19  A.    No, sir, we didn't.

20  Q.    Did anybody ever express any concern that you

21  were beating him up too much?

22  A.    Nobody in the room said anything.

23  Q.    Of all of the beatings that you described that

24  you participated in, where would the beating of Anthony

25  Daye rank?

```
 1   A.     Number one.

 2   Q.     For...

 3   A.     Violence.

 4   Q.     Who else was in the chapel at the time that you

 5   beat Anthony Daye with Ben Lassalle and Wade Bergeron?

 6   A.     Louis Ackal and Bret Broussard, for sure.

 7   Q.     How do you know Louis Ackal was there?

 8   A.     Because whenever we got him up and we went to

 9   walk him out, that's when he told Louis Ackal that I

10   spit on him.

11   Q.     Did you see Louis Ackal in the chapel?

12   A.     Yes, I did.

13   Q.     Why would you pay attention to where Louis Ackal

14   was?

15   A.     Because he was our boss.  He ordered it and he

16   came in with us.  He walked -- from the time I got my

17   hands on Anthony Daye and walked him in the chapel,

18   Louis Ackal was behind us walking him in.

19   Q.     At any point in time did Louis Ackal tell you to

20   stop?

21   A.     No, sir, he didn't.

22   Q.     At any point in time did Louis Ackal try to

23   intervene in any fashion?

24   A.     No, sir, he didn't.

25   Q.     What did Louis Ackal tell Anthony Daye when you
```

 1    got him up and walked him out?

 2    A.    When Anthony Daye told him we spit or I spit on

 3    him, he said, *he didn't spit on you*, *you were in a*

 4    *fight*, which he was.  Earlier that day, he was in a

 5    fight.

 6    Q.    What did you understand that comment to mean?

 7    A.    That that's our cover story.  Anthony Daye was

 8    involved in a fight.

 9    Q.    How did you feel after you beat Anthony Daye the

10    way you did?

11    A.    I had no feelings.

12    Q.    It didn't bother you, really, did it?

13    A.    No, sir.

14    Q.    In fact, you didn't go and confess to anybody;

15    right?

16    A.    No, sir.

17    Q.    The only time you actually confessed to anybody

18    is when the FBI started investigating these things?

19    A.    Yes, sir, when I sat down with y'all.

20    Q.    In fact, you weren't completely truthful about

21    this episode when you got sued; right?

22    A.    That is correct.  I lied about it.

23    Q.    Did you see Bret Broussard do anything to Anthony

24    Daye while you were in the chapel?

25    A.    Yes, sir.  As we were walking him out the door,

1    Bret punched him in the stomach.

2    Q.    Was Louis Ackal in a position to see that?

3    A.    He should have been.  He was right behind us, and

4    I seen it.

5    Q.    Did Louis Ackal say anything to Bret Broussard?

6    A.    No, sir, he didn't.

7    Q.    Did you ever get disciplined in any way, shape or

8    form for your behavior at the jail on April 29, 2011?

9    A.    No, sir, I didn't.

10   Q.    To your knowledge, did either Bret Broussard,

11   Wade Bergeron or Ben Lassalle get disciplined for their

12   behavior at the jail on April 29, 2011?

13   A.    No, sir.

14   Q.    Would you have been in a position to know if they

15   had?

16   A.    If one of them would have got disciplined and

17   nothing happened to me, they would have said something.

18   Q.    In fact, did you have conversations with them

19   about the Anthony Daye episode in the lead up to the

20   deposition?

21   A.    The day of the deposition, yes, I had a

22   conversation with Ben and Wade about it.

23   Q.    At that point in time did either of those two

24   guys ever mention anything about being disciplined?

25   A.    No, sir, they didn't.

1    Q.    So let me ask you about that deposition.

2    A.    Yes, sir.

3    Q.    In the Fall of 2011 you get noticed that there is

4    a lawsuit, right?

5    A.    Yes, sir.

6    Q.    Describe what you learned and from whom did you

7    learn it.

8    A.    I was -- I found out there was a lawsuit.  The

9    day of the deposition I met with Steve Elledge, which

10   is the attorney for the IPSO.  He's their general

11   counsel.  I went to his office that morning of the

12   deposition.

13   Q.    What is a deposition, by the way?

14   A.    Sworn testimony to the facts that what happened.

15   Q.    Okay.

16   A.    And Steve asked me if everything in the lawsuit

17   was -- really happened, and he said, *whatever you tell*

18   *me is attorney-client privilege*.  And I told Steve,

19   *everything in the lawsuit is a hundred percent correct*.

20   Q.    What was the essence of the lawsuit?

21   A.    That we beat Anthony Daye in the chapel in the

22   presence of the sheriff.

23   Q.    Okay.  What was Steve Elledge's response?

24   A.    *We have to fix it*.

25   Q.    Did he have a recommendation as to how to fix it?

1   A.   He --

2           MR. MCLINDON:   Objection.   Hearsay as to what

3   Steve Elledge said.

4           MR. BLUMBERG:   Coconspirator hearsay

5   statement.

6           MR. MCLINDON:   He's not named as a

7   conspirator in this indictment.

8           THE COURT:   Overruled.

9   BY MR. BLUMBERG:

10  Q.   What did Steve Elledge tell you to do about

11  fixing it?

12  A.   Get with Ben and Wade.

13  Q.   What did he mean by that?

14  A.   To make sure all our stories were the same before

15  we sat down and gave our deposition.

16  Q.   And did you do that?

17  A.   Yes, I did.

18  Q.   What did you do?

19  A.   I called Ben and Wade and told them to meet me at

20  Bank Street Park.

21  Q.   Did you?

22  A.   Yes, sir, I did.

23  Q.   Did you have a conversation with those two?

24  A.   Told them exactly what Steve told me.

25  Q.   What was their response?

1  A.    We came up with a cover story.

2  Q.    What was the cover story that you came up with?

3  A.    That Anthony Daye wanted to speak to us to give

4  us information, and we went in the chapel with him,

5  nothing happened, we left, and he was involved in a

6  fight earlier that day.

7  Q.    So the cover story itself didn't even include

8  some necessary use of force, did it?

9  A.    No, sir.

10 Q.    The cover story was that no force of any kind was

11 needed?

12 A.    Correct.  Because he was involved in a fight

13 earlier that day and that's where his injuries came

14 from.

15 Q.    Was Anthony Daye able to get out of the chapel

16 back in April of 2011 under his own steam?

17 A.    No, sir.  We had to drag him out.

18 Q.    But the cover story was no use of force?

19 A.    Yes, sir.

20 Q.    Do you know whether Wade and Ben went along with

21 the cover story?

22 A.    Yes, sir, they did.

23 Q.    How do you know that?

24 A.    Because I was in the deposition.

25 Q.    Were all three of you sued?

1    A.    Yes, sir.  We were all three sued.  We were all

2    three parties, so we could sit in the deposition.  We

3    all sat in the same deposition.

4    Q.    You could hear each other's testimony?

5    A.    Yes, sir.  I went first, I believe Ben went

6    second and then Wade.

7    Q.    What about Steve Elledge?  Could he hear all

8    three testimonies as well?

9    A.    Steve Elledge was sitting -- it was Fred

10   Schroeder, which was the Louisiana Sheriffs's Office

11   Association's attorney, he was sitting to the right of

12   me, Ben and Wade as we gave our depositions, then there

13   was Steve Elledge sitting to the right of him.

14   Q.    Did Steve Elledge give you any instructions

15   relative to Fred Schroeder, the Louisiana Sheriff's

16   Association lawyer?

17   A.    Yes, sir.  Before we went and meet with Ben and

18   Wade, he told me, *do not tell Fred anything.  Don't*

19   *tell Fred what happened.*  He didn't want Fred to know

20   that we actually beat that guy in front of Louis.

21   Q.    Did you ever tell Fred?

22   A.    No, I didn't.

23   Q.    As far as you know, did Fred Schroeder think your

24   testimony was true?

25   A.    Yes, sir, because he told me after, we did very

```
 1   good on our depositions.

 2   Q.    Did you ever have a conversation about your

 3   deposition with the defendant, Louis Ackal?

 4   A.    Yes, sir.

 5   Q.    When did that happen?

 6   A.    Shortly thereafter the deposition, at the end of

 7   the driveway.

 8   Q.    Whose driveway?

 9   A.    Mine and his.

10   Q.    Describe the conversation.

11   A.    Told him that we gave the depositions on Anthony

12   Daye, and he was pretty much, *fuck that nigger.  He got*

13   *in a fight.*

14   Q.    What did you understand that to mean?

15   A.    That our fight story was good.  That was our

16   cover story.  That's -- that's what we said, and that's

17   what was used.

18   Q.    But your lying didn't end with Anthony Daye; did

19   it?

20   A.    No, sir.

21   Q.    When was the next time you were lying?

22   A.    Curtis Ozenne's lawsuit.

23   Q.    Describe for members of the Jury what happened.

24   A.    I was sued by Curtis Ozenne for excessive force.

25   And I went into Steve's office and I told him the day
```

1    of the deposition, *Curtis Ozenne can walk in today and*

2    *hit me, and I couldn't tell you it's Curtis Ozenne.   I*

3    *don't know who Curtis Ozenne is.*  And Steve said -- I

4    said, *I wasn't in the room.*  And he's like, *Okay.   Do*

5    *you know who was in the room?*  I said, *I think so.*   He

6    said, *look, during the deposition, don't say any names.*

7    Q.    Slowly.  Go ahead.

8    A.    I'm sorry.

9    Q.    Finish.  That's okay.

10   A.    I'm good.  So I didn't say any names during the

11   deposition.  I received a phone call prior to my

12   deposition from Jeremy Hatley and said, *look, you*

13   *weren't in the room for Curtis Ozenne.*

14   Q.    Excuse me.  Who is Jeremy Hatley?

15   A.    Jeremy Hatley used to be a narcotics agent, then

16   he went on the road with his K-9.

17   Q.    Why would Jeremy Hatley know whether you were in

18   the room with Curtis Ozenne?

19   A.    He had to be in the room.

20   Q.    Is that what your understanding was from the

21   conversation with Jeremy Hatley?

22   A.    Yes, sir.

23   Q.    What did you say in response to Hatley's

24   comments?

25   A.    I said okay.

Q.    What did you do?

A.    When I went in the deposition and I was asked if I knew who was in the room, I told them no.

Q.    Did you know?

A.    I assumed Jeremy Hatley was in the room.

      THE COURT:  The question was:  Did you know?

BY MR. BLUMBERG:

Q.    Did you know for sure?

A.    Yes.  Yes, sir.

Q.    How did you know?

A.    Because during my conversation, Hatley never said he was in the room, but the way he beat around the bush, he was in the room.

Q.    Did you ever have any conversations with anybody else that indicated to you who was in the room for the beating of Curtis Ozenne?

A.    Ben Lassalle.

Q.    When did that conversation take place?

A.    After the deposition.

Q.    What did he say?

A.    He asked me if I said he was in the room.

Q.    Why did he want to know?

A.    Because I'm assuming he was in the room -- at the time, I was assuming he was in the room.

Q.    Did you have any conversations with Louis Ackal

1   about whether you could get away with lying in these

2   depositions?

3   A.   The Anthony Daye lawsuit, I was told there was no

4   video.

5   Q.   Who told you that?

6   A.   Louis Ackal and Steve Elledge.

7   Q.   What was the importance of that conversation with

8   them?

9   A.   Because if there was no video, that means they

10  didn't see us going in or out the chapel.  They didn't

11  see us ever putting hands on Anthony Daye.

12  Q.   So in 2011, the sheriff told you, *don't worry,*

13  *there is no video of the hallway going into the chapel*?

14  A.   Yes, sir.  They even showed me a video in his

15  office.

16  Q.   Whose office?

17  A.   The sheriff's.

18  Q.   What was on that video?

19  A.   Just a picture of the chapel and that was it.

20  They said that it had a 30-day record-over time, excuse

21  me, on the video and there was no video of us going in

22  the chapel.

23  Q.   What was your reaction to learning there was no

24  video of you going in and out of the chapel?

25  A.   That our fight cover story was going to be good.

1   Q.    What do you expect to happen to you as a result

2   of your pleas?

3   A.    It's left up to the Judge.  I don't know if --

4   how much jail time we're going to get.

5   Q.    Do you expect to go to prison?

6   A.    Yes, sir.

7   Q.    What do you hope to happen?

8   A.    As anybody would in my position, as least time as

9   possible.

10  Q.    Do you know how much time you're facing?

11  A.    A lot.

12  Q.    Do you understand what the provision of the U.S.

13  Sentencing Guidelines of 5K1.1 means?

14  A.    Yes, sir.  I get a reduction for my cooperation.

15  Q.    Who gives that to you?

16  A.    The Judge.

17  Q.    How does it get presented to the Judge?

18  A.    By my level of truthfulness.

19  Q.    Who is responsible for making the recommendation

20  to the Court?

21  A.    The Government.

22  Q.    What was the condition of the Government making

23  such a recommendation?

24  A.    Me being truthful, giving truthful testimony and

25  everything I tell y'all is truthful.

1    Q.    Do you have any idea whether you're going to get

2    such a recommendation?

3    A.    I do not, no.

4    Q.    Do you have any idea what sentence a court might

5    give to you?

6    A.    I have no clue.

7    Q.    So why are you here today?

8    A.    To give truthful testimony in hopes of getting a

9    5K1 reduction.

10   Q.    Who do you blame for sitting there in that

11   witness stand?

12   A.    Me and Louis Ackal.

13   Q.    Why do you blame yourself?

14   A.    Because I did it.

15   Q.    Why do you blame Louis Ackal?

16   A.    Because he knew what we was doing and he never

17   did nothing about it.

18              MR. BLUMBERG:  That's all I have, Your Honor.

19              THE COURT:  Your witness, Counsel.

20              THE WITNESS:  Can I get some more water

21   before we start.

22              THE COURT:  Yes, please.

23              MR. BLUMBERG:  I'll get it.

24              (Pause in the proceedings.)

25   ***

```
 1                        CROSS-EXAMINATION

 2   BY MR. MCLINDON:

 3   Q.    Good afternoon, Mr. Comeaux.

 4   A.    Good afternoon, sir.

 5   Q.    Do you consider yourself to be an honest person?

 6   A.    Yes, sir.

 7   Q.    You do?  You've been an honest person pretty much

 8   your whole life?

 9   A.    Besides for the depositions that I lied on, yes,

10   sir.

11   Q.    Okay.  But you've lied quite a lot these last few

12   years, haven't you?

13   A.    About...

14   Q.    About this case?

15   A.    About the depositions?  All my depositions, I

16   did.

17   Q.    Okay.  You lied to the FBI?

18   A.    Not that I'm aware of.

19   Q.    You were completely honest with the FBI during

20   all of your interviews?

21   A.    Yes, sir.

22   Q.    Okay.  You've lied under oath before, haven't

23   you?

24   A.    During my depositions, yes, sir, I did.

25   Q.    Okay.  But today, November 1st, you're an honest
```

1   person today; is that right?

2   A.   Being a hundred percent truthful today.  Yes,

3   sir.

4   Q.   You've lied in how many depositions?

5   A.   Two.

6   Q.   Curtis Ozenne and Anthony Daye?

7   A.   Yes, sir.

8   Q.   And in those depositions, did you raise your

9   right hand?

10  A.   Yes, sir, I did.

11  Q.   And you swore to tell the truth?

12  A.   Yes, sir.

13  Q.   Just like you did today?

14  A.   Yes, sir.

15  Q.   Okay.  Now, you testified earlier that you've

16  been sued more than just those Anthony Daye and Curtis

17  Ozenne lawsuits; right?

18  A.   Yes, sir.

19  Q.   Like eight or nine times?

20  A.   I don't know the exact number.

21  Q.   Okay.  Did you lie on all of those?

22  A.   I didn't give depositions in most of those.  They

23  were all settled.

24  Q.   Okay.  Did -- well, were you asked what happened

25  in those lawsuits by your lawyer or anybody else?

```
 1   A.   Some, yes.  Some, no.

 2   Q.   Did you lie about that?

 3   A.   No, sir, I didn't.

 4   Q.   You told the truth all the time?

 5   A.   Yes, sir.

 6   Q.   Okay.  You are a convicted felon?

 7   A.   I am now, yes, sir.

 8   Q.   Okay.  Let me ask you some questions about that.

 9        You signed a plea agreement on March the 7th

10   of this year; is that right?

11   A.   Yes, sir, I did.

12   Q.   And then after you signed it, you went into a

13   court and you pled guilty?

14   A.   Yes, sir.

15   Q.   Okay.  Now, you're not sitting in jail waiting.

16   You're out on a bond; is that right?

17   A.   Yes, sir.

18   Q.   Okay.  And you're waiting to be sentenced?

19   A.   Yes, sir.

20   Q.   Now, as part of that plea agreement, did the

21   Government agree to drop some charges against you?

22   A.   I didn't know that they had any other charges --

23   the first plea agreement they gave me, I signed.

24   Q.   Okay.  Were you ever charged with lying -- were

25   you ever told you lied to a FBI agent?
```

```
 1    A.    No, sir.

 2    Q.    You were never charged with lying to a FBI agent?

 3    A.    No, sir, I was not.

 4    Q.    Okay.  Now, you pled to a civil rights violation;

 5    is that right?

 6    A.    Yes, sir.

 7    Q.    And that was for beating who?

 8    A.    Anthony Daye.

 9    Q.    Okay.  You also pled to a -- to the lying in the

10    deposition; is that right?

11    A.    Yes, sir.

12    Q.    Okay.  That's a crime of dishonesty; is it not?

13    A.    Yes, sir, it is.

14    Q.    Is there a statutory maximum that you are facing

15    in jail?  Do you know what the maximum you can get is?

16    A.    I haven't looked because I have a son and I don't

17    want to know.

18    Q.    No one's -- no one's told you what the maximum

19    is?

20    A.    I haven't asked.  I don't want to know.

21    Q.    Okay.  You certainly do not want to go to jail.

22    A.    Who does?

23    Q.    You don't want to go to jail; do you?

24    A.    No, sir.

25    Q.    Okay.  You have children?
```

A.   Yes, sir.

Q.   Okay.  You would do almost anything to stay out
of jail; wouldn't you?

A.   I would.  But I wouldn't sit here and lie today.

Q.   You would do almost anything to stay out of jail,
wouldn't you?

A.   I would.

Q.   Now, this 5K motion, you understand that the
Government has to file that motion; right?

A.   Yes, sir, I do.

Q.   And they have not filed it yet.

A.   Yes, sir, I do.

Q.   Now, you understand the Judge will ultimately
decide your sentence?  You know that; right?

A.   Yes, sir, I do.

Q.   But if the 5K motion doesn't get filed, then the
Judge can't consider a reduction in sentence; right?

A.   That's correct.

Q.   And you desperately hope that the Government is
going to file that motion for you, don't you?

A.   I won't say *desperately*, but I hope they do.

Q.   You hope they do.

     Let me ask you about the shakedown incident.
This was in April of 2011; is that right?

