IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   )   Case No:
                                   )   16-cr-00048-DEW-PJH
     vs.                           )
                                   )   Volume 3
LOUIS ACKAL,                       )   Pages 431 - 799
                                   )
          Defendant.               )
_____    )


TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE DONALD E. WALTER

WEDNESDAY, NOVEMBER 2, 2016; 9:00 A.M.
SHREVEPORT, LOUISIANA


APPEARANCES:
(Continued on Page 2.)

FOR THE UNITED STATES:

     Mark Blumberg
     Tona Cartwright-Boyd
     U.S. DEPARTMENT OF JUSTICE CIVIL RIGHTS DIVISION
     950 Pennsylvania Avenue N W
     Washington, DC 20530

     Joseph G. Jarzabek
     U.S. ATTORNEY'S OFFICE
     WESTERN DISTRICT OF LOUISIANA
     300 Fannin Street, Suite 3201
     Shreveport, Louisiana 71101-3068


          *******************************


          GAYLE WEAR, RPR, CRR
     Federal Official Court Reporter
          800 Lafayette Street
      Lafayette, Louisiana 70501
          337.593.5222

```
 1    APPEARANCES OF COUNSEL:
      (Continued from Page 1.)
 2

 3    FOR THE DEFENDANT ACKAL:

 4        John S. McLindon
          WALTERS, PAPILLION, THOMAS, CULLENS, LLC
 5        12345 Perkins Road, Building 2, Suite 202
          Baton Rouge, Louisiana 70810
 6

 7

 8

 9

10                        *     *     *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                         I N D E X

 2     PROCEEDINGS:                              PAGE:
       (Continued on page 434.)
 3

 4     GOVERNMENT WITNESSES:

 5

       BYRON LASSALLE  (Resumed)
 6
            Direct examination by Mr. Blumberg      436
 7          Cross-examination by Mr. McLindon       481
            Redirect examination by Mr. Blumberg    512
 8

 9     HAROLD GUIDRY

10          Direct examination by Ms. Boyd          515
            Cross-examination by Mr. McLindon       530
11          Redirect examination by Ms. Boyd        540

12
       WESLEY HAYES
13
            Direct examination by Ms. Boyd          546
14          Cross-examination by Mr. McLindon       579
            Redirect examination by Ms. Boyd        611
15

16     BRET BROUSSARD

17          Direct examination by Mr. Blumberg      617
            Cross-examination by Mr. McLindon       648
18          Redirect examination by Mr. Blumberg    661

19
       ZACHARY SCHAUBERT
20
            Direct examination by Mr. Jarzabek      667
21          Cross-examination by Mr. McLindon       680
            Redirect examination by Mr. Jarzabek    688
22

23

24

25
```

```
1                          I N D E X

2    PROCEEDINGS:                              PAGE:
     (Continued from page 433.)
3

4    GOVERNMENT WITNESSES:

5

6    WADE BERGERON

         Direct examination by Mr. Blumberg      693
7        Cross-examination by Mr. McLindon       746
         Redirect examination by Mr. Blumberg    766
8

9    JEREMY KELLEY

10       Direct examination by Mr. Jarzabek      769
         Cross-examination by Mr. McLindon       791
11       Redirect examination by Mr. Jarzabek    795

12

13                        *    *    *

14

15

16

17                     E X H I B I T S

18

19      (Master Index to be provided at trial conclusion.)

20

21

22                        *    *    *

23

24

25
```

```
 1      November 2, 2016                          9:00 a.m.

 2                         ---oOo---

 3                 P R O C E E D I N G S

 4                         ---o0o---

 5           THE COURT:  Is there anything before we bring

 6      the jury in?

 7           MR. BLUMBERG:  The area that you allowed me

 8      to lead a witness on yesterday is going to come up on

 9      several witnesses today.  And with the Court's

10      permission, I'll lead in the same way.

11           THE COURT:  In fact, I instruct you to do so.

12           MR. BLUMBERG:  Thank you, sir.

13           THE COURT:  All right.  We got our witness?

14           MR. BLUMBERG:  Yes, we do.

15           THE COURT:  Where is he?

16           MR. BLUMBERG:  He should be right outside.

17           THE COURT:  Anything else before I bring the

18      jury in?

19           MR. MCLINDON:  No, Your Honor.

20           MR. BLUMBERG:  Not from the Government's

21      side.

22           THE COURT:  Bring them in, please.

23           (Discussion held off the record.)

24           (The Jury enters the courtroom.)

25           THE COURT:  Okay.  You all may be seated.
```

1           Good morning.  Thank you for being so prompt.
2    By the way, it was yesterday a false alarm.  And I was
3    about to sit through it, and I couldn't stand the
4    headline, *14 jurors killed because Judge* -- so, sure
5    enough, you all had to clear the building before they
6    discovered that it was a false alarm.  I hope it
7    doesn't happen today, but we'll see.
8           You understand, sir, you are still under
9    oath?
10          THE WITNESS:  Yes, sir.
11          THE COURT:  All right.  Proceed.
12          MR. BLUMBERG:  Thank you, Your Honor.
13                    BYRON LASSALLE
14               (Previously sworn.)
15               DIRECT EXAMINATION
16                  (Continued.)
17   BY MR. BLUMBERG:
18   Q.   Good morning, Mr. Lassalle.
19   A.   Good morning.
20   Q.   When we left yesterday, we were talking about
21   Ricky Roche; do you recall?
22   A.   Yes.
23   Q.   And, as I recall, we had left at the part where
24   Mr. Roche was being targeted by the narcotics unit for
25   his alleged assault on Gerald Savoy.

1          Do you recall that.

2    A.    Yes.

3    Q.    Why don't you describe for the members of the

4    jury how you targeted Ricky Roche.

5    A.    Um, after Gerald was punched by -- after we were

6    told that Gerald was punched by Ricky Roche one night,

7    we were told that it was priority to make a case on

8    him.

9    Q.    Who told you that?

10   A.    I think it was Bubba, Gerald.

11   Q.    And who did he tell you had made it a priority?

12   A.    Gerald told us that was as per the sheriff.

13   Q.    Would that have been an uncommon kind of

14   conversation for Gerald Savoy to relay instructions

15   from the sheriff?

16   A.    No.

17   Q.    Did it appear to you, as a narcotics agent, that

18   Gerald Savoy had a lot of communications with the

19   sheriff?

20   A.    Yes.

21         THE COURT:  Excuse me for just one moment.

22         MR. BLUMBERG:  Yes, sir.

23         THE COURT:  I want to make it clear to the

24   jury that Bubba and Gerald Savoy are all one person.

25         Okay.  Go ahead.

1          THE WITNESS:  I'm sorry about that.

2    BY MR. BLUMBERG:

3    Q.    No, that's my fault.  Thank you.

4          How often do you think you would get

5    instructions from the sheriff relayed through Gerald

6    Savoy?

7    A.    Pretty often.

8    Q.    Was it unusual to get an assignment like *target*

9    *Ricky Roche* from the sheriff?

10   A.    No.

11   Q.    While we're on the topic, before we get into

12   Ricky Roche, there was somebody else in the narcotics

13   unit that relayed information back and forth to the

14   sheriff to you, wasn't there?

15   A.    Yes.

16   Q.    Who was that?

17   A.    Jason Comeaux.

18   Q.    What was the nature of Jason Comeaux's

19   relationship with the sheriff?

20   A.    They were neighbors.

21   Q.    Were they more than that?

22   A.    Yeah, I believe they were friends.

23   Q.    What was your understanding?

24   A.    That they lived across the street from each other

25   and they knew each other really well.

1   Q.   Was it your understanding that the sheriff and

2   Jason Comeaux spoke on a regular basis about narcotics

3   business?

4   A.   Yes.

5   Q.   Did Jason Comeaux, to your knowledge, tell the

6   sheriff about the abuses the narcotics unit engaged in?

7   A.   I believe so.

8   Q.   Why do you believe that?

9   A.   Jason has told me that, that, you know, *Me and*

10   *the sheriff talked about what happened last week* or --

11   you know, I don't have a specific, but it was those

12   kind of conversations.

13   Q.   How often do those conversations take place, you

14   think?

15   A.   I would say at least once a month.

16   Q.   Put it another way.  Did you have any secrets

17   about your behavior from Sheriff Ackal?

18   A.   No.

19   Q.   And who were the conduits or the pathways of that

20   information?

21   A.   Jason and Gerald.

22   Q.   Were those the kinds of conversations that let's

23   you know that the sheriff approved of the abuses you

24   engaged in?

25   A.   Yes.

```
 1    Q.    Did you ever -- and you previously, yesterday,
 2    talked about anywhere from 50 to 100 or more abuses.
 3    Were you ever concerned that the sheriff would know
 4    about that?
 5    A.    No.
 6    Q.    Why not?
 7    A.    I just knew I wouldn't get in trouble.
 8    Q.    Why not?
 9    A.    Because no one else ever got in trouble for doing
10    the same type -- types of stuff.
11    Q.    And was it also because of the conversations you
12    had with Comeaux and Savoy?
13    A.    Yes.
14    Q.    Let's go back to Ricky Roche for a moment.  You
15    heard about the instructions that came down from the
16    defendant; right?
17    A.    Yes.
18    Q.    What did you do about them?
19    A.    We targeted him.  We set surveillance up,
20    followed him, ended up getting in a vehicle pursuit
21    with him.  It ended in a little trailer park.  He got
22    out of the truck and ran on foot.  We chased him down,
23    caught him behind a trailer and beat him up.
24    Q.    Who is we?
25    A.    Myself and Wade Bergeron.
```

1   Q.    Describe the nature of the beating to the members

2   of the jury, please.

3   A.    When we caught him, we beat him up.  We kicked

4   him, punched him, knee struck him.  Probably hit him

5   with batons if we had batons.

6   Q.    What about a flashlight?

7   A.    Flashlight.  If we had a flashlight, he got hit

8   with a flashlight.  At one point, it was a patrol

9   deputy ran around the corner of the trailer, and we

10  hollered at him, you know, *Get out of here.  We got*

11  *this.*  And we beat him up.  It was retaliation.

12  Q.    Why did you exclude the patrol deputy?

13  A.    We didn't want any witnesses.  We didn't want him

14  to tell on us.

15  Q.    Now, at the time of the beating that you

16  described, was Ricky Roche posing any threat to you?

17  A.    Probably in the first 10, 15 seconds he fought

18  back, but after that -- I mean, it probably lasted two

19  minutes.

20  Q.    During the second minute and 50 seconds, had he

21  been subdued?

22  A.    Yes.

23  Q.    Was he compliant?

24  A.    Yes.

25  Q.    Did you and Wade Bergeron have control over him?

```
 1   A.    Yes.

 2   Q.    Was there any need for any force on Ricky Roche

 3   in the minute and 50 seconds after he had been subdued?

 4   A.    No.

 5   Q.    Was he trying to get up, still?

 6   A.    Probably trying to get away from us.

 7   Q.    Why?

 8   A.    Because we were beating him up.

 9   Q.    Now, in all of your Use of Force training that

10   you've had, was there anything that came close to being

11   appropriate about the beating that you and Wade

12   Bergeron administered to Ricky Roche?

13   A.    No.

14   Q.    Why did you do that?

15   A.    Retaliation for Bubba.

16   Q.    So what?  So the man got in a bar fight.  Big

17   deal.  Why would you do it?

18   A.    We were told to.

19   Q.    By whom?

20   A.    By Bubba, as per the sheriff.

21   Q.    You knew it was wrong, didn't you?

22   A.    Yeah.

23   Q.    Honestly, it really didn't bother you that much?

24   A.    No.

25   Q.    I mean, honestly, it was kind of fun for you,
```

1    wasn't it?

2    A.    Yeah.

3    Q.    Okay.  Did you like the fact that the sheriff was

4    giving you these instructions?

5    A.    Yeah.

6    Q.    Why?

7    A.    Just kind of had a sense of power, a sense of

8    authority.  And we all just got used to it.

9    Q.    Did it give you permission to do the things you

10   wanted to do?

11   A.    Yeah.

12   Q.    If the sheriff had ever said to you, *Ben, stop*

13   *beating people up*, what would have happened?

14   A.    I'd probably stop beating people up.

15   Q.    Why?

16   A.    I listened to him.

17   Q.    Why?

18   A.    Because you listen to your boss.

19   Q.    Now, after Ricky Roche got beaten by you and Wade

20   Bergeron, you had to justify, perhaps, the injuries

21   that Mr. Roche suffered; right?

22   A.    Yes.

23   Q.    How did you do that?

24   A.    In one of the offices -- I think it was Bret's

25   office -- I slapped Wade on the neck several times to

1    make a big red spot.

2    Q.    Why would you do that?

3    A.    To justify our use of force on him.

4    Q.    Describe how that would justify the use of force.

5    A.    It would show that Ricky had punched Wade or hit

6    Wade and when that didn't really happen.

7    Q.    I'm going to show you now what has been marked

8    previously as Government's Exhibit Number 35 for

9    identification purposes only and ask you to take a look

10   at this, if you would, please.  It should be on your

11   screen in a moment.

12           MR. MCLINDON:  What's the exhibit number?

13           MR. BLUMBERG:  35.

14   BY MR. BLUMBERG:

15   Q.    Do you see that?

16   A.    No.

17   Q.    It's not on your screen?

18   A.    No, sir.

19           MR. BLUMBERG:  Did I make a mistake?  With

20   the Court's permission, I can hand him the hard copy.

21           THE COURT:  Okay.

22           MR. BLUMBERG:  Thank you.

23   BY MR. BLUMBERG:

24   Q.    Mr. Lassalle, why don't you take a look at that

25   for a moment until the monitor comes up.  What does

1    Exhibit 35 appear to be?

2    A.    A case report.

3    Q.    What does the case report relate to?

4    A.    Ricky Roche.

5    Q.    You can take it out of the sleeve, sir, and

6    describe how many pages it is.

7    A.    Almost four -- almost four pages.

8    Q.    Do you recognize that report?

9    A.    Yes.

10    Q.    Is that the report that you wrote related to your

11    detention of Ricky Roche?

12    A.    Yes.

13    Q.    Is it an accurate copy of that report, as far as

14    you can tell?

15    A.    Yeah, as far as I can tell.

16    Q.    And you've seen that before in preparation for

17    today's testimony; correct?

18    A.    I don't believe.

19    Q.    Oh.  Well, take a look at it.  Make sure it's the

20    right copy.  You don't have to read the whole thing,

21    but you can take a look and see if it appears to be

22    what you wrote.

23    A.    Yes.

24    Q.    Okay.  Now, is any of that true in there?

25    A.    Some of it.

```
1    Q.    What parts are true?

2    A.    You know, we conducted surveillance.  You know,

3    we followed him as he left the bar.

4    Q.    Does it include the information about targeting

5    him at the sheriff's direction?

6    A.    No.

7    Q.    Does it include any portions about your

8    intentions when you finally arrested him?

9    A.    No.

10   Q.    Does it make reference to any false injuries that

11   you inflicted on Wade Bergeron?

12   A.    No.

13   Q.    By the way, did you hit Wade or did he hit

14   himself?

15   A.    I hit Wade.

16   Q.    How hard did you hit him?

17   A.    I slapped him a few times.

18   Q.    Now, Mr. Lassalle, you understand you're talking

19   about hitting a fellow agent hard enough to leave a

20   mark on his body; right?

21   A.    Yes.

22   Q.    All for the purpose of...

23   A.    Falsifying a report.

24   Q.    Isn't that a little messed up, sir?

25   A.    Yes.
```

```
 1   Q.    Why would you do that?

 2   A.    Following orders.

 3             MR. BLUMBERG:  Move Government's Exhibit 35

 4   into evidence, Your Honor.

 5             THE WITNESS:  It's on the screen now.

 6             MR. BLUMBERG:  I'll take it back.

 7             Move Government's Exhibit 35 into evidence.

 8             THE COURT:  Is there an objection?

 9             MR. MCLINDON:  No objection, Your Honor.

10             THE COURT:  Without objection, it is

11   received.

12             MR. BLUMBERG:  Thank you.

13                  (Government's Exhibit 35 received

14                   into evidence.)

15   BY MR. BLUMBERG:

16   Q.    Anything else happen to Ricky Roche at the

17   sheriff's direction that day?

18   A.    Um --

19   Q.    What happened when he got back to the narcotics

20   unit?

21   A.    Yeah, once he got back to the office, I remember

22   he had blood on the wall from where he was sitting or

23   kneeling, and I remember Jason making him lick it off,

24   lick the blood off the wall.

25   Q.    His own blood?
```

1    A.    Yes.

2    Q.    Why did he do that?

3    A.    Probably to punish him further.

4    Q.    At any point in time, did you tell Comeaux, *Man,*

5    *don't do that*?

6    A.    No.

7    Q.    Did any of the other narcotics agents see it?

8    A.    I'm sure.

9    Q.    Anybody else tell Comeaux, *Man, don't do that*?

10   A.    No.

11   Q.    Why not?

12   A.    Because it's what we were doing.  It was

13   understood that he was getting punished for what he

14   did.

15   Q.    Was that behavior typical of the way the

16   narcotics unit functioned while you were there for

17   those many years?

18   A.    Yes.

19   Q.    And was it typical that it functioned that way at

20   the direction of Gerald Savoy and Sheriff Ackal?

21   A.    Yes.

22   Q.    Did you celebrate, by the way, with Bubba

23   afterwards?

24   A.    I'm sure we did.  I'm sure we did.  I'm sure we

25   were excited about it.

1   Q.    Okay.  All right.  So characterize in general the

2   kinds of abuses that narcotics agents engaged in during

3   this time frame.  Occasionally you would go out to

4   neighborhoods, and you would engage in some kind of

5   abuse; right?

6   A.    Yes.

7   Q.    Tell them what kind of abuse you would engage in.

8   A.    Sometimes it was -- it was, you know, go and jack

9   people up.  And if we were told to clear the streets,

10   we cleared the streets.  We --

11   Q.    My fault.  I covered that yesterday, I think.

12   A.    Yeah, I believe so.

13   Q.    We'll move on.  Okay.

14          Oh, by the way, do you know what a Use of

15   Force report is?

16   A.    Yes.

17   Q.    What is it?

18   A.    It's a Use of Force -- it's a report you write

19   after you use force on someone.

20   Q.    Are you obligated to write them at the IPSO?

21   A.    No, not that I know of because I've never written

22   one.

23   Q.    Are there policies that relate to that?

24   A.    I believe so.

25   Q.    Have you ever written a Use of Force report?

1   A.   No.

2   Q.   Has anybody ever asked you for one?

3   A.   No.

4   Q.   In your entire time in narcotics, how many both

5   legitimate and illegitimate uses of force do you think

6   you've used?

7   A.   A lot.  It's hard to put a number on it.

8   Q.   Hundreds?  Thousands?

9   A.   I would say hundreds.

10   Q.   Has any supervisor ever asked to see it?

11   A.   No.

12   Q.   Has the defendant ever asked you or anybody else

13   in narcotics about whether there are Use of Force

14   reports?

15   A.   No.

16   Q.   Why do you think that is?

17   A.   They didn't care about them.

18   Q.   Okay.  Now, I want to ask you about some

19   conversations that you've had with Louis Ackal

20   personally; okay?  And I want you to answer only the

21   questions I ask; okay?

22   A.   All right.

23   Q.   All right.  Have you -- you have heard Louis

24   Ackal brag about some of his own behavior when he was a

25   Louisiana State Police trooper; correct?

A.    Yes.

Q.    And in that bragging, he would tell stories and one story in particular about him using excessive force; correct?

A.    Yes.

Q.    And he would describe the victims of that excessive force using racial slurs; correct?

A.    Yes.

Q.    And then he would -- as part of that story, he would indicate that he concealed it from his bosses so that he would not get caught; correct?

A.    Yes.

Q.    All right.  What was the -- how many of those kinds of stories -- you know the story I'm talking about?

A.    Yeah.

Q.    Okay.  How many of those kinds of stories do you think he talked about?

A.    10, 15, at least.

Q.    What was the impact on you personally of hearing those stories coming directly from the constitutional officer in the parish?

A.    That he used excessive force.  He bragged about it, and it was okay that we did it.

Q.    How did that impact your behavior?

```
 1   A.    I used excessive force.

 2   Q.    In all of these stories --

 3              THE COURT:  Okay.  Let's move on.  I think

 4   we've got that covered.

 5              MR. BLUMBERG:  Yes, sir.

 6   BY MR. BLUMBERG:

 7   Q.    Okay.  Let's turn our attention to April 29th,

 8   2011, and the jail shakedown, okay?

 9   A.    Okay.

10   Q.    All right.  What brought you there that day?

11   A.    I believe I was called as part of the SWAT team

12   to respond back to the jail.

13   Q.    You were both narcotics and SWAT?

14   A.    Yes.

15   Q.    How did that work with your command structure?

16   A.    Um --

17   Q.    Did you have different commanders --

18   A.    Yes.

19   Q.    -- depending on which hat you were wearing?

20   A.    Yes.

21   Q.    Okay.  This is my fault, so I'm going to take the

22   heat for this, but we cannot talk over each other;

23   okay?  Because she is going to take everything down.

24   So you make sure you wait until I'm done; okay?

25   A.    Yes.
```

1    Q.    Thank you.

2          Did you have different command structures

3    depending on which hat you were wearing?

4    A.    Yes.

5    Q.    Who was your commander for SWAT?

6    A.    At the time, it was Wendell Rayborn.

7    Q.    In April of 29 [sic], was Wendell Rayborn your

8    commander at the jail shakedown?

9    A.    Yes.

10   Q.    Now, your guilty plea, which we touched on

11   earlier, related to your abuses in the jail; right?

12   A.    Correct.

13   Q.    Does Wendell Rayborn know anything about any of

14   that?

15   A.    He probably did.

16   Q.    Do you think he knew about your abuses?

17   A.    Probably.

18   Q.    Did you ever tell him?

19   A.    No.

20   Q.    Was he present during any of the abuses?

21   A.    He may have been.

22   Q.    You don't remember one way or the other?

23   A.    No.

24   Q.    Okay.  Who was in command of the jail that day,

25   even though Wendell Rayborn was your SWAT commander?

1   A.   The sheriff.

2   Q.   Why?

3   A.   Because he was there.

4   Q.   Was that typical of when the sheriff was on the

5   scene?

6   A.   Yes.

7   Q.   Now, each unit within IPSO has a separate command

8   structure; right?

9   A.   Correct.

10  Q.   And there are specialized commands?

11  A.   Correct.

12  Q.   Why wouldn't the specialized commander be in

13  charge at a scene, even if the sheriff is there?

14  A.   Whenever the sheriff showed up on scene, he took

15  control of it, he would start barking out orders.

16  Q.   Was that typical of the way the sheriff acted?

17  A.   Yes.

18  Q.   By the way, you are a narcotics unit.  You were

19  separate -- your office was separate from the

20  sheriff's; right?

21  A.   Correct.

22  Q.   Who had access to that?

23  A.   We did.  He did.

24  Q.   Is there anything that you did that the sheriff

25  wouldn't have had access to?

1   A.   I don't believe.

2   Q.   Would it have even been possible for you to

3   exclude Louis Ackal from any of the behavior or conduct

4   that you engaged in?

5   A.   No.

6   Q.   Could you have locked him out of the narcotics

7   unit?

8   A.   No.

9   Q.   Why not?

10   A.   He's the sheriff.

11   Q.   Okay.  So April 29th, 2011.  What do you think

12   you're supposed to do when you get there?

13   A.   Wasn't sure.

14   Q.   Who would --

15   A.   Probably when we got there.

16   Q.   Who gave you instructions?

17   A.   I don't even know exactly.  What I recall is we

18   were there for a couple of days in a row, and just for

19   unruly inmates.

20   Q.   Okay.  Did you have -- do you remember who

21   specifically directed you to one place or another?

22   A.   No.

23   Q.   Okay.  At some point did you receive some

24   instructions from Louis Ackal?

25   A.   Yes.

```
 1   Q.    Okay.  Now, we're going to talk about that in one

 2   moment.  Did you plead guilty to conspiring to beat

 3   inmates on that day?

 4   A.    Yes.

 5   Q.    How many inmates do you think you beat that day?

 6   A.    Two.

 7   Q.    How many inmates did you watch get beaten that

 8   day?

 9   A.    One more.

10   Q.    Do you know the names of those people?

11   A.    Yes.

12   Q.    Who are they?

13   A.    Scott Spears, Curtis Ozenne, and Anthony Daye.

14   Q.    By the way, Anthony Daye, you say you didn't beat

15   him?

16   A.    No.

17   Q.    Why not?

18   A.    I couldn't.

19   Q.    Why?

20   A.    There was too many people between he and I.

21   Q.    Were you trying to beat him?

22   A.    Yes.

23   Q.    All right.  We'll get to those details also in a

24   moment.  So why don't you describe how this, these

25   beatings began.
```

```
 1    A.    Um, at one point, with Curtis Ozenne, we were in
 2    one of the rec yards and all the inmates were being
 3    pulled out of a cell and put on their knees in the rec
 4    yard.   And I was standing next to the sheriff, and
 5    Curtis Ozenne made a comment towards either myself or
 6    the sheriff.   And the sheriff looked at me and said, go
 7    take care of him, baby.
 8    Q.    What did that mean to you?
 9    A.    Grab him and go beat him up.
10    Q.    Why did you think that's what it meant?
11    A.    Because that's what was happening.
12    Q.    Well, it could have meant take him to segregation
13    and have him fill out disciplinary paperwork; right?
14    A.    That's not what he meant.
15    Q.    It could have meant just remove him and counsel
16    him; right?
17    A.    (Witness nodding in the negative.)
18    Q.    It could have meant just anything.
19    A.    No.
20    Q.    Why did you think it meant beat him up?
21    A.    Because I knew that's what he wanted done.
22    Q.    And what was the basis of your understanding?
23    A.    Everything he's talked about and everything else
24    I've already seen and done.
25    Q.    So what did you do?
```

1    A.    I took him to the chapel, and I beat him with a

2    baton.

3    Q.    How did you know to go to the chapel?

4    A.    That was a place that didn't have any recording,

5    any video cameras.

6    Q.    How did you know that?

7    A.    We were told that.

8    Q.    Do you remember who told you?

9    A.    I think it was Wesley Hayes.

10   Q.    Was the sheriff present when Wesley Hayes told

11   you that?

12   A.    I believe so.

13   Q.    Who went with you to the chapel?

14   A.    I remember Wesley being in there and I remember a

15   couple of other people in the chapel, and I don't

16   specifically remember it being Bret Broussard and

17   Jeremy Hatley, but I have been told it was Bret

18   Broussard and Jeremy Hatley.

19   Q.    Who told you that?

20   A.    I think it was Hatley that told me that.

21   Q.    Hatley was somebody you would have shared

22   information with on these topics?

23   A.    Yes.

24   Q.    Did you consider him part of your group?

25   A.    Yes.

```
1    Q.    How did you beat Curtis Ozenne?

2    A.    Placed him on his knees and hit him with a stick,

3    hit him with a baton.

4    Q.    I'm going to show you now --

5    A.    That one.

6    Q.    -- what is marked as Government's Exhibit

7    Number 52 for identification and demonstrative

8    purposes.  And while I don't want you to swing it, is

9    this the object or an object similar that you used to

10   beat Curtis Ozenne?

11   A.    Yes.

12   Q.    Is it an object that was available to you in the

13   jail?

14   A.    Yes.

15   Q.    Did you carry one of those typically?

16   A.    No.

17   Q.    Where did you get it from?

18   A.    Whenever we met at the jail that morning, we were

19   handed riot gear and this was part of it.

20   Q.    Why hit the man with a baton?

21   A.    Punish him.

22   Q.    Why not use your fist?

23   A.    I hit him with a baton, I'm not hurting my hand.

24   Q.    Was Curtis Ozenne posing any threat to you at the

25   time you hit him with the baton?
```

```
 1   A.    No.

 2   Q.    Was he trying to get up and run away?

 3   A.    Not get up and run away, but he was begging for

 4   me to stop.

 5   Q.    How long did the beating take place?

 6   A.    Close to a minute.

 7   Q.    In all the beatings you have administered, where

 8   does Curtis Ozenne's rank?

 9   A.    He's up there.

10   Q.    Better or worse than the Daye beating that you

11   witnessed?

12   A.    Not quite.

13   Q.    But bad?

14   A.    Yeah, it was bad.

15   Q.    Did any of the other people -- who else was in

16   the chapel?

17   A.    I remember Wesley Hayes and Bret and Hatley.

18   Q.    Was Wesley the Warden at the time?

19   A.    Yes.

20   Q.    Between Wesley and the defendant, who was in

21   control of the jail that day?

22   A.    The sheriff.

23   Q.    Even though Wesley was the Warden?

24   A.    Yes.

25   Q.    Did any of those people try and stop you from
```

```
1    beating Mr. Ozenne?

2    A.    No.

3    Q.    What were you thinking when he was begging you to

4    stop?

5    A.    Carrying out orders.

6    Q.    What happened -- how did it end?

7    A.    He was crying and telling me that he didn't say

8    it.

9    Q.    Were you asking him something?

10   A.    I may have asked him, *well*, you know, *if you*

11   *didn't say it, who said it.*

12   Q.    So what was the topic of your interchange with

13   him that he would say *I didn't say it*?

14   A.    I'm not quite understanding.

15   Q.    My fault.  Terrible question.

16          Were you asking him about the comments that

17   he made?

18   A.    Yes.

19   Q.    Why?

20   A.    Because he made the comments towards the sheriff

21   or myself.  And I was told to take care of it, so I was

22   taking care of that specific order.

23   Q.    By the way, were those comments made in the rec

24   yard or could they have been made in the hallway?  Do

25   you remember?
```

1    A.    We were in the rec yard.

2    Q.    All right.  So it ended when he said he didn't

3    say it?

4    A.    Um, probably not the first time he said that.

5    Q.    No?

6    A.    I'm sure I struck him a couple more times before

7    stopping.

8    Q.    Because it went on for a minute or more?

9    A.    Yeah.

10   Q.    So how did it end?

11   A.    Finally, he was telling me that he didn't say it.

12   I said, *okay, well, you're going to tell me who did say*

13   *it*.

14   Q.    Did he?

15   A.    Yeah.  We went back and by then, they weren't in

16   the rec yard anymore, they were in a -- in a cell, a

17   housing cell, and we went around the room.  *Was it him?*

18   *Was it him?  Was it him*?  And when we got to Scott

19   Spears, he said, *yeah, that's who said it*.

20   Q.    Was Curtis Ozenne black or white?

21   A.    Black.

22   Q.    Was Scott Spears black or white?

23   A.    White.

24   Q.    What did you do with Ozenne after he pointed out

25   Spears?

1   A.    I grabbed Spears, and I brought him to the

2   chapel.

3   Q.    Were you alone or with somebody else?

4   A.    I believe the same people were in the chapel.

5   Q.    In terms of the escort, do you remember one way

6   or the other if anybody was with you?

7   A.    No, I don't.

8   Q.    Was there anybody else in the chapel when you

9   returned with Spears?

10   A.    The same three people is the only people I

11   remember.

12   Q.    All right.  Do you remember Wade Bergeron being

13   there?

14   A.    No, but he may have been.  I just don't remember

15   if he was.

16   Q.    Were you focusing on the people who were in

17   there?

18   A.    No.

19   Q.    Who were you focusing on?

20   A.    On the guy I had just brought in there.

21   Q.    And what happened?

22   A.    I asked him if he made the comment, and he said

23   *no*.  And I beat him with a stick.

24   Q.    Same idea.  Same stick?

25   A.    Yes.

1    Q.    How many times?

2    A.    Several.

3    Q.    Why did you beat him?

4    A.    Following orders.  I was told to take care of

5    him.  So first guy said he didn't do it; he pointed out

6    another guy.  So I brought him there and I was taking

7    care of him.

8    Q.    Did you feel badly about it at all?

9    A.    No, not at the time.

10   Q.    How did that one end?

11   A.    I'm sure he ended up saying he didn't do it, and

12   I probably got tired.

13   Q.    He wasn't posing any threat to you; was he?

14   A.    No.

15   Q.    Was he trying to get up and run away?

16   A.    Probably.

17   Q.    Was he handcuffed?

18   A.    I don't -- I don't remember.

19   Q.    When you say he was probably trying to get up and

20   run away, why?

21   A.    I don't know.  If I was getting beat with a

22   stick, I would be trying to get away.

23   Q.    Was there anything within your Use of Force

24   training that made that beating legitimate?

25   A.    No.

Q.    He wasn't posing any risk to anybody, was he?

A.    No.

Q.    Did any of the other people in the chapel intervene in any fashion?

A.    No.

Q.    Did anybody say *stop*?

A.    No.

Q.    Did anybody put their hand on your shoulder and say, *Ben, knock it off*?

A.    No.

Q.    The abuse of Scott Spears did not end with a beating though, did it?

A.    No.

Q.    What happened?

A.    Somehow I found out that he was a sex offender. And I placed the baton between my legs and I made him suck on the baton as I thrust it into his -- into his throat.

Q.    What effect did that have on Scott Spears?

A.    He was choking and gagging.

Q.    Did it appear to hurt him?

A.    Yes.

Q.    By the way, did the beating appear to hurt him?

A.    Yes.

Q.    Was he making noises and sounds during the

1    beating like he was being hurt?

2    A.    Yes.

3    Q.    Was it your intention to hurt him?

4    A.    Yes.

5    Q.    Why would you shove a baton in this guy's mouth?

6    A.    No idea.  I was told he was a sex offender, and I

7    just did it.

8    Q.    Did you think you could just do anything to these

9    guys?

10   A.    Yeah.

11   Q.    Why?

12   A.    I wouldn't get in trouble, and it was happening,

13   and...

14   Q.    Why did you think you wouldn't get in any

15   trouble?

16   A.    I just knew we wouldn't get in trouble.  I mean,

17   no one else got in trouble before.

18   Q.    Where did you take Scott Spears when it was over?

19   A.    I'm assuming back to that cellblock.

20   Q.    Do you have a clear recollection?

21   A.    No.

22   Q.    Did you bring anybody else into the chapel that

23   day?

24   A.    No.  Not that I recall.

25   Q.    So you did find yourself, however, in the chapel

1    again?

2    A.    Yes.

3    Q.    Did you know an inmate at the time named Anthony

4    Daye?

5    A.    Yes.

6    Q.    How do you know him?

7    A.    I know him.  I arrested him at some point prior

8    to this, and he was just a name on the street.

9    Q.    Okay.

10   A.    That we --

11   Q.    Would you recognize him?

12   A.    I'm sure I did that day.

13   Q.    How did you find yourself in the chapel with

14   Anthony Daye?

15   A.    I just remember being in the chapel and him

16   getting worked over, and I couldn't get to him to hit

17   him.  But he was getting beat up in the chapel.

18   Q.    Who was beating him?

19   A.    I remember seeing Wade -- the back of Wade, and I

20   remember seeing Jason spitting on him.

21   Q.    How was Wade beating him?

22   A.    Probably with a baton.

23   Q.    Is that your best recollection?

24   A.    Yes.

25   Q.    Was it with a straight baton like you just

```
1    identified, or a collapsible metal baton?

2    A.    I don't remember.

3    Q.    What about Jason?  How was he hitting him?

4    A.    I don't remember Jason hitting him.  I remember

5    Jason spitting on him.

6    Q.    Could he have been hitting him?

7    A.    I'm sure he was.

8    Q.    How is your recollection of exactly who was

9    throwing which blows in that room?

10   A.    I don't remember much of it.

11   Q.    Okay.  Does it get confused with the other

12   beatings?

13   A.    Yes.

14   Q.    Was there a dog in that room at the time?

15   A.    I've been told there was.  I don't personally

16   remember.

17   Q.    Could there have been a dog?

18   A.    Absolutely.

19   Q.    Could there have been another inmate in that room

20   at the time?

21   A.    Possible.

22   Q.    You don't have a clear recollection one way or

23   the other?

24   A.    No.

25   Q.    How badly was Anthony Daye beat?
```

1   A.   He was beat up pretty bad.

2   Q.   In your ranking of beatings in your career, where

3   did the Anthony Daye one --

4   A.   He's one of the top.

5   Q.   Why was it so bad?

6   A.   He -- I don't think he was able to walk on his

7   own.  He had to get drug out.

8   Q.   How long did it go on?

9   A.   Probably a couple minutes, at least.

10  Q.   Was it loud in there during the beating?

11  A.   I don't really remember.

12  Q.   Could people have been yelling?

13  A.   I'm sure.

14  Q.   It's not a quiet effort to beat somebody like

15  that, huh?

16  A.   No.

17  Q.   Do you remember seeing the sheriff near the

18  chapel after Daye was beaten?

19  A.   Yes.

20  Q.   Where was he?

21  A.   I remember seeing him in the hallway.  I remember

22  Anthony Daye getting drug out of the chapel.  And

23  whoever was dragging him was dragging him towards the

24  sheriff, and I remember Anthony Daye telling the

25  sheriff, *sheriff, they beat me up, they beat me up.*

```
 1    And the sheriff sarcastically, oh, come on, baby, and
 2    he told him to shut the fuck up.
 3    Q.    Could the sheriff have been there in the chapel
 4    that day?
 5    A.    It's possible.
 6    Q.    Were you paying attention?
 7    A.    No.
 8    Q.    What was your understanding -- what impact did
 9    the sheriff's comments to Daye have on you?
10    A.    We did good.
11    Q.    So to be clear, was Anthony Daye resisting you in
12    any way when he was getting beaten in the chapel?
13    A.    No.
14    Q.    Was he posing a risk of harm or threat to
15    anybody?
16    A.    No.
17    Q.    Why was he in there?
18    A.    To get beat up.
19    Q.    Is there anything in your Use of Force training
20    that made that beating legitimate in any way?
21    A.    No.
22    Q.    What was Anthony Daye saying during the beating?
23    A.    I don't -- I don't really remember.  I'm sure he
24    was hollering and crying and screaming and begging us
25    to stop.
```

Q.    Was the beating that bad?

A.    Yeah.

Q.    Were his injuries pretty obvious?

A.    Like I said, I remember his feet dragging the ground as if he couldn't walk.

Q.    Well, tell me about the investigation that the sheriff launched after seeing this man dragged out of the chapel where he couldn't walk.

A.    That wasn't an investigation that I know of.

Q.    Did the sheriff call you in and ask you what happened?

A.    No.

Q.    Did he want to know how the injuries took place?

A.    No.

Q.    Did he want to know what was going on in the chapel?

A.    No.

Q.    But actually there was a kind of investigation that arose later that year, wasn't there?

A.    Yes.

Q.    It was a civil suit?

A.    Yes.

Q.    And in that civil suit, Anthony Daye complained that he had gotten beaten in the chapel by members of the IPSO; right?

1    A.    Okay.

2    Q.    Were you familiar with the allegations by Anthony

3    Daye?

4    A.    Yes.

5    Q.    Were they true?

6    A.    Yes.

7    Q.    Did you have an opportunity to testify on that

8    topic?

9    A.    Yes.

10   Q.    Were you truthful?

11   A.    No.

12   Q.    What did you say?

13   A.    I said I didn't remember what happened.

14   Q.    Did you remember?

15   A.    Parts of it, I did.

16   Q.    The parts you testified here today?

17   A.    Correct.

18   Q.    So why did you lie?

19   A.    I was told to lie.

20   Q.    By who?

21   A.    Jason.

22   Q.    Describe the conversation you had with Jason for

23   the Jury.

24   A.    Prior to this deposition, Jason told us that he

25   had met with Steve Elledge, and Steve told Jason to

```
 1   tell Wade and I to make the story right.

 2   Q.    Did you?

 3   A.    Yes.

 4   Q.    Did you have any discussions with Wade and Jason

 5   about how to make the story right?

 6   A.    Yeah, I believe we had talked about it.

 7   Q.    What did you talk about?

 8   A.    I think we -- I don't remember the conversation

 9   verbatim or anything, but it was more or less we're

10   going to go in there and deny it.

11   Q.    Did you get an opportunity to listen to the

12   depositions of Wade and Jason?

13   A.    Yes.

14   Q.    Why?

15   A.    We were sitting together during the deposition.

16   Q.    Because you were all sued as defendants?

17   A.    Yes.

18   Q.    Did you listen -- who went first?  Do you

19   remember?

20   A.    No.  I think I went last.  I don't remember if it

21   was Jason or Wade.

22   Q.    Did you have any concerns about your testimony

23   when you heard their testimony?

24   A.    No.

25   Q.    What happened after the deposition?  Did you have
```

1   any conversations with Steve Elledge again?

2   A.    I'm sure I did, but I don't recall.

3   Q.    Okay.  That was not the only deposition that you

4   were involved in for the chapel beatings, was it?

5   A.    No.

6   Q.    Curtis Ozenne also sued you related to the

7   beatings; right?

8   A.    Correct.

9   Q.    Did you give a deposition in that case?

10  A.    Yes.

11  Q.    Did you testify truthfully in that one?

12  A.    No, I didn't.

13  Q.    Why not?

14  A.    Again, I was told to make it right, make the

15  story right.

16  Q.    Who told you that?

17  A.    Jason.

18  Q.    Where did those orders come from that were

19  relayed to Jason?

20  A.    Jason told me that Steve Elledge has told him

21  that.

22  Q.    Do you know a lawyer named Fred Schroeder?

23  A.    Yes.

24  Q.    Was he present in these depositions?

25  A.    I believe so.

```
 1    Q.    Did you tell Fred Schroeder the truth about what
 2    happened in the chapel before the depositions?
 3    A.    No.
 4    Q.    Why not?
 5    A.    I'm sticking to our story.
 6    Q.    You were lying to your outside lawyer?
 7    A.    Correct.
 8    Q.    What were you worried about?
 9    A.    We didn't want to get sued.  We wanted to beat
10    it, beat the lawsuit.
11    Q.    And you didn't want to show up here, did you?
12    A.    Correct.
13    Q.    At some point, did you actually tell Fred
14    Schroeder?
15    A.    Yes.
16    Q.    What did you say?
17    A.    As soon as we finished the deposition for Curtis
18    Ozenne, myself, Steve and Fred went into Steve's office
19    and they were talking to each other.  And at one point
20    Fred looked at me and he was like, *are you sure you*
21    *didn't hit him*?  And I looked at Fred and I looked at
22    Steve, and I was like, *Well, yeah, I hit him.  You know*
23    *I hit him.*
24          And then Steve, you know, looked like he had
25    got punched in the stomach, just like all the air blown
```

1    out of him, and they asked me to leave.

2    Q.    Did you get fired?

3    A.    No.

4    Q.    Did you get disciplined?

5    A.    No.

6    Q.    Did you get training?

7    A.    No.

8    Q.    Was your name referred to the FBI?

9    A.    No.

10   Q.    In March 2014, you had an opportunity to do a

11   favor for Louis Ackal; right?

12   A.    Yes.

13   Q.    Describe how you got called to the sheriff's

14   office in March 2014.

15   A.    Again, I don't remember if it was Gerald Savoy or

16   Bret Broussard that contacted me, but one of them did

17   and told me to go meet the sheriff at his office.

18   Q.    Did you?

19   A.    Yeah.

20   Q.    Who did you go with?

21   A.    Um, I think I got there by myself.  I know David

22   Hines was there.  There was an old man that was beat up

23   maybe wearing -- had his arm in a sling.  I think that

24   was the sheriff's cousin.  And there was a detective in

25   there also, Hotard, Scott Hotard.

```
1    Q.    Who was David Hines?

2    A.    He was one of the narcs that worked for me.

3    Q.    Did you trust David Hines?

4    A.    Yes.

5    Q.    Did you trust him in the way that you trusted

6    Jason Comeaux, Bret Broussard, Wade Bergeron, Gerald

7    Savoy, and other members of the narcotics unit?

8    A.    Yes.

9    Q.    Meaning what?

10   A.    He was -- he was -- he was down for doing

11   anything.

12   Q.    Including...

13   A.    Beating people up.

14   Q.    What happened?

15   A.    Um, we were told that somebody that was staying

16   with the old man had beat him up and maybe took some

17   pills or something.  And they told us to go over there

18   and arrest him.

19   Q.    Okay.  Who told you to go arrest him?

20   A.    The sheriff.

21   Q.    Did he use those words arrest him?

22   A.    No.

23   Q.    What words did he use?

24   A.    He told us to go take care of him.

25   Q.    Were those the same words he used related to
```

1    Curtis Ozenne a few years before?

2    A.    Yes.

3    Q.    What did you understand the sheriff to mean when

4    he said, *Go take care of Trosclair*?

5    A.    Go beat him up.

6    Q.    Do you know whether Trosclair had committed any

7    crimes?

8    A.    No.

9    Q.    What if he had committed forms of domestic

10   violence or drug offenses?  What should have happened?

11   A.    He should have typed up an arrest warrant and,

12   you know -- they could have made a legitimate case on

13   him.

14   Q.    Is that what happened?

15   A.    No.

16   Q.    What happened?

17   A.    We were sent over there to go take care of him.

18   And we found him and we beat him up.

19   Q.    Who participated with you?

20   A.    Me and David Hines.

21   Q.    Describe the beating.

22   A.    I remember knee striking him.  A bunch of knee

23   strikes is what I remember of that one.

24   Q.    How did David Hines hit him?

25   A.    I remember him knee striking him, also.

```
 1   Q.    Any batons involved?

 2   A.    I'm sure if he had one, he used one.

 3   Q.    Where did the beating take place?

 4   A.    It wasn't in their apartment.  It was in the

 5   upstairs apartment.

 6   Q.    Where was Trosclair when the beating took place?

 7   A.    In the upstairs apartment.

 8   Q.    Standing?  Sitting?  On the floor?

 9   A.    When we walked in, he was standing.  I think

10   David may have kicked him in the chest or in the

11   stomach, and Trosclair fell, and we got on him and beat

12   him up.

13   Q.    Near a hallway or something like that?

14   A.    Yeah, we ended up in a hallway.

15   Q.    Was he subdued when the beating began?

16   A.    Yes.

17   Q.    Was he posing any risk of harm to you or Hines?

18   A.    No.

19   Q.    Was there anything legitimate, per your training,

20   about that beating?

21   A.    No.

22   Q.    Was he able to run away?

23   A.    No.

24   Q.    Why did you beat him?

25   A.    We were told to go take care of him.
```

1    Q.    Did you file any reports?

2    A.    No.

3    Q.    Did David Hines?

4    A.    Yeah.  I mean, he did an arrest report.

5    Q.    Okay.  Did you have a chance to review it?

6    A.    I'm sure I did, but I don't specifically

7    remember.

8    Q.    Would it have been a true report?

9    A.    No.

10   Q.    Why not?

11   A.    We were fixing our story.

12   Q.    What do you think is going to happen to you as a

13   result of your plea, Mr. Lassalle?

14   A.    Probably going to jail.

15   Q.    Do you have any idea how long you're going to

16   jail?

17   A.    No clue.

18   Q.    What do you hope for from the federal government?

19   Anything?

20   A.    Some leniency.

21   Q.    Why?

22   A.    For testifying today.

23   Q.    Has anybody told you you would get any leniency?

24   A.    No.

25   Q.    Do you actually expect any leniency?

```
 1    A.    No.
 2               MR. BLUMBERG:  That's all I have, Your Honor.
 3               THE COURT:  Your witness, Counselor.
 4               MR. MCLINDON:  May I approach the witness,
 5    Your Honor?
 6               THE COURT:  You may.
 7                         CROSS-EXAMINATION
 8    BY MR. MCLINDON:
 9    Q.    Good morning.
10    A.    Good morning.
11    Q.    Mr. Lassalle, for a large part of your career,
12    you have been a narcotics agent; is that correct?
13    A.    Correct.
14    Q.    Okay.  And in narcotics work, you do undercover
15    work; is that right?
16    A.    Some.
17    Q.    Okay.  And let's talk about what undercover work
18    is.  You go out on the street.  You're not wearing
19    anything that says you're police; right?
20    A.    Correct.
21    Q.    No uniform, no T-shirts, anything.  You're not
22    driving a marked unit?
23    A.    No.
24    Q.    And you go into the areas where you believe drug
25    dealing is taking place.
```

1    A.    (Nodding in the affirmative).

2    Q.    And you engage these drug dealers as a citizen

3    and not as a police officer; is that right?

4    A.    Correct.

5    Q.    And you try to get them to sell you drugs?

6    A.    Correct.

7    Q.    Okay.  And so you're lying to these people;

8    right?

9    A.    Correct.

10   Q.    You don't tell them, *Hey, I'm a cop*.  You have to

11   lie and put on this facade of who you really are?

12   A.    Correct.

13   Q.    Okay.  And some of these guys are pretty

14   dangerous guys --

15   A.    Correct.

16   Q.    -- that carry guns; right?

17   A.    Correct.

18   Q.    They shoot people?

19   A.    Yes.

20   Q.    And so your lying has to be pretty darned good;

21   right?

22   A.    Yes.

23   Q.    Because if they hint that you might be who you

24   really are, they could shoot you or kill you?

25   A.    Yes.

```
1    Q.    And you've undergone training on how to do this?

2    A.    Some.

3    Q.    And so as a result of it, you're an excellent

4    liar.

5    A.    I wouldn't say that.

6    Q.    You wouldn't say that?

7    A.    Not an excellent liar.

8    Q.    How many undercover transactions have you done in

9    your career?

10   A.    Not that many.  Maybe 20.

11   Q.    And how many years have you been doing it?

12   A.    I probably only did it for two or three years,

13   about two or three years.

14   Q.    And do you receive training on how to do it?

15   A.    A little bit.

16   Q.    But you -- in those 20 or 30 times you've done

17   it, you've developed the ability to look somebody right

18   in the eye and fool them; right?

19   A.    No.

20   Q.    No?

21   A.    I usually wouldn't look at them in the eye.

22   Q.    You would be in very close proximity to them and

23   engage in a drug transaction with them?

24   A.    Yes.

25   Q.    And you could trick them?
```

```
 1    A.    Yes.

 2    Q.    And they didn't -- they had no idea you were

 3    lying to them?

 4    A.    Yes.

 5    Q.    Now, you have met with the FBI several times;

 6    right -- or the federal agents several times --

 7    A.    Yes.

 8    Q.    -- is that right?

 9          I'm going to go through some of the meetings.

10    The first one you had was back in January of this year

11    of 2016.  Does that sound about right?

12    A.    About right.

13    Q.    Okay.  And during that meeting, you started to

14    talk about the incident in the rec yard?

15    A.    Yes.

16    Q.    Okay.  And that is Curtis Ozenne?

17    A.    (Nodding in the affirmative).

18    Q.    Now, Curtis Ozenne or somebody apparently made a

19    very nasty remark towards you or the sheriff; is that

20    right?

21    A.    Correct.

22    Q.    And that remark took place where?

23    A.    In the rec yard.

24    Q.    In the rec yard.  Okay.  While he's down on his

25    knees?
```

1    A.    Correct.

2    Q.    Okay.  And when that happened, if I wrote down

3    correctly, what you said was the sheriff said -- well,

4    what did the sheriff say when that happened?  You tell

5    us.

6    A.    He told me to go take care of him.

7    Q.    Okay.  And so you picked him up?

8    A.    Yes.

9    Q.    And you walked him out?

10   A.    Yes.

11   Q.    Okay.  So you're in the rec yard -- let me place

12   this again.  You're in the rec yard.  This guy mouths

13   off, says something ugly.  The sheriff says, *Take care*

14   *of him*?

15   A.    Yes.

16   Q.    You take him, and you escort him to the chapel?

17   A.    Yes.

18   Q.    Okay.  So the sheriff didn't say to take him to

19   the chapel?

20   A.    No.

21   Q.    The sheriff didn't say, *Go beat this man with a*

22   *baton*?

23   A.    No.

24   Q.    The sheriff -- and I'm going to use some ugly

25   language here.  The sheriff didn't say, *Take care of*

1    *that fucking nigger*?

2    A.    I don't remember those words.

3    Q.    Okay.  Those are pretty harsh words.  I mean,

4    that might be something that you would remember; right?

5    A.    Yes.

6    Q.    Okay.  So you take Mr. Ozenne into the chapel.

7    And who's in there with you?

8    A.    Like I said, I remember Wesley Hayes and two

9    other people.

10   Q.    Okay.

11   A.    I was told it was Bret Broussard and Jeremy

12   Hatley.

13   Q.    Okay.  Now, the reason you go to the chapel is

14   because there's no camera?

15   A.    Correct.

16   Q.    And when you go in the chapel, there are some

17   windows there, but y'all cover the windows up?

18   A.    I think they were already covered.

19   Q.    Already covered.  And then you shut the door?

20   A.    I don't know if I did or not.

21   Q.    But you would -- because of what you're doing,

22   you wanted to hide it from everybody?

23   A.    Correct.

24   Q.    So the door was shut?

25   A.    Yeah.

1  Q.    Okay.  Then you proceeded to beat Curtis Ozenne?

2  A.    Correct.

3  Q.    And during that beating, he said something to the

4  effect, *It wasn't me that said that; it was a different*

5  *guy*?

6  A.    Correct.

7  Q.    *It was a white guy*?

8  A.    Or he said it wasn't him.

9  Q.    Okay.  And so you escorted him -- and the sheriff

10 is not in the chapel when any of this is happening?

11 A.    I don't remember seeing the sheriff in the

12 chapel.

13 Q.    All right.  So you escort Curtis Ozenne back to

14 the pod, and you do something like this:  *Was it him?*

15 *Was it him?  Was it him?*  And then when they got to

16 Scott Spears, they said, *Yes, it was Scott Spears*?

17 A.    Correct.

18 Q.    And so you dropped Ozenne and you took Scott

19 Spears?

20 A.    Correct.

21 Q.    Escorted him back to the chapel?

22 A.    Correct.

23 Q.    Never saw the sheriff during any of that, did

24 you?

25 A.    I don't remember seeing the sheriff.

Q.    Okay.  Brought Scott Spears into the chapel?

A.    Yes.

Q.    Shut the door and made sure the blinds were there?

A.    Yes.

Q.    And you proceeded to beat Scott Spears?

A.    Yes.

Q.    And then you proceeded to make him perform that simulated sex act on him?

A.    Correct.

Q.    Okay.  Sheriff Ackal had nothing to do with that?

A.    I don't remember him being in the room.

Q.    And you never saw him when you were escorting Curtis Ozenne back to the pod?

A.    I don't remember seeing him, no.

Q.    And you never saw the sheriff as you were escorting Scott Spears back to the chapel?

A.    No.

Q.    So that sick and devious act that you did was all in your brain.  You came up with that idea to do that.

A.    (No audible answer.)

Q.    Well, the sheriff didn't say, *Hey, go shove a baton in the guy's mouth*?

A.    No.

Q.    The sheriff didn't even know you had Scott Spears

1   in there, did he?

2   A.   I don't know if he knew or not.

3   Q.   You've never told anyone in all these interviews

4   with the FBI that the sheriff knew about that.

5   A.   I'm sure the sheriff knew about it.

6   Q.   Knew that you were escorting Scott Spears?

7   A.   I'm sure he knew what was going on.

8   Q.   He knew that you were going to stick a baton in

9   his mouth?

10   A.   No.   That just happened.

11   Q.   While you were doing this baton act, did anyone

12   say, *Stop it; that's disgusting; stop that*?

13   A.   No.

14   Q.   No one ever told you to stop that?

15   A.   No.

16   Q.   You beat Curtis Ozenne.   You beat Scott Spears.

17   Was it later in the day Anthony Daye was in the chapel?

18   A.   Yes.

19   Q.   Okay.   You walked into the chapel?

20   A.   I just remembered being in the chapel.   I'm sure

21   I walked into the chapel.

22   Q.   Okay.   Do you remember -- do you have to -- to

23   get in that door, is it where you have to hit the

24   intercom and say, *Hey, let me in?*   Or can you knock on

25   the door and somebody else can let you in?   Or did you

1    have a key?

2    A.    I don't remember.

3    Q.    Somehow you got through that door?

4    A.    Yes.

5    Q.    And when you got there, you said there were 10 to

6    12 guys in there?

7              THE COURT:  Give a heartbeat between the

8    question and answer, both of you, please.

9              MR. MCLINDON:  I apologize.

10   BY MR. MCLINDON:

11   Q.    When you got inside the chapel, you saw 10 to 12

12   guys in there?

13   A.    Correct.

14   Q.    Okay.  You wanted to beat Anthony Daye?

15   A.    Correct.

16   Q.    But you couldn't get to him?

17   A.    Correct.

18   Q.    Now, if I understood your testimony, you just

19   happened to be walking by and saw or heard what was

20   going on in there.

21   A.    I don't remember how I ended up in there.  I may

22   have been part of the group that carried -- or that

23   brought Anthony Daye into there.  I don't remember

24   that.  I just remember being in the chapel when Anthony

25   Daye got beat.

1  Q.   And at no time did Sheriff Ackal -- were you

2  following orders from Sheriff Ackal to go into that

3  chapel and attempt to beat Anthony Daye?

4  A.   At that point, no, not directly from Sheriff

5  Ackal.  I don't remember that.

6  Q.   You did that on your own free will?

7  A.   Yes.

8  Q.   Now, this is a little bit out of order here.

9  When the two civil lawsuits were filed, Anthony Daye

10  and Curtis Ozenne, okay, you were asked to give sworn

11  testimony; is that right?

12  A.   (Nodding in the affirmative).

13  Q.   And for one of them, you met with two other

14  officers.  Y'all met at the Bank Street Park.

15         Do you remember that?

16  A.   Um, I remember -- I don't specifically remember

17  that.

18  Q.   Did you meet with --

19  A.   If you have some information, then I may recall

20  that.  The Bank Street Park was a meeting spot that we

21  would always meet up at.

22  Q.   *We*, being the narcotics agents?

23  A.   Yes.

24  Q.   Okay.  And do you remember meeting with Jason

25  Comeaux and -- the other officer was Bergeron --

1    A.    Correct.

2    Q.    -- that was involved?

3          Do you remember meeting with those two to

4    talk about how to prepare for this deposition?

5    A.    Yes, but I don't remember if it was at the Bank

6    Street Park or not.

7    Q.    But y'all met somewhere?

8    A.    Yeah, we met somewhere prior to.

9    Q.    You didn't invite Louis Ackal to that meeting,

10   did you?

11   A.    No.

12   Q.    So y'all got together and concocted what lies you

13   were going to tell in the deposition?

14   A.    Correct.

15   Q.    And then the three of y'all rode together for the

16   deposition, is that right, in the same car?

17   A.    I don't remember if we did or not.

18   Q.    The three of y'all sat in the same conference

19   room and listened to each other give their testimony?

20   A.    Correct.

21   Q.    Okay.  And when you went in there, there was a

22   court reporter like there is one here today; is that

23   right?

24   A.    Correct.

25   Q.    And you had to raise your right hand?

1    A.    I don't remember.  Probably so.

2    Q.    Did you swear to tell the truth?

3    A.    I believe so.

4    Q.    Okay.  Just like you did today?

5    A.    Correct.

6    Q.    And you lied?

7    A.    For the deposition, I did.

8    Q.    And you went again for a second deposition?

9    A.    Yes.

10   Q.    And you had the opportunity then to tell the

11   truth, that *Hey, look, I really did beat these guys.*

12   You could have done that?

13   A.    Correct.

14   Q.    Okay.  You lied again under oath?

15   A.    Correct.

16   Q.    You have a habit of lying under oath?

17         MR. BLUMBERG:  Objection.

18         THE COURT:  Sustained.  Argumentative.

19   BY MR. MCLINDON:

20   Q.    In addition to talking to those guys in

21   preparation for the deposition, you've talked to other

22   narcotics agents about this case; right?

23   A.    I believe so.

24   Q.    Okay.  You have talked to Hines and Cody Vaughn;

25   is that right?  Do you remember meeting them in the

1    Lowe's parking lot to talk to them?

2    A.    Yeah.   That was -- that was prior to this.

3    Q.    Right.   It was in preparation -- when the federal

4    government came to town and started investigating you

5    guys --

6    A.    Correct.

7    Q.    -- you started talking to some of your fellow

8    agents?

9    A.    Correct.   I talked to all of them.

10   Q.    Except Louis Ackal?

11   A.    Correct.   That day, except Louis Ackal.   I had

12   talked to him prior to.

13   Q.    After the January interview, you then met with

14   the FBI in February of 2016.   Does that sound about

15   right?

16   A.    That sounds about right.

17   Q.    And you told the FBI -- do you remember telling

18   the FBI that after your January meeting with them, that

19   after you left, you got a text from Bubba, Gerald

20   Savoy?

21   A.    Um-hum.

22   Q.    Okay.   And then the next day after the January

23   FBI meeting, January 21 -- so the next day,

24   January 22nd, Bubba Savoy showed up at your house.

25              Do you remember that?

1   A.    I believe so.

2   Q.    Okay.  And he wanted to know what you talked

3   about; right?

4   A.    Yeah.

5   Q.    And you told him?

6   A.    No.

7   Q.    You didn't tell him?

8   A.    Not everything.

9   Q.    Okay.  The sheriff never showed up at your house,

10  did he?

11  A.    No.

12  Q.    The sheriff never texted you?

13  A.    No.

14  Q.    You never texted the sheriff?

15  A.    No.

16  Q.    You never called the sheriff?

17  A.    No.

18  Q.    Well, Mr. Lassalle, I'm just wondering -- I mean,

19  the FBI is all over you.  You're nervous.  I'm guessing

20  you're pretty nervous at this point --

21  A.    Correct.

22  Q.    -- back in January of this year.  And yet, you've

23  told this jury all morning that Sheriff Ackal approved

24  this, condoned it, thought it was great.  You never

25  called the sheriff and said, *Hey, boss, the Feds are*

1   *all over me; you told me I could do this; come on, I*

2   *need some help; back me up on here*?

3          You never called him and told him that?

4   A.   No.

5   Q.   Okay.  Is the reason you never called him is

6   because you hid a lot of things from him?

7   A.   No.

8   Q.   You did a lot of things that he didn't know

9   about; right?

10  A.   I'm sure I did things that he didn't know about,

11  but I think if he knew about them, he would have been

12  okay with it.

13  Q.   That's just an assumption on your part?

14  A.   Yes.

15  Q.   You talked to -- let's talk about some other

16  folks you talked to.  You talked to David Hines; right?

17  A.   Correct.

18  Q.   This is after your fist interview with the FBI?

19  A.   Yes.

20  Q.   Okay.  Jason Comeaux came by your house?

21  A.   Yes.

22  Q.   Cody Vaughn came by your house?

23  A.   Yes.

24  Q.   Hatley texted you?

25  A.   Um, I don't -- if he did -- I'm not denying that

1    he did.

2    Q.    Okay.  And everybody I just mentioned, they were

3    all narcotics officers?

4    A.    Correct.

5    Q.    Let me ask you some questions about Ricky Roche

6    or Roche, however it's pronounced.  He punched -- he

7    was in a bar and he punched Bubba Savoy in the eye

8    unprovoked, apparently?

9    A.    Something to that effect is what we were told.

10   Q.    So there was at least a justification for you

11   guys to go out and arrest this guy.  I mean, he had

12   committed assault and battery; right?

13   A.    Correct.

14   Q.    So there is nothing illegal about going to get

15   him?

16   A.    No.

17   Q.    There wasn't.  And so the sheriff -- let me make

18   sure I'm clear.  The instructions to go get him, did it

19   come from Bubba Savoy or did it come from the sheriff

20   directly?

21   A.    Directly to me was from Bubba Savoy.

22   Q.    Okay.

23   A.    Him telling me that it came from the sheriff.

24   Q.    So the sheriff said something to Bubba Savoy.

25   You're not sure what he said because you weren't there?

A.    Correct.

Q.    And then Bubba Savoy said to you, *go get Roche*.
Or what did he say?

A.    At first, Todd Anslum was supposed to be making
the case on Ricky Roche and nothing was happening.  And
Bubba had said that, *hey, something needs to happen.*
*Sheriff keeps asking, keeps asking.*  So he told me he
wanted me to make the case on Ricky Roche.

Q.    Okay.  And again, you would have every legal
right in the world to go arrest this man for punching
Bubba Savoy in the eye?

A.    Correct.

Q.    Okay.  And Bubba Savoy told you, *the sheriff*
*wants you to go do that*?

A.    Correct.

Q.    Okay.  And as part of your plan to go get Ricky
Roche, you were going to -- you were going to drop some
dope on him; right?

A.    That was the plan prior.

Q.    And so the way that works is you, as a narcotics
officer, you have access to drugs, that you have a bag
of drugs that you keep in your pocket.  And then when
the guy's on the ground, you drop the bag of dope and
you say, *hey, look what we found on this guy*?

A.    That's not what the plan was.

```
 1   Q.    Well, how do you drop dope?

 2   A.    I had never dropped dope before.

 3   Q.    How were you planning on doing it that night?

 4   A.    Wade had some in his pickup truck and said no

 5   matter what, he was going to have dope on him.

 6   Q.    So?

 7   A.    Meaning we were going to drop dope.  But after we

 8   beat him up and we walked his trail back that he had

 9   run, there was legitimate dope there.  So we didn't

10   have to put the drop dope.

11   Q.    And you swear to this jury today you have never

12   dropped dope on anyone in your career?

13   A.    Not that I remember.

14   Q.    Well, we know this.  Sheriff Ackal didn't tell

15   you, *hey, be sure to drop dope on this guy*, did he?

16   That was something that y'all concocted in your own

17   minds?

18   A.    Yes.

19   Q.    Am I correct that nobody in the narcotics unit

20   really reports anybody for wrongdoing?

21   A.    Correct.

22   Q.    It's a pretty tight-knit group?

23   A.    Correct.

24   Q.    So y'all -- you get Ricky Roche and you beat him

25   pretty good; right?
```

```
 1    A.    Correct.

 2    Q.    Okay.  You take him back to the narcotics

 3    building, not to the jail?

 4    A.    Correct.

 5    Q.    Not to the sheriff's office?

 6    A.    No.

 7    Q.    And at the narcotics unit, he's handcuffed to a

 8    bench?

 9    A.    I believe so.

10    Q.    Okay.  And then a few other narcotics agents get

11    a few licks in on him; is that right?

12    A.    That's what I was told.

13    Q.    Todd Anslum punched him once.  Do you remember

14    that?

15    A.    I don't remember him getting punched while he was

16    on the bench.  I only remember him licking the blood

17    off the wall.

18    Q.    You didn't see him lick the blood off the wall?

19    A.    I do remember that.

20    Q.    You saw that.  Jason Comeaux told him to lick the

21    blood off the wall?

22    A.    Right.

23    Q.    You would agree with me that Sheriff Ackal at no

24    time ever said, *chain him to a bench, punch him and*

25    *make him lick blood off the wall*?
```

A.    No.

Q.    You took the sheriff's instructions to go get this guy, and you justify that for all these disgusting things that you are telling us about?

A.    Correct.

Q.    Let me go back -- and I apologize for jumping around.  I'm following the interview order.

         I'm going to go back to Anthony Daye. Anthony Daye was beaten so badly -- well, you watched. You weren't able to beat him; is that right?

A.    Right.

Q.    Is that what you're telling us?  Who did beat him?  Was that Jason Comeaux?

A.    I remember seeing Wade's back, and I remember seeing Jason spit on him.

Q.    Okay.

A.    But I know there were more people in there, and I'm sure the people that were in there were also beating him.

Q.    Was there more than one inmate in there at the time?

A.    I don't specifically recall another inmate being in there, but there may have been.

Q.    Let me ask you this.  If there were two inmates in there at the same time and both were being beaten at

```
 1    the same time, would that be something you would
 2    remember?  That's kind of unusual, isn't it?
 3    A.    I remember -- I don't remember another inmate
 4    getting beaten at the time.
 5    Q.    And you don't remember two inmates being beaten
 6    at the same time, Anthony Daye and some other guy?
 7    A.    No.
 8    Q.    Did you escort Anthony Daye back to his pod?
 9    A.    I don't think I did.  If I did, I don't remember.
10    Q.    Okay.  So the conversation that Anthony Daye had
11    with the sheriff back towards his pod, you weren't a
12    part of that conversation?
13    A.    The way I remember it, I remember Anthony -- it
14    being me, then Anthony Daye, then the sheriff.  Like I
15    was standing behind Anthony Daye as he was crying to
16    the sheriff.
17    Q.    But was somebody escorting him or he was walking
18    on his own?
19    A.    No, I believe he was getting drug.
20    Q.    Okay.  And you were behind Anthony Daye?
21    A.    I believe so.
22    Q.    And then the sheriff -- was anybody standing next
23    to the sheriff?
24    A.    Not that I remember.
25    Q.    Did you know a lady named Monica Bruno?
```

```
 1   A.    No.
 2   Q.    You don't remember the sheriff standing next to
 3   an African-American lady at that time?
 4   A.    No.
 5   Q.    Let me ask you about Mr. Trosclair.  The
 6   allegation was that he had beaten up an elderly man; is
 7   that right?
 8   A.    Correct.
 9   Q.    Did you ever see the man who Trosclair was
10   alleged to have beaten?
11   A.    Yes.
12   Q.    Was he -- he was in the office when you were
13   called to go there?
14   A.    Yes, in the sheriff's office.
15   Q.    Did he look like he had been beaten?
16   A.    I remember one of his eyes being red and one arm
17   in a sling.
18   Q.    And roughly, how old was this guy?
19   A.    60 or 70.
20   Q.    Did the sight of this man, did that upset you at
21   all?
22   A.    I wouldn't say I was upset.
23   Q.    So after you saw that, you were told by the
24   sheriff to go and get Trosclair?
25   A.    To go take care of him.
```

```
 1   Q.    And the allegation was Trosclair had beat this
 2   elderly man?
 3   A.    Correct.
 4   Q.    And Trosclair was like, what, 40 years old?
 5   A.    Probably.
 6   Q.    Okay.  And you were also told that Trosclair may
 7   have narcotics or pills on him; is that right?
 8   A.    Correct.
 9   Q.    Okay.  Did you say most of your conversations
10   with upper management, most of them would have been
11   with Bubba Savoy, Gerald Savoy?
12   A.    Correct.
13   Q.    He was a layer between you and the sheriff; is
14   that right?
15   A.    Yes.
16   Q.    Do you use racial slurs?  In your career, did you
17   use racial slurs about African-Americans?
18   A.    Yes.
19   Q.    Okay.  Was that common on the narcotics unit?
20   A.    Yes.
21   Q.    You started at the Iberia Parish Sheriff's Office
22   in 2006?
23   A.    Yes.
24   Q.    Before Louis Ackal became sheriff?
25   A.    Yes.
```

1    Q.    Were you a narcotics agent then?

2    A.    No.

3    Q.    What did you do then?

4    A.    I was a patrolman.

5    Q.    And you became narcotics when?

6    A.    When Louis Ackal took office.

7    Q.    In 2008?  Had you ever seen Gerald *Bubba* Savoy

8    beat up people before?

9    A.    Yes.

10   Q.    Did you keep -- did you and the other narcotics

11   agents keep from the regular patrol units what y'all

12   were doing?

13   A.    Yes.

14   Q.    You would exclude them from -- from some of the

15   things that y'all did that were illegal?

16   A.    Yes.

17   Q.    Do you remember an incident on Cherokee Street?

18   Have y'all talked about that in your meetings with the

19   FBI?

20   A.    I believe I know what you're talking about.

21   Q.    Is that where the guy was almost choked to death?

22   A.    Yes.

23   Q.    Okay.  You were present for that?

24   A.    Yes.

25   Q.    Were you one of the guys who did the choking?

```
1    A.    No.

2    Q.    Okay.  When y'all were doing that, the IMPACT or

3    patrol officers were outside of the house; right?

4    A.    Correct.

5    Q.    And you didn't want them to come in to see what

6    was going on?

7    A.    At one point, one of them did come in, and we

8    made him leave.

9    Q.    Get out.  Okay.  Apparently the guy was choked,

10   he almost died, but he lived; is that right?

11   A.    Correct.

12   Q.    And no one ever reported that to the sheriff?

13   A.    I don't know if that was reported to the sheriff

14   or not.  I didn't personally report it.

15   Q.    Okay.  And you can't sit here today and tell us

16   anybody that you know ever reported that incident to

17   the sheriff?

18   A.    No.

19           MR. MCLINDON:  Just give me a second, sir.

20           (Pause in the proceedings.)

21   BY MR. MCLINDON:

22   Q.    This whole case broke open, you guys got exposed

23   because of Wesley Hayes; is that right?

24           MR. BLUMBERG:  Objection.

25           THE COURT:  On what basis?
```

```
 1              MR. BLUMBERG:  Relevance, and also the basis

 2   of his knowledge and it's what the federal

 3   government --

 4              THE COURT:  What's the relevance?

 5              MR. MCLINDON:  Can I rephrase the question,

 6   Your Honor?

 7              THE COURT:  I don't know.  Can you?

 8              MR. MCLINDON:  I'll try.

 9   BY MR. MCLINDON:

10   Q.   Do you know what started the federal

11   government -- the investigation of the federal

12   government?

13              MR. BLUMBERG:  Objection.  Relevance.

14              THE COURT:  What's the relevance?

15              MR. MCLINDON:  I was going to refer him to an

16   affidavit of Wesley Hayes.

17              THE COURT:  What fact at issue would be made

18   more or less probable by the answer to that question?

19              MR. MCLINDON:  I will withdraw the question

20   and save it for Wesley Hayes, Your Honor.

21              THE COURT:  All right.  Proceed.

22              MR. MCLINDON:  Thank you.

23              (Pause in the proceedings.)

24   BY MR. MCLINDON:

25   Q.   Going back to Ricky Roche for a minute, and again
```

```
 1    I apologize going out of order.  I'm following the
 2    interviews.
 3              You testified that you struck your fellow
 4    officer, Mr. Bergeron, in the neck, red.
 5    A.   Yes.
 6    Q.   That was part of a coverup?
 7    A.   Yes.
 8    Q.   Sheriff Ackal never told you to do that?
 9    A.   No.
10    Q.   Are you aware of Sheriff Ackal firing other
11    officers for excessive use of force?
12              MR. BLUMBERG:  Objection.  Relevance.
13              THE COURT:  Overruled.
14    BY MR. MCLINDON:
15    Q.   Are you aware of Sheriff Ackal firing other
16    officers for excessive use of force?
17    A.   No.
18    Q.   Did you know an officer by the name of Deputy
19    Laperouse?
20    A.   Yes.
21    Q.   Was he fired?
22    A.   I don't know.
23    Q.   You don't know anything about that incident?
24              THE COURT:  Well, the answer is no.  I will
25    again tell the Jury that questions are not evidence.
```

```
 1              Proceed.
 2    BY MR. MCLINDON:
 3    Q.   Do you know anything about Deputy Laperouse being
 4    fired?
 5    A.   I think that's the incident --
 6              THE COURT:  The question is, do you know
 7    anything?  That's a "yes," "no," or "I don't know."
 8              THE WITNESS:  What was the question again?
 9    BY MR. MCLINDON:
10    Q.   Do you know anything about Deputy Laperouse being
11    fired?
12    A.   Yes.
13    Q.   What do you know?
14    A.   I know -- I know that he doesn't work for the
15    sheriff's office anymore.  I don't know if he resigned
16    or if he was fired.
17    Q.   Do you know why he was fired?
18              MR. BLUMBERG:  Objection.
19              THE COURT:  The question is, do you know?
20    "Yes," "no," "I don't know."
21              THE WITNESS:  Again, I don't know if he was
22    fired or if he resigned.
23              THE COURT:  You don't know?
24              THE WITNESS:  No, I don't know.
25              THE COURT:  Next.
```

1    BY MR. MCLINDON:

2    Q.    Do you know anything about what led to his

3    leaving the office of the Iberia Parish Sheriff's

4    Office?

5    A.    Yes.

6              MR. BLUMBERG:  Objection.  Hearsay.

7              THE COURT:  Okay.  Next question.  I'll

8    permit that and just leave it.

9    BY MR. MCLINDON:

10   Q.    Do you know Jackie Rhine?

11   A.    Yes.

12   Q.    Do you know whether or not Jackie Rhine still

13   works at the sheriff's office?

14   A.    I don't know.

15   Q.    Back to Jason Daye for just a second.

16             THE COURT:  I'm sorry.  What?

17             MR. MCLINDON:  I said I'll go back to Jason

18   Daye for just a second.

19   BY MR. MCLINDON:

20   Q.    Um, on Jason Daye, you testified that you were

21   just kind of in the area and you walked in.  Sheriff

22   didn't tell you, *hey, go in there and get in on some of*

23   *that action*; did he?

24   A.    I think you're talking about Anthony Daye?

25   Q.    I'm sorry.  Anthony Daye.  I keep saying Jason

1    Daye.  I apologize.  Anthony Daye.

2    A.    No.

3    Q.    So you weren't following orders when you went in

4    there?

5    A.    No.

6    Q.    Do you know whether or not Anthony Daye was

7    involved in a fight with another inmate on that day of

8    the shakedown?

9    A.    We were told that he was.

10   Q.    Okay.  Is that the extent of your knowledge?

11   A.    That's the extent of my knowledge.

12   Q.    In your civil depositions that you gave, you

13   testified on direct that Jason Comeaux told you to lie?

14   A.    Correct.

15   Q.    That Jason had had a conversation with Steve

16   Elledge?

17   A.    Correct.

18   Q.    For both depositions, that's what happened?

19   A.    Correct.

20   Q.    Sheriff Ackal had nothing to do with that?

21   A.    No.

22         MR. MCLINDON:  Just give me one second, Your

23   Honor.

24         THE COURT:  Yes, sir.

25         (Pause in the proceedings.)

```
1              MR. MCLINDON:  That's all we have, Your

2    Honor.  Thank you.

3              THE COURT:  Redirect?

4              MR. BLUMBERG:  Thank you, sir.

5                    REDIRECT EXAMINATION

6    BY MR. BLUMBERG:

7    Q.   Who was Steve Elledge?

8    A.   Steve Elledge was the sheriff's office attorney.

9    Q.   Do you know whether the defendant had anything to

10   do with the instructions to you to lie?

11   A.   Can you --

12   Q.   Sure.  Counsel asked you a question as to Jason

13   Comeaux telling you that Steve Elledge said lie in the

14   depositions?

15   A.   Correct.

16   Q.   Do you know whether Louis Ackal played any role

17   in that?

18   A.   No, I'm not sure.

19   Q.   You did have an opportunity to talk to the

20   defendant, though, about your lies; didn't you?

21   A.   Yes.

22   Q.   Did you go to his office?

23   A.   Yes.

24   Q.   Was he present?

25   A.   Yes.
```

```
1    Q.    Was his lawyer present?

2    A.    Yes.

3    Q.    Were other members of narcotics present?

4    A.    Gerald Savoy.

5    Q.    Did you tell him that you lied in your

6    deposition?

7    A.    Yes.

8    Q.    Did you tell them that you were scared that you

9    had lied in your deposition?

10   A.    Yes.

11   Q.    What was the defendant's response?

12   A.    He told Steve Elledge to take care of it, to fix

13   it.

14   Q.    Did he tell you you were going to be in any

15   trouble?

16   A.    He told me I would be okay.

17   Q.    Why did he tell you you were okay?

18   A.    He just told me I --

19         MR. MCLINDON:  Objection.  Calls for

20   speculation.

21         THE COURT:  I think so.  Sustained.

22   BY MR. BLUMBERG:

23   Q.    Did he talk to you about the federal

24   investigation at all?

25   A.    Yes.
```

1    Q.    Did he mention a consent decree?

2    A.    Yes.

3    Q.    Do you know what that is?

4    A.    A little bit.  Not too much about it.

5    Q.    At the time, did you understand that it was a

6    civil proceeding?

7            MR. MCLINDON:  Objection.  That's a leading

8    question.

9            THE COURT:  No, it's not.

10   BY MR. BLUMBERG:

11   Q.    Did you understand that it was a civil

12   proceeding?

13   A.    Yes.

14   Q.    Did you understand the defendant to be telling

15   you that no criminal prosecution would take place?

16   A.    Correct.

17   Q.    Was that related to his comment to you of, *you'll*

18   *be okay*?

19   A.    Yes.

20           MR. BLUMBERG:  That's all the questions I

21   have, Your Honor.

22           THE COURT:  Is the witness excused?

23           MR. BLUMBERG:  Yes, Your Honor.

24           MR. MCLINDON:  Yes, Your Honor.

25           THE COURT:  You're free to go.  Thank you,

```
 1   sir.

 2           Call your next witness.

 3           MS. BOYD:  The Government calls Harold

 4   Guidry.

 5           MR. BLUMBERG:  Excuse me, Your Honor.

 6           THE COURT:  Yes.

 7           MR. BLUMBERG:  Not yet, okay.

 8           (Pause in the proceedings.)

 9           THE COURT:  Raise your right hand, please,

10   sir, and be sworn.

11           THE COURTROOM DEPUTY:  Do you solemnly swear

12   that the testimony you will give in this case will be

13   the truth, the whole truth and nothing but the truth,

14   so help you God?

15           THE WITNESS:  Yes, ma'am.

16           THE COURTROOM DEPUTY:  Can you please spell

17   your first and last name for the court reporter?

18           THE WITNESS:  H-A-R-O-L-D, G-U-I-D-R-Y.

19           THE COURTROOM DEPUTY:  Thank you.

20                       HAROLD GUIDRY,

21    First having been duly sworn by the Courtroom Deputy,

22                     testifies as follows:

23                     DIRECT EXAMINATION

24   BY MS. BOYD:

25   Q.   You can have a seat, Mr. Guidry.
```

```
 1              Please tell the jury your name.
 2   A.    Harold Guidry.
 3   Q.    How far did you go in school, Mr. Guidry?
 4   A.    I graduated.
 5   Q.    From high school?
 6   A.    Yes, ma'am.
 7   Q.    Did you receive any training after high school?
 8   A.    Yes, ma'am.
 9   Q.    What kind of training did you receive?
10   A.    Building trade, technology.
11   Q.    Mr. Guidry, where do you currently live?
12   A.    Currently, Mississippi.
13   Q.    Okay.  And are you currently incarcerated in
14   Mississippi?
15   A.    Yes, ma'am.
16   Q.    Did you live in the Iberia Parish jail in April
17   of 2011?
18   A.    Yes, ma'am.
19   Q.    Were you taken to a place at the jail that didn't
20   have cameras back then?
21   A.    Yes, ma'am.
22   Q.    What was that place?
23   A.    The chapel.
24   Q.    While you were at Iberia Parish jail on
25   April 29th when you were taken to the chapel, had you
```

1    been convicted of a crime yet or were you waiting to go

2    to court on charges?

3    A.    Waiting to go to court on charges.

4    Q.    Were the charges that you were waiting to go to

5    court on federal or state?

6    A.    Federal.

7    Q.    Were you ultimately convicted of a felony charge

8    relating to that period?

9    A.    Yes, ma'am.

10   Q.    What was that charge?

11   A.    Pardon me.  The charge that I'm on now?

12   Q.    Okay.  Yes.

13   A.    Yes, ma'am.  Conspiracy, cocaine.

14   Q.    Conspiracy to distribute cocaine?

15   A.    Yes, ma'am.

16   Q.    Do you know when you were convicted of that?

17   A.    Um, in February -- November.  It would be

18   November of 2012.

19   Q.    November of 2012?

20   A.    Yes, ma'am.

21   Q.    Had you been convicted of any felonies prior to

22   that, sir?

23   A.    Yes, ma'am.

24   Q.    Can you tell the jury what those were?

25   A.    Aggravated battery and, um -- and a misdemeanor,

1    simple battery or something.

2    Q.    And when was that other felony conviction?

3    A.    2007.

4    Q.    Was there another conviction associated with that

5    in 2007?

6    A.    No, ma'am.

7    Q.    Were you ever convicted of possession with intent

8    to distribute in 2006?

9    A.    Oh, yes, ma'am.  Yes, ma'am.  Those were

10   together.

11   Q.    Okay.  Those were together?

12   A.    Yeah.

13   Q.    I want to turn your attention back to what

14   happened when you were at the Iberia Parish jail back

15   in April of 2011; okay?

16   A.    Yes, ma'am.

17   Q.    What was happening at the jail the day that you

18   were taken to the chapel?

19   A.    A shakedown.

20   Q.    What does that mean for you in terms of the

21   shakedown, what was happening?

22   A.    They go through your things, do the shakedown,

23   the process they go through.

24   Q.    Okay.  Was the defendant, the sheriff, at the

25   jail that day?

1    A.    Yes, ma'am.

2    Q.    When did you first see the defendant?

3    A.    When he came in the dorm we was in.

4    Q.    Do you know what dorm you were in at the time?

5    A.    Across from E.  That would be the trusty pod.

6    Q.    What happened when the sheriff came into your

7    dorm that day?

8    A.    When he first came in, we all had to get down.

9    Then he took a few of us in line and talked to us one

10   at a time.

11   Q.    What was the sheriff saying when he came into

12   your dorm?

13   A.    About the people calling the marshal, sending

14   pictures out.  They was looking for contraband, phones.

15   Q.    Was there a time when you were brought to the

16   defendant's attention?

17   A.    Yes, ma'am.

18   Q.    Can you tell the jury what happened?

19   A.    Um, it's like a -- when you're coming out, the

20   slider open, it's like a little breezeway.  And they

21   were standing in the breezeway, asking me questions

22   about the contraband.

23   Q.    When you said you were standing in the breezeway,

24   is that the hallway outside of your dorm?

25   A.    Yes, ma'am.

```
 1    Q.    Who was standing with you there?
 2    A.    Um, the sheriff, Officer Burrell, and the K-9
 3    unit.
 4    Q.    Was Officer Burrell somebody who worked at the
 5    jail at the time?
 6    A.    Yes, ma'am.
 7    Q.    What was Officer Burrell saying to the defendant
 8    when you were in the hallway there?
 9    A.    Oh, he was saying that I'm always complaining,
10    making my family call the marshals and writing letters.
11    Q.    What did the defendant say in response to that?
12    A.    Send him to the chapel.
13    Q.    What was the defendant's attitude about you
14    having been writing letters to the marshals and
15    complaining?
16    A.    It was just like -- I can't really -- like his
17    face expression was just, Send him to the chapel.
18    Q.    So were you, in fact, sent to the chapel?
19    A.    Yes, ma'am.
20    Q.    Who took you to the chapel that day?
21    A.    Officer Burrell, and the K-9 unit walked behind
22    us.
23    Q.    Did anyone else go with you to the chapel?
24    A.    No, ma'am.
25    Q.    When you got to the chapel, who was inside?
```

1    A.    Um, I don't really know his name by heart, but I

2    know they was from the outside.   There was three

3    officers.

4    Q.    So you didn't know those officers' names, but you

5    knew that those officers didn't work at the jail that

6    day?

7    A.    Yes, ma'am.

8    Q.    Where was the defendant?

9    A.    By the time I sat down, he was at the door.

10   Q.    At the door of the chapel?

11   A.    Yes, ma'am.

12   Q.    Was the door to the chapel open at that time?

13   A.    Yes, ma'am.

14   Q.    So was the defendant able to see you in the

15   chapel there?

16   A.    Yes, ma'am.

17   Q.    You said you sat down at a certain point.   Were

18   you handcuffed or restrained in any way?

19   A.    Yes, ma'am.

20   Q.    How were you restrained?

21   A.    Through the front.

22   Q.    What happened when you were sat down in the

23   chapel with your hands cuffed in the front?

24   A.    First, I was just sitting there waiting for

25   whatever the situation would have been.   We was just

```
 1   sitting down --
 2            THE COURT:  Can you speak up a little louder,
 3   sir, and get a little closer to the microphone?
 4            THE WITNESS:  All right.
 5            THE COURT:  Thank you.
 6            THE WITNESS:  I was sitting down at the
 7   chapel on the bench, and the K-9 unit was in front of
 8   me.  And the dog was just barking like -- like kept
 9   grabbing at you, like going at you, and kept pulling
10   the dog back.
11   BY MS. BOYD:
12   Q.   How did that make you feel to have the dog so
13   close to you there?
14   A.   I was scared.
15   Q.   What were you scared was going to happen?
16   A.   Like he going to bite me, the dog.
17   Q.   So what happened as the dog was coming at you and
18   barking?
19   A.   After the dog kept doing that, they just was
20   talking to him, asking me about what phones there was.
21   And I was like, *I don't know what you're talking about.*
22   *I don't have no phone*.
23   Q.   How did the guard react when you told him that
24   you didn't have any phone?
25   A.   Like he was just getting mad.  He kept asking me
```

1  the same question, and I kept answering it.

2  Q.   So what happened?

3  A.   Right about that time, before I knew it, I was on

4  the side.  He had hit me, and I went over because I

5  couldn't control my balance because I was cuffed in the

6  front.

7  Q.   When the officer hit you and you fell over, how

8  did that feel?

9  A.   Oh, I was helpless, mad, frustrated.

10  Q.   Had you done anything to the officer physically

11  to threaten him or try to harm him in any way?

12  A.   No, ma'am.

13  Q.   Where was the defendant when the officer hit you

14  while you were sitting there with your hands cuffed?

15  A.   Like I'm sitting right here, and he was standing

16  there right catty-corner.

17  Q.   Standing catty-corner toward you?

18  A.   Yes, ma'am.

19  Q.   Was he inside the chapel, still?

20  A.   Yes, ma'am.

21  Q.   So what happened after that officer hit you and

22  you fell over?

23  A.   After that, like when they go to pick me up -- he

24  go to bring me back up, by that time, they was coming

25  with another inmate in the chapel.

1   Q.    Did you recognize that other inmate?

2   A.    Yes, ma'am.

3   Q.    Who was that other inmate?

4   A.    Anthony.

5   Q.    Do you know his last name?

6   A.    Daye.

7   Q.    What happened when those officers brought Anthony

8   Daye into the chapel?

9   A.    Oh, like that took their attention off of me when

10  he came into the chapel.

11  Q.    How did that make you feel?

12  A.    I was still uncomfortable, helpless, couldn't

13  help myself up, any chance of helping him neither.

14  Q.    Where was the defendant when Anthony Daye was

15  brought into the chapel?

16  A.    Still in that position.

17  Q.    Where was Jailer Burrell?

18  A.    He was in and out.

19  Q.    So what happened when the officers brought

20  Anthony Daye into the chapel?

21  A.    Oh, they was like pounding him onto the ground,

22  taking shots at him, punching on him.  He was

23  screaming.

24  Q.    And could you see what was happening to Anthony

25  Daye then?

```
 1    A.    Yes, ma'am.

 2    Q.    How did that make you feel to see those officers

 3    punching and taking shots --

 4    A.    Scared, helpless.

 5    Q.    Where was the defendant when that was going on?

 6    A.    In the chapel, still in the same position.

 7    Q.    What was the defendant saying as those officers

 8    were beating on Anthony Daye?

 9    A.    That's what happens to people that kill innocent

10    people, people that kill people that help the

11    community.

12    Q.    What else did the defendant say?

13    A.    He was just going on and on about, That's how you

14    get treated in here.  It's his jail.  He run his jail

15    how he want to run his jail.

16    Q.    How did that make you feel to have the defendant

17    saying that while they were striking Anthony Daye?

18    A.    I was just scared.

19    Q.    What were you scared of?

20    A.    Like I would be next.

21    Q.    Did anybody say anything to you in the chapel to

22    that effect?

23    A.    Yes, ma'am.

24    Q.    Can you tell the jury about what happened when

25    they said that to you?
```

A.    Well, 'cause I kept putting my head down -- I kept putting my head down, and the officer with the cargos -- he had the cargos on with the baton.  Because I kept putting my head down, so he tapped me on my head like to get my attention.  And when I wouldn't pick up my head, he did it again.  And when I picked up my head, and was like, *Pay attention because you're next.*

Q.    What did that make you think was going to happen to you in there?

A.    The same thing.

Q.    Did any other officer strike you with a baton while you were in the chapel?

A.    No, ma'am.

Q.    So what happened after those officers had struck Anthony Daye?

A.    It was like -- they kept -- they kept -- they repeatedly hit him.  They kept hitting him because like he was trying to ball up like, because he's shackled, too.  And he trying to ball up.  And one move with his hand, and they're hitting him in the face, hitting him in the face, and he started screaming.

Q.    Was there any time that you saw the defendant ever try to stop those officers from doing that to Anthony Daye?

A.    No, ma'am.

1   Q.   Did you ever see Anthony Daye try to do anything

2   to harm or threaten those officers while they were

3   doing that?

4   A.   No, ma'am.

5   Q.   Where was Jailer Burrell as those officers were

6   beating Anthony Daye?

7   A.   He was in there.  He was in the chapel.  He came

8   back in the chapel.

9   Q.   And what happened when Jailer Burrell came back

10   into the chapel?

11   A.   When he come back in the chapel, the K-9, he had

12   got the dog back.  When he got the dog back, he started

13   talking like -- he started talking things like, *It's my*

14   *turn; it's my turn.*

15   Q.   You're talking about the officer who had the dog?

16   A.   Yes, ma'am, the K-9.  He was like, *It's my turn;*

17   *it's my turn*.  So when he get the dog back to him, he

18   go over there and he hit on him, he hit on him.

19   Q.   You're talking about Anthony Daye?

20   A.   Anthony Daye, yes, ma'am.

21   Q.   And what happened after that?

22   A.   He started hollering, like saying like he didn't

23   do it, he didn't do it, he didn't do it, and he kept

24   telling him he lying, he lying.

25        And then he come back and he's standing in

```
 1    front of me.

 2    Q.    You're talking about the K-9 officer?

 3    A.    Yes, ma'am.

 4    Q.    You just mentioned that some people were talking.

 5    So you said somebody was saying, *Stop, stop*.  Who was

 6    saying that?

 7    A.    For him to stop?

 8    Q.    Yes.

 9    A.    No.  He -- Anthony Daye was screaming for him to

10    stop.

11    Q.    And what were the officers saying in response?

12    A.    Nah, he wasn't saying -- he was saying, *Stop*.  He

13    was telling him this at the beginning.

14    Q.    Okay.  And then so what happened when the K-9

15    officer came over to you?

16    A.    He started talking -- he started talking, and

17    that's when -- I'm looking at him now because like I'm

18    really -- I'm scared, like, I'm helpless.  That's when

19    he hit me.  He got his lick.  Like he hit me.  And when

20    he hit me, Burrell was like, *No, don't* -- Officer

21    Burrell was like, *Don't hit him.  He always be writing

22    these letters*.  He said something about the letters

23    that I be writing to the U.S. Marshals that they

24    intercept.

25              (Court Reporter clarification.)
```

```
1              THE WITNESS:  Yes, ma'am.  It's like he
2    always sending letters.  Yeah, he always write letters,
3    and his family is always calling and coming up.
4    BY MS. BOYD:
5    Q.    Did Jailer Burrell mention that you were a
6    federal inmate?
7    A.    Yes, ma'am.
8    Q.    So what happened after that?
9    A.    That's when they went outside to talk.
10   Q.    Who went outside to talk?
11   A.    Officer Burrell, um, the sheriff and the dude
12   with the cargo pants.
13   Q.    And then what happened after that?
14   A.    They came back in.  They came back in.  When they
15   came back in, they came back in with the wheelchair.
16   Q.    Who was the wheelchair for?
17   A.    For the other inmate, Anthony.
18   Q.    What was Anthony Daye's condition after those
19   officers had beat on him and struck him?
20   A.    He was hurt.  He couldn't move.  That's all he
21   kept saying, like he hurt and he can't move.  So they
22   went and got the wheelchair.
23   Q.    How was Anthony Daye ultimately taken out of the
24   chapel?
25   A.    In a wheelchair.
```

Q.   Did you have injuries based on what happened to you in the chapel?

A.   Yes, ma'am.

Q.   What kind of injuries did you have?

A.   My teeth, it had cracked.

Q.   How were you ultimately taken out of the chapel?

A.   I got up and walked.

Q.   While you are were in the chapel, did you think about asking the defendant for help?

A.   Yes, ma'am.

Q.   Did you ask him for help?

A.   I couldn't talk.

Q.   Why not?

A.   It wouldn't -- it wouldn't have mattered.

Q.   Why did you think it wasn't going to matter?

A.   Because like I know he could have stopped it at that moment.

Q.   And did the defendant ever stop what happened in the chapel?

A.   No, ma'am.

          MS. BOYD:  No further questions, Your Honor.

          THE COURT:  Your witness, Counselor.

                    CROSS-EXAMINATION

BY MR. MCLINDON:

Q.   Good morning.

```
1    A.    Good morning.

2    Q.    When you're in any jail, you're not allowed to

3    have cell phones, are you?

4    A.    No, sir.

5    Q.    Okay.  That's considered contraband?

6    A.    Yes, sir.

7    Q.    Okay.  And on this particular day, there was a

8    shakedown going on at the jail?

9    A.    Yes, sir.

10   Q.    And they were looking for any type of contraband?

11   A.    Yes, sir.

12   Q.    And did you have a cell phone?

13   A.    No, sir.

14   Q.    Okay.  Had you -- did you have a cell phone

15   before that day?

16   A.    No, sir.

17   Q.    Was there an allegation that you had been taking

18   pictures of the jail conditions and reporting it?

19   A.    Yes, sir.

20   Q.    Is that a true allegation?

21   A.    No, sir.

22   Q.    Okay.  But somebody had -- somebody had told the

23   jailhouse people that you were doing that?

24   A.    I guess so, yes, sir.

25   Q.    In fact, when they -- when they came to you in
```

```
1    the pod, they asked you about that, if you had been
2    writing letters to the Marshal?
3    A.    Yes, sir.
4    Q.    Okay.  And let me ask you, Mr. Guidry, before I
5    get in just a little deeper, you met with the FBI back
6    in November of 2015.
7              Do you remember that?
8    A.    Yes, sir.
9    Q.    And you gave an interview to them?  Okay.
10             And so when they -- they came up to you in
11   your jail pod and said, Have you been taking pictures?
12   Have you been writing letters about the jail
13   conditions, you denied it?
14   A.    No, sir.
15   Q.    You didn't deny it?
16   A.    No, sir.
17   Q.    What did you say?
18   A.    They had the letters.  They intercepted a few of
19   my letters.
20   Q.    Okay.  So you had sent some letters?
21   A.    Yes, sir.
22   Q.    And that's fine.  But they thought you had been
23   taking pictures?
24   A.    Yes, sir.
25   Q.    Now, without getting too graphic, sometimes
```

1    inmates will hide contraband in kind of various body

2    parts; is that right?

3              MS. BOYD:  Objection.  Relevance.

4              MR. MCLINDON:  Well, Your Honor --

5              THE COURT:  Tell me what type of issue.

6              MR. MCLINDON:  I'm leading up to strip

7    searches, Your Honor.

8              THE COURT:  All right.  Well, let's see.  I'm

9    going to overrule, and we'll see.

10             MR. MCLINDON:  Okay.

11   BY MR. MCLINDON:

12   Q.   Am I correct that sometimes inmates will hide

13   contraband between their butt cheeks and down by their

14   private parts?

15   A.   I'm not sure of that.

16   Q.   You've never heard of that?

17   A.   I've heard of it, but I'm not positive.

18   Q.   And so sometimes what the jailhouse employees

19   will do is they'll do a strip search?

20   A.   Yes, sir.

21   Q.   Have you ever been subject to a strip search?

22   A.   Yes, sir.

23   Q.   And they make you drop your pants and bend down;

24   right?

25   A.   Yes, sir.

1    Q.    Okay.  And so when y'all had this initial

2    conversation in the jail, I believe it was the Jailer

3    Burrell said to the sheriff, *This is the guy who is*

4    *either writing the letters or taking the pictures*,

5    something to that effect?

6    A.    Yes, sir.

7    Q.    And he said, *Take him to the chapel*?

8    A.    Yes, sir.

9    Q.    Okay.  And the chapel has been used for strip

10   searches before; right?

11   A.    Yes, sir.

12   Q.    Okay.  You never heard the sheriff say, *Take him*

13   *in there and beat the hell out of him*?

14   A.    No, sir.

15   Q.    You never heard the sheriff say --

16            THE COURT:  Speak up, please.

17            THE WITNESS:  No, sir.

18   BY MR. MCLINDON:

19   Q.    Okay.  All right.  You heard him say, *Take him to*

20   *the chapel*?

21   A.    Yes, sir.

22   Q.    Okay.  Now, when you got into the chapel, was

23   Anthony Daye already there?

24   A.    No, sir.

25   Q.    Okay.  So when you got in the chapel, who was

```
 1    there?

 2    A.    The officers.

 3    Q.    How many?

 4    A.    Three.

 5    Q.    Do you know their names?

 6    A.    No, sir.

 7    Q.    Okay.  And you sat on a bench?

 8    A.    Yes, sir.

 9    Q.    Okay.  And one of the officers had a dog?

10    A.    Yes, sir.

11    Q.    Okay.  And did they start to interrogate you or

12    ask you questions?

13    A.    Yes, sir.

14    Q.    Okay.  And who was it that struck you?  Well, you

15    don't know the name, do you?  One of them struck you?

16    A.    Two of them.

17    Q.    Okay.  Was one of them the K-9 handler?

18    A.    Yes, sir.

19    Q.    And he hit you with a fist?

20    A.    Yes, sir.

21    Q.    And then the other guy, what did he hit you with?

22    A.    A fist.

23    Q.    Okay.  Are those the only two blows that you

24    received that day?

25    A.    Yes, sir.
```

1   Q.    Okay.  So you got hit two times, but one by -- by

2   two different officers?

3   A.    Yes, sir.

4   Q.    Okay.  Did somebody yell, *Stop, he's a federal*

5   *inmate*?

6   A.    Yes, sir.

7   Q.    Do you know who that was?

8   A.    Officer Burrell.

9   Q.    Okay.  Did Anthony Daye come in after that?

10  A.    Yes, sir.

11  Q.    Okay.  And you stayed in there while Anthony Daye

12  was in there?

13  A.    Yes, sir.

14  Q.    Okay.  And was he beaten?

15  A.    Yes, sir.

16  Q.    Okay.  Were you -- I know the chapel is not very

17  big, but were you really close to Anthony Daye when he

18  was being beaten?

19  A.    Yes, sir.

20  Q.    Okay.  Did they ever like beat you a little

21  bit and then turn and come back -- I'm sorry, beat

22  Anthony Daye a little bit and then come back and then

23  beat you a little bit?

24  A.    Just the one time.

25  Q.    Okay.  Let me do it better.

```
 1              You got hit twice?
 2    A.    Yes, sir.
 3    Q.    You got punched twice?  Then they brought Anthony
 4    Daye in, and they beat him pretty good?
 5    A.    Yes, sir.
 6    Q.    Once they started beating Anthony Daye, they
 7    never came back and beat you again, did they?
 8    A.    Yes, sir.  I got hit once before and once after.
 9    Q.    Okay.  Okay.  So it was one punch before Anthony
10    Daye.  And then, when Anthony Daye came, somebody else
11    punched you one more time?
12    A.    Yes, sir.
13    Q.    When was it that Officer Burrell yelled, stop,
14    stop, he's a federal inmate?
15    A.    Second blow.
16    Q.    Okay.  While Anthony Daye was being beaten?
17    A.    Yes, sir.
18    Q.    Okay.  The guys that were hitting Anthony Daye
19    and you, did they have any T-shirts that had any words
20    on them that you remember?
21    A.    No, sir.
22    Q.    You don't remember seeing the word IMPACT written
23    on their T-shirts?
24    A.    No, sir.
25    Q.    Do you remember that Sheriff Ackal was not in the
```

1    chapel, but he came in after the beatings?

2    A.    No, sir.

3    Q.    Okay.  Did you ever tell that to the FBI during

4    your interview, that Sheriff Ackal came in after the

5    beatings?

6    A.    He never came in after the beatings.

7    Q.    Did you tell the FBI that Sheriff Ackal came in

8    after the beatings?

9    A.    No, sir.

10   Q.    Okay.  I would like to show you a document.

11          MR. MCLINDON:  I'll show it to opposing

12   counsel.  I'll show him his 302, page 3.

13   BY MR. MCLINDON:

14   Q.    Let me show you a document, sir.

15          MR. MCLINDON:  Is the Elmo on, please?

16   BY MR. MCLINDON:

17   Q.    Now, I don't want you to read any of this out

18   loud, but is this your name right here?

19   A.    Yes, sir.

20   Q.    Okay.  And you testified earlier you remember

21   meeting with the FBI; is that right?

22   A.    Yes, sir.

23   Q.    Okay.  Now, I have some underlined language here.

24   Just read this part to yourself.  Starting right there

25   with that quote where it says "Guidry."  And you can go

```
 1    ahead and read to the end of that paragraph.  It's just
 2    a few sentences.
 3              (Pause in the proceedings.)
 4              THE WITNESS:  (Witness complied.)
 5    BY MR. MCLINDON:
 6    Q.    Are you finished?
 7    A.    Yes, sir.
 8    Q.    So I want to ask you now if your memory has been
 9    refreshed.  Did you tell the FBI that Sheriff Ackal
10    came in after?
11    A.    No, sir.
12    Q.    You didn't tell them that?
13    A.    No, sir.
14    Q.    So what you just read is incorrect?
15    A.    Yes, sir.
16    Q.    Okay.  Now, after Anthony Daye had been beaten,
17    somebody -- you testified somebody brought a wheelchair
18    into the chapel?
19    A.    Yes, sir.
20    Q.    And they put him in the wheelchair in the chapel
21    and wheeled him out?
22    A.    Yes, sir.
23    Q.    Did you follow them?
24    A.    No, sir.
25    Q.    But you don't know where they went?
```

```
1    A.    Sir?

2    Q.    You don't know where they took Anthony Daye in

3    the wheelchair?

4    A.    No, sir.

5    Q.    There is no doubt in your mind he was in a

6    wheelchair when he left that chapel?

7    A.    Yes, sir.

8    Q.    Okay.

9          MR. MCLINDON:  Thank you, sir.  That's all I

10   have.

11         THE COURT:  Redirect?

12                    REDIRECT EXAMINATION

13   BY MS. BOYD:

14   Q.    Mr. Guidry, you were asked some questions about

15   how many times you were struck in the chapel?

16   A.    Yes, ma'am.

17   Q.    Was there an officer that was using a baton on

18   you in the chapel?

19   A.    Yes, ma'am.

20   Q.    Can you describe for the jury what the officer

21   was doing with the baton to you?

22   A.    Because when I kept putting my head down, he

23   would just hit me on top the head, trying to get my

24   attention.

25   Q.    Okay.  When that was happening, was Jailer
```

```
 1   Burrell in the chapel?
 2   A.    Yes, ma'am.  Yes, ma'am.
 3             MS. BOYD:  Thank you, Your Honor.  No further
 4   questions.
 5             THE COURT:  All right.  Is the witness
 6   excused?
 7             MR. BLUMBERG:  Yes, Your Honor.
 8             MS. BOYD:  Yes, Your Honor.
 9             THE COURT:  All right.  Thank you,
10   Mr. Guidry.
11             We'll take our morning break now.
12   15 minutes, ladies and gentlemen.  All rise.
13             (The Jury exits the courtroom.)
14             THE COURT:  Mr. Blumberg?
15             MR. BLUMBERG:  Yes, sir.
16             THE COURT:  Any idea when you're going to
17   finish?
18             MR. BLUMBERG:  Yes, Your Honor.
19             THE COURT:  When?
20             MR. BLUMBERG:  I have a better idea at least.
21   I believe we will be done by close of business
22   tomorrow.  I have informed Mr. McLindon that there is a
23   chance, although small, that we would be done before
24   the end of the day tomorrow.
25             THE COURT:  Okay.
```

```
 1              MR. BLUMBERG:  So that he could have
 2    witnesses available.  But I think my best guess, it
 3    would be close of business tomorrow.
 4              THE COURT:  Okay.  Recognizing always,
 5    Mr. McLindon, that you have no obligation to do
 6    anything, if you do something, how long do you think it
 7    will take?
 8              MR. MCLINDON:  Your Honor, I've told
 9    Mr. Blumberg that we have a witness list of about
10    seven, but they're not very long witnesses.
11              THE COURT:  Okay.  So that -- now do you want
12    to answer my question?
13              MR. MCLINDON:  I would say that I can do all
14    my witnesses and their cross in one day.
15              THE COURT:  Okay.  I'm going to suggest to
16    the Jury that there is a chance that we will finish
17    this case on Saturday if they're willing to come in on
18    a Saturday.  Any objection?
19              MR. BLUMBERG:  Your Honor, I live and die by
20    the University of Illinois with a terrible football
21    team.  I'm reliably informed that there is a football
22    game and a large celebration.
23              THE COURT:  But it's at 8 o'clock at night.
24    So...
25              MR. BLUMBERG:  Fair enough.  I would only ask
```

```
 1    Your Honor that the week has been long and to the
 2    extent that the Court would allow us to finish up on
 3    Monday, it would be useful for the Government staff to
 4    be prepared to give closing and to deliver the matter
 5    to the Jury on Monday.
 6              THE COURT:  And, then, it may well turn out
 7    that way.
 8              MR. MCLINDON:  Judge, if I could --
 9              THE COURT:  I tell you what.  I don't think
10    I'm going to suggest anything to them.  I'm just going
11    to leave it and we'll see where we are on Friday.
12              MR. MCLINDON:  Can I share this with you,
13    Judge, and it pains me to say this, but my son is a
14    freshman at the University of Alabama and he is coming
15    into town, Baton Rouge, this week and he's --
16              THE COURT:  To watch the slaughter?
17              MR. MCLINDON:  Well, he's bringing ten of his
18    friends with him, Judge.  And I told him I won't be
19    there until late Friday night.  My preference is to be
20    there Saturday if at all possible.
21              THE COURT:  Does he play football?
22              MR. MCLINDON:  No, he doesn't.
23              THE COURT:  Who was the football player who
24    allegedly said, *we can take Alabama*?
25              MR. MCLINDON:  I wish he wouldn't have said
```

1    that.

2            THE COURT:  I assume it spread all over the

3    Alabama campus by now.

4            MR. MCLINDON:  Not a smart thing to say.

5            THE COURT:  All right.  Fifteen minutes and

6    we'll see where we're going.

7            MR. BLUMBERG:  There is one matter quickly,

8    Your Honor.

9            THE COURT:  Yes, sir.

10           MR. BLUMBERG:  During the course of the

11   trial, on several occasions, the defendant is audibly

12   uttering words like *bullshit*.

13           THE COURT:  Yep.  I've cautioned him several

14   times.  And if it happens again and I catch him at it,

15   he's going to be sitting on the other side of the table

16   facing the wall.

17           MR. BLUMBERG:  Yes, sir.

18           THE COURT:  Okay?  Off the record.

19           (Discussion held off the record.)

20           THE COURTROOM DEPUTY:  All rise.

21           THE COURT:  Fifteen minutes.

22           (Recess taken.)

23           THE COURT:  Anything before we bring the Jury

24   in?  Okay.  Bring them in, please.  Have you got your

25   next witness ready?

1           MS. BOYD:  Yes, Your Honor, I believe so.

2           THE COURT:  Okay.

3           (The Jury enters the courtroom.)

4           THE COURT:  All right.  You may all be

5    seated.

6           Raise your right hand and be sworn, please,

7    sir.

8           THE COURTROOM DEPUTY:  Do you solemnly swear

9    the testimony you will give in this case shall be the

10   truth, the whole truth, and nothing but the truth, so

11   help you God?

12          THE WITNESS:  I do.

13          THE COURTROOM DEPUTY:  Can you please spell

14   your first and last name for the court reporter?

15          THE WITNESS:  The first name is Wesley,

16   W-E-S-L-E-Y.  The last name is Hayes, H-A-Y-E-S.

17          THE COURTROOM DEPUTY:  Thank you.

18                    WESLEY HAYES,

19    first having been duly sworn by the Courtroom Deputy,

20          testifies under oath as follows:

21                 DIRECT EXAMINATION

22   BY MS. BOYD:

23   Q.   Would you please introduce yourself to the jury?

24   A.   Yes, ma'am.  My name is Wesley Hayes.  I'm

25   36 years old, and I used to be employed by the Iberia

1    Parish Sheriff's Office.

2    Q.    What part of the sheriff's office had you been

3    employed by?

4    A.    I was employed in the corrections division in the

5    Iberia Parish jail.

6    Q.    What was your position at the Iberia Parish jail

7    on April 29th, 2011?

8    A.    I was the Warden of the Iberia Parish jail.

9    Q.    What was your primary duty as the Warden of the

10   jail?

11   A.    I oversaw day-to-day operations involving the

12   administration of the jail, the care, custody and

13   control of inmates, dealing with outside agencies, just

14   overall day-to-day operations.  I was the commander in

15   charge of the jail.

16   Q.    Did you fulfill your duty, vis-à-vis the care,

17   custody and control of the inmates, on April 29, 2011?

18   A.    No, ma'am, I did not.

19   Q.    How did you fail your duty?

20   A.    By participating in, not reporting wrongdoings in

21   the jail, the inmate beatings.

22   Q.    Did you and other Iberia Parish Sheriff's Office

23   supervisors and staff agree to use force to physically

24   harm inmates at the jail that day?

25   A.    Yes, ma'am.

```
1    Q.    Did you have a duty to stop those abuses?

2    A.    Yes, ma'am.

3    Q.    Did you do anything to stop them?

4    A.    No, ma'am, I did not.

5    Q.    Did you plead guilty in relation to your role and

6    involvement in those beatings?

7    A.    Yes, ma'am.

8    Q.    Are you prepared to tell the jury about your role

9    and what you saw others do that day?

10   A.    Yes, ma'am.

11   Q.    Before I ask you about that day, I want to find

12   out a little bit more about your law enforcement

13   background.

14   A.    Yes, ma'am.

15   Q.    When did your career in law enforcement begin?

16   A.    In August of 2003.

17   Q.    What law enforcement agency did you start with?

18   A.    The Iberia Parish Sheriff's Office.

19   Q.    Can you explain how the Iberia Parish Sheriff's

20   Office is related to the running of the jail?

21   A.    Yes, ma'am.  The Iberia Parish jail is owned by

22   the Iberia Parish Government; however, it is operated

23   by the Iberia Parish Sheriff's Office.  So it -- the

24   employees who operate the jail are Iberia Parish

25   Sheriff's deputies.
```

```
 1    Q.    Can you explain what other divisions are run by

 2    the sheriff's office, aside from the jail?

 3    A.    Yes, ma'am.  The Iberia Parish Sheriff's Office

 4    has several divisions, one of which being the patrol

 5    division.  They have a bureau of investigations

 6    division, which consists of narcotics and detectives.

 7    We have a civil division.  There are multiple divisions

 8    throughout the sheriff's office.

 9    Q.    Did you start your career in the jail at the

10    sheriff's office?

11    A.    Yes, ma'am, I did.

12    Q.    What were some of the positions that you held

13    during your time at the jail?

14    A.    When I began at the jail, I was a control

15    officer, where I maintained a written log of activities

16    within the area I was supervising.  I maintained the

17    control switchboard, which allowed access to and from

18    secured areas, such as dorms and cells.  And, again, I

19    recorded on a log all activities.

20    Q.    Were you eventually promoted to be a supervisor

21    at the jail?

22    A.    I was.

23    Q.    When did you receive that promotion?

24    A.    It was a few years after I began.  I worked my

25    way up the ranks to internal security and then on to a
```

```
 1    booking officer.  And then from there, a few years
 2    after my starting date, I became a sergeant in a
 3    supervisory position.
 4    Q.    When did you become Warden at the jail?
 5    A.    I became Warden of the jail sometime in 2009.  It
 6    was -- I believe it was later in the year 2009.
 7    Q.    How long were you the IPSO Warden?
 8    A.    Approximately four years.
 9    Q.    Did there come a time for you on April 29th,
10    2011, when you were outranked at the jail as warden?
11    A.    Yes, ma'am.
12    Q.    Who is the highest ranking official at the
13    sheriff's office?
14    A.    The sheriff, Sheriff Louis Ackal.
15    Q.    And was he one of the officials who outranked you
16    at the jail that day?
17    A.    Yes, ma'am.
18    Q.    Who else would have outranked you on April 29th,
19    2011?
20    A.    Gerald Savoy would have outranked me, as well as
21    Bert Berry.
22    Q.    What was Gerald Savoy's position at the time?
23    A.    He was commander over the bureau of
24    investigations.
25    Q.    Who would that have meant he supervised?
```

```
 1    A.    He supervised narcotics agents and detectives,
 2    and I believe the SWAT team was under him, if I'm not
 3    mistaken.
 4    Q.    You mentioned that Bert Berry also outranked you
 5    that day?
 6    A.    He did.
 7    Q.    What was his position at the time?
 8    A.    He was part of the narcotics -- or the -- I'm
 9    sorry, DEA task force.  I'm not sure how -- you know, I
10    just knew him as a DEA task force, and also he was
11    pretty much the sheriff's kind of right-hand guy.
12    Q.    What brought all of those high-ranking officials
13    to the jail on April 29th?
14    A.    On April 29th, we -- at the jail, we had planned
15    a routine shakedown of a particular pod within the
16    jail.  And when the officers who worked in the jail --
17    we had convened a small team to go inside the jail --
18    inside the pod to conduct a shakedown.  And when the
19    officers entered the pod, which was K-2, they were met
20    with verbal noncompliance from the inmates.  Basically,
21    they were told to, *Get out of our dorm; get out of our
22    house*.
23          And so they backed out and notified -- I was
24    notified of this.  So I made a call to the -- to the
25    chief deputy to notify him what was going on, in hopes
```

1    to get a few extra people in the jail to help us get a

2    bigger team together so we can conduct the shakedown as

3    planned.

4    Q.    When you called for extra assistance, had there

5    been any attacks on any officers that day?

6    A.    No, ma'am.

7    Q.    Was there any sort of violence that was going on

8    at the jail that day when you called for assistance?

9    A.    No, ma'am.

10   Q.    So what did you expect when you called for

11   backup?

12   A.    A few additional officers from patrol, just to

13   come in and give us a little more manpower to be able

14   to effectively shake down -- or take control of and

15   shake down and the pod.

16   Q.    What kind of backup did you end up getting that

17   day?

18   A.    The majority of the department, from the sheriff,

19   numerous officers from multiple divisions, commanders

20   from the divisions all showed up at the jail that day.

21   Q.    On April 29th, given the amount of outside staff

22   that responded to the jail, who was in charge of the

23   shakedown?

24   A.    When the response came and the sheriff showed up,

25   he ultimately took control of the shakedown at the

1   jail.

2   Q.    Ordinarily, who would be in charge of the

3   shakedown when the sheriff is not present?

4   A.    Myself or the highest ranking officer on scene.

5   Q.    What was the defendant's demeanor when he arrived

6   to the shakedown that day?

7   A.    He was -- he was pretty pissed that they had

8   issues in the jail from the inmates.  He was coming in

9   to make sure his -- you know, they got dealt with

10  because of their -- their noncompliance, verbal

11  noncompliance.

12  Q.    What kinds of things was the sheriff doing in

13  taking control of the shakedown?

14  A.    He was directing officers throughout the --

15  throughout the jail, all the officers who were

16  responding, just taking control of the entire scene,

17  you know, calling the shots.

18  Q.    Did there come a time when the sheriff was

19  standing with you and the shakedown sort of turned?

20  A.    Yes, ma'am.

21  Q.    Where were you standing when that happened?

22  A.    We were standing right outside of the periodics

23  recreation yard, in the hallway right in front of the

24  recreation yard.

25  Q.    What happened when you were standing with the

1    sheriff outside of that periodics rec yard?

2    A.    Inmate -- an inmate was brought out by Agent Ben

3    Lassalle.  The inmate's name is Curtis Ozenne.  He

4    was -- he was brought out handcuffed into the hallway

5    near where I was standing with the sheriff.

6    Q.    Who was Ben Lassalle?

7    A.    Ben Lassalle is a narcotics agent who was also

8    assigned to the SWAT team and the IMPACT team.

9    Q.    What was Agent Lassalle's demeanor when he

10   approached you with Ozenne in that manner?

11   A.    He was very upset.  He looked like he was pissed

12   off, as if Ozenne had did something to upset him.

13   Q.    And where was the defendant when that happened?

14   A.    He was standing right in that area with me.

15   Q.    Was Mr. Ozenne doing anything to interfere with

16   the escort that Agent Lassalle was effecting?

17   A.    No, ma'am.

18   Q.    You said that Ozenne was restrained at the time?

19   A.    Yes, ma'am.

20   Q.    What did Agent Lassalle say as he approached you

21   and the sheriff with Ozenne?

22   A.    He asked for -- if we had any room in the jail

23   that was not under video or audio surveillance.

24   Q.    Now, at that point, when Ben Lassalle asked you

25   that question, had you had previous interactions with

1    him?

2    A.    I did.

3    Q.    Based on your prior interactions with Ben

4    Lassalle, what was your impression of him?

5    A.    He was a very aggressive officer, took care of

6    business.  When an inmate or someone stepped out of

7    line with him, he was quick to take care of business,

8    you know, rough them up, speak down upon them.  Just

9    take care of business that way.

10   Q.    Were those things that you had seen Ben Lassalle

11   do in the past?

12   A.    I have.

13   Q.    So when Agent Lassalle approached you with Ozenne

14   in that manner and asked where was a place without

15   video or audio surveillance, what did you think he

16   meant?

17   A.    He wanted a place where he couldn't be seen or

18   heard; that he was about to teach Ozenne a lesson by

19   physical force, by beating him up.

20   Q.    What gave you that impression at that time?

21   A.    Um, his demeanor and his past actions, as well as

22   it being a widely-known fact that the sheriff expected

23   that type of handling of people who disrespected his

24   officers, who stepped out of line with his officers.

25   Q.    Where was the defendant when Ben Lassalle asked

1    that question?

2    A.    He was right next to me.

3    Q.    How did you respond to that question?

4    A.    I told him we do have a room, that's the chapel,

5    that was not video or audio recorded.

6    Q.    Based on what you observed of Mr. Ozenne at that

7    moment, was there any reason to take him someplace

8    without video or audio surveillance and use force on

9    him?

10   A.    No, ma'am.

11   Q.    Why not?

12   A.    He was -- Mr. Ozenne was cooperative.  He was not

13   being resistive or combative in any way, not even being

14   noncompliant.

15   Q.    What were you taught about using force on someone

16   who is compliant and not combative?

17   A.    That force is only to be used in the -- the most

18   minimum amount of force should be used to gain control

19   of a situation or a person, an inmate, only the minimum

20   amount of force needed.

21   Q.    So why would you tell Agent Lassalle of a place

22   where he could go and do exactly what you were trained

23   not to do?

24   A.    Because I knew that that's what the sheriff

25   expected of me, that he made it very well known that if

```
 1    someone steps out of line with his officers, that they
 2    would be taught a lesson.  And if that officer doesn't
 3    comply with those orders, that they are going to face
 4    disciplinary action directly from him.
 5    Q.    How did you know that?
 6    A.    At the very beginning of Sheriff Ackal's term, we
 7    had a -- he had visited the jail, and we had a small
 8    meeting with some officers of the jail.  And in that
 9    meeting it was brought up that the previous sheriff,
10    who was Sid Hebert, had a no-touch policy within the
11    jail, which Sid Hebert's no-touch policy was that
12    officers are not allowed to place their hands on an
13    inmate, of course, without justification.  And Sheriff
14    Ackal mentioned he's coming in and he's bringing his
15    own no-touch policy.
16    Q.    What was the defendant's no-touch policy?
17    A.    The sheriff's no-touch policy is that no one is
18    to put their hands or disrespect their -- well, put
19    their hands on his officers.  And otherwise, if they
20    did, they're going to get their ass kicked; and if that
21    officer fails to do so, they're going to have to face
22    him personally for disciplinary action.
23    Q.    How did that policy -- or how did the sheriff
24    sharing that policy with you impact what you did that
25    day?
```

1    A.    Um, well, I knew it was expected from the sheriff

2    of me to act in that manner.  I also felt protected,

3    that he had my back if I were to put my hands on an

4    inmate or allow it to happen; and also that if I did

5    not, I knew I could face disciplinary action from the

6    highest-ranking officer in the sheriff's office.

7    Q.    So when you were standing there with the sheriff

8    and Ben asked you for the place without the cameras and

9    you responded *the chapel*, how did the defendant react?

10   A.    Very approvingly.  He gave a look of affirmation

11   that, you know, *We're taking this guy to the chapel.*

12   *You know, you need to -- you need to come up with this*

13   *room and show him to the room.*

14   Q.    Did he ever say anything to the contrary?

15   A.    He did not.

16   Q.    So what did you do as a result?

17   A.    I escorted Ben Lassalle and Curtis Ozenne to the

18   chapel.

19   Q.    You've mentioned already that the chapel was a

20   place without audio and video surveillance; is that

21   right?

22   A.    That's correct.

23   Q.    Is the rest of the jail covered by video cameras

24   and some parts audio?

25   A.    Yes, ma'am.

1    Q.    Is that surveillance maintained at the jail in

2    any way?

3    A.    It's maintained on basically a two-week loop

4    cycle.  And after two weeks, the video would loop over

5    two-week-old footage in just a continuous loop.

6    Q.    So how does one save and maintain video

7    surveillance from the jail?  What has to happen in

8    order to do that?

9    A.    Someone has to go into the video surveillance

10   software and select a certain portion that still

11   exists, and basically download a copy and save it to a

12   hard drive.

13   Q.    You said that after Lassalle asked you where to

14   go, you told him the chapel, and you, in fact, went

15   there with him?

16   A.    Yes, ma'am.

17   Q.    As you were escorting Ozenne to the chapel that

18   day, did you observe any visible injuries on

19   Mr. Ozenne?

20   A.    No, ma'am.

21   Q.    Was anyone else with you when you went to the

22   chapel with Mr. Ozenne?

23   A.    Aside from Agent Lassalle, no, ma'am.

24   Q.    What happened when you got to the chapel?

25   A.    We got into the chapel and secured the door,

```
 1    locked the door behind us.  There was some vinyl
 2    curtains that were blocking -- obstructing view from
 3    the outside to the inside because the room was also
 4    used -- it was used as a shakedown -- as a strip search
 5    room.  So the vinyl curtains prevented someone from the
 6    outside viewing in.
 7              And when we got in, Agent --
 8    Q.   Let me ask you a question before you continue.
 9              You mentioned the chapel is used for strip
10    searches.
11    A.   Yes, ma'am.
12    Q.   Did you believe you were going into the chapel to
13    strip search Mr. Ozenne?
14    A.   No, ma'am.
15    Q.   Was that ever a question in your mind?
16    A.   No, ma'am.
17    Q.   Okay.  So what happened when you went into the
18    chapel with Mr. Ozenne?
19    A.   We got into the chapel.  Ozenne was made to lie
20    down face down on the floor, still handcuffed.  Agent
21    Lassalle then pulled out his baton and began to
22    question Ozenne about vulgar comments that he said were
23    made, that he believed Ozenne made.  And -- yes, ma'am.
24    Q.   What kind of baton did Mr. Lassalle take out?
25    A.   It was an extendable.  I believe they call it an
```

1    ASP baton.

2    Q.    Okay.  So what did he do as he took out the baton

3    and was questioning Mr. Ozenne?

4    A.    As he questioned Mr. Ozenne about the vulgar

5    comments and Ozenne would deny having made the

6    comments, every time he would deny, Agent Lassalle,

7    walking around Ozenne, would strike him a couple of

8    times with the baton every time he would deny making

9    comments.

10   Q.    Where was Agent Lassalle striking Mr. Ozenne?

11   A.    On -- on pretty much the four limbs, the two

12   arms, the two legs, the sides.  Just --

13   Q.    Can you just -- I'm sorry?

14   A.    Just kind of all around his body as he was

15   walking around him.

16   Q.    Can you describe the sound that was made by the

17   baton striking Mr. Ozenne?

18   A.    Yes, ma'am.  It was like a dull thud is the sound

19   that I can recall hearing.

20   Q.    What kind of force was Mr. Lassalle using as he

21   struck Mr. Ozenne?

22   A.    Kind of a sideward, downward motion.  He would

23   kind -- can I demonstrate?

24   Q.    Sure.

25   A.    He would take his baton in his hand and just

1    slightly bent over, reach behind him sort of to the

2    side and come downward at an angle, swinging downward,

3    striking Mr. Ozenne.

4    Q.    Okay.  So to describe for the record what you

5    just did, you took your arm to the side, to the back of

6    you and then swung forward towards your lap in a

7    downward motion?

8    A.    Yes, ma'am.

9    Q.    How did Mr. Ozenne respond to those strikes?

10   A.    He was in -- I can hear that he was in pain with

11   the sounds he was making.  He was attempting his best,

12   under the circumstances of being restrained, to try to

13   deflect the strikes coming at him.  And as the strikes

14   went along, he eventually began crying.

15   Q.    Was there any reason for Mr. Lassalle to be using

16   that type of force on Mr. Ozenne in the chapel?

17   A.    No, ma'am.

18   Q.    Was Mr. Ozenne a threat in any way to either

19   Mr. Lassalle or yourself?

20   A.    No, ma'am.

21   Q.    What were you taught to do when you see an

22   officer using more force than is necessary on someone?

23   A.    To intervene and stop the force being used

24   and/or -- and report the force being used.

25   Q.    Did you stop Mr. Lassalle from striking

1    Mr. Ozenne in the chapel that day?

2    A.    No, ma'am, I didn't.

3    Q.    Why not?

4    A.    Because I knew it was -- what Sheriff Ackal had

5    expected of myself and Lassalle to teach this inmate a

6    lesson, and I knew that if I stepped in and I stopped

7    Lassalle from doing what he was doing, that it would be

8    me facing the disciplinary action from Sheriff Ackal.

9    Q.    How many times would you say Agent Lassalle

10   struck Mr. Ozenne in the chapel?

11   A.    Approximately 12 times, 10 to 12 times at least.

12   Q.    How long did the whole thing last?

13   A.    A few minutes.  Maybe three to four minutes.

14   Q.    What was Mr. Ozenne's condition after that?

15   A.    He was in obvious signs of pain, crying, kind of

16   humiliated.

17   Q.    So what happened?

18   A.    Once the -- after the strikes had happened

19   several times, Ozenne had told Lassalle that it was not

20   him who made comments, that it was the white boy next

21   to him named Scott.

22   Q.    Who was Scott?

23   A.    Scott is Scott Spears, another inmate that was

24   housed in the Iberia Parish jail.

25   Q.    What happened when Mr. Ozenne said that Scott had

```
1    made the comments?

2    A.   Once he said Scott made the comments and the

3    beating stopped, and Ozenne was placed back on his feet

4    and taken out of the chapel and returned to the area

5    that the shakedown was occurring.  And --

6    Q.   What did you do when Mr. Ozenne was taken out of

7    the chapel?

8    A.   I stayed around the chapel area and just

9    awaited -- I pretty much knew that Scott Spears was

10   going to be on his way up as well.

11   Q.   What did you think was going to happen to Scott

12   Spears?

13   A.   He was going to get the same beating that Ozenne

14   just got.

15   Q.   Why did you wait around in the chapel, knowing

16   that was going to happen?

17   A.   It was expected of me.  It was -- I would face

18   disciplinary action.  I knew what was about to happen

19   and how much -- you know, it was pretty much the

20   culture of what was going on in the Iberia Parish

21   Sheriff's Office.  I knew what was coming, and I knew

22   what was expected of me.

23   Q.   Was Mr. Spears eventually brought to the chapel?

24   A.   Yes, ma'am.

25   Q.   Who came with Mr. Spears to the chapel?
```

A.    In addition to Agent Lassalle, we had a couple of our -- about at least three other officers; two that I can remember were Wade Bergeron and Robert Burns.

Q.    What happened when those officers arrived in the chapel with Mr. Spears?

A.    We all entered the chapel, and the door was secured once again and Mr. Spears was placed on his knees.

Q.    What happened after he was placed on his knees?

A.    Agent Lassalle then began to question him the same way he did with Ozenne about the vulgar comments. And as Spears was also denying making the comments, he would receive a couple of strikes on the legs, on the arms, on the side.

Q.    Was Mr. Spears restrained at the time?

A.    He was.  He was handcuffed.

Q.    Was there any reason for Mr. Lassalle to be striking Mr. Spears at that time?

A.    No, ma'am.

Q.    Did you do anything to stop that?

A.    No, ma'am, I didn't.

Q.    Did anyone else who was in the chapel stop Agent Lassalle from striking Mr. Spears?

A.    No, ma'am.

Q.    What happened after that?

```
 1    A.    After the questioning and the strikes went on,

 2    eventually the -- someone asked Spears why he was in

 3    jail, and Spears mentioned that he was in there for a

 4    sex crime.  And so they questioned more about that and

 5    asked him what specific crime he had committed, and he

 6    mentioned that he had an underage female perform oral

 7    sex on him.

 8              And the attention then turned to the crime,

 9    and Agent Lassalle asked him -- asked Scott if he knows

10    what kind of impact this had on this -- on his victim

11    for having to be forced to perform oral sex.  And he

12    said he has to live with that every day, he regrets it

13    every day.

14    Q.    How did Agent Lassalle respond to that?

15    A.    Agent Lassalle took his baton and with the baton

16    extended, went around his back area and placed the

17    baton between his legs from behind his own body to

18    simulate a penis, and --

19    Q.    What did Mr. Lassalle do to Mr. Spears in that

20    position?

21    A.    He forced Mr. Spears to simulate oral sex on the

22    baton.

23    Q.    Was Mr. Spears handcuffed at the time?

24    A.    He was.

25    Q.    How did Mr. Spears react to Agent Lassalle doing
```

```
 1  that to him?
 2  A.    I can hear Mr. Spears choking.  I mean, the baton
 3  was being shoved in his throat, and I can hear him
 4  choking.  And after it happened for a few seconds, he
 5  just -- he looked very dejected, very -- just dejected,
 6  just, you know --
 7  Q.    Did you do anything to try to stop Agent Lassalle
 8  from doing that?
 9  A.    No, ma'am, I didn't.
10  Q.    Why not?
11  A.    Because again, I knew this was the culture of the
12  jail.  This is what the sheriff wanted from his
13  officers, was to -- if any inmate disrespects his
14  officers, they are to get dealt with, they are to get
15  basically their ass kicked.  And I knew that if I
16  stepped in and intervened, also that I would be facing
17  disciplinary action.
18  Q.    You never heard the sheriff say anything about
19  doing that to Mr. Spears, did you?
20  A.    No, ma'am.
21  Q.    Why did you think that that type of behavior was
22  expected?
23  A.    It started with the first meeting that we had
24  back in 2008 with the sheriff where he outlined his
25  no-touch policy.  Again, the no-touch policy where if
```

```
 1    we were -- if any inmate did anything to his officers,
 2    especially touched them, you know, or any disrespect,
 3    that we were to take them and kick their ass, teach
 4    them a lesson by kicking their ass, or face
 5    disciplinary action.
 6            And throughout the course of me being warden,
 7    I've heard him reiterate things to that nature through
 8    staff meetings.  I mean, I was present just about every
 9    week, every Wednesday for a commander's meeting, and in
10    those meetings he also spoke the same of inmates and
11    people in the public.
12    Q.   Did you see anybody in the -- anybody else in the
13    chapel try to stop what was happening to Mr. Spears?
14    A.   No, ma'am.
15    Q.   How did that episode end?
16    A.   Just after -- after the simulation of oral sex,
17    it just -- it just ended there, and Spears was brought
18    back to the area where the shakedown was being
19    conducted.  And the deputies involved, we all just
20    dispersed and went about our -- in the jail.
21    Q.   Did you ever learn of any other inmates being
22    abused during the shakedown on April 29th, 2011?
23    A.   I hadn't heard anything about other inmates being
24    abused that day, no, ma'am.
25    Q.   Did you learn that there had been a fight at the
```

1    jail that day between two inmates?

2    A.    I remember hearing of an incident that happened

3    in one of the dorms, I believe it was K-2 and, if I

4    recall right, it was a fight that had occurred.

5    Q.    Do you know which two inmates were fighting in

6    K-2 that day?

7    A.    Not offhand, no, ma'am.

8    Q.    Would looking at your logs from April 29th, 2011,

9    help refresh your memory as to which two inmates

10   engaged in a fight that day?

11   A.    Yes, ma'am.  It should mention in the log, so it

12   would list and refresh my memory.

13           MS. BOYD:  Could I pull up the Elmo for the

14   witness?

15           MR. MCLINDON:  Your Honor, I have no

16   objection to leading on this issue if it will speed the

17   process up.  That's fine with me.

18           THE COURT:  All right.

19   BY MS. BOYD:

20   Q.    Mr. Hayes, have you been able to review these

21   logs in the past?

22   A.    I've looked at some logs in the past, yes, ma'am.

23   Q.    Okay.  I'm going to ask you to take a look at the

24   log on your screen there.

25   A.    Um-hum.

1   Q.   And look at the area that's highlighted.  And

2   once you've looked, let me know and then I'll pull it

3   away and ask you about the two inmates who engaged in a

4   fight that day.

5   A.   Okay.

6   Q.   Okay.  Which two inmates was it that engaged in a

7   fight?

8   A.   Jabrison Lewis and Anthony Daye.

9   Q.   Jabrison Lewis and Anthony Daye?

10  A.   Yes, ma'am.

11  Q.   Did you ever hear of an inmate named Aquilla

12  Thomas engaging in a fight that day?

13  A.   Not that I recall, no, ma'am.

14  Q.   Did you ever see any logs that suggested to you

15  that Aquilla Thomas engaged in a fight that day?

16  A.   No, ma'am.

17  Q.   Mr. Hayes, April 29th, 2011, was not the last

18  time that you were involved in a use of force against

19  an inmate in the chapel, was it?

20  A.   No, ma'am, it wasn't.

21  Q.   In fact, several months later you were involved

22  in an incident with an inmate?

23  A.   Yes, ma'am.

24  Q.   What was that inmate's name?

25  A.   Eric Mitchell.

1    Q.    Who did that episode involve in the chapel?

2    A.    It was Eric Mitchell, myself, the two captains of

3    the Iberia Parish Sheriff's Office, Mark Frederick and

4    Jesse Hayes, as well as Gerald Savoy.

5    Q.    Is Jesse Hayes related to you in any way?

6    A.    He is.

7    Q.    How is he related to you?

8    A.    He is my brother, my twin brother.

9    Q.    Your twin brother?

10   A.    Yes, ma'am.

11   Q.    How did Eric Mitchell come to your attention and

12   the others that day?

13   A.    Myself, Captains Hayes and Frederick, as well as

14   Gerald Savoy were in my office.  I don't know.  We

15   just were in their discussing or just talking and

16   received a phone call that there had been an incident

17   in one of the -- one of the dorms involving a struggle

18   between an inmate and a deputy.

19          Once we gathered all the information on the

20   incident, we went -- I had a computer which allowed me

21   to view the cameras in the jail in my office.  So we

22   went off the footage and rewinded it and looked at the

23   incident between the deputy and the inmate.  And there

24   was a struggle and that's how I became aware of the

25   incident.

```
1    Q.    Who was it that day that directed that

2    Mr. Mitchell be taken to the chapel?

3    A.    That was Gerald Savoy.

4    Q.    Mr. Hayes, before we continue with that incident,

5    I want to go back to what happened on April 29th, 2011;

6    okay?

7    A.    Okay.

8    Q.    Prior to taking Ozenne and Spears to the chapel

9    and seeing what you saw there, had you seen the

10   defendant present at other shakedowns at the jail?

11   A.    Yeah, I have.  Yes, ma'am.

12   Q.    And when you saw the defendant present at other

13   shakedowns at the jail, was he present when inmates

14   were being treated inappropriately?

15   A.    Yes, ma'am.

16   Q.    What did the defendant do in response to that

17   inappropriate treatment?

18   A.    Um, he was very accepting to the way inmates were

19   treated.

20         MR. MCLINDON:  Your Honor, I would like to

21   enter an objection.

22         THE COURT:  Basis?

23         MR. MCLINDON:  Beyond the scope of the

24   indictment and not listed in 404(b).

25         MS. BOYD:  Your Honor, it goes to this
```

```
 1    witness's knowledge of the expectations of the
 2    defendant on April 29th, 2011.
 3            MR. MCLINDON:  This is the first time I've
 4    heard of this information.  It was not disclosed in the
 5    404(b), and it is not listed in the indictment.
 6            THE COURT:  I'm going to sustain the
 7    objection for a moment and ask you to proceed.
 8            MS. BOYD:  Okay.
 9    BY MS. BOYD:
10    Q.   Mr. Hayes, I want to turn your attention back to
11    the incident involving Eric Mitchell.
12    A.   Yes, ma'am.
13    Q.   Who was it that directed that Eric Mitchell be
14    taken to the chapel that day?
15    A.   That was Gerald Savoy.
16    Q.   When Mr. Mitchell was taken to the chapel, was he
17    uncompliant in any way?
18    A.   No, ma'am.
19    Q.   Was he, in fact, restrained when he was brought
20    in there?
21    A.   Yes, ma'am.
22    Q.   Did you all ultimately use force to punish
23    Mr. Mitchell in the chapel?
24    A.   Yes, ma'am.
25    Q.   Why did you do that?
```

1    A.    Because he had -- became apparently physical with

2    a deputy.  He was noncompliant and got in an incident

3    that involved us to have to teach him a lesson,

4    according to what we were told to do.  He disrespected

5    an officer, so we were going to teach him a lesson, we

6    were going to kick his ass.

7    Q.    You said you did that according to what you were

8    told to do.  Who told you to do that?

9    A.    Well, the sheriff did.  I mean, he made it clear

10   on what he expected on how to deal with inmates who did

11   what Mr. Mitchell did.

12   Q.    Was that something that you had been trained

13   about, Mr. Hayes?

14   A.    Not trained, no, ma'am.

15   Q.    So it was contrary to your training, what you

16   were expected to do?

17   A.    Yes, ma'am.

18   Q.    Mr. Hayes, Eric Mitchell is not the only person

19   that you have used more force than necessary on while

20   you were at the jail, is he?

21   A.    No, ma'am.

22   Q.    There are in fact several other occasions when

23   you used unnecessary force when you worked at the jail;

24   is that correct?

25   A.    That's correct.

1    Q.     Were you ever disciplined for doing that?

2    A.     No, ma'am.

3    Q.     Were you ever told, *hey, lay off, you need to*

4    *treat the inmates better*?

5    A.     No, ma'am.

6    Q.     Did you ever communicate to the sheriff that you

7    were handling things the way he wanted and that you

8    were following his no-touch policy?

9    A.     Right, yes, ma'am.

10   Q.     When did you do that?

11   A.     There was an incident that occurred with an

12   inmate who had punched me in the face and, as a result,

13   he was brought to the chapel and he was handled with

14   physical force while being restrained.  And I believe

15   it was the very next staff meeting, at our commander's

16   meeting that I attended, and the sheriff had become

17   made aware that I had been hit in the face.  And he

18   asked me, he said, *well, did he get his ass kicked*?

19   And I said -- I told him we took care of it.  And he --

20   Q.     How did the defendant respond when you said that

21   you had taken care of it that way?

22   A.     He said he was very pleased.  Or he seemed very

23   pleased.  You know, I believe he even kind of laughed

24   and, you know --

25   Q.     Were you ever disciplined for that incident?

1   A.    No, ma'am.

2   Q.    I want to make sure to clarify.  You indicated

3   that the inmate had struck you at some point; is that

4   right?

5   A.    Yes, ma'am.

6   Q.    You are allowed to use force when necessary on

7   inmates at the jail, right?

8   A.    Right.

9   Q.    Was what you did in the chapel to that inmate

10   necessary?

11   A.    No, ma'am.

12   Q.    Was he physically threatening you at the time

13   that you all used force on him?

14   A.    No, ma'am.

15   Q.    You indicated that you told the defendant about

16   what you did to that inmate who struck you.

17   A.    Yes, ma'am.

18   Q.    Did you ever report that to anyone outside the

19   sheriff's office?

20   A.    No, ma'am.

21   Q.    Did you come forward and report outside the

22   sheriff's office what had happened in the chapel on

23   April 29th, 2011?

24   A.    Yeah, I did at one time, but not -- you know, not

25   while I was with the sheriff's office.

1    Q.    When did you come forward and report that?  What

2    were the circumstances?

3    A.    I had been terminated from the sheriff's office,

4    and I filed a lawsuit against the sheriff's office for

5    wrongful termination in a whistleblower lawsuit.  And

6    in that, I reported what had taken place inside the

7    chapel on April 29th.

8    Q.    To be fair, Mr. Hayes, when you reported

9    initially what happened in the chapel on April 29th,

10   did you give all the details about your involvement and

11   what you had done?

12   A.    No, ma'am, I didn't.

13   Q.    And you had filed a lawsuit in fact related to

14   whistleblower against the sheriff's office?

15   A.    Yes, ma'am.

16   Q.    What were you expecting to get in return for that

17   lawsuit?

18   A.    Lost wages as a result of my termination.

19   Q.    You later met with the FBI following filing this

20   suit; didn't you?

21   A.    Yes, ma'am.

22   Q.    When you initially met with the FBI, were you

23   upfront then about your role and what happened in the

24   chapel beatings and other beatings that you had been

25   involved in?

A.    Not initially, no, ma'am.

Q.    Why not?

A.    I was afraid because I knew I had did -- I had
some wrongdoings.  I had committed crimes, and I was
afraid to bring those to light.

Q.    Ultimately, did you admit the role that you
played in the chapel beatings as well as what happened
with Eric Mitchell in the chapel?

A.    Yes, ma'am.

Q.    Did you plead guilty in relation to your role in
those two incidents?

A.    Yes, ma'am.

Q.    What did you plead guilty to?

A.    One count of conspiracy to commit violation of
civil rights and also one count of committing violation
of civil rights.

Q.    What sentence do you expect to receive?

A.    I don't -- I don't have any expectation of a
sentence.  I have a hope of a sentence to receive, but,
I mean, nothing was ever promised to me.

Q.    What is the sentence that you hope you are going
to receive?

A.    I'm hoping and praying to receive a period of
probation.

Q.    Who is it that will ultimately decide what your

```
 1   sentence is?

 2   A.    That would be the federal judge that sentences

 3   me.

 4   Q.    What role do you expect the government will play

 5   in your sentence?

 6   A.    Um, just, you know, by my testimony and

 7   assistance to the government -- I mean, no role in the

 8   sentencing, but hopefully I can get a -- you know, the

 9   Judge would be told that I did provide substantial

10   assistance prior to my sentencing.

11   Q.    But who is it that you understand will ultimately

12   decide what your sentence is?

13   A.    It would be the federal judge.

14           MS. BOYD:  Your Honor, may I have your

15   indulgence for one moment?

16           THE COURT:  Yes.

17           (Pause in the proceedings.)

18   BY MS. BOYD:

19   Q.    Mr. Hayes, can you explain to the jury how you

20   got to this point of testifying about crimes you

21   committed while you were a sworn law enforcement

22   officer?

23   A.    Yes, ma'am.  I -- once I was terminated, and I

24   filed a whistleblower lawsuit, and I began meeting with

25   the federal government to discuss wrongdoings that had
```

```
 1    occurred in the jail.  And in that, eventually I came

 2    forward with my own wrongdoings within the jail.

 3            Then I agreed to enter into a plea in which I

 4    will give my version of truthful testimony as to all

 5    that I know and participated in within the jail, the

 6    wrongdoings and, hopefully, get this all behind me.

 7            MS. BOYD:  Okay.  Thank you, Mr. Hayes.

 8            No further questions, Your Honor.

 9            THE COURT:  Mr. McLindon?

10            MR. MCLINDON:  Yes, sir.

11            THE COURT:  Your witness.

12                    CROSS-EXAMINATION

13    BY MR. MCLINDON:

14    Q.    Good morning.

15    A.    Good morning.

16    Q.    Approximately how many prisoners were there at

17    the Iberia Parish Sheriff jail when you were the

18    warden?

19    A.    Approximately 500, give or take.

20    Q.    500.  And how many guards?

21    A.    At any one period of time or all?

22    Q.    On one shift.

23    A.    On one shift?  Approximately, I would say 10 to

24    maybe 12.

25    Q.    So 500 prisoners and 12 guards?
```

1    A.    Yes, sir.

2    Q.    So you're easily outnumbered; right?

3    A.    Right.

4    Q.    So if there is a shakedown and the inmates are

5    already causing trouble, it would be perfectly

6    reasonable to call in some other officers, wouldn't it?

7    A.    If the situation called for it, yes, sir.

8    Q.    Okay.  And on April 29th, you felt like the

9    situation did call for it?

10   A.    For a little -- just to staff up the manpower,

11   yes, sir.

12   Q.    Okay.  Because when you shake them down, you take

13   them out of their jail cells, and they're not wearing

14   handcuffs, and they are more or less free?

15   A.    Correct.

16   Q.    And are you familiar with the structure or the

17   hierarchy of the sheriff's department as far as the

18   sheriff and all the different divisions below him?

19   A.    Right.  Yes, sir.

20   Q.    Okay.  Let me show you an exhibit.

21         MR. MCLINDON:  This is y'all's exhibit, but

22   mine, too.  I think it's the chart.  It's in your book.

23         (Pause in the proceedings.)

24         (Attorneys conferring.)

25         MR. MCLINDON:  Your Honor, I have an exhibit

```
 1    I would like to show the witness, but I think we have

 2    an objection from the Government.  Do you want to argue

 3    it now?

 4              MR. BLUMBERG:  May we approach?

 5              THE COURT:  Well, let's see.  Okay.

 6              (Sidebar discussion begins.)

 7              MR. MCLINDON:  This is an exhibit that I gave

 8    to them weeks ago, and it's just a basic structure of

 9    the sheriff's office -- of the sheriff's office and all

10    of his divisions below him.  I'm not sure what the

11    origin is.

12              MR. BLUMBERG:  The problem is it's not

13    time-specific, and the structure there changed

14    considerably with different titles and different

15    positions that were created.

16              THE COURT:  It says March 22, 2016.

17              MR. MCLINDON:  That's when it was prepared.

18              MR. BLUMBERG:  My exhibit did not have that

19    date.

20              MR. MCLINDON:  I'm sorry.

21              MR. BLUMBERG:  That date is irrelevant to

22    anything in the facts of this case.

23              MR. MCLINDON:  Judge, I am not asking --

24              THE COURT:  What's the relevance?  Why do you

25    want to --
```

```
 1              MR. MCLINDON:  I want to show that the
 2    sheriff has a whole lot going on -- I'm sorry, that he
 3    has a whole lot going on, and it's quite possible that
 4    he doesn't know what every officer is doing at every
 5    time.  I just thought the warden was one of the better
 6    witnesses to show this to.  I mean, I can have one of
 7    my witnesses do it.  I'll probably draw the same
 8    objection, but I'm not asking him if this is exactly
 9    identical.
10              MR. BLUMBERG:  I have no objection to the
11    testimony.  That exhibit is not accurate for the time
12    period for --
13              THE COURT:  Is it accurate?
14              MR. MCLINDON:  For what time period?
15              THE COURT:  The 29th of April.
16              MR. MCLINDON:  I can't say that it is, Judge.
17              THE COURT:  Then you're just going to have to
18    take the time to say who are the people he supervised
19    and --
20              MR. MCLINDON:  All right.  Fair enough.
21              (Sidebar discussion concludes.)
22    BY MR. MCLINDON:
23    Q.   Mr. Hayes, as the -- you're the warden of the
24    jail?  You run that jail?
25    A.   Yes, sir.
```

1    Q.    You're in charge of it.  Okay.  And who do you

2    answer to above that?

3    A.    The chief deputy and the sheriff.

4    Q.    Okay.  The chief deputy was who?

5    A.    At the time of the -- April -- April 29th of

6    2011?

7    Q.    Sure.

8    A.    It was Toby Hebert.

9    Q.    Okay.  And then above him was the sheriff?

10   A.    Yes, sir.

11   Q.    Okay.  And then the sheriff is -- and if you

12   don't know, just tell me.  He's in charge of a bunch of

13   other divisions; right?  He's not just in charge of

14   watching you run the jail; right?

15   A.    Correct.

16   Q.    Do you know the names of the other divisions?

17   A.    I know the names of most of them.

18   Q.    Tell me some of them.

19   A.    Sure.  We've got the civil division.  We have the

20   patrol division, and we have the bureau of

21   investigations.

22   Q.    The civil division, they collect property taxes,

23   things like that?

24   A.    I believe so, yes, sir.

25   Q.    They serve lawsuits and things like that?

```
1    A.    Right.

2    Q.    Do you know how many -- you said there were -- do

3    you know how many total employees there are in the

4    sheriff's office?

5    A.    Approximately 300 at that time.

6    Q.    Okay.  Thank you.

7              Now, when you filed this lawsuit -- you

8    called it a whistleblower lawsuit; is that right?

9    A.    Yes, sir.

10   Q.    You were -- you took it very seriously when you

11   filed the lawsuit; right?

12   A.    Right.  Yes, sir.

13   Q.    This wasn't something you just did real quickly

14   overnight.  You went and consulted an attorney; right?

15   A.    Um-hum.  That's correct.

16   Q.    And you gave the information to the attorney --

17   A.    Yes, sir.

18   Q.    -- about why you were suing?

19   A.    (Nodding in the affirmative.)

20   Q.    And he drafted a lawsuit?

21   A.    Yes, sir.

22   Q.    And when you did that, you knew that lawsuit was

23   going to be filed with a Clerk of Court and allotted a

24   number and become a case that might end up in court?

25   A.    Yes, sir.
```

1    Q.    Okay.  So you wanted the information in that

2    lawsuit to be accurate?

3    A.    Yes, sir.

4    Q.    You didn't want to mislead the Court in any of

5    your pleadings?

6    A.    Right.  Yeah.

7    Q.    You wanted to tell the truth.  You didn't leave

8    anything out, did you?

9    A.    I did.  I did not come forward with my own

10   involvement in the incidents that -- some of the

11   incidents that were brought into play.

12   Q.    In the civil lawsuit you filed, you withheld

13   information?

14   A.    Yes, sir.

15   Q.    Okay.  Now, in the -- in the lawsuit you attached

16   an affidavit -- I'm sorry.  Let me back up.

17              You know who Curtis Ozenne is?

18   A.    Yes, sir.

19   Q.    Than you knew that Curtis Ozenne had filed his

20   own civil lawsuit?

21   A.    I had eventually found out he did file a civil

22   lawsuit, yes, sir.

23   Q.    Okay.  And at some point, you got in touch with

24   Curtis Ozenne's lawyer?

25   A.    My -- I believe my attorney did speak to Ozenne's

1    lawyer.

2    Q.    Okay.  And there was an affidavit drafted for

3    your signature?

4    A.    Yes, sir.

5    Q.    And that affidavit was going to go into Curtis

6    Ozenne's lawsuit --

7    A.    Um-hum.

8    Q.    -- is that right?

9    A.    Right.  I'm guessing it would have.

10   Q.    Okay.  And then that same affidavit was attached

11   to your lawsuit --

12   A.    Yes, sir.

13   Q.    -- is that right?

14         I would like to show you a document, please.

15   I show you the top.  Do you recognize the caption of

16   the case at the top?

17   A.    I do, yes, sir.

18   Q.    Okay.  Let me switch over to the last page.  Is

19   that your signature?

20   A.    Yes, sir, it is.

21   Q.    Okay.  Is this the affidavit that you signed in

22   the Curtis Ozenne lawsuit?

23   A.    From what I can see, it is.

24   Q.    Let me just hand it to you, sir.  Just take a

25   minute and read through that.

```
 1              (Document handed to the witness.)

 2    A.   (Witness complied.)  Yes, sir.

 3    BY MR. MCLINDON:

 4    Q.   Okay.  You can just hold on to that.

 5              MR. MCLINDON:  I take it you guys have a

 6    copy?

 7              MR. BLUMBERG:  Yes.

 8    BY MR. MCLINDON:

 9    Q.   Now, this affidavit, you mentioned, was given to

10    Curtis Ozenne's lawyer.  In fact, if you look at the

11    top, the caption of the case says what?

12    A.   Curtis Ozenne versus Deputy Jason Comeaux.

13              MR. MCLINDON:  Okay.  Your Honor, I move

14    to -- well, let me back up.  One more second.

15    BY MR. MCLINDON:

16    Q.   Then that affidavit was attached to one of your

17    pleadings that you filed into your lawsuit?

18    A.   I believe so, yes, sir.

19    Q.   Okay.  Let me show you this document right here.

20    Do you recognize that document?

21    A.   Yes, sir.  It looks like the lawsuit that I

22    filed.

23    Q.   Okay.  And if we turn to the last page, towards

24    the end, do you see that?  That's the same affidavit

25    that you have in front of you?
```

```
 1    A.    Yes, sir.

 2    Q.    Okay.

 3          MR. MCLINDON:  Your Honor, I would move to

 4    introduce as the defendant -- this is Exhibit F.  It is

 5    the first supplemental and amending petition of Wesley

 6    Hayes.  It's his civil lawsuit.

 7          MS. BOYD:  No objection.

 8          THE COURT:  It is received.

 9                (Exhibit F received into evidence.)

10    BY MR. MCLINDON:

11    Q.    Okay.  Now, let's go to that affidavit.  Do you

12    have it in front of you?

13    A.    Yes, sir.

14    Q.    The paragraph is not numbered, but the first

15    paragraph says, Before me.

16          MR. MCLINDON:  Okay.  And maybe I can just --

17    I would like to publish this to the Jury, Your Honor.

18          THE COURT:  All right.

19    BY MR. MCLINDON:

20    Q.    Okay.  Now, again, this was done for the Curtis

21    Ozenne lawsuit; is that right?

22    A.    Yes, sir.

23    Q.    Okay.  Now, I'm going to move down here to this

24    paragraph.  The IMPACT team, patrol officers.  Are you

25    with me?
```

1  A.    Yes, sir.

2  Q.    Now, do you see the last sentence of that

3  paragraph or the last part?  It says, *Sheriff Louis*

4  *Ackal came to the jail to assist at the direction of an*

5  *unknown authority.*

6              Do you see that?

7  A.    Yes, sir.

8  Q.    Okay.  And you're referring to the April 29th

9  shakedown when you say that; right?

10  A.    Right.

11  Q.    So Louis Ackal was not in charge that day, was

12  he?

13  A.    He was.  Once he arrived at the jail, he started

14  directing what was happening at the jail.  He became

15  ultimately in charge.

16  Q.    Well, that's not what you said in this affidavit,

17  is it?

18  A.    Well, I'm -- it was -- he came to the jail.

19  He -- he was in charge.

20  Q.    But that's not what you said in this affidavit,

21  is it?

22  A.    Not directly, but I'm just, you know, making it

23  known that he was directing what was happening.  But, I

24  mean, no, it doesn't say directly in there that, you

25  know, he was in charge.

Q.   Well, who was the assisting, it said, of an
unknown authority?  Who was that?

A.   I don't know who the unknown authority is.

Q.   Sir, didn't you draft this affidavit?

A.   I did, but what I'm -- I understand, and -- but
at the time I wrote this, I can tell you -- I mean, I
did leave some facts out of it and -- because I knew
that I was involved in some wrongdoing.  But when the
sheriff -- I can tell you, when he came, he was in
ultimate control of that jail.

Q.   That's your testimony today?

A.   Yes, sir.

Q.   But when you did this affidavit, that wasn't your
sworn testimony, was it?

A.   Correct.

Q.   Is the unknown authority you, Mr. Hayes?

A.   I -- no.  I mean, I --

Q.   Who outranks you at the jail?

A.   Within the jail?

Q.   Yes.

A.   I'm the ultimate authority at the jail.

Q.   You have no idea who the unknown authority is?

A.   It could have been -- I'm guessing I was
referring to myself.  I don't -- I don't know.

Q.   Now, let me talk to you about Curtis Ozenne on

```
 1   April 29th, 2011.  You're in the hallway, and Ben
 2   Lassalle comes walking with Curtis Ozenne, and he's
 3   escorting him?
 4   A.    Yes, sir.
 5   Q.    And the sheriff is already standing there next to
 6   you?
 7   A.    Yes, sir.
 8   Q.    Okay.  And that's when Mr. Lassalle asks you if
 9   there is a place without cameras?
10   A.    Correct.
11   Q.    Okay.  The sheriff did not know that the chapel
12   was cameraless, that it had no cameras?  He didn't know
13   that, did he?
14   A.    I believe he was aware of that, yes, sir.
15   Q.    Okay.  But when the question was asked, he just
16   sat there and didn't say word, did he?
17   A.    He didn't say anything, no, sir.
18   Q.    And Ben Lassalle directed his question directly
19   to you?
20   A.    Right.
21   Q.    Okay.  And was Ben Lassalle -- he came out of the
22   rec yard with Curtis Ozenne into the hallway?
23   A.    Yes, sir.
24   Q.    And was he by himself?  Did he have another guard
25   escorting him?
```

1   A.    Not that I'm aware of, no, sir.

2   Q.    You were in the chapel when Curtis Ozenne was

3   being beaten?

4   A.    Yes, sir.

5   Q.    And you didn't do anything about it?

6   A.    No, sir.

7   Q.    The sheriff was not in the chapel?

8   A.    No, sir.

9   Q.    The door was shut?

10  A.    Yes, sir.

11  Q.    Okay.  Was it shut to the extent that you had to

12  hit the intercom button to get out or use a key?

13  A.    Yeah, either/or.  A key or the intercom button.

14  Q.    I'm assuming as the warden, you had a key?

15  A.    Not on me at the time.  I didn't carry around a

16  key.

17  Q.    Okay.  But do you have a key?

18  A.    Oh, yeah.  There's a key that's for that door,

19  yes, sir.

20  Q.    But on that day, you didn't have it?

21  A.    I didn't have it on me, no, sir.

22  Q.    Do you remember how y'all got that door opened

23  when you wanted to put Ozenne in or take Ozenne out?

24  A.    Right.  I believe we used the intercom button.

25  Q.    And they would remotely open the door for you?

1    A.    Yes, sir.

2    Q.    Okay.  When Curtis Ozenne left, who escorted him

3    out of the jail -- out of the chapel?

4    A.    I don't remember exactly if it was Ben Lassalle

5    or if we had gotten another deputy to escort him back.

6    I'm not sure who it was particularly who escorted him.

7    Q.    Did you stay in the chapel?

8    A.    I stayed in the -- either in or around the

9    chapel.  Yes, sir.

10   Q.    And then he brought Scott Spears back?

11   A.    Correct.

12   Q.    Okay.  And y'all went back to the chapel and shut

13   the door again?

14   A.    Yes, sir.

15   Q.    Okay.  The blinds -- you wanted -- the

16   blinds were up on the windows?

17   A.    They were already up.  Yes, sir.

18   Q.    Okay.  And you didn't do anything to stop Ben

19   Lassalle?

20   A.    No, sir, I didn't.

21   Q.    The sheriff was not in there?

22   A.    No, sir.

23   Q.    Mr. Hayes, were you scared of Ben Lassalle?

24   A.    No, I wasn't scared of Ben Lassalle.  No, sir.

25   Q.    He's a pretty tough dude, though, isn't he?

1    A.    Oh, he is.  Yes, sir.

2    Q.    You weren't -- you weren't scared that if you

3    said something, he might whip your ass?

4    A.    Not that he would -- he would whip my ass, no,

5    sir.

6    Q.    You didn't have any fear of him physically

7    assaulting you?

8    A.    No, sir.

9    Q.    You testified about an incident involving an

10   inmate named Eric Mitchell.

11   A.    Yes, sir.

12   Q.    The sheriff was not there?

13   A.    No, sir.

14   Q.    Wasn't even in the jail?

15   A.    No, sir.

16   Q.    This was not the day of the shakedown.  This is

17   weeks or maybe months later?

18   A.    Correct.

19   Q.    Okay.  And Eric Mitchell did something which you

20   felt like he deserved to be punished for --

21   A.    Right.

22   Q.    -- is that right?

23         And who inflicted the punishment on Eric

24   Mitchell?

25   A.    It was a few officers.  It was myself, Gerald

1    Savoy, Jesse Hayes and Mark Frederick.

2    Q.    Okay.  And what was it that Eric Mitchell had

3    done to you?

4    A.    Oh, well, he had -- he had gotten in a -- in a

5    physical altercation with one of the jail deputies.

6    Q.    Now, the sheriff is not there.  Did you ever

7    think -- I mean, you're the Warden.  You're the number

8    one guy there.  Did you ever think of saying, *Guys,*

9    *look, we don't need to do this; the sheriff is not*

10   *here; the sheriff is not going to know about that;*

11   *let's just leave this guy alone; put him in solitary*

12   *confinement* or something like that?

13   A.    Well, no.  All I've ever known from the sheriff

14   is, if an inmate steps out of line, we could bring

15   somebody in to kick his ass.

16   Q.    But what I'm asking you, Mr. Hayes, as the

17   warden -- I mean, you're the number one guy there --

18   did you ever think to say to yourself or the people

19   below you, *Look*, *we don't need to do this; the sheriff*

20   *is not here; he's not even in the jail; we don't need*

21   *to do this; let's stop?*  Did you ever think about doing

22   that?

23   A.    I didn't because I knew what he expected of me.

24   Q.    But he was never going to find out.  If you did

25   it the right way, he never would know.

1    A.    I don't know that.  There were other officers

2    there, including Gerald Savoy, who was very close to

3    the sheriff, and I knew that, that could have very well

4    said, *Hey, you know, we wanted to whip this guy's ass,*

5    *and Wesley stopped us.*

6    Q.    And that would have been the right thing to do?

7    A.    It would have been the right thing to do.  Yes,

8    sir.

9    Q.    Before you were the warden, was Roberta Boudreaux

10   the Warden?

11   A.    Roberta Boudreaux was, yes, sir.  Well, not

12   immediately before me.  She was under the previous

13   sheriff.

14   Q.    Did you serve under Roberta Boudreaux?

15   A.    I did.

16   Q.    Is she a political enemy of Sheriff Ackal?

17   A.    She is.

18   Q.    When she was a warden, were there numerous civil

19   rights lawsuits filed?

20         MS. BOYD:  Objection, Your Honor.  Relevance.

21         THE COURT:  What's the relevance?

22         MR. MCLINDON:  The testimony has been that

23   all of this started in 2008 when Sheriff Ackal was

24   elected.  I think this tends to show --

25         THE COURT:  I'm going to sustain the

```
 1   objection.
 2              MR. MCLINDON:  So the objection is sustained?
 3              THE COURT:  Sustained.
 4              MR. MCLINDON:  Thank you, Your Honor.
 5              THE COURT:  We are not going to try the
 6   validity of prior officers.
 7              MR. MCLINDON:  Yes, sir.
 8   BY MR. MCLINDON:
 9   Q.   Mr. Hayes, were you fired or did you quit?
10   A.   I was terminated.  I was fired.
11   Q.   Who fired you?
12   A.   The sheriff did.
13   Q.   Where?
14   A.   The sheriff signed a documentation that -- of my
15   termination.
16   Q.   Okay.  Do you have that with you today?
17   A.   I do not have that.
18              MR. MCLINDON:  Is that an exhibit?
19              MS. BOYD:  (Shaking her head.)
20              MR. MCLINDON:  Okay.
21   BY MR. MCLINDON:
22   Q.   Do you have that somewhere at your house?
23   A.   Yes, sir.
24   Q.   Okay.  Now, you knew trial was today or this
25   week; right?
```

1   A.    Yes, sir.

2   Q.    Okay.  Did it ever cross your mind to bring that

3   document with you?

4            MS. BOYD:  Objection.  Relevance.

5            THE COURT:  Sustained.

6   BY MR. MCLINDON:

7   Q.    How did you get this document?

8   A.    It was issued to me the day that I was told to

9   report to the Iberia courthouse to sign my termination

10  papers.

11  Q.    Okay.  Describe it.  What does the document look

12  like?

13  A.    It's a just a one-page document.  It's called a

14  PAR, Personnel Action Request form.  And it states

15  briefly the officer who is being affected and whatever.

16  It could be to hire, fire, promote.  It basically

17  just -- it's a change of status form.

18  Q.    And the change of status said what, you're fired?

19  A.    Termination.

20  Q.    Termination, okay.  Did you feel like this

21  termination was justified?

22  A.    No, sir, I did not.

23  Q.    What was the reason for the termination?

24  A.    Well, I had submitted a video of an incident

25  involving a K-9 officer allowing a K-9 dog to bite at

1    an inmate, as well as strike an inmate who was laying

2    facedown.  And I turned it in to first the inmate --

3    the deputy's supervisor.

4         When nothing was done, I turned it in to

5    Gerald Savoy, who was over investigations, and he

6    assured me it would get to the chief deputy and the

7    sheriff.  And eventually, a few months later, I'm

8    terminated.

9    Q.    A few months after that?

10   A.    Right.

11   Q.    Okay.  Now, that K-9 incident you're talking

12   about has nothing to do with this, what we've been

13   talking about today; is it?  It's not the day of the

14   shakedown or anything like that.

15   A.    No, sir.

16   Q.    So you decided to report this K-9 incident?

17   A.    I did.

18   Q.    Well, what's going on?  Because you said earlier

19   on the Eric Mitchell, you know, I asked you why didn't

20   you just take charge?  And what happened?  Why all of a

21   sudden you decided to report it now?

22   A.    I had video evidence of something that had

23   occurred in the jail, and I decided to report it.

24   Q.    Now, you remember, sir, that the Department of

25   Corrections came in and did an audit of your jail; is

1    that right?

2    A.    An audit?  You mean, that occurred on an

3    occasional basis, yes, sir.

4    Q.    Okay.  Do you remember an audit that said that

5    there was money was missing and that your jail was

6    being run very poorly?

7    A.    There was money missing?

8    Q.    Yes.

9    A.    I don't recall.

10    Q.    Do you remember there being an audit that said

11    your jail was being run very poorly and it needed a lot

12    of improvement?

13    A.    I think there was an audit that was done after I

14    was terminated; that the Department of Corrections came

15    in and did an audit.  We had regular audits that were

16    required by the Department of Corrections but, I mean,

17    there was no reports of any, you know, poor running of

18    the jail or money missing.

19    Q.    Well, do you remember the date you were

20    terminated?

21    A.    I do.  It was October, I believe, 23rd, 2013.

22    Q.    Okay.  And were there allegations that your

23    jail -- you were doing a bad job as warden?

24    A.    Not to my knowledge, no, sir.

25    Q.    Did you ever take your badge off and take your

```
1    shirt off and lay them down and throw them on the
2    ground?
3    A.    I did take my badge off.  I put it on the desk at
4    one point during an argument with Gerald Savoy and then
5    I said, well, I'm going to speak to the sheriff.  I put
6    my badge back on and I went to report to the courthouse
7    to try to speak to the sheriff.
8    Q.    You didn't tell Gerald Savoy you took your badge
9    off and said, I quit?
10   A.    I may have in the heat of the moment, but I just,
11   you know, I decided instead of taking -- making a bad
12   decision and quitting, that I would go and take it up
13   with the sheriff.
14   Q.    What was the time line between you taking your
15   badge off and telling Gerald Savoy you quit and when
16   you got that termination paper?
17   A.    Um --
18   Q.    How much longer?
19   A.    A few days.  That same day, I was told that Jesse
20   Hayes and another officer, Lieutenant Camellia Prince,
21   were going to be terminated and that I was not going to
22   be terminated.  And then later on after their
23   termination, a few hours later, I was put on
24   administrative leave for the rest of the week.  Excuse
25   me.  And then during the course of that weekend, I was
```

```
 1    notified I was terminated and to report to the

 2    courthouse on Monday.

 3    Q.   And you felt this termination was not fair?

 4    A.   Right.

 5    Q.   And it made you angry?

 6    A.   Yeah.

 7    Q.   Okay.  You are angry at Sheriff Ackal?

 8    A.   Well, sure.

 9    Q.   Is today payback?

10    A.   No, sir.

11              THE COURT:  Mr. McLindon.

12              MR. MCLINDON:  Sir?

13              THE COURT:  Have you reached a stopping place

14    or do you need a few minutes?

15              MR. MCLINDON:  Judge, I think I can do it in

16    ten minutes, yes, sir.

17    BY MR. MCLINDON:

18    Q.   Did you have a jailer named Jackie Rhines work

19    for you?

20    A.   Yes, sir.

21    Q.   Did Jackie Rhines use excessive force on an

22    inmate?

23    A.   Yes, sir, he did.

24    Q.   And Sheriff Ackal fired him?

25              MS. BOYD:  Objection.  Relevance, Your Honor.
```

1           MR. MCLINDON:  I beg your pardon?

2           MS. BOYD:  Relevance?

3           THE COURT:  I see the relevance.  Overruled.

4    Let's go ahead and take --

5           MR. MCLINDON:  All right.

6           THE COURT:  Five after 1:00.  Is that okay

7    with everybody?

8               (The Jury exits the courtroom.)

9           THE COURT:  Court is in recess until five

10   after 1:00.

11   (Lunch break recess at 12:05 p.m.; resuming 1:05 p.m.)

12                        *    *    *

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    November 2, 2016                              1:07 p.m.

 2                      ---o0o---

 3              A F T E R N O O N   S E S S I O N

 4                      ---o0o---

 5              THE COURT:  Anything before we bring the jury

 6    in?

 7              Bring them in, please.

 8              (The Jury enters the Courtroom.)

 9              THE COURT:  All right.  You may all be

10    seated.  Mr. Hayes, understand you are still under

11    oath.

12              THE WITNESS:  Yes, sir.

13    BY MR. MCLINDON:

14    Q.   Mr. Hayes, I think when we left off, I had

15    started to ask you about an employee of yours at the

16    jail named Rhimes, R-H-I-M-E-S?

17    A.   R-H-I-N-E.  Jackie Rhine.

18    Q.   Jackie?

19    A.   Yes, sir.

20    Q.   And did he engage in excessive force with an

21    inmate?

22    A.   He did.

23    Q.   And Sheriff Ackal fired him?

24    A.   Not while I was the warden of the jail.

25    Q.   Okay.  You since learned he was fired for that?
```

1    A.    Yes, sir.

2    Q.    Okay.  During the Spears incident, you said you

3    didn't try and do anything to stop it.  Did you hear

4    anyone else in the chapel try and stop it?

5    A.    No, sir.

6    Q.    You have had used excessive force yourself?

7    A.    Yes, sir.

8    Q.    Okay.  Have you been sued for it civilly?

9    A.    I may have been, and I'm not quite aware.

10   Q.    Were you sued by the family of Michael Jones?

11   A.    Yes, sir.

12   Q.    Okay.  For excessive force?

13   A.    Yes, sir.

14   Q.    In the jail?

15   A.    Yes, sir.

16   Q.    What happened to Michael Jones?

17   A.    Michael Jones resisted while we were attempting

18   to give him -- or get medical help for him, and we --

19   once we restrained him, we had Acadian Ambulance en

20   route, and the end result is Michael Jones ended up

21   passing away.

22   Q.    He died in the jail?

23   A.    He died in the jail.  Yes, sir.

24   Q.    And you laid hands on him that day?

25   A.    I did.

```
1    Q.    And your brother did, too?

2    A.    Yes, sir.

3    Q.    And you were sued for that?

4    A.    Right.  Yes, sir.

5    Q.    There were some questions earlier, and you were

6    shown a jail log.  There was a fight between Mr. Daye

7    and another inmate.  Do you remember the name of the

8    other inmate?

9    A.    It was Jabrison Lewis.

10   Q.    Okay.  That fight was the same day as the

11   shakedown?

12   A.    I believe so.  Yes, sir.

13   Q.    Okay.  It was earlier in the day?

14   A.    I believe it was in the evening.

15   Q.    Okay.  Was it prior to Mr. Daye being taken to

16   the chapel?

17   A.    I'm not sure of when he was taken to the chapel.

18   Q.    But y'all documented the fight?

19   A.    Correct.  Well, the control officer documented

20   the fight as it occurred.

21   Q.    I'm assuming you don't document every little

22   disturbance between inmates?

23   A.    In a perfect world, it would be but, I mean, no,

24   it doesn't get documented.  Not every single incident

25   -- incident.
```

Q.   In other words, it would have to be a pretty
serious fight to get documented?

A.   Right.  Yes, sir.

Q.   Okay.  Now, I'm going to ask you some questions
about the -- what you refer to as the no-touch
policy --

A.   Yes, sir.

Q.   -- that Sheriff Ackal had said.

He said he did not want inmates touching,
grabbing, kicking, shoving, spitting on the guards;
right?

A.   That's correct.

Q.   Okay.  Did you ever hear him say, *we're not going
to let the inmates run the prison*?

A.   Yes, sir, I have.

Q.   Was that a problem before he got there?

A.   Not -- no, sir.  I didn't find it to be a
problem.

Q.   Now, would y'all have monthly meetings when y'all
would talk about these things?

A.   Um --

Q.   Talk about what's going on at the jail?  How are
things going?  How are the inmates behaving?  Did y'all
talk about those at your monthly meetings?

A.   As far as with the sheriff?

1   Q.   Yeah.

2   A.   When I was a warden, we had weekly commanders

3  meetings.

4   Q.   Did the sheriff show up for those?

5   A.   Yes, sir.

6   Q.   Did y'all talk about these things?

7   A.   Yeah, on occasion we did.

8   Q.   At any time from the first meeting on, he never

9  said, *look, it's appropriate to beat somebody so badly*

10  *that they have to be carried out*?

11   A.   What he said was, you know, if an inmate stepped

12  out of line, you know, *kick his ass*, you know, *make*

13  *sure we teach him a lesson*.

14   Q.   But he never said *I want you to beat these guys*

15  *with batons* -- in fact, let me ask this.  Do you even

16  carry batons in the jail?

17   A.   No, sir.  I never did.  The staff did not carry

18  batons.

19   Q.   Certainly there's no firearms in the jail?

20   A.   No, sir.

21   Q.   And there's no batons.  So when the sheriff said

22  this no-touch policy, he obviously knew you guys didn't

23  carry batons; right?

24   A.   Right.

25   Q.   He never said, *look, bring batons in here and*

1    *just beat the hell out of these guys*?

2    A.    Not specifically, no, sir.

3    Q.    Now, if an inmate had a grievance of some sort,

4    whether he was -- if he says one of your jailers put

5    hands on him or shoved him or kicked him or whatever,

6    they can fill out a grievance form; is that right?

7    A.    That's correct.

8    Q.    And that ultimately ends up on your desk?

9    A.    Um, sometimes it does, yes, sir.

10   Q.    Okay.  And what you used to do is you take a

11   stack of them and you just push them to the side and

12   not pay attention to them?

13   A.    At times, yes, sir.

14   Q.    In your lawsuit against the sheriff, are you

15   seeking money?

16   A.    Yes, sir.

17   Q.    Do you know how much?

18   A.    No, sir.

19   Q.    In your plea agreement that you have with the

20   Government, they are not promising that they are going

21   to file a motion for you to reduce your sentence?

22   A.    No, sir.

23   Q.    They have not filed it yet?

24   A.    No, sir.

25   Q.    There is a possibility they're going to file it?

1    A.     There is a possibility.

2    Q.     Okay.  And does that depend on you coming to

3    court today?

4    A.     It depends on me providing the true and

5    substantial assistance to the Government.

6    Q.     Well, what if you just say, *look, I don't want to*

7    *come to court.  I'm not testifying*.  Would you agree

8    with me there's no chance they would ever file that

9    motion for you if you took that position?

10   A.     I don't know what they would do.  I'm -- I can't

11   say what they would do.

12   Q.     But the best way to get that motion filed is for

13   you to come in here and tell your story?

14   A.     Well, yeah.  I mean, you know, and it's not the

15   only reason I want to come here and tell my story.

16   But, yeah.

17   Q.     And you have not been truthful with the federal

18   agents before, have you?

19   A.     At the very beginning, I did leave out some facts

20   of these incidents.

21   Q.     And you were untruthful in your court filings in

22   your civil lawsuit?

23   A.     Yes, sir.  I did leave out some facts in the

24   early court filings.

25          MR. MCLINDON:  Thank you very much.

```
 1                    THE COURT:  Redirect?

 2                    MS. BOYD:  Yes, Your Honor.

 3                         REDIRECT EXAMINATION

 4    BY MS. BOYD:

 5    Q.    Mr. Hayes, you were asked some questions

 6    about the defendant's knowledge about what was going on

 7    in the jail, what was going on in the chapel.

 8                    Do you remember those questions?

 9    A.    Yes, ma'am.

10    Q.    You talked about some of the things that the

11    defendant had said in prior commander meetings?

12    A.    Yes, ma'am.

13    Q.    Were there occasions aside from those commander

14    meetings where the defendant was present at the jail

15    and there were inmates that were being abused in his

16    presence?

17    A.    Yes, ma'am.

18    Q.    How did the defendant respond to those instances?

19    A.    He was very accepting.  He -- he allowed it to

20    happen in his presence.

21    Q.    Was that prior to the shakedown on April 29th,

22    2011?

23    A.    Yes, ma'am.

24    Q.    What types of things would the defendant say in

25    the meetings with commanders that you were at regarding
```

1    the people of Iberia Parish?

2    A.    Um, the sheriff expressed multiple times his

3    displeasure with a certain section of New Iberia.

4    Q.    What section was that?

5    A.    It's called the West End.  It's a community

6    that's predominantly a black community.  In these

7    meetings, when something would happen in the West End

8    or there was an incident there, he would refer to the

9    residents of the West End as *porch monkeys*.  He

10   referred to them in racially charged terms such as

11   using the word "nigger" and just calling them *animals*.

12   Q.    What impact did that have on how you treated

13   people at the jail?

14   A.    That he had no regard for -- for people and the

15   way that they were treated.  That he was above and that

16   he put us above people, just normal people, whether

17   they be in the jail or not, that we would treat them as

18   they were below us.

19   Q.    So did you act in accordance with that?

20   A.    I did.

21   Q.    You were asked some questions about Gerald Savoy

22   in relation to the Eric Mitchell incident?

23   A.    Yes, ma'am.

24   Q.    What was the relationship between Gerald Savoy

25   and the defendant?

1    A.    They were very close.  I put him -- I mentioned

2    earlier Bert Berry as being one of the sheriff's

3    right-hand men, and Gerald Savoy was right along with

4    him.  In other words, you would rarely see one without

5    the other two.  They were very close.  I mean, their

6    relationship was very strong.

7    Q.    You were asked questions about whether or not the

8    defendant was present when Eric Mitchell was taken to

9    the chapel that day.  Was he present?

10   A.    The sheriff was present, yes, when we took him to

11   the chapel.  He wasn't present in the chapel, but he

12   was present when we took him to the chapel.

13   Q.    Was the sheriff related in any -- strike that.

14         Let me ask you about what you were talking

15   about in terms of Mr. Savoy's knowledge of your

16   reaction to abusing Mr. Mitchell in the chapel.

17   A.    I'm sorry.  Can you repeat that?

18   Q.    You testified earlier that you had some concerns

19   about stopping Mr. Savoy from abusing Eric Mitchell in

20   the chapel?

21   A.    Right.

22   Q.    Where did those concerns come from?  What were

23   you worried about?

24   A.    Well, that I would -- that if I were to stop him

25   or anyone else, that I would have to face disciplinary

1    action from Sheriff Ackal.

2    Q.    Why did you think the sheriff would find out

3    about you stopping Gerald Savoy from abusing

4    Mr. Mitchell in the chapel?

5    A.    When we found out about the incident and we

6    viewed it on the video, Gerald Savoy was extremely

7    beside himself, he was livid.  I could tell by the way

8    he looked, the look on his face, he was really pissed

9    off and he was ready to hem this guy up.  And if I had

10   said, *well, let's take a step back, let's not do this,*

11   *it's not right*, I fully believe he would have gone to

12   Sheriff Ackal and say, *hey, this guy touched a deputy.*

13   *We were going to kick his ass and Wesley stopped us.*

14   Q.    What did you think would happen if Gerald Savoy

15   told the defendant that?

16   A.    Likely I would have been disciplined as far as

17   demotion or even termination.

18   Q.    And that's discipline for not having participated

19   in that abuse?

20   A.    That's correct.

21   Q.    You were asked questions about why you turned

22   over the video involving the use of a dog on the rec

23   yard?

24   A.    Yes, ma'am.

25   Q.    Okay.  I want to ask you about that.  Was there

1    any video of what happened in the chapel on April 29th,

2    2011?

3    A.    No, ma'am.

4    Q.    So why were you concerned about the video and the

5    dog incident?

6    A.    Because it was caught on video and it was

7    witnessed by several deputies, and I knew that it could

8    possibly come up and come back against me if I had not

9    turned it in.  I had no participation in it as well,

10   and I was aware of the video.

11   Q.    How is that different from what happened with the

12   chapel incident?

13   A.    Um, in the chapel, I knew that it was agreed upon

14   between me and the other participating officers and

15   that it, you know, there would be no repercussion for

16   those because there was no evidence, no video evidence.

17   Q.    You were asked about the firing of Jackie Rhine

18   from the jail?

19   A.    Yes, ma'am.

20   Q.    Was Jackie Rhine fired before or after the

21   federal investigation began into what happened in the

22   chapel?

23   A.    I believe it was -- I have to say after.  I'm not

24   sure of the exact timeline that he was fired.  But I

25   believe it was after the federal investigation had

begun.

Q.    Do you know when he was fired in relationship to when you first met with federal investigators?

A.    No, ma'am, I do not.

Q.    You were asked about entering into a plea agreement with the Government?

A.    Yes, ma'am.

Q.    What condition -- or what is the condition of your plea agreement?  What is your part of that bargain?

A.    To testify to the truth of my participation and what I did and failed to act to do within these jail beatings that occurred in the chapel.

          MS. BOYD:  Can I have the Court's indulgence for a moment?

          THE COURT:  You may.

          MS. BOYD:  No further questions, Your Honor.

          THE COURT:  All right.  Is the witness excused?

          MS. BOYD:  Yes, Your Honor.

          THE COURT:  You're excused, sir.  You're free to go.

          THE WITNESS:  Thank you, Your Honor.

          THE COURT:  Call your next witness.

          MR. BLUMBERG:  The Government calls Bret

1    Broussard, Your Honor.

2              (Pause in the proceedings.)

3              THE COURTROOM DEPUTY:  Please raise your

4    right hand.  Do you solemnly swear the testimony you

5    will give in this case will be the truth, the whole

6    truth and nothing but the truth, so help you God?

7              THE WITNESS:  I do.

8              THE COURTROOM DEPUTY:  Would you please spell

9    your first and last name for the Court Reporter.

10             THE WITNESS:  Bret, B-R-E-T, Broussard,

11   B-R-O-U-S-S-A-R-D.

12             THE COURTROOM DEPUTY:  Thank you.

13                       BRET BROUSSARD,

14    first having been duly sworn by the Courtroom Deputy,

15             testifies under oath as follows:

16        MR. BLUMBERG:  You can have a seat, sir.

17                   DIRECT EXAMINATION

18   BY MR. BLUMBERG:

19   Q.   Good afternoon, Mr. Broussard.

20   A.   Good afternoon.

21   Q.   You have a soft voice.  I'm going to ask to make

22   sure you speak loudly and close to the microphone, if

23   that's okay.

24   A.   Okay.

25   Q.   Thank you.  Sir, please introduce yourself to the

```
 1    Jury.  How old are you?  Where do you live?

 2    A.    My name is Bret Broussard.  I'm 35 years old and

 3    I live in Broussard, Louisiana.

 4    Q.    Can you speak loudly and slowly so she gets

 5    everything down?  Okay?

 6    A.    (Nodding in the affirmative.)

 7    Q.    Okay.  Are you a little nervous about being here

 8    today?

 9    A.    Yes, sir.

10    Q.    Why?

11    A.    Intimidating experience.

12    Q.    Why?

13    A.    It just is intimidating to me, you know, to be in

14    here.  Whole thing.

15    Q.    Okay.  Did you plead guilty to committing crimes,

16    Mr. Broussard?

17    A.    Yes, sir.

18    Q.    Are you going to testify about those today?

19    A.    Yes, sir.

20    Q.    Is that part of why this is an intimidating

21    experience for you?

22    A.    Yes, sir.

23    Q.    Are you worried about going to jail?

24    A.    Yes, sir.

25    Q.    When did you first start in law enforcement?
```

```
 1    A.    Sometime in 2004.

 2    Q.    Who did you start with?

 3    A.    Iberia Parish Sheriff's Office.

 4    Q.    What were your responsibilities at the time?

 5    A.    Just general patrol duties.

 6    Q.    Okay.  How long were you in general patrol

 7    duties?

 8    A.    A few years.

 9    Q.    What was it like being in patrol?

10    A.    Um, at first, when I first started, it was -- it

11    was quiet.  It wasn't high-call volume.  There wasn't

12    much going on.

13    Q.    Over time, did that change?

14    A.    Yeah, it did change when the city consolidated

15    police services with the sheriff's office.

16    Q.    How did that affect you?

17    A.    Worked a lot.  Didn't have enough people to cover

18    all shifts and everything, so we had to work a lot all

19    the time.

20    Q.    To be clear, there were two separate law

21    enforcement agencies in the parish at the time; is that

22    what you mean?

23    A.    Correct.

24    Q.    One for the city?

25    A.    Correct.
```

1   Q.   And one for the parish?

2   A.   Correct.

3   Q.   And what you are saying is they consolidated into

4   one law enforcement agency?

5   A.   Correct.

6   Q.   And that was the sheriff's department?

7   A.   Correct.

8   Q.   Okay.  Where did you go after you were in patrol?

9   A.   To narcotics.

10   Q.   What year did you go to narcotics?

11   A.   I believe it was 2009.

12   Q.   All right.  Do you remember Louis Ackal being

13   elected sheriff in the Summer of 2008?

14   A.   Yes, sir.

15   Q.   When was the first time you had a chance to see

16   Louis Ackal personally?

17   A.   I'm not sure.

18   Q.   Did you see him in the Summer of 2008 while you

19   were a patrol deputy still?

20   A.   I'm sure.  I just don't recall.

21   Q.   Do you ever remember being present in the jail

22   with Louis Ackal in the Summer Or Fall of 2008?

23   A.   Yes.

24   Q.   Was anything special going on in the jail that

25   day?

```
 1    A.    We were doing a -- what they call a shakedown

 2    with --

 3              THE COURT:  Okay.  You're going to have to

 4    speak up.  The Jury is having difficulty hearing you,

 5    sir.

 6              THE WITNESS:  I'm sorry.  We were doing what

 7    was called a shakedown with prison guards from Angola

 8    penitentiary.

 9    BY MR. BLUMBERG:

10    Q.    Where is Angola?

11    A.    It's a penitentiary, I think around maybe

12    St. Francisville, Baton Rouge somewhere.

13    Q.    Why was there a shakedown taking place with

14    Angola prison guards?

15    A.    I'm not sure.

16    Q.    How did you know that you should be at the jail

17    that day?

18    A.    We got called by our supervisors.

19    Q.    Who got called?

20    A.    I did, and there was quite a few other people

21    there.

22    Q.    What were the Angola guards like?

23    A.    Um, they were different.  Pretty aggressive.

24    Q.    How?

25    A.    They had brought some dogs with them, some K-9s.
```

```
 1   They weren't -- I don't remember them being like

 2   regular police K-9s.  They looked kind of like mutts

 3   from the pound, honestly.  You know, they were putting

 4   dogs on inmates for no reason, making them bite them.

 5   Q.    Tell the members of the Jury what you saw happen.

 6   A.    Um, they would make the K-9s bite deputies -- I'm

 7   sorry -- bite inmates that were lined up against the

 8   walls and stuff like that.

 9   Q.    Now, you have had Use of Force training as a

10   patrol officer; haven't you?

11   A.    Yes, sir.

12   Q.    Did you have to receive Use of Force training in

13   order to become POST-certified?

14   A.    Yes, sir.

15   Q.    Are you POST-certified?

16   A.    Yes, sir.

17   Q.    And did you learn when you could and could not

18   use force against a handcuffed or restrained inmate or

19   detainee?

20   A.    Yes, sir.

21   Q.    In your opinion, did what you see with the Angola

22   guards and the dogs violate those Use of Force

23   principles?

24   A.    Yes, sir.

25   Q.    How many times do you think you saw those
```

```
1   principles violated that day by the Angola guards?

2   A.    Quite a few.  I couldn't put a number to it.

3   Q.    More than one?

4   A.    Yes.

5   Q.    More than ten?

6   A.    It's hard to say.  It's hard to put a number to

7   it.

8   Q.    Was Louis Ackal present in the jail that day?

9   A.    Yes, sir.

10  Q.    Did he see the things you saw?

11  A.    I don't know everything he saw, but I'm sure he

12  did.

13  Q.    Why are you sure?

14  A.    Because I remember one incident.  It was in one

15  of the pods.  I don't know which one it was.  He was

16  sitting on one of the benches out in the middle, and a

17  prison guard from Angola had an inmate on his knees on

18  the side of him, and the sheriff was asking him

19  questions.  And, you know, if he didn't respond quickly

20  enough or for whatever reason, the guard would smack

21  him in the side of the head.

22  Q.    And if the inmate had responded quickly enough

23  for Louis Ackal's taste, how did the Angola guard

24  respond?

25  A.    I don't remember.
```

```
 1   Q.    Do you remember saying that he petted the inmate
 2   like a dog?
 3   A.    Oh, yes, he did.  Yes, sir.
 4   Q.    How hard was the inmate struck if he didn't
 5   respond quickly enough?
 6   A.    It wasn't that hard.  It's kind of hard to
 7   describe.
 8   Q.    Did it give you an impression of how Louis Ackal
 9   felt about uses of force towards people in his custody?
10   A.    That it didn't matter to him.
11   Q.    Did Louis Ackal ever tell the Angola guard not to
12   strike the inmate?
13   A.    No, sir.
14   Q.    Did he tell him not to pet him like a dog?
15   A.    No, sir.
16   Q.    What was Louis Ackal's reaction when he would see
17   the inmate struck?
18   A.    I don't remember if he had a specific reaction,
19   but he didn't stop it.
20   Q.    Did he laugh?
21   A.    I don't remember if he laughed or not.
22   Q.    Did you see any other inmates in the presence of
23   Louis Ackal that day?
24   A.    There was a lot of inmates.
25   Q.    Sorry.  That's a fair point.
```

```
 1              Did you see an inmate injured, thrown into a

 2    hallway, who needed medical care that day?

 3    A.    Yes.

 4    Q.    Describe what you saw to the members of the jury.

 5    A.    Some of the Angola prison guards brought one --

 6    an inmate from somewhere in the jail to the front door

 7    and said his shoulder was broken.

 8    Q.    What happened to the inmate?

 9    A.    You mean, how did his shoulder get broken?

10    Q.    No.  What happened to the inmate that you saw?

11    A.    He was just left there.

12    Q.    Where?

13    A.    By the front door.

14    Q.    On the floor?

15    A.    Yes, sir.

16    Q.    Without medical care?

17    A.    The sheriff told them to bring him to the

18    hospital.

19    Q.    And what was the sheriff's reaction to what

20    Angola said?  -

21    A.    I'm sorry.  I didn't --

22    Q.    What was the sheriff's reaction to what the

23    Angola guard said?

24    A.    All he said was his shoulder was broken.  I don't

25    know how it -- how it happened.
```

1   Q.    Did he laugh or chastise anybody?

2   A.    No.

3   Q.    Did he ask any questions about how the inmate's

4   shoulder was broken?

5   A.    Not that I can remember.

6   Q.    What was your impression of Louis Ackal's feeling

7   about uses of force from what you saw that day when the

8   Angola guards participated in the shakedown?

9   A.    That he didn't disapprove of it.

10  Q.    Use of abusive force?

11  A.    Right.

12  Q.    What impact did that have on you as a patrol

13  deputy in the Iberia Parish Sheriff's Office?

14  A.    That, you know, you could do things that you

15  weren't supposed to and not fear getting in trouble for

16  it.

17  Q.    And did you do things you weren't supposed to?

18  A.    Yes, sir.

19  Q.    Did you get in any trouble for it?

20  A.    No, sir.

21  Q.    When is the first time you remember engaging in

22  physical force that was excessive, as a patrol deputy?

23  A.    Sometime on patrol.

24  Q.    About how many times, roughly?

25  A.    Five, ten.  It's hard to say.

```
 1   Q.    Did you use your baton on people you weren't
 2   supposed to use your baton on?
 3   A.    Yes, sir.
 4   Q.    Give an example of the time in which you did
 5   that, to the jury.
 6   A.    There was one guy that we were -- had a call on
 7   at his house.  I am not sure what we were there for,
 8   but we were dispatched there.  And he kept, you know,
 9   running his mouth to us, and I hit him with my baton.
10   Q.    Was he posing a risk of harm to you?
11   A.    No, sir.
12   Q.    Was he trying to run away?
13   A.    No, sir.
14   Q.    Was he trying to hurt himself or somebody else?
15   A.    No, sir.
16   Q.    Why did you hit him with a baton?
17   A.    I just did it, you know.  I didn't think about
18   it.  I just made a bad decision.
19   Q.    You were kind of happy with that decision,
20   weren't you, at the time?
21   A.    Yeah.
22   Q.    You bragged about it a bit?
23   A.    Yes, sir.
24   Q.    You actually named your baton after that fella,
25   didn't you?
```

```
1    A.    Yes, sir.

2    Q.    What was the baton's name after that?

3    A.    Walter.

4    Q.    Okay.  So how many times do you think in your

5    career as a law enforcement agent that you used more

6    force than was reasonably necessary against somebody in

7    your custody?

8    A.    It's really hard to say.  A few.

9    Q.    Dozens?

10   A.    I would say so.

11   Q.    How about if you include all those instances in

12   which you saw somebody else using force that they

13   weren't supposed to do and you failed to stop it?

14   A.    Dozens.

15   Q.    Would you say that was the common practice among

16   the narcotics agents when you finally made it into

17   narcotics?

18   A.    Yes, sir.

19   Q.    What year did you -- what month and year did you

20   go into narcotics?  Do you remember?

21   A.    I'm not sure of the month, but it was 2009, I

22   believe.

23   Q.    Summertime or fall, thereabouts?

24   A.    Probably.

25   Q.    All right.  At times either as a patrol deputy or
```

```
 1    as a narcotics agent, were you called to scenes in
 2    which Louis Ackal would arrive, himself?
 3    A.    Yes.
 4    Q.    At those instances, who would take control of the
 5    scenes that you were present at?
 6    A.    He would.
 7    Q.    What about if there were other commanders
 8    present?  Who would take control?
 9    A.    He's still the sheriff, you know.  He was
10    ultimately in charge.
11    Q.    How would he exercise that control?
12    A.    Um, pretty abrasive and wanted things done his
13    way.
14    Q.    Was there ever any doubt when he was on a scene
15    as to who was in control of the scene?
16    A.    No.  He was the sheriff.
17    Q.    I'm asking you how he acted.  Did he act in a way
18    that he took control of the scenes?
19    A.    Oh, yes, sir.
20    Q.    Okay.  Did you hear how he talked to people
21    within the custody of the sheriff's department when he
22    arrived on the scenes?
23    A.    Yes, sir, sometimes.
24    Q.    Did the sheriff appear to have a problem with the
25    way he talked to African-American people in the custody
```

1    of the sheriff's deputies when you were present?

2    A.    I'm sorry.  I don't quite understand your

3    question.

4    Q.    Yeah.  Did he go ahead and use slurs when talking

5    to people in custody when you were present?

6    A.    Yes.

7    Q.    How did he do that?  Give some examples.

8    A.    He used racial --

9          MR. MCLINDON:  I want to enter an objection

10   at this point.

11         THE COURT:  Beg your pardon?

12         MR. MCLINDON:  I would like to enter an

13   objection.

14         THE COURT:  I'm going to sustain it.

15   BY MR. BLUMBERG:

16   Q.    Did you get the impression -- whatever the

17   comments were that Louis Ackal made toward

18   African-Americans, without going into any details, when

19   they were in custody and your presence, did he give you

20   an impression of how Louis Ackal wanted you to act

21   towards those people?

22         MR. MCLINDON:  Objection.  Calls for

23   speculation.

24         THE COURT:  I'm going to permit the answer.

25   ***

1   BY MR. BLUMBERG:

2   Q.   Do you understand the question, Mr. Broussard?

3            THE COURT:  Just "yes," "no," or "I don't

4   know."

5            THE WITNESS:  Can you repeat it again,

6   please.

7   BY MR. BLUMBERG:

8   Q.   Yeah.  Did you get an impression how Louis Ackal

9   wanted you to act toward African-American people within

10  your custody?

11  A.   Yes.

12  Q.   What was that impression that you received?

13           MR. MCLINDON:  That's where I object.

14  Speculation.

15           THE COURT:  No.  It's his impression.  I'm

16  going to permit it, and let's then move on.

17  BY MR. BLUMBERG:

18  Q.   You can answer it, sir.

19  A.   Can you repeat it for me?

20  Q.   Yeah.  How did you think he wanted you to act

21  toward the black people in your custody?

22  A.   He didn't care about them.

23  Q.   What does that mean exactly?

24           THE COURT:  Okay.  That's it.  Let's move on.

25           MR. BLUMBERG:  Yes, sir.

BY MR. BLUMBERG:

Q.    Based on those impressions, did you, in fact, act in a way toward African-American people in your custody?

A.    Yes, sir.

Q.    Okay.  And what would that have been?

A.    I spoke to them, you know, using racial slurs; used force on them.

Q.    Force that was appropriate or force that was inappropriate?

A.    Both.

Q.    And when you say inappropriate force, what are you talking about?

A.    It wasn't needed to control them or restrain them in any way.

Q.    Did you rise to the level of a supervisor in the narcotics unit?

A.    Yes, sir.

Q.    Were you aware of the fact that your fellow narcotics agents were acting by using inappropriate force toward people within their custody?

A.    Yes, sir.

Q.    Did you do anything to stop it?

A.    No, sir.

Q.    Who was your immediate supervisor?

1    A.    Gerald Savoy.

2    Q.    Was Gerald Savoy aware of the fact that people

3    within the narcotics unit were beating people up

4    without justification?

5    A.    Yes, sir.

6    Q.    How do you know that?

7    A.    He was around, saw it.

8            THE COURT:  Louder, please.

9            THE WITNESS:  He was around when it occurred.

10   BY MR. BLUMBERG:

11   Q.    Did he ever object?

12   A.    No, sir.

13   Q.    Did you ever feel a concern that he would find

14   out and tell somebody?

15   A.    No, sir.

16   Q.    What was his relationship with Louis Ackal?

17   A.    Um, I think they were pretty close.

18   Q.    How do you know that?

19   A.    Just hearing him talk, you know, about the

20   sheriff, and I got the impression they were pretty

21   close.

22   Q.    Did you ever get the -- did Gerald Savoy relay

23   messages back and forth between narcotics and the

24   sheriff?

25   A.    Yeah.  He wanted certain things done, taken care

1    of.

2    Q.    Was there somebody else in the unit that had a

3    close relationship with Louis Ackal?

4    A.    Yes, sir.

5    Q.    Who was that?

6    A.    Jason Comeaux.

7    Q.    And did Jason Comeaux relay messages back and

8    forth between the sheriff and the narcotics unit?

9    A.    I'm sure he did.  I can't think of anything

10   specific, though.

11   Q.    Do you have a recollection at least of

12   instructions being relayed back from the sheriff

13   through Jason Comeaux?

14   A.    Not really, no, sir.

15   Q.    Fair enough.  What about the instance of Ricky

16   Roche?  Do you know Ricky Roche?

17   A.    Yes, sir.

18           MR. BLUMBERG:  Now, with the Court's

19   permission, I'll lead through some of this a bit.

20   BY MR. BLUMBERG:

21   Q.    Mr. Roche was somebody who was accused of taking

22   a swing at Gerald Savoy; correct?

23   A.    Yes, sir.

24   Q.    And in the end, he got targeted by the narcotics

25   unit for abuse; isn't that right?

1   A.    Yes, sir.

2   Q.    Okay.  Why was he targeted?

3   A.    Because that's what Savoy had ordered us to do.

4   Q.    Where did that information come from -- what did

5   Savoy tell you?  That is, where -- forget that.

6         Why did you obey what Gerald Savoy told you

7   to do?

8   A.    He was my supervisor.  I didn't want to go

9   against him, you know.  I wanted to be accepted.

10  Q.    How was Ricky Roche abused?

11  A.    He was beaten.

12  Q.    Who beat him?

13  A.    Jason Comeaux and Todd Anslum.

14  Q.    Anybody else?

15  A.    That's the only two I saw.  But when he was

16  arrested, Ben Lassalle and Wade Bergeron.

17  Q.    How do you know that?

18  A.    Because they told us.

19  Q.    Did you come upon the scene while that beating

20  was taking place?

21  A.    No, sir.

22  Q.    Did you come up on it afterwards?

23  A.    Yes, sir.

24  Q.    All right.  And when did they tell you that they

25  beat him?

1    A.    Maybe it was at the office.  I'm not exactly

2    sure.

3    Q.    Okay.  And your understanding was that that use

4    of force by Lassalle and Bergeron was inappropriate;

5    correct?

6    A.    They said he resisted.  I mean, they didn't go

7    into detail about it, whether they went overboard or

8    not.

9    Q.    Okay.  Did you -- did you conduct any

10   investigation into the fact that Jason Comeaux and Todd

11   Anslum used more force than was necessary on Ricky

12   Roche?

13   A.    No, sir.

14   Q.    And you actually saw them strike him, Ricky

15   Roche, while he was shackled to a bench; right?

16   A.    Yes, sir.

17   Q.    Why didn't you do something about it?

18   A.    Because I knew that's what Savoy wanted.

19   Q.    Okay.  How did you know that Gerald -- well,

20   never mind.

21         I want to bring your attention to April 29th,

22   2011, at the Iberia Parish jail; okay?

23   A.    Yes, sir.

24   Q.    All right.  Were you there?

25   A.    Yes, sir.

```
 1    Q.    What capacity did you arrive in?  What were you

 2    doing there?

 3    A.    We were called to assist with the shakedown.

 4    Q.    Okay.  And what was your role?

 5    A.    Just to assist.

 6    Q.    And were you there as a SWAT team member, as a

 7    narcotics team member?  Why were you there?

 8    A.    I believe I was there as a narcotics.

 9    Q.    Did you assist in the shakedown?

10    A.    Yes, sir.

11    Q.    What did you do?

12    A.    We moved inmates in and out of pods, searched

13    pods for contraband, stuff of that nature.

14    Q.    Did you find yourself in a chapel that day?

15    A.    Yes, sir.

16    Q.    Did you find yourself in a chapel with inmates?

17    A.    Yes, sir.

18    Q.    How did you wind up in the chapel that day?

19    A.    Um, I was walking down one of the halls.  I don't

20    know the names of the pods or anything like that.  And

21    I came across Ben Lassalle, who had an inmate on his

22    knees against the wall, Gerald Savoy and the sheriff

23    and Wesley Hayes.

24    Q.    What was going on?

25    A.    When I walked up, the sheriff was asking Wesley,
```

1    who was the warden, where in the jail they didn't have

2    any cameras, surveillance cameras.

3    Q.    What did you understand the significance of that

4    question to be?

5    A.    That an inmate had done something and, you know,

6    wanted him retaliated against where it wouldn't be on

7    film.

8    Q.    Why was that your impression?

9            THE COURT:  You're really going to have to

10   try to speak up, please, sir.

11           THE WITNESS:  I'm sorry, Your Honor.

12   BY MR. BLUMBERG:

13   Q.    Why was that your impression, sir?

14   A.    Why else would he want to know where there was no

15   cameras?

16   Q.    What happened?

17   A.    The warden told him the chapel.  And Ben and the

18   warden started walking towards the chapel with the

19   inmate.  I followed them, and Jeremy Hatley also

20   followed us.

21   Q.    Did you go into the chapel?

22   A.    Yes, sir.

23   Q.    Do you remember the race of the inmate that you

24   went in with?

25   A.    No, sir.

1   Q.   Now, before we find out what happened in that

2   chapel, Mr. Broussard, you've had the chance to talk

3   about these events with the federal government on

4   several occasions in the past; right?

5   A.   Yes, sir.

6   Q.   Have you been honest with them every single time

7   you've spoken with federal agents?

8   A.   No, sir.

9   Q.   Sometimes you made falsehoods in order to protect

10   yourself; right?

11   A.   Yes, sir.

12   Q.   Sometimes you made falsehoods to try and say you

13   were places that you weren't?

14   A.   Yes, sir.

15   Q.   What did you plead guilty to?

16   A.   Deprivation of rights.

17   Q.   For what?

18   A.   This chapel incident.

19   Q.   What was your responsibility?

20   A.   I was present and didn't stop it.

21   Q.   What was the condition of your plea agreement?

22   A.   Um, that I would testify.

23   Q.   Just testify?

24   A.   Truthfully.

25   Q.   Do you know what's going to happen to you, sir?

1    A.    No, sir.

2    Q.    Do you know if you're going to jail?

3    A.    No, sir.

4    Q.    Do you know if the federal government is going to

5    make any recommendations on your behalf one way or the

6    other?

7    A.    No, sir.

8    Q.    Do you hope they do?

9    A.    Yes, sir.

10   Q.    What do you think is going to happen?

11   A.    I honestly have no idea.

12   Q.    What happened in the chapel?

13   A.    Um, once we got in there, Ben put the inmate on

14   his knees, or he was sitting on a pew.  I'm not exactly

15   sure which.  He was down at that level, though.  Ben

16   had a baton.  He was asking him why did he do it, why

17   did he do it.  And then Ben just started hitting him in

18   the shoulder --

19   Q.    How many times?

20   A.    -- with the baton.  Five, six, seven.  I'm not

21   exactly sure.

22   Q.    How was he swinging the baton?

23   A.    From up here (indicating).

24   Q.    And for the record, you raised your arm above

25   your shoulder?

1    A.    Yes, sir.

2    Q.    Did it appear that the baton strike -- did the

3    strikes land?

4    A.    Yes, sir.

5    Q.    Where did they land on the inmate?

6    A.    In the shoulder area right here (indicating).

7    Q.    What was the reaction of the inmate?

8    A.    It appeared he felt it.  He moved.

9    Q.    Did he make any noises?

10   A.    I don't remember.

11   Q.    Did it appear that the blows had enough force to

12   inflict pain?

13   A.    I'm sure it did.

14   Q.    Did it appear that the blows were intended to

15   inflict pain?

16   A.    Yes, sir.

17   Q.    Was the inmate in any way, shape or form posing a

18   risk or threat to you?

19   A.    No, sir.

20   Q.    To anybody else there in the chapel?

21   A.    No, sir.

22   Q.    So why in the heck was he hitting him with a

23   baton?

24   A.    He had done something.  He was retaliating

25   against him.

```
1    Q.    Did he know it was wrong at the time?

2    A.    Yes, sir.

3    Q.    Why was it wrong at the time?

4    A.    Because he posed no threat to us.

5    Q.    Did you stop it?

6    A.    No, sir.

7    Q.    Did anybody else stop it?

8    A.    No, sir.

9              (Court reporter clarification.)

10             THE WITNESS:  He wasn't posing a threat to

11   anybody.

12   BY MR. BLUMBERG:

13   Q.    Did you stop it?

14   A.    No, sir.

15   Q.    Did anybody else stop it?

16   A.    No, sir.

17   Q.    How did the episode end?

18   A.    I walked out.  I'm not exactly sure how it came

19   to an end.  But before that, Ben, after he hit him a

20   few times, he was kind of holding the baton down to his

21   side.  And for some reason, Jeremy Hatley told him to

22   make him suck it, and that's when Ben put the baton

23   between his legs --

24             THE COURT:  I'm sorry, sir.  The Jury has to

25   hear you, and they're just not hearing you.
```

1          THE WITNESS:  I'm sorry, Your Honor.

2          THE COURT:  If you will speak up, please.

3          MR. BLUMBERG:  Your Honor, if I may, if I ask

4    questions from the podium, it may make it easier if he

5    talks to me that way.

6          THE COURT:  You can try it.

7          MR. BLUMBERG:  Thank you.  I'll talk over

8    here, Mr. Broussard.

9    BY MR. BLUMBERG:

10   Q.    How did the episode in the chapel end?

11   A.    I don't know exactly how it ended.  I walked out,

12   like I said.  But after Ben had hit him with the baton,

13   he was holding the baton down at his side and just kind

14   of standing there.  And for some reason, Jeremy Hatley

15   told him, *Make him suck it*, and Ben put the baton

16   between his legs and into the inmate's mouth.

17   Q.    Who is Jeremy Hatley?

18   A.    He was a K-9 officer at the time.

19   Q.    Is he a friend of yours?

20   A.    Yes, sir.

21   Q.    Is he a close friend of yours?

22   A.    Yes, sir.

23   Q.    What was your reaction when you heard Jeremy

24   Hatley tell Lassalle to make the inmate suck it?

25   A.    I was kind of shocked.

1    Q.    Could you see any reason in the world why

2    Lassalle should put that baton in that guy's mouth?

3    A.    No, sir.

4    Q.    What was your reaction when you saw Lassalle's

5    behavior?

6    A.    I was still kind of shocked about what I was

7    seeing.

8    Q.    Did you report it to anybody?

9    A.    No, sir.

10   Q.    In fact, it wasn't the end of the abuses that you

11   were aware of that day, was it?

12   A.    No, sir.

13   Q.    Why didn't you just run and tell the sheriff what

14   you just saw?

15   A.    Nothing would have happened.

16   Q.    Why do you think that?

17   A.    You know, you go back to the Angola incident, and

18   nothing happened.  He seemed to approve of it.

19   Q.    Are you familiar with a story that -- of an event

20   that occurred in the narcotics unit before you arrived

21   there, in November of '08?

22   A.    Yes, sir.

23   Q.    Tell the members of the Jury that story that you

24   were aware of.

25   A.    Um, from what I heard just throughout the

1   department, Troy Willis, Wade Bergeron and Jacob

2   Huckabay were drinking at Troy Willis's house, I

3   believe it was, having a barbecue or something.

4           MR. MCLINDON:  Objection, Your Honor.  This

5   whole story is based on hearsay, apparently.

6           MR. BLUMBERG:  It's offered for the effect on

7   him as to what the defendant's intentions were.

8           MR. MCLINDON:  It still is hearsay.

9           THE COURT:  Well, only if it's offered for

10   the truth therein.  I think I'm going to exclude it

11   under 403 as cumulative.

12           MR. BLUMBERG:  Yes, sir.  If I may.

13   BY MR. BLUMBERG:

14   Q.   Mr. Broussard, are you aware of an event that

15   occurred in narcotics before you arrived there that had

16   an impact on what you perceived Louis Ackal's

17   intentions were about uses of force?

18   A.   Yes, sir.

19           MR. BLUMBERG:  May I ask that further, Your

20   Honor, without going into the details?

21           THE COURT:  All right.

22   BY MR. BLUMBERG:

23   Q.   That event that involved other narcotics agent,

24   what was the impact on you of that story in terms of

25   the way you made a decision whether to tell Louis Ackal

1    about what happened in the chapel?

2    A.    Um, you know, nothing happened to them.  I think

3    they were just --

4    Q.    Without going into the details.  Without going

5    into the details, what impact did it have on you in

6    terms of your decision to talk to him about what Ben

7    Lassalle was doing?

8    A.    They weren't disciplined, so I didn't think it

9    mattered.

10   Q.    Okay.  Next episode in the jail on April 29th,

11   2011, you did something you weren't supposed to do

12   besides just watching; right?

13   A.    Yes, sir.

14   Q.    Tell the members of the Jury what happened.

15   A.    Um, came across Anthony Daye who was an inmate in

16   the jail.  Some of the deputies had him in one of the

17   halls and he was laying on his side, and I walked up to

18   him and struck him.

19   Q.    How did you strike him?

20   A.    With my hand.

21   Q.    Where did you strike him?

22   A.    Stomach region.

23   Q.    Was he handcuffed at the time?

24   A.    I don't remember.

25   Q.    Was he compliant or subdued at the time?

```
1    A.    Yes, sir.

2    Q.    Was Louis Ackal in the area at the time?

3    A.    Yes, sir.

4    Q.    Could he see what you did?

5    A.    He could.  I don't know if he did.

6    Q.    How close was he?

7    A.    Ten, 15 feet-ish.

8    Q.    Did you have any concerns about striking a

9    compliant inmate in the jail with the chief law

10   enforcement officer of the parish 10 to 15 feet from

11   you?

12   A.    No, sir.

13   Q.    Why not?

14   A.    Based on previous events and experience that I

15   didn't think anything would happen to me discipline

16   wise.

17          MR. BLUMBERG:  That's all I have, Your Honor.

18          THE COURT:  Your witness, Counselor.

19          MR. MCLINDON:  I would like to try from here

20   if I can, Judge.

21          THE COURT:  Keep your voice up, please,

22   Mr. Witness.

23          THE WITNESS:  Yes, sir.  Yes, Your Honor.

24   ***

25   ***
```

```
 1                        CROSS-EXAMINATION

 2   BY MR. MCLINDON:

 3   Q.    Mr. Broussard, let me ask you a couple of

 4   questions about the Angola guards that came for the

 5   shakedown.

 6   A.    Yes, sir.

 7   Q.    One of the inmates showed up with a broken

 8   shoulder; is that right?

 9   A.    Yes, sir.

10   Q.    You're not sure how that happened?

11   A.    No, sir.

12   Q.    And when Louis Ackal saw that, he said, take this

13   guy to the hospital?

14   A.    Yes, sir.

15   Q.    Okay.  Did the Angola inmates ever -- Angola

16   guards ever come back there?

17   A.    They may have, but I don't think so.

18   Q.    You don't think so.  In fact, do you remember

19   Louis Ackal being very upset with those Angola guards

20   for the way they conducted that shakedown?

21   A.    No, sir.

22   Q.    You weren't with him the entire time?

23   A.    Oh, no, sir.

24   Q.    Okay.  Now, you have used excessive force on not

25   inmates but citizens on the street?
```

1    A.    Yes, sir.

2    Q.    Did you distinguish between black and white?

3    A.    No, not really.  But the area I worked in was

4    predominantly, you know, where black people resided.

5    Q.    All right.  But you didn't, in your mind, say,

6    *I'm going to go target black people*.  You would use

7    excessive force on black and white people?

8    A.    I have, yes.

9    Q.    Okay.  Now, the people on whom you used excessive

10   force, were they just -- would you ever go up to

11   somebody that you thought, *this guy's never done*

12   *anything wrong in his life* and just abuse them, or were

13   you using -- were you carrying out what started off as

14   a legal arrest or a legal detention, a legal detention

15   on somebody who had done something wrong and then you

16   just threw in a few extra knee kicks and stuff?

17   A.    That did occur, yes.

18   Q.    Okay.  But what I'm saying is you never just went

19   up to somebody for absolutely no reason at all and just

20   kicked him and threw him down and punched him?

21   A.    Just out of the blue walked up to him?

22   Q.    Yeah.  You never did that, did you?

23   A.    Is that what you're saying, just walked up to

24   somebody randomly?

25   Q.    Yes.

1    A.    No, sir.

2    Q.    So the excessive force that you used, while

3    illegal, it was on somebody that has either been

4    arrested or under suspicion for a crime?

5    A.    Had some sort of interaction with, whether

6    traffic stop or call.

7    Q.    Ricky Roche, you had very good reason -- well,

8    you didn't go out and effect the arrest, did you?

9    A.    No, sir.

10   Q.    But you understood there was a good reason to at

11   least go arrest this man?

12   A.    It was gone about the wrong way, though.

13   Q.    Right.  But let's start with this.  There was a

14   reason to go arrest him?

15   A.    For the simple battery.

16   Q.    Right.

17   A.    Yes, sir.

18   Q.    He had punched Gerald Savoy --

19   A.    Yes, sir.

20   Q.    -- in the eye.  Okay.  And did you talk directly

21   to Bubba Savoy about it?

22   A.    Yeah.  I mean, it was not a one-on-one

23   conversation, you know, a group conversation.

24   Q.    So you weren't in the high-speed chase with Ricky

25   Roche?

1   A.    I was behind it.

2   Q.    Okay.  And then you were there at the trailer

3   park when they tackled him?

4   A.    When I got there, he was already in custody.

5   Q.    Okay.  But Bubba Savoy had told you all to go get

6   this guy?

7   A.    Yes, sir.

8   Q.    You don't know what Sheriff Louis Ackal told

9   Bubba Savoy?

10  A.    No, sir.

11  Q.    And you never talked to Sheriff Ackal about it?

12  A.    No, sir.

13  Q.    And what you saw back at the narcotics station

14  when he was -- when you was back there, Sheriff Ackal

15  wasn't there?

16  A.    No, sir.

17  Q.    And you didn't go tell Sheriff Ackal about that?

18  A.    No, sir.

19  Q.    Let me ask you about Mr. Ozenne.  When you

20  first -- well, I'm not sure you know this guy's name.

21  When you first encountered -- do you know the names of

22  any of the inmates that were abused in the chapel?

23  A.    No, sir.

24  Q.    All right.  You testified that you saw Ben

25  Lassalle and the sheriff and Wesley and they had an

1    inmate on his knees in the hallway?

2    A.    Yes, sir.

3    Q.    Was that hallway close to the rec yard?  Do you

4    know?

5    A.    I don't know where the rec yard is.  I mean, I

6    know I've been in it, but I can't visualize.

7    Q.    Do you remember if that inmate was black or

8    white?

9    A.    No, sir.

10   Q.    Okay.  That inmate was on his knees, and Ben

11   Lassalle escorted him to the chapel?

12   A.    Yes, sir.

13   Q.    Okay.  Ben Lassalle asked the warden, *where is*

14   *there a place with no cameras*.  Did you hear that?

15   A.    I didn't hear Ben Lassalle ask that.

16   Q.    Okay.  So he's in the hallway and he's on his

17   knees, they pick him up off his knees and Ben takes him

18   to the chapel?

19   A.    Yes, sir.

20   Q.    And you go in there with him?

21   A.    Yes, sir.

22   Q.    Is that the same inmate that had the baton put in

23   his mouth?

24   A.    Yes, sir.

25   Q.    Okay.  And you do not recall whether he was black

1    or white?

2    A.    No, sir.

3    Q.    Did you outrank Ben Lassalle?

4    A.    I'm pretty sure I did, yes, sir.

5    Q.    And even though you outranked him, you couldn't

6    have just said, *hey, man, stop.  This is enough, don't*

7    *do this*?

8    A.    I could have, I should have, but I didn't.

9    Q.    And Officer Hatley was the one who yelled, *make*

10   *him suck it*?

11   A.    Yes, sir.

12         THE COURT:  I didn't hear the answer.

13         THE WITNESS:  Yes, sir.

14   BY MR. MCLINDON:

15   Q.    You were at the sheriff's office prior to Sheriff

16   Ackal getting there; is that right?

17   A.    Yes, sir.

18   Q.    Were you in narcotics before he got there?

19   A.    No, sir.

20   Q.    When did you start in narcotics?

21   A.    Sometime in 2009.

22   Q.    Now, you interviewed with the FBI several times?

23   A.    Yes, sir.

24   Q.    Is that right?  And in your first interview you

25   lied?

1    A.    Yes, sir.

2    Q.    Okay.  And so you came back for the second

3    interview.  And do you remember telling the FBI that

4    after the first interview you went to hypnosis?

5    A.    Yes, sir.

6    Q.    And this hypnotherapist helped improve your

7    memory of what happened?

8    A.    Yes, sir.

9    Q.    Are you still sticking to that story?

10   A.    Yes, sir.

11   Q.    That you went through hypnosis and somehow it

12   enabled you to remember things?

13   A.    It's not -- it wasn't hypnosis like you would see

14   from a movie.  You know, it wasn't a thing on stopwatch

15   or laying down on a couch or anything that you would

16   think.  He was an attorney.  It was mostly just

17   relaxation techniques to get me to calm down.

18   Q.    Well, if the hypnosis improved your memory, then

19   maybe you really didn't lie to the FBI?

20   A.    No, sir.

21   Q.    So you lied?

22   A.    Yes, sir.

23   Q.    Then you went to hypnosis?

24   A.    Yes, sir.

25   Q.    And your memory got better?

1    A.    Partially, yes, sir.

2    Q.    So what you did in the first interview was

3    partially lying and partially not remembering?

4    A.    I lied.

5    Q.    Okay.  But you must not have remembered something

6    because that's why you went to hypnosis; right?

7    A.    Correct.

8    Q.    How many times did you go to the hypnotherapist?

9    A.    Once.

10   Q.    In between the first interview with the FBI and

11   the second interview, in addition to hypnosis, did you

12   talk to any of the other fellow narcotics friends?

13   A.    No, sir.

14   Q.    After the second interview with the FBI, did you

15   then talk to some of your fellow narcotics friends?

16   A.    No, sir.

17   Q.    Throughout the duration of this whole

18   investigation, have you talked to them?

19   A.    From the point of the first interview on?

20   Q.    Yes.

21   A.    No, sir.

22   Q.    How about from the point of before your first

23   interview when you knew that the FBI was looking at all

24   of you guys, did you talk to any of your friends?

25   A.    Yes, sir.

1   Q.    Did y'all get together and try and concoct

2   stories or anything like that?

3   A.    No, sir.

4   Q.    Okay.  Did you go talk to the sheriff?

5   A.    No, sir.

6   Q.    Okay.  Did you ever think about going to the

7   sheriff and saying, *hey, you know, you approved this;*

8   *you told me I can do all this and now I'm in trouble*

9   *with the Feds*?

10  A.    No, I didn't.

11  Q.    Is that because the sheriff didn't know

12  everything that you were doing?

13  A.    He didn't know everything.

14  Q.    So you didn't -- y'all hid things from him;

15  right?

16  A.    I wouldn't say we hid them.  He just wasn't

17  there.

18  Q.    He wasn't there, and you didn't want to tell him

19  about that?

20  A.    I mean, I didn't see him every day to tell him,

21  but we weren't actively hiding it.

22  Q.    Your building was nowhere near his office; right?

23  A.    We moved several times.  But, no, I wasn't in the

24  same building.

25  Q.    So you saw the beating of the inmate who had a

1   baton put in his mouth?

2   A.   Yes, sir.

3   Q.   And then you came back later and saw the Anthony

4   Daye incident?

5   A.   Not in the chapel, no, sir.

6   Q.   Where did you see the Anthony Daye thing?

7   A.   I struck Anthony Daye out in the hall.

8   Q.   What -- okay.  You saw him out in the hall?

9   A.   Yes, sir.

10  Q.   What did you see?

11  A.   Some deputies had him, and he was laying on the

12  ground kind of on his side up against the wall.

13  Q.   Outside of the chapel?

14  A.   No, it was further down one of the halls.

15  Q.   Closer to one of the pods?

16  A.   Closer to -- I guess there's some pods back

17  there.

18  Q.   Just laying on the ground?

19  A.   On his side, yes.

20  Q.   And you walked up to him and did what?

21  A.   Struck him.

22  Q.   With your fist?

23  A.   Yes, sir.

24  Q.   You never talked to the sheriff about what you

25  did or saw in the chapel?

1   A.    No, sir.

2   Q.    Now, you have signed a plea agreement; is that

3   right?

4   A.    Yes, sir.

5   Q.    And I'm not going to repeat everything that

6   Mr. Blumberg asked you, but you are scared about going

7   to prison?

8   A.    Yes, sir.

9   Q.    You do not want to go to prison?

10  A.    No, sir.

11  Q.    Okay.  And you hoped that these guys -- and when

12  I say *these guys*, the prosecution team will file a

13  motion and ask the Judge to reduce your sentence?

14  A.    Yes, sir.

15  Q.    You're hoping maybe to get probation?

16  A.    Yes, sir.

17  Q.    Okay.  If you had told the prosecution team, *I'm*

18  *not interested in testifying*, do you think that they

19  would have filed this motion for you to reduce your

20  sentence?

21          MR. BLUMBERG:  Objection.

22          THE COURT:  Go ahead and answer and then

23  let's move on.

24          THE WITNESS:  I don't know.

25  * * *

```
 1    BY MR. MCLINDON:

 2    Q.    Your uses of excessive force predate Louis Ackal

 3    ever becoming the sheriff; right?

 4    A.    Probably.  I don't have a specific on dates,

 5    but --

 6    Q.    But you remember you testified before a grand

 7    jury?

 8    A.    Yes, sir.

 9    Q.    Did you tell that to the grand jury, that you

10    started violating people when you were a patrol deputy?

11    A.    Yes, sir.

12    Q.    And that was the story we heard earlier.  The

13    first guy you ever hit with a baton, the guy's name was

14    Walter?

15    A.    Yes, sir.

16    Q.    And you named your baton *Walter*?

17    A.    Yes, sir.

18    Q.    That was before Louis Ackal was ever the sheriff

19    of Iberia Parish?

20    A.    Yes, sir.  I think so.

21    Q.    There were problems in that office before Louis

22    Ackal ever got there?

23    A.    Some, yes, sir.

24    Q.    Were you involved in the arrest of a man on

25    Cherokee Street that was choked almost to death?
```

```
 1    A.    Yes, sir.

 2    Q.    Okay.  Were you one of the ones who did the

 3    choking?

 4    A.    No, sir.

 5    Q.    Okay.  Y'all never told the sheriff about that?

 6    A.    I reported it to Savoy.

 7    Q.    Okay.

 8    A.    What he did with that, I don't know.

 9    Q.    You don't know what Savoy did with that?

10          I may have asked you, so just bear with me.

11    The incident with Ricky Roche, at no point did you ever

12    report that to the sheriff?

13    A.    No, sir.

14              (Pause in the proceedings.)

15    BY MR. MCLINDON:

16    Q.    Did you ever take money off of citizens by doing

17    a pat-down search or an arrest?  And if money falls

18    out, did you ever take their money?

19    A.    I was involved in that, yes.

20    Q.    You didn't report it.  You didn't turn it in like

21    you were supposed to.  You kept that money?

22    A.    Correct.

23    Q.    Were you involved in throwing down drugs on

24    somebody when they were arrested?

25    A.    No, sir.
```

1    Q.    What about weapons?  Did you ever do a drop down

2    weapon?

3    A.    No, sir.

4              MR. MCLINDON:  That's all I have.  Thank you.

5              THE COURT:  Redirect?

6              MR. BLUMBERG:  Yes, sir.

7                        REDIRECT EXAMINATION

8    BY MR. BLUMBERG:

9    Q.    Mr. Broussard, have you tried to talk to Louis

10   Ackal in the past about whether some use of force would

11   be appropriate or not?

12   A.    Yes, sir.

13   Q.    How did that get met?  What sort of response did

14   you get?

15   A.    Um, I mean, I can give one example for sure.

16   Q.    Give one example.

17   A.    I believe it was at the beginning of this year,

18   maybe towards the end of last year, we were called to

19   assist St. Mary Parish Sheriff's Office.  We did a

20   homicide with a suspect barricaded in a house.  So we

21   went out there.  I was a SWAT team commander at the

22   time.

23             MR. MCLINDON:  I'm going to object.  This may

24   be beyond the scope of my cross-examination.

25             MR. BLUMBERG:  If I may, Your Honor, when you

1    have a moment.

2              THE COURT:  I think so.  I'm going to

3    sustain.  We didn't go into that.

4              MR. BLUMBERG:  No, we did not, but it does

5    respond to questions as to an example of why the

6    witness does not tell certain things to the defendant

7    based on this reaction that he received.  And I can

8    make a proffer at the bench if the Court would like.

9              (Pause in the proceedings.)

10             THE COURT:  I'm going to sustain the

11   objection.

12   BY MR. BLUMBERG:

13   Q.   Let's go back to the day of the jail episode that

14   we've discussed here for a moment on April 29th, 2011.

15   Did you hear Louis Ackal yelling that inmates should be

16   *tuned up*?

17   A.   Yes, sir.

18   Q.   What did that mean to you?

19   A.   Beaten.

20   Q.   What did it mean to you at the time?

21   A.   Beaten.

22   Q.   Is that a reason why you didn't go and tell him

23   about what happened with Ben Lassalle?

24   A.   Yes, sir.

25   Q.   Why?

1    A.    Because it's what he wanted.  It's what he was

2    telling people to do, you know.  I didn't think

3    anything would have happened, you know.  It wouldn't

4    have stopped anything or made any further beatings not

5    happen.

6    Q.    Because he was wanting to *tune people up*?

7    A.    Yes, sir.

8    Q.    Now, as it relates to Anthony Daye, immediately

9    before you hit Anthony Daye, you heard him talking

10   about Anthony Daye; right?

11   A.    Um, he may have said a few things about him.  I

12   know he was pretty upset and agitated over something

13   that happened in the jail.

14   Q.    Do you remember talking about this topic with the

15   Federal Bureau of Investigation on a couple of

16   instances?

17   A.    Yes, sir.

18   Q.    Would seeing notes about that conversation help

19   refresh your recollection as to exactly what Louis

20   Ackal said?

21   A.    Possible.

22        MR. BLUMBERG:  With the Court's permission,

23   then.  May I use the Elmo?

24        MR. MCLINDON:  May I see?

25        MR. BLUMBERG:  Yes, I am going to show you.

```
 1                    (Pause in the proceedings.)

 2                    (Counsel conferring.)

 3    BY MR. BLUMBERG:

 4    Q.    Mr. Broussard, do not read out loud.  Just read

 5    to yourself.  I am going to direct your attention to

 6    the very bottom of page 3 of the exhibit, which I have

 7    shown to you, which, for the record, is a FBI interview

 8    dated 2/9/2016.  Read the bottom to yourself.  It's

 9    highlighted in pink.

10    A.    Those two lines?

11    Q.    Those two lines, that's right -- or, actually,

12    there are one, two -- three and a half.

13    A.    Okay.  Well, then maybe it's at --

14    Q.    I'm talking at the very bottom of the page.  Do

15    you see them?

16    A.    Okay.  Yes.

17    Q.    Tell me when you're done.

18    A.    Okay.

19    Q.    Does that refresh your recollection as to what

20    was being said by Louis Ackal before you struck Anthony

21    Daye?

22    A.    Well, I'm reading at the bottom --

23    Q.    No, no, no.  Does it refresh your recollection?

24    A.    What I just read, no.

25    Q.    It does not?
```

1  A.   It has nothing to do with the jail, what I just

2  read.

3  Q.   Okay.  Sir, are you looking at this right?

4  A.   That's why -- I don't think we are.

5  Q.   Okay.  How about that?

6  A.   Yeah.  I wasn't seeing that.

7  Q.   I didn't move it up far enough.  My apologies,

8  Mr. Broussard.  Take a look.

9  A.   Yes, sir.

10  Q.   Does that refresh your recollection?

11  A.   Yes, sir.

12  Q.   What was said by Louis Ackal before you struck

13  Anthony Daye?

14  A.   He wanted to know what the hell his problem was

15  and take him to find out.

16  Q.   Did he curse?

17  A.   Yes.

18  Q.   Did that have any bearing on why you struck

19  Anthony Daye?

20  A.   Yes.

21  Q.   Did it have any bearing on why you weren't

22  worried about striking him 10 to 15 feet from the

23  sheriff?

24  A.   Yes, sir.

25  Q.   Let's talk about Ricky Roche for a minute.  You

```
 1    indicated that it would have been appropriate to

 2    investigate and potentially arrest Ricky Roche for an

 3    assault on Gerald Savoy; right?

 4    A.   Yes, sir.

 5    Q.   You were the narcotics unit?

 6    A.   Yes, sir.

 7    Q.   Did you investigate assaults?

 8    A.   Not commonly, no.

 9    Q.   Who did that in the department?

10    A.   Either patrol deputies or detectives.

11    Q.   Why was narcotics involved?

12    A.   Because it happened Gerald Savoy was the victim.

13    Q.   This was designed to be retaliation; right?

14    A.   Yes, sir.

15    Q.   Did you, in the course of your hypnotic therapy,

16    learn anything that was materially different than

17    anything you had said before to the FBI?

18    A.   Yes.

19    Q.   What was it?

20    A.   That I wasn't present in the chapel for any other

21    beatings.

22    Q.   Other than just the one?

23    A.   Other than the one, yes.

24              MR. BLUMBERG:  Okay.  That's all I have, Your

25    Honor.
```

```
 1              THE COURT:  Is the witness excused?
 2              MR. BLUMBERG:  Yes, Your Honor.  We're done.
 3              MR. MCLINDON:  Yes, Your Honor.
 4              THE COURT:  The witness can be excused.
 5              Call your next witness.
 6              MR. JARZABEK:  The Government calls Zachary
 7    Schaubert.
 8              (Pause in the proceedings.)
 9              THE COURTROOM DEPUTY:  Please raise your
10    right hand.  Do you solemnly swear that the testimony
11    you will give in this case will be the truth, the whole
12    truth, and nothing but the truth, so help you God?
13              THE WITNESS:  I do.
14              THE COURTROOM DEPUTY:  Can you please spell
15    your first and last name for the Court Reporter?
16              THE WITNESS:  Zachary, Z-A-C-H-A-R-Y.  Last
17    name Schaubert, S-C-H-A-U-B-E-R-T.
18              THE COURTROOM DEPUTY:  Thank you.
19                        ZACHARY SCHAUBERT,
20     first having been duly sworn by the Courtroom Deputy,
21               testifies under oath as follows:
22                        DIRECT EXAMINATION
23    BY MR. JARZABEK:
24    Q.   Mr. Schaubert, where do you live?
25    A.   New Iberia.
```

```
 1   Q.    And are you currently employed?

 2   A.    Yes, sir.

 3   Q.    Where?

 4   A.    The Youngsville Police Department.

 5   Q.    And how long have you been in law enforcement?

 6   A.    About seven and a half years.

 7   Q.    And have you previously been employed by the

 8   Iberia Parish Sheriff's Office?

 9   A.    I was.

10   Q.    And when did that start?

11   A.    September of 2009.

12   Q.    And what was your first position inside of the

13   Iberia Parish Sheriff's Office?

14   A.    I was on patrol.

15   Q.    Okay.  Did you later join a unit known as IMPACT?

16   A.    Yes, sir, I did.

17   Q.    What was the IMPACT unit's function?

18   A.    It was increase -- increase manpower to assess

19   criminal trends.  It was hard criminal activity.

20   Q.    Did you get assigned to different areas?

21   A.    Yes, sir.

22   Q.    How long were you on the IMPACT unit?

23   A.    Um, probably about a year and a half.

24   Q.    Okay.  And, um, after you -- do you remember --

25   were you in IMPACT in 2011?
```

A.    Yes, I was.

Q.    Okay.  Did you hold any other jobs at the Iberia Parish Sheriff's Office besides IMPACT?

A.    Yes.  At that time, I was on the SWAT team, as well.

Q.    Okay.  And did you leave IMPACT for another unit in the Iberia Parish Sheriff's Office later?

A.    Yes, I did.

Q.    What unit was that?

A.    I was promoted to sergeant of the marine division.

Q.    Okay.  And did you leave that unit?

A.    If I left the marine division?

Q.    Yes, sir.

A.    Upon leaving the sheriff's office.

Q.    Okay.  And why did you leave the sheriff's office?

A.    Because I got a new job at the Youngsville Police Department.

Q.    And have you been at Youngsville since then?

A.    Yes, I have.

Q.    Now, you've met with me and others of the federal government several times, have you not?

A.    Yes, sir.

Q.    Does the name *Anthony Daye* mean anything to you?

```
1    A.    It rings a bell.

2    Q.    Okay.  Do you remember being in the Iberia Parish

3    Sheriff jail on 4/29 of 2011 for a shakedown?

4    A.    I do.

5    Q.    Okay.  And when was the first time you saw

6    Anthony Daye during that day, that you can remember?

7    A.    Probably when we entered the K-pod he was in.

8    Q.    Okay.  And do you know who took him out of K-pod?

9    A.    I did.

10   Q.    Okay.  Did you turn him over to anybody?

11   A.    Yes.

12   Q.    Who?

13   A.    The narcotics division.

14   Q.    Do you remember any specific people in the

15   narcotics division you turned him over to?

16            THE COURT:  Speak up, please, sir, and get a

17   little closer to the microphone.

18            THE WITNESS:  Um, specific members, Jason and

19   Ben.

20   BY MR. JARZABEK:

21   Q.    Okay.  Jason Comeaux?

22   A.    Yes, sir.

23   Q.    Ben Lassalle?

24   A.    Lassalle.

25   Q.    Okay.  Were there other narcotics officers
```

1    present at the time?

2    A.    Yes, sir.

3    Q.    Okay.  And was Jason Comeaux talking to Daye?

4    A.    Yes.

5    Q.    Okay.  And were there other people around while

6    this conversation was going on?

7    A.    There was.

8    Q.    Okay.  And did the subject of the chapel come up

9    in your presence?

10    A.    It did.

11    Q.    And who did that topic come up with?

12    A.    The sheriff and either the warden or the

13    assistant warden.

14    Q.    Okay.  You're not sure whether it was the warden

15    or the assistant warden?

16    A.    I'm not.

17    Q.    Is there a reason why you might not be sure?

18    A.    I know they were all in the jail at that date.

19    Q.    Are the warden and the assistant warden also

20    identical twins?

21    A.    Correct.

22    Q.    Okay.  Now, at the time that you turned over the

23    inmate, Mr. Daye, to Comeaux and Lassalle, did he

24    appear to be injured?

25    A.    No.

1   Q.   Now, in this conversation about the chapel -- let

2   me ask it again.   Who was it with, the warden or the

3   assistant warden?   Is that what I understood you to

4   say?

5   A.   I can't recall.

6   Q.   But it was with one of them?

7   A.   Yes.

8   Q.   Okay.   As a result of that discussion about the

9   chapel, did you see Anthony Daye taken anywhere?

10  A.   Yes.

11  Q.   Where?

12  A.   He was escorted to the chapel.

13  Q.   And again, who took him to the chapel?

14  A.   Since he was my arrestee or detainee at that

15  time, I -- I escorted him to the chapel with the

16  narcotics group.

17  Q.   Okay.   Did you go in the chapel?

18  A.   No, sir.

19  Q.   Did they go in the chapel --

20  A.   Yes, sir.

21  Q.   -- the narcotics group --

22  A.   Yes, sir.

23  Q.   -- that you previously discussed?

24  A.   Yes, sir.

25  Q.   At the time that he was taken into the chapel,

1   was he handcuffed?

2   A.   Yes, sir.

3   Q.   Was he resisting in any way?

4   A.   No, sir.

5   Q.   Was he posing a threat to anybody?

6   A.   No, sir.

7   Q.   Was -- did he appear to be completely compliant

8   with the instructions that were being given to him?

9   A.   Yes, sir.

10  Q.   Did there appear to be any -- well, you've

11  received Use of Force training, have you not?

12  A.   Yes, sir.

13  Q.   Did there appear to be any reason for the use of

14  force against Mr. Daye at the time you observed him?

15  A.   No, sir.

16  Q.   All right.  Now, besides Mr. Comeaux and

17  Mr. Lassalle, did others enter the chapel at that time?

18  A.   Yes.

19  Q.   And did the chapel enjoy, in your mind, a

20  reputation for specific activity besides praying?

21  A.   Correct.

22  Q.   And what was that activity?

23  A.   Beatings.

24  Q.   You were aware that it had been used before for

25  that purpose?

1    A.    Yes, sir.

2    Q.    You had heard that?

3    A.    Yes, sir.

4    Q.    Did you hear anything coming out of the chapel

5    noise-wise after Mr. Daye went inside it?

6    A.    Yes, sir.

7    Q.    What did you hear?

8    A.    It sounded like somebody getting beat.

9    Q.    Okay.  Did you hear Mr. Daye's voice?

10   A.    Per se, no.

11   Q.    When you say *per se*, did you hear somebody?

12   A.    I could hear somebody that was taking strikes.

13   Q.    Okay.  Did you hear anybody calling out for help

14   or for the beatings to stop?

15   A.    Yes.

16   Q.    You did hear that?

17   A.    Yes.

18   Q.    Did you observe Mr. Daye leave the chapel?

19   A.    Yes.

20   Q.    What was his condition when he left the chapel?

21   A.    He was limping.

22   Q.    Was he being -- was he walking on his own, or was

23   he being dragged?

24   A.    He was being dragged.

25   Q.    Both feet dragging, as far as you could tell?

1    A.    That I can recall.

2    Q.    I'm sorry?

3    A.    That I can recall, yes.

4    Q.    Do you know where they took him?

5    A.    I can't recall.

6    Q.    Okay.  Do you remember, wherever he was taken,

7    who took him there?

8    A.    The narcotics group.

9    Q.    Was Mr. Lassalle and Mr. Comeaux still part of

10   that group?

11   A.    Yes, sir.

12   Q.    Okay.  And there were others that you don't

13   remember; am I correct?

14   A.    Yes.

15   Q.    You said you had heard about the chapel being

16   used for beatings before; correct?

17   A.    Yes.

18   Q.    Had you heard that from the narcotics officers?

19   A.    It was the known deal around the jail.  It was

20   the only place that didn't have cameras.

21   Q.    And that was the purpose, because it didn't have

22   a camera?

23   A.    Correct.

24   Q.    That's what you understood?

25   A.    Yes.

1   Q.    Were you aware of other times that you personally

2   thought that you might have observed somebody being

3   taken into the chapel to be beaten?

4   A.    Yes.

5   Q.    More than once?

6   A.    Yes.

7   Q.    Did those involve two different people or more?

8   A.    Multiple.

9   Q.    Multiple times.  And at the time that these

10  people were being taken in there, you had the -- you

11  believed they were being taken in there to be beaten;

12  is that correct?

13  A.    Correct.

14  Q.    Were those incidents close in time to the Anthony

15  Daye incident?

16  A.    Yes.

17  Q.    Is it possible they could have occurred on the

18  same day?

19  A.    Could have.

20  Q.    You're not sure?

21  A.    No.

22  Q.    Who was the supervisor of the narcotics unit at

23  the time?

24  A.    It was either Broussard or -- no.  I think at

25  that time it was Gerald Savoy.

1    Q.    Okay.  And had you had any encounters -- or did

2    you know of any incidents involving Mr. Savoy in terms

3    of the chapel?

4    A.    Not that I can recall.

5    Q.    Okay.  Was the sheriff present during this

6    shakedown?

7    A.    Yes, he was.

8    Q.    Was he roaming the areas?

9    A.    Yes.

10   Q.    Who was in charge?

11   A.    Ultimately, he was.

12   Q.    Now, did you encounter the sheriff discussing

13   Mr. Daye being involved in a fight that day?

14   A.    I do believe.

15   Q.    Okay.  Do you remember who the sheriff was having

16   that conversation with?

17   A.    I believe it was Gerald Savoy.  And at some

18   point, the warden came up, because they were looking to

19   find a place with no cameras.

20   Q.    That's a conversation you overheard?

21   A.    Correct.

22   Q.    And did the sheriff issue any directives in

23   connection with that conversation?

24   A.    Yes.

25   Q.    What was it?

1   A.    He wanted Anthony Daye to be taken care of.

2   Q.    Okay.  Did he indicate where that should take

3   place?  Do you remember that?

4   A.    After whoever was in charge with the jail that

5   day, after they advised that the chapel was set up and

6   didn't have cameras, he was instructed to go to the

7   chapel.

8   Q.    What do you mean *set up*?

9   A.    They had a large windowpane on the chapel that

10  was closed off by either mattresses or sheets.

11  Q.    Do you know whether or not the sheriff was in the

12  chapel during any of these beatings?

13  A.    I do not.

14  Q.    Do you know if he -- can you say definitively he

15  wasn't?  Do you know for a fact he wasn't in the

16  chapel?

17  A.    No.

18  Q.    Now, going back to the conversation that you

19  overheard.  It was in the context of Anthony Daye being

20  taken to be -- which term did you -- did you use the

21  term *tune em up*?  Did you use that term?

22  A.    Initially.

23  Q.    Yeah.  And, again -- I want to be clear about

24  this -- the conversation also involved where there were

25  no cameras in the chapel being set up; correct?

1   A.   Correct.

2   Q.   And at that point, did the sheriff indicate

3   anything about where the inmate should be taken?

4   A.   Yes, sir.

5   Q.   And where was that?

6   A.   To the chapel.

7   Q.   Was this a calm, smooth discussion by the

8   sheriff?

9   A.   No.  I believe he was a little riled up.  There

10  was a lot of stuff going on that day.

11  Q.   But did he seem to be upset about the situation

12  that was being discussed at the time?

13  A.   Yes.

14  Q.   Was he loud?

15  A.   The sheriff is a very vocal man.

16  Q.   Did he appear to be upset?

17  A.   Not that I can recall.

18  Q.   But it was clearly in the context of Mr. Daye and

19  where he was going; correct?

20  A.   Correct.

21  Q.   And that conversation also involved the head of

22  the narcotics unit, Mr. Gerald Savoy; correct?

23  A.   Correct.

24  Q.   Did the sheriff indicate who should carry out

25  these orders?

1   A.    Yes, sir.

2   Q.    Who?

3   A.    He told Bubba, Gerald Savoy, to have his crew.

4   Q.    That would be narcotics; correct?

5   A.    Correct.

6            MR. JARZABEK:  A moment, Your Honor?

7            THE COURT:  Yes.

8            (Pause in the proceedings.)

9            MR. JARZABEK:  No further questions, Your

10  Honor.

11           THE COURT:  Your witness, sir.

12           MR. MCLINDON:  Yes, sir.

13                    CROSS-EXAMINATION

14  BY MR. MCLINDON:

15  Q.    Do you pronounce your last name -- is it -- how

16  do you pronounce it?

17  A.    Schaubert.

18  Q.    Schaubert.  Mr. Schaubert, do you remember

19  meeting with the FBI back in June of 2015?

20  A.    I can't recall the date, sir.

21  Q.    The Summer of 2015, do you remember you met with

22  them?

23  A.    Yes, sir.

24  Q.    Okay.  Have you had a chance to review that

25  report from that meeting?

1    A.    I looked at it briefly a while back.

2    Q.    Okay.  Do you remember telling the federal agents

3    that in that meeting you told them you thought that the

4    Iberia Parish Sheriff's Office was going sideways?

5    A.    Correct.

6    Q.    And do you remember telling them you thought it

7    was going sideways because of three people.  Do you

8    remember that?

9    A.    Correct.

10   Q.    And the three people were Ben Lassalle, Jason

11   Comeaux, and Bret Broussard --

12   A.    Okay.

13   Q.    -- is that right?

14   A.    They -- they had something to do with it, yes.

15   Q.    Okay.  Well, did you tell them that *I think that*

16   *IPSO is going sideways because of those three guys*?

17   A.    I can't recall that exact statement.

18   Q.    Okay.  Well, I'm going to show it to you.  If you

19   look on the -- do you have the one?  You've got it?

20         MR. BLUMBERG:  Yeah.  Thanks.

21   BY MR. MCLINDON:

22   Q.    Look in front of you.  Don't read it out loud.

23   Do you see where I have underlined that word?  Just

24   start with *Schaubert stated* and just read to the bottom

25   of that paragraph.

```
 1    A.    Okay.  I can agree.

 2    Q.    All right.  So you told them, the FBI, that

 3    because of your associates, Ben Lassalle, Jason Comeaux

 4    and Bret Broussard, this department was going sideways.

 5    You didn't say Sheriff Ackal, did you?

 6    A.    No.

 7    Q.    Do you remember telling the FBI that Lassalle and

 8    Savoy would cover for each other when something crooked

 9    was done?

10    A.    Often.

11    Q.    That's true?

12    A.    Yes.

13    Q.    Did Bubba, Gerald Savoy, know what was going on

14    with the officers using unnecessary force?

15    A.    Yes.

16    Q.    And you told that to the FBI?

17    A.    Yes.

18    Q.    But you didn't tell them that the sheriff knew?

19    A.    Okay.

20    Q.    Is that a "yes"?

21    A.    I can't recall.

22    Q.    Okay.  I'm going to show it to you real quick.

23    A.    And was this the first time I went over there?

24    The second time I went over there?

25    Q.    Yes, sir.  This is the first time.
```

1    A.    Okay.

2    Q.    Could I have that -- start with where it says

3    *Gerald, Bubba Savoy.*  Do you see where I am?

4    A.    Okay.

5    Q.    You didn't mention the sheriff, did you?

6    A.    No.

7    Q.    You could have?

8    A.    I could have.

9    Q.    Did the narcotics officers feed off of each

10   other?

11   A.    Very often.

12   Q.    Do you remember going out to an incident to

13   what's been referred to as the Hilltop Circle?

14            Do you remember that?

15   A.    Yes.

16   Q.    You need to speak up just a little bit.

17   A.    Okay.

18   Q.    That's a "yes"?

19   A.    Yes.

20   Q.    Okay.  And were you serving on the IMPACT unit?

21   A.    I was.

22   Q.    Okay.  Were you allowed to go into the house?

23   A.    No.

24   Q.    Okay.  Were you -- did you testify in front of

25   the grand jury that Jason Comeaux had the suspect in

1    the bathroom handcuffed?

2    A.    Yes.

3    Q.    How did you know that?

4    A.    Because I was informed.

5    Q.    Okay.  Who told you that?

6    A.    Rickey Boudreaux.

7    Q.    Was that an excessive use of force by

8    Mr. Comeaux?

9    A.    Yes.

10          MR. JARZABEK:  Your Honor, objection.  He

11   didn't see it.  He is already at hearsay.

12          THE COURT:  Well, do you want to lay a

13   foundation for how he would know that?

14   BY MR. MCLINDON:

15   Q.    So you talked to Rickey Boudreaux about it.

16   A.    Correct.

17   Q.    And he relayed the information to you?

18   A.    Yes.

19          MR. MCLINDON:  Judge, these are all

20   statements of coconspirators, unindicted and --

21   coconspirators.

22          MR. JARZABEK:  That's not a fact, Your Honor.

23          THE COURT:  Well, I'm going to sustain the

24   objection.

25          MR. MCLINDON:  All right.  Let me get to the

1    chapel and talk about Anthony Daye.

2    BY MR. MCLINDON:

3    Q.    Anthony Daye had been in a fight; is that right?

4    A.    Correct.

5    Q.    In his pod?

6    A.    Correct.

7    Q.    Okay.  Did you actually see the fight?

8    A.    Not that I can recall.

9    Q.    But you were asked to escort him out of the pod

10   because of that fight?

11   A.    Yes.

12   Q.    Okay.  And did you then -- did Jason Comeaux join

13   you?  Or did you turn him over to Jason Comeaux?  Or

14   how did that happen?

15   A.    From what I can recall, I put handcuffs on

16   Mr. Daye and began escorting him out the pod, and I

17   believe we all met up at the pod door.  If I recall

18   correctly, the sheriff was to the left and Bubba was in

19   the area.  Either the warden or assistant warden had

20   walked up.  There were several people right there.

21   Q.    Now, when you were escorting him, where were you

22   taking him?

23   A.    I stood at the chapel door for a while while

24   Jason Comeaux was talking.  And there was a large group

25   of people right there talking, and we were instructed

```
 1    to take him to the chapel.

 2    Q.    By whom?

 3    A.    The sheriff then advised Gerald Savoy.

 4    Q.    Now, you testified before a grand jury; right?

 5    A.    Yes, sir.

 6    Q.    Twice?

 7    A.    Yes, sir.

 8    Q.    Right?  Okay.  The first time -- I'm not going to

 9    hold you to the exact date, but back in the Summer of

10    2015; right?

11    A.    Okay.

12    Q.    Okay.  Now, you were asked some questions about

13    this.  Did you tell the grand jury that there was a

14    detour, that they were going from the dorm to the

15    J-pod, and then Jason Comeaux and Anthony Daye started

16    having words with each other?

17    A.    Correct.

18    Q.    So the original plan was they were not going to

19    the chapel.  They were going from the dorm to the

20    J-pod, and then Anthony Daye and Jason Comeaux started

21    jawing back and forth at each other?

22    A.    Okay.

23    Q.    Is that right?

24    A.    It appears so.

25    Q.    Okay.  And that's why he went to the chapel; is
```

1    that right?

2    A.    I can't recall.

3    Q.    Okay.  Did you change your testimony from the

4    first grand jury to the second grand jury?

5    A.    In regards to what?

6    Q.    To anything?  Do you remember now?  Do you have

7    any independent recollection of you being dishonest or

8    less than honest in the first grand jury and more so in

9    the second grand jury?

10   A.    I do recall being less than honest.  I was never

11   dishonest.

12   Q.    What was *less than honest*?  What did you forget?

13   What did you do?

14   A.    I remember Mr. Blumberg asking me some questions

15   about something else that we spoke of at a later date.

16   Q.    After the first grand jury?

17   A.    Correct.

18   Q.    So the chain of events is you went to the grand

19   jury, you were less than honest.  Then you met with

20   Mr. Blumberg?

21   A.    I wouldn't say I was less than honest, sir.  I

22   recall my statement to say that maybe I remembered a

23   little more.  It's been since 2011.  We're in '15 and

24   '16.

25   Q.    Okay.  So, but after the first grand jury, you

```
 1    met with some authorities from the federal government,

 2    and then your story changed when you went to the second

 3    grand jury?

 4    A.    Okay.

 5    Q.    Is that right?

 6    A.    Could have.

 7    Q.    Okay.

 8              MR. MCLINDON:  Just give me one second, Your

 9    Honor.

10              THE COURT:  Yes, sir.

11              (Pause in the proceedings.)

12              MR. MCLINDON:  Nothing further.  Thank you.

13              MR. JARZABEK:  One more.

14                        REDIRECT EXAMINATION

15    BY MR. JARZABEK:

16    Q.    Mr. Schaubert, you were -- you made two

17    appearances in front of the grand jury; is that

18    correct?

19    A.    Yes, sir.

20    Q.    And you were interviewed prior to both occasions;

21    is that correct?

22    A.    Correct.

23    Q.    Now, did you deliberately lie at any time?

24    A.    No, sir, I didn't.

25    Q.    Were you volunteering information?
```

1  A.    Yes, sir.

2  Q.    Okay.  Were you reluctant to volunteer some

3  information?

4  A.    I mean, I had great respect for the man.

5  Q.    *The man* being --

6  A.    The sheriff.

7  Q.    Okay.  Were you uncomfortable being there under

8  the circumstances that you were?

9  A.    Absolutely.

10         MR. JARZABEK:  Now, to establish a timeline

11  here, if I could put up for the witness exhibit --

12  Government's Exhibit 10 -- hang on a second -- yeah,

13  107, page 11.  107, page 11.

14  BY MR. JARZABEK:

15  Q.    Now, I ask you to read that page, sir, briefly.

16         MR. JARZABEK:  Can you expand it for the

17  witness, please?

18         Better yet, may I approach the witness, Your

19  Honor?

20         THE COURT:  You may.

21  BY MR. JARZABEK:

22  Q.    Page 11, Mr. Schaubert.  Would you read that,

23  please?

24         THE COURT:  To yourself.  To yourself,

25  please.

```
 1                    (Pause in the proceedings.)

 2   BY MR. JARZABEK:

 3   Q.    Are you finished, Mr. Schaubert?

 4   A.    Yes, sir.

 5   Q.    Mr. Schaubert, is that testimony consistent with

 6   what you've testified here today concerning who told

 7   everybody to take Mr. Daye to the chapel?

 8   A.    Absolutely.

 9   Q.    And the circumstances that it occurred under?

10   A.    Yes.

11   Q.    Okay.  And if you would, look at the very

12   beginning of that transcript.  The very first page,

13   sir.  What's the date of that grand jury appearance for

14   you?

15   A.    14th day of January.

16   Q.    Okay.  Which year?

17   A.    2016.

18   Q.    All right.  I show you this, which would be

19   Government's Exhibit 106, first page.  What's the date

20   of that grand jury appearance?

21   A.    10th day of June, 2015.

22   Q.    So you appeared for the first time in front of

23   the grand jury on June 10th of 2015; correct?

24   A.    Correct.

25   Q.    Now, before you appeared before the grand jury,
```

```
 1    you had an interview with the FBI, didn't you?

 2    A.    Correct.

 3    Q.    Now, I'm going to show you --

 4          MR. JARZABEK:  Elmo only, please, for the

 5    witness at the very bottom.

 6    BY MR. JARZABEK:

 7    Q.    Can you see that paragraph at the very bottom

 8    beginning Sheriff Louis Ackal?

 9    A.    Yes.

10    Q.    Would you read that, please.

11    A.    (Witness complied.)

12    Q.    Does that paragraph indicate that you told the

13    FBI that you thought the sheriff was involved in the

14    discussion of taking Mr. Daye to the chapel?

15    A.    Correct.

16    Q.    I'm going to show you the front of that page of

17    that document, sir.  If I could direct your attention

18    to right here (indicating).  Do you see it?

19    A.    Yes, sir.

20    Q.    What's the date that that interview was conducted

21    on?

22    A.    June 8th of 2015.

23    Q.    Two days before your first grand jury appearance?

24    A.    Correct.

25          MR. JARZABEK:  No further questions.
```

```
 1              THE COURT:  Anything further from the
 2   witness?
 3              You're free to go, sir.  Thank you.
 4              THE WITNESS:  Thank you.
 5              THE COURT:  Call your next --
 6              MR. BLUMBERG:  Yes, Your Honor.  The
 7   Government calls Wade Bergeron.
 8              THE COURT:  We will take our afternoon break;
 9   15 minutes.
10              (The Jury exits the courtroom.)
11              (Recess taken.)
12              THE COURT:  Anything before we bring the jury
13   in?
14              Bring them in, please.  Is Mr. Bergeron
15   ready?
16              MR. BLUMBERG:  He is ready, Your Honor.
17              THE COURTROOM DEPUTY:  Please raise your
18   right hand.  Do you solemnly swear that the testimony
19   you --
20              THE COURT:  You may all be seated until the
21   Jury can gets here, anyway.
22              (The Jury enters the courtroom.)
23              THE COURT:  All right.  You may be seated.
24   Sir, if you will raise your right hand and be sworn.
25              THE COURTROOM DEPUTY:  Do you solemnly swear
```

1    that the testimony you give in this case will be the

2    truth, the whole truth, and nothing but the truth, so

3    help you God?

4              THE WITNESS:  Yes.

5              THE COURTROOM DEPUTY:  Could you please spell

6    your first name and last name for the Court Reporter.

7              THE WITNESS:  W-A-D-E, B-E-R-G-E-R-O-N.

8              THE COURTROOM DEPUTY:  Thank you.

9                        WADE BERGERON,

10    first having been duly sworn by the courtroom deputy,

11            testifies under oath as follows:

12                      DIRECT EXAMINATION

13    BY MR. BLUMBERG:

14    Q.    Good afternoon, Mr. Bergeron.

15    A.    Yes.

16    Q.    So, Mr. Bergeron, you were at one point a law

17    enforcement officer; is that right?

18    A.    Yes, sir.

19    Q.    Why don't you introduce yourself to the members

20    of the jury and tell them about your tenure in law

21    enforcement.

22    A.    My name is Wade Bergeron.  I worked at the Iberia

23    Parish Sheriff's Office.  I started in the jail, worked

24    on the road, and then worked in narcotics.  Right

25    before I left, I worked on -- back on the road and in

1    the IMPACT division when I left.

2    Q.    How long did you work in the jail, sir?

3    A.    I'm not really sure.  About six months to a year.

4    Q.    Do you remember when you started at the IPSO?

5    A.    I don't know the year, but I know it was around

6    Mardi Gras, before Mardi Gras.

7    Q.    Could it have been 2006?

8    A.    Yes.

9    Q.    All right.  And after you left the jail, did you

10   become a road deputy?

11   A.    Yes.

12   Q.    And after you became a road deputy, you became a

13   narcotics agent?

14   A.    Yes, I did.

15   Q.    In general, what were your responsibilities as a

16   narcotics agent?

17   A.    Produce cases, find them, arrest people

18   selling and using drugs.

19   Q.    Roughly, was that the Summer of 2008 or before?

20   A.    Right around that time.

21   Q.    Okay.  Was that about the same time that Louis

22   Ackal became sheriff?

23   A.    Yes.

24   Q.    All right.  Who were the agents in narcotics at

25   the time that you started there?

1    A.    Jacob Huckabay, Troy Willis, Marion Borel, Ben
2    Lassalle, a couple other guys.  I don't remember their
3    names.
4    Q.    Okay.  Now, as you sit here today, you have pled
5    guilty to federal crimes, haven't you?
6    A.    Yes, I have.
7    Q.    Briefly, what's the source?  What led to those
8    plea -- that plea agreement?
9    A.    What charges led to that?
10   Q.    Yeah.
11   A.    An incident at the jail when I hit someone with a
12   baton.
13   Q.    Illegally?
14   A.    Yes.
15   Q.    All right.  That was not the first time that you
16   hit somebody illegally as a law enforcement officer,
17   was it?
18   A.    No, sir.
19   Q.    Is it fair to say that that kind of behavior on
20   your part began in the Summer and Fall of 2008?
21   A.    Yes, sir.
22   Q.    Who did you engage in that kind of behavior with
23   back then?
24   A.    The rest of the agents.
25   Q.    The people that you just described?

```
1    A.     Yes.

2    Q.     Did everybody participate equally?

3    A.     I don't know because I really work hands-on with

4    all of them.  So the ones that I worked with, yes.

5    Q.     All right.  What form did the abuses take that

6    you engaged in back in the fall and -- Summer and Fall

7    of 2008?

8    A.     Like what form?  I'm not --

9    Q.     What did you do?

10   A.     Well, part of our job, we would go and run the

11   streets.  And by running the streets, we would, you

12   know, go run at everybody who was on the streets and

13   find out what they were doing, what they were up to, if

14   they were dealing drugs.  If they were in a high drug

15   traffic area, where.

16   Q.     I'm going to ask you to speak slowly, because she

17   is going to take everything down, and lean forward.

18   A.     Yeah.  I'm sorry.

19          So part of our job was to find people who

20   were selling narcotics on the street.  So we would go

21   out and actively pursue these people, being proactive.

22   We would see people on the corner in an area where

23   drugs were known to be sold and purchased.  So we would

24   go out and apprehend these people, whoever they may be.

25          We didn't, you know, typically know who we
```

1    were going to find every time we went out.  Most of the

2    times everybody would run.  You could say *stop* a

3    million times, but they're going to run.  You would

4    chase them down.  The incidents that he's talking about

5    was, you know, when someone falls and you grab them and

6    you hit them a few times that you didn't need to,

7    that's the abuse that --

8    Q.    That actually took a couple of different forms,

9    didn't it?

10   A.    Yes, it did.

11   Q.    And we've had a chance to talk about that between

12   you and members of the FBI, haven't you?

13   A.    Yes, we have.

14   Q.    Have we talked about something that we referred

15   to as jump-outs?

16   A.    Yes.

17   Q.    All right.  Describe what that meant, actually.

18   A.    So on jump-outs, we'd get in a vehicle and we

19   would just pull up on someone and jump out of a vehicle

20   on them.  That's why it was called jump-outs.  That's

21   what we did.

22   Q.    Whether you had reason to believe that they were

23   engaging in misconduct or not; right?

24   A.    That was to be determined.

25   Q.    Right.  And even before you determined it, you

```
 1   would frequently take people and slam them into hard

 2   objects?

 3   A.    Yes.

 4   Q.    Why would you do that?

 5   A.    Set a precedence.

 6   Q.    What kind of precedent?

 7   A.    That we -- we were here to take care of everybody

 8   and secure it and, through intimidation, going to keep

 9   you off the streets.

10   Q.    Now, the area that you are talking about in

11   Iberia Parish was a predominately African-American

12   area; is that right?

13   A.    Yes, it was.

14   Q.    You were not above hurting white people as well

15   as black people, though; right?

16   A.    Right.

17   Q.    Who do you think you spent more time hurting?

18   A.    Black people.

19   Q.    And in the course of these jump-outs, would you

20   use slurs and call names?

21   A.    Every now and then, yes.

22   Q.    All right.  How often do you think in the Fall

23   and Summer of 2008 that you and your fellow narcotics

24   agents were jumping out of cars and slamming people

25   into objects before you knew if you had a reason to?
```

1    A.    Like a number?

2    Q.    Yeah.

3    A.    Um, through the tenure through my entire time,

4    100, 200 times.

5    Q.    All right.  And what we're talking about now is

6    physical force that would have been in violation of

7    your Use of Force training; is that right?

8    A.    Yeah.  Well, just the jump-outs.  I would say

9    that number is a little bit less on the Use of Force

10   violations.

11   Q.    You mean, in total?

12   A.    In total, correct.

13   Q.    So we'll come back to Use of Force training in a

14   moment and talk about the other form of abuse that

15   you've described; okay?  The other form of abuse

16   related to you chasing people down?

17   A.    Correct.

18   Q.    Describe what you mean by that.

19   A.    So when you would walk up to someone or run up to

20   someone or approach someone in whatever fashion who was

21   in an area that you believed to be a high drug traffic

22   area, the kind of -- the unspoken rule was whoever ran

23   was guilty.  So whoever ran, we chased.  And that's,

24   you know, chase 'em, catch 'em, tune 'em up.  Several

25   terms were used, but definitely hit them more times

1    than they needed to be to effect the arrest.

2    Q.    You did have Use of Force training in order to

3    become POST-certified; right?

4    A.    Yes, I did.

5    Q.    And is it fair to say you also had Use of Force

6    training on an annual basis to be a member of the

7    Iberia Parish Sheriff's Office?

8    A.    Yes, I did.

9    Q.    Without going into the details of your Use of

10   Force training, did any of the conduct you just

11   described violate your Use of Force training?

12   A.    Yes.

13   Q.    Why?

14   A.    So Use of Force training was left up to the

15   officer because of the situation.  So I guess for

16   anyone to say if it was a violation, it would be the

17   officer.  I'm saying it was.

18   Q.    Okay.  Because you were using more force than was

19   reasonably necessary to deal with a threat or to make a

20   detention or to gain compliance?

21   A.    Yes, sir.

22   Q.    All right.  At the time that you and your fellow

23   narcotics agents were engaging in this kind of abuse in

24   2008 and into 2009, did you have any question as to

25   whether your conduct was appropriate or not?  Let me

1    see if I can ask it this way.

2          Did you have any question as to whether it

3    violated your policies and training?

4    A.    Oh, no.  I knew it did.

5    Q.    Okay.  You hesitated on the stand a moment ago

6    when I asked whether it was appropriate or not.  Right?

7    A.    Right.

8    Q.    Why did you hesitate to that question?

9    A.    Appropriate when, I guess was the question.

10   Q.    In the Fall and the Summer of 2008, moving into

11   2009, where are you concerned and having difficulty

12   answering whether the behavior was appropriate?

13   A.    At the time, it just -- it's just what we did.

14   It wasn't -- I never thought about it being appropriate

15   or inappropriate.  It's just what we did, how we acted

16   and how we got things done.  I do not believe now that

17   it is appropriate.

18   Q.    Even though you knew that it was wrong, according

19   to your training --

20   A.    Yes, I did.

21   Q.    -- policies and procedures?

22   A.    Yes, I did.

23   Q.    Okay.  Here is a commitment.  We're going to try

24   not to talk over each other so she doesn't throw things

25   at us; okay?

1    A.      Sorry.

2    Q.      Thank you.  So did there come a time during the

3    Fall of 2008 in which there was sort of a change in the

4    behavior of the narcotics unit?

5    A.      I don't know what you're --

6    Q.      Sure.  Did something happen in the Fall of 2008

7    in which there was a slightly different attitude by the

8    narcotics people based on an event that you

9    participated in?

10   A.      Oh, yes.

11   Q.      Okay.  Do you recall being involved in a criminal

12   act in November of 2008?

13   A.      I remember the exact timeframe, and I know what

14   you are referring to, yes, sir.

15   Q.      Okay.  And we can use a report to give the date

16   in a moment.  But why don't you tell the members of the

17   Jury what happened in early November 2008 that had an

18   impact on you in the narcotics unit.

19   A.      Myself and two other agents were at a party and

20   we were drinking and we left that party and we went and

21   got in a fight with two other people.  And there were

22   three of us and we went and beat up two other people.

23   Q.      To be clear, this wasn't a fight, was it?

24   A.      No, no.  I mean, we went and beat up two people.

25   Q.      Okay.  And what happened?

1    A.    And then we left.  We ran, and they caught up to

2    us.  Several -- several people caught up to us.  I was

3    taken into the back of a unit, the department was

4    called and I went and got in the back of the unit.

5    Q.    Why didn't the police show up?

6    A.    Because the people we got in a fight with -- the

7    people we beat up called the sheriff's department.

8    Q.    They called for help?

9    A.    Yes.

10   Q.    Because one of the kids was 16 years old; right?

11   A.    I believe so, yes.

12   Q.    And the other one was 21; right?

13   A.    Yes.

14   Q.    And so they called the police for help?

15            MR. MCLINDON:  Objection.  Leading.

16            MR. BLUMBERG:  I'll be more careful.

17   BY MR. BLUMBERG:

18   Q.    At the time that you beat these people up, did

19   you identify yourselves as police?

20   A.    No, I did not.

21   Q.    Were you with other police officers?

22   A.    Yes, I was.

23   Q.    Did either of them identify themselves as police?

24   A.    No, we did not.

25   Q.    Did you have an opportunity to talk to Iberia

1    Parish Sheriff's deputies when they arrived in response

2    to the call for help from victims?

3    A.    Yes, I did.

4    Q.    Do you remember who those people were?

5    A.    The only one I remember was Richard Baker.  And

6    when he pulled up, I said, *just put me in the back of*

7    *your car and take me out of here.*

8    Q.    Did he ask you any questions?

9    A.    He did but I over spoke him and said, *put me in*

10   *the back of your car and take me out of here.*

11   Q.    Where did he take you?

12   A.    I believe he took me to the parking lot of a

13   restaurant down the street.

14   Q.    Were there other deputies there?

15   A.    Yes.

16   Q.    Do you know a deputy by the name Jeremy Kelley?

17   A.    Yes, I do.

18         THE COURT:  You just have to pause between

19   question and answer.  I know you're anxious to get this

20   going, but give the court reporter a break, please.

21   BY MR. BLUMBERG:

22   Q.    How do you know Jeremy Kelley?

23   A.    I worked with him.

24   Q.    Was he present in the parking lot when you

25   arrived there that night?

1    A.    Yes, he was.

2    Q.    Did you have an opportunity to talk to him?

3    A.    I believe I did, yes.

4    Q.    Did you explain to him what had happened?

5    A.    No.

6    Q.    Truthfully?

7    A.    No.  No, I did not.

8    Q.    Did you give him a false version of what had

9    happened?

10   A.    I don't think I told him anything at that time.

11   Q.    Were you worried about Jeremy Kelley's reaction

12   to the circumstances that brought him there?

13   A.    Yes.

14   Q.    Why were you worried?

15   A.    I didn't want to get in trouble, and I knew that

16   I had done something wrong.

17   Q.    What did you do after you left the parking lot?

18   A.    I went back to Troy Willis's house where we

19   had -- where we were at.

20   Q.    I'm going to show you what has been previously

21   marked as Government's Exhibit 17 for identification,

22   and ask you to take a look at that if you would,

23   please, when it shows up on your screen.  Is it in

24   front of you?

25   A.    A statement, yes, sir.

```
 1    Q.    Okay.  Just take a look at it for a moment.  Does

 2    that report have a date on it?

 3    A.    Yes, it does.

 4    Q.    Does that appear to be your report that you

 5    originally wrote in connection with the episode that

 6    you have just described?

 7    A.    Yes, it is.

 8    Q.    Is that a true or a false statement?

 9    A.    A false statement.

10          MR. BLUMBERG:  Move Government's 17 into

11    evidence, Your Honor.

12          MR. MCLINDON:  No objection.

13          THE COURT:  Without objection.

14          MR. BLUMBERG:  Can we publish?  Thank you.

15          See if you can highlight the very top,

16    please.

17    BY MR. BLUMBERG:

18    Q.    Do you see the date there, Mr. Bergeron?

19    A.    Yes, I do.

20    Q.    11/2/08?

21    A.    Yes.

22    Q.    And the time stamp, what is that?

23    A.    2:30 a.m.

24    Q.    Do you think you wrote this report at 2:30 a.m.

25    on 11/2/08?
```

1    A.    No, I do not.

2    Q.    When do you think you wrote this report?

3    A.    I believe the next day.

4    Q.    Why would you have backdated or back-timed it?

5    A.    A chain of evidence.

6    Q.    Okay.

7          MR. BLUMBERG:  Steve, can you go back out to

8    the body of the report, please.

9    BY MR. BLUMBERG:

10   Q.    Could you read that out loud, please?

11   A.    *I, Deputy Bergeron --*

12         THE COURT:  Slowly.

13         THE WITNESS:  Sorry.

14         *I, Deputy Bergeron, on 11-2-2008, was in the*

15   *area of Back Manila when I observed a white Dodge --*

16   and I can't read the -- *Durango.  Someone exit the*

17   *vehicle when the* -- I can't read it -- *I then left the*

18   *area.  I then jumped several fences.  My shirt was torn*

19   *by the fence, and I stopped at a residence on French*

20   *Street and waited until units arrived.*

21   BY MR. BLUMBERG:

22   Q.    Is Government's Exhibit 17 an official report on

23   official IPSO stationery or paperwork?

24   A.    Yes, sir.

25   Q.    Is it designed to be an official statement by you

1    as a law enforcement officer of the circumstances that

2    occurred on 11/2/08?

3    A.    Yes, sir.

4    Q.    All right.

5          MR. BLUMBERG:  You can take it down, Steven.

6    Thank you very much.

7    BY MR. BLUMBERG:

8    Q.    So how did you come to write this false report

9    that's in -- well, by the way, was it?  You said it was

10   false.  What was false about it?

11   A.    It left a lot of the truth out.

12   Q.    What truth did it leave out?

13   A.    The whole ordeal of me beating someone up.

14   Q.    Why did you go beat those kids up, by the way?

15   A.    Stupidity.

16   Q.    Anything else to it?

17   A.    Alcohol.  I just -- I made a mistake.  I don't

18   know what else to --

19   Q.    Who did you go looking for to beat up?

20   A.    Anyone.  We went into a predominantly black area,

21   if that's what you're --

22   Q.    You knew who you were looking for that night,

23   didn't you?

24   A.    Not -- I'm -- no, I'm not looking for anyone in

25   particular, if that's what you're asking.

```
 1    Q.    So how did you wind up beating up two teenagers,

 2    a 16-year old and a 21-year old?

 3    A.    That was the first people we came across.

 4    Q.    Did they do anything to you?

 5    A.    No.

 6    Q.    Did they say anything to you?

 7    A.    No.

 8    Q.    Did they pose any threat to you?

 9    A.    No.

10    Q.    You and two other agents just --

11    A.    Jumped them when they were in an area where no

12    one else could see us.

13    Q.    If people of Iberia Parish had done that to

14    somebody, what should happen to them?

15    A.    Um, they would be arrested and charged for that

16    crime.

17    Q.    Is that the sort of thing that Iberia Parish

18    Sheriff's Office typically investigates and arrests

19    people for?

20    A.    Yes, sir.

21    Q.    All right.  Were you investigated or arrested for

22    that?

23    A.    I was not arrested for that.  No, sir.

24    Q.    Why not?

25                MR. MCLINDON:  Objection.  Calls for
```

```
 1   speculation.  He doesn't know why.
 2              MR. BLUMBERG:  I think he does.
 3              THE COURT:  Do you know?
 4              THE WITNESS:  I believe I do, yes.
 5              THE COURT:  Go ahead.
 6              THE WITNESS:  So after that happened, the
 7   next day we, as a group, the three of us, went and
 8   talked to our lieutenant.  I believe he was
 9   lieutenant or captain.  He was a captain at the time.
10   And we told him what happened.
11   BY MR. BLUMBERG:
12   Q.    When you say you told him what happened -- by the
13   way, do you remember the man's name?
14   A.    Yes, I do, but not right this second.
15   Q.    Was it Grady Thibodeaux?
16   A.    Yes, it was Grady Thibodeaux.  Yes.
17   Q.    When you say you told him what happened, did you
18   tell him the truth about what you did?
19   A.    Yes, we did.
20   Q.    Did you tell him that you had been caught by
21   sheriff's deputies?
22   A.    Yes, we did.
23   Q.    Did you tell him you were worried that the
24   sheriff's deputies might identify you as suspects in a
25   beating?
```

1   A.    If we did, I don't remember that.  I don't

2   remember that.

3   Q.    Okay.  So what did you tell your captain?

4   A.    So we told him what happened and he said, *you got*

5   *to go tell the sheriff*.

6   Q.    Did you?

7   A.    Yes, we did.

8   Q.    Describe the circumstances of that meeting.

9   Where did it take place?

10  A.    In his office.

11  Q.    Who else was present?

12  A.    All I remember is us three.

13  Q.    Do you remember whether Thibodeaux was present?

14  A.    He may have been, but I don't -- I don't remember

15  him being there.

16  Q.    You were there?

17  A.    Yes, I was.

18  Q.    Was Huckabay there?

19  A.    Yes, he was.

20  Q.    And was Willis there?

21  A.    Yes, he was.

22  Q.    And was Louis Ackal there?

23  A.    Yes, he was.

24  Q.    Did you tell Louis Ackal what happened the night

25  before?

```
1    A.    Yes, we did.

2    Q.    Did you tell him the truth?

3    A.    Yes, we did.

4    Q.    Did you tell him you had beaten up two kids for

5    no good reason?

6    A.    Yes, I did.

7    Q.    Did you tell him you had been stopped by

8    sheriff's deputies?

9    A.    Yes, we did.

10   Q.    Did you tell him that you didn't have any basis

11   to beat those kids?

12   A.    I think it was implied.  I don't think we had to

13   say it.

14   Q.    What did he tell you?

15   A.    Uh, his remark was, it sounds like just another

16   case of nigger knocking.

17   Q.    What did you understand that comment to mean?

18   A.    Um, I didn't really -- it broke the mood, so I

19   felt more comfortable that I wasn't about to go to jail

20   and that what I had done wasn't as bad as I thought it

21   was to be.

22   Q.    Why did you -- did you really think it wasn't as

23   bad as you thought it would be?

24   A.    As horrible as that sounds, yes, sir.

25   Q.    I don't understand that.  Please explain that.
```

1  A.   I guess at -- like as a kid, you know, you're
2  waiting for the punishment from your father, reprimand
3  from whomever, for something you believe you did wrong.
4  And then whenever that person doesn't reprimand you for
5  what you did, then, okay, so it wasn't that bad.
6  Q.   How did you come to write Government's Exhibit
7  Number 17?
8  A.   We were told that was the story that we were
9  going to tell, and that was the only story we were
10  going to tell.
11  Q.   Who told you that?
12  A.   The sheriff did.
13  Q.   What did you understand that to mean?
14  A.   That that was the story that was going to be on
15  the books and that was the truth and the only truth.
16  Q.   Are you saying that the chief law enforcement
17  officer of Iberia Parish instructed you to write a
18  false report to cover up your beating of these two
19  kids?
20  A.   Yes, sir.
21  Q.   Did you?
22  A.   Yes, I did.
23  Q.   Did Jacob Huckabay?
24  A.   I believe he did.
25  Q.   Did you get prosecuted for that beating?

1    A.    No, I did not.

2    Q.    Do you know whether there were any other reports

3    that were written that documented the assault that you

4    and the other narcotics agents committed?

5    A.    I -- I was told that there was an ARMMS report,

6    which is the system that we used to document all of the

7    investigations and crimes and incidences that we're

8    involved in.

9    Q.    Let me interrupt you for one second.   ARMMS, is

10   A-R-M-S?  Do you know?

11   A.    I believe it's A-R-M-M-S.   I'm not sure.

12   Q.    It's just the acronym that you use for the

13   computer system in the IPSO that keeps track of

14   official reports?

15   A.    Correct.

16   Q.    Okay.  Did you ever go looking for that official

17   report that you believed to exist?

18   A.    I did.

19   Q.    How do you do that?

20   A.    I log into the system and look up that report.

21   Q.    Did you find it?

22   A.    We did, yes.   I didn't do it by myself.   I

23   believe it was Huck who called it to my attention.   And

24   then me and Huck went and looked at it and he showed it

25   to me.

1    Q.    And what did it say?

2    A.    It said almost exactly what happened --

3            MR. MCLINDON:  Objection.  Objection.

4    Hearsay.  Quoting from that report.

5            THE COURT:  Any exceptions?

6            MR. BLUMBERG:  Yes, Your Honor.  It is going

7    to explain future actions.  It's also a business

8    record.

9            THE COURT:  All right.  Proceed.

10           THE WITNESS:  So it read what they observed.

11   BY MR. BLUMBERG:

12   Q.    Were you named as a suspect in Jeremy Kelley's

13   report?

14   A.    Yes, I was.

15   Q.    What happened to that report?  Do you know?

16   A.    No.  I know that looking it up later, I was

17   unable to find it.

18   Q.    When you say *looking it up*, do you mean on the

19   ARMMS system?

20   A.    I do.

21   Q.    How long after did you go looking for the report?

22   A.    It was within a couple of months, but not much,

23   not long after.

24   Q.    Why did you try and find it again?

25   A.    Because I was told it wasn't there.

1    Q.    Who told you?

2    A.    I don't remember.  Either -- the guys, either

3    Huck or Troy or somebody.

4    Q.    Why was that important to you to learn whether it

5    was still there or not?

6    A.    Because that reiterated the fact that I was

7    untouchable.

8    Q.    Is that how you felt after this episode?

9    A.    Yes, sir.

10   Q.    Did you get disciplined for this at all?

11   A.    Yes, I did.

12   Q.    What was your discipline?

13   A.    I was -- left narcotics and went back to patrol.

14   Q.    How long were you in patrol?

15   A.    Six months.

16   Q.    And then?

17   A.    Back to narcotics.

18   Q.    Did your name ever get referred to a prosecutor,

19   as far as you know?

20   A.    No, it didn't.  No.

21   Q.    Okay.  We started this part of the testimony with

22   saying what was the impact of this episode on you and

23   the behavior in the narcotics unit by fellow narcotics

24   agents; right?

25   A.    Right.

1    Q.    What was the impact of this episode on the

2    narcotics unit?

3    A.    That we could pretty much get away with anything.

4    Q.    Did you talk about that amongst your narcotics

5    agent colleagues?

6    A.    Yeah, a little bit.

7    Q.    What did you talk about?

8    A.    That we were lucky to not be in jail.  That, you

9    know, that is, you know, other than a DWI or anything

10   like that, we were safe.  We were good, you know.

11   Q.    What does that mean?

12   A.    That freed up the reins quite a bit to anything

13   went it came to a black and white line.

14   Q.    Mr. Bergeron, you're going to have to be more

15   explicit.  What did that mean to you and what did you

16   talk about --

17   A.    So what it meant is that to have done that, it

18   was okay to do again.  That was okay to go there.  That

19   this is the worst that's going to happen.  Well, that

20   really wasn't, you know, that bad.  So if it happened

21   again, well, that was the worst I was going to have to

22   put up with, then it wasn't that big of a deal.

23   Q.    Because you were protected?

24   A.    Yes.

25   Q.    By whom?

1    A.    By the sheriff.

2    Q.    Was this a conversation that was had amongst

3    narcotics agents?

4    A.    Yes.

5    Q.    You've indicated, I think -- I'll start with a

6    question.  Was the narcotics unit fairly close?

7    A.    Oh, yes, we were.

8    Q.    Is this the sort of thing that would have been

9    shared amongst your narcotics agent colleagues?

10   A.    Oh, yes.

11   Q.    And was it shared?

12   A.    Yes, it was.

13   Q.    Do you know a know a man named *Gerald Savoy*?

14   A.    Yes, I do.

15   Q.    Was he in the unit at the time that you were

16   there?

17   A.    Yes, he was.

18   Q.    Is it fair to say that he engaged in the same

19   kind of abuses that you engaged in?

20   A.    Yes, it is.

21   Q.    Did you ever have any concern or issue that

22   Gerald Savoy would report you to anybody?

23   A.    No.

24   Q.    Why not?

25   A.    He was a member of the unit.

1    Q.    What kind of behavior did Gerald Savoy engage in

2    that made you clear on how he felt about using more

3    force than was necessary?

4    A.    Because he took part in it.

5    Q.    Do you remember an episode in which Gerald Savoy

6    specifically asked to you hit somebody within your

7    custody?

8    A.    Yes.

9    Q.    Describe that episode, please.

10   A.    I had effected an arrest on a guy in the car.

11   During the arrest, the individual had punched me

12   several times.  I handcuffed him and had him off to the

13   side.  And Gerald Savoy pulled up in his unit and asked

14   Bret Broussard, who was with me, what had happened.

15   And Bret told him that the guy had hit me several times

16   and, you know, what we've got, you know, what the case

17   was.  Because this is now a case.

18          So Bubba told me to put him in the back of

19   the car.  So I put him in the back seat of the -- in

20   the back seat of our unit, or his unit and we left

21   there.  He said, *let's go take a ride*.  So we did.  We

22   took a ride.  We drove down --

23   Q.    Excuse me.  The phrase "let's go take a ride,"

24   shouldn't you have simply gone back to finish arrest

25   paperwork?

```
 1    A.    Yes.

 2    Q.    The man had committed crimes; right?

 3    A.    Yes.

 4    Q.    What should have happened?

 5    A.    He should have been brought to the parish jail

 6    and booked.

 7    Q.    Is that a fairly common procedure?

 8    A.    Yes, it is.

 9    Q.    Is that what happened initially?

10    A.    Initially?

11    Q.    Yeah, when you say let's take a ride.

12    A.    Yeah, that's what I thought was going to happen.

13    Q.    Okay.  And what did happen?

14    A.    That's not what happened.  We drove down a road

15    in south Louisiana.  During that time, we had a lot of

16    cane.  And to the right of the road was a cane field,

17    and to the left of the road was a tree line and there

18    were no street lights.  It was a very dark area.

19              THE COURT:  Okay.  Slow down.

20              THE WITNESS:  Bubba stopped the car.  We

21    parked the unit.  I got out.  We got the guy out.

22    Bubba -- Gerald Savoy took the guy and kneeled him down

23    by the back tire and started yelling at him profanity

24    and just -- I can't recall exactly what he was saying.

25              At some point, he pulled his revolver out and
```

1    removed a bullet from his revolver.  He placed a bullet

2    in the guy's mouth and continued to yell at him about,

3    *How does that feel when you have a bullet in your*

4    *mouth?*  And then he -- the guy was trembling, so the

5    bullet was shaking.  The bullet fell out of his mouth.

6    And Bubba, Gerald Savoy, put his revolver in the guy's

7    mouth and continued to yell at him.  And then he pulled

8    the gun out, and he instructed me to hit the guy and,

9    you know, show him that he will not hurt one of our

10    agents.

11          I did not hit him.  I kind of laughed it off.

12    When I'm nervous, that's just what I do, I just laugh.

13    So we put the guy back in the car and ended up booking

14    him in the jail.

15    BY MR. BLUMBERG:

16    Q.    So why were you nervous?

17    A.    That was going really far.

18    Q.    Even for you?

19    A.    That was definitely way further than -- yes.

20    Q.    What were your impressions of Gerald Savoy after

21    that episode?

22    A.    I was scared.

23    Q.    How would you characterize how close Gerald Savoy

24    was with Louis Ackal?

25    A.    I never saw him, you know -- well, I saw him out

1    drinking a few times.  But Gerald Savoy moved up really

2    fast when -- in rank.  When we started, me and him were

3    of equal rank.  Shortly after, he became sergeant,

4    lieutenant.  And then within four or five years, he was

5    lieutenant or captain.  So...

6    Q.    Was there anything at all appropriate about

7    taking a guy out to a cane field, putting a bullet in

8    his mouth, putting a gun in his mouth and ordering a

9    subordinate to hit him?

10   A.    No, sir.

11   Q.    Did you report Gerald Savoy to Louis Ackal?

12   A.    No, sir.

13   Q.    Why not?

14   A.    He was either my lieutenant or captain at the

15   time.  And my direct supervisor was Bret Broussard, the

16   guy back at the car.  I spoke to him about it, and

17   nothing ever came of it.

18   Q.    Mr. Bergeron, you were a sworn law enforcement

19   officer.

20   A.    Yes, I was.

21   Q.    He was the chief law enforcement officer in the

22   parish.

23   A.    Yes, sir.

24   Q.    Why not break chain of command and go talk to the

25   boss and say, *This was terrible behavior*?

1  A.    I didn't think anything would be done.

2  Q.    Why not?

3  A.    Because nothing had been done in the past.

4  Q.    When?

5  A.    When we beat up the guys in the -- you know, in

6  the field, me, Troy and Huck, the complaints that I

7  know had to be coming in or I believe were, you know,

8  being lodged at the sheriff's department.

9  Q.    You know a man named *Jason Comeaux*?

10  A.    Yes, I do.

11  Q.    How do you know him?

12  A.    I worked with him.

13  Q.    In the narcotics unit?

14  A.    Yes.

15  Q.    How would you describe his relationship with

16  Louis Ackal?

17  A.    I believe they were very close.  He bragged about

18  living next to the sheriff and that anything he needed,

19  he would just go ask the sheriff.

20  Q.    Do you think that he and Sheriff Ackal talked

21  about abuses within the narcotics unit?

22          MR. MCLINDON:  Objection.  Calls for

23  speculation.

24          THE COURT:  Sustained.

25  BY MR. BLUMBERG:

1   Q.    Have you ever heard --

2              MR. MCLINDON:  Objection.  Hearsay.

3              MR. BLUMBERG:  A co-conspirator hearsay

4   statement.

5              THE COURT:  You may answer.  If you would

6   just finish the question.

7              MR. BLUMBERG:  Yes, sir.  I apologize.

8   BY MR. BLUMBERG:

9   Q.    Have you and Jason Comeaux ever had any

10  conversations in which he has acknowledged that he has

11  discussed abuses by the narcotics unit with Louis

12  Ackal?

13  A.    I believe so, yes.

14  Q.    How many times do you think that happened?

15  A.    I don't know.  Fifty times.

16  Q.    Did you ever see any discipline of anybody after

17  those conversations were reported to you?

18  A.    No.  In fact, Jason was -- he was also elevated

19  in rank.

20  Q.    Did Jason engage -- Jason Comeaux engage in the

21  same kind of abuses that you've just described?

22  A.    Yes, sir.

23  Q.    Does Jason's behavior -- or did Jason's behavior,

24  as well as his conversations regarding what he had told

25  Louis Ackal in the past, contribute to your decisions

1    not to report things to Louis Ackal?

2    A.    Yes.

3    Q.    Was there another reason?

4    A.    That I didn't report them to Louis?  I didn't

5    want to -- I didn't want to lose my job.

6    Q.    Well, and to be fair, what else?  You didn't mind

7    these abuses that much, did you?

8    A.    No, no.  Well, some of them, I did, but most --

9    for the most part, no.  You're correct.

10   Q.    Okay.  And were you worried about getting in

11   trouble yourself if you were to report these?

12   A.    Not anymore, no, sir.

13   Q.    Okay.  So let's talk about a man named *Ricky*

14   *Roche*.  You know Ricky Roche; right?

15   A.    Yes.

16   Q.    Or you did.  Okay.  Did you and other narcotics

17   units come to learn that Ricky Roche was accused of

18   taking a swing at your supervisor, Gerald Savoy?

19   A.    I was told he hit him.

20   Q.    And did you and the narcotics agents do something

21   about it?

22   A.    Yes, we did.

23   Q.    What did you do?

24   A.    We tracked him down, and it ultimately led to a

25   vehicle pursuit.  At the end of the vehicle pursuit, he

1    jumped out of his -- well, during the vehicle pursuit,

2    a female jumped out of his vehicle.  Then he came to a

3    stop, and he took off running.  When he took off

4    running, I caught him around the backside of a trailer.

5    Q.    Slowly.

6    A.    He -- he fell down.  Ben -- Benjamin -- Byron,

7    anyway, he came around the other side of the trailer,

8    and he grabbed the guy.  Whenever I came around the

9    trailer, I hit an oxygen cylinder bottle or

10   something -- I believe that's what it was.  Anyway, I

11   fell to the ground.

12   Q.    Slowly, Mr. Bergeron.

13   A.    So Ben had him.  And then I remember Bubba

14   showing up and hitting the guy before he was arrested

15   or brought to the units that were there.

16   Q.    Did you hit the guy?

17   A.    Yes.  I believe I did, yes.

18   Q.    Did you hit him within policy or outside of

19   policy?

20   A.    Outside policy.

21   Q.    Did you beat the guy up?

22   A.    Yes.

23   Q.    Did Ben Lassalle beat him up?

24   A.    Yes.

25   Q.    Did Gerald Savoy?

```
 1   A.    Yes.

 2   Q.    It would have been appropriate, right, for him to

 3   be arrested for punching Gerald Savoy outside a bar?

 4   A.    I believe so, yes.

 5   Q.    Why would narcotics go out and target this man,

 6   then?

 7   A.    Because of who he hit.

 8   Q.    Your boss?

 9   A.    Yes.

10   Q.    Did you write any reports as it relates to your

11   surveillance and arrest and detention of Ricky Roche?

12   A.    I don't remember.

13   Q.    Okay.  I'm going to show you what has been

14   previously marked as Government's 18 for

15   identification.

16         MR. BLUMBERG:  If you could bring that up,

17   Steven, please.

18   BY MR. BLUMBERG:

19   Q.    Take a look at that.  Take a few moments to look

20   at it, if you would.

21         (Pause in the proceedings.)

22         THE WITNESS:  Okay.

23   BY MR. BLUMBERG:

24   Q.    Okay.  Are you familiar with that report?

25   A.    I am.
```

1    Q.    Let me ask you this.  If you --

2          MR. BLUMBERG:  Steven, if you can move to

3    page 3 of the report, please, Exhibit 18-003.

4    BY MR. BLUMBERG:

5    Q.    Does that appear to be your signature at the

6    bottom of the report?

7    A.    Yes, it does.

8    Q.    Does this appear to be the report that you wrote

9    related to the arrest of Ricky Roche?

10   A.    Yes, it does.

11   Q.    Is this a false report or a true report?

12   A.    It's false.

13   Q.    Is it, as far as you can remember, an accurate

14   rendition or an accurate depiction of your false

15   report?

16   A.    Yes.

17         MR. BLUMBERG:  Move Government's 18 into

18   evidence, Your Honor?

19         MR. MCLINDON:  No objection.

20         THE COURT:  Without objection.

21   BY MR. BLUMBERG:

22   Q.    Mr. Bergeron --

23         MR. BLUMBERG:  I would ask to publish.  Thank

24   you.

25   BY MR. BLUMBERG:

1    Q.    If I could direct your attention to 18-002 or the

2    second page.

3              MR. BLUMBERG:   Steven?

4    BY MR. BLUMBERG:

5    Q.    And I'm about three paragraphs down in the

6    paragraph that begins *Ricky struck me*.  Do you see

7    that?

8    A.    Yeah.

9    Q.    Would you read that sentence out loud, please.

10   A.    *Ricky struck me with a closed fist on the left*

11   *side of my neck.  After being hit, I let go of his*

12   *shirt, and he began to run again.  I continued to chase*

13   *him as he turned and ran.*

14   Q.    Okay.  You can stop there.  That line about Ricky

15   Roche, *Ricky struck me with a closed fist on the left*

16   *side of my neck*, that's a false statement; right?

17   A.    Yes.

18   Q.    Why did you write a false statement like that in

19   this particular document?

20   A.    To justify the use of force.

21   Q.    Could you please explain that in more detail to

22   the jury?

23   A.    So the Use of Force policy is that you can use

24   the same force on them that they use on you or one step

25   higher.  And if he had hit me, then that would justify

1   us hitting him.

2   Q.    How did you come up with the idea of creating a

3   false injury or a false strike to yourself?

4   A.    It was not my idea.

5   Q.    Whose idea was it?

6   A.    Either Ben's or Bubba's.

7   Q.    What happened?

8   A.    I was in Bret's office, I believe.  I think,

9   yeah, Bubba was captain at the time.  So it was Bret's

10  office.  And they were talking about -- and I say *they,*

11  whoever was in the office.  And it was me, Ben and

12  Bubba for sure.  I don't know who else was in there.

13  Q.    Slowly.

14  A.    They were discussing that someone had to have

15  been hit for the report to be -- to read accurately.

16  At this point, Ben hit me really hard on the neck with

17  an open hand, so hard it knocked me to my knees, and it

18  left what he wanted, was a nice whelp and red mark.

19  Q.    Why not just make it up as opposed to going

20  through the charade of actually being hit?

21  A.    Well, photos are worth a thousand words.  That's

22  what he said.

23  Q.    And did you, in fact, take a photo of that

24  injury?

25  A.    Yes, there was a photo taken.

1    Q.    Do you know what ever happened to that photo?

2    A.    No, I do not.

3    Q.    Have you ever seen it since it was taken?

4    A.    I don't think so.

5    Q.    To be clear, did you include this fabricated

6    injury in the report in order to justify the abuse if

7    anybody had looked close enough?

8    A.    I'm sure we did, yes.

9    Q.    Where did you learn to do that?

10   A.    Where did I learn to do what?

11   Q.    Create a false injury.

12   A.    Right then and there.

13   Q.    That's the first time?

14   A.    Yes, sir.

15   Q.    Anybody else ever talk about it before?

16   A.    Yeah.  It had been talked about.  It's just never

17   been done to me like that.

18        MR. BLUMBERG:  You can take that down,

19   Steven.  Thank you.

20   BY MR. BLUMBERG:

21   Q.    Did Gerald Savoy have any objection to you

22   writing a false report and creating a fabricated

23   injury?

24   A.    No, sir.

25   Q.    Did Mr. Roche get beaten any further that day?

1    A.    I believe he did, yes.

2    Q.    Why do you believe that?

3    A.    Because he was the person on the bench that was

4    hit.  Whenever we arrested him, we took him back to our

5    office.  He was shackled to a bench.  So the

6    shackles took a pipe under the bench to your ankle so

7    you can't run.  The back of the bench sits against the

8    brick wall.  I was in the kitchen area of our office,

9    and I was right adjacent to where the bench is.

10            I walked in that area after he had been put

11   down on the bench.  And I think it was Comeaux who was

12   hitting him at the time.  And I walked back into the

13   kitchen where -- I don't remember his name.

14   Q.    Todd Anslum?

15   A.    -- Todd was.  And Gerald was in the kitchen.  And

16   Gerald pulled Todd off to the side and said, *If you*

17   *don't hit him, no one here is going to respect you.*

18   Q.    Did Todd hit him?

19   A.    Yes, he did.

20   Q.    Did you hit him?

21   A.    Not there, but I did earlier, yes.

22   Q.    Effectively, was this the way the narcotics unit

23   did business on a regular basis?

24   A.    Not to this extreme, but, yes.

25   Q.    Let's talk about the narcotics office for a

1    moment.  Would you have ever excluded Louis Ackal from

2    the narcotics office if he wanted to walk in?

3    A.    No, sir.

4    Q.    Why not?

5    A.    He's the sheriff.

6    Q.    Would you have ever found a way to hide reports

7    from him?

8    A.    No, sir.

9    Q.    Why not?

10   A.    He's the sheriff.

11   Q.    If he asked you to come in and see how you did

12   business as a narcotics agents, would you have let him?

13   A.    Most definitely, yes, sir.

14   Q.    Why?

15   A.    Because he's the sheriff.

16   Q.    What would have happened if you had tried to

17   exclude the sheriff from your narcotics unit?

18   A.    Brimstone and fire.

19   Q.    Let's talk about the chapel on April 29, 2011,

20   okay?

21   A.    Yes, sir.

22   Q.    It's the behavior on that day that led to your

23   plea agreements; right?

24   A.    Yes, it is.

25   Q.    Okay.  What brought you into the jail that day?

1    A.    Um, I believe the shakedown.

2    Q.    Were you a member of the SWAT unit in April of

3    2011?

4    A.    I believe I was, yes, sir.

5    Q.    When you arrived, did you go in your capacity as

6    SWAT or narcotics?

7    A.    As narcotics.

8    Q.    Okay.  Do you remember what kind of gear you had?

9    A.    No, not exactly, but more than likely, it would

10   have been a TAC vest and a set of BDUs.

11   Q.    Were you carrying any weapons?

12   A.    Like handguns?

13   Q.    Any kind of weapon.

14   A.    Intermediate only.

15   Q.    Which would have been what?

16   A.    Baton, pepper spray.

17   Q.    Do you remember what kind of baton you were

18   carrying?

19   A.    Collapsible.

20   Q.    I'm going to show you what has been previously

21   marked as Government's Exhibit 54 for identification

22   for demonstrative purposes only.  Does that fairly and

23   accurately reflect the kind of baton you would have

24   carried on April 29th, 2011, into the jail?

25   A.    Similar, yes.

1    Q.    How is that typically used?

2    A.    What do you mean?  How was it --

3    Q.    How do you typically use a baton?  Why do you

4    typically use a baton?

5    A.    To restrain someone.

6    Q.    Did you find yourself in the chapel at any point

7    in time on April 29th, 2011?

8    A.    Yes, I did.

9    Q.    Who was in the chapel when you found yourself

10   there?

11   A.    The warden, myself and Jason -- or -- and Ben.

12   Q.    Okay.  Was there anybody else in there at the

13   time?

14   A.    Not that I remember.

15   Q.    How about an inmate?

16   A.    Yes.

17   Q.    What was the inmate doing?

18   A.    Being hit.

19   Q.    Who was hitting the inmate?

20   A.    Which one?

21   Q.    Let's start with the first one you remember.

22   A.    Um, the first one was Jason and Ben.

23   Q.    What were they using?

24   A.    Batons.

25   Q.    Were they using collapsible batons, like

1    Government's Exhibit 54, or also straight batons?

2    A.    I believe they were using straight batons.

3    Q.    I show you now what has been previously marked as

4    Government's 52 for identification and demonstrative

5    purposes.  Is that a straight baton?

6    A.    Yes, it is.

7    Q.    Is that like the baton that was being used in the

8    chapel on April 29th, 2011, by Lassalle and Comeaux?

9    A.    Yes, it is.

10   Q.    How were they using that baton?

11   A.    They were questioning and hitting the inmate.

12   Q.    How did you get in -- why were you in the chapel?

13   A.    I didn't want to search cells.

14   Q.    So why did you go in the chapel as opposed to,

15   say, the library or the parking lot?

16   A.    Oh.  Well, I was searching cells, and I saw Ben

17   and Jason, and I could get away from the cell searches,

18   so I went and hang out with them.  So when I went in

19   the room, I walked all the way to the opposite side and

20   sat down in a chair and tried to get a nap.

21   Q.    What prevented you from getting a nap?

22   A.    What was transpiring inside the chapel.

23   Q.    At the time that Lassalle and Comeaux were

24   beating the inmate with the baton, was the inmate

25   posing any risk of harm or threat to anybody?

1    A.    No, sir.

2    Q.    Was this a kind of typical beating for the

3    narcotics unit?

4    A.    No.

5    Q.    Why not?

6    A.    Because, one, it was in the jail.  Two, the guy

7    was cuffed.  And, three, it just -- I don't know.  It

8    just seemed unreal.

9    Q.    Did it seem kind of extreme?

10   A.    Yes.

11   Q.    Did you run and tell Louis Ackal what you saw?

12   A.    I did not.

13   Q.    Why not?

14   A.    I just didn't.

15   Q.    Oh, come on.  You knew it was wrong; right?

16   A.    Yes.

17   Q.    Why didn't you go tell the chief law enforcement

18   officer of the parish what you were witnessing?

19   A.    Nothing was going to get done.

20   Q.    Why do you think that?

21   A.    Nothing had been done in the past.

22   Q.    How long did the beating take place?

23   A.    I don't know the exact time frame.

24   Q.    How many times do you think the inmate was

25   beaten?

```
1    A.    How many times was he hit?

2    Q.    Struck, excuse me, yes.

3    A.    20 to 50 times.

4    Q.    Did you try and intervene in any way?

5    A.    I did not.

6    Q.    Did the warden try and intervene in any way?

7    A.    He did not.

8    Q.    Why didn't you personally try and intervene, even

9    if you wouldn't go tell the defendant?

10   A.    Cowardice.

11   Q.    Did Comeaux's connection to the sheriff play any

12   role?

13   A.    Yeah.

14   Q.    How many inmates did you see get beaten that day?

15   A.    Three.

16   Q.    What was the next inmate that you saw get beaten?

17   A.    I don't remember his name.

18   Q.    Was it a black guy or a white guy?

19   A.    He was a white guy.

20   Q.    Is this upsetting to you?

21   A.    Yes, it is.

22   Q.    Why?

23   A.    I didn't do what I needed to do.

24              (Court reporter clarification.)

25              THE WITNESS:  I did not do what I needed to
```

1    do.

2    BY MR. BLUMBERG:

3    Q.    What happened to the second inmate you saw?

4    A.    The same thing during the beating process, but he

5    was also -- Ben put his baton in the inmate's mouth.

6    Q.    And...

7    A.    And simulated oral sex.

8    Q.    How long did the beating take place of that

9    inmate before the oral sex simulation?

10   A.    They all seemed to be about the same.

11   Q.    What was the reaction of these two inmates to

12   getting beaten?

13   A.    Horrified.

14   Q.    Did it appear that the strikes were hard enough

15   to cause injury?

16   A.    Yes.

17   Q.    Did the inmates make noises and sounds as if they

18   were being injured?

19   A.    They would wince when they were hit, yes, sir.

20   Q.    Would anybody else in the chapel at the time stop

21   either beating?

22   A.    Not until it was done.

23   Q.    That was not the last time you were in the chapel

24   to see a beating that day, though, was it?

25   A.    No, sir.

1   Q.    You found yourself in there with an inmate named

2   *Anthony Daye*?

3   A.    I did.

4   Q.    Did you know Anthony Daye before you were in the

5   chapel with him on April 29th?

6   A.    I may have met him before or arrested him.   I

7   don't know.

8   Q.    Do you know of an inmate by the name of *Little*

9   *Amp*?   The nickname *Little Amp*?

10  A.    Yes.

11  Q.    Do you know that to be Anthony Daye?

12  A.    Yes.

13  Q.    At the time you were in the chapel with an inmate

14  and you learned it was Anthony Daye, did you know him

15  at the time to be Little Amp?

16  A.    I believe so.

17  Q.    How did you find yourself in the chapel with

18  Anthony Daye?

19  A.    He was brought into the chapel to be questioned.

20  Q.    By whom?

21  A.    Jason and Ben.

22  Q.    Why did you think that was the purpose of

23  bringing him in?

24  A.    Oh, I knew that was not the purpose.

25  Q.    Make sure we don't talk over each other.   How did

```
 1    you know that wasn't the purpose?

 2    A.    Because -- because it wasn't what transpired

 3    previously.

 4    Q.    Because there had been beatings going on all day?

 5    A.    Yes, sir.

 6    Q.    Did you participate in beating Anthony Daye?

 7    A.    Yes, I did.

 8    Q.    Did you hit him with a baton?

 9    A.    Yes, I did.

10    Q.    Straight baton or collapsible baton?

11    A.    I believe a collapsible.

12    Q.    How long did you beat Anthony Daye?

13    A.    I don't know.

14    Q.    Who else beat him with you?

15    A.    Jason and Ben.

16    Q.    Anybody try and stop it?

17    A.    No.

18    Q.    Was there any reason to use any force on Anthony

19    Daye?

20    A.    No, sir.

21    Q.    Was he trying to get up?

22    A.    No.

23    Q.    Why did you beat that guy?

24    A.    I don't know.  To fit in.  To --

25              THE COURT:  Speak up, please.
```

1           THE WITNESS:  To fit in.  To be a part of the
2      group.  To be trusted.
3      ***
4      BY MR. BLUMBERG:
5      Q.    You haven't always been honest about what
6      happened in the chapel, have you?
7      A.    No, I haven't.
8      Q.    Or about your previous narcotics history?
9      A.    No, I have not.
10     Q.    Have you had a chance to meet with these folks
11     over here at the table a fair bit; right?
12     A.    Yes, I have.
13     Q.    Did you start off telling them the truth?
14     A.    No, I did not.
15     Q.    You had actually been under oath on these topics
16     in the past, haven't you?
17     A.    Yes, I have.
18     Q.    Did you testify in civil depositions?
19     A.    I did, yes.
20     Q.    Your understanding of a deposition is a statement
21     under oath in a civil lawsuit; right?
22     A.    Yes, sir.
23     Q.    Were you honest in those depositions?
24     A.    I was not.
25     Q.    Why not?

1   A.   I didn't want to get in trouble.

2   Q.   Did you have any conversations before you were

3   dishonest with your fellow narcotics agents?

4   A.   Yes, I did.

5   Q.   Who did you talk to?

6   A.   Jason and Ben.

7   Q.   When did you do that?

8   A.   I'm not exactly sure of the timeframe.  After we

9   were notified that there was going to be a deposition,

10  Jason kind of ran everything, what we were going to say

11  and what was going to happen.  And he actually said

12  that I'll be the one to talk about the questioning and

13  everything else.  So that was the discussion.

14            THE COURT:  Jason is who?

15            THE WITNESS:  Jason Comeaux.

16  BY MR. BLUMBERG:

17  Q.   Did you come up with a cover story among the

18  other two narcotics agents?

19  A.   Yes, we did.

20  Q.   Was it a false cover story?

21  A.   Yes, it was.

22  Q.   Do you know who instructed that you create a

23  false cover story?

24  A.   Jason.

25  Q.   Did he tell you who instructed him?

```
1    A.    No, sir.

2    Q.    Did you in fact lie?

3    A.    Yes, I did.

4    Q.    On the day after -- excuse me.  After the beating

5    in the chapel of Anthony Daye, you had a chance to go

6    to the control room in the jail, didn't you?

7    A.    Yes, I did.

8    Q.    What did you do in that control room?

9    A.    We were looking at the video.

10   Q.    Video of what?

11   A.    Of the escorting of Anthony Daye and the other

12   inmates.

13   Q.    Did you see yourself on the video?

14   A.    Yes, I did.

15   Q.    What did you see?

16   A.    I saw me walking into the chapel.  I really don't

17   remember anything other than that.  I think -- I think

18   I remember seeing myself -- I remember seeing myself

19   leaving with Anthony Daye, helping him leave the

20   chapel.

21   Q.    Helping him or dragging him?

22   A.    Well, dragging him, yeah.

23   Q.    Was he able to walk on his own?

24   A.    No.

25   Q.    Why wasn't he able to walk on his own?
```

1    A.    Because he had been hit in the -- in the leg.

2    Q.    Of all the beatings that you have administered in

3    the past and that you are aware of by narcotics, where

4    does the Anthony Daye beating rank?

5    A.    That's the top.

6                THE COURT:  Louder, please.

7                THE WITNESS:  That's the top.

8    BY MR. BLUMBERG:

9    Q.    Whatever happened to that video?  Do you know?

10   A.    I don't know.

11   Q.    Has anybody ever told you that that video of you

12   going in and out of that chapel exists?

13   A.    I believe -- I believe it does, yes.

14   Q.    Do you?

15   A.    Yeah.

16   Q.    Why do you believe that?

17   A.    Because I know Gerald Savoy had everything -- or

18   was told that he had everything on a computer.

19   Q.    Have you ever seen it?

20   A.    Nope.  I've heard people who have.

21   Q.    What's your understanding of what's going to

22   happen to you?

23   A.    As far as my sentencing?

24   Q.    Yup.

25   A.    My sentencing guidelines are six to eight years.

```
1    Q.    Do you think you're going to prison?

2    A.    I believe I am.

3    Q.    Who is going to make that decision ultimately?

4    A.    The Judge right there.

5    Q.    What do you expect -- what do you hope to happen

6    by being here today, testifying to these folks?

7    A.    What do I hope?

8    Q.    Yeah.

9    A.    I hope for probation to be able to go home with

10   my family.

11   Q.    Do you really think that's going to happen?

12   A.    I do not.

13         MR. BLUMBERG:  That's all I have, Your Honor.

14         THE COURT:  Your witness, Mr. McLindon.

15         MR. MCLINDON:  With the Court's permission, I

16   would like to start.  My client -- can I start with my

17   client -- he wants to step out to go to the bathroom

18   real quick.  He has given me permission to start the

19   questioning without him here.

20         THE COURT:  All right.  Proceed.

21                    CROSS-EXAMINATION

22   BY MR. MCLINDON:

23   Q.    Good afternoon.

24   A.    Good afternoon.

25   Q.    Let me start off with this -- this incident with
```

1    Bubba Savoy where he says, *let's take a ride*.  There

2    was a guy that had punched you while you were arresting

3    him; is that right?

4    A.    Yes, sir.

5    Q.    And when Bubba came on the scene or whatever,

6    y'all put him in the car and said, *let's take a ride*.

7    Y'all went out to a cane field?

8    A.    Yes, sir.

9    Q.    And you got the guy out of the car and kneeled

10   him down; is that right?

11   A.    Yes, sir.

12   Q.    Okay.  And Bubba put a bullet in his mouth?

13   A.    Yes.

14   Q.    And then ultimately put the gun in his mouth?

15   A.    Yes, sir.

16   Q.    And you had never seen anything like that before?

17   A.    Not in real life.

18   Q.    No.  It was almost like a movie?

19   A.    Yes.

20   Q.    In fact, Mr. Blumberg said that was going really

21   far, what you saw there?

22   A.    Yes, sir.

23   Q.    It was shocking?

24   A.    Yes, sir.

25   Q.    Okay.  Bubba told you to punch him?

1    A.    Yeah, something like that.

2    Q.    You just did -- you just didn't do it?

3    A.    Correct.

4    Q.    You never went to Sheriff Ackal and said, *look,*

5    *I've seen something I've never seen before.  This is*

6    *way too far.*  You never did that?

7    A.    No, I did not.

8    Q.    You could have done that?

9    A.    Yes, I could have.

10   Q.    You could have gone to another law enforcement

11   agency and complained to them; right?

12   A.    Yes, sir.

13   Q.    You could have gone to the state police, district

14   attorney, FBI?

15   A.    Yes, sir.

16   Q.    And the reason you didn't is because you were

17   okay with this kind of behavior?

18   A.    Yes, sir.

19   Q.    And you were okay with not telling the sheriff

20   about it?

21   A.    Yes, sir.

22   Q.    You met with the FBI eight times; is that right?

23   A.    I don't remember how many times.

24   Q.    You would agree that the narcotics, they're a

25   close-knit group?

```
 1    A.    Yes, sir.

 2    Q.    Very tight?

 3    A.    Yes, sir.

 4    Q.    When you first met with the FBI, you lied?

 5    A.    Yes, sir.

 6    Q.    Right?  Did they tell you before the interview

 7    started, look, you can't lie to us; it's a crime to lie

 8    to a federal agent?

 9    A.    Yes.

10    Q.    You knew that going in?

11    A.    Yes, I did, yeah.

12    Q.    And in spite of that, you went ahead and lied

13    anyway?

14    A.    Yes, sir.

15    Q.    You lied because you didn't want to go to jail?

16    A.    Correct.

17    Q.    During the second interview, they asked you about

18    your deposition in the civil lawsuit with Anthony Daye?

19    A.    Yes, sir.

20    Q.    Is that right?  Okay.  Did you -- clearly you

21    lied in that deposition?

22    A.    Yes, sir.

23    Q.    You were under oath; right?

24    A.    Yes, sir.

25    Q.    And who else -- did you give two depositions,
```

1    Anthony Daye and Curtis Ozenne?  Or you only gave one?

2    A.    One deposition.

3    Q.    When you were in the Anthony Daye deposition,

4    were other members -- were any of your friends in

5    there, these narcotics agents in there?

6    A.    Sitting right next to me.

7    Q.    Okay.  So they could listen to your story and

8    then when they would testify, that's how you kept your

9    story straight?

10   A.    Yes.

11   Q.    And y'all met beforehand; right?

12   A.    Yes, sir.

13   Q.    You didn't invite Louis Ackal to that meeting;

14   did you?

15   A.    No, we did not.

16   Q.    So the idea to lie was concocted among you three?

17   A.    Yes, sir.

18   Q.    Now, when you went and met with the FBI, did you

19   tell the FBI, *hey, I lied in the deposition* or *I told*

20   *the truth in the deposition*?

21   A.    I told them that I tried to tell as close to the

22   truth as I could.

23   Q.    So that was one of your big lies to the FBI.  You

24   said, *yeah, I was truthful in the deposition*?

25   A.    Yes, sir.

1    Q.    Let me ask you about the chapel.  You were there

2    a couple of times that day; right?

3    A.    Yes, sir.

4    Q.    The first one -- the first time you were there,

5    was that the Scott Spears incident where the baton got

6    put in his mouth?

7    A.    I don't know the exact order.

8    Q.    Okay.  Well, let me see if I can back it up.  The

9    first guy in there was Curtis Ozenne.

10            Do you recognize that name?

11   A.    I know Travis Ozenne.

12   Q.    All right.  Do you remember it was a black inmate

13   and he was being beaten but he wasn't -- he didn't have

14   a baton put in his mouth; right?

15   A.    Yes, sir.

16   Q.    And they took him out?

17   A.    Yes, sir.

18   Q.    Okay.  So you've witnessed that?

19   A.    Yes.

20   Q.    And then they brought back the white guy and beat

21   him?

22   A.    Yes, sir.

23   Q.    And then Lassalle put that baton in his mouth?

24   A.    Yes, sir.

25   Q.    And that disgusted you?

```
 1    A.    Yes, sir.

 2    Q.    In fact, you went up and you grabbed Lassalle by

 3    the vest and you said that's enough?

 4    A.    Yes, sir.

 5    Q.    Did you swing him around hard?

 6    A.    I turned him towards me.

 7    Q.    Okay.  And you raised your voice?

 8    A.    Yes, I did.

 9    Q.    You said that's enough.

10    A.    I believe I just said enough.  I don't remember

11    exactly what I said, yeah, but --

12    Q.    What did he do?

13    A.    He stopped and --

14    Q.    And everybody saw that?

15    A.    No.  I had walked back into the chapel after

16    walking out of the chapel when that happened.

17    Q.    So you saw what was happening and you were

18    disgusted and you walked out?  Is that it?

19    A.    No.  I walked out.  And then they weren't behind

20    me, so I turned around to see what was going on and

21    went back in.  I saw that this was going on.  I grabbed

22    Ben, said enough, and then...

23    Q.    You grabbed Ben while he was actually doing it to

24    this guy?

25    A.    Yes.
```

1   Q.   By the vest and swung him away pretty hard?

2   A.   Towards me, yes.

3   Q.   And that's what caused him to stop?

4   A.   Yes.

5   Q.   Okay.  Now, there is no question that you did

6   that?

7   A.   Yes.

8   Q.   Sheriff Ackal was not in the chapel?

9   A.   I didn't see him if he was.

10  Q.   After you grabbed Ben Lassalle, did you then pick

11  up Mr. Spears and escort him out?

12  A.   I don't remember what happened after that.

13  Q.   Okay.  Do you remember telling the FBI that

14  that's what you did, that you escorted Mr. Spears out?

15  A.   I don't -- I don't remember.

16  Q.   Is it possible you told him that?

17  A.   Yes.  It's possible, yes, sir.

18  Q.   Again, after this incident with Scott Spears,

19  which is very disturbing, I understand, you tried to

20  talk to Bret Broussard about it; right?  Did you go try

21  and talk to Bret Broussard?

22  A.   The incident with who?

23  Q.   With Scott Spears, the baton in the guy's mouth?

24  A.   Oh, I don't remember if I did or not.  I don't

25  know.

1    Q.    Well, did you remember telling the FBI that you

2    tried to talk to Scott Spears?

3    A.    I may have.

4    Q.    Okay.  But again, never went to Sheriff Ackal?

5    A.    No, I did not.

6    Q.    Were you kind of shunned by narcotics agents

7    after that, after you stood up to him there?

8    A.    Me and Jason's relationship was falling apart.

9    We didn't get along.  And at that point, I was ready to

10   go out of narcotics.  And then, yeah, that's what ended

11   me and Ben's relationship.

12   Q.    In fact, after that when you would walk into the

13   narcotics office, people would just walk out, right,

14   when they saw you walk in?

15   A.    I don't remember that.  But --

16   Q.    Do you remember ever telling that to the FBI in

17   their interview?

18   A.    I may have.  I don't remember.  I'm sure there

19   were instances when that happened, but...

20   Q.    Did narcotics agents withhold information from

21   you?

22   A.    Yes.

23   Q.    Now, you testified that you felt that

24   Mr. Comeaux, Jason Comeaux, was close to the sheriff.

25   He talked about being close to him?

```
 1   A.    Yes, sir.

 2   Q.    Isn't it true that Comeaux used to lie to the

 3   sheriff about what other supervisors and officers were

 4   doing?

 5   A.    I don't know what he talked to the sheriff about.

 6   Q.    Did you tell the FBI during an interview that

 7   Comeaux used to lie to the sheriff?  I'll show you

 8   this.

 9   A.    Yeah.

10         MR. MCLINDON:  Show this to just the witness,

11   please.

12         (Counsel conferring.)

13   BY MR. MCLINDON:

14   Q.    I'm just going to show you something and ask you

15   to read it to yourself, please.  Is it on the screen in

16   front of you?  Okay.  I have it underlined.  Just start

17   right there and read to the end of that paragraph.

18         Okay.  Have you read that?

19   A.    Give me one second.

20   Q.    Okay, go ahead.

21   A.    Sure.  I don't understand it, but okay.

22   Q.    So you told the FBI that Comeaux used to lie to

23   Sheriff Ackal?

24   A.    No.  I don't remember saying that, no.

25   Q.    You don't remember saying that?
```

1  A.    No.

2  Q.    Are you saying that what's in this report is

3  incorrect or you just don't remember saying it?

4  A.    I'm saying I just don't remember it.

5        MR. BLUMBERG:  Objection.  He actually

6  mischaracterizes what's in there, so the question

7  should be about his memory.

8        THE COURT:  Well, all right.

9  BY MR. MCLINDON:

10  Q.    You don't remember saying that?

11  A.    No, sir.

12  Q.    Do you ever remember there being dogs in the

13  chapel during any of the times that you were in there?

14  A.    No.  No, I do not.

15  Q.    You don't remember any dogs, okay.

16        Now, let me go back to the streets.  We

17  talked about these jump outs?

18  A.    Yes, sir.

19  Q.    Jumping out of a car and approaching a citizen,

20  that in and of itself is not illegal, is it?

21  A.    No, sir.

22  Q.    Okay.  If you see two guys on the corner standing

23  close together, appearing, you know -- what appears to

24  be a hand-to-hand transaction, you would jump out and

25  approach them as quickly as you could; right?

```
 1   A.    Yes, sir.

 2   Q.    And the sheriff wanted y'all to do that?

 3   A.    Yes.

 4   Q.    What you did illegally or excessively when they

 5   would run, you would tackle them and give them a little

 6   extra knee or elbow or something like that?

 7   A.    Yes, sir.

 8   Q.    And in your Use of Force training, when a subject

 9   is resisting or doing anything, you're supposed to get

10   them on the ground; is that right?

11   A.    You're supposed to gain control of them.

12   Q.    Okay.  And one of the ways of gaining control is

13   you get them on the ground?

14   A.    Yes.

15   Q.    And you want them preferably on their stomach?

16   A.    Correct.

17   Q.    So you can pull their arms behind their back;

18   right?

19   A.    Yes, sir.

20   Q.    In fact, you've been shot at before; haven't you?

21   A.    Yes, sir.

22   Q.    Like second day on the job maybe?

23   A.    Second week.

24   Q.    Second week on the job?

25          MR. BLUMBERG:  Objection.  Relevance.
```

```
 1              THE COURT:  I'm sorry?

 2              MR. BLUMBERG:  Relevance.  Objection.

 3              MR. MCLINDON:  He's talking about these --

 4              THE COURT:  I'm going to permit him to answer

 5    that, and then I say let's move on.

 6              MR. MCLINDON:  I will, Judge.

 7    BY MR. MCLINDON:

 8    Q.    You were shot at the second week on the job.

 9    A.    Yes, sir.  Second week on patrol.

10    Q.    On patrol, okay.  Sometimes on patrol, you and

11    Ben Lassalle would tackle people or knock them down and

12    you would take their money from them, wouldn't you?

13    A.    That has happened, yes.

14    Q.    And you kept the money and you didn't report it

15    back to the sheriff or anything like that?

16    A.    No, we did not.

17    Q.    Just used it to go eat breakfast?

18    A.    Yes.

19    Q.    That's not very honest, is it?

20    A.    No.

21    Q.    In one of your interviews with the FBI, did you

22    tell the FBI that Agents Lassalle, Broussard, Comeaux

23    and Savoy were morally corrupt?

24    A.    Yes.

25    Q.    Okay.  Now, this was -- this interview was around
```

1    December of 2015?  I know you don't remember the date,

2    but you remember saying that; right?

3    A.    Yes.

4    Q.    Okay.  Now --

5         THE COURT:  Let's stop and take a short break

6    for the jury.

7         MR. MCLINDON:  Yes, sir.

8         THE COURT:  All rise.

9         (The Jury exits the courtroom.)

10        (Recess taken.)

11        (The Jury enters the courtroom.)

12        THE COURT:  You may be seated.

13        Proceed, sir.

14        MR. MCLINDON:  Thank you, Your Honor.

15   BY MR. MCLINDON:

16   Q.    When we left off, Mr. Bergeron, I was asking

17   about -- one of your interviews with the FBI was in

18   December of 2015.  Did you tell the FBI that you

19   thought that Lassalle, Broussard, Comeaux and Savoy

20   were morally corrupt?

21   A.    Yes, I did.

22   Q.    Okay.  You didn't say the sheriff in that group

23   of people, did you?

24   A.    No, I did not.

25   Q.    Okay.  You told the FBI that -- well, let me back

1    up.  Mr. -- Bubba Savoy, you felt like, was close to

2    the sheriff?

3    A.    Yes.

4    Q.    Did you testify about that?

5    A.    Yes.

6    Q.    Okay.  And did you have -- did you -- did you

7    tell the FBI that Bubba Savoy was manipulative and

8    sneaky?

9    A.    Yes.

10   Q.    Okay.  And you still believe that?

11   A.    Yes, I do.

12   Q.    At one point, did Officer Willis actually conduct

13   surveillance on Sheriff Ackal?

14   A.    I believe he did.  I'm not positive, though.

15   Q.    Okay.  Did you tell that to the FBI, that he did?

16   A.    Yes.

17   Q.    Did you believe that the narcotics units were a

18   bunch of potheads?

19   A.    Yes.

20   Q.    Okay.  That they abused narcotics and other

21   drugs?  Or any particular drug they abused?

22   A.    Marijuana.

23   Q.    Okay.  Were any of them ever high at work?

24   A.    Not that I know of.

25   Q.    Okay.  Were you a pothead?

1    A.    No, sir.

2    Q.    You met in another meeting with the FBI.  This

3    one was in July of '16, so this past summer.  Again,

4    you were asked about Gerald Savoy.  Did you tell the

5    FBI that he lied and used everybody?

6    A.    Yes.

7    Q.    Did you tell them that Gerald Savoy manipulated

8    situations?

9    A.    Yes.

10   Q.    All right.  Let's go to the incident.  You were

11   at a party at Troy Willis's house, and y'all got drunk?

12   A.    Yes, sir.

13   Q.    You, Willis and Huckabay?

14   A.    Yes, sir.

15   Q.    Sheriff Ackal wasn't at the party?

16   A.    No, sir.

17   Q.    This idea to go out and find somebody and beat

18   them up, that just originated in your own minds; right?

19   A.    Yes, sir.

20   Q.    And y'all went and y'all came across the first

21   two guys you found and attacked them?

22   A.    Yes, sir.

23   Q.    And then those guys kind of started getting the

24   better of it or something happened that y'all had to

25   run?

```
1    A.    Yes, sir.

2    Q.    And y'all got all torn up --

3    A.    Yes, sir.

4    Q.    -- getting away from those guys?  Okay.

5          You didn't go directly to Sheriff Ackal and

6    tell him about that, did you?

7    A.    No, sir.

8    Q.    You decided to go to somebody else; right?

9    A.    Yes.

10   Q.    Grady Thibodeaux?

11   A.    Yes, sir.

12   Q.    Okay.  And then Grady said, *Well, look, we need

13   *to -- let's go tell the sheriff*.  And that made you a

14   little nervous?

15   A.    Yes, sir.

16   Q.    You didn't want to tell the sheriff about this,

17   did you?

18   A.    No, sir.

19   Q.    And the three of y'all went in there together

20   with Grady?

21   A.    I believe Grady came in there, yes.

22   Q.    Was Hebert there?  Toby Hebert, was he there?

23   A.    I don't remember if he was.

24   Q.    And you were nervous going in?

25   A.    Yes, sir.
```

```
1    Q.    You apologized to him?

2    A.    I believe I did.

3    Q.    Okay.  And I'm not sure if it was you.  One of

4    them kind of started crying a little bit; right?  Do

5    you remember that?

6    A.    I -- no.

7    Q.    It wasn't you?

8    A.    It may have been.  I don't know.  I don't

9    remember exactly what happened.

10   Q.    And the original recommendation from Grady

11   Thibodeaux was fire all three of y'all?

12   A.    Yes, sir.

13   Q.    Okay.  Not even for your lying about it, just for

14   going out and doing it, he wanted y'all fired?

15   A.    Yes, sir.

16   Q.    Okay.  And the sheriff wanted, instead, to just

17   suspend y'all?

18   A.    Yes, sir.

19   Q.    Okay.  And this was right before Christmas,

20   wasn't it?

21   A.    I don't remember the exact date.

22   Q.    Okay.  And you have children?

23   A.    Yes, I do.

24   Q.    Okay.  Did you have children back then?

25   A.    Um, I believe so.
```

1    Q.    Well, one of the -- did not the sheriff tell you,

2    *Look* -- or the group of you, *You've got kids; it's*

3    *almost Christmastime; I'm not going to fire you;*

4    *instead of doing that, we're going to suspend you*, and

5    y'all each served your suspensions?

6    A.    Yes, sir.

7    Q.    Okay.  Were you demoted, as well?

8    A.    Yes.

9    Q.    Back to patrol?

10   A.    Yeah.  It was lateral.

11   Q.    Okay.  Ricky Roche, a sheriff, was never there

12   for any of that?

13   A.    No, sir, not that I know of.

14   Q.    You told me earlier that you lied to the FBI in

15   your first meeting.  And I have counted eight separate

16   meetings.  Does that sound about right?

17   A.    (Nodding in the affirmative).

18   Q.    Did you lie after the first meeting?  Did you

19   continue to lie or withhold information?

20   A.    I believe so, yes.

21   Q.    Are you being prosecuted for lying to a federal

22   agent?

23   A.    No, sir.

24   Q.    Is that part of your plea agreement, that they

25   agreed not to prosecute you for that?

1   A.   Yes, sir.

2   Q.   One of the reasons you lied is because you did

3   not want to go to jail?

4   A.   Correct.

5   Q.   So you will lie to try and stay out of jail?

6   A.   Yes, sir.

7   Q.   Just a couple of other questions from your direct

8   testimony.  The -- the incident where -- was it Ben

9   Lassalle that hit you on the neck?

10  A.   Yes, sir.

11  Q.   That was something y'all just created in your own

12  minds; right?

13  A.   Yes, sir.

14  Q.   The sheriff didn't tell you to do that?

15  A.   No, sir.

16  Q.   Didn't know about it?

17  A.   No, sir.

18  Q.   Okay.  When you saw Anthony Daye in the chapel,

19  you hit him?

20  A.   Yes, sir.

21  Q.   How many -- how many officers were in there at

22  the time?

23  A.   I believe there were just four of us.  That's all

24  I remember.

25  Q.   Okay.  Was Ben Lassalle in there?

1    A.    Yes, he was.

2    Q.    Okay.  Did Ben Lassalle hit him?

3    A.    Yes, sir.

4    Q.    Okay.  Did -- was there any other inmates in

5    there at the time or just --

6    A.    I don't think so, no, not that I saw.

7    Q.    You didn't see any others?  Pretty small room.

8    A.    Yes, sir.

9    Q.    If there was another inmate, you would have seen

10   him?

11   A.    I believe so, yes, sir.

12   Q.    And you never saw the sheriff?

13   A.    No, sir.

14          MR. MCLINDON:  Okay.  Thank you very much.

15          THE COURT:  Redirect?

16          MR. BLUMBERG:  Thank you, sir.

17                  REDIRECT EXAMINATION

18   BY MR. BLUMBERG:

19   Q.    Mr. Bergeron?

20   A.    Yes, sir.

21   Q.    The November 02, 2008 episode, did the sheriff

22   actually make fun of you in that meeting that you had

23   with him?

24   A.    Yes, sir.

25   Q.    What did he say?

```
1    A.    He was making fun of the fact that I couldn't

2    run, that I was out of shape.

3    Q.    That you got caught?

4    A.    That I got caught, yes.

5    Q.    How seriously did he take the fact that you had

6    just committed a crime?

7    A.    Not very.

8    Q.    Now, there were some questions that you had about

9    communications between Jason Comeaux and the sheriff.

10   A.    Yes, sir.

11   Q.    Based on your conversations with Jason Comeaux,

12   did Sheriff Ackal tell you guys directly who he wanted

13   you to target?

14   A.    The areas, yes, sir.

15   Q.    And how about the people?

16   A.    Well, that -- who lived in that area, yes, sir.

17   Q.    And when we're talking about targeting, we're

18   talking about excessive uses of force; correct?

19   A.    Yes, sir.

20   Q.    How would you characterize the relationship

21   between the narcotics unit as a whole and Louis Ackal?

22   A.    A good one.

23   Q.    Have you ever used the phrase that you were the

24   sheriff's *errand boys*?

25   A.    Yes, sir.
```

1    Q.    What did you mean by that?

2    A.    If an area needed to be targeted and quieted

3    down, we were the ones that would go do it.

4    Q.    If Louis Ackal wanted somebody targeted, would

5    you manufacture some reason to do it?

6    A.    Yes, sir.

7    Q.    Like in the Ricky Roche episode?

8    A.    Yes, sir.

9    Q.    Do you remember everybody who was in all of the

10   rooms in the chapel when you were beating those guys?

11   A.    No, sir.

12   Q.    What were you focusing on?

13   A.    The beating.

14        MR. BLUMBERG:  That's all I have, Your Honor.

15        THE COURT:  All right.  The witness is

16   excused?

17        MR. MCLINDON:  Yes, sir.

18        THE COURT:  You're excused, sir.  Thank you.

19        Do you have another witness?

20        MR. JARZABEK:  Yes, we do, Your Honor, Jeremy

21   Kelley.

22        THE COURTROOM DEPUTY:  Please raise your

23   right hand.  Do you solemnly swear that the testimony

24   you will give in this case will be the truth, the whole

25   truth, and nothing but the truth, so help you God?

```
 1              THE WITNESS:  I do.

 2              THE COURTROOM DEPUTY:  Could you please spell

 3   your first and last name for the Court Reporter?

 4              THE WITNESS:  Jeremy, J-E-R-E-M-Y, Kelley,

 5   K-E-L-L-E-Y.

 6                    JEREMY KELLEY,

 7    first having been duly sworn by the Courtroom Deputy,

 8              testifies under oath as follows:

 9                 DIRECT EXAMINATION

10   BY MR. JARZABEK:

11   Q.   Good afternoon, sir.

12   A.   Good afternoon.

13   Q.   You've indicated your name is Jeremy Kelley; is

14   that correct?

15   A.   Yes, sir.

16   Q.   Where do you live?

17   A.   New Iberia.

18   Q.   And are you currently employed?

19   A.   Yes, sir.

20   Q.   Where?

21   A.   At the Iberia Sheriff's Office.

22   Q.   How long have you been an employee of the Iberia

23   Parish Sheriff's Office?

24   A.   Twelve years.

25   Q.   So that would be -- if I'm doing my math right,
```

```
 1    take you back to 2004?

 2    A.    Yes, sir.

 3    Q.    So that was before Sheriff Ackal came on the

 4    scene; correct?

 5    A.    Yes, sir.

 6    Q.    Um, before Sheriff Ackal became the sheriff, what

 7    duties were you assigned to?

 8    A.    In 2004, I was a patrolman.  In 2005, I went

 9    through a board and was promoted to a narcotics agent.

10    In 2006, I was transferred to the detectives division.

11    And then in 2007, I went to a small crime suppression

12    team that we had called the Directed Patrol Unit.  And

13    then Sheriff Ackal came into office that July.

14    Q.    Okay.  And what position did you assume after he

15    took office?

16    A.    I became a patrol sergeant.

17    Q.    Okay.  And what positions have you held since

18    then above the sergeant of patrol?

19    A.    In 2008, I was promoted to sergeant.  In 2011, I

20    was promoted to a shift lieutenant.  In 2013 or 2014 --

21    I get a little confused -- I was transferred from

22    patrol lieutenant to the executive officer of the

23    enforcement services division.  And then -- I'm sorry.

24    After that, August of last year, I transferred to the

25    intelligence unit as a lieutenant.
```

```
 1    Q.    Okay.  In November of 2008 -- which was just a

 2    few months after Sheriff Ackal took office; correct?

 3    A.    Yes, sir.

 4    Q.    At that time, were you a sergeant of patrol?

 5    A.    Yes, sir.

 6    Q.    Essentially, you were a patrol supervisor;

 7    correct?

 8    A.    Mid-level patrol supervisor.

 9    Q.    Underneath the shift lieutenant; is that correct?

10    A.    Yes, sir.

11    Q.    And that was your duties on November 2nd of 2008;

12    correct?

13    A.    Yes, sir.

14          MR. JARZABEK:  May I approach the witness,

15    Your Honor?

16          THE COURT:  You may.

17    BY MR. JARZABEK:

18    Q.    Lieutenant Kelley, I show you what's been marked

19    for identification purposes Government's Exhibit 13 and

20    14.  Do you recognize those documents?

21    A.    Yes, sir.

22    Q.    Okay.  Let's start with Number 13.  Who drafted

23    Number 13?

24    A.    Deputy Jamal Davis.

25    Q.    Okay.  And the date on that report is, sir?
```

1    A.    The report was dated November 2nd, 2008, at

2    1:46 a.m.

3    Q.    Okay.  And does it indicate -- I'm sorry.  Does

4    it indicate why that report was drafted?

5    A.    It was a report of a simple battery.  Yes, sir.

6    Q.    Okay.  And is that -- did patrolman -- is it

7    patrolman or just deputy?

8    A.    Deputy.

9    Q.    Did Deputy Davis respond to a 9-1-1 call?

10   A.    He responded to calls for service, complaint of a

11   battery.  Yes, sir.

12   Q.    Okay.  And does that report indicate who the

13   victims of that battery are?

14   A.    Yes, sir.

15   Q.    And who are they?

16   A.    Sheldon Wilson and Dewayne Laday.

17   Q.    Does it give an indication of the ages and race

18   of those two people?

19   A.    Yes, sir, it does.

20   Q.    And they are...

21   A.    Shelton was 16, and Dewayne was 22.  They were

22   both African-American males.

23   Q.    Okay.  And, in summary, what does that report

24   indicate?

25   A.    May I?

1   Q.   Feel free to take it out and look at it.   Pardon

2   me.

3          MR. MCLINDON:  Has the report been introduced

4   into evidence?

5          MR. JARZABEK:  Pardon me.  My fault.  Move

6   Government's Exhibit 13 into evidence.

7          MR. MCLINDON:  I have no objection.

8          THE COURT:  Without objection, it is

9   admitted.

10  BY MR. JARZABEK:

11  Q.   I'm sorry.  Go ahead, sir.

12  A.   I'm sorry.

13  Q.   That's all right.

14  A.   Um, in summary, it states that these two victims

15  claimed they were jumped by three unknown white males

16  on the west end of town.

17  Q.   Okay.  And did they -- does it indicate what

18  steps he took after he showed up on the scene?  Other

19  than taking their statements?

20  A.   No, sir.  It just says that the victims were

21  transported to the hospital and no further action was

22  taken.

23  Q.   So basically the report ends with the fact that

24  they were attacked and transported, correct?

25  A.   Yes, sir.

1    Q.    Now, deputy that wrote that report was acting

2    under your supervision; is that correct?

3    A.    Yes, sir.

4    Q.    Okay.  I direct your attention to Government's

5    Exhibit 14.  Do you recognize that document?

6    A.    Yes, sir.

7             MR. JARZABEK:  Approach the witness, Your

8    Honor.

9             THE COURT:  You may.  You need not ask each

10   time.

11            MR. JARZABEK:  Thank you, Your Honor.  One

12   other question on G-13.

13   BY MR. JARZABEK:

14   Q.    What's the date of that report?  When does it

15   indicate the events took place?

16   A.    November 2nd, 2008.

17   Q.    Time?

18   A.    01:46 a.m.

19   Q.    One o'clock in the morning; right?

20   A.    Yes, sir.

21   Q.    Now, Government's Exhibit 14, who wrote that

22   report?

23   A.    I did.

24   Q.    And is it of the same incident?

25   A.    Yes, sir.

1    Q.    Okay.  How soon did you arrive on the scene after

2    Deputy Davis?

3    A.    Um, I don't recall precisely how long after he

4    arrived that I arrived.  It should be indicated on the

5    report, if I'm not mistaken.  Would you like me to find

6    it?

7             MR. JARZABEK:  Let me first move Government's

8    Exhibit 14 into evidence.

9             MR. MCLINDON:  No objection.

10            THE COURT:  Without objection, it is

11   received.

12   BY MR. JARZABEK:

13   Q.    Without referring to the report, were you there

14   before any other action was taken other than taking the

15   complaint from the young gentlemen that were attacked?

16   A.    Was I there prior to any other actions being

17   taken?

18   Q.    Correct.

19   A.    By whom?

20   Q.    By either you or patrolman -- or Deputy Davis.

21            Let me rephrase the question.

22   A.    Okay.

23   Q.    Where does your report begin?

24   A.    Upon my arrival.  Upon my arrival at the incident

25   location.

1    Q.    Does it indicate a time?

2    A.    No, sir.

3    Q.    Okay.  What actions, according to your report --

4    and if you remember something differently -- what

5    actions did you take upon your arrival?

6    A.    I specifically recall upon arriving in the area

7    seeing a couple of the deputies that were on scene

8    putting someone in the back of one of the patrol units.

9    Q.    And did you recognize that person?

10   A.    Not immediately.  I pulled up, got out of my

11   vehicle and asked who was in the car.  And then they

12   told me who the person was.

13   Q.    Who was that person?

14   A.    It was an employee of ours, Agent Wade Bergeron

15   with the narcotics unit at the time.

16   Q.    And what did you do next?

17   A.    I asked him what was going on and they said that

18   they located Deputy Bergeron, Agent Bergeron under the

19   carport.  He said he was conducting an undercover

20   operation and asked him to remove him from the area.

21   Q.    He asked them to remove him from the area?

22   A.    Yes, sir.

23   Q.    Go ahead.

24   A.    So I told Deputy Richard Baker, who was the one

25   who was putting him in his car at the time, to drive to

1    a nearby location of a Hardee's® restaurant and I'll

2    meet him in the parking lot there.

3    Q.    And did you proceed to the Hardee's location?

4    A.    Yes, sir.

5    Q.    And did you encounter anybody on the way?

6    A.    I did.

7    Q.    Who was that?

8    A.    As I was driving to Hardee's, as I was going

9    around the block, I noticed another individual running

10   down the side of the road that I recognized to be Jacob

11   Huckabay, who is also an employee of ours at the time.

12   Q.    Did you recognize at the time that both of these

13   people were narcotics agents?

14   A.    Yes, sir.

15   Q.    And what did you do when you encountered

16   Mr. Huckabay?

17   A.    I stopped my car and told him to get in.

18   Q.    Did he ask any questions or do anything?

19   A.    Yes, sir.  He said, *what's going on*?

20   Q.    And you said...

21   A.    I said, *you know what's going on*.

22   Q.    Did he get in the vehicle?

23   A.    Yes, sir.

24   Q.    And did you take him to the Hardee's parking lot?

25   A.    I did.

1   Q.    Did you question both gentlemen?

2   A.    I did.

3   Q.    What did they tell you they were doing in the

4   area?

5   A.    They told me they were conducting an undercover

6   operation of suspected drug activity in the area on

7   St. Joseph Street.

8   Q.    Did they have any identification of themselves as

9   police officers?

10  A.    No, sir.

11  Q.    Did they have weapons?

12  A.    No, sir.

13  Q.    Have anything to indicate that they were actually

14  on duty at the time?

15  A.    No, sir.

16  Q.    And yet the story was they were conducting

17  surveillance?

18  A.    Yes, sir.

19  Q.    Now, did you notice anything about their

20  appearance that made you conduct further inquiry?

21  A.    Yes, sir.  Their clothing was torn and tattered.

22  They had fresh cuts on their hands and body, their

23  stomach, their legs.

24  Q.    Did you take pictures?

25  A.    I did.

1    Q.    Are they attached to that report?

2    A.    Yes, sir.

3    Q.    And if you could locate a photograph that's

4    descriptive, if you see one there, that's of what you

5    were talking about?

6    A.    Yes, sir.  (Indicating.)

7    Q.    Okay.

8              MR. JARZABEK:  If I could have Government's

9    Exhibit 14, page 11.

10   BY MR. JARZABEK:

11   Q.    Do you see the photograph there?  Does that match

12   what you have in your hand, sir?

13   A.    Yes, sir.

14   Q.    Okay.  And who is that a photograph of?

15   A.    That's Wade Bergeron.

16   Q.    Okay.  And that's the clothing torn and

17   everything else that you are talking about?

18   A.    Yes, sir.

19   Q.    Okay.  Abrasions and scrapes on their bodies?

20   A.    Yes, sir.

21   Q.    Did you question Wade Bergeron and Mr. Huckabay

22   about the fact of whether they had been in an

23   altercation with anybody?

24   A.    Yes, sir, I did.

25   Q.    And what was their response?

1   A.    They stated that they had not been in an

2   altercation with anybody, that they were running away

3   from someone who was trying to chase after them.

4   Q.    Okay.  So they told you that they had not been in

5   a physical altercation with anybody?

6   A.    Correct.

7   Q.    And that these scrapes and cuts and torn clothing

8   was the result of them running away from what?

9   A.    From someone chasing after them.

10  Q.    Did they say in what way were they being chased?

11  Did they indicate that to you?

12  A.    Yes, sir.  It was both by someone on foot,

13  allegedly with a stick of some sort, and someone in a

14  white Dodge Durango vehicle.

15  Q.    Do you have another photograph that displays what

16  you are talking about?

17  A.    Yes, sir.  Number 12 is more of Deputy Bergeron's

18  clothing, and then number 15 --

19  Q.    Let's start with if you will hold off for a

20  second.

21        MR. JARZABEK:  Could we have --

22  BY MR. JARZABEK:

23  Q.    Again, on the screen there, is that reflective of

24  what you are looking at?

25  A.    Yes, sir.

1    Q.    Would you describe that to the Jury, please?

2    A.    Yes.   That's Deputy Bergeron's clothing and some

3    of the fresh scrapes to his knee that I photographed a

4    little more closely.

5    Q.    And 15?

6    A.    Yes, sir.   That was Deputy Huckabay's appearance

7    at the time I encountered him.

8    Q.    Any other photographs that you think are

9    relevant?

10   A.    Yes, sir.   Number 17.

11   Q.    Hold on.

12         MR. JARZABEK:   Number 17, please, sir.

13   BY MR. JARZABEK:

14   Q.    Are those the hands of one of the deputies?

15   A.    Yes, sir, of Jake Huckabay.   And the reason I

16   thought it was important at the time is because there

17   was a lot of fresh scrape wounds and abrasions,

18   including the next photo as well, number 18.

19         MR. JARZABEK:   Number 18, please.

20         THE WITNESS:   That shows one a little more

21   closely on the side of his hand, which at the time he

22   claimed was an old injury that he had torn open during

23   his running away from whoever was chasing him.

24   BY MR. JARZABEK:

25   Q.    Is that pretty much it, sir?

1    A.    Of officers, yes, sir.

2    Q.    You also took victims -- there is also pictures

3    of victims in there?

4    A.    Yes, sir.  Correct.

5    Q.    Correct?  And does that show the abrasions and

6    cuts they received?

7    A.    Yes, sir.

8    Q.    Any particular note to you?

9    A.    Um, one of the victims, I mean, obviously had a

10   very swollen lip and contusion to his head.  And the

11   other victim, similar injuries to his face.

12   Q.    Based on all this --

13         MR. JARZABEK:  Thank you.

14   BY MR. JARZABEK:

15   Q.    Based on all the evidence that you were

16   observing, did you accept the version of what happened

17   to the agents that they gave you?

18   A.    No, sir.

19   Q.    Okay.  And did you call anybody as a result of

20   that?

21   A.    Yes, sir.

22   Q.    Who?

23   A.    I notified my shift lieutenant, Dickie Freeman,

24   and advised him of what our investigation had shown at

25   that point.  He advised me that we needed to contact

 1    those agents's supervisor, who was Lieutenant Troy

 2    Willis.

 3    Q.    Did you try to contact Mr. Willis?

 4    A.    Yes, sir, I did.

 5    Q.    Were you successful?

 6    A.    No, sir, I wasn't able to get in contact with

 7    him.

 8    Q.    Did you contact somebody above Mr. Willis's

 9    level?

10    A.    Yes, sir.  His supervisor at the time was Captain

11    Grady Thibodeaux.

12    Q.    Were you able to link up with Mr. Thibodeaux?

13    A.    No, sir.

14    Q.    Did you call anybody else?

15    A.    Yes, sir.

16    Q.    Who?

17    A.    Major Michael Barnett.

18    Q.    What was Major Barnett's position at the time?

19    A.    He was the enforcement major.  He was over

20    Captain Thibodeaux.

21    Q.    Did you finally talk to him?

22    A.    Yes, sir, I did.

23    Q.    What did he say?

24    A.    Major Barnett instructed me to complete my

25    investigation and that it would be forwarded to our

1    internal affairs division for further review the

2    following Monday morning.  He said do everything that

3    you need to do and get your report completed and

4    submitted.

5    Q.    If you could -- if I can take that report back?

6    A.    Yes, sir.

7    Q.    On this report there is a narrative portion, but

8    you also fill out different parts.  This is part of a

9    form, is it not?

10   A.    Yes, sir.

11   Q.    And where is that form located?

12   A.    In our computer system.  Whether it's at the

13   office or on our laptops, in our vehicles.

14   Q.    Okay.  Do you remember where you drafted this?

15   A.    If I'm not mistaken, I typed that report at the

16   office.

17   Q.    Okay.  Is it an automatic system of some kind?  A

18   reporting system?  A uniform reporting system?

19   A.    A uniform reporting system.

20   Q.    What's it called?

21   A.    ARMMS.

22   Q.    It's an acronym for what?

23   A.    Automated Reporting Mapping and Management

24   System.

25              MR. JARZABEK:  If I could have Government's

1    Exhibit 14, page 2, please.

2    BY MR. JARZABEK:

3    Q.    This form, the initial deputy, Davis, did not

4    list any suspects as far as naming them; is that

5    correct?

6    A.    Correct.

7    Q.    He just named three unknown white males?

8    A.    Correct.

9    Q.    This is your report.

10          MR. JARZABEK:   If I could have the bottom

11   part of the report, please.

12   BY MR. JARZABEK:

13   Q.    Did you in fact in this report identify Jacob

14   Huckabay as a suspect in the attack on the two black

15   youths?

16   A.    I did.

17          MR. JARZABEK:   Page 3, please, top of the

18   page.

19   BY MR. JARZABEK:

20   Q.    This is -- the top is a continuation of a

21   description of the first suspect; correct?

22   A.    Yes, sir.

23   Q.    Who do you list as suspect number two?

24   A.    Wade Bergeron.

25   Q.    Again, description of his condition and what he

1   was wearing?

2   A.   Yes, sir.

3   Q.   Did you fill this report out that night?

4   A.   Yes, sir, I did.

5   Q.   Okay.  And that report is generated the early

6   morning of hours of November the 2nd; is that correct?

7   A.   Yes, sir.

8          MR. JARZABEK:  Thank you.

9   BY MR. JARZABEK:

10  Q.   Now, in the reporting system there's two

11  different categories; is that correct?  A draft and

12  then an approved section; is that correct?

13  A.   Yes, sir.

14         MR. MCLINDON:  Objection.  Leading questions.

15         THE COURT:  Don't lead, Mr. Jarzabek.

16         MR. JARZABEK:  Thank you, Your Honor.

17  BY MR. JARZABEK:

18  Q.   Was this ever in the approved section, that you

19  know of?

20  A.   I can't answer that with certainty.  I'm not

21  sure.

22  Q.   Were you leaving town for any purpose?

23  A.   Yes, sir.

24  Q.   For what purpose?

25  A.   I was leaving after I got off shift that day to

```
 1   go to a training for negotiators in Luling, Louisiana
 2   for a week.
 3   Q.    So the next day?
 4   A.    Yes, sir.
 5   Q.    November the 3rd?
 6   A.    Yes, sir.
 7   Q.    And after you drafted this report, Government's
 8   Exhibit 14, did you do anything else?
 9   A.    Yes, sir.  I printed the report.
10   Q.    Did you keep a hard copy?
11   A.    I did.
12   Q.    Is that the hard copy you saved?
13   A.    It's a copy of it.
14   Q.    Well, when you came back from your trip, your
15   training?
16   A.    Yes, sir.
17   Q.    Did you attempt to go into the ARMMS system and
18   find out if the report was there and what its status
19   was?
20   A.    Yes, sir, I did.
21   Q.    And what did you find?
22   A.    To the best of my recollection, the report wasn't
23   there in the unapproved section or the approved section
24   of the ARMMS system.
25   Q.    Okay.  And did you check several other times?
```

1   A.    Yes, sir, I did.  I spoke with my supervisor,

2   Lieutenant Freeman, and asked him a question about it

3   as well.

4   Q.    Did he acknowledge knowing that the report was

5   gone?

6   A.    No, sir.

7   Q.    Okay.  Have others looked for it after that that

8   you are aware of?

9   A.    Yes, sir.

10  Q.    Did they find it?

11  A.    No, sir.

12  Q.    It's just gone?

13  A.    It was.

14  Q.    Now, did -- to your knowledge, did this incident

15  become fairly well known within the Iberia Parish

16  Sheriff's Office?

17  A.    Sometime down the road, yes, sir.

18  Q.    Has the sheriff or anybody else in the position

19  of management indicated to you that they were aware of

20  the report disappearing?

21          MR. MCLINDON:  Objection.  Hearsay, unless he

22  can better define.

23          THE COURT:  Overruled.

24          MR. JARZABEK:  Thank you, Your Honor.

25          THE WITNESS:  Yes, sir.

```
 1              THE COURT:  Your question is:  Did the
 2   sheriff or anybody else in a position of management
 3   indicate to you that they were aware the report was
 4   missing?  "Yes," "no," "I don't know."
 5              THE WITNESS:  Yes.
 6   BY MR. JARZABEK:
 7   Q.   Have you had conversations with Toby Hebert about
 8   this?
 9   A.   Yes, sir.
10   Q.   Toby Hebert is a nickname, is it not?  What's his
11   full name?
12   A.   Russell Hebert.
13   Q.   At the time, what was Russell Hebert's position
14   at the Iberia Parish Sheriff's Office?
15   A.   At which time?
16   Q.   At the time of this report.
17   A.   I believe he was heading up our internal affairs
18   division.  I believe.  I could be mistaken, though.
19              MR. JARZABEK:  A moment, Your Honor.
20              THE COURT:  Yes.
21   BY MR. JARZABEK:
22   Q.   Now, you've already indicated, I believe, that --
23   well, was it normal for you to print out hard copies of
24   reports that you drafted?
25   A.   No, sir.
```

```
1    Q.    You did in this case?

2    A.    Yes, sir.

3    Q.    Why?

4    A.    A gut feeling.

5    Q.    Would it have anything to do that there are two

6    employees of the Iberia Parish Sheriff's Office named

7    as suspects in this report?

8    A.    Yes, sir.

9    Q.    Is that one reason you believed you should keep a

10   hard copy of it?

11   A.    Yes, sir.

12   Q.    Now, the -- we've talked about the fact that Wade

13   Bergeron and Mr. Huckabay were -- are narcotics agents

14   at the time; correct?

15   A.    Yes, sir.

16   Q.    Had you had any conversations with the sheriff

17   that -- up until this point -- that would have led to

18   you helping yourself print out that copy?

19   A.    Not anything specific that I can recall.

20   Q.    Did you have a feeling that it was necessary

21   because of those encounters?

22   A.    Because of which encounters?

23   Q.    Any encounters with Sheriff Ackal?

24   A.    No, sir.

25   Q.    Okay.  But you did have a gut feeling that you
```

1   should keep a hard copy of this report?

2   A.   Yes, sir.

3   Q.   Okay.  Thank you.

4        MR. JARZABEK:  No further questions.

5        THE COURT:  Your witness.

6        MR. MCLINDON:  Thank you, Your Honor.

7                    CROSS-EXAMINATION

8   BY MR. MCLINDON:

9   Q.   Mr. Kelley, you're still employed with the

10  sheriff's office?

11  A.   Yes, sir.

12  Q.   And you had no fear at all in copying this report

13  and keeping it for yourself; did you?

14  A.   No, sir.

15  Q.   You didn't feel like you were going to get fired

16  or anything because of that.  You did it because you

17  felt like it was the right thing to do?

18  A.   Yes, sir.

19  Q.   Now, the three officers that you ran into that

20  night, basically they just lied to you about what

21  happened; right?

22  A.   I'm not sure if they did or didn't.

23  Q.   Well, they told you that they were out doing some

24  type of surveillance and what they were doing was

25  perfectly legitimate part of their police work; right?

1   A.    That's what they told me, yes, sir.

2   Q.    Okay.  Do you have information now that that's

3   actually not what happened?

4   A.    I don't have direct information that that's not

5   what actually happened.

6   Q.    Do you believe that's what happened that night?

7   A.    I don't believe that's what happened.

8   Q.    Okay.  So these guys lied to you?

9   A.    I believe so.

10  Q.    Okay.  And you're a fellow officer?

11  A.    Yes, sir.

12  Q.    Right to your face they lied to you?

13  A.    Yes, sir.

14  Q.    Now, the picture we saw of the guy standing up, I

15  think -- was that Bergeron?

16  A.    Yes, sir.

17  Q.    He kind of seemed to be smiling.

18  A.    He was.

19  Q.    What was his overall demeanor and mood that -- I

20  guess it was early in the morning, wasn't it?

21  A.    It was.

22  Q.    Was he happy?  Was he -- I mean, he looks pretty

23  happy in the picture.  Do you remember?

24  A.    He was pretty laid back, not seemed to be too

25  uptight about anything, kind of joking in mannerisms

```
1    and answering questions I was asking.

2    Q.    Okay.  Kind of arrogant and smug about the whole

3    thing?

4    A.    Yes, sir.

5    Q.    Okay.  And did he make any reference -- any

6    racial terms when he talked about what he had been

7    doing?

8    A.    Not that I can recall.

9    Q.    So race was not an issue --

10   A.    No, sir.

11   Q.    -- and y'all brought it up?  Okay.

12          So there are actually -- there were two

13   reports prepared, one by Jamal Davis --

14   A.    Yes, sir.

15   Q.    -- and one by you?

16   A.    Yes, sir.

17   Q.    The one by Jamal Davis is wrong; is that correct?

18   A.    I would say it's lacking information, at best.

19   Q.    Okay.  And then yours was more thorough and

20   detailed?

21   A.    Yes, sir.

22   Q.    Okay.  And yours ended up -- you couldn't find it

23   on the ARMMS computer system?

24   A.    Correct.

25   Q.    What about Jamal Davis's?
```

1    A.    It was always there.

2    Q.    It was always there and still --

3    A.    Yes.

4    Q.    -- as far as you know, still there?

5    A.    Yes, sir.

6    Q.    Okay.  You don't know why yours disappeared?

7    A.    I didn't -- well, I do.

8    Q.    Well, it's basically what somebody told you.

9    Let's just say that.

10   A.    Yes, sir.

11   Q.    Okay.  Do you have personal knowledge of who

12   deleted that report?

13   A.    No, sir.

14   Q.    Did you ever hear my client, Louis Ackal, say, *I*

15   *want that report deleted*?

16   A.    No, sir, not to me.

17   Q.    Okay.  Did you -- when you -- you got back from

18   your training and you noticed the report was deleted,

19   did you go to the sheriff and say, *Hey, this report is*

20   *deleted*?

21   A.    No, sir.

22   Q.    One second.  You heard -- you know who Toby

23   Hebert is; right?

24   A.    Yes, sir.

25   Q.    You heard Toby Hebert refer to this incident as

1    nigger knocking; is that right?

2    A.    Yes, sir.

3    Q.    And you never heard Sheriff Ackal use that

4    phrase?

5    A.    I did not.

6         MR. MCLINDON:   Thank you very much, Officer.

7    That's all I have.

8         THE COURT:   Redirect?

9         MR. JARZABEK:   Yes, Your Honor.

10                    REDIRECT EXAMINATION

11   BY MR. JARZABEK:

12   Q.    But for the fact that you saved a hard copy of

13   that report, would it exist, to your knowledge?

14   A.    Not to my knowledge, no.

15   Q.    Did you go around telling people, like the

16   sheriff, that, *gee, I've got a hard copy left over*?

17   A.    I did not.

18   Q.    That wasn't disclosed until you started meeting

19   with the FBI; is that not correct?

20   A.    That's true.

21   Q.    So it's not like the report was just out there,

22   is it?

23   A.    No, sir.

24   Q.    Now, you recall my testimony -- my questions

25   about your discussions of different things with the

 1   sheriff; correct?

 2   A.    Yes.

 3   Q.    My question then was regarding the specifics of

 4   the report; correct?

 5   A.    As far as I understand, yes, sir.

 6   Q.    Did you ever over time believe that the sheriff

 7   was tolerant of the use of excessive force?

 8   A.    Over time?

 9   Q.    Yes, sir.

10   A.    Somewhere in the middle.

11   Q.    Okay.  But it's a fact, if I'm understanding your

12   answer correctly, that your opinion did change.

13   A.    Change from?

14   Q.    Well, did you have a favorable opinion of the

15   sheriff's use of force initially, his attitude towards

16   it?

17          MR. MCLINDON:  I object.  Now we're beyond --

18   I didn't bring up use of force.

19          THE COURT:  You're right.

20          MR. MCLINDON:  This is beyond my cross.

21          THE COURT:  Sustained.

22   BY MR. JARZABEK:

23   Q.    In relation to your report, you actually stated

24   in your report that you suspected the two narcotics

25   officers of committing a crime, did you not?

1    A.    Yes, sir.

2    Q.    You clearly identified them as suspects, did you

3    not?

4    A.    Yes, sir, I did.

5    Q.    And that's the report that disappeared; correct?

6    A.    Yes, sir.

7    Q.    The initial report by Deputy Davis didn't

8    disappear, did it?

9              MR. MCLINDON:  Objection.  Fourth leading

10   question in a row.  He's testifying, Your Honor.

11   BY MR. JARZABEK:

12   Q.    Did Mr. Davis's report disappear?

13   A.    No, sir, it did not.

14   Q.    Did yours disappear?

15   A.    Yes, sir, it did.

16   Q.    Did Davis's report list anybody as suspects with

17   Iberia Parish Sheriff's Office?

18   A.    No, sir, it did not.

19   Q.    Did yours?

20   A.    Yes, sir, it did.

21              MR. JARZABEK:  No further questions.

22              THE COURT:  The witness is free to go?

23              MR. JARZABEK:  Yes, Your Honor.

24              MR. MCLINDON:  Yes, Your Honor.

25              THE COURT:  You're free to go.  Thank you,

```
 1   sir.

 2            THE WITNESS:  Thank you, Your Honor.

 3            THE COURT:  Ladies and gentlemen, you're free

 4   to go.  And I'll, once again, tell you please don't

 5   read, watch, listen to any news account.  Don't discuss

 6   it even with your nearest and dearest.  See you at 9:00

 7   tomorrow morning.  All rise.

 8            (The Jury exits the courtroom.)

 9            THE COURT:  Court is in recess until 9:00

10   tomorrow.  I believe you have, what, five witnesses

11   left?

12            MR. BLUMBERG:  Let me check, Your Honor, to

13   be sure.  Six, Your Honor.

14            THE COURT:  Six witnesses?  You, obviously,

15   have somebody -- I don't know, but that's okay.

16            MR. MCLINDON:  So, Judge, if they rest --

17   Anthony Daye is here incarcerated.  So if they rest, I

18   can at least call Anthony Daye tomorrow afternoon.

19            THE COURT:  Sure.  Okay.

20            MR. MCLINDON:  And then I can probably get

21   one other guy here for tomorrow afternoon, but he'll

22   have to spend the night.

23            THE COURT:  That may be a good idea.

24            MR. MCLINDON:  I'll do my best, Judge.

25            THE COURT:  All right.  Thank you.  The Court
```

1    is in recess.

2              (Recessed at 4:57 p.m.)

3                    *    *    *    *    *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3             I, Gayle Wear, Federal Official Court

4    Reporter, in and for the United States District Court

5    for the Western District of Louisiana, do hereby

6    certify that pursuant to Section 753, Title 28 United

7    States Code, that the foregoing is a true and correct

8    transcript of the stenographically reported proceedings

9    held in the above-entitled matter and that of the

10   regulations of the Judicial of the United States.

11

12                      Dated this 2nd day of November 2016.

13

14                      /s/ Gayle Wear
                        Gayle Wear, RPR, CRR
15                      Federal Official Court Reporter

16

17

18

19

20

21

22

23

24

25