A.   Yes, sir, it is.

Q.    Okay.  You don't work at the jail?

A.    No, sir, I don't.

Q.    You were brought out there for the shakedown?

A.    Yes, sir.

Q.    Is that because the inmates had kind of caused a ruckus and a disturbance when they were trying to conduct a routine shakedown?

A.    I don't know if they were conducting a routine shakedown.  All I know is we were called there for a ruckus and a disturbance.

Q.    By the inmates?

A.    Yes.  I don't know what happened prior to me getting there.

Q.    But everyone was kind of on a heightened kind of alert because of this ruckus or this disturbance.  Were you?

A.    It was just another day at the jail.

Q.    Okay.  Now, when you got there that day, you went to the K-2 pod; is that right?

A.    That was one of the pods we went to that day.

Q.    And you encountered Anthony Daye; is that right?

A.    I didn't actually go into the pod.

Q.    Okay.  But you were aware that he was in his bed and he would not get out?

A.    I guess, yes.

1    Q.    I mean --

2    A.    I don't --

3    Q.    I can pull it up, if you like.  Do you remember

4    him being in his bed and he wouldn't get --

5    A.    I didn't make entry into the pod.  And with all

6    the inmates and the other deputies into the pod, I

7    wouldn't be able to tell you if he was in his bed or

8    not.

9    Q.    Well, did you see Bret Broussard pulling him out

10   of his bed?

11   A.    I believe he did.

12   Q.    Okay.  So you were not actually in the pod, but

13   you saw him pulling Anthony Daye out of his bed?

14   A.    There was one day that he pulled Anthony Daye out

15   of his bed.  I don't remember if it was that day or

16   not.

17   Q.    And after he came out of his bed, you escorted

18   him -- you escorted Anthony Daye to the chapel?

19   A.    Yes, me and other people.

20   Q.    Who?

21   A.    Wade and Ben would have been with me, and the

22   sheriff was behind us.

23   Q.    Wade, Ben, and you escorted Anthony Daye to the

24   chapel?

25   A.    And the sheriff was behind us walking to the

1    chapel.

2    Q.    Okay.  Did the sheriff ever tell you, *I want you*

3    *to beat Anthony Daye with a baton*?

4    A.    He didn't say those words.

5    Q.    Did he ever tell you to punch him?

6    A.    He never said those words.

7    Q.    Did he ever tell you to kick him?

8    A.    No, sir.  He never said those words neither.

9    Q.    Okay.  So Anthony Daye -- you bring Anthony Daye

10   into the chapel.  When you walk into the chapel, is it

11   empty?

12   A.    The chapel has a few rows of pews in it.

13   Q.    Okay.

14   A.    And there's a box with a TV monitor.  Other than

15   that, there is nothing else in the chapel.

16   Q.    What I meant, there was no other people in there?

17   A.    No, sir, there was no other people.

18   Q.    So you walk in with Anthony Daye.  There's no

19   other inmates and no other guards?

20   A.    No, sir.

21   Q.    Okay.  And you put -- y'all kneel Anthony Daye

22   down?

23   A.    I don't know if we knelt him down or he was given

24   a knee strike to get down, but he was put on the

25   ground.

1    Q.    Okay.  Do you have information that Anthony Daye

2    had been in a fight earlier that day?

3    A.    That's what I was told --

4    Q.    Okay.

5    A.    -- after.

6    Q.    Okay.  Do you know the name of the inmate with

7    whom he was in a fight?

8    A.    No, sir, I don't.  I did see video later of him

9    being in a fight.

10   Q.    Okay.  So you know that he was in a fight --

11   A.    Yes, sir.

12   Q.    -- because you saw the video?

13   A.    Yeah.  This was after the whole beating in the

14   chapel.

15   Q.    Was it Aquilla Thomas -- does that name ring a

16   bell -- that he was in a fight with?

17   A.    I know Aquilla Thomas's name from working a case

18   on it before or being involved in a case with him, but

19   I don't know if it was him or not.

20   Q.    Okay.  So you walk into this empty chapel.  Do

21   you remember how you got the door to the chapel open?

22   Did you have a key?  Did you have to buzz in?

23   A.    No.  Wesley, the Warden, was with us, and he

24   would open the door.

25   Q.    With a key?

1   A.   Yes, sir.

2   Q.   Okay.  And then you close the door behind you

3   shut?

4   A.   Yes, sir.

5   Q.   And the windows are covered?

6   A.   I actually told Wesley to close the curtain on

7   the door of the chapel so no one from the outside could

8   see in.

9   Q.   So it's you, Bergeron, Wesley Hayes, and Ben

10  Lassalle?

11  A.   And Louis Ackal.

12  Q.   And you say Louis Ackal was in there?

13  A.   Yes, sir.

14  Q.   Okay.

15       MR. MCLINDON:  Could we pull up a picture of

16  the chapel, please.

17  BY MR. MCLINDON:

18  Q.   Can you tell me where Anthony Daye was put down?

19  A.   This table where --

20       MR. MCLINDON:  You might be able to -- we

21  might be able to back out maybe a little bit.

22       THE WITNESS:  You see where the TV is on the

23  table?

24  BY MR. MCLINDON:

25  Q.   Yes.

1    A.    That table wasn't in there.

2    Q.    All right.

3    A.    At the time, that was a box on wheels.

4    Q.    Okay.

5    A.    And that's where he was at.

6    Q.    So point to the front door with your finger.

7    A.    (Witness complied.)

8    Q.    All right.  So you brought him in, and you moved

9    him to about where that table is, and you put him down

10   there; is that right?

11   A.    Yes, sir.

12   Q.    Okay.  And --

13   A.    And I'm not sure if at the time them benches that

14   are underneath the window to the left of the door --

15   Q.    Right.

16   A.    -- I'm not sure if those were even in there.

17   Q.    But what do you know is you walked in the door,

18   and you went to your right, and there was a wall there,

19   and you kneeled him down or put him down right there to

20   the right?

21   A.    Yes, sir.

22   Q.    And you punched him?

23   A.    Yes, sir.

24   Q.    And then the other two guys beat him with batons?

25   A.    Yes, sir.

```
 1    Q.    Where was Louis Ackal?

 2    A.    He would have been right around the door area by

 3    Bret Broussard.

 4    Q.    Can you point?  Can you make a mark?

 5    A.    (Witness complied.)

 6    Q.    Right there in front of the door.  Okay.

 7          Was he saying anything?

 8    A.    With everybody screaming and hollering at Anthony

 9    Daye and Anthony Daye screaming because we were beating

10    on him, it was hard to hear anybody saying anything.

11    Q.    So you don't know if he said anything or not?

12    A.    No, sir.

13    Q.    Okay.

14    A.    I know he didn't walk up to us and tell us to

15    stop.

16    Q.    After you had beaten Anthony Daye, you escorted

17    him back to his cell; is that right?

18    A.    No, sir.  We escorted him to J-pod.

19    Q.    To J-pod.  Okay.

20          MR. MCLINDON:  I was wondering, can we please

21    pull up the diagram, Government's Exhibit 1.

22          Can you -- if we could clear it.  Do you want

23    me to clear it?

24          MR. BLUMBERG:  Yes.

25          MR. MCLINDON:  I'll clear it.
```

```
 1    BY MR. MCLINDON:

 2    Q.   Can you draw the path you took where you escorted

 3    him from the chapel?

 4    A.   Yes, sir.  We walked out of the chapel.  We made

 5    a right, and we came down this way, and we went into

 6    J-pod.

 7    Q.   Where is J-pod?

 8    A.   I can't see it on here.  I didn't work in the

 9    jail, so I didn't -- I don't know the name of the pods.

10         MR. MCLINDON:  Okay.  If we could blow that

11    up a little bit and see if we can see it.  Okay.

12    BY MR. MCLINDON:

13    Q.   Do you see J-pod on there?

14    A.   Yes, sir.  So we came out the chapel this way.

15    We came down this way, and we went into J-pod.

16    Q.   Was it just you escorting him?

17    A.   No.  It was me and somebody to his right that I

18    don't know, and Louis Ackal was behind us.

19    Q.   Did y'all talk to anybody on the way there?  Did

20    y'all see any other guards or anything like that?

21    A.   Not that I'm aware of.

22    Q.   Did Anthony Daye talk to Louis Ackal on the way

23    there?

24    A.   Anthony Daye told Louis Ackal I spit on him.

25    Q.   Where was he when he said that?
```

1    A.    We were just coming out the chapel.

2    Q.    Right out the door; is that right?

3    A.    Yes, sir.

4    Q.    Okay.  Did you spit on him?

5    A.    Me and him was screaming and hollering at each

6    other before it all started, and there was spit flying

7    both ways.

8    Q.    After you escorted Anthony Daye, what did you do?

9    A.    I went back -- after we left J-pod?

10   Q.    Yeah.

11   A.    I went back to my duties of whatever we were

12   doing.  Searching cells, helping clear cells.

13   Q.    Did you beat any other inmates that day?

14   A.    I already said I did.

15   Q.    But Curtis Ozenne?

16   A.    I didn't touch Curtis Ozenne.

17   Q.    You didn't touch Curtis Ozenne?

18   A.    No, sir.

19   Q.    Who was the other inmate that you beat?

20   A.    I don't know his name.

21   Q.    Was it after Anthony Daye?

22   A.    I don't know if it was after or before.

23   Q.    Where did you beat him?

24   A.    In the chapel.

25   Q.    Who beat him with you?

```
1   A.    I'm not sure.  It may have been just me.

2   Q.    Did you beat Scott Spears?

3   A.    I don't know who Scott Spears is.

4   Q.    Did you watch your friend, Ben Lassalle, beat

5   Scott Spears?

6   A.    I don't know who Scott Spears is.  If that's the

7   Curtis Ozenne incident, I wasn't in there.

8   Q.    You weren't involved in that at all?

9   A.    No, sir.

10  Q.    Now, when -- when you got -- when the word got

11  out that the FBI was in Iberia Parish investigating

12  these things, you got pretty worried, didn't you?

13  A.    I didn't get worried until I was told I had to

14  leave DEA.  That's when I got worried.

15  Q.    You didn't get worried until what?

16  A.    Until I was asked to leave DEA.

17  Q.    Because of this investigation?

18  A.    Yes, sir.

19  Q.    Okay.

20  A.    My group supervisor at the time said my name came

21  up in it and they were asking me to leave.

22  Q.    Now, let me be clear --

23              THE COURT:  The DEA is --

24              THE WITNESS:  The Drug Enforcement

25  Administration.  Yes, sir, I was assigned to them
```

1    through the sheriff's office.

2    BY MR. MCLINDON:

3    Q.    Right.  I was going to ask you that.

4            The DEA is a federal agency; is that right?

5    A.    Yes, sir.

6    Q.    You did not become a W-2 employee of the DEA, did

7    you?

8    A.    I carried a federal commission, but I was

9    actually employed by the sheriff's department, assigned

10   to the DEA.

11   Q.    A task force?

12   A.    Yes, sir, a task force.

13   Q.    So when did you start to get worried?  When you

14   had to give up your spot on that DEA task force?

15   A.    Yes, sir.  I almost left that office that day and

16   went to the FBI.

17   Q.    Okay.  And during that time period, you met with

18   Mr. Bergeron and Mr. Lassalle; is that right?

19   A.    Not Mr. Bergeron.

20   Q.    Okay.  Did you have a meeting at the Bank Street

21   Park?

22   A.    That was prior to my deposition.

23   Q.    Okay.  Well, is it in the same time frame, or

24   you're back in 2011 around the deposition?  The meeting

25   at the park.

1    A.    With Mr. Bergeron?

2    Q.    At the Bank Street Park, tell us who you met

3    with.

4    A.    We've met there numerous times.  But in reference

5    to this, what I testified to earlier, I met at the Bank

6    Street Park with Ben and Wade to discuss our cover

7    story for the Anthony Daye deposition.

8    Q.    Was that prior to the federal -- the FBI coming

9    into town and investigating?

10   A.    That was way before.

11   Q.    Way before.  That's what I said, prior.  It was a

12   long time before?

13   A.    Yes, sir.

14   Q.    Okay.  Are you looking at something over there?

15   A.    Well, no.  You said prior, and I'm thinking

16   prior -- I met them before the FBI started

17   investigating for the deposition.

18   Q.    So let's see if we're clear.  And maybe I

19   confused it.

20          You had a meeting at the Bank Street Park

21   with Mr. Bergeron and Mr. Lassalle to talk about your

22   depositions in the civil case?

23   A.    Yes, sir.

24   Q.    Okay.  And y'all got together to concoct a story?

25   A.    Yes, sir.

1    Q.    Louis Ackal was not at that meeting?

2    A.    No, sir.

3    Q.    Okay.  And in the deposition -- you testified on

4    direct that all three of y'all sat in the room giving

5    the depositions.  Was that the Anthony Daye deposition

6    or the Curtis Ozenne deposition?

7    A.    Anthony Daye.  Curtis Ozenne, I was the only one

8    named in that lawsuit for the deposition, and I gave my

9    deposition on that alone.

10   Q.    Let me ask you about that.  You were sued by

11   Curtis Ozenne in a civil lawsuit, but you're telling us

12   you swear today you never touched Curtis Ozenne?

13   A.    Yes, sir, I am.

14   Q.    That lawsuit was completely frivolous?

15   A.    Yes, sir.

16   Q.    Okay.  Did he go back and amend and change it to

17   *Ben Lassalle*?

18   A.    Yes, sir, he did.  And if I could answer your

19   question a little bit further on that and why I thought

20   it happened.

21   Q.    That's okay.

22            THE COURT:  Just hold on.

23   BY MR. MCLINDON:

24   Q.    You'll be all right.

25            Now, so you had the meeting at the park to

1   concoct your story.  You didn't invite the sheriff to

2   that meeting?

3   A.    No, sir, because --

4   Q.    Okay.  Then you went to the deposition -- the

5   three of y'all went to the deposition --

6   A.    Yes, sir.

7   Q.    -- and you lied in that deposition?

8   A.    Yes, sir, I did.

9   Q.    Now, in that deposition, it would have been you,

10   I think you said Mr. Schroeder --

11   A.    Yes, sir.

12   Q.    -- Mr. Elledge --

13   A.    Yes, sir.

14   Q.    -- the lawyer for the plaintiff, Anthony Daye --

15   A.    Yes, sir.

16   Q.    -- and the court reporter?

17   A.    Yes, sir.

18   Q.    And you were able to sit there under oath and

19   completely fool all these people; is that right?

20   A.    We told them my version of the story.

21   Q.    And they believed it?

22           MR. BLUMBERG:  Objection as to what other

23   people believed, Your Honor.

24           THE COURT:  All right.  I'll sustain that.

25   BY MR. MCLINDON:

```
 1    Q.    Did Mr. Schroeder or the plaintiff lawyer ever,
 2    during the deposition or after, and say, Man, you're
 3    lying; that's just not true; come on; you're lying?
 4    A.    I don't know if the plaintiff's lawyer during the
 5    deposition said we were lying or not, but Mr. Schroeder
 6    didn't.
 7    Q.    Did not?
 8    A.    He did not.
 9    Q.    So you were able to fool those people?
10    A.    He believed the story we told.  He thought we
11    were being truthful.
12    Q.    That was five people that you fooled that day
13    under oath?
14          MR. BLUMBERG:  Objection.  Only Mr. Schroeder
15    said, Your Honor.
16          MR. MCLINDON:  What was the objection?
17          THE COURT:  I don't understand.  What is your
18    objection?
19          MR. BLUMBERG:  It's misleading and
20    mischaracterizing his testimony.
21          THE COURT:  You made your point.
22          Do you understand the question?
23          THE WITNESS:  Yes, sir.
24          THE COURT:  Can you answer it?
25          THE WITNESS:  Mr. Schroeder believed we gave
```

1    the full story.  I don't know if the defense attorney

2    did -- or the plaintiff's attorney did or not.

3    BY MR. MCLINDON:

4    Q.    Okay.  But he certainly didn't pressure you or

5    after the deposition accuse you of lying or anything

6    like that, did he?

7    A.    After my -- after we were finished, we got up and

8    walked out of the room before he did.

9    Q.    Do you think you could fool 12 people,

10   Mr. Comeaux?

11        MR. BLUMBERG:  Objection, Your Honor.

12   Relevance.

13        THE COURT:  Sustained.  It's argumentative.

14   BY MR. MCLINDON:

15   Q.    Let's move forward a little bit.  So the federal

16   investigation -- this is after you've lied in the

17   deposition.  The federal investigation starts to pick

18   up, and you have to get off that DEA task force; right?

19   A.    Yes, sir.

20   Q.    And you're starting to get a little worried?

21   A.    Yes, sir.

22   Q.    Okay.  And you did start to talk to and meet with

23   other deputies; is that right?

24   A.    We really started talking whenever -- me and Ben

25   talked after he got his phone call.

```
 1   Q.    Okay.  Did you -- you never went to the sheriff
 2   and said, Look, Sheriff, you told us we could do all
 3   this; you condoned it; you approved it; you're the
 4   boss; help me get out of this jam?
 5   A.    I went to the sheriff, but not in them words.
 6   Q.    You never went to him, though, and said, Look,
 7   you told me I could do all this; you said this was
 8   great.  This is all -- you got my back and all that
 9   stuff, and now I've got to go meet with the FBI?  You
10   never asked him -- you never told him that, did you?
11   A.    The sheriff didn't even know I received my phone
12   call.
13   Q.    I know, but you could have gone to him.  You live
14   across the street from him; right?
15   A.    Not anymore.  He's moved.
16   Q.    At the time, you lived across the street from
17   him?
18   A.    No.  He's moved before.
19   Q.    Well, you could find him if you needed him?
20   A.    Yes.  I knew where he lived.
21   Q.    You didn't go to him and say, Man, I got a phone
22   call from the FBI; I'm kind of scared about this;
23   you're my boss; you told me I could do all this?
24   A.    I went to him and said that I was worried, and he
25   said as long as we didn't say nothing, we're okay.
```

Q.    In fact, what he said was, *tell the truth*, didn't he?

A.    No, he did not.

Q.    Which street was the narcotics building located on?

A.    We were on the Lewis Street at one time.  We -- I mean -- let me start from the beginning.  We were on Hacker Street.  We moved from Hacker Street behind Cajun Co-op.  We moved from Cajun Co-op to Lewis Street.  We moved from Lewis Street back to Hacker Street.  Then we moved from Hacker Street to Main Street.

Q.    You were never in the courthouse building, were you?

A.    No, sir.

Q.    And that's where Sheriff Ackal's office was?

A.    Yes, sir.

Q.    Y'all were miles away from him?

A.    At the most, 10, 15.

Q.    Okay.

A.    That would have been behind the sugar mill.

Q.    10 to 15 miles behind --

A.    Yes, sir.

Q.    Okay.  And am I correct that y'all had -- that the narcotics agents had a separate little key to get

1    into their building that other officers did not have?

2    A.   Yes, sir.

3    Q.   Okay.  It was a very tight-knit group, the

4    narcotics agents?

5    A.   Yes, sir.

6    Q.   It's like a clique, like a fraternity?

7    A.   It was -- we were our own specialized unit

8    that -- we investigated other officers.  We didn't tell

9    anybody what we were doing.

10   Q.   You hid things from other officers; right?

11   A.   Yes, sir.

12   Q.   Let me ask you who else you talked to.  You

13   talked to Jeremy Hatley, is that right, about these

14   problems that you were -- the investigation of the FBI?

15   A.   Me and Hatley did talk.

16   Q.   Okay.  Let's go over them.  Lassalle.  We've

17   talked Lassalle.  You met with -- you talked to him

18   when the FBI started investigating?

19   A.   Yes, sir.

20   Q.   Bergeron?

21   A.   I haven't spoken to Wade Bergeron since he's left

22   IPSO.

23   Q.   You didn't?

24        Okay.  Well, that was the meeting in the park

25   for the deposition?

1  A.    Yes, sir.

2  Q.    But when the FBI started, you had not talked to

3  Wade Bergeron?

4  A.    I haven't talked to him since he left IPSO.

5  Q.    And then you talked to Hatley.

6         Did you ever find -- do you know who Bert

7  Berry is?

8  A.    Yes, sir.

9  Q.    Did you ever believe that he was trying to keep

10  officers from talking to the sheriff, like he was like

11  a buffer between the officers and the sheriff?

12  A.    Yes, sir.

13  Q.    Did he try to keep information from the sheriff?

14  A.    Depending on who the officer involved with it

15  was, yes.  If it would have been something that I did

16  that he knew about, no, he wouldn't have kept it from

17  the sheriff.

18  Q.    Do you remember what's been referred to as the

19  Hilltop incident on Hilltop Street?

20  A.    Yes, sir.

21  Q.    Okay.  Now, that was a call you went on.  And

22  that man that you arrested, I believe he was charged

23  with a sex crime; is that right?

24  A.    Yes, sir, he was.

25  Q.    Okay.  And narcotics agents showed up for that?

1    A.    We served a search warrant on the building.

2    Q.    Okay.

3    A.    Or the residence.

4    Q.    The sheriff was not there, was he?

5    A.    No, sir.

6    Q.    Okay.  And you all went in and you used the

7    IMPACT officers as your outside security; is that

8    right?

9    A.    I don't know if it was IMPACT or detectives.  I

10   know Rickey Boudreaux made entry with us on the

11   residence, and he was over IMPACT.

12   Q.    And you or others on narcotics told these outside

13   officers, *don't come inside*?

14   A.    I was on the entry team.  I don't know who told

15   them what.

16   Q.    You've never heard that before?

17   A.    We've told people don't come inside of a

18   residence before, yes.

19   Q.    Because you don't want them to see what you're

20   doing?

21   A.    Yes, sir.

22   Q.    On that case you took that young man into the

23   bathroom and just basically beat the hell out of him?

24   A.    I didn't take him into the bathroom.  When we

25   made entry, he was sitting in his room on a chair with

1  a big old knife.  He was removed from the chair and we

2  ended up in the shower.  Yes, I did knee strike him a

3  few times to gain compliance.  The shower turned on and

4  I turned it off once I got handcuffs on him and I was

5  barely wet.

6  Q.    Are you telling us that that beating was a

7  justified use of force?

8  A.    Yes, sir, I am.

9  Q.    And have you told that to the FBI?

10  A.    Yes, sir, I did.

11  Q.    Has anyone told you that that was an excessive

12  use of force?

13  A.    No one -- no one told me that was an excessive --

14  Q.    Any fellow officers said that to you?

15  A.    No, sir.

16  Q.    Going back to the FBI investigation, did you also

17  reach out to Bubba Savoy and talk to him about it?

18  A.    Yes, before -- once Ben got his call, me, Bubba

19  and Ben met up and we talked and we said we were going

20  to come tell the truth.

21  Q.    You met with Steve Elledge, the attorney; right?

22  You met with Steve Elledge, the attorney for the

23  sheriff's department?

24  A.    I have met with him before, yes.

25  Q.    Prior to the Anthony Daye deposition?

1    A.    Prior to the Anthony Daye -- yes, I met with

2    Steve several times since the Anthony Daye

3    investigation.

4    Q.    Let me ask you a question about something that

5    came up on direct examination.  You said you were

6    thinking about getting into law enforcement and you

7    talked to Louis Ackal because he was your neighbor and

8    he told you a story about something he had done 30-odd

9    years ago in the state police; is that right?

10    A.    Yes, sir.

11    Q.    And did I understand you correctly that you said,

12    *that's what I want to hear and now I'm going to join*

13    *law enforcement*?

14    A.    I never said that.

15    Q.    What did you say?

16    A.    I said exactly what he told me.

17    Q.    And that was you were thinking about getting into

18    law enforcement; right?

19    A.    I was thinking about getting back into it, yes,

20    sir.

21    Q.    And he told you this story, right, about abusing

22    African-Americans 30 years ago?

23    A.    Yes, sir.

24    Q.    And that was your impetus to say, *okay, I'm in.*

25    *Sign me up*?

1    A.    No.   There was other stories that he told me, but

2    that was one that sticks out.

3    Q.    Did you ever say, *gosh, sheriff, that doesn't*

4    *sound very cool to me.   I don't think I want to get*

5    *involved in something like that*?

6    A.    No, I never say that.

7    Q.    You wanted to do that, didn't you?   You wanted to

8    do what you're pleading guilty to?

9    A.    I didn't say I wanted to.

10   Q.    But you did it.

11   A.    But I did it.

12   Q.    When you heard this story, you didn't question

13   him or just say -- say, *man, that sounds bad.   I don't*

14   *want anything to do with that*?

15   A.    No, I didn't.

16   Q.    You've heard the sheriff use racial slurs?

17   A.    Numerous times.

18   Q.    And you use racial slurs?

19   A.    I have before.   Yes, sir, I have.

20   Q.    Quite a lot?

21   A.    I've used them before.

22   Q.    And a lot of guys on the force use them; is that

23   right?

24   A.    Yes, sir.

25   Q.    Let me ask you about Mr. Roche.   Is it Ricky

1   Roche?

2   A.    Ricky Roche, yes, sir.

3   Q.    Okay.  He apparently punched one of your fellow

4   narcotics officers, Bubba Savoy?

5   A.    Yes, sir.

6   Q.    Punched him in a bar one night?

7   A.    Outside the bar on Iberia Street.

8   Q.    And you decided -- you and some other guys

9   decided to go arrest him for that; is that right?

10  A.    No, sir.  That's --

11  Q.    You decided to go get some payback.

12  A.    I tried to get payback the night that he punched

13  Bubba.

14  Q.    Okay.  And that's when you chased him down.  You

15  beat on the window?

16  A.    I tried to break the window.  Yes, sir.

17  Q.    When was it you actually caught him?

18  A.    It was several months later.  I was working

19  undercover, and they witnessed him do what they said

20  was a hand-to-hand transaction and started following

21  him.

22  Q.    And there was kind of a high-speed chase; right?

23  A.    I wasn't involved, but that's what I was told,

24  yes.

25  Q.    But you eventually got to the scene?

1    A.    Got to the office.

2    Q.    You got to the office.  By the time you got to

3    the office, he had already been apprehended and brought

4    back to the station?

5    A.    Yes, sir, back to the office.

6    Q.    Now, how did you know he had been apprehended?

7    A.    I was told that they were following him.

8    Q.    Okay.

9    A.    I found out later that he was apprehended when I

10   arrived at the narcotics office.

11   Q.    Did you go to the -- so he wasn't brought to the

12   jail, he was brought to the narcotics office?

13   A.    So the paperwork could be completed, yes, sir.

14   Q.    Okay.  And the sheriff was not there.

15   A.    Not that I'm aware of.

16   Q.    Sheriff did not know he had even been arrested

17   that night.

18   A.    He knew the next morning when I told him.

19   Q.    Let's go in order.  He didn't know that he had

20   been arrested that night?

21   A.    Not from me.  I didn't tell him.

22   Q.    Okay.  And Mr. Roche was handcuffed to a bench?

23   A.    Yes, sir.  He had been shackled to the bench.

24   Q.    And there was blood on the wall?

25   A.    Yes, sir.

1    Q.    His blood?

2    A.    Yes, sir.

3    Q.    And you told him to lick his blood off of the

4    wall?

5    A.    Put a wet paper napkin in his mouth and told him

6    to clean my wall.

7    Q.    With his face, more or less.  He couldn't use his

8    hands?

9    A.    That's correct.

10   Q.    Louis Ackal never told you to do that?

11   A.    No, he didn't.

12   Q.    And did you actually lay hands on him that night?

13   Did you beat Mr. Roche?

14   A.    Yes.

15   Q.    Louis Ackal never told you to do that?

16   A.    No, sir.

17   Q.    When did you tell Louis Ackal about Ricky Roche?

18   A.    The following morning.

19   Q.    Did you say, *sheriff, I beat this guy*?

20   A.    I told him he got his issue.

21   Q.    Did you say, *sheriff, I beat this guy*?

22   A.    I told him he had his issue.

23        MR. MCLINDON:  Your Honor, would you instruct

24   him to answer my question, please?

25        THE COURT:  Did you use those words?  Did you

```
 1   say, I beat this guy?

 2             THE WITNESS:  No, sir, I didn't.

 3             THE COURT:  Okay.

 4   BY MR. MCLINDON:

 5   Q.    Did you say, Sheriff, I made this guy wipe his

 6   own blood off the wall?

 7   A.    I'm not sure if I told him that or not.

 8   Q.    All you said was, he got his issue?

 9   A.    Yes, sir.

10   Q.    Do you remember an incident on Cherokee Street?

11   A.    Yes, sir.

12   Q.    We've talked about that with the FBI a lot;

13   right?

14   A.    Yes, sir, I did.

15   Q.    Tell us about that.  What did you do on Cherokee

16   Street?

17   A.    We were serving a narcotics search warrant.  We

18   made entry through the rear door of a shotgun house.  I

19   was on the shield.  As we were coming through, I seen

20   the suspect run, grab a bunch -- grab something off the

21   dresser and put it in his mouth.  We bought crack from

22   the residence.  It was probably crack.

23   Q.    You presumed that he was trying to destroy

24   evidence?

25   A.    Yes, sir.
```

1  Q.    Or on drugs?

2  A.    So the suspect ends up on the bed and I notice a

3  weapon laying on the bed, which was a pistol.   I

4  screamed, *gun*.   I removed the pistol, step out into the

5  other room and clear.   When I came back, the suspect

6  was choked out.

7  Q.    Let me stop right there.   Did you participate in

8  the choking of this suspect?

9  A.    No, sir.   I was clearing the weapon.

10  Q.    Somebody else on the narcotics unit did?

11  A.    Yes, sir.

12  Q.    Okay.   Were other -- like the Hilltop incident,

13  did you exclude other officers from coming in there to

14  watch what y'all were doing?

15  A.    I did not.   We had our entry team, and we had

16  people for outside.   Everybody -- when --

17  Q.    Okay.   So you --

18  A.    Everybody had a job.

19  Q.    Okay.

20  A.    And they were told to stay outside.

21  Q.    Did that guy almost die?

22  A.    I walked outside on the front porch and called

23  for Acadian Ambulance, and told the rest of the unit to

24  start CPR on him.

25  Q.    Are you telling this Jury that that was an

```
 1    acceptable use of force?

 2    A.    I'm not saying it was.

 3    Q.    The sheriff wasn't there?

 4    A.    No, sir.

 5    Q.    Is there a bad drug problem in New Iberia?

 6              MR. BLUMBERG:  Objection.  Relevance.

 7              THE COURT:  Sustained.

 8    BY MR. MCLINDON:

 9    Q.    When you were working, did you see drug dealers?

10              THE COURT:  I'll remind the Jury that

11    questions are not evidence; answers are.

12              Go ahead.

13              MR. MCLINDON:  I'm sorry.

14    BY MR. MCLINDON:

15    Q.    Did you see drug dealers on the street a lot when

16    you were --

17              MR. BLUMBERG:  Objection.  Relevance.

18              THE COURT:  Sustained.

19    BY MR. MCLINDON:

20    Q.    Come back to Anthony Daye for a second in the

21    chapel.  Were there any dogs in there?

22    A.    I'm not sure if there was a dog in there or not.

23    Q.    If there were a dog in there and they were

24    barking, would you remember that?

25    A.    I don't remember if there was a dog in there.
```

1    Q.    You can't say one way or the other?

2          In the jail, when you were beating Anthony

3    Daye, did you see any of the IMPACT officers wearing

4    their T-shirts that said *IMPACT*?

5    A.    There was IMPACT officers there that day.  I

6    don't -- there was not -- there was none of them in the

7    chapel --

8    Q.    All right.

9    A.    -- when the Anthony Daye thing happened that I'm

10   aware of.

11   Q.    Okay.  Well, you testified earlier who you saw.

12   You said -- you listed everybody and I believe they

13   were all narcotics agents; right?

14   A.    Besides Wesley Hayes and the sheriff.

15   Q.    Okay.  So is your testimony different now?  The

16   IMPACT guys wore T-shirts that said *IMPACT*; right?

17   A.    Yes, sir.

18   Q.    Do you remember if any IMPACT guys were in the

19   chapel when you were beating Anthony Daye?

20   A.    I don't remember if any IMPACT guys were in the

21   chapel.

22   Q.    You testified on direct that over the years, you

23   have beaten a fair amount of people; is that right?

24   A.    Yes, sir.

25   Q.    How many did you estimate?

A.    30, 40.

Q.    You did it, you said, because you liked it?  Did you say that on direct examination?

A.    I don't know if I use the words "I liked it," but I said it.

Q.    The people you beat, you thought they were the scum of the earth; is that right?

A.    Yes, I did.

Q.    Let me ask you, you have probably heard this before.  Do some police officers, in their reports they'll put, *the defendant resisted and that's why I had to use excessive force*?

A.    Some do, yes.

Q.    Did you ever do that?

A.    Very rarely I charge people with excessive force.

Q.    You -- certainly, Louis Ackal never told you to do that?

A.    To do what?

Q.    To put in your report -- make sure you put in your report that he resisted arrest?

A.    I hardly charged people with resisting.

Q.    Louis Ackal never told you to put that in a report, did he?

A.    No, sir.

Q.    I'm going to now go to some questions that came

1  up on direct examination.  You talked about an incident

2  with Major Michael Barnett where he pulled out a gun,

3  trying to get some information out of that guy.

4          Do you remember talking about that?

5  A.   Yes, sir.

6  Q.   That upset you so much that you walked out?

7  A.   Yes, sir.  I was probably a week or two into

8  narcotics at the time.

9  Q.   And you never went and told the sheriff, did you?

10  A.   I don't remember if I told him that or not.

11  Q.   You wouldn't remember something like that,

12  telling the sheriff?

13  A.   I don't remember if I told him that or not.

14  Q.   Do you remember talking about the three officers

15  who got drunk at a party off duty?

16  A.   Yes, sir.

17  Q.   That was Willis, Huckabay and Bergeron; right?

18  A.   Yes, sir.

19  Q.   They were at a party at Willis's house?

20  A.   From what I was told, yes.

21  Q.   You weren't at the party?

22  A.   No, sir.

23  Q.   The sheriff was not at the party?

24  A.   No, sir.

25  Q.   They got drunk, and they drank a lot of tequila;

1    right?

2    A.    I don't know what they drank.

3    Q.    And then they went out and attacked some guys;

4    right?

5    A.    That's what I was told.

6    Q.    Everything you know about that is hearsay?

7    A.    It's from Louis Ackal.

8    Q.    Okay.  So Louis Ackal told you that they came to

9    his office the next morning.  Is that what he told you?

10   A.    He told me about the incident.  He never said

11   they came to his office.

12   Q.    Did he tell you that they apologized to him?

13   A.    No, sir, he didn't.

14   Q.    Did he tell you that he suspended them?

15   A.    Not that I'm aware of.

16   Q.    You don't know that?

17   A.    I don't know that.

18   Q.    You do know that Louis Ackal has filed -- has

19   fired a couple of officers for excessive use of force;

20   right?

21   A.    Yes, sir.

22   Q.    He's fired Deputy Lapeyrouse; right?  Are you

23   aware of that one?  At the sugarcane festival?

24   A.    Yes, sir.

25   Q.    He's fired Jackie Rinds?

1   A.    Yes, sir.

2   Q.    You heard about that one?

3   A.    (Nodding in the affirmative.)

4   Q.    *Yes*?

5   A.    Um-hum.  Yes, sir.

6   Q.    You testified a little bit about the internal

7   affairs being disbanded.

8   A.    Yes, sir.

9   Q.    Is that right?  Now, there are still

10  investigations done of officers without -- without

11  using internal affairs; right?

12  A.    I'm assuming.  I don't know.  After I was called,

13  I was never called in about any investigation on me.

14  Q.    Do you know if the section commanders now do the

15  investigations of officers who have complaints lodged

16  against them?

17  A.    I know Bubba did several investigations on other

18  officers.

19  Q.    After they disbanded IA?

20  A.    Yes, sir.

21  Q.    Let me ask you about these clearing the streets.

22  Did you ever hear Louis Ackal say, *we're going to take*

23  *the streets back from crime*?

24  A.    Not to me personally, no.  But I've heard it at

25  his election speeches.

```
 1    Q.    Okay.  You've heard that we're going to take the
 2    streets back from crime?
 3    A.    Yes, sir.
 4    Q.    And Hopkins Street, describe that for me.
 5    A.    Hopkins Street is a main highway on the west end
 6    of New Iberia that has stores that the residents in
 7    that community frequent a lot.
 8    Q.    Okay.  Is there a residential area, too?
 9    A.    Yes, sir.
10    Q.    Is there a lot of crime on Hopkins Street?
11    A.    On Hopkins Street, to say, no.
12              MR. BLUMBERG:  Objection.  Relevance.
13              THE COURT:  What's the relevance?
14              MR. MCLINDON:  Your Honor, he brought it up
15    on these jump-outs were on Hopkins Street and clearing
16    the streets on Hopkins Street.  I just want to get an
17    idea of what the atmosphere is like on Hopkins Street.
18              THE COURT:  Why?
19              MR. MCLINDON:  I want to make sure it's clear
20    to the Jury that they're not going down just any
21    residential street and jumping out and clearing the
22    streets.
23              THE COURT:  The objection is sustained.
24              MR. MCLINDON:  Okay.
25    BY MR. MCLINDON:
```

1   Q.    And so a *clear the streets* is something you said

2   that you would do every six months or so?

3   A.    High -- if something high profile happened, yes,

4   we'd clear the streets.

5   Q.    And so, for example, you talked about a situation

6   where there were a bunch of home invasions?

7   A.    Yes, sir.

8   Q.    And so the idea was, *hey, let's clear the streets*

9   *until this little high-profile crime wave is either*

10  *solved or passes*; is that right?

11  A.    Yes, sir.

12  Q.    Now, the jump-outs is something that you and your

13  narcotics agents did just routinely?

14  A.    Once a week.

15  Q.    Once a week, but not every six weeks.  And you

16  would stop, jump out and chase people down or just

17  throw them down on the ground?

18  A.    Yes, sir.

19  Q.    The sheriff never went with you on any jump-outs,

20  did he?

21  A.    Not with me.  But I heard of him going on some

22  before I got into narcotics.

23  Q.    Now, when you -- you're primarily a narcotics

24  agent, but you would occasionally work on SWAT; that's

25  right?

1   A.   Yes, sir.

2   Q.   And when you did certain things, you did not --

3   well, the head of SWAT was Mr. Rayborn; is that right?

4   Wendell Rayborn?

5   A.   Yes, sir, at the time.

6   Q.   And you testified that you would keep things from

7   him.  You didn't want him to know what you did on

8   narcotics?

9   A.   Yes, sir, that's correct.

10   Q.   Okay.  And you said you were worried that he

11   might -- originally you kept it secret is you're

12   worried he might tell people?

13   A.   Yes, sir.

14   Q.   And you said you didn't want him to tell the

15   sheriff; is that right?

16   A.   I don't believe I said the sheriff.

17   Q.   You don't think you said that?

18   A.   I don't believe I did.

19        MR. MCLINDON:  Just give me one second, Your

20   Honor.

21        (Pause in the proceedings.)

22        MR. MCLINDON:  That's all I have, Your Honor.

23   Thank you.

24        THE COURT:  Any redirect?

25        MR. BLUMBERG:  Briefly, sir.

REDIRECT EXAMINATION

BY MR. BLUMBERG:

Q.    Have you ever been at the scene of activity, police activity, in which Louis Ackal has arrived when you were there?

A.    Yes, sir, I have.

Q.    Has there ever been an occasion in which when he arrives, he talks to you about making sure somebody gets their issue or gets their ass whipped?

A.    There's been times where he's -- he's witnessed -- when Louis Ackal arrives on a scene, whoever is in control of it is pretty much not in control of it anymore; Louis Ackal is, and it gets hectic.

One scene in particular I can recall is we had a guy.  SWAT had a house surrounded.  The guy pops a few shots off out the house.  Louis takes off walking to the house that he's going to kill the son of a bitch, screaming.  I had to grab him and pull him back to the back of the vehicle where Bert Berry and Bubba and all them were standing.

Q.    Have there been times in which he asks you a question about whether an officer was injured?

A.    Yes, sir.

Q.    Describe typically how that conversation goes

```
 1    when Louis Ackal arrives at a scene.
 2              MR. MCLINDON:  Objection.  This is beyond the
 3    scope on cross.
 4              THE COURT:  Sustained.
 5              MR. BLUMBERG:  That's all I have, Your Honor.
 6              THE COURT:  Is the witness excused?
 7              MR. BLUMBERG:  Yes, sir.
 8              THE COURT:  The witness is excused.  Thank
 9    you, sir.
10              Let's have our afternoon break; 15 minutes.
11              (The Jury exits the courtroom.)
12              (Recess taken.)
13              (The Jury enters the courtroom.)
14              THE COURT:  You can all be seated, yes,
15    please.
16              THE COURTROOM DEPUTY:  Please raise your
17    right hand.  Do you solemnly swear that the testimony
18    you will give in this case will be the truth, the whole
19    truth and nothing but the truth, so help you God?
20              THE WITNESS:  I do.
21              THE COURTROOM DEPUTY:  Can you please spell
22    your first and last name for the court reporter.
23              THE WITNESS:  First name is Monica,
24    M-O-N-I-C-A.  The last name Bruno, B-R-U-N-O.
25              THE COURTROOM DEPUTY:  Thank you.
```

```
 1                        MONICA BRUNO,

 2     first having been duly sworn by the Courtroom Deputy,

 3              testifies under oath as follows:

 4                       DIRECT EXAMINATION

 5   BY MS. BOYD:

 6   Q.    Please have a seat and introduce yourself to the

 7   Jury.

 8   A.    My name is Monica Bruno.

 9   Q.    Where do you currently work?

10   A.    I work at Chili's in New Iberia, and overnight

11   WalMart in New Iberia.

12   Q.    Were you previously in law enforcement?

13   A.    Yes, I was.

14   Q.    Did you work for the Iberia Parish Sheriff's

15   Office jail in April of 2011?

16   A.    Yes, I did.

17   Q.    Were you on duty on April 29th, 2011, during a

18   shakedown?

19   A.    Yes, I was.

20   Q.    What was your position at the jail that evening?

21   A.    At that time I was paged out to go and help with

22   the shakedown.

23   Q.    What was your role in the shakedown?

24   A.    I was supposed to be helping look for contraband

25   and stuff like that.
```

1    Q.    Was this shakedown different than previous

2    shakedowns that you had participated in at the jail?

3    A.    Yes, it was.

4    Q.    How was it different?

5    A.    They had, um, the sheriff was there, patrol,

6    IMPACT, the SWAT, aside from the jail employees.

7    Q.    While you were present during the shakedown, did

8    you see an inmate that you believed to have been

9    abused?

10   A.    Yes.

11   Q.    What was that inmate's name?

12   A.    Anthony Daye.

13   Q.    When you first saw Mr. Daye that evening, did he

14   have any injuries?

15   A.    No.

16   Q.    Where was it that you first encountered Mr. Daye

17   during the shakedown?

18   A.    When I first saw Anthony, he was in the

19   educational room.

20   Q.    What was happening in the educational room at

21   that time?

22   A.    There was a lot of inmates there.  Some of them

23   was naked.  Some of them was fully clothed.  Some of

24   them had just their boxers on.  But they all was

25   kneeling down, their ankles was crossed and their hands

1    was interlocked behind their heads.

2    Q.   Was that how Mr. Daye was positioned when you saw

3    him?

4    A.   No.  He was in handcuffs, but he was on his

5    knees.

6    Q.   What interaction did you have with Mr. Daye when

7    you saw him in that position in the education room?

8    A.   When I first saw him, he said to me, *Miss Bruno,*

9    *please help me.*

10   Q.   What was his emotion when he said that?

11   A.   He was pretty much in tears.

12   Q.   How did you respond?

13   A.   I told him, *I'm sorry, Anthony, I can't help you.*

14   *It's out of my hands now.*

15   Q.   Why did you respond that way?

16   A.   Because I was outranked.  There was people there,

17   officers there that outranked me.

18   Q.   How did that make you feel at that time?

19   A.   I felt helpless.

20   Q.   Did you come to see Mr. Daye again during the

21   shakedown that evening?

22   A.   Yes, I did.

23   Q.   Where were you when you saw Mr. Daye again that

24   evening?

25   A.   At that point I had made it to the Max area, and

1    I was standing next to the sheriff at that time.

2    Q.    What happened as you were standing next to the

3    sheriff and you saw Anthony Daye again?

4    A.    When I saw Anthony, he wasn't walking.  There was

5    a deputy on each side of him pretty much dragging him

6    under -- by under his arms, and Anthony said to the

7    sheriff, *please help me.  They just beat me.*

8    Q.    How did the defendant respond when Mr. Daye said

9    that?

10   A.    He said, um -- he said, *oh, boy, go ahead.  We*

11   *don't beat people around here.  As a matter of fact, go*

12   *tell that to Cliff's family.*

13   Q.    What was the significance of the sheriff or the

14   defendant telling Anthony Daye to tell it to Cliff's

15   family?

16   A.    Anthony was in jail charged with the murder of

17   Cliff.

18   Q.    What did that mean to you when the sheriff made

19   that comment to Mr. Daye as he was asking for help?

20   A.    A lot of things went through my head at the time.

21   Um, I couldn't believe that he was actually telling

22   that to him.

23   Q.    How did you react?

24   A.    I just looked and shook my head.

25   Q.    Did you try to get Mr. Daye any help at that

1   time?

2   A.    No.

3   Q.    Why not?

4   A.    I mean, there was the sheriff standing right

5   here.  He asked the sheriff.  There was the Warden

6   there.  There was people that outranked me.  If they

7   didn't get him any help, I mean, like I couldn't.  I

8   mean, I was outranked.

9   Q.    Why didn't you feel like you could turn to the

10  defendant and ask him to help Mr. Daye?

11  A.    I don't know.  It's just Anthony asked for help.

12  Anthony asked him, and he laughed it off.  So, I mean,

13  I couldn't -- I don't know.

14  Q.    Where was Mr. Daye taken after that?

15  A.    He went to lockdown.

16  Q.    Did you see either the defendant or anyone else

17  try to get Anthony Daye medical care at that time?

18  A.    Not at that time, no.

19  Q.    Thank you.

20          MS. BOYD:  No further questions.

21          THE COURT:  Your witness, Counselor.

22          MR. MCLINDON:  Thank you, Your Honor.

23          Can we get up Government's Exhibit 1, a map

24  of the prison.

25  * * *

```
 1                      CROSS-EXAMINATION

 2    BY MR. MCLINDON:

 3    Q.    Good afternoon.

 4    A.    Hi.

 5    Q.    We're going to pull up a map here.

 6              Do you see it on your screen?

 7    A.    Yes.

 8    Q.    Can you point out where the -- I think you

 9    said -- was it Med/Max where you were standing?  Do you

10    want us to blow it up a little bit?

11    A.    Please, because I can't see it.

12    Q.    Do you see Med/Max there?

13    A.    Yes.

14    Q.    Okay.  You were standing -- can you touch the

15    screen.  You said you were standing next to the

16    sheriff?

17    A.    Yes.

18    Q.    At Med/Max.  Touch the screen where y'all were

19    standing.

20    A.    Right here.

21    Q.    Okay.  So I see Med/Max a little bit higher up.

22    Did you mean to be there?  I thought you were standing

23    at Med/Max.

24    A.    I was in Med/Max area.

25    Q.    Okay.  So that's where you were standing with
```

1    Louis Ackal?

2    A.    Yes.

3    Q.    Okay.   And you saw Anthony Daye being carried,

4    more or less, by two guards; is that right?

5    A.    Yes.

6    Q.    Or escorted, one on each shoulder?

7    A.    Pretty much dragged.

8    Q.    Okay.

9    A.    Because he was not walking.

10   Q.    Which direction were they coming from?

11   A.    They was coming from here and they came around

12   that way (indicating.)

13   Q.    Okay.   So to follow that path, they come there.

14   And you and the sheriff are standing there and you can

15   see Anthony Daye being escorted down towards you; is

16   that right?

17   A.    Yes.

18   Q.    And that's when Anthony tells the sheriff, *hey,*

19   *these guys just beat me*; is that right?

20   A.    Okay.

21   Q.    Is that right?

22   A.    Yes.

23   Q.    Okay.   Now, where is the education room?   Is it

24   reflected on that map?

25   A.    Education room would be right here (indicating).

1    Q.    Okay.  And it was earlier in the day that you saw

2    Anthony Daye in the education room?

3    A.    Minutes earlier.

4    Q.    Just a few minutes earlier?

5    A.    Yes.

6    Q.    Do you -- did he appear like he had been abused

7    or beaten when you saw him in the education room?

8    A.    No.

9    Q.    Okay.  And what -- were you standing by the --

10   were you in the education room?

11   A.    I was standing at the window.

12   Q.    Okay.

13   A.    Where he was.

14   Q.    Okay.  And then how did you get out of the

15   education room back over here with Sheriff Ackal?

16   Which path did you take, if you remember?

17   A.    I came around this way (indicating).

18   Q.    Okay.  Were you by yourself?

19   A.    Yes.

20   Q.    Okay.  And then you ran into the sheriff over

21   here?

22   A.    By K-1 door, yes.

23   Q.    Did -- you said you didn't -- after seeing the

24   obvious condition of Mr. Daye, he looked pretty bad.

25   He had been beaten pretty badly; right?

1    A.    Yes.

2    Q.    And I understand you didn't make a complaint or

3    file anything with the Warden or anybody like that; is

4    that correct?

5    A.    That's correct.

6    Q.    Okay.  In the past, have you made complaints to

7    Warden Hayes about inmate abuse?

8    A.    I meet -- I've told the Warden that inmates

9    complained about being --

10   Q.    Okay.

11   A.    -- abused.

12   Q.    Did you ever see a lot of papers stacked up on

13   the desk of Jesse Hayes and get the feeling like,

14   *nothing's happening here*?

15            MS. BOYD:  Objection.  Relevance.

16            THE COURT:  Overruled.

17            She can answer.

18   BY MR. MCLINDON:

19   Q.    Did you ever see papers stacked up on Jesse

20   Hayes's desk and just get a feeling that nothing's ever

21   happening, nothing's ever getting done?

22   A.    On Jesse's desk, no.

23   Q.    What about Wesley?

24   A.    Yes.

25   Q.    Okay.  And they're brothers; right?

```
 1    A.    Yes.
 2    Q.    And Wesley's the Warden, and Jesse's the
 3    Assistant Warden?
 4    A.    Yes.
 5    Q.    Okay.  Do you have any information about whether
 6    or not Anthony Daye had been in a fight earlier that
 7    day?
 8    A.    No.
 9    Q.    You don't know anything about that.  Okay.
10          Do you find that at the Iberia Parish
11    Sheriff's Office there are certain cliques, and they
12    keep to themselves and don't necessarily include
13    everybody in their cliques?
14    A.    Yes.
15    Q.    Do you feel like sometimes you were left out of
16    that clique?
17    A.    I don't feel that I was left out because it
18    didn't bother me.  I wasn't there to be in a clique.
19    Q.    You didn't want to be a part of it?
20    A.    Actually, no, I didn't.  I was there to work.
21    Q.    Okay.
22          MR. MCLINDON:  Thank you very much.  That's
23    all I have.
24          MS. BOYD:  Brief redirect, Your Honor.
25          THE COURT:  Redirect.
```

```
 1                    REDIRECT EXAMINATION

 2  BY MS. BOYD:

 3  Q.    Ms. Bruno, you were asked about the two guards

 4  who were escorting Anthony Daye when he came across

 5  yourself and the sheriff that evening?

 6  A.    Yes.

 7  Q.    Did you recognize those guards in any way?

 8  A.    They was not guards.  They wasn't part of the

 9  jail staff.

10  Q.    Do you know what unit they were a part of?

11  A.    They were part of patrol.  They had -- they

12  was -- appeared to me to be off duty because they had

13  T-shirts on.

14  Q.    Could you identify them in any other way?

15  A.    I remember them coming in the jail.  Like if they

16  would bring inmates in, sometimes they would come to my

17  office for paperwork or to make copies of something.

18  So I knew they was -- they wasn't with the jail.

19              MS. BOYD:  Thank you.  No further questions,

20  Your Honor.

21              THE COURT:  All right.  Is the witness free

22  to go?

23              MS. BOYD:  Yes, from the Government.

24              MR. MCLINDON:  Yes, Your Honor.

25              THE COURT:  You're excused, ma'am.  Thank you
```

```
 1    very much.  You are free to go home.
 2              THE WITNESS:  Thank you.
 3              THE COURT:  Call your next witness.
 4              MR. BLUMBERG:  Yes, Your Honor.  The
 5    Government calls Robert Burns.
 6              THE COURTROOM DEPUTY:  Please raise your
 7    right hand.  Do you solemnly swear that the testimony
 8    you will give in this case will be the truth, the whole
 9    truth and nothing but the truth, so help you God?
10              THE WITNESS:  I do.
11              THE COURTROOM DEPUTY:  Thank you.
12                        ROBERT BURNS,
13     first having been duly sworn by the Courtroom Deputy,
14              testifies under oath as follows:
15                     DIRECT EXAMINATION
16    BY MR. BLUMBERG:
17    Q.   Good afternoon, Mr. Burns.
18    A.   Good afternoon.
19    Q.   I'm going ask you to keep your voice up; okay?
20    A.   All right.
21    Q.   Okay.  Mr. Burns, how long -- how are you
22    employed at the moment?
23    A.   I'm not.
24    Q.   Okay.  Were you ever a law enforcement officer?
25    A.   Yes, sir.
```

```
1    Q.    When were you a law enforcement officer?

2    A.    From 2001 to 2014.

3    Q.    Please given your résumé to the jury, please.

4    A.    Résumé started 20 years' military experience,

5    retired.  Joined law enforcement in Iberia Parish in

6    2001.  Um, went from there.  2013 I moved from Iberia

7    Parish working as a K-9 officer to UL police, working

8    for the state with the UL Police Department.

9    Q.    UL refers to...

10   A.    University of Louisiana.

11   Q.    I'm going to ask to focus your attention now on

12   your time at the Iberia Parish Sheriff's Office; okay?

13   A.    Yes, sir.

14   Q.    What does it mean to be a K-9 handler at the

15   IPSO?

16   A.    The K-9 handler, you have a dual-purpose dog.

17   The dual-purpose dog is used for --

18   Q.    I'm going to ask you to speak very slowly 'cause

19   I'm working real hard to do it, so you can't speed me

20   up.

21   A.    Yes, sir.  A dual-purpose dog is a narcotics

22   detector dog as well as a criminal apprehension.  I

23   worked a dog from 2006, when I came back from Iraq,

24   until 2013 when I left the IPSO.

25   Q.    Describe a little bit about those dual functions
```

1   of the use of that dog.

2   A.    The dog is used for criminal apprehension,

3   tracking, apprehending criminals that have committed a

4   felony or above.  Usually that responded to burglaries

5   in progress, any felony-in-progress calls.  Narcotics

6   detection, the dog searches for an odor or that it's

7   certified in.

8   Q.    What kind of training do you get as a dog handler

9   at the IPSO?

10  A.    We trained once a week for approximately three

11  hours, different places.  You go to a class when you

12  get a new K-9.  Every time you get a dog, you go to a

13  handler's course, which is a month long, by a certified

14  instructor and then you have to certify that dog in

15  patrol and also narcotics, whatever it's certified in.

16  Q.    What's involved in getting a dog certified?

17  A.    Um, quite a bit.  You have to do recall, building

18  search, searches with the dog.  You have to do a

19  narcotics search of a building, three rooms.  You have

20  to locate the narcotics.  You have to do recall.  The

21  dog's got to listen to you off leash; that's quite a

22  bit.

23  Q.    Do dog handlers get Use of Force training?

24  A.    At -- while you're at your class, by -- legally

25  you -- yes.

1    Q.    What kind of Use of Force training do dog

2    handlers get?

3    A.    It's all written in the law, you know, what you

4    can and what you can't do with that dog.

5    Q.    Do dog handlers have to follow the Use of Force

6    policies for the rest of the department that you're in?

7    A.    Yes.

8    Q.    Do dog handlers have to follow the Use of Force

9    policies that you get when you become POST-certified?

10   A.    Yes.

11   Q.    You were POST-certified; right?

12   A.    Yes, sir.

13   Q.    What does that mean, real quickly?

14   A.    You're -- you're a -- you're a law enforcement

15   officer, you're certified to be a law enforcement

16   officer.

17   Q.    In Louisiana?

18   A.    In Louisiana.

19   Q.    In order to be a sworn law enforcement officer,

20   you have to pass certain tests; is that right?

21   A.    Yes, sir.  You go to the academy and pass a test.

22   Q.    Okay.  And that's what you mean by

23   POST-certified?

24   A.    Yes, sir.

25   Q.    And there is Use of Force training associated

```
 1    with that?
 2    A.    Sir?
 3    Q.    There is Use of Force training associated with
 4    that?
 5    A.    Yes, sir.
 6    Q.    All right.  Is the dog classified as any kind of
 7    a weapon at the IPSO?
 8    A.    A weapon.  It's a tool.
 9    Q.    Okay.  And are you taught that you need to use
10    the tool in similar ways that other tools could be
11    used, like batons, Tasers, pepper spray, that kind of
12    thing?
13    A.    It falls in -- in that curriculum, correct.
14    Q.    So is it fair to say that the dogs follow the
15    same kind of Use of Force principles as other deputies
16    might use who are being trained on some kind of an
17    IMPACT weapon?
18    A.    Yes, sir.
19    Q.    And what do you mean -- what do you understand
20    that I mean when I use the word "IMPACT weapon" as it
21    relates to the IPSO?
22    A.    A baton, expandable baton.
23    Q.    Anything else?
24    A.    Riot sticks, but I've never used them.
25    Q.    Okay.  And so what is your understanding of what
```

1    the Use of Force principles were at the time that you

2    were a K-9 handler for IPSO?  What were you allowed to

3    do?

4    A.    Criminal apprehension as a felony.  Depends on

5    the felony.  Anything violent.

6    Q.    Could you have the dog bite anybody you wanted?

7    A.    I could make him bite anybody.

8    Q.    Were you allowed to do that?

9    A.    No, sir.

10   Q.    Why not?

11   A.    That was the handler's call.

12   Q.    But what are the principles that guide when you

13   can have a dog bite somebody?

14   A.    When it's -- when there is a felony taking place,

15   when there is a felony -- in pursuit of a felony.

16   Q.    What if a felony wasn't taking place?

17   A.    You don't have a bite.  That's illegal.

18   Q.    What if the person who is the suspect wasn't

19   posing a threat?

20   A.    You can't bite him.

21   Q.    Could you use a dog to bite somebody because you

22   were angry at them?

23   A.    No.

24   Q.    Okay.  Were there other ways that you used the

25   dogs in IPSO in the jail?

1   A.   We did searches for narcotics with the dog.  The

2   dog was a force multiplier, basically.  But what

3   happened is you're limited on people, your ratio.  So

4   when you walk into a pod, you go to either side and

5   they -- you just stand there and wait for them to clear

6   the cells.  Then you run the dog for searching for

7   narcotics.

8   Q.   Okay.  As you sit here today, have you pled

9   guilty to committing a constitutional violation for the

10  way you handled your business with your dog in the jail

11  on April 29, 2011?

12  A.   Yes, sir.

13  Q.   What did you plead guilty to?

14  A.   Making him bark.

15  Q.   What else?

16  A.   I believe I struck an inmate.

17  Q.   You believe or you did?

18  A.   I did.  While I was telling him to look ahead and

19  keep his head straight.

20  Q.   You pled guilty to striking that inmate; right?

21  A.   Yes, sir.

22  Q.   Was there a good reason for you to strike him?

23  A.   I was told to watch him.

24  Q.   You have had your Use of Force training, sir,

25  haven't you?

1    A.    Yes, sir.

2    Q.    Was there a good reason to strike him?

3    A.    No, sir, not at all.

4    Q.    Is that why you pled guilty to the constitutional

5    violation?

6    A.    Yes, sir.

7    Q.    Now, Mr. Burns, we have had an opportunity to

8    talk about that striking several times, you and I and

9    members of the FBI, haven't we?

10   A.    Yes, sir.

11   Q.    Have you always been honest with us about those

12   circumstances?

13   A.    No.

14   Q.    Why not?

15   A.    It's embarrassing.  I felt bad.  I was trying

16   to -- it was pure embarrassment to, you know, put

17   yourself in that position and then get questioned on it

18   because that's not how I operate.  That's not how I

19   worked.  That's not how I was trained or taught.

20   Q.    It was how you worked on April 29, 2011, though?

21   A.    Yes, sir.

22   Q.    All right.  So let's talk about how you got here.

23   Okay?

24   A.    Yes.

25   Q.    You got called to respond to a shakedown in the

1   jail; is that right?

2   A.    Yes, sir.

3   Q.    All right.  What's involved with that?

4   A.    Officers go inside the jail.  You get a briefing.

5   And they go to each pod and shake it down, pull

6   everything out.  The officers go through and look for

7   contraband.  They got -- there's specific things I'm

8   assuming they're looking for.

9   Q.    You are not a jailer, are you?

10  A.    No, sir.

11  Q.    Did you find yourself in one of the rec yards on

12  April 29, 2011, as helping out with the shakedown?

13  A.    Yes, sir.

14  Q.    Okay.  What role did you play in the rec yard

15  that day?

16  A.    I was a K-9 handler.

17  Q.    What did you see when you were in there?

18  A.    Inmates being pulled into the rec yard, officers

19  placing them against the wall.  They were facing the

20  wall.

21  Q.    At the time that you were in there, did you see

22  any inmates posing any risk of harm to any of the

23  deputies?

24  A.    No, sir.

25  Q.    How many deputies were coming and going in that

1    rec yard that day?

2    A.    I would say at a given time, five.

3    Q.    How many total, do you think?

4    A.    I would say no more than eight.

5    Q.    Did you see Louis Ackal that day in the rec yard?

6    A.    Yes, sir.

7    Q.    At any point in time, did you see Louis Ackal at

8    risk from any of the inmates?

9    A.    No, sir.

10   Q.    Did you see any of the inmates in that rec yard

11   trying to get up and run away?

12   A.    No, sir.

13   Q.    Did you see any of the inmates trying to hurt

14   another inmate?

15   A.    No, sir.

16   Q.    How about any inmates disobeying commands that

17   would require force?

18   A.    No, sir.

19   Q.    Did you use your dog to intimidate an inmate in

20   that rec yard?

21   A.    Yes, sir.

22   Q.    Why did you do that?

23   A.    I don't recall why.  I was told to bring my dog

24   over and watch the inmate while there was another

25   officer on top of him or holding him down.

```
 1   Q.    Who told you to do it?

 2   A.    The sheriff.

 3   Q.    Do you see him here in court today?

 4   A.    Yes, sir.

 5   Q.    At the defense table?

 6   A.    Yes, sir.

 7            MR. BLUMBERG:  Steve, if you would, please,

 8   clip -- Exhibit Number 9, the clip we talked about.

 9            (Video playing.)

10   BY MR. BLUMBERG:

11   Q.    Do you see yourself in Exhibit Number 9,

12   Mr. Burns?

13   A.    Yes, sir.

14   Q.    Describe where you're at, please.

15   A.    I am standing closest to the camera.

16   Q.    Are you looking down at something?

17   A.    I'm looking at my phone.

18   Q.    Would you be looking at your phone if you saw

19   some kind of risk of harm going on?

20   A.    No, sir.

21   Q.    What's the name of your dog, by the way?

22   A.    Reddick.

23   Q.    Are there two dogs in that rec yard?

24   A.    Yes, sir.

25   Q.    Why are there two?
```

```
 1   A.    That was the supervisor.  That's -- that's Brinca
 2   (ph).  There was two.  He just came out.  The dog
 3   needed to get some air.  We were down waiting for the
 4   next --
 5   Q.    Do you see Louis Ackal in Exhibit Number 9?
 6   A.    Yes, sir.
 7   Q.    What's he wearing?
 8   A.    A light blue shirt.
 9   Q.    What's he doing in that video?
10   A.    He's talking to somebody, yelling at an inmate or
11   doing something.
12   Q.    Now, at 45 seconds into this clip, you walk over
13   to an inmate on his belly, don't you?
14   A.    Yes, sir.
15   Q.    Why do you do that?
16   A.    I was called over there.
17   Q.    By whom?
18   A.    The sheriff.
19   Q.    At the time that you walked over there, what was
20   the condition of that inmate?
21   A.    He was on the ground with an officer on top of
22   him.
23   Q.    Was he handcuffed?
24   A.    No, sir.
25   Q.    Are you sure?
```

1    A.    No, sir.  I don't think he was.

2    Q.    Okay.  Did he appear to be immobile?

3    A.    Yes, sir.

4    Q.    What was the other officer doing?

5    A.    He was just holding him down.

6    Q.    Do you remember who that officer was?

7    A.    Eric Segura.

8    Q.    Have you ever talked with Eric Segura about

9    anything in this video?

10   A.    No, sir.

11   Q.    Have you ever talked with Eric Segura about any

12   of your testimony?

13   A.    No, sir.

14   Q.    When is the last time you had even seen Eric

15   Segura?

16   A.    I seen him at a gas station about six months ago.

17   Q.    Any conversation about --

18   A.    No.  I passed him.

19   Q.    Okay.  What are you doing now at time stamp

20   1 minute and 43 seconds?

21   A.    Making the dog bark.

22   Q.    Why are you doing that?

23   A.    I was told to.

24   Q.    By whom?

25   A.    The sheriff.

1    Q.    What's the purpose of doing that?

2    A.    Intimidating.

3    Q.    Why would you need to intimidate that inmate?

4    A.    No reason.

5    Q.    There's got to be some reason.

6    A.    To scare him.

7    Q.    Is that what you were intending to do?

8    A.    Yes.

9    Q.    Was there any legitimate need to scare that

10   inmate?

11   A.    Not at all, sir.

12   Q.    So what's the purpose of scaring the inmate?

13   A.    We were just told to do it by --

14   Q.    Mr. Burns, you served in Iraq; right?

15   A.    Right.

16   Q.    You served your country; right?

17   A.    Yes, sir.

18   Q.    You've taken lots of Use of Force training;

19   right?

20   A.    Yes, sir.

21   Q.    You know the difference between right and wrong?

22   A.    Yes, sir.

23   Q.    What were you doing there?

24   A.    Doing what I was told.

25   Q.    Yeah.  And what was that?

1    A.    Intimidate that prisoner.

2    Q.    How close did that dog get to that prisoner's

3    face?

4    A.    Within a foot.

5    Q.    Is that dog loud?

6    A.    The dog is very loud.

7    Q.    Is that dog scary?

8    A.    Yes, sir.

9    Q.    Do you have trouble controlling that dog at

10   times?

11   A.    He had his moments.

12   Q.    Did he bite other deputies at times?

13   A.    He bit me.

14   Q.    Is that a *yes*?

15   A.    Yes.

16          MR. BLUMBERG:  You can take that down,

17   Steven.  Thanks.

18          (Video stops playing.)

19   BY MR. BLUMBERG:

20   Q.    Ultimately, why did you take the dog away from

21   the inmate?

22   A.    Everything was over.  I guess they were taking

23   inmates back in or whatever they do with the inmates.

24   Q.    Were there other supervisors in the rec yard at

25   the time that you were intimidating the inmate with the

1   dog?

2   A.    Yes, sir.

3   Q.    Did anybody try and intervene?

4   A.    No, sir.

5   Q.    Did anybody at any point ever say to Louis Ackal,

6   *Hey, you don't need to put the dog in that guy's face*?

7   A.    No, sir.

8   Q.    Did you ever say to Louis Ackal, *Look, this is*

9   *not the way we are trained to use dogs*?

10  A.    No, sir.

11  Q.    Why didn't you do that?

12  A.    I like my job.  I want to keep my job.  I have a

13  family to feed.

14  Q.    Mr. Burns, you were a sworn law enforcement

15  officer.

16  A.    Absolutely.

17  Q.    Why not look at the chief constitutional officer

18  and say, *This is against our training, sir*?  Why not?

19  A.    Because he's the man in charge.  He's the one

20  that's calling and telling us what to do.

21  Q.    Did you think he would receive that information

22  well?

23  A.    Probably not.

24  Q.    Why not?

25  A.    Because he's the sheriff.

```
 1    Q.    What were you worried about?
 2    A.    My job.
 3    Q.    Why did you think he would fire you if you just
 4    cited the law to him?
 5    A.    It would make it -- because that's -- that's the
 6    sheriff.  I never questioned his authority or his --
 7    what he told us to do.
 8    Q.    Was there anybody else in command in that rec
 9    yard that day?
10    A.    Yes, sir.
11    Q.    Who was giving the orders?  Who was giving the
12    orders in that rec yard?
13    A.    The sheriff.
14    Q.    Was that the only time you used the dog
15    improperly that day?
16    A.    No, sir.
17    Q.    Now, at some point you found yourself in the jail
18    chapel, didn't you?
19    A.    Yes, sir.
20    Q.    Roughly, how many occasions do you think you were
21    in the chapel that day with your dog?
22    A.    I probably searched it after everybody is out
23    five or six times, if not more.
24    Q.    Five or six times, if not more?
25    A.    If not more.
```

1   Q.   Okay.  I'm reliably informed that you need to

2   speak louder.

3   A.   All right.  I'm deaf.  I apologize.  I'll try and

4   keep it down.

5   Q.   What's the chapel in the jail typically used for?

6   A.   The correct use for it?

7   Q.   Yes.

8   A.   It's a chapel.

9   Q.   Okay.  Was it being used as a chapel, as a place

10   to pray, on April 29, 2011?

11   A.   No, sir.

12   Q.   What was it being used for?

13   A.   Detaining inmates.

14   Q.   Detaining them?

15   A.   Bringing them in.  Um, the housing, housing them

16   while they're searching their pods, their cells.

17   Q.   Mr. Burns, what was the chapel being used for?

18   A.   They are also -- I'm getting to that part.  They

19   were also bringing inmates in there to beat them.

20   Q.   How do you know that?

21   A.   Because I actually walked by and went in.

22   Q.   And?

23   A.   They were beating an inmate.

24   Q.   How many inmates did you see get beaten that day?

25   A.   Four.

1    Q.    So did you hear any conversation in that rec yard

2    before you went out to the chapel between Louis Ackal

3    and the inmate who was on the ground?

4    A.    No, sir.

5    Q.    Did you ever hear Louis Ackal tell anybody to

6    take an inmate to the chapel that day?

7    A.    No, sir.

8    Q.    When you walked by the chapel the first time,

9    what did you see?

10   A.    Is an inmate being hit, like they were fighting

11   with the inmate.  That was the narcotics officers.  As

12   I walked in, they actually had him on his knees, and

13   they were disciplining him for something that he did.

14   Q.    Was there a fight going on?

15   A.    No.  I thought that there may have been -- they

16   were trying to detain the subject.  So I walked into

17   it, and they actually had him down on his knees doing

18   his -- they were beating him.

19   Q.    Who was beating him?

20   A.    Narcotics agents.

21   Q.    Identify them.

22   A.    One was Ben Lassalle.  The other one was Jason

23   Comeaux.

24   Q.    What was the inmate doing at the time?

25   A.    He was kneeled down, facing the wall.

```
 1    Q.    Handcuffed?

 2    A.    He was handcuffed.

 3    Q.    Posing any risk of harm?

 4    A.    No, sir.

 5    Q.    Did you go in and stop it?

 6    A.    No, sir.

 7    Q.    Did it appear to be a legitimate use of force?

 8    A.    No, sir.

 9    Q.    Did it appear to be a use of force that was

10    contradicted by your policy and training?

11    A.    No, sir.

12    Q.    I'm going to ask it.  Was it a good use of force

13    or bad use of force?

14    A.    Bad.

15    Q.    Why didn't you stop it?

16    A.    I don't know.

17    Q.    Sure, you do.

18    A.    Um, because that's narcotics.  I mean, that's

19    their business.  I don't know what they're doing, what

20    they're investigating half the time.

21    Q.    Mr. Burns, was that an investigation?

22    A.    No.

23    Q.    What was it?

24    A.    That was a beating.

25    Q.    So why didn't you run to the sheriff and tell him
```

1   you saw a beating?

2   A.    Because he was standing in the general area.

3   Q.    Could he hear -- could he hear what you heard?

4   A.    Yes, sir.

5   Q.    Why didn't you go to the sheriff and tell him,

6   *They're beating that man in there, Sheriff*?

7   A.    He should have been in there telling him himself,

8   stopping it.  They had a lot of people in there,

9   officers that were at rank that should have been

10  stopping all this.

11  Q.    Now, you and I have had this conversation about

12  the sheriff giving instructions before, haven't we?

13  A.    Correct.

14  Q.    You've actually testified in front of the grand

15  jury on these topics, haven't you?

16  A.    Yes, sir.

17  Q.    Fair to say that you told the grand jury

18  something different than you told them here today?

19  A.    That he gave the orders?

20  Q.    Yeah.

21  A.    I could hear them.  I didn't see them.

22  Q.    What was the order that you heard?

23  A.    *Beat that inmate.*

24  Q.    When did he give that order?

25  A.    At the door.

```
 1   Q.    Door to what?

 2   A.    To the chapel.

 3   Q.    Where were you?

 4   A.    I was inside the chapel.

 5   Q.    How many inmates were in the chapel at the time

 6   that you heard that?

 7   A.    Two.

 8   Q.    I want to talk to you about the inmates you saw

 9   get beaten before there were two in there.  Okay?

10   A.    Okay.

11   Q.    Who is the first inmate that you remember getting

12   beat?

13   A.    Who?

14   Q.    Yeah, if you know their name.

15   A.    Oh, I have no idea who they are.

16   Q.    Who was physically present when you saw the first

17   inmate that day that was getting beaten?

18   A.    Bubba was at the door.  Jason Comeaux, Ben

19   Lassalle, and Wade Bergeron was standing against the

20   wall.

21   Q.    Was that inmate black or white?

22   A.    He was black, I believe --

23   Q.    Because you did --

24   A.    -- the first one.

25   Q.    You did see an episode later with a white inmate,
```

```
 1   didn't you?

 2   A.    Yes, sir.

 3   Q.    We'll talk about that in a minute.

 4   A.    Okay.

 5   Q.    The first one, the black inmate, when he's all by

 6   himself in the chapel -- are you with me?

 7   A.    Yes, sir.

 8   Q.    Why didn't you tell the sheriff about that

 9   inmate?

10   A.    I don't know.  Um, he told the narcotics guys to

11   bring him in there.

12   Q.    How do you know that?

13   A.    Because they were outside getting their hair cut.

14   Q.    Tell the jury what you heard the sheriff say

15   about bringing him there.

16   A.    He said, Take 'em in there and tune 'em up.

17   Q.    Which --

18   A.    Which means handle it.

19   Q.    Handle it?

20   A.    Beat 'em.

21   Q.    How do you know that that's what it means?

22   A.    I've heard it before.

23   Q.    By whom?

24   A.    The narcotics.  The sheriff.

25   Q.    Did you think that --
```

1          THE COURT:  Louder, please, sir.  Lean

2     forward and maybe get closer to the mic.

3          THE WITNESS:  All right.

4     BY MR. BLUMBERG:

5     Q.    Did you think that the sheriff was giving an

6     order to have him properly disciplined?

7     A.    Not properly disciplined, no.

8     Q.    Was there any reason that you could see why the

9     sheriff would order an inmate to be *tuned up*?

10    A.    No, sir.

11    Q.    Were you confident that you understood what *tuned*

12    *up* meant?

13    A.    Yes, sir.

14    Q.    In fact, were you correct?

15    A.    Yes, sir.

16    Q.    How do you know that?

17    A.    Because the inmate was getting beaten.

18    Q.    Now, I want to talk about the second inmate that

19    you saw get beaten that day.  That's the white guy;

20    right?

21    A.    Yes, sir.

22    Q.    Do you know that guy's name?

23    A.    No, sir.

24    Q.    Who was in the chapel -- where did that beating

25    take place?

1    A.    In the chapel.

2    Q.    Had you stayed in the chapel for -- between the

3    time when the black guy and the white guy were getting

4    beaten?

5    A.    No, sir.

6    Q.    Where did you go?

7    A.    I went outside.  I went outside the chapel,

8    immediately -- about 10 or 15 feet away from it.

9    Q.    Did you see deputies bring the white guy into the

10   chapel?

11   A.    They walked by.  They brought him -- they walked

12   by.

13   Q.    So why did you go and follow them into the

14   chapel?

15   A.    They called me.

16   Q.    Who called you?

17   A.    Bubba.

18   Q.    What did he say?

19   A.    *Bring the dog.  Burns, bring you and your dog*

20   *over here.*  So I walked in.

21   Q.    Now, I'm talking about the white inmate; right?

22   A.    Right.

23   Q.    All right.  What happened once you got into the

24   chapel?

25   A.    There was two people inside.  They had him in on

1    the far left.

2    Q.    Wait a minute.  Back up a minute.  There are

3    multiple episodes of beatings you have; right?

4    A.    Correct.

5    Q.    One episode involved two black inmates; is that a

6    fair statement?

7    A.    Yes.

8    Q.    I want to focus now on the beating related to the

9    white inmate.  Are you with me?

10   A.    Okay.

11   Q.    All right.  How did you find yourself in the

12   chapel for the white inmate?

13   A.    Um, Bubba called me.

14   Q.    For the white inmate?

15   A.    Yes.

16   Q.    What did he say?

17   A.    He said, *Bring the dog over here*.

18   Q.    Who was in the chapel when you got there?

19   A.    It was Wade, Comeaux -- Jason Comeaux and Ben

20   Lassalle.

21   Q.    What did you see happen?

22   A.    They were beating him.

23   Q.    Who was beating him?

24   A.    Ben and Jason.

25   Q.    And who were they beating?

1    A.    The white inmate.

2    Q.    Was he handcuffed?

3    A.    Yes, sir.

4    Q.    Was he standing or on the ground?

5    A.    He was kneeling on the ground.

6    Q.    Was he posing any risk of harm to anybody in the

7    chapel?

8    A.    No, sir.

9    Q.    Was he trying to run away?

10   A.    No, sir.

11   Q.    Did he appear to have any weapons?

12   A.    No, sir.

13   Q.    Could you see any reason for the beating to take

14   place?

15   A.    No, sir.

16   Q.    Describe the beating.

17   A.    He used expandable batons, kicking, punching.

18   Q.    How long did it go on?

19   A.    Ten minutes, maybe, if that.

20   Q.    Ten minutes?

21   A.    If that.

22   Q.    That seems like a long time.

23   A.    That is a long time.

24   Q.    Did you try and stop it?

25   A.    No, sir.

1  Q.    You had a dog with you; right?

2  A.    Yes, sir.

3  Q.    You could have used the dog to stop it.

4  A.    Yes, sir.

5  Q.    How did you feel watching the man get beaten for

6  that length of time?

7  A.    I felt bad for him.

8  Q.    Why didn't you try and stop it?

9  A.    I -- because narcotics was being narcotics.  They

10  were doing their thing.

11  Q.    What was their reputation?

12  A.    Beat -- if you don't do what they say, they would

13  take -- beat you.

14  Q.    Why not go to the sheriff and say, *Look, these*

15  *narcotics guys, they're out of control; they're beating*

16  *another guy in the chapel*?

17  A.    That is the sheriff's baby.  The narcotics

18  officers were close-knit, I guess, to the sheriff.  I

19  mean, that's his people.

20  Q.    Did anybody else in the chapel try and stop that

21  beating of the white guy?

22  A.    No.

23  Q.    How did that beating end?

24  A.    Um, he was taken out --

25          THE COURT:  I'm sorry.  Speak up.

1    THE WITNESS:  He was taken out -- they

2    carried him out, I believe.  They brought him to see

3    the medics or the nurse.

4    BY MR. BLUMBERG:

5    Q.    Did something happen to the white guy with the

6    baton before he left the chapel?

7    A.    Yes, sir.

8    Q.    What happened?

9    A.    He was forced to do oral sex on it.

10   Q.    Who forced the inmate to perform oral sex on the

11   baton?

12   A.    Ben Lassalle.

13   Q.    Describe what you saw happen.

14   A.    There was an inmate kneeling.  You have Jason

15   Comeaux standing to the right of him and then Ben

16   Lassalle standing in front of him with the baton like

17   it's a dick in his hand; and I couldn't see the guy

18   actually, but with his head movement and his hips

19   moving, you could tell it was going in his mouth, he

20   was forcing him to suck on it.

21   Q.    How did you react to that?

22   A.    I walked out and told my supervisor at the time,

23   Hatley, I said, *this is* -- excuse my language -- *F'd*

24   *up.  Why are we even here?*

25   Q.    What was Hatley's response?

```
 1   A.    He was like, I don't know, man.  He was just
 2   like, we got to stay here.
 3   Q.    Pretty shocking description that you provided?
 4   A.    Yes, sir.
 5   Q.    Why did you stay?
 6   A.    Sir?
 7   Q.    Why did you stay?
 8   A.    Because that was where we supposed -- that was
 9   our place of duty.  That was where we were supposed to
10   go.  That's where we were supposed to be.  If we would
11   have left, I would have turned my dog in, all my
12   equipment and just went home.
13   Q.    Why not do that?
14   A.    Because I needed a job to -- I have kids that are
15   in school.  I mean, I had to put groceries on the
16   table, you know.
17   Q.    Why not find another job?
18   A.    I eventually did, but I couldn't at the time.
19   Q.    Why not?
20   A.    Because I needed that job.
21         THE COURT:  I'm sorry?
22         THE WITNESS:  I needed the job.  I enjoyed
23   what I did.  Not beating people; that wasn't me.  I
24   enjoyed helping people.
25   BY MR. BLUMBERG:
```

1  Q.   The beatings weren't over for you that day; were

2  they?

3  A.   No, sir.

4  Q.   Now we get to the time in which there were two

5  inmates in the chapel; right?

6  A.   Yes.

7  Q.   Tell them.

8  A.   There's two inmates in the chapel.  They called

9  us in.  They were beating the one inmate.  And when

10 they went from that one inmate to the next one, they

11 told me to watch him.  And he kept turning his head to

12 look over to see what they were doing to him.  So I

13 popped him in the back of the head and said, *keep your*

14 *eyes straight ahead*.  And he did.

15 Q.   Who called you into that chapel?

16 A.   Bubba.

17 Q.   What did he ask you to do?

18 A.   Watch that inmate.

19 Q.   What else did he ask you to do?

20 A.   *Make your dog bark*.

21 Q.   Say it again?

22 A.   *Make your dog bark*.

23 Q.   Did you make the dog bark like you made it bark

24 in the rec yard earlier that day?

25 A.   Yes.

Q.    How close did you get Reddick to that inmate's

face in the chapel?

A.    It was to the back of him.  He was facing away

from me, so it was behind him.  Probably about a foot,

same distance.

Q.    Same loud barking?

A.    Oh, yeah.

Q.    Same snarling?

A.    Yes, sir.

Q.    Same effort to intimidate and terrify that

inmate?

A.    Yes, sir.

Q.    Was there any reason for you -- legitimate law

enforcement reason to hit the guy in the back of the

head?

A.    No.

Q.    Was there any legitimate law enforcement reason

to use the dog to terrify that inmate?

A.    No.

Q.    There was another beating going on; correct?

A.    Yes.

Q.    While you were watching that inmate?

A.    Um-hum.

Q.    Yes or no?

A.    Yes.

1    Q.    Describe that beating to the Jury.

2    A.    They were beating him with their expandible

3    batons, Asps, more than one.  It was Ben and Jason were

4    beating him.  Wade was against the wall standing there

5    while this inmate -- while I was watching him.

6    Q.    How were the inmates positioned?

7    A.    They were on their knees facing the wall with

8    their hands handcuffed behind their back.

9    Q.    Were they posing any threat of harm to anybody in

10   that room?

11   A.    No, sir.

12   Q.    How many total officers were in there?

13   A.    Six.

14   Q.    What kind of noises were the inmates making?

15   A.    Grunting.  Painful.  If you get hit with an asp,

16   you're going to -- painful noises.  I mean, *ow, hey,*

17   *stop.  Ooh, ooh, ooh*, you know.

18   Q.    Were they begging for it to stop?

19   A.    No.

20   Q.    Did they make noises like they were hurt?

21   A.    Yes.

22   Q.    What did Louis Ackal say about the beating?

23   A.    Nothing.  *Tune them up.*

24   Q.    Where was Louis Ackal?

25   A.    He was standing in the doorway behind me.

```
 1   Q.    How do you know that?

 2   A.    His voice.

 3   Q.    Describe it.

 4   A.    Very -- it's loud.  It's intimidating.  He's got

 5   a very -- he's got a voice you don't forget.

 6   Q.    Was he yelling?

 7   A.    He was yelling.

 8   Q.    Was he screaming?

 9   A.    Not screaming.

10   Q.    What was he yelling?

11   A.    Tune 'em up.

12   Q.    Was he using slurs?

13   A.    Yes, sir.

14   Q.    Was he talking about it being his jail?

15   A.    Yes, sir.

16   Q.    Do you have any doubt that Louis Ackal was

17   standing off to your shoulder in the doorway?

18   A.    No, sir.

19   Q.    Did Louis Ackal at any point in time stop you

20   from slapping the inmate?

21   A.    No, sir.

22   Q.    Stop you from intimidating the inmate with the

23   dog?

24   A.    No, sir.

25   Q.    Did he do anything to stop the beating of the
```

```
 1    inmate that was next to you?

 2    A.    No, sir.

 3    Q.    Did you ever put the dog on that other inmate?

 4    A.    I walked around to guard him, but not bark at

 5    him.

 6    Q.    And then what happened when you left Inmate

 7    Number 1 and walked to Inmate Number 2?  What happened

 8    to Inmate Number 1?

 9    A.    They commenced on tuning him up, beating him.

10    Q.    Did Louis Ackal ever stop that beating?

11    A.    No, sir.

12    Q.    Did he ever try and intervene in any way?

13    A.    No, sir.

14    Q.    Did he continue making slurs?

15    A.    Yes, sir.

16    Q.    The chapel, reasonably small?

17    A.    Very small.

18    Q.    Could anybody have stopped that beating that was

19    taking place?

20    A.    Yes, sir.

21    Q.    Mr. Burns, why has it been so much trouble for

22    you to explain this story to the FBI and even here

23    today?

24    A.    It's embarrassing.  For law enforcement alone,

25    extremely embarrassing.  I've been in it way too long
```

1    to have that end my career.

2    Q.    Are you worried about going to jail?

3    A.    I'm always worried.  Everybody's worried about

4    going to jail, sure.

5    Q.    It took you a while to provide this testimony.

6    A.    I was hoping you would leave me alone.

7    Q.    Why were you hoping we would leave you alone?

8    A.    Because you had other fish that were out there

9    that could probably give you a better rendition of what

10   happened.

11   Q.    When did you reach the conclusion that the

12   federal government was not going to leave you alone?

13   A.    After about the third time I talked to them.

14   Q.    To the --

15   A.    I said, *you know what?  Here you go.  This is*

16   *what happened*.

17              MR. BLUMBERG:  Thank you, Mr. Burns.

18              THE WITNESS:  You're welcome.

19              THE COURT:  Your witness, Counselor.

20              MR. MCLINDON:  Yes, sir.

21                        CROSS-EXAMINATION

22   BY MR. MCLINDON:

23   Q.    Good afternoon.

24   A.    Good afternoon.

25   Q.    Mr. Burns, you started at the sheriff's office in

```
1    2002; is that right?
2    A.    2001.
3    Q.    So you were there seven years before Louis Ackal
4    ever got there; is that right?
5    A.    Yes, sir.
6    Q.    Did you ever serve as a narcotics agent?
7    A.    No, sir.
8    Q.    Okay.  You were always K-9?
9    A.    I was a patrol officer.
10   Q.    And then you became K-9?
11   A.    When I came back from Iraq, they had a opening.
12   Q.    Did you notice or see problems with the sheriff's
13   office before Louis Ackal got there?
14   A.    No, sir.
15   Q.    You never saw any indication of use of excessive
16   force or anything wrong?
17   A.    No, sir.
18   Q.    Before Louis Ackal arrived.  Okay.  I want to
19   talk about the two beatings that you saw.  You don't
20   routinely work at the jail; is that right?
21   A.    No, sir.
22   Q.    You were brought out there?
23   A.    Um-hum.
24   Q.    Called out there, to come out there?
25   A.    Yes.
```

1    Q.    Were you told to bring your dog?

2    A.    Yes, sir.

3    Q.    Do you remember who made that call to you?

4    A.    I was on IMPACT, so it was probably Rickey

5    Boudreaux.

6    Q.    Okay.  Were you wearing a T-shirt that said

7    *IMPACT* on it when you were there that day?

8    A.    No.  I was wearing BDU top, BDU top.  I think the

9    *IMPACT* was in small letters on it.

10   Q.    Now, when you got there, is the first place you

11   went was to the rec yard?

12   A.    I don't recall.  The first place we went was to

13   get a briefing as to what was going to be taking place.

14   Q.    And did you learn that there had been some type

15   of commotion by the inmates, they were not responding

16   to the shakedown?

17   A.    Something in that nature.  It was always -- they

18   always have a reason for a shakedown.

19   Q.    But you eventually ended up in the rec yard that

20   we saw on the video?

21   A.    Yes.

22   Q.    Is that right?

23   A.    Yes.

24   Q.    Okay.  And the dog in that video, it never

25   actually touched the inmate; did it?

1    A.    No.

2    Q.    Okay.  You never heard -- in the rec yard you

3    never heard Sheriff Ackal say *take him to the chapel*.

4    You never heard him say that?

5    A.    No, sir.

6    Q.    You never heard him say that.  Okay.  In fact, do

7    you even -- were you even there -- do you know the name

8    of that inmate?

9    A.    No.

10   Q.    Do you know how that inmate left the rec yard?

11   A.    Uh-uh.

12   Q.    You don't know who escorted him or where he went?

13   A.    I know Eric was on top of him.

14   Q.    Eric Segura?

15   A.    Yes, sir.

16   Q.    He had his knee in his back; is that right?

17   A.    He was holding him down.  Yes, sir.  Yes, sir.

18   Q.    And so other than the rec yard, you had your dog

19   get close to that inmate, bark?

20   A.    Um-hum.

21   Q.    And then other than that, you really don't know

22   what else happened that day in the rec yard?

23   A.    No.  No, sir.

24   Q.    Nothing else happened really, as far as you know?

25   A.    As far as I know.

1   Q.    And then the next incident that you talked about

2   was you were walking down the hallway by the chapel and

3   you just happened to look in?

4   A.    Yeah.  The door's wide, it's open.  You can

5   see -- you have to see them to walk past it.  So when

6   you're walking -- where I used to stand, the door was

7   here --

8             MR. MCLINDON:  Tell you what.  Can we just

9   pull up the map of the prison?  It might help us.

10            Okay.  Focus in on the chapel.

11  BY MR. MCLINDON:

12  Q.    All right.  Do you see the chapel there in

13  yellow?

14  A.    Yeah.

15  Q.    Tell us what happened.

16  A.    The door is right here.

17  Q.    You can't see it.

18  A.    I walked past the door.  We usually stage right

19  here or stand with the dogs.  Myself and then Hatley

20  was on the other side of the wall.

21  Q.    By the central control?

22  A.    Before that.  It was probably halfway.  We would

23  just kind of stay right there posted, just hanging out.

24  Q.    So you just found yourself walking down the

25  hallway?

```
 1   A.    I was coming back from the other pods, walking

 2   down this hallway and seen 'em.

 3   Q.    But the door was wide open?

 4   A.    Um-hum.

 5   Q.    And did you have your dog with you?

 6   A.    Yes, sir.

 7   Q.    Okay.  And you looked in?

 8   A.    (Nodding in the affirmative.)

 9   Q.    And this was the white inmate; is that right?

10   A.    Yes -- no.

11   Q.    These were the two black inmates?

12   A.    That was -- no, it was the white inmate.  You're

13   right.

14   Q.    Okay.  And you stopped.  Did you go into the

15   chapel?

16   A.    Um-hum.

17   Q.    And you brought your dog in there with you?

18   A.    Yes.

19   Q.    And there's some pews in there; right?

20   A.    Yes.

21   Q.    Did you sit on the pews?

22   A.    No.

23   Q.    Were there any other dogs in there?

24   A.    No.

25   Q.    The other dog handler is Hatley; is that right?
```

```
 1    A.    Yes.

 2    Q.    He wasn't in there?

 3    A.    No, not at that time.  I was walking to find --

 4    go to him.

 5    Q.    And what made you go sit in that chapel?

 6    A.    I didn't know what was actually going on at the

 7    time at first.  It kind of like struck me odd to see

 8    what was going on.  So I walked in there to make sure

 9    that there wasn't nothing crazy going on.

10    Q.    And in fact there was something crazy?

11    A.    It was crazy, yeah, exactly.  It ended up being a

12    beating instead of trying to, you know, wrestle an

13    inmate there for whatever reason.

14    Q.    And Sheriff Ackal was not in there?

15    A.    Not at that time.

16    Q.    Okay.  And they were beating him and then they

17    took the baton and did that simulated sex act; right?

18    A.    Right.  That was the white --

19    Q.    And you just stayed in there and watched that the

20    whole time?

21    A.    I was dumbfounded, yes.  I was like, *really?  I*

22    *don't believe this*.

23    Q.    You didn't yell anything or anything like that?

24    A.    I didn't -- I didn't -- it was narcotics.  You

25    know, it was like typical.
```

1    Q.    And was the door open the whole time?

2    A.    Um-hum.

3    Q.    When you walked in, you didn't close that door

4    behind you?

5    A.    No.

6    Q.    Okay.  And your dog was just -- what was your dog

7    doing?

8    A.    Standing there.

9    Q.    It wasn't barking?

10   A.    No.

11   Q.    Okay.  So after the sex act, you left?  You left

12   after it was over or was it still going on?

13   A.    No.  I walked out, met Hatley and told him, *this*

14   *is screwed up.  Why are we even here?  We need to*

15   *leave.  We should have been done hours ago.*

16   Q.    Okay.  And so what next brought you to the

17   chapel?

18   A.    They had called me --

19   Q.    Who?

20   A.    -- to the chapel.  Bubba.

21   Q.    Bubba Savoy?

22   A.    Yes, sir.

23   Q.    And he asked you to bring your dog?

24   A.    Yes, sir.

25   Q.    Okay.  So you walked into the chapel?

```
 1   A.    Yes, sir.

 2   Q.    Was the door open again?

 3   A.    Uh-huh.

 4   Q.    Wide open?

 5   A.    Yes, sir.

 6   Q.    Okay.  And tell us again what you saw when you

 7   walked in there.

 8   A.    They had one inmate by the wall, far side of the

 9   chapel, and there was another inmate closer to the

10   door.  He said, watch this guy.  That's the guy that I

11   popped in the back of the head because he kept looking

12   over at him.

13   Q.    Okay.  And you got your dog to bark at him?

14   A.    I made the dog bark at him.  Now, the dog's kind

15   of amped up at that point anyways because he sees

16   fighting.  Seeing all that, amps the dog up to a civil

17   drive.  So the dog's going to want to bark.  He's going

18   to want to act like that.  But, yeah, I made him bark

19   by Bubba telling me to make him bark.

20   Q.    Now, Bubba Savoy was in there?

21   A.    He was standing at the door, kind of like leaned

22   up, you know, closer to the -- to the hinges, hinge

23   side of the door that's open.

24   Q.    And the two inmates, who was beating -- were the

25   inmates being beaten at the same time?
```

1    A.    No, sir.

2    Q.    They were just beating one?

3    A.    Yes, sir.

4    Q.    And then you were watching the other one?

5    A.    I was watching the other one.

6    Q.    Do you know the names of either of those inmates?

7    A.    No, sir.

8    Q.    Do you know the names of the guards doing the

9    beating -- of the deputies doing the beating?

10   A.    Yeah, Ben Lassalle and Jason Comeaux.

11   Q.    Those were with the only two?

12   A.    Wade Bergeron was standing on the other side, but

13   I didn't see him strike an inmate.

14   Q.    The one that you were watching, did you ever see

15   him get struck with a baton?

16   A.    After I walked around.  Not while I was watching

17   them, no.  After.  I was just watching this guy, making

18   sure he didn't try to get up or whatever, seeing what

19   they were doing.

20   Q.    And they were handcuffed?

21   A.    Yes, sir.

22   Q.    Behind the back?

23   A.    Yes, sir.

24   Q.    And it was after you slapped him --

25   A.    Right.

```
1   Q.    -- that -- which one was it?  Comeaux or Lassalle
2   that came to beat him with the baton?
3   A.    It was Ben, and they just transferred their
4   energy from this guy to this guy.
5   Q.    Okay.
6   A.    So -- you know.
7   Q.    After they finished beating the first one, they
8   just left him on the ground?
9   A.    No.  He was kneeling.  I just walked over.
10  Q.    He was kneeling?
11  A.    Yeah, on their knees.
12  Q.    And you watched him.  Okay.  Now, is it your
13  testimony that Louis Ackal was in the chapel for that?
14  A.    I heard -- he was behind me in the doorway.
15  Q.    In the doorway?
16  A.    Yes.
17  Q.    Okay.  Now, that hasn't always been your
18  testimony under oath; is that right?
19  A.    Right.
20  Q.    In fact, you've previously said under oath that
21  you don't know if he was there or not?
22  A.    If he was in the doorway?
23  Q.    If he was there?
24  A.    I didn't see him.  I could hear him.
25  Q.    Well, so let me see if I get this straight.  You
```

1  testified before a grand jury; is that right?

2  A.   Yes.

3  Q.   And you told the grand jury, *I don't remember*

4  *seeing him there*?

5  A.   Correct.

6  Q.   Okay.  Today, you remember seeing him there?

7  A.   He was at -- I didn't see him in the chapel.  I

8  seen him at the jail.

9  Q.   Okay.  You didn't see him in the chapel?

10  A.   No.  I could hear him --

11  Q.   Gotcha.

12  A.   -- talking behind me and yelling.

13  Q.   In the hallway.

14  A.   At the doorway.

15  Q.   Okay.  Well, maybe I'm not understanding it.  At

16  the doorway, does that mean he's in the chapel or out

17  of the chapel?

18  A.   He's standing in the door right next to Bubba.

19  Bubba was standing in the doorway.

20  Q.   And he's standing next to Bubba?

21  A.   Yes, sir.

22  Q.   Okay.

23       MR. MCLINDON:  Can we pull up the diagram

24  picture of the chapel, please.  I think it's

25  Government's Exhibit 9.

```
 1              MS. BOYD:  Ten.

 2              MR. MCLINDON:  Is it 10?  I guess we can use

 3     that one.

 4     BY MR. MCLINDON:

 5     Q.    There is some technology, Mr. -- there you go.

 6     Can you touch where you think Sheriff Ackal was?

 7     A.    Well, if that door was open, (Witness complied.)

 8     Q.    Standing right there?

 9     A.    Well, Bubba would be right here, but he stood

10     like right here (indicating).

11     Q.    And the sheriff was right next to him?

12     A.    I don't know.  Can you see it?

13     Q.    Yeah, I can see it.

14     A.    And this door was open, so the sheriff was

15     standing in the doorway.

16     Q.    Was he saying anything?

17     A.    Yeah, he was yelling.

18     Q.    What was he yelling?

19     A.    Profanities.

20     Q.    I'm just trying to figure out why you didn't tell

21     the grand jury that, but today somehow you're able to

22     remember that.

23     A.    I didn't have all this -- I don't -- I didn't

24     remember a lot of it.  This is 2011, so I had to sit

25     back and go back and say, *okay, what happened*.  Then
```

1    that's the same day, you know, I got dog bit by my dog.

2    I had to go get stitches, I had to go get my hand glued

3    shut.  A lot of that stuff I don't remember.

4    Q.   So you testified before the grand jury in January

5    of this year; is that right?

6    A.   Yes, sir.

7    Q.   And your testimony today is different than what

8    you told the grand jury?

9    A.   I don't believe.

10   Q.   You don't believe?  Well, didn't you tell the

11   grand jury, *I don't remember seeing* --

12   A.   I didn't see him there in the doorway.  I could

13   hear him.

14   Q.   Okay.  But today, are you telling us that you saw

15   him in the doorway --

16   A.   No.  I seen him --

17   Q.   -- or you just heard him?

18   A.   No, sir.  I saw him at the jail.

19   Q.   All right.

20   A.   Okay.  Not in the doorway.  I could hear him in

21   the doorway.  But he was at the jail that day.  Because

22   it's odd that he was ever at the jail while we were

23   doing a shakedown.

24   Q.   Did you tell the FBI in a meeting that you had

25   with them that you remember him being -- that Sheriff

```
 1    Ackal being there immediately before the assault began,

 2    but you don't recall him being there as the assault was

 3    taking place?

 4    A.    That may have been in one of the interviews that

 5    I had with them.  I don't recall.

 6    Q.    You don't recall?

 7    A.    Uh-uh.

 8              MR. MCLINDON:  Okay.  I'm just going to show

 9    him a 302 dated 9/27/16.  Okay.  This is just for the

10    witness, please.

11    BY MR. MCLINDON:

12    Q.    I am just going to show you this document.  If

13    you would just read this to yourself right here.  Start

14    with Burns.  Just read that to the end of that

15    paragraph.

16    A.    (Witness complied.)

17    Q.    If you look down, you will see the date.

18    A.    Correct.

19    Q.    All right.  Now, my question is, did you tell the

20    FBI that you were unable to recall if he was there

21    during the actual assault?  Did you tell that to the

22    FBI?

23    A.    Um, I may have.

24    Q.    Okay.  The Scott Spears incident with the

25    simulated sex act, did you initially lie to the FBI
```

1    about being there?

2    A.    Yes.

3    Q.    The incident -- the two things with the dog where

4    you had him bark at an inmate, have you ever done that?

5    These two incidents aside, have you ever done that

6    before?

7    A.    No.

8    Q.    Never, either before or after?  You've never done

9    that?

10   A.    Crowd control.  You can make the dog bark

11   anytime.  You know, the dog -- but as far as intimidate

12   an inmate like that, no.

13   Q.    Or not an inmate, but maybe somebody on the

14   street?

15   A.    No.

16   Q.    You've never done that?

17   A.    I've done it for crowd control with dogs muzzled.

18   Q.    *Crowd control* meaning the people are just getting

19   out of control?

20   A.    Right.

21   Q.    Okay.  Did you ever hear Louis Ackal say, *Beat*

22   *that inmate with a baton or a first or a kick* or

23   anything like that?

24   A.    No.  *Tune up.  Tune him up*.  That's about --

25   Q.    That's it?

A.    That's it.

Q.    Did you ever hear -- when the two inmates were in there at the same time, did you hear any of the guards say, *Stop, stop, stop, he's a federal inmate*?

A.    No, sir.

Q.    You never heard that.  Now, you testified on direct that you were -- you were hoping that the -- one of the reasons you lied to the FBI, you were just hoping they would leave you alone and go away?

A.    (Nodding in the affirmative).

Q.    You thought they were looking for a bigger fish?

A.    Correct.

Q.    Who?

A.    Narcotics.

Q.    Okay.

A.    They kept saying that I was in narcotics.  They had IMPACT and narcotics mixed up --

Q.    Okay.

A.    -- basically.

Q.    Any other big fish you think they were looking for?

A.    (Witness nodding in the negative.)

Q.    Never --

A.    Just the ones that were involved in that incident.

1   Q.    Do you know when your sentencing is going to be?

2   A.    No, sir.

3   Q.    Okay.  Has anyone promised you what your sentence

4   is going to be?

5   A.    No, sir.

6   Q.    Is it your understanding that the federal

7   government -- the federal prosecutors might file a

8   motion to reduce that sentence?

9   A.    That's not -- they haven't said anything to me.

10  Q.    Is it a possibility?

11  A.    I would hope, but I won't hold it against them if

12  they don't.

13  Q.    It's in your plea agreement there is a

14  possibility that they could file a motion to reduce

15  your sentence?

16  A.    Right.

17  Q.    And you hope that they do that; right?

18  A.    That's their decision, not mine.

19  Q.    But do you hope that it happens?

20  A.    Wouldn't you?

21  Q.    I'm just asking you.

22  A.    Yes, sir.

23  Q.    You do hope that that happens.  It hasn't been

24  filed yet, has it?

25  A.    No, sir.

1    Q.    Were you ever given a 90-day suspension for

2    insubordination?

3    A.    Yes, sir.

4    Q.    What was that about?

5    A.    Um, I was downtown and, um, I had gotten some new

6    meds from the VA, and I mixed it with alcohol, and it

7    had a very, very, very adverse effect.  And I got into

8    an argument with my captain, at the time, Rickey

9    Boudreaux, and I was suspended.

10   Q.    Have you ever shown up for work inebriated or

11   under the influence?

12   A.    Oh, no, sir.

13             MR. MCLINDON:  Thank you.  That's all I have.

14             THE COURT:  All right.  Redirect?

15                     REDIRECT EXAMINATION

16   BY MR. BLUMBERG:

17   Q.    Mr. Burns, with the sheriff yelling, was it loud?

18   A.    Yes, sir.

19   Q.    With the inmates grunting, was it loud?

20   A.    Yes, sir.

21   Q.    If somebody mentioned a federal inmate, is it

22   possible you wouldn't have heard it?

23   A.    If they would have mentioned it, I would have

24   heard it, but it wouldn't made any -- it wouldn't have

25   made -- I wouldn't have questioned it because I

1   wouldn't know what -- *oh, that's a federal inmate.*  I

2   don't work in the jail.  I don't know what that means.

3   Q.   Would you even remember it?

4   A.   No, sir.

5   Q.   Would it have made any impression on you at all?

6   A.   None.

7   Q.   I'm going to ask you about an interview that you

8   had with it FBI, if I can, for a moment.

9   A.   Yes, sir.

10          MR. BLUMBERG:  Steven, if you would, please,

11  I would like to show the Government -- show the witness

12  Government's Exhibit 135 for identification purposes

13  only.  So only show it to the witness.

14          (Court Reporter clarification.)

15          MR. MCLINDON:  I said *the same 302.*

16          It's just for his use?

17          MR. BLUMBERG:  Yes.

18          MR. MCLINDON:  Got it.

19          MR. BLUMBERG:  I'm going to use the Elmo, if

20  I can, please.  Thank you.

21  BY MR. BLUMBERG:

22  Q.   I'm going to direct your attention to the bottom

23  of this document.  Is this the same document that

24  Mr. McLindon just showed you?

25  A.   Yes, sir.

1   Q.    Okay.  I'm going to direct your attention -- and

2   again, read it only to yourself, not out loud,

3   please -- to the second paragraph that indicates --

4   there is a numeral 2.  Do you see that?

5   A.    Yes.

6   Q.    Okay.

7   A.    Well, there are several numeral 2s.  The lower

8   one or the top?

9   Q.    The lower one.

10  A.    Okay.

11        MR. BLUMBERG:  You can take that away.  Thank

12  you very much.

13  BY MR. BLUMBERG:

14  Q.    Did you have an opportunity read it?  I'm sorry.

15  I apologize.

16  A.    I thought you were going to point something else

17  out.

18  Q.    No.  Go ahead and take a moment to read that.

19  A.    (Witness complied.)

20  Q.    Okay.  Have you had an opportunity to take a look

21  at it?

22  A.    Yes, sir.

23  Q.    Did you tell the FBI that you recalled Louis

24  Ackal being present outside the chapel immediately

25  before the beatings began?

```
 1   A.     He was there.  Um, I don't recall that in

 2   particular because he -- he had been all over the place

 3   in that jail.  So he was in that general area.

 4   Q.     Okay.  And do you recall telling the FBI that you

 5   didn't look up to see Louis Ackal at the time?

 6   A.     No.  I could hear him.

 7   Q.     Thank you.

 8              MR. BLUMBERG:  That's all I have, Your Honor.

 9              THE COURT:  Is the witness free to go?

10              MR. BLUMBERG:  Yes, sir.

11              THE COURT:  You're excused, sir.  Thank you.

12              Call your next witness.

13              MR. BLUMBERG:  Your Honor, may we approach

14   the bench for a moment?

15              THE COURT:  Yes.

16              (Sidebar discussion begins.)

17              MR. BLUMBERG:  The next witness is Harold

18   Guidry.  He is an inmate who is being transported here.

19   He is not in the building right now.  I would like --

20              THE COURT:  I hope you have somebody else,

21   though.

22              MR. BLUMBERG:  I do.  I was hoping for the

23   Court's indulgence to end a little bit early so we

24   could put him in order.

25              THE COURT:  Not a chance.
```

1          (*Sidebar discussion concludes.*)

2          MR. BLUMBERG:  The Government would call Ben

3    Lassalle to the stand, Your Honor.

4          (Pause in the proceedings.)

5          THE COURTROOM DEPUTY:  Please raise your

6    right hand.  Do you solemnly swear that the testimony

7    you will give in this case will be the truth, the whole

8    truth and nothing but the truth, so help you God?

9          THE WITNESS:  Yes.

10         THE COURTROOM DEPUTY:  Could you please spell

11   your first and last name for the Court Reporter?

12         THE WITNESS:  B-Y-R-O-N, L-A-S-S-A-L-L-E.

13         THE COURTROOM DEPUTY:  Thank you.

14         MR. BLUMBERG:  Have a seat, sir.

15                     BYRON LASSALLE,

16    First having been duly sworn, testifies as follows:

17                   DIRECT EXAMINATION

18   BY MR. BLUMBERG:

19   Q.   Mr. Lassalle, what is your first name?

20   A.   Byron.

21   Q.   Do you go by any other first names?

22   A.   Ben.

23   Q.   Is it common for people to refer to you as *Ben*?

24   A.   Yes.

25   Q.   Sir, have you ever been -- served in a law

```
 1    enforcement capacity?

 2    A.    Yes.

 3    Q.    How long have you been a law enforcement officer?

 4    A.    I worked for the Iberia Parish Sheriff's Office

 5    for almost ten years.

 6    Q.    When did you begin there?

 7    A.    I think it was April of 2006.

 8    Q.    What were your responsibilities when you were

 9    first hired?

10    A.    I was a patrolman.

11    Q.    What did that involve?

12    A.    Just I was on the 300-shift, the night shift, and

13    just responded to calls.

14    Q.    How long were you a patrolman at the IPSO?

15    A.    Um, right over two years.

16    Q.    Did you move to another unit at that time?

17    A.    Yes.

18    Q.    Where did you go?

19    A.    I went to narcotics.

20    Q.    Have you ever been a law enforcement officer

21    anyplace other than the IPSO?

22    A.    No.

23    Q.    Are you currently employed?

24    A.    Yes.

25    Q.    What do you do now?
```

1   A.     Self-employed.   Lawn service.

2   Q.     Okay.   How did you make your way into narcotics?

3   A.     Um, when Louis Ackal got hired, I transferred to

4   narcotics.

5   Q.     Do you mean when he was elected?

6   A.     Yeah, elected.   I'm sorry.

7   Q.     Roughly, what year was that?

8   A.     That was July 1st of 2008.

9   Q.     And how did you get notified that you were going

10  to move into narcotics?

11  A.     Probably, um, a month or two prior to July, we

12  had an interview.   And a short time after that, I was

13  contacted by the -- the lieutenant of narcotics at the

14  time, I was contacted by him, and he told me July 1st I

15  would move into narcotics.

16  Q.     Did you enjoy your time in narcotics?

17  A.     Yes.

18  Q.     Was it your time in narcotics that has led you to

19  be here today?

20  A.     Yes.

21  Q.     Was it your time in narcotics that has led you to

22  plead guilty to federal crimes?

23  A.     Yes.

24  Q.     How long were you in narcotics?

25  A.     From 2008 until this past February, so almost

```
 1    eight years -- oh, yeah, almost eight years.

 2    Q.    What's your understanding of what you pled guilty

 3    to?

 4    A.    I pled guilty to beating a couple of inmates and

 5    conspiracy to cover it up.

 6    Q.    Do you know who you pled guilty to beating?

 7    A.    Yes.

 8    Q.    Who?

 9    A.    Scott Spears and Ozenne, Curtis Ozenne.

10    Q.    Okay.  Now, those beatings that you -- that

11    formed the basis of your guilty pleas are not the only

12    people that you beat as a narcotics agent; is that

13    right?

14    A.    No.

15    Q.    If you had to guess, how many people did you beat

16    or injure needlessly as a narcotics agent?

17    A.    Anywheres from 50 to a hundred.

18    Q.    You don't really know, do you?

19    A.    No.

20    Q.    Of that number, separate number, how many

21    beatings do you think you watched other people commit?

22    A.    I would say at least the same amount.

23    Q.    And those would be instances in which you knew

24    you should intervene and did not?

25    A.    Yes.
```

1   Q.    As a law enforcement officer at the IPSO, did you

2   get trained on when you could use force and when you

3   couldn't?

4   A.    Yes.

5   Q.    What was your understanding of what your training

6   said?

7   A.    There was a force continuum.  You can go to the

8   level of force necessary.

9   Q.    What did that mean to you?

10  A.    If I would have been playing by the rules, you

11  just go to the force that's necessary to control the

12  situation.

13  Q.    What if a person was not resisting you in any

14  way?

15  A.    Well, you shouldn't need to use any force in any

16  way.

17  Q.    I'm going to ask you to keep your voice up a bit.

18  A.    All right.

19  Q.    Thank you.

20        Were you trained about whether you could use

21  force to punish somebody?

22  A.    No.

23  Q.    What were you told?

24  A.    Just use force to gain control of an uncompliant

25  suspect.

1   Q.   And if they were compliant?

2   A.   Then we shouldn't have used force.

3   Q.   Okay.  So you have to tell us.  The numbers you

4   give are huge.  How did you start beating people up in

5   violation of your training?

6   A.   It started early, in 2008.

7   Q.   Tell them.

8   A.   In 2008, in the narcotics unit, we got called to

9   do the dirty work, more or less.  If there was an area

10  of town that wouldn't settle down, we were told go in

11  there and quiet it down.

12  Q.   How would you do that?

13  A.   Sometimes it was just a presence and then -- you

14  know, a presence, being there.  And then it would calm

15  down.  And then sometimes it was -- we would get out of

16  the truck and jack people up.

17  Q.   What does it mean to *jack people up*?

18  A.   If you have a group of people standing on the

19  sidewalk, we would drive up to them pretty quick, jump

20  out of the truck, grab them, throw them against the

21  hood of the vehicles.  Sometimes throw them on the

22  ground.  Pat them down for weapons.  Sometimes we did

23  it harder than other times.

24  Q.   What did you refer to those instances?

25  A.   I would jack them up hard.

1   Q.   And were those the instances that you're

2   describing in which you would beat people beyond the

3   rules allowed?

4   A.   Yes.

5   Q.   And you used the phrase *jack them up hard*?

6   A.   Yes.

7   Q.   Were there other phrases used by the narcotics

8   unit to describe that kind of use of force?

9   A.   A *jack them up hard*, and we were told shut the

10  streets, shut the streets down.

11  Q.   Have you ever heard the phrase *giving somebody*

12  *their issue*?

13  A.   Yeah.

14  Q.   What does that mean to you?

15  A.   You give them their issue.  If -- if they're

16  acting up and -- you're hard on them.  You hit them

17  when you shouldn't hit them.  You kick them when you

18  shouldn't kick them.  You knee strike them when you

19  shouldn't knee strike them.

20  Q.   How common was that phrase?

21  A.   Pretty common.

22  Q.   Have you ever heard the phrase *tune them up*?

23  A.   Tune them up, yes.

24  Q.   How was that phrase used?

25  A.   Same thing as *give them their issue*.

1   Q.    Same thing as *jack them up hard*?

2   A.    Same thing.

3   Q.    What other forms of abuse did narcotics engage in

4   besides the jump out and jack them up hard?

5   A.    I'm not sure if I'm following you.

6   Q.    What happens if you chased somebody?

7   A.    Oh, yeah.  If we had a suspect that was running,

8   then it was -- they were getting -- they were getting

9   jacked up hard when they got caught.  They were getting

10   tuned up.  They were getting punished for running.

11   Q.    There were some instances in which you can use

12   force to capture somebody who is fleeing from you;

13   right?

14   A.    Correct.

15   Q.    Is that what you're talking about?

16   A.    No.

17   Q.    What are you talking about?

18   A.    I'm talking about when people ran, we punished

19   them for running.

20   Q.    In your Use of Force training, did you learn

21   concepts of escalation and deescalation?

22   A.    Yes.

23   Q.    Describe for the Jury what that meant to you.

24   A.    Um, we didn't practice it.

25   Q.    How would it -- how was it supposed to be used?

1    A.    Supposed to try to deescalate a situation.

2    Q.    Let me ask you this.  Is it fair to say that your

3    training indicated that your responses were governed by

4    the actions of the suspect?

5    A.    Yes.

6    Q.    If the suspect stopped resisting, what were you

7    supposed to?

8    A.    Stop.

9    Q.    Is that what you understand deescalation to mean?

10   A.    Yes.

11   Q.    Did you follow those principles?

12   A.    Not always.

13   Q.    How about not very often?

14   A.    Yeah, not too often.  It depended on the

15   circumstance.

16   Q.    Okay.  Between July '08 when you started and

17   roughly November '08, how often was this behavior going

18   on?

19   A.    July '08 to November '08?  Um, not extremely

20   often.  It was -- it was after that when it became a

21   norm.

22   Q.    Was there an event that occurred in November of

23   '08 which helped add fuel to the fire, so to speak?

24   A.    Yes.

25   Q.    What was that event?

1   A.    I believe that was when three narcotics agents

2   got drunk one -- I think it was a Saturday night and

3   went on the predominantly black part of town and jumped

4   somebody for no reason.

5   Q.    And what was it about that episode that created

6   more of an activity in terms of abuse?

7   A.    At that point, you know, there was three of them.

8   There was a supervisor and two agents, and nothing

9   happened to them.  But it's like they barely got a slap

10  on the wrist for doing what they did.  I know a short

11  time later they were transferred out of narcotics and

12  then before we knew it, a couple of them came back to

13  narcotics.

14  Q.    The people -- you weren't involved in that

15  episode; were you?

16  A.    No.

17  Q.    But you were friends with those people?

18  A.    Yes.

19  Q.    In fact one of them at the time was a very good

20  friend of yours; right?

21  A.    Yes.

22  Q.    Who was that?

23  A.    Wade Bergeron.

24  Q.    Did you have conversations with Wade Bergeron

25  about that evening and what happened?

1    A.    Yeah.  And he wouldn't talk about it.

2    Q.    But it was the subject of a lot of conversation

3    in the narcotics unit, wasn't it?

4    A.    Yes.

5    Q.    And what was the important part of that story?

6    A.    They broke the law and they didn't get in trouble

7    for it.

8    Q.    Who didn't get them in trouble for it?

9    A.    Who didn't get them in trouble for it?

10   Q.    That was a terrible question.

11         Who was responsible for not disciplining

12   them?

13   A.    I believe the sheriff.

14   Q.    And why did you believe that?

15   A.    Because he was the head man in charge.

16   Q.    So what impact did that episode have on your

17   behavior?

18   A.    It taught me that I didn't have to follow the

19   rules, that it was okay to step out of line, that I

20   wouldn't get in trouble for it.

21   Q.    Did your -- who was your command structure at the

22   time in November of '08?

23   A.    I think it was Troy Willis and Kevin Judice, a

24   sergeant and lieutenant.

25   Q.    Mr. Willis was one of the people involved in the

1    episode; right?

2    A.    Right.

3    Q.    Fast forward to January of '09, a couple of

4    months later, did the command structure change in

5    narcotics?

6    A.    Yes.

7    Q.    Did Gerald Savoy became a supervisor of some

8    kind?

9    A.    I believe so.  I think it was Gerald Savoy and

10   maybe Marion Borel.

11   Q.    And did you have conversations with Gerald Savoy

12   about the episode in November of '08?

13   A.    Um, yeah.  Actually, the weekend that it

14   happened, Gerald Savoy was with me in Texas.  We were

15   deer hunting.

16   Q.    Did you learn about it together when you

17   returned?

18   A.    Yes.

19   Q.    What was Gerald Savoy's reaction to hearing the

20   story?

21   A.    Nothing.  Like, you know, *that's awesome*.

22   Q.    Did you have any worries about Gerald Savoy

23   reporting that episode to outside authorities?

24   A.    No.

25   Q.    Why not?

1    A.    I just didn't.  We -- it's how we operated.

2    Q.    Was Gerald Savoy a line agent with you in the

3    Summer and Fall of '08?

4    A.    Yes.

5    Q.    Did he participate in the same kind of jacking up

6    part that you described?

7    A.    Yes.

8    Q.    Is that one of the reasons why you didn't worry

9    about Gerald Savoy going outside your agency?

10   A.    Yes.

11   Q.    So what did it mean to you when Gerald Savoy

12   became a supervisor of the narcotics unit?

13   A.    That we were going to continue operating like we

14   were operating.  Um, we could bend the rules and not

15   get in trouble for it.

16   Q.    Over time, did another supervisor move up by the

17   name of Bret Broussard?

18   A.    Yes.

19   Q.    How do you know Bret?

20   A.    Same thing.  He was pretty much an equal to me.

21   I think he was on the -- I don't even know what the

22   name was.  He was in a cop car, but they were attached

23   to the narcotics unit.

24   Q.    Okay.  Was Bret Broussard aware of your illegal

25   activities?

```
 1    A.    Yes.

 2    Q.    How do you know that?

 3    A.    We participated in them together before.

 4    Q.    He had even boasted in the past to you about his

 5    own abuse; didn't he?

 6    A.    Yes.

 7    Q.    Did he have one particular story?

 8    A.    Yes.

 9    Q.    What was it?

10    A.    This was on patrol.  He had a wooden baton, and

11    he had named it Walter.

12    Q.    Why did he name it Walter?

13    A.    I think the baton was pretty new; and Walter

14    mouthed off to him, so Bret beat him with it.  And

15    after that he named it -- you know, he called his baton

16    Walter.

17    Q.    You didn't have any concerns about Bret Broussard

18    telling on you, did you?

19    A.    No, not at all.

20    Q.    Was there an episode that took place in which he

21    targeted a particular person for a beating?

22    A.    Yes.

23    Q.    What was that first episode and episode?

24    A.    That was Ricky Roche.

25    Q.    Okay.  Now, how did you know you were to target
```

1    that person for a beating?

2    A.    I was told to.

3    Q.    By whom?

4    A.    Um, I believe it was Gerald Savoy.

5    Q.    And who told Gerald Savoy?

6    A.    I was told that Louis Ackal told Gerald Savoy.

7    Q.    Who told you that?

8    A.    What's that?

9    Q.    Who told you that the sheriff ordered Savoy?

10   A.    Savoy did.

11   Q.    You had a conversation?

12   A.    Yes.

13   Q.    He was your supervisor at the time?

14   A.    Yes.

15   Q.    Did you in fact beat up Ricky Roche?

16   A.    Yes.

17   Q.    Let's take the most condensed version of this,

18   okay?

19   A.    Okay.

20   Q.    At some point you learn that Ricky Roche had hit

21   Gerald Savoy; right?

22   A.    Yes.

23   Q.    And you guys targeted him to be arrested?

24   A.    Yes.

25   Q.    Surveilled him for a couple of months?

A.    Yeah.  I didn't take over until -- until the end.

Q.    Okay.  And at some point you and Wade Bergeron

tried to conduct a car stop on Ricky Roche; is that

fair?

A.    Yes.

Q.    What happened then?

A.    He refused to stop.  Pretty long vehicle pursuit,

finally we ended up in a trailer park.  He jumped out

of his truck and ran to the back side of the trailers.

Wade and I caught him back there and beat him up.

Q.    Describe the beating.

A.    We kicked him and punched him and probably choked

him.

             (Fire Alarm interruption.)

             THE COURT:  Is this one of the accidents

or --

             LOUD SPEAKER ANNOUNCEMENT:  May we have your

attention, please.

             (Discussion held off the record.)

                 (Jury exits the courtroom.)

             THE COURT:  We'll start at nine o'clock

tomorrow morning.  And do we have anything we need to

clean up to use this 30 minutes for anything?

             MR. MCLINDON:  Judge, if I could -- I think

the trial is going a lot faster, which is good.  I'm

```
 1   trying to time my witnesses, and I just wondered if
 2   they can give me an estimate of when they might be
 3   resting.
 4           MR. BLUMBERG:  I have no idea.
 5           MR. JARZABEK:  We will be in a position to
 6   possibly answer that question tomorrow morning.  We
 7   need to talk about where we're at.
 8           THE COURT:  Okay, good.
 9           MR. MCLINDON:  Just so everybody knows, y'all
10   originally told me Wednesday, so I had my subpoenas for
11   Monday, but I'm going to call my witnesses --
12           THE COURT:  Do that.
13           MR. MCLINDON:  -- if it's going to be Friday.
14           THE COURT:  I would rather a witness hang
15   around than jurors.
16           MR. MCLINDON:  Yes, sir.  We'll get together
17   and talk.  If there is any chance of resting Friday, I
18   need to know.
19           THE COURT:  I can't tell you we'll rest
20   Friday, but we'll see.  Okay.
21           MR. BLUMBERG:  Thank you, sir.
22           THE COURT:  Court's in recess.  Starting at
23   9:00 tomorrow morning.
24           (Court in recess at 4:29 p.m.)
25                   *    *    *    *    *
```

```
 1                C E R T I F I C A T I O N

 2

 3            I, Gayle Wear, Federal Official Court

 4    Reporter, in and for the United States District Court

 5    for the Western District of Louisiana, do hereby

 6    certify that pursuant to Section 753, Title 28 United

 7    States Code, that the foregoing is a true and correct

 8    transcript of the stenographically reported proceedings

 9    held in the above-entitled matter and that of the

10    regulations of the Judicial of the United States.

11

12                       Dated this 1st day of November 2016.

13

14                       /s/ Gayle Wear
                         _____
                         Gayle Wear, RPR, CRR
15                       Federal Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```