```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF LOUISIANA
 2                    SHREVEPORT DIVISION

 3   UNITED STATES OF AMERICA,            )
                                          )
 4            Plaintiff,                   )
                                          )  Case No:
 5                                         )  16-cr-00048-DEW-PJH
         vs.                               )
 6                                         )  Volume 4
     LOUIS ACKAL,                          )
 7                                         )  Pages 800 - 1046
              Defendant.                   )
 8   _____      )

 9

              TRANSCRIPT OF JURY TRIAL PROCEEDINGS
10            BEFORE THE HONORABLE DONALD E. WALTER

11            THURSDAY, NOVEMBER 3, 2016; 9:00 A.M.
                     SHREVEPORT, LOUISIANA
12

13   APPEARANCES:
     (Continued on Page 2.)
14
     FOR THE UNITED STATES:
15
         Mark Blumberg
16       Tona Cartwright-Boyd
         U.S. DEPARTMENT OF JUSTICE CIVIL RIGHTS DIVISION
17       950 Pennsylvania Avenue N W
         Washington, DC 20530
18
         Joseph G. Jarzabek
19       U.S. ATTORNEY'S OFFICE
         WESTERN DISTRICT OF LOUISIANA
20       300 Fannin Street, Suite 3201
         Shreveport, Louisiana 71101-3068
21

22       ******************************

23            GAYLE WEAR, RPR, CRR
         Federal Official Court Reporter
24            800 Lafayette Street
         Lafayette, Louisiana 70501
25                337.593.5222
```

```
1    APPEARANCES OF COUNSEL:
     (Continued from Page 1.)
2

3    FOR THE DEFENDANT ACKAL:

4        John S. McLindon
         WALTERS, PAPILLION, THOMAS, CULLENS, LLC
5        12345 Perkins Road, Building 2, Suite 202
         Baton Rouge, Louisiana 70810
6

7

8

9

10                        *    *    *

11

12   COURT REPORTER'S NOTE:  There is no page number 1045.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                         I N D E X

 2    PROCEEDINGS:                                    PAGE:
      (Continued on page 803.)
 3

 4    GOVERNMENT WITNESSES:

 5
      JACOB HUCKABAY
 6
          Direct examination by Mr. Blumberg        805
 7        Cross-examination by Mr. McLindon         839
          Redirect examination by Mr. Blumberg      863
 8

 9    MARION BOREL

10        Direct examination by Mr. Blumberg        869
          Cross-examination by Mr. McLindon         880
11        Redirect examination by Mr. Blumberg      886

12
      RUSSELL HEBERT
13
          Direct examination by Mr. Blumberg        888
14        Cross-examination by Mr. McLindon         922
          Redirect examination by Mr. Blumberg      946
15

16    DAVID HINES

17        Direct examination by Mr. Jarzabek        953
          Cross-examination by Mr. McLindon         968
18        Redirect examination by Mr. Jarzabek      975

19                      *    *    *

20

21    DEFENSE WITNESSES:

22
      ANTHONY DAYE
23
          Direct examination by Mr. McLindon        979
24        Cross-examination by Ms. Boyd             990
          Redirect examination by Mr. McLindon     1006
25
```

```
1                           I N D E X

2    PROCEEDINGS:                                    PAGE:
     (Continued from page 802.)
3

4    DEFENSE WITNESSES:

5

     ANTHONY GREEN
6
          Direct examination by Mr. McLindon       1010
7

8    DICKIE FREMIN

9         Direct examination by Mr. McLindon       1016
          Cross-examination by Mr. Jarzabek        1020
10        Redirect examination by Mr. McLindon     1023

11

     PAUL SCOTT
12
          Direct examination by Mr. McLindon       1025
13        Cross-examination by Mr. Jarzabek        1030

14

     RICHARD LANDRY
15
          Direct examination by Mr. McLindon       1032
16        Cross-examination by Mr. Blumberg        1036

17

18                        *    *    *

19

20                    E X H I B I T S

21

22
       (Master Index to be provided at trial conclusion.)
23

24

25                        *    *    *
```

```
 1    November 3, 2016                           9:05 a.m.

 2                       ---o0o---

 3              P R O C E E D I N G S

 4                       ---o0o---

 5         (The Jury enters the courtroom.)

 6         THE COURT:  Good morning, ladies and

 7    gentlemen.  We had a little bit of business beforehand,

 8    and that's why we're starting five minutes late.  Don't

 9    worry.  You are on time.

10         You may have often noticed from time to time

11    the defendant will leave the courtroom.  He has to go

12    to the bathroom, and I've given him permission to do

13    so.  So don't draw any conclusion about why he's

14    leaving.

15         All right.  Call your next witness, please.

16         MR. BLUMBERG:  The Government calls Jacob

17    Huckabay, Your Honor.

18         THE COURT:  All right.

19         THE COURTROOM DEPUTY:  Please raise your

20    right hand.

21         Do you solemnly swear that the testimony you

22    will give in this matter will be the truth, the whole

23    truth, and nothing but the truth, so help you, God?

24         THE WITNESS:  Yes, I do.

25         THE COURTROOM DEPUTY:  Could you please spell
```

1    your first and last name for the Court Reporter.

2           THE WITNESS:  First name is Jacob, J-A-C-O-B.

3    Last name is Huckabay, H-U-C-K-A-B-A-Y.

4           THE COURTROOM DEPUTY:  Thank you.

5                     JACOB HUCKABAY,

6     first having been duly sworn by the Courtroom Deputy,

7              testifies under oath as follows:

8                     DIRECT EXAMINATION

9    BY MR. BLUMBERG:

10   Q.    Good morning, sir.

11   A.    Good morning.

12   Q.    Would you please introduce yourself to the

13   members of the Jury.

14   A.    Good morning.  My name is Jacob Huckabay.  I'm

15   from New Iberia, Louisiana.

16   Q.    Where do you live now, sir?

17   A.    I still live in New Iberia, but a few months out

18   of the year I live in Kansas, southwest Kansas.

19   Q.    How old are you?

20   A.    I'm 34.

21   Q.    Excuse me.  Are you currently employed?

22   A.    Yes, sir.  You could call it self-employed.

23   Q.    How are you employed?

24   A.    I manage a commercial hunting operation.  We hunt

25   white tail and mule deer, and I also have a catering

1    company back home where we do boiled crawfish and

2    seafood.

3    Q.    Are you currently in law enforcement?

4    A.    No, sir.  Well, I am a reserve with Youngsville

5    Police Department.

6    Q.    Were you a full-time law enforcement officer at

7    one point?

8    A.    Yes, sir.

9    Q.    Where were you employed as a law enforcement

10   officer?

11   A.    I started off in Iberia Parish.  Later on,

12   switched to St. Martin Parish, and then back to Iberia

13   Parish.

14   Q.    During your first tenure at the Iberia Parish

15   Sheriff's Office, what were your responsibilities?

16   A.    I was a patrol deputy.

17   Q.    When did you start there?

18   A.    2004.  Late 2004, I believe, or 2005.

19   Q.    How long were you a patrol deputy?

20   A.    A year and a half or so.

21   Q.    Did you like it?

22   A.    Yes, sir.

23   Q.    What did you like about it?

24   A.    Um, I mean, the -- I don't know.  The cliché

25   answer is helping, you know.  But I just like being

1    involved with other people.  I'm a people person.  And,

2    you know, there's adrenaline; there's action; and

3    there's fun.

4    Q.    Did your attitude toward policing change over

5    time?

6    A.    Oh, absolutely.

7    Q.    Did it become less fun?

8    A.    Um, yes.

9    Q.    Did you ever work in the narcotics unit at the

10   Iberia Parish Sheriff's Office?

11   A.    Yes.  When I -- when I left -- I would go into

12   St. Martin.  When I left there, I went straight into

13   the narcotics division in 2008.

14   Q.    Did that coincide with the election of Louis

15   Ackal?

16   A.    Yes.  I actually -- I was asked to come early, a

17   month or two early, before he actually took over.  I

18   think it's July 1st.  So I was there in early June or

19   so.

20   Q.    Did you start in the patrol unit again, or did

21   you go directly into narcotics?

22   A.    No.  I went straight into narcotics.

23   Q.    What were your responsibilities and rank in the

24   narcotics unit at the time that you joined in the

25   Summer of 2008?

1    A.    When I -- when I went back, I was just an agent.

2    And, you know, we were tasked with investigating

3    narcotics crimes, some street crimes, but mainly

4    focusing on street-level narcotics.

5    Q.    Who was in the narcotics unit at the time that

6    you joined in the Summer of 2008?

7    A.    When I first joined, it was -- Kevin Judice was

8    the lieutenant.  Troy Willis was the sergeant.  I

9    believe Grady Thibodeaux was there early, also, as the

10   captain.  There was an individual who came in a little

11   bit after me, Gerald Savoy.  Ben Lassalle.  And Marion

12   Borel, I believe, was in there.  Maybe a few others

13   that I'm forgetting, but it was not a whole lot of us.

14   Q.    Do you know a man by the name of *Wade Bergeron*?

15   A.    Yes, sir.

16   Q.    Was he a member of the narcotics unit, roughly,

17   during that time period, as well?

18   A.    Yes, sir.  I think he probably came in maybe

19   right after Louis took office, but it was early.

20   Q.    Okay.  How would you describe the character of

21   that unit?

22   A.    Oh, we were -- we were a ragtag group of guys.

23   We -- I mean, we -- none of us, other than Troy Willis

24   and Kevin, had a whole lot of narcotics experience.

25   Um, we were -- we were young.  We were -- you know, we

```
1    had a lot of energy.  We put a lot of time on the
2    streets.
3    Q.    What were you supposed to be doing on the
4    streets?
5    A.    We were supposed to be getting drugs off the
6    streets and arresting drug dealers.
7    Q.    Did you have rules and regulations and policies
8    that you were supposed to abide by in that process?
9    A.    Absolutely.  I mean, there's -- there's
10   department policy, which, you know, as a -- as a
11   deputy, everybody's aware of their department policy.
12   Then there's state law and federal law.  So absolutely
13   there's regulations.
14   Q.    You didn't always follow those regulations,
15   though, did you?
16   A.    No.
17   Q.    In fact, specifically, were you following the
18   regulations as it applied to uses of -- permissible
19   uses of force as a law enforcement officer?
20   A.    No.  That's one of the -- that's probably one of
21   the more broken regulations.
22   Q.    By you?
23   A.    Yes, sir, along with others.
24   Q.    In the narcotics unit?
25   A.    Yes.
```

1   Q.    In the Summer and Fall of '08?

2   A.    Yes, sir.

3   Q.    And after?

4   A.    Yes, sir.

5   Q.    What kind of things were you doing that were

6   violating your policies, training and procedures

7   related to the use of force?

8   A.    Well, use of force is -- it's black and white.

9   It honestly is.  But there's always -- there's always

10  the ability to stretch it and to find the gray areas.

11  So use of force was something that we kind of --

12  whatever it was that we're doing, if we're effecting an

13  arrest and there was force used, whether it was

14  necessary or unnecessary, you could always hinge what

15  you've done on a Use of Force policy.  And basically --

16  Q.    Mr. Huckabay, let me interrupt you for one

17  minute.  I want to make sure we're talking about the

18  same thing.

19  A.    All right.

20  Q.    I'm not talking about justifying things at the

21  moment.  I'm talking about the actual doing.  You

22  understand me?

23  A.    Yeah.

24  Q.    So let's talk about the black-and-white rules

25  that you've described.

1    A.    Then we were in the black.

2    Q.    Meaning?

3    A.    The wrong side of it.

4    Q.    What were you doing that was on the wrong side?

5    A.    We were -- as little explanation as possible, we

6    were violating department policy, state law and federal

7    law.

8    Q.    How?

9    A.    By excessive force.

10   Q.    What were you doing?

11   A.    People were getting -- they were getting punched,

12   kicked, beat, you know, probably false arrests, if you

13   boil it down to that.  And, you know, that's the pieces

14   of it.

15   Q.    This is a little hard for you to testify about,

16   isn't it?

17   A.    Yes, sir.

18   Q.    Are you proud of your behavior back then?

19   A.    Not at all.

20   Q.    We've talked about the various forms that these

21   rules violations took, haven't we?

22   A.    Yes, sir.

23   Q.    In general, you're talking about beating people

24   without cause; is that right?

25   A.    Yes.

Q.    Why did you do that?

A.    It -- you know, you could say that it's -- when you're -- when you're operating like that, when you're doing those things, it's liberating, I guess.  To be -- to have a little power -- extra power over somebody, it's -- it's liberating at times.  It's -- it's fun, I guess.

Q.    Kind of an adrenaline rush?

A.    Yes, sir.

Q.    Was it shared among -- that feeling shared among the other narcotics agents?

A.    Yes.

Q.    At some point, did your behavior that fell in the black raise concerns in the community?

A.    Yeah.

Q.    Which community principally was raising concerns about the behavior of the narcotics unit?

A.    There's -- there's only one community that we -- you know, that we involved ourselves with like that, and that was the black community, I guess.

Q.    All right.  So to be fair, you weren't running over into the wealthy white communities and beating people up there?

A.    No.  I mean, when we got the chance to go arrest a white guy, well, absolutely we would go because, you

1    know, it kind of offset stuff.

2    Q.   What does that mean?

3    A.   Well, if you -- if you look at a narcotics group

4    and the only thing they do is arrest black people,

5    well, then, that looks bad; right?  So you get a chance

6    to go put a white guy in jail, well, let's go put a

7    white guy in jail and even things out a little bit.

8    Q.   In terms of your excessive uses of force, where

9    was that directed?

10   A.   The black community.

11   Q.   The complaints began to come in at some point;

12   right?

13   A.   Yes, sir.

14   Q.   Even as early as the Summer and Fall of 2008?

15   A.   Yes.

16   Q.   Did you get a visit from Louis Ackal as a result

17   of those complaints?

18   A.   Yeah.

19   Q.   Who else came with him?

20   A.   I don't know if he was -- I think he was Internal

21   Affairs at the time.  But that was Russell Hebert, Toby

22   Hebert.

23   Q.   Who was present at this meeting?

24   A.   All the members of narcotics.

25   Q.   Did Louis Ackal and Toby Herbert raise the issue

```
 1    of these complaints by the African-American community?
 2    A.    Yeah.  Basically, that was the -- that was the
 3    basis of the meeting.  We were -- we got called to the
 4    office, and we were told, you know, the sheriff and
 5    Toby wanted to talk to us.  Now, Toby's IA, so we knew
 6    something -- something was up.
 7            And during the meeting, basically, we were
 8    told that, All right, look, there's -- there's quite a
 9    bit of complaints coming in, and that's -- that's good.
10    Y'all are doing a good job.  Don't worry about it.
11    Y'all are doing a good job.  But I want you to just
12    remember don't do anything too far out on a limb where
13    we can't get you back.
14            And this is the sheriff telling us this.
15    Q.    What was your -- what was your reaction to that
16    statement?
17    A.    Well, the first thing is you're kind of looking
18    around the room and seeing what everybody else's
19    reaction is.  And, you know, I took it as -- almost set
20    back by it because, like I said, you knew why IA was
21    there, because there was complaints.  IA is never a
22    good thing for a police officer, or that's the
23    mentality of it.
24            So IA comes in and says, We got complaints,
25    but don't worry about it.  We're going to take care of
```

1    *it, you know, if it's not too crazy.*

2              So I was a little set back.  But then, you

3    know, after the fact, it's okay.  Everybody else had

4    the same reaction.  Well, okay, cool.

5    Q.   Well, did you get investigated right away?

6    A.   No.

7    Q.   Were there any specific victims who were

8    interviewed and brought forward and asked you to --

9    were you asked about the allegations?

10   A.   No.

11   Q.   To your knowledge, was anybody in narcotics

12   investigated based on the complaints that were raised

13   in this meeting?

14   A.   No, not in that meeting.

15   Q.   What did you take that meeting to mean for you

16   and your behavior?

17   A.   I called it a green light, I guess.  Um,

18   basically -- basically, it was a pat on the back,

19   saying, *okay, look, guys, y'all are doing a good job.*

20   *I understand why you're doing what you're doing.  Keep*

21   *doing it, but keep this in mind, you know.*

22   Q.   What do you think the comment about *don't go so*

23   *far out I can't bring you back* meant?

24              MR. MCLINDON:  Objection.  That calls for

25   speculation.

```
 1              THE COURT:  Do you want to rephrase that
 2    question?
 3              MR. BLUMBERG:  Yes, sir.
 4    BY MR. BLUMBERG:
 5    Q.   Did you, under -- how did you act based on the
 6    comments don't go so far out I can't bring you back?
 7    A.   I acted as if -- you know, I made it very --
 8    everything we did was specifically geared to that to
 9    where, you know, in the back of my mind, I'm like,
10    okay, I'm getting to that point to where I think I
11    couldn't be brought back, so let's stop; right?
12    Q.   Give us an example of where that line would have
13    been.
14    A.   Getting caught.
15    Q.   By whom?
16    A.   Um, I don't -- I didn't know.
17    Q.   Video?
18    A.   Video.  You know, something -- something you
19    can't argue.
20    Q.   Outside police agency?
21    A.   Yeah.  You know, I don't know what -- what it
22    would have been, but...
23    Q.   At some point, did you find out where that line
24    was or was not?
25    A.   Oh, absolutely.
```

```
 1    Q.    In November of 2008?

 2    A.    Yes.

 3    Q.    So after the meeting that you've just described,

 4    you and the narcotics agents continued to beat people

 5    without cause; is that a fair statement?

 6    A.    Yes, sir, that's fair.

 7    Q.    By the way, how often was this kind of behavior

 8    going on?

 9    A.    Oh, I guess it depended on how busy we got, you

10    know.  But in a given week, if we arrested ten people,

11    probably two of them, two or three of them, you know.

12    Q.    In a week?

13    A.    Yes, sir.

14    Q.    Okay.  So November 2008 comes along, and you now

15    have a better idea of what these comments meant; right?

16    A.    Yes.

17              MR. MCLINDON:  Objection.  Leading question.

18              THE COURT:  You are leading, sir.

19              MR. BLUMBERG:  Yes, sir.  I apologize.

20    BY MR. BLUMBERG:

21    Q.    Okay.  You go out and get liquored up at some

22    point?

23    A.    Yes, sir.

24    Q.    All right.  Describe what happened.

25    A.    Um, we had a -- I don't know if you call it a
```

```
 1   party, but just this particular night we went to -- he
 2   was our lieutenant at the time.  We went to his house
 3   and, you know, had some beers, had some drinks.  And it
 4   was getting late in the night and myself, Troy Willis
 5   and Wade Bergeron were kind of the only remaining --
 6   remaining guys there, and we decided let's go -- let's
 7   go get in a fight.  Let's go beat somebody up.
 8   Q.   Did you?
 9   A.   Yes.
10   Q.   Where did you go?
11   A.   Troy lives kind of on the edge of what we call --
12   refer to as the west side of town, so within walking
13   distance of, you know, a predominantly black area of
14   town.  So that's where we went.
15   Q.   But on the border between a predominantly white
16   area and a predominantly black area?
17   A.   Yeah.  If you walk this way, you get black
18   people.  If you walk this way, you get white people.
19   Q.   How did you decide which direction to walk?
20   A.   I don't think it was a conscious decision.  You
21   know, nobody said, *Well, let's go to the black part*,
22   but that's the direction we went.  There was -- there
23   was no question that that's the way we went.  It was
24   never even a thought to go the other way.
25   Q.   I want to talk about that for just a moment.
```

1          Did you have any feelings in terms of the

2    people that you beat, as a narcotics agent, whether

3    they would be believed if they made an allegation

4    against you?

5    A.    No.

6    Q.    Did you worry that they would be believed if they

7    made an allegation against you?

8    A.    No, not at all.

9    Q.    Did you believe that allegations by black people

10   would be looked at as less credible than allegations by

11   white people?

12   A.    Absolutely.

13   Q.    Did you think that played a role in which

14   direction you chose to walk that night?

15   A.    Yeah, it had to have.  I mean, like I said,

16   consciously, it wasn't something -- but there was

17   evidently underlying, you know, thoughts, and that's

18   the way we decided to go because of those things, you

19   know.  If -- if we thought differently, we wouldn't

20   have done it that way.

21   Q.    What did you do?

22   A.    Well, we -- we went off -- I don't know.  We were

23   probably ten or twelve blocks from Troy's house, and

24   the first people we came across is two guys walking

25   across a field; and they got beat up.

1    Q.    Do you know how old they were?

2    A.    At the time, I did not know.

3    Q.    Did it matter to you?

4    A.    No.

5    Q.    Were they doing anything wrong at the time?

6    A.    No.

7    Q.    Was there any reason to use force on them at all?

8    A.    No.

9    Q.    Who participated in the beating?

10   A.    Myself, Troy Willis, and Wade Bergeron.

11   Q.    What happened?

12   A.    We beat them up and then basically left there and

13   headed back to Troy's house.

14   Q.    Did somebody end up calling the police?

15   A.    Yes.  Well, yeah, somebody eventually did.  I

16   don't know who it was.  One of those two guys called, I

17   guess, a friend of theirs, and they -- their friends

18   showed up and started to chase us.

19   Q.    Did the police arrive?

20   A.    Yes.

21   Q.    Did you talk to any of the Iberia Parish

22   Sheriff's officers that did arrive?

23   A.    Yes.

24   Q.    Did you get in the car with any of them?

25   A.    I got in the car with Jeremy Kelley.

1   Q.    What did you tell him happened?

2   A.    I don't remember exactly what I told him at the

3   time, but it was -- we lied to him, basically.  We told

4   him that we were doing some surveillance and these guys

5   started chasing us, thinking that we were somebody

6   else.  Obviously, the way we did it was these guys got

7   beat up by some white guys; okay?  Well, we happened to

8   be some white guys doing a good thing over here, and

9   they thought we were the ones that beat them up.  That

10  was the basis of it.

11  Q.    Totally false?

12  A.    Completely false.

13  Q.    Do you think Jeremy Kelley believed you?

14  A.    Absolutely not.

15  Q.    Why do you think that?

16  A.    Jeremy is a good cop.  He is -- and he had been

17  around long enough where, you know, it was -- it was --

18  it was maybe believable to somebody who, you know,

19  wasn't as experienced.  But Jeremy -- Jeremy knew

20  better.

21  Q.    Were you worried about the fact that he didn't

22  believe you?

23  A.    Yes.

24  Q.    Why?

25  A.    Um, Jeremy wasn't one of us.  Jeremy was patrol.

1    So we -- I guess you could say we didn't know whether

2    to trust him or not, not whether we didn't know or not.

3    We didn't, you know.  So, I mean, that was the worry

4    behind that.  We didn't trust him.

5    Q.    How did you react to that concern?

6    A.    Well, that night, Troy and Wade and I, we kind of

7    got together and talked about it, talked about our

8    story.  Basically, I think we left it alone that night.

9    And early the next morning, we talked about it and

10   pretty much decided that, you know, it's too shaky.

11   There's -- there's -- we're caught.

12   Q.    What did you do?

13   A.    We -- we called the captain, Grady Thibodeaux.

14   Called him to come meet us at the park.  And I don't

15   know if Grady knew then.  I think Grady knew the night

16   before, too.  He knew the story we had come up with.

17   Q.    The false story?

18   A.    The false story.  The next morning, we decide,

19   look, this -- it ain't -- it's not worth it.  We have

20   to -- we have to, you know, basically come clean.  So

21   we told Grady, and Grady met us -- well, we told him at

22   the park.  He met us at the park.  Told him.  And Grady

23   basically brought us straight to the sheriff's office.

24   Q.    What did you think was going to happen?

25   A.    Well, Grady -- the words out of Grady's mouth

1  were, *Y'all should probably be fired.  Let's go see the*
2  *sheriff.*

3  Q.    You had a different thought, though, didn't you?

4  A.    In the back of my mind, yes, sir.

5  Q.    What was that?

6  A.    Well -- and we talked about it that morning, and
7  I told the guys, I said, *Look, we've got to -- we've*
8  *got to come clean with this* because very -- you know,
9  very shortly before that we had had the meeting in the
10 narcotics office about *y'all are doing a good job.  But*
11 *don't get too far out there, I can't pull you back.*
12 That went off like a light bulb in my head.  And that's
13 what we based our decision off of, is what we were
14 told.  So, you know, we knew we were far out there.  We
15 just thought maybe we could be brought back, I guess.

16 Q.    Was this the moment where you were going to find
17 out where that line was?

18 A.    Yes, sir.

19 Q.    Did you find out whether the line was there or
20 not?

21 A.    Well, I can tell you we didn't cross it.

22 Q.    How do you know you didn't cross it?

23 A.    Well, we were -- we were, quote, unquote, brought
24 back.

25 Q.    Did you have a meeting --

1    A.    It was fixed.

2    Q.    Did you have a face-to-face in-person meeting

3    with Louis Ackal?

4    A.    Yes, sir.

5    Q.    Who was present?

6    A.    Um, it was myself, Wade and Troy.  Because we

7    left the park and went straight into the sheriff's

8    office.  It was myself, Wade Bergeron, Troy Willis and

9    Grady -- that's who I remember being in there -- and

10    the sheriff.

11    Q.    Did you admit to the sheriff what you had done?

12    A.    Yes, sir.  We told him -- we told him the story

13    just like I told it here, probably more detail because

14    it was very fresh.

15    Q.    In telling that story, was it absolutely clear

16    that you had committed a crime?

17    A.    100 percent clear.

18    Q.    That you had beaten up a couple of black guys for

19    no good reason?

20    A.    Yes, sir.

21    Q.    What was the defendant's reaction to you telling

22    the story?

23    A.    The -- after we told the story, the sheriff sat

24    back in his chair, crossed his arms and said, *sounds*

25    *like a good ole case of nigger knocking to me.  What do*

1    *we have to do*?

2    Q.    And what did you have to do?

3    A.    Well, with that, we had to cover it up.

4    Q.    Did you?

5    A.    Yes.

6    Q.    How?

7    A.    Um, we basically told him this is -- *this is what*

8    *we've already said.  This is the story we gave the*

9    *deputies last night.  So we kind of got to stick with*

10   *that; all right*?  So we did, we stuck with it.

11   Q.    What was Louis -- what was the defendant's

12   reaction when you told him about *we have to stick with*

13   *the story we already gave*?

14   A.    Sounds -- I mean, he agreed with that.

15   Q.    I'm going to show you now what has been

16   previously marked as Government's Exhibit Number 15 for

17   identification.  It should be on the screen in front of

18   you.

19   A.    Yes, sir.

20   Q.    Take a moment to look at that.

21   A.    Yes, sir.

22   Q.    Does that appear to be a report of yours?

23   A.    It's a handwritten witness statement.

24   Q.    Does it relate to the episode that you've just

25   described?

1   A.   Yes, sir.

2   Q.   Is it an accurate reflection of the statement

3   that you wrote related to this episode?

4   A.   Yes, sir.  This is what we used as our cover

5   story, I guess.

6   Q.   It is a false statement?

7   A.   Correct.

8           MR. BLUMBERG:  Move Government's 15 into

9   evidence, Your Honor.

10          MR. MCLINDON:  No objection.

11          THE COURT:  Without objection.

12  BY MR. BLUMBERG:

13  Q.   Could you please read the statement out loud?

14          MR. BLUMBERG:  See if you can highlight it to

15  make it easier.

16          THE COURT:  I'm sorry.  Go to the microphone,

17  please.

18          MR. BLUMBERG:  Yes.

19          THE WITNESS:  *On November 2nd, Agent Bergeron*

20  *and I were conducting surveillance in the area of Back*

21  *Manila.*

22          THE COURT:  Slowly, please.

23          THE WITNESS:  *While on foot, a black male*

24  *with a bat confronted us at St. Mary and St. Jude*

25  *Streets.  The male was hollering at us.  Instead of*

1    *giving up our identity, we jogged away from him, down*

2    *St. John to the tracks, then across St. Mary into the*

3    *fields and yards.  The male, along with several others,*

4    *cornered us in a white Dodge.  We had to jump several*

5    *fences.  Then patrol arrived.*

6    BY MR. BLUMBERG:

7    Q.    Was that statement true or false?

8    A.    That's false.

9    Q.    I'm going to show you what has now previously

10   been admitted as Government's 14-10.

11          Do you see that picture?

12   A.    Yes, sir.

13   Q.    Does that appear to be one of the people that you

14   beat up that night?

15   A.    I -- I assume it is.  I don't recognize him as

16   one of the people.

17   Q.    Let me ask you this.  Do the injuries that you

18   see in that picture reflect what you remember occurring

19   to that person?

20   A.    Yes, sir.

21   Q.    I will show you what has been previously marked

22   as Government's Exhibit -- admitted as Government's

23   Exhibit 14-20.

24          Do you see that photograph in front of you?

25   A.    Yes, sir.

1    Q.    And the injuries that are reflected there appear

2    to be consistent with the kind of beating that you

3    administered on the night of November 2nd, 2008?

4    A.    Yes, sir.

5    Q.    You still had a problem with Jeremy Kelley,

6    though; didn't you?

7    A.    Yes.

8    Q.    What was that problem?

9    A.    There was -- there was a report done.  Jeremy's

10   the one that came out -- he was a sergeant at the time,

11   I believe.  And for a sergeant to come handle a report,

12   it holds a little bit more weight.  It's a little

13   bigger of an incident than if there was just a fight on

14   the street.  Any patrol deputy could handle that.

15           But for a sergeant to show up and actually

16   take the report, that was another indicator to me that,

17   you know, Jeremy knows what's going on.

18   Q.    When the sheriff asked you what needs to be done,

19   did the subject of Jeremy Kelley's report come up?

20   A.    Yes.  I told him there is a report done.  There

21   is a report in the system.  And that that report

22   basically needs to go away.

23   Q.    In front of you, did the sheriff pick up the

24   telephone?

25   A.    Yes, sir.  He called Colette Voorhies, who at the

```
 1   time was like our, I guess, IT person.  She had control

 2   over the whole reporting system to where she was, I

 3   think, the only person that could actually remove

 4   reports from the system.

 5           MR. MCLINDON:  Objection, Your Honor.  I

 6   don't think this witness is qualified to testify --

 7           THE COURT:  It's unresponsive, so I'll strike

 8   the last part.  And to make it clear, I'm striking and

 9   the Jury is instructed to disregard the statement that

10   she was the only person that could actually remove

11   reports.

12           Proceed.

13   BY MR. BLUMBERG:

14   Q.    Did you understand Colette Voorhies to have the

15   ability to remove reports from the system?

16   A.    That's why the sheriff called her.  Yes, sir.

17   Q.    What did he tell her?

18   A.    He gave her the report number and told her to

19   remove it from ARMMS, which is the reporting system.

20   Q.    What did you understand that to mean?

21   A.    That this is how we have to basically cover it

22   up, get rid of it.

23   Q.    Had you heard the phrase -- I'm just going to say

24   N knocking before?

25   A.    Yes, I had heard it before.  But what -- the
```

```
1    reference I had was not the way it was used in that
2    office.
3    Q.   What did you understand the reference to mean
4    that the defendant meant?
5    A.   I mean, I thought it was, you know, my whole
6    life.
7    Q.   I'm asking what you thought he meant.
8    A.   Oh, he meant.
9    Q.   Yes.
10   A.   Exactly what happened, going and beat up a couple
11   of black guys.
12   Q.   Did it appear that he had -- that that phrase had
13   meant something to him in the past?
14          MR. MCLINDON:  Objection.  That calls for
15   speculation.
16          THE COURT:  You may answer.
17          THE WITNESS:  It had to have meant something
18   in the past.
19          THE COURT:  Okay.
20          THE WITNESS:  It was an actual thing.
21          THE COURT:  Okay.  Next.
22   BY MR. BLUMBERG:
23   Q.   What happened to you as a result of this episode?
24   A.   Um, we got -- we got reprimanded.  We had to --
25   we got a suspension as a result of it.  But the
```

1    suspension we got, the way it was worded was we were

2    basically drinking on duty and that's why we got

3    reprimanded for it.

4    Q.    Did the suspension reflect the fact that you had

5    committed a battery on people?

6    A.    No.

7    Q.    Did the suspension reflect the fact that you had

8    filed false police reports?

9    A.    No.

10    Q.    Did the suspension reflect the fact that Jeremy

11    Kelley's report was deleted from the ARMMS system?

12    A.    No.

13    Q.    Did the suspension reflect the fact that you had

14    lied to your captain?

15    A.    No.

16    Q.    By the way, how much longer was Captain

17    Thibodeaux with the narcotics unit?

18    A.    Not very long.

19    Q.    Weeks?

20    A.    Probably, yes, sir.

21    Q.    He left?

22    A.    Yes, sir.

23    Q.    Were you shocked to hear Louis Ackal use the word

24    that he used referring to this particular episode?

25    A.    No, not at all.

```
1    Q.    Why not?

2    A.    Um, that's -- that was a pretty common word

3    around Louis Ackal.

4    Q.    Did it have any impact on you in terms of his use

5    of that word?

6    A.    No.

7    Q.    Did it have any impact on how you treated the

8    people who were within your custody?

9    A.    It didn't -- um, it didn't change anything.  It

10   kind of solidified some things, but it didn't --

11   because it was -- it was -- you know, we used that word

12   before that.  You know, we used it after that.  So, I

13   mean, it didn't change anything, the way we acted, in

14   terms of -- I didn't hear the word and say oh, well, I

15   can say it now.  No, that didn't happen.

16   Q.    How long were you suspended?

17   A.    It was supposed to be two weeks, but there was

18   something happened and a couple of us had some supposed

19   death threats, I think, yeah, for something else.  I

20   don't even remember what it was, but they brought us

21   back.

22   Q.    So you were only suspended for about a week?

23   A.    About a week, yes, sir.

24   Q.    Did you come back to narcotics?

25   A.    Yes.
```

Q.    When?

A.    Um, after about a week I went back into narcotics, but I was transferred out shortly after that.  I don't remember the time period.  But it wasn't very long after that.

Q.    Was that the last time you were in narcotics?

A.    No.  I got transferred out.  Not long after that, I went to patrol for a very short period of time and then I went into another unit and then back into narcotics within, I don't know, a few months, I guess.

Q.    Would you describe this episode that we've just talked about as a defining moment for you?

A.    Very defining.

Q.    In what way?

A.    A couple of ways.  You know, at the time, the defining moment was -- it kind of -- it kind of explained to us where we stood in this statement from the meeting with the IA, with Russell Hebert and the sheriff.  You know, so we knew -- we knew what had happened.  We knew the things that we had gotten caught with, but we were still brought back.  We were still -- we were still working.  Everything was fine.  We made it okay.  So that kind of defined, you know, the level that we could go to.

Q.    And did you take it to the level that you

1    perceived you could go to?

2    A.    Yes, sir.  I mean, and -- I wasn't -- I wasn't in

3    there for very much longer.  But as a group, as a

4    whole, yeah, it remained at that level and beyond, I

5    guess.

6    Q.    Was the lenient treatment that you received the

7    subject of conversation among narcotics agents?

8    A.    Oh, yeah.  I mean, you know, I don't know what

9    night of the week that happened on.  But within the

10   next couple of weeks, everybody knew exactly what had

11   happened.  Everybody within narcotics had known exactly

12   what happened.  And it was -- I mean, it was common

13   knowledge among us.  So, I mean, it was just like

14   everybody was involved, so everybody kind of got the

15   same effect of it.

16   Q.    After this episode involving the attack in which

17   you admitted the false stories, is it fair to say that

18   the behavior of the narcotics unit became increasingly

19   bad?

20           MR. MCLINDON:  Objection.  I don't think he

21   can testify to the entire narcotics unit.

22           THE COURT:  You have to lay a foundation

23   better than that.

24   BY MR. BLUMBERG:

25   Q.    You remained in the narcotics unit?

```
 1   A.    For a short time.  Yes, sir.

 2   Q.    Did you see additional abuses after the

 3   November 2008 episode?

 4   A.    Yes.  It did not stop.

 5   Q.    Did you participate in additional abuses?

 6   A.    Yeah.  Yes, sir, I'm sure.

 7   Q.    Did you discuss additional abuses among your

 8   narcotics colleagues?

 9   A.    Yeah.  Every -- everything that happens, you

10   know, we talk about.  Narcotics is a very, very

11   tight-knit group of guys.  I mean, you know, you know

12   things about these guys that their wives don't know.

13   So anything that happens within the division,

14   absolutely, every one of them knows.

15   Q.    Is it fair to say, based on your conversations,

16   your own behavior, what you witnessed and what you

17   failed to intervene on, that the excessive uses of

18   force that you described became more exaggerated and

19   more frequent after he covered up for you?

20   A.    Yeah.

21   Q.    Sir, you've testified on these issues under oath

22   before; haven't you?

23   A.    Yes, sir.

24   Q.    Have you always been honest about them?

25   A.    Yes, sir.
```

```
1    Q.    Always?

2    A.    These issues?

3    Q.    Yeah.

4    A.    Yes, sir.

5    Q.    Did you ever testify in front of a United States

6    grand jury?

7    A.    Yes, sir.

8    Q.    How many times?

9    A.    Twice.

10   Q.    In the first time, did you tell that grand jury

11   everything you just told this trial jury?

12   A.    No, sir.

13   Q.    Did you know you ought to?

14   A.    Yes, sir.

15   Q.    Would you characterize that as honest?

16   A.    Um, I would characterize that as not completely

17   forthcoming, yes, sir.

18   Q.    At the time that the agents of the FBI came to

19   talk to you about your tenure at the IPSO, did you know

20   what kind of things they were looking at?

21   A.    Yes, sir.

22   Q.    Did you know that when they asked you questions,

23   you were obligated to be truthful with them?

24   A.    Yes, sir.

25   Q.    Did you know that you couldn't obstruct or
```

1    conceal information relevant to their investigation

2    into exactly what we're talking about?

3    A.    Yes, sir.

4    Q.    Did you obstruct and conceal?

5    A.    Yes.

6    Q.    Why?

7    A.    When I first talked to these guys, you know,

8    there's always buzz about what they're actually looking

9    into, what they want, you know, the things that they're

10   on.  And I had -- I mean, I had information to some of

11   that.  So I kind of figured that I'll be upfront about

12   that stuff, and I'll be okay.

13   Q.    You were willing to point the fingers at other

14   people?

15   A.    Right.

16   Q.    But not at yourself.

17   A.    Correct.

18   Q.    Why?

19   A.    You know, I had kind of moved past all of that in

20   my -- in my career, and, you know, somewhere deep

21   inside of me I kind of hoped it would stay back there.

22   Q.    Did you think the whole thing would go away?

23   A.    No, sir.  Well, I guess at the time I didn't

24   realize the snowball that had started.  But it wasn't

25   very long after, you know, the first grand jury that I

1    kind of figured, oh, well, they're going to want to
2    know about that one day, you know.
3    Q.    Did you volunteer to come in?
4    A.    No, sir.
5    Q.    Would you have been just as happy if they never
6    called you again?
7    A.    Probably.
8    Q.    Do you know if you're going to be charged with
9    any crimes related to hiding information from them or
10   from the crimes that you committed as a narcotics
11   agent?
12   A.    I have no idea.
13   Q.    Do you have -- as you sit here today, do you have
14   any agreement about what will happen to you with the
15   United States Government at all?
16   A.    No, sir.
17   Q.    Do you have any expectations whether you're going
18   to go to prison or get charged or anything?
19   A.    No, sir.
20   Q.    Why are you sitting here telling these things?
21   A.    I was asked about them.  I have to tell it.  I
22   have to tell the truth about it.  And, you know, in the
23   grand scheme of things, it's the right thing to do.
24   So...
25   Q.    And you were worried you got caught?

```
 1   A.   Well -- well, when you called -- when they
 2   called, Miss Sandra called me and asked if I would come
 3   in, well, again, I knew -- I knew that there was that
 4   that we hadn't talked about, and this is what this is
 5   about.  And nobody had to tell me.  I knew.
 6            MR. BLUMBERG:  May I have a moment, Your
 7   Honor, with counsel?
 8            THE COURT:  You may.
 9            MR. BLUMBERG:  That's all I have for now,
10   Your Honor.
11            THE COURT:  Your witness, Mr. McLindon.
12                      CROSS-EXAMINATION
13   BY MR. MCLINDON:
14   Q.   Mr. Huckabay, in the Iberia Parish Sheriff's
15   Office, there is a form known as a Use of Force report.
16   Do you know about those?
17   A.   Yes, sir.
18   Q.   Okay.  How many have you filled out in your
19   career?
20   A.   A handful maybe, five or six.
21   Q.   Is it fair to say that you have engaged in
22   excessive force, abused citizens, on numerous occasions
23   and you did not fill out a Use of Force report?
24   A.   Yes.
25   Q.   Okay.  Now, if you do fill out a Use of Force
```

```
 1   report, it would be reviewed by your higher-ups; right?
 2   A.    Yes.
 3   Q.    All the way up to the sheriff?
 4   A.    I don't know about that, but --
 5   Q.    But certainly people that outrank you would
 6   review those?
 7   A.    Yes.
 8   Q.    And if you don't fill out a Use of Force report,
 9   then they have no way of knowing that you used
10   excessive force; right?
11   A.    They wouldn't have any way of knowing if I did
12   use of force.
13   Q.    If you filled out the form, they would know that
14   you had used excessive force?
15   A.    Incorrect.
16   Q.    All right.  Well, let's walk through that.  Let's
17   say you arrest somebody and you use -- let's just say
18   you used force, tackle the guy, throw him on the
19   ground.  You have to fill out a Use of Force report?
20   A.    Correct.
21   Q.    Okay.  You didn't always do that?
22   A.    No.
23   Q.    Okay.  If you did do that, then somebody would
24   look at that report and say, *Hey, come in, you know.*
25   *Let's talk about this.  Why did this happen?  You know,*
```

1    *why did you tackle the guy*?

2          If you Tase somebody, you have to fill out --

3    use a form for that?

4    A.    Yes, sir.

5    Q.    Okay.  And you didn't always do that?

6    A.    I never Tased anybody with Iberia.

7    Q.    Okay.  But if you use force, you're supposed to

8    fill out that report?

9    A.    Yes, sir.

10   Q.    And many times you did not?

11   A.    Correct.

12   Q.    And so no one above you would know that you used

13   force, any type of force?

14   A.    Yes, they would.

15   Q.    How?

16   A.    Even if you don't use the Use of Force form, you

17   still put it in the report.

18   Q.    But there's a -- you can do a separate Use of

19   Force report?

20   A.    There is a separate Use of Force form, yes,

21   besides the computer system, reporting system.

22   Q.    And in the vast majority of the cases, you and

23   your fellow narcotics agents just chose not to fill

24   that out?

25   A.    Correct.

1   Q.    Have you heard the phrase *acting under the color*
2   *of law*?
3   A.    Yes.
4   Q.    Do you know what that means?
5   A.    Yes.
6   Q.    It means that you did something while you were a
7   police officer on duty.
8   A.    Correct.
9   Q.    Okay.  Now, let's talk about the night you guys
10  got drunk.  You were not on duty at the time?
11  A.    No, sir.
12  Q.    You weren't wearing a police uniform?
13  A.    No, sir.
14  Q.    And you didn't go out driving in a police unit?
15  A.    No, sir.
16  Q.    You were not acting under the color of law when
17  you did that?
18  A.    No, sir.
19  Q.    You were a private citizen that got drunk?
20  A.    Correct.
21  Q.    And you made a conscious decision to go out there
22  and beat somebody up?
23  A.    Yes, sir.
24  Q.    You didn't call the sheriff and tell him you were
25  going to do that?

```
 1   A.    No.

 2   Q.    The sheriff wasn't even at the party, was he?

 3   A.    No.

 4   Q.    And when you got caught, you were confronted by

 5   Jeremy Kelley?

 6   A.    Correct.

 7   Q.    A good cop; right?

 8   A.    Yes.

 9   Q.    Okay.  And -- but he's not -- he's not a

10   narcotics agent.

11   A.    No.

12   Q.    Not in y'all's little fraternity, is he?

13   A.    No, sir.

14   Q.    Okay.  And you looked him right in the eye and

15   you lied to him.

16   A.    Yes, sir.

17   Q.    A fellow officer, you blatantly lied to him.

18   A.    Yes, sir.

19   Q.    In fact, you are trained in how to lie.

20   A.    No, sir.

21   Q.    Are you an undercover agent?

22   A.    Yes, sir.

23   Q.    Okay.  When you do undercover deals, you don't

24   tell the persons from whom you are buying drugs -- you

25   don't tell them you're a cop, do you?
```

```
 1   A.    No.

 2   Q.    You lie to them?

 3   A.    Yes.

 4   Q.    And you learned how to do that in training?

 5   A.    I didn't have -- I was never sent to -- at this

 6   time, I was never sent to any schools before

 7   becoming --

 8   Q.    You had no training in how to lie?

 9   A.    Training?

10   Q.    Yeah, at the academy in undercover work.

11   A.    We didn't do undercover work in the academy.

12   Q.    Okay.  You didn't -- you didn't receive any

13   training on how to do undercover work?

14   A.    Not prior to becoming a narcotics agent.

15   Q.    So you're just naturally a good liar.

16             MR. BLUMBERG:  Objection.

17             MR. MCLINDON:  It goes to his credibility,

18   Your Honor.

19             THE COURT:  Well, the question is phrased in

20   an argumentative manner.  And I recognize that you have

21   him under cross-examination, but you might tone it down

22   a little bit.

23             MR. MCLINDON:  Yes, sir.

24   BY MR. MCLINDON:

25   Q.    You have the ability to approach somebody, fool
```

```
 1  them or trick them into thinking you're a private
 2  citizen and purchase drugs from them?
 3  A.    Yes, sir.
 4  Q.    Okay.  Without them ever knowing?
 5  A.    I wouldn't say ever knowing, but --
 6  Q.    During the transaction.
 7  A.    Yes, sir.
 8  Q.    And some of these guys are very dangerous?
 9  A.    Yes, sir.
10  Q.    They carry guns?
11  A.    Yes, sir.
12  Q.    If they thought for a second you're a police
13  officer, they could shoot you, attack you, kill you?
14  A.    Yeah.
15  Q.    So when your life is on the line, you've got to
16  be the best liar you can possibly be?
17  A.    It's part of the job, yes, sir.
18  Q.    So after you lied to Officer Kelley, you got back
19  together with the other two guys, Willis and Bergeron?
20  A.    Yes.
21  Q.    Okay.  And y'all decided -- y'all came up with a
22  plan --
23  A.    Yes.
24  Q.    -- right?
25        Okay.  Now, you didn't call Sheriff Ackal?
```

1    A.    No, sir.

2    Q.    Okay.  You were scared to call Sheriff Ackal?

3    A.    No, sir.

4    Q.    Okay.  But you didn't call him.  Instead, you

5    called Grady Thibodeaux?

6    A.    Yes.

7    Q.    Because you were hoping that Grady Thibodeaux

8    would never tell Sheriff Ackal?

9    A.    No, sir, that's not what I was hoping.

10   Q.    Okay.  But you didn't -- for whatever reason, you

11   just chose not to call Sheriff Ackal.  You decided to

12   go to Grady Thibodeaux?

13   A.    Chain of command.

14   Q.    Okay.  You could have gone to Sheriff Ackal if

15   you wanted to?

16   A.    No, sir.

17   Q.    No.  Impossible for you to go to -- just

18   impossible for you to go to him?

19   A.    Not impossible, but it's not -- it's not the

20   way -- it's not the way we did things.  I'm more than

21   certain if we would have went to the sheriff's house

22   that morning instead of the park, that that would have

23   been fine, as well.

24   Q.    But you didn't do that?

25   A.    No, sir.

1    Q.    Okay.  The three of y'all came up with a

2    collective decision, *Let's go to Grady Thibodeaux and*

3    *tell him, see how he handles it*?

4    A.    Yes, sir.

5    Q.    And one of your hopes was that he would just

6    handle it without telling the sheriff?  You hoped that

7    that would happen?

8    A.    No, sir.

9    Q.    You didn't?

10   A.    That is not what I hoped.

11   Q.    You didn't hope that at all?

12   A.    No.  Because the basis of our decision revolved

13   around going to the sheriff with it.  So that's not at

14   all what we hoped for.  We wanted to go to the sheriff

15   with it because that's -- that's collectively how we

16   decided we wanted it to happen.

17   Q.    But you didn't?

18   A.    We couldn't, because the chain of command says

19   you go to your next -- next higher official, which we

20   had a lieutenant with us, so it had to go to the

21   captain.

22   Q.    So as a result of that, there were actually two

23   reports made; right?  Do you remember that?

24   A.    No, sir.

25   Q.    Do you remember Jamal Davis made a report?

1    A.    I think Jamal was the one that initially was

2    given the call.

3    Q.    Right.  And his report contained false

4    information; right?

5    A.    Um, I -- I don't know.

6    Q.    Okay.  Jeremy Kelley's report contained your

7    lies; right?

8    A.    Yes, sir.

9    Q.    Okay.  You don't know what Officer Davis put in

10   his report?

11   A.    Um, as far as I know, we were just listed in the

12   report.  The only thing I saw -- ever saw was we were

13   listed as suspects in the report.  So I don't know who

14   put what.

15   Q.    Okay.  And I may have stated something

16   incorrectly.  Officer Kelley's report was the true

17   version of what happened; is that correct?

18   A.    There was some truth in there, but I believe

19   there was also some of the stuff that we had told him.

20   Q.    Some of your lies?

21   A.    Yes, sir.

22   Q.    But the first report that was prepared, Officer

23   Davis's, was all of your lies?

24   A.    I don't know.

25   Q.    You've never read that report?

1    A.    No, sir.  I don't remember reading anything from

2    Officer Davis.

3    Q.    Now, the original decision was you were to be

4    fired -- the original thought was you were going to be

5    fired from your job for what you did?

6    A.    I mean, the original thought --

7    Q.    Did you think you were going to be fired?

8    A.    I had no idea what was going to happen.

9    Q.    Did Grady Thibodeaux tell you you were going to

10   be fired?

11   A.    No.  The only comment he made was *Y'all should be*

12   *fired*.

13   Q.    Okay.  But the sheriff decided just to give you a

14   suspension; is that right?

15   A.    Yeah.  I mean, that's -- that was the decision,

16   but it had nothing to do with what had actually

17   happened.

18   Q.    But it had -- it had to do with what started

19   this, of getting drunk; right?

20   A.    The suspension was worded this way:  *These*

21   *officers are to receive a two-week suspension for being*

22   *intoxicated while on duty.*  That's what the --

23   Q.    Okay.

24   A.    -- basis of the suspension was.

25   Q.    And you were brought back early from that

```
 1    suspension?

 2    A.    Yes.

 3    Q.    Because there was a death threat to some other

 4    police officers?

 5    A.    Yes, sir.  Myself included.

 6    Q.    Right.  And so the sheriff needed additional

 7    resources to counter this death threat?

 8    A.    No.  He didn't -- he basically said he didn't

 9    want us to not be able to be on duty and protect

10    ourselves if there was a death threat.

11    Q.    He didn't want you to get harmed?

12    A.    Right.

13    Q.    Okay.  So he brought you back so you could then

14    carry your firearm again?

15    A.    Correct.

16    Q.    You testified that the narcotics unit was a

17    tight-knit group.

18    A.    Yes.

19    Q.    You knew things about your fellow agents that

20    even their wives didn't know?

21    A.    Yes.

22    Q.    You hid -- consciously, you guys hid information

23    about what you all did?

24    A.    From who?

25    Q.    From -- well, from wives.
```

```
 1    A.    Okay.

 2    Q.    Yes?

 3    A.    Yeah.

 4    Q.    Other officers?

 5    A.    Yes.

 6    Q.    And the sheriff?

 7    A.    I wouldn't -- I wouldn't say that the sheriff is

 8    included in that, because, you know, we felt -- we kind

 9    of felt like the sheriff was one of us, basically,

10    because that's how it was portrayed to us from the

11    start.

12    Q.    But you didn't tell him about all your excessive

13    abuses of force, did you?

14    A.    Not me personally, no, sir.

15    Q.    And when you went and met with the FBI, you

16    weren't completely truthful, were you?

17    A.    Everything we talked about at first, yeah, it was

18    extremely truthful.

19    Q.    But you withheld information?

20    A.    I didn't -- we didn't talk about everything I

21    knew.

22    Q.    Okay.  And at the grand jury, you also withheld

23    information?

24    A.    No.  I answered everything that was asked of me

25    at the grand jury.
```

```
 1   Q.    Did you testify on direct that you were not
 2   completely forthcoming?
 3   A.    No.
 4   Q.    You didn't just say that?
 5   A.    Oh, today, yes, sir.
 6   Q.    You were not forthcoming.  You minimized your
 7   involvement, didn't you?
 8   A.    I'm not trying to minimize it.
 9   Q.    I'm talking about when --
10   A.    That's --
11   Q.    Go ahead.
12         THE COURT:  Give him a time period.  As I
13   understood your question, you are talking about a
14   different time period.
15         MR. MCLINDON:  Yes, sir.  Not today.
16   BY MR. MCLINDON:
17   Q.    I'm talking about either when you talked to the
18   FBI or went to the grand jury, you minimized your
19   involvement?
20   A.    At one point, yes, sir.
21   Q.    Okay.  You were willing, as you said on direct,
22   to just point fingers at other people; right?
23   A.    Yes, sir.
24   Q.    Kind of like you're doing today?
25         MR. BLUMBERG:  Objection.
```

1          THE COURT:  It's fair.

2    BY MR. MCLINDON:

3    Q.    Are you pointing the finger at other people

4    today?

5    A.    I'm pointing the finger at myself.  I'm pointing

6    my finger at anybody that's, you know, involved.

7    Q.    Now, today you're appearing because you were

8    subpoenaed to be here.

9    A.    Yes, sir.

10   Q.    You didn't drive up here voluntarily?

11   A.    No, sir.

12   Q.    And you have not signed a plea agreement with the

13   Government?

14   A.    No, sir.

15   Q.    Okay.  You don't know if you're going to be

16   charged or not?

17   A.    No idea.

18   Q.    Okay.  You certainly hope you don't get charged?

19   A.    Correct.

20   Q.    Do you know Jason Comeaux?

21   A.    Yes, sir.

22   Q.    Do you have an opinion as to his truthfulness?

23   A.    Yes, I do.

24   Q.    What is that?

25   A.    Um, it's a very undesirable opinion of him.

1    Q.    He's a very dishonest person; correct?

2    A.    Yes, sir.

3    Q.    Do you have any question in your mind that he

4    would lie under oath?

5              MR. BLUMBERG:  Objection.

6              THE COURT:  I'm going to sustain the

7    objection under 403.  You can argue later.

8    BY MR. MCLINDON:

9    Q.    You do not find him to be a believable person, do

10   you?

11   A.    My experiences with him, no, sir.

12   Q.    Do you know a guy named Paul Venable?

13   A.    Yes, sir.

14   Q.    Did y'all withhold and hide information from him?

15   A.    Not -- Paul never asked me anything that I didn't

16   tell him.  Paul and I are pretty good friends.

17   Q.    What does Paul do?  What did he do at the

18   sheriff's office?

19   A.    Paul's done everything from worked at the jail,

20   to now he's an administrative captain, I believe.

21   Q.    Do you remember telling the FBI that he is a

22   phenomenal guy?

23   A.    Yes.

24   Q.    And do you remember telling them that he has no

25   idea what's going on because *We don't tell him what's*

1  *going on*?

2  A.   Right.

3  Q.   Okay.  Do you know a guy named Gerald "Bubba"

4  Savoy?

5  A.   Yes, sir.

6  Q.   Do you have an opinion as to his truthfulness?

7  A.   It's the same as Jason Comeaux's.

8  Q.   He lies a lot?

9  A.   Yes, sir.

10  Q.   Were you aware -- did you -- did you hear stories

11  about beatings at the jail in the chapel?

12  A.   Yes, sir.

13  Q.   Okay.  But you didn't hear about those until you

14  saw it on the news years later?

15  A.   Excuse me.  No.

16  Q.   Okay.  Did you tell the FBI that?

17          THE COURT:  I'm sorry.  No, you didn't --

18          THE WITNESS:  No, sir, I hadn't heard about

19  them.  I did not hear about them until later.

20  BY MR. MCLINDON:

21  Q.   Well, when did you hear about them?

22  A.   I don't remember exactly when it was, but it was

23  probably -- I learned some of it through the news

24  media, you know, through media outlets.

25  Q.   So you did learn through some -- you did learn

1    about it through the news media outlets?

2    A.    Yes, sir.

3    Q.    Okay.  You said that the use of force can

4    sometimes fall in a gray area; is that right?

5    A.    You can -- you can make it a gray area, yes, sir.

6    Q.    So, in other words, if you are, say, conducting a

7    pat-down search of somebody and if he flings an arm and

8    tries to hit you, you have every right to grab his arm

9    and put it behind his back; is that right?

10   A.    Yes.

11   Q.    Is that a legal use of force?

12   A.    Yes.

13   Q.    And that's black and white?

14   A.    Yes.

15   Q.    In that example, tell me what's gray.

16   A.    Um, in that example, there is no gray.

17   Q.    Well, what if you decided just to get in an extra

18   knee strike or an elbow strike?  Is that a gray area of

19   force on somebody who is resisting?

20   A.    In the eyes of the law, no, that's not a gray

21   area.  You have to create the gray area.  This is black

22   and white.

23   Q.    Give us an example of a gray area.

24   A.    Okay.  The extra elbow that you mentioned, okay,

25   if -- according to the Use of Force policy, there is

1   nothing in there that says an elbow, okay, to the back

2   of the head.  All right?  But if I take that and I use

3   my own words and I make it sound like, you know -- or

4   an elbow to the ribs -- I make it sound like I had to

5   do that to overcome the force that this guy was using,

6   then that's your gray area.  Okay?  So I make -- I take

7   that -- I take the black and put it in the white.

8   Q.   Right.

9   A.   Okay?

10  Q.   And you used to do that a lot?

11  A.   Yes, sir.

12  Q.   And wouldn't put it in your arrest report?  In

13  other words, you didn't put in your arrest report --

14  A.   That it was a gray area?  No.

15  Q.   You didn't put in an extra elbow that wasn't

16  necessary.  And, of course, if it's not in your arrest

17  report, no one knows about it, right, except maybe your

18  fellow officers that were with you?

19  A.   Right.

20        MR. BLUMBERG:  Your Honor, may we approach

21  for a moment?

22        (Sidebar discussion begins.)

23        THE COURT:  Yes, sir.

24        MR. BLUMBERG:  I'm sorry to interrupt

25  Mr. McLindon's cross.  I would ask that we take a break

```
 1   at this point.  Mr. Ackal either appears to be in
 2   distress or is feigning distress at the defense table.
 3            MR. MCLINDON:  He has a kidney --
 4            THE COURT:  So what do you want to do?
 5            MR. BLUMBERG:  I would like to take a break
 6   and find out if he needs help.
 7            (Sidebar discussion concludes.)
 8            THE COURT:  All right.  Ladies and gentlemen,
 9   we need to take a break.  Let's go ahead and take our
10   mid-morning break, 15 minutes.
11            (The Jury exits the courtroom.)
12            MR. MCLINDON:  I object to the use of the
13   word feigning.
14            THE COURT:  Well --
15            MR. MCLINDON:  If you want to talk to the
16   sheriff about his pains --
17            THE COURT:  I don't want to talk to the
18   sheriff about anything, but you tell me what you want.
19            MR. MCLINDON:  He is in a significant amount
20   of pain.  He's got kidney stones.
21            THE COURT:  Is he able to follow what is
22   happening?
23            MR. MCLINDON:  Yes, he's okay with that, but
24   the grunts are not some type of show.  He is in a lot
25   of pain.
```

1              THE COURT:  So what does the Government or

2    you want from me?

3              MR. BLUMBERG:  I just wanted to find out

4    whether he was genuinely in distress and needed medical

5    care or to find out whether there was some way to --

6              THE COURT:  Do you need medical care, sir?

7              THE DEFENDANT:  I need a shot, and it's being

8    brought up from home.

9              THE COURT:  It's on its way here?

10             THE DEFENDANT:  Yes, from New Iberia.  And it

11   helps to relieve the kidney-stone-movement pain.

12             THE COURT:  Okay.

13             THE DEFENDANT:  Sir, I am in a lot of pain.

14   And if you've ever had a kidney stone --

15             THE COURT:  All right.  Stop, stop.

16             MR. MCLINDON:  Direct it to the Judge.

17             THE COURT:  Do you want to wait until you get

18   the shot?

19             THE DEFENDANT:  No, sir.

20             THE COURT:  Do you want to proceed?

21             THE DEFENDANT:  Yes, sir.  Barbara and I can

22   go sit back in the row instead of close up here.  I

23   can't keep still when it starts moving.

24             THE COURT:  Is that what you want to do is go

25   sit in the back row?

```
 1              THE  DEFENDANT:   Sit  right  here.
 2              MR.  MCLINDON:   Not  in  the  back  row,  but
 3    maybe --
 4              THE  DEFENDANT:   So  it's  not  obvious  that  I'm
 5    flinching.
 6              THE  COURT:   You  may  do  so.
 7              MR.  BLUMBERG:   Your  Honor,  I  would  ask  that
 8    we  wait  until  the  shot  arrives  so  that  it  does  not
 9    appear  that  Mr.  Ackal  is  in  desperate  need  or  in
10    distress.
11              THE  COURT:   No.   Fifteen-minute  recess.
12              MR.  BLUMBERG:   Yes,  sir.
13              (Recess  taken.)
14              THE  COURT:   All  right.   You  may  all  be
15    seated.   Mr.  McLindon?
16              MR.  MCLINDON:   Yes,  sir.
17              THE  COURT:   Is  there  any  doubt  in  your  mind
18    as  to  your  client's  ability  to  continue?
19              MR.  MCLINDON:   My  client  cognitively  is  fine,
20    he  understands  what's  going  on,  he's  able  to  assist  me
21    and  all  of  those  factors  that  I  know  the  Court's
22    concerned  about.   He's  just  in  physical  pain.
23              THE  COURT:   Okay.   And  I  understand  that  he
24    is  going  to  get  a  shot  of  Tramadol?
25              MR.  MCLINDON:   Yes,  sir.
```

```
1              THE COURT:  And that's a non-narcotic?

2              THE WITNESS:  Correct.

3              THE COURT:  So that should not affect his

4    ability --

5              THE WITNESS:  It should help.

6              THE COURT:  -- to understand what's going on

7    here today and help you.  So I'm depending on you to

8    keep track of that; okay?

9              MR. MCLINDON:  Sheriff, I want to be clear,

10   what you're taking, it doesn't make you woozy?

11             THE DEFENDANT:  No, no.  It's non-narcotic,

12   Tramadol.  It's designed --

13             THE COURT:  Okay.  If it gets here and you

14   need to, we'll take a break so you can get your shot.

15             Okay.  Anything else?

16             MR. BLUMBERG:  No.  We just need the witness,

17   Your Honor.

18             THE COURT:  Beg your pardon?

19             MR. BLUMBERG:  I'll get the witness.

20             THE COURT:  Yes.

21             MR. MCLINDON:  Judge --

22             THE COURT:  Mr. McLindon, I'm depending on

23   you to keep track of him as to his ability --

24             MR. MCLINDON:  I am.

25             THE COURT:  -- to help out.
```

```
 1              MR. MCLINDON:  My paralegal is with him,
 2    judge.  So on scheduling, you know, this is hard.  I'm
 3    trying my best.  My witnesses are three hours away.
 4    I've now been told that that witness list of six
 5    yesterday, now they're only calling three more.
 6              THE COURT:  All right.  We'll do -- let's
 7    don't burn our bridge till we get to it.
 8              MR. MCLINDON:  Yes, sir.
 9              (Pause in the proceedings.)
10              THE COURT:  I hope y'all understand that I'm
11    not trying to save my time.
12              MR. MCLINDON:  Yeah.
13              THE COURT:  I know you work by the hour.
14    It's the citizens that I'm totally concerned with.
15              MR. MCLINDON:  Yes, sir.
16              THE COURT:  This jury has just been paying
17    extraordinarily close attention, from what I've
18    observed.  I don't think they're even aware of --
19              MR. MCLINDON:  Judge, did you watch the game
20    last night?
21              THE COURT:  Beg your pardon?
22              MR. MCLINDON:  Did you watch the game last
23    night?
24              THE COURT:  I confess, when they put the tarp
25    out, I said I'll find out in the morning.  It turned
```

```
 1    out all right.  Sort of sorry I missed it, but I should

 2    have recorded it.

 3                 (The Jury enters the courtroom.)

 4                 THE COURT:  All right.  You may be seated.

 5                 Do you understand you are still under oath,

 6    sir?

 7                 THE WITNESS:  Yes, sir.

 8                 THE COURT:  Proceed.

 9                 MR. MCLINDON:  Mr. Huckabay, thank you.

10    That's all the questions I have for you.

11                 THE WITNESS:  Thank you.

12                 THE COURT:  Redirect?

13                 MR. BLUMBERG:  Yes, sir.

14                       REDIRECT EXAMINATION

15    BY MR. BLUMBERG:

16    Q.   Who is Paul Venable?

17    A.   Paul is -- like I said earlier, I think he's an

18    administrative captain now with the sheriff's

19    department.  But I've worked with Paul since day one

20    with Iberia.

21    Q.   Did Paul express some concerns to you about this

22    investigation?

23                 MR. MCLINDON:  Objection.  Hearsay.

24                 MR. BLUMBERG:  If I may, Your Honor, it goes

25    to the --
```

```
 1              THE COURT:  Wait a minute.  What's the

 2    relevance?

 3              MR. BLUMBERG:  The question is to Paul

 4    Venable's character that was brought out on cross.  And

 5    I can make an offer of proof at the bench, if the Court

 6    would like us to, as to why it would be relevant.

 7              THE COURT:  Did he express some concern about

 8    this investigation?

 9              THE WITNESS:  Paul?

10              THE COURT:  Yes.

11              THE WITNESS:  Yes, sir, he's concerned.

12              THE COURT:  Now what?

13    BY MR. BLUMBERG:

14    Q.   Was Paul a person who would look the other way if

15    he saw excessive force?

16    A.   I don't know.  I've never had to cross that with

17    Paul.

18    Q.   Did you in fact have a conversation with Paul

19    Venable in which he told you about such an episode?

20              MR. MCLINDON:  Objection.  Hearsay.

21              THE COURT:  I'm going to sustain the

22    objection.

23    BY MR. BLUMBERG:

24    Q.   Did you tell the Government something else on

25    this topic?
```

1    A.    I don't remember.

2    Q.    If I showed you some notes related to a

3    conversation with the FBI, might that refresh your

4    recollection?

5    A.    Yes, sir, it would.

6          MR. BLUMBERG:  With the Court's permission, I

7    will use the Elmo.

8    BY MR. BLUMBERG:

9    Q.    I'm going to ask you to take a look,

10   Mr. Huckabay, at some notes before you.  Do you see

11   them?

12   A.    Yes.

13   Q.    Do you see that it appears -- without reading

14   them, without reading them --

15          THE COURT:  Don't read them out loud.

16   BY MR. BLUMBERG:

17   Q.    Yeah, without reading them aloud, do you see the

18   highlighted pink portion?

19   A.    Yes, sir.

20   Q.    Now, turning to the top of the second page of the

21   notes, it appears only that -- I am directing your

22   attention now to the page -- at the bottom of page 1.

23   Does that refresh your recollection as to a different

24   statement that you provided --

25   A.    Yeah.

Q.    -- to the FBI?

A.    Yes, sir.

Q.    Did you say something different to the FBI

before?

A.    Yes.  And Paul and I had -- had -- that's really

the only thing -- I guess we talked about what -- you

know, what the FBI was interested in, and Paul made

mention to it.  He said --

MR. MCLINDON:  Objection to what Paul made

mention to.

THE COURT:  Okay.  Where are you going?

MR. BLUMBERG:  Counsel has raised the issue

of Mr. Venable --

THE COURT:  Where are you going?  What's the

next question that you have?

BY MR. BLUMBERG:

Q.    Did Mr. Venable indicate to you that he did not

report an excessive force episode --

MR. MCLINDON:  Objection.  Leading and --

THE COURT:  Sustained.

BY MR. BLUMBERG:

Q.    To your knowledge, has Paul Venable ever failed

to report the use of excessive force?

A.    No, not to my knowledge.

THE COURT:  Anything else?

```
 1              MR. BLUMBERG:  Yes, sir.
 2   BY MR. BLUMBERG:
 3   Q.   Why do you think that Louis Ackal was, quote, one
 4   of you, end quote?
 5   A.   That's the way he made us feel.  He used -- he
 6   uses very endearing terms when talking to us or with
 7   us, which -- you know, which makes you feel as a part
 8   of a group which he's part of, you know.  And
 9   there's -- there was -- he always talked about his time
10   with the state police narcotics.  And that -- that
11   right there is the reason that we felt a higher
12   connection than most with him, because he was -- he did
13   the same thing we did.  He understood it.  That's where
14   he came from.  That's where his roots were, in
15   narcotics, in state police.  So...
16              MR. MCLINDON:  Objection.  This is a
17   narrative and going way too far.
18              THE COURT:  I think he has finished his
19   answer.  Next.
20   BY MR. BLUMBERG:
21   Q.   Did you know Jason Comeaux?
22   A.   Yes, sir.
23   Q.   Did you know Jason Comeaux to have a particularly
24   close relationship with Louis Ackal?
25   A.   Closer than all of us, yes, sir.
```

```
 1   Q.   Did you know that Jason Comeaux had conversations
 2   with Louis Ackal about the conduct of the narcotics
 3   unit at IPSO?
 4   A.   Yes.
 5   Q.   Is that one of the reasons why you also saw the
 6   sheriff as one of you?
 7   A.   Yes, sir, it had something to do with it.
 8           MR. BLUMBERG:  That's all I have, Your Honor.
 9           THE COURT:  All right.  The witness is
10   excused?
11           MR. MCLINDON:  Yes, sir.
12           MR. BLUMBERG:  Yes.
13           THE COURT:  You're free to go, sir.  Thank
14   you.
15           Call your next witness.
16           MR. BLUMBERG:  The Government calls Marion
17   Borel, Your Honor.
18           THE COURTROOM DEPUTY:  Please raise your
19   right hand.  Do you solemnly swear that the testimony
20   you give in this case will be the truth, the whole
21   truth, and nothing but the truth, so help you God?
22           THE WITNESS:  Yes, ma'am.
23           THE COURTROOM DEPUTY:  Could you please spell
24   your first and last name for the Court Reporter?
25           THE WITNESS:  Marion, M-A-R-I-O-N, Borel,
```

```
1    B-O-R-E-L.

2              THE COURTROOM DEPUTY:  Thank you.

3                      MARION BOREL,

4     first having been duly sworn by the courtroom deputy,

5               testifies under oath as follows:

6                   DIRECT EXAMINATION

7    BY MR. BLUMBERG:

8    Q.    Good morning, Mr. Borel.

9    A.    Good morning.

10   Q.    Mr. Borel, are you currently employed?

11   A.    Yes, sir.

12   Q.    How are you employed?

13   A.    I am a detective with the Lafayette Police

14   Department.

15   Q.    How long have you been in law enforcement?

16   A.    Almost 19 years.

17   Q.    Would you give a brief resumé of your time in law

18   enforcement to the members of the jury, please?

19   A.    Well, I started in a little ole' town called

20   Abbeville, Louisiana.  I started in narcotics, and then

21   I worked my way up.  Later on in life, my wife and I

22   decided we wanted to have a baby, of course, so I went

23   to a bigger jurisdiction for more money, which was

24   Iberia Parish Sheriff's Office.

25              And then in April -- I think it was
```

```
 1   April 2nd, 2010, I left Iberia and went to Lafayette,

 2   and I'm there now.  And I'm a detective assigned to the

 3   ATF Task Force.

 4   Q.   How long total were you a member or deputy

 5   sheriff with the IPSO?

 6   A.   I started in November of '04.  And, like I say, I

 7   think it was April 2nd, 2010, was my last day.

 8   Q.   Did you enjoy your time at the IPSO?

 9   A.   Some of it, yes.

10   Q.   What part did you like?

11   A.   The part when I was in narcotics under the

12   previous administration.

13   Q.   Did that change -- or your attitude towards

14   narcotics change when Louis Ackal became sheriff?

15   A.   Oh, absolutely.

16   Q.   Why?

17   A.   Um, whenever he first came in, he kind of set, I

18   guess, the guidelines when the guys came in, kind of

19   introduced himself, said that his background was in

20   narcotics, he loved narcotic work.

21        THE COURT:  Mr. Borel, slow down a little

22   bit, sir.

23        THE WITNESS:  Okay, Your Honor.

24        That his background was in narcotics.  He

25   wanted to do whatever it took to straighten up the
```

1   narcotic problem in Iberia Parish.  And he particularly

2   wanted the guys to concentrate on the west side of town

3   and wanted to take the streets back from the niggers.

4   BY MR. BLUMBERG:

5   Q.   What did you understand that to mean?

6   A.   That pretty much meant to me that he wanted the

7   guys to do whatever needed to be done.

8   Q.   Including what?

9   A.   Including use whatever force necessary to get it

10  straight.

11  Q.   Is that what happened?

12  A.   Yes.  Eventually, yes.

13  Q.   As a member of the narcotics unit, did you

14  witness abuses, physical abuses, by your colleagues in

15  the narcotics unit?

16  A.   Yes.

17  Q.   Did you participate yourself?

18  A.   No.

19  Q.   Did you report what you saw?

20  A.   Yes.

21  Q.   Who did you report it to?

22  A.   Well, to -- then it was -- for a little while, he

23  was a captain.  I had a conversation with Toby Hebert

24  about a problem that I thought was going to escalate,

25  just because -- it wasn't just the abuses.  It was like

```
 1    a lot of attitude.  You could tell that a lot of the
 2    younger guys, the way they acted, you knew that it
 3    wasn't good.
 4              MR. MCLINDON:  Objection.  Speculation as to
 5    what the younger guys knew or how they interpreted --
 6              THE COURT:  Okay.  Maybe just let's confine
 7    the narrative and particularize your questions.
 8    BY MR. BLUMBERG:
 9    Q.    Let's go back to the abuses in a moment, and
10    let's talk about any additional comments made by Louis
11    Ackal; okay?
12    A.    Um-hum.
13    Q.    You have to make sure you answer "yes" or "no."
14    A.    Yes.
15    Q.    Okay.  Was there some other reason that you
16    believed that Louis Ackal's comments about taking the
17    streets back from the niggers meant to engage in
18    excessive force?
19    A.    Well, he said that to do what needed to be done,
20    as long as they didn't get too far away to where he
21    couldn't bring them back.
22    Q.    Did he also have conversations in which he would
23    talk about working people over?
24    A.    Well, there was a time -- yeah.  And if somebody
25    had to be worked over, they would be charged -- or --
```

1    I'm trying to think of the word -- tuned up.  They had

2    to charge them with resisting.

3    Q.    As a police officer, had you heard the phrase

4    *tuned up* before?

5    A.    No.

6    Q.    Did you understand -- what did you understand

7    that comment to mean in the context of Louis Ackal's

8    comments to you?

9    A.    That if somebody had to be roughed up, go ahead

10   and do it.

11   Q.    What was the import or the importance of the

12   comments about charging resisting arrest?

13   A.    I would -- well, the only way I could see is if

14   you charge somebody with resisting and it eventually

15   ends up going to court, it's pretty much that officer's

16   word against the defendant, against the subject.

17   Q.    And what would be the importance of charging

18   resisting arrest?

19   A.    Well, if there was any injuries to that person,

20   that resisting charge would -- I don't want to use the

21   word *substantiate*, but it would help it.

22   Q.    Did you understand it to be a way of covering up

23   for the excessive force?

24   A.    Yes.

25   Q.    To be fair, sir, how many times do you think you

1  witnessed your fellow narcotics agents engage in

2  physical abuse of people?

3  A.    There was only a few, because I realized after

4  those few times that I would just stop working with

5  them in the -- see, we would work like during the day,

6  daytime hours.  And at night they would run the

7  streets.  And it just got to the point to where I

8  wouldn't even -- I would do my daytime duties and go

9  home.

10  Q.    Why?

11  A.    Because I did not want to be a part of this.

12  Q.    Did you intervene in the abuses that you

13  witnessed?

14  A.    No.

15  Q.    Should you have?

16  A.    Absolutely.

17  Q.    Why?

18  A.    Because it's wrong.

19  Q.    Were you trained that you were obligated to

20  intervene?

21  A.    Yes.

22  Q.    At the time that you were a narcotics agent, had

23  you been a police officer for some time?

24  A.    By then, I had almost 12 years, yeah.

25  Q.    You had already been POST certified?

A.    Yes.

Q.    Did you understand what your constitutional obligations were?

A.    Yes.

Q.    Did you satisfy those obligations?

A.    No.

Q.    Why not?

A.    Because I didn't want to be -- honestly, I didn't want to be involved in the situation at all, but I didn't want to be that lone person to stick my neck out and be the only one to try to do something.  I can't -- even when I made it to the point of supervisor in narcotics, which lasted a short time, you'd make comments to the deputies, and it would be pretty much, *Screw you.  The sheriff's got my back*.  I didn't want to be that lone guy.

      I thought by speaking to the people I had talked to that were in the positions they were in, that something would be done.  And, obviously, it never was.

Q.    Was one of those persons Russell Hebert?

A.    Yes -- well, Toby.  I call him Toby Hebert.  He was the -- initially, he was the internal affairs captain and then was promoted to chief deputy.

Q.    How do you know nothing was done?

A.    Well, I'll say I never saw anything done.

1    Q.    Did the abuses continue despite your complaint?

2    A.    Yes.

3    Q.    Was there an event that occurred in November of

4    '08 which seemed to exacerbate or perpetuate the abuses

5    you were aware of?

6    A.    Yes.

7    Q.    What was that event, without going into detail,

8    just in summary?

9    A.    There were three narcotics agents who were

10   drinking at one of the guys' houses, and for whatever

11   reason, they went out into the west side of town, where

12   they jumped two black male subjects.  And, evidently,

13   one of them got beat up pretty bad, because, if I

14   remember correctly, he had broken bones to the face.

15   Q.    What did you learn was the defendant's reaction

16   to learning of that episode?

17          MR. MCLINDON:  Objection, Your Honor.  I

18   just -- we've heard this story 15 times.  This is

19   cumulative testimony.  I am not sure --

20          THE COURT:  No, no.  Overruled.

21          Proceed.

22   BY MR. BLUMBERG:

23   Q.    What did you learn was the defendant's reaction

24   when he learned of that episode?

25   A.    From what I understood, that he was glad that it

happened.  He was proud of it.

Q.   Did you learn that from fellow narcotics agents?

A.   Yes.

Q.   Who would those agents have been?

A.   Oh, there was Troy Willis, Jacob Huckabay, *Bubba*/Gerald Savoy, Wade Bergeron, and there might have been another one in there.  I just can't remember the name.

Q.   Based on your conversations with the fellow people who had been committing abuses, did you understand that Louis Ackal had covered up that event?

A.   Eventually, that's what it seemed to have happened, yes.

Q.   And what was the impact on the behavior of the narcotics unit after that event?

A.   They felt they were completely untouchable.

Q.   And was that based on your experience with them?

A.   Yes.

Q.   Was that based on your conversations with them?

A.   Yes.

Q.   Do you know a man named *Gerald Savoy*?

A.   Yes.

Q.   At the time in narcotics, did it appear to you -- describe the nature of the relationship that Gerald Savoy had with Louis Ackal.

```
1    A.    Gerald, um, whenever we first -- Louis first took

2    office --

3              THE COURT:  Just tell us what the

4    relationship was.

5              THE WITNESS:  Yes, sir.  At the time that I

6    was there, Gerald was really just -- I don't want to

7    use the word nobody, but a low-ranking person.  And it

8    seemed that he could go to the sheriff whenever he

9    wanted.

10   BY MR. BLUMBERG:

11   Q.    And at some point, did that become very clear to

12   you in, roughly, January of 2009?

13   A.    Yes, sir.

14   Q.    Did you have an experience with Gerald Savoy and

15   Louis Ackal in January of 2009?

16   A.    Yes, sir.

17   Q.    How would you characterize that experience?

18   A.    Strange.

19   Q.    What was it?

20   A.    Gerald asked me one day if I would go take a ride

21   with him.  He wanted to go look at something.  I said,

22   Okay.  We took off, and we ended up turning into a cane

23   field on the outskirts of Loreauville.  We went through

24   a cane field into a headland.  And the sheriff was

25   there, along with Mike Barnett and somebody else I
```

1    can't remember.

2    Q.    Who was Mike Barnett at the time?

3    A.    At the time, Mike Barnett would have still been

4    the major of enforcement.

5    Q.    What was Mike Barnett before he came to the IPSO?

6    A.    Before he came.  He worked for the New Iberia

7    Police Department before it was shut down, and then I

8    do believe he was Louis's campaign manager.

9    Q.    When he ran for office --

10   A.    Yes.

11   Q.    -- for election?

12   A.    Yes, when he ran for sheriff.

13   Q.    One at a time.

14         In July of 2008?

15   A.    Yes.

16   Q.    What happened during this meeting in the cane

17   field between you, Savoy, Barnett and the defendant?

18   A.    Gerald pretty much told the sheriff that if he

19   wanted the narcotics unit to run better, that he needed

20   to promote me to lieutenant in Troy Willis's place,

21   promote Gerald to sergeant, and give him Jacob Huckabay

22   back in narcotics because Huckabay had already been

23   taken out for that previous incident.

24   Q.    Was Gerald Savoy one of the people that you had

25   seen commit physical abuses that violated your rules,

1    policies and procedures?

2            (Court Reporter clarification.)

3    A.    Wait.  You said Jacob Huckabay or Gerald Savoy?

4    Q.    Gerald Savoy.  Let's rephrase it again.  My

5    fault.

6            Was Gerald Savoy one of the people that you

7    witnessed commit physical abuses while you were in the

8    narcotics unit?

9    A.    Yes.

10   Q.    What influence did it appear that Gerald Savoy

11   had on Louis Ackal based on this conversation in the

12   cane field?

13   A.    It seemed to me like he had a lot of influence

14   over the sheriff.

15   Q.    What was the sheriff's reaction to what Gerald

16   Savoy was suggesting?

17   A.    Everything he suggested took place.

18           MR. BLUMBERG:  If I may have a moment, Your

19   Honor?

20           THE COURT:  You may.

21           MR. BLUMBERG:  That's all the questions I

22   have for Mr. Borel at the moment, Your Honor.

23           THE COURT:  Your witness.

24                       CROSS-EXAMINATION

25   BY MR. MCLINDON:

1   Q.    Good morning.

2   A.    Good morning.

3   Q.    While you were an officer at the Iberia Parish

4   Sheriff's Office, did you use excessive force yourself?

5   A.    No.

6   Q.    You've never used excessive force?

7   A.    No.

8   Q.    Okay.  When you arrest somebody and you use

9   legitimate force --

10  A.    Um-hum.

11  Q.    -- are you supposed to document that in the file,

12  in the arrest report?

13  A.    In an arrest report?

14  Q.    Yes.

15  A.    Yeah, but --

16  Q.    By legitimate force -- I'll give an example.  If

17  you're doing a pat-down search of somebody and he takes

18  a swing at you --

19  A.    Yeah, if you do like a -- have to do like an arm

20  bar takedown or something to gain compliance from the

21  subject, yeah, you should.

22  Q.    And at what point would you fill out a separate

23  Use of Force report?

24  A.    The supervisor normally fills out the Use of

25  Force report.

1    Q.    Based on what you tell him?

2    A.    Based on what -- yeah, because a lot of times the

3    supervisors may not even be present.

4    Q.    Right.  So if you're -- if you're conducting an

5    arrest and you have a use of force and you don't tell

6    your supervisor and you don't put it in a report, he's

7    not going to know about it; right?

8    A.    Correct.

9    Q.    Okay.  When -- let me ask you about this meeting

10   in the cane field.  You felt that was kind of unusual?

11   A.    For me, I thought it was very unusual.

12   Q.    Okay.  And during that meeting or at the time of

13   that meeting, you knew that Bubba Savoy had engaged in

14   excessive uses of force?

15   A.    Yes.

16   Q.    Okay.  At any time after that meeting -- well,

17   let me back up.

18           And at that meeting, Savoy was recommending

19   you to be promoted?

20   A.    Yes, sir.

21   Q.    To what?

22   A.    Lieutenant.

23   Q.    In the narcotics division?

24   A.    Yes.

25   Q.    Okay.  But from what I can tell, you were a

1    pretty good cop.  You didn't use excessive use of

2    force?

3    A.    Correct.

4    Q.    You had a pretty good reputation?

5    A.    Correct.

6    Q.    So that was a good thing to promote, Mr. Borel,

7    up there because you are a good, clean cop?

8    A.    Correct.

9    Q.    So the sheriff thought -- he didn't have any

10   problems with moving you up.  There had been no citizen

11   complaints against you?

12   A.    No, sir.

13   Q.    But you knew that Savoy was a bad cop?

14   A.    Right.

15   Q.    Okay.  I want to know.  Did you ever, after that

16   meeting, call the sheriff, go see him, tell him in any

17   way, *look, you may not know this, but Bubba Savoy's a*

18   *bad dude*?

19   A.    No.

20   Q.    You never went and said, *Bubba Savoy engages in*

21   *excessive uses of force*?

22   A.    To the sheriff, no.

23   Q.    Yes, to the sheriff.

24   A.    Not directly to the sheriff, no.

25   Q.    Did you ever go to him not just about Bubba

1    Savoy, but any of these other guys?

2    A.    Yes.

3    Q.    Well, let me back up.  You said that you just

4    decided *I'm not going to ride at nighttime with these*

5    *guys anymore*?

6    A.    Correct.

7    Q.    Okay.  Did you go to the sheriff and tell him

8    that?

9    A.    No.

10   Q.    Okay.  Now, you went to some other folks?

11   A.    Yes, sir.

12   Q.    But not to Sheriff Ackal?

13   A.    Correct.

14   Q.    Okay.  Do you believe that Sheriff Ackal just

15   listened to Mr. Savoy too much?

16   A.    You're asking me my opinion?

17   Q.    Yes.  Well, based on what you saw.

18   A.    Yes.

19   Q.    Okay.  He would take advice from Bubba Savoy and

20   pretty much go with it.

21   A.    On the times that I saw, yes, because what he

22   suggested, happened.

23   Q.    Now, you talked about -- or do you remember the

24   sheriff saying, *look, I want to take back the streets,*

25   *but you guys don't go too far*?

1  A.    Yes.

2  Q.    Okay.  Now, you understood that to mean, you

3  know, be tough with these guys.  These are bad guys

4  you're dealing with; right?

5  A.    Yes.

6  Q.    These drug dealers?

7  A.    Yes.

8  Q.    And you have to be tough with these guys.  But

9  you never interpreted that to mean use illegal

10 unnecessary use of force?

11 A.    No, I didn't.

12 Q.    You understood what he meant.  Be tough, take

13 back the streets from crime.

14 A.    As me, yes.

15 Q.    Yes.

16 A.    I knew what he meant.

17 Q.    Okay.  Do you know an officer named *Jason*

18 *Comeaux*?

19 A.    Yes.

20 Q.    Do you have an opinion as to his truthfulness?

21 A.    The little bit of time that I got to work with

22 Jason Comeaux, because he came into the narcotics unit

23 a little bit later -- you're asking me my opinion.  I

24 was not very impressed with the young man, but he is

25 another one that would throw out the sheriff's name a

```
1    lot in the office because he would go to his house,
2    they lived next door; and the sheriff, out of his own
3    mouth, took care of him.
4    Q.    That was Jason -- he was name dropping; right?
5    A.    Yes.
6    Q.    Did you ever get the impression that Jason
7    Comeaux was on drugs while at work?
8    A.    There were several times where he had the
9    appearance of -- he looked like he was possibly on
10   maybe some pill or something because he was never up,
11   he was always kind of down.
12   Q.    Did you ever report that to anybody?
13   A.    No.
14         (Pause in the proceedings.)
15         MR. MCLINDON:  Just one more second.  Thank
16   you, Officer.  That's all I have for you.
17         THE WITNESS:  Thank you.
18         THE COURT:  Any redirect?
19                   REDIRECT EXAMINATION
20   BY MR. BLUMBERG:
21   Q.    I want to talk about what you think Louis Ackal
22   meant by his comments in the Summer of 2008 versus what
23   you did; okay?  You understand?
24   A.    Correct.
25   Q.    All right.  What comments did he make to you
```

1    about making -- using resisting arrest charges to hide

2    excessive uses of force?

3    A.    That if somebody had to be tuned up, that they

4    were to be charged with resisting arrest.

5    Q.    And you understood *tuned up* to mean to beat

6    somebody unnecessarily?

7    A.    Correct.

8    Q.    So what did Louis Ackal convey to the group about

9    using excessive force?

10   A.    Do whatever needed to be done.

11   Q.    Including using excessive force?

12   A.    Correct.

13   Q.    Now, did you?

14   A.    No.

15   Q.    You understood -- did you understand what he

16   meant?

17   A.    What he meant, yes.

18   Q.    But did you decide to follow it?

19   A.    No.

20         MR. BLUMBERG:  That's all the questions I

21   have, Your Honor.

22         THE COURT:  The witness is excused?

23         MR. BLUMBERG:  Yes, Your Honor.

24         THE COURT:  You're free to go.  Thank you.

25         Next witness?

```
 1              MR. BLUMBERG:  I'm sorry, Your Honor, the

 2   Government calls Russell Hebert.

 3              If I may be excused for a moment, Your Honor.

 4              THE COURT:  Yes.

 5              (Pause in the proceedings.)

 6              THE COURTROOM DEPUTY:  Please raise your

 7   right hand, sir.  Do you solemnly swear that the

 8   testimony you will give in this case will be the truth,

 9   the whole truth and nothing but the truth, so help you

10   God?

11              THE WITNESS:  I do.

12              THE COURTROOM DEPUTY:  Could you please spell

13   your first and last name for the Court Reporter.

14              THE WITNESS:  R-U-S-S-E-L-L, H-E-B-E-R-T.

15              THE COURTROOM DEPUTY:  Thank you.

16                        RUSSELL HEBERT,

17    first having been duly sworn by the Courtroom Deputy,

18              testifies under oath as follows:

19                      DIRECT EXAMINATION

20   BY MR. BLUMBERG:

21   Q.   Good morning, Mr. Hebert.

22   A.   Good morning, sir.

23   Q.   Mr. Hebert, are you currently employed?

24   A.   No, sir, I'm retired.

25   Q.   Where was the last place that you were employed
```

1    full-time?

2    A.    New Iberia Sheriff's Department.

3    Q.    When did you leave the New Iberia Sheriff's

4    Department?

5    A.    Sometime in August.

6    Q.    Of this year?

7    A.    Yes, sir.

8    Q.    Okay.  And, Mr. Hebert, I'm going to ask that you

9    keep your voice up and, if need be, lean forward; okay?

10   A.    Okay.

11   Q.    Immediately prior to your departure, what was

12   your role?

13   A.    I was a captain in charge of internal affairs.

14   Q.    How long had you been captain in charge of

15   internal affairs in the most recent stint that you

16   spent there?

17   A.    Two years.

18   Q.    Who hired you into that position?

19   A.    Sheriff Ackal.

20   Q.    Approximately when did he hire you to be captain

21   of internal affairs in the most recent stint?

22   A.    That would be August of '14.

23   Q.    Until August of this year?

24   A.    Yes, sir.

25   Q.    Did you serve in that capacity during that entire

```
1    two-year time?

2    A.    Yes, sir, I did.

3    Q.    How do you know Louis Ackal?

4    A.    I've known the sheriff since he's 18 years old.

5    Q.    How did you know him?

6    A.    I was a state police detective working a crime

7    scene, a murder scene, and he was a young radio

8    operator with the Iberia Parish Sheriff's Office, and

9    it was about two in the morning and he brought us

10   coffee and food on the orders of the then-sheriff.

11   Q.    Ultimately did he work as a Louisiana state

12   patrolman or trooper with you at the LSP?

13   A.    Yes, sir.  He served his time in uniform, then he

14   worked with me.  I was chief of detectives.  He worked

15   as a narcotics agent.

16   Q.    At some point, Louis Ackal ran for sheriff of

17   IPSO; is that right?

18   A.    That's correct, sir.

19   Q.    What was your career like?  Your law enforcement

20   career?

21   A.    I started as a state police uniform troopers.

22   Two years later, I became a detective.  And I was the

23   first state trooper to actively work narcotics.  I

24   formed a narcotics squad.  I trained with the Treasury

25   Department.  Graduated.  I trained with the FBI
```

1    Academy.  I trained at Northwestern University.

2            And I worked undercover seven years.  Then

3    they pulled me out from undercover, and I was able to

4    form the first narcotics squad with the state police;

5    and there were a dozen of us, and one of which was

6    Sheriff Ackal.

7    Q.    Despite your long career in law enforcement, are

8    you testifying here today under a grant of official

9    immunity from prosecution?

10   A.    Yes, sir, I am.

11   Q.    What do you understand that immunity from

12   prosecution to mean?

13   A.    It means that I won't be charged with any crimes.

14   Q.    Crimes that you committed while at the IPSO?

15   A.    Yes, sir.

16   Q.    In 2008, did you become head of internal affairs

17   at the Iberia Parish Sheriff's Office?

18   A.    That's correct, sir.

19   Q.    How did you get that job?

20   A.    I was appointed to it by Sheriff Ackal.

21   Q.    What was your understanding when you were first

22   hired there in 2008 of the purpose of internal affairs?

23   A.    Would you restate that, sir?

24   Q.    Sure.  When you were first hired in July of 2008

25   to head the internal affairs unit of the IPSO, what was

```
 1    your understanding of the purpose of that unit?
 2    A.   To investigate crimes committed by the deputies
 3    or violations of departmental policy.
 4    Q.   Did that include the investigation of allegations
 5    of excessive force under color of law by law
 6    enforcement agents?
 7    A.   Yes, sir.
 8    Q.   And -- what was the structure of internal affairs
 9    at the time that you were hired?
10    A.   It was myself with the rank of captain.  I had an
11    assistant named Dean Burley.  I had a secretary, and I
12    had another sergeant, who intermittently helped us,
13    named Gary Louviere.
14    Q.   What are the general mechanics of the way an
15    internal affairs investigation is conducted?
16    A.   Generally, the citizen will come in and file a
17    complaint, and we investigate and either sustain or
18    clear the officer.  Sometimes, but rarely, we get
19    complaints from a section commander about the actions
20    of a particular officer.
21    Q.   What is internal affairs supposed to do with
22    those complaints?
23    A.   We investigate it, and if it is sustained, we
24    take a copy of the entire investigation to the sheriff.
25    Q.   Are those investigations supposed to be
```

1    impartial?

2    A.    Yes, sir.

3    Q.    Are they supposed to be unbiased?

4    A.    Yes, sir.

5    Q.    Are they supposed to be in accord with the rules

6    and policies and procedures of the department?

7    A.    Yes, sir, they are.

8    Q.    Ultimately, what is the sheriff supposed to do

9    with the investigations that are provided to him by the

10   internal affairs division?

11   A.    He makes a decision of what course to follow.

12   Q.    Early on in your tenure at the IPSO, were you

13   worried that the internal affairs unit would not be

14   able to function as it was intended to do?

15   A.    Yes, sir.  We had some restrictions.

16   Q.    Were you worried in part because of comments made

17   by Louis Ackal?

18   A.    Yes, sir, somewhat.  Yes, sir.

19   Q.    Mr. Hebert, how hard is this for you to be here

20   testifying?

21   A.    Incredibly hard, sir.

22   Q.    Why is it so hard?

23   A.    Because at one time, Louis and I were very close

24   friends.

25   Q.    Are you close friends now?

1   A.   No, sir, we're not.

2   Q.   Despite this difficulty, I need you to be as

3   honest as you can be.   You understand the oath that

4   you're under?

5   A.   Yes, sir, I do.

6   Q.   What was it early on that Louis Ackal said to you

7   or in your presence that made you worry that internal

8   affairs would not be able to perform its functions as

9   intended?

10  A.   He said to take it easy.   He didn't want a lot of

11  paper.   If some of the guys were roughing up some of

12  the citizens, he didn't want to hear about it.   Things

13  of that nature.   And more or less he said, *let 'em kick*

14  *ass and take names.*

15  Q.   In the Summer of 2008, did Louis Ackal tell you

16  that he was *worried about the niggers and wanted his*

17  *officers to lean on them*?

18  A.   Yes, sir, he did.

19  Q.   What was your impression of that statement?

20  A.   Well, it's what he wanted to do.   He wanted to

21  clean up Hopkins Street.

22  Q.   Did you think he was encouraging legal or illegal

23  behavior with that statement?

24  A.   Well, it would be illegal.

25  Q.   Did you think he was encouraging the unbiased and

1    objective performance of internal affairs or a biased

2    performance of internal affairs?

3    A.    It would have been biased.

4    Q.    Did he make other similar comments about how to

5    hide excessive force by his law enforcement officers?

6    A.    It was the way we would frame it in the report,

7    sir.

8    Q.    Did Louis Ackal say to you in the Summer of 2008

9    that *if the officers had to use force, that they should*

10   *make sure to charge suspects with resisting arrest*?

11   A.    Yes, sir, he did.

12   Q.    What was the significance to you of that

13   statement?

14   A.    That meant if the officers put their hands on the

15   person being arrested or roughed him up in any way,

16   then he was to be charged resisting arrest, even though

17   he had not resisted.

18   Q.    For what purpose?

19   A.    To avoid lawsuits or false arrest.

20   Q.    To conceal the truth of the uses of force?

21   A.    Yes, sir.

22   Q.    Did you hear Louis Ackal make that statement to

23   other deputies?

24   A.    I can't recall, but he made it to me.

25   Q.    Did he talk to you about how to make paperwork

1    look good in the context of your internal affairs

2    responsibilities?

3    A.    The only thing I can recall about our reports, he

4    said he didn't want a lot of paper, which I took to

5    mean he just wanted us to do just a cursory type of

6    investigation.

7    Q.    What was your sense, when you started, of the

8    importance of the internal affairs unit?

9    A.    Well, sir, I had done internal affairs work as a

10   state -- when I was chief of detectives, they used to

11   send me to troubled troops, and I understood exactly

12   what IA work was, was to uphold the integrity of the

13   department by investigating misbehavior.

14   Q.    Do you have any -- did you have at the time, when

15   you began, in the Summer and the Fall of 2008 any

16   question as to what Louis Ackal meant when he said he

17   wanted the paper to look good, that he didn't want

18   paper on this or that he wanted to create false

19   justifications for uses of force?

20   A.    I think his intention was to present a good

21   picture to the department.

22   Q.    A false picture?

23   A.    To some extent, yes, sir.

24   Q.    Well, Mr. Hebert, I realize this is hard, but you

25   yourself have engaged in excessive uses of force;

1  haven't you?

2  A.    Many years ago, yes, when I was a young trooper.

3  Q.    Did you have any illusions about what Louis Ackal

4  was encouraging when he talked -- gave these

5  instructions to you and to other deputies?

6  A.    No, sir, I didn't.

7  Q.    Did you know it was wrong, what he was saying

8  back then?

9  A.    Yes, sir.

10  Q.    Do you know it was wrong now, as you sit here?

11  A.    Yes, sir.

12  Q.    Do you think that Louis Ackal was encouraging the

13  deputies to engage in illegal activity?

14  A.    Yes, sir.

15  Q.    Did you tell him that he was wrong at the time?

16  A.    Tried to, sir.

17  Q.    What was his reaction, typically?

18  A.    He would listen, and usually he would not respond

19  in words.  He would take his glasses off and clean them

20  or he would turn to his computer and play with it.  And

21  myself and usually accompanied by the departmental

22  attorney, Mr. Steve Elledge, we knew that was a sign to

23  leave.

24  Q.    In the Fall of 2008, did you have complaints that

25  the narcotics unit of the IPSO was engaging in

1    excessive uses of force?

2    A.    Yes, sir.

3    Q.    Did those complaints come from the

4    African-American community?

5    A.    Some, yes, sir.  A few from the whites.

6    Q.    Did they come from within the narcotics unit?

7    A.    Not to me, sir.

8    Q.    Do you know of any particular narcotics agent who

9    might have made a complaint to you?

10   A.    Say again, sir, please.

11   Q.    Do you know of any specific narcotics agent who

12   might have made a complaint to you?

13   A.    Not that I can remember, sir.

14   Q.    Do you know a man named *Marion Borel*?

15   A.    Vaguely.  I think he was a jailer.

16   Q.    Did you have conversations with -- withdrawn.

17          Did you have conversations in the Summer and

18   Fall of 2008 with Louis Ackal around whether you should

19   go, quote, *looking to make cases or not*?

20   A.    Looking to make what, sir?

21   Q.    Cases.

22   A.    I can't truthfully recall, sir.

23   Q.    Sure.  Let me ask you this.  Did you have

24   conversations with him about how hard you should

25   investigate?

A.    Yes, sir.

Q.    Did you have conversations with him about what you should do if you received a complaint from outside the department?

A.    He said I should pursue it and then inform him what I had found out.

Q.    Did he say specifically, *Don't go looking to make cases; take complaints; write them up*, and just bring them to him?

A.    That's exactly what he said, sir.

Q.    And what was your understanding of those statements to you?

A.    Well, I reported only to him.  And sometimes I received some guidance from his attorney, Steve Elledge, but he didn't want it publicized.  And early on, I had stamps made *For the Sheriff's eyes only*.

        And then I would bring the reports to him fairly well sanitized.

Q.    To the lawyer?

A.    Yes.  He would review them, and then I would take them in to the sheriff.

Q.    Now, very early in your tenure as Internal Affairs chief in July of '08, did Louis Ackal tell you, *The niggers are out of control; we have to do something about the niggers; I'm going to set narcotics loose*?

1    A.    Yes, sir.

2    Q.    Did you know that that was just wrong at the

3    time?

4    A.    Yes, sir.

5    Q.    And did you bring it to your friend, Steve

6    Elledge, the lawyer?

7    A.    Did I what, sir?

8    Q.    Did you tell that to your friend, Steve Elledge,

9    the sheriff's lawyer?

10   A.    I think he was present, sir, at one of the

11   conversations, yeah.

12   Q.    What was Elledge's response?

13   A.    When we left, he and I, we went to his office on

14   one occasion, and I remember he says, *We're going to*

15   *get a lot of lawsuits*.  And --

16        MR. MCLINDON:  Objection.  Hearsay as to what

17   Steve Elledge said.

18        MR. BLUMBERG:  Offer it as a co-conspirator

19   hearsay statement, Your Honor.

20        THE COURT:  Overruled.

21   BY MR. BLUMBERG:

22   Q.    Mr. Hebert, did Steve Elledge tell you that he

23   had any control over Louis Ackal?

24   A.    After I became chief deputy is when I spent most

25   of my time with Steve Elledge.  I remember specifically

1    on occasion he told me, *He will not follow the advice*
2    *of his attorney.*
3    Q.    Now, to be clear, his attorney, that person is
4    not in the courtroom.  You're talking about the lawyer
5    for the IPSO; correct?
6    A.    That's correct, sir.
7    Q.    All right.  In the Fall of 2008, did you go
8    directly to Louis Ackal and tell them, quote, *The*
9    *narcotics guys are out of control; they are engaging in*
10   *beatings on the street*?
11   A.    Yes, sir, I did.
12   Q.    And what was his response?  Do you recall?
13   A.    Oh, he says, *They're just a little vigorous.*
14   *They're just trying to break up that drug traffic, and*
15   *I am going to break up those gangs on Hopkins Street*
16   *that are standing on the corners* and that type of
17   thing.
18   Q.    Did he tell you, quote, *They are doing what I*
19   *told them to do*, end quote?
20   A.    Yes, sir.
21   Q.    Did those words come as -- let me put it this
22   way.  Did your comments to Louis Ackal appear to
23   surprise him when you reported the abuses?
24   A.    No, sir.
25   Q.    He's told you what he's thought of excessive

```
 1   force complaints, hasn't he?
 2   A.    Again, sir, please?
 3   Q.    Has Louis Ackal told you what he thinks of
 4   excessive force complaints?
 5   A.    Well, he says, If they give you any lip at all,
 6   he says, you're chewing them up.
 7   Q.    What does chewing them up mean?
 8   A.    Rough them up.
 9   Q.    Has Louis Ackal said to you, quote, There is no
10   such thing as excessive force, end quote?
11   A.    Yes, sir.
12   Q.    And what is your understanding of that comment
13   from the defendant?
14   A.    Well, you had to do what you wanted to do with
15   the prisoner if he gave you any trouble.
16   Q.    Did you know that everything that we've just
17   talked about was illegal at the time that you were
18   hearing it?
19   A.    To my shame, sir, yes.
20   Q.    Why didn't you stop it?
21   A.    Well, I was an old man in my 70s, and I needed
22   the money.  And having been a sergeant in the Marine
23   Corps, I place a high value on loyalty.  And as long as
24   Sheriff Ackal was putting food on my table, I was going
25   to be loyal to him.  So I went against my better
```

1    judgment, made mistakes, and just followed orders, sir.

2    Q.    In November of 2008, were you called into a

3    meeting with Louis Ackal about some abuse by three

4    narcotics agents who were off duty?

5    A.    Yes, sir.  I remember that specifically.

6    Q.    At that point, did you learn that a man named --

7    do you know who Jeremy Kelley is?

8    A.    Jeremy Kelley, yes, sir.

9    Q.    At that point, did you learn that Jeremy Kelley

10   had written a report about the allegations of

11   misconduct by these off-duty officers?

12   A.    Yes, sir.

13   Q.    Did you receive any instructions from Louis Ackal

14   about what to do with that report?

15   A.    I did not get a physical copy of the report.  It

16   was just a call for service type of report that at the

17   time Sergeant Kelley wrote, and it was just -- it

18   didn't indicate any misbehavior, as I recall.  But I

19   did not get a copy.  But it stated that something had

20   taken place.

21   Q.    Did you get a call from Louis Ackal and an

22   instruction about what to do with the report?

23   A.    As I recall, sir, I did not act on it.

24   Q.    Did you get a call and instruction from Louis

25   Ackal about what to do with the report?

1    A.    Yes.

2    Q.    What was it?

3    A.    *Leave it alone.*

4    Q.    Did you get an instruction to delete the report?

5    A.    Yes, sir.

6    Q.    Who gave you that instruction?

7    A.    The sheriff.

8    Q.    What did you do about it?

9    A.    I told the tech, Colette -- I can't recall her

10   last name.  I told Colette to go -- the current term is

11   *wipe the server clean.*

12   Q.    Was the server wiped clean?

13   A.    For that case, as far as I know, yes, sir.

14   Q.    Why do you know that?

15   A.    She told me she did it.

16   Q.    Now, what was the significance of deleting this

17   report?

18   A.    Destruction of public records, sir.

19   Q.    And?

20   A.    A violation of law.

21   Q.    Why did you do that?

22   A.    Because I was told to do so.

23   Q.    Is your -- in your capacity as head of Internal

24   Affairs, were you familiar with the IPSO Use of Force

25   rules, principles and procedures?

```
 1   A.    Yes, sir.
 2            MR. BLUMBERG:  With the Court's permission?
 3            Your Honor, if we may, I would like to bring
 4   up Government's Exhibit Number 22 for identification,
 5   please, only.
 6   BY MR. BLUMBERG:
 7   Q.    Mr. Hebert, can you take a look at Government's
 8   Exhibit 22 on your screen, please.
 9   A.    Yes, sir.  "...use of force..."
10            THE COURT:  No, no.
11   BY MR. BLUMBERG:
12   Q.    Don't read it.  Just look at it for a moment.
13            Does that appear to be -- by the way, are you
14   POST certified?
15   A.    Yes, sir.
16   Q.    What does POST certified mean?
17   A.    It means you're POST-certified officers and fully
18   trained according to the POST rules in Louisiana.
19   Q.    Are you familiar with the Use of Force training
20   offered through your POST certification process?
21   A.    Yes, sir.
22   Q.    I want to have you take a look at Government's
23   Exhibit 22 now.  It's about six pages.  Tell me when
24   you've had a chance to look through page one, briefly,
25   and then we'll move on to the others.
```

1    A.    Okay.  Okay.

2    Q.    Okay.

3            MR. BLUMBERG:  Next page, please.  Next page,

4    Steve.

5    BY MR. BLUMBERG:

6    Q.    Tell me when you've had a chance to look at that

7    one, Mr. Hebert.

8    A.    Yes.

9            MR. BLUMBERG:  Next page, Steven, please.

10   BY MR. BLUMBERG:

11   Q.    Do you have page 4 in front of you, Mr. Hebert?

12   A.    Sir?

13   Q.    Is there a page 4 in front of you at the moment?

14   A.    Yes, sir.  Yes, sir.

15   Q.    Okay.

16           MR. BLUMBERG:  Okay.  Next page, Steven,

17   please.

18           Okay.  That's all, Steve.

19   BY MR. BLUMBERG:

20   Q.    Mr. Hebert, does Government's Exhibit Number 22

21   fairly capture Use of Force training that you received

22   when you became POST certified as it relates to uses of

23   force?

24   A.    Yes, sir.

25           MR. BLUMBERG:  Move Government's 22 into

1    evidence, Your Honor?

2              MR. MCLINDON:  I have no objection, Your

3    Honor.

4              THE COURT:  Without objection, it's received.

5    BY MR. BLUMBERG:

6    Q.    Please take a look at Government's Exhibit

7    Number 23 for identification, Mr. Hebert.

8    A.    Sir, I have to state this and correct you on

9    something.

10   Q.    Yes, please.

11   A.    I was grandfathered into POST.  I was an officer

12   before even the *Miranda* decision.  What I was taught

13   about the use of force and everything like that was at

14   the State Police Academy.

15   Q.    Thank you, sir.

16   A.    So I never had to be retrained.

17   Q.    Does Government's 22 accurately reflect the

18   principles that you learned when you were trained in

19   uses of force at the State Police Academy?

20   A.    Yes, sir, there, and at the FBI Academy.

21   Q.    Thank you.

22             MR. BLUMBERG:  Government's Number 23,

23   please.

24   BY MR. BLUMBERG:

25   Q.    Mr. Hebert, as head of Internal Affairs who would

1    investigate excessive force complaints, was it your

2    responsibility to know the Use of Force policies for

3    the IPSO?

4    A.    Yes, sir.

5    Q.    I'm going to ask you to take a look at

6    Government's 23 and see if you can identify what that

7    appears to be.

8    A.    Well, it's about conducting field interviews.

9    Q.    Just first tell me if you can identify what it

10   is.

11   A.    Sir?

12   Q.    The title at the very top, does this look

13   familiar to you?

14   A.    Yes, field interviews.

15   Q.    Is it a standard operating procedure from the

16   IPSO?

17   A.    Yes, I believe it is.  I haven't read the whole

18   thing, but I believe it is.

19   Q.    Take a look, if you would, please.

20   A.    Yes, sir.

21         MR. BLUMBERG:  Next page, please, Steven.

22         THE WITNESS:  Yes, sir.

23   BY MR. BLUMBERG:

24   Q.    Does that appear to accurately reflect the IPSO

25   standard operating procedures to the way law

1    enforcement officers are obligated to conduct their

2    field interviews as it stood in October of 2007?

3    A.    Yes.  It's pretty detailed.

4          MR. BLUMBERG:  Move Government's Exhibit 23

5    into evidence, Your Honor?

6          MR. MCLINDON:  No objection.

7          THE COURT:  Without objection, it is

8    received.

9    BY MR. BLUMBERG:

10   Q.    I'm going to ask you to take a look at now what's

11   been identified as Government's 24 for identification

12   purposes.  Sir, can you take a look at the front page

13   of that document?  Does it look familiar to you?

14   A.    Yes, sir, it does.

15   Q.    Does it appear to be a procedural order from the

16   IPSO related to Use of Force principles and guidelines?

17   A.    Yes, as to use of force.  And it defines deadly

18   force.

19   Q.    Without going into details to what it says, does

20   it appear to be --

21         MR. MCLINDON:  I'll just object.  It's a

22   leading question.  If he could ask him what it is

23   instead of telling him what it is.

24         THE COURT:  Do you want to rephrase?

25         MR. BLUMBERG:  Yes.

BY MR. BLUMBERG:

Q.    What is the date upon which this appears to be active?

A.    October 1 of 2007, sir.

Q.    Please take a look at the document and see if it accurately reflects your understanding of the policies that were in place of October 1st, 2007.

A.    Yes, sir, it does.  It was written by the sheriff prior to Sheriff Ackal.

Q.    Okay.  Please take a look at page 2.

A.    Yes, sir, I recognize it.

Q.    Please take a look at page 3.

A.    Yes, sir.

Q.    Please take a look at page 4.

A.    Yes, sir.

Q.    Are you comfortable that that is the procedural order that was in place in October of 2007 related to Use of Force obligations by deputy sheriffs?

A.    I'm reasonably comfortable with it, sir.

        MR. BLUMBERG:  Move Government's 24 into evidence, Your Honor?

        MR. MCLINDON:  No objection.

        THE COURT:  Without objection, it's received.

BY MR. BLUMBERG:

Q.    Please take a look at Government's 25 for

```
 1    identification.  Does that appear to be also from the
 2    IPSO procedural orders, sir?
 3    A.    Yes, sir.  Yes, sir, it does.
 4    Q.    Does it relate to Uses of Force obligations --
 5    Use of Force forms?
 6    A.    Patrol has a form that anytime they make an
 7    arrest and they have to use force, it has to be filled
 8    out and submitted.
 9    Q.    Is Government's 25 the written policy and
10    procedure that relates to that?
11    A.    Yes, sir.
12          MR. BLUMBERG:  Move Government's 25 into
13    evidence, Your Honor?
14          MR. MCLINDON:  No objection.
15          THE COURT:  Without objection.
16    BY MR. BLUMBERG:
17    Q.    Were you worried about the impact on the
18    narcotics unit from deleting the report related to the
19    beatings by the three narcotics agents?
20    A.    Well, sir, I didn't have much intercourse with
21    the narcotics unit.  And I -- I thought by deleting the
22    report, that it would give the agents an idea that they
23    could do exactly as they wanted.
24    Q.    Is it your understanding that that is exactly
25    what happened?
```

A.     Exactly, sir.

Q.     Because -- did you continue to receive reports of excessive force by narcotics agents?

A.     Yes, sir, from time to time.

Q.     In January of 2009, did you have a job change from internal affairs.

A.     Yes, sir.  I was promoted to chief deputy.

Q.     What were your responsibilities as chief deputy?

A.     Well, I became substantially disengaged from enforcement activities where we were in bad financial straits, and the sheriff told me to direct my attentions to curbing spending.  And I did all the firing at his direction, the firing of employees.  And from time to time, I would get IA investigations brought to me by Burley while we had an internal affairs.

Q.     Did you receive instructions from Louis Ackal about what to say to Burley regarding his excessive force investigations while he was heading up internal affairs?

A.     Yes, sir.

Q.     What did Louis Ackal say?

A.     More or less, what he told me, to just take it easy on the boys.

Q.     Did he tell you, quote, *they're working too hard*?

```
 1    A.    I don't understand, Mr. Blumberg.

 2    Q.    Did Louis Ackal refer to Burley and another man

 3    in internal affairs, a man named Gary Louviere, as

 4    saying, quote, they are working too hard?

 5    A.    Yes, sir, words to that effect.

 6    Q.    And what did you understand those words to mean?

 7    A.    For those internal affairs officers to lighten up

 8    on their investigations.

 9    Q.    Excessive force investigations?

10    A.    All types of investigations.

11    Q.    Did you have a conversation during this period of

12    time when you became chief deputy in which you reported

13    to Louis Ackal that, quote, His boys were going too

14    hard on the niggers again?

15    A.    Yes, sir.

16    Q.    And what was Louis Ackal's response?

17    A.    He said, Well, I suppose they deserve it.

18    They're doing things that merit rough treatment.

19    Q.    What was he worried about in terms of the people

20    hanging on the street?  What did he say?

21    A.    Well, the sheriff had grown up close to that

22    neighborhood; he knew it well.  He had a friend in the

23    black community, a black man, a barber, that was

24    murdered.  It bothered the sheriff a great deal.  And

25    he just wanted to crack down on the gangs that we had
```

```
 1    in New Iberia and especially in the black community.
 2    And he was a vigorous enforcer.
 3    Q.    How did he talk about the people in the
 4    community?
 5    A.    Well, a specific group, sir?
 6    Q.    How did he talk about the black people in the
 7    west end?
 8    A.    He didn't think very much of them, sir.
 9    Q.    How do you know that?
10    A.    He stated it to me, sir.
11    Q.    What did he state?
12    A.    He says, Those niggers are out of control.
13    Q.    Did you understand him to care one way or the
14    other about the Constitution as it related to the
15    niggers on the west end?
16    A.    Well, sir, it was an interesting dichotomy.  I
17    know for a fact the sheriff had some black friends, so
18    he didn't indict everyone that was black.  It was just
19    a certain type, the thugs on the street, that bothered
20    him.
21    Q.    How would he refer to the people on the street?
22    A.    Well, he didn't like the pants pulled down and
23    the walking and holding the crotch, and he called them
24    niggers, sir.
25    Q.    Did he call them animals?
```

1   A.   Yes, sir.

2   Q.   Did he call them *porch monkeys*?

3   A.   I don't recall that term, sir.

4   Q.   When you told him that *your boys are whipping the*

5   *niggers again*, did he tell you, *Leave those boys alone;*

6   *they know what they are doing*?

7   A.   Exactly, sir.

8   Q.   And which boys were you referring to when you

9   told him?

10  A.   Specifically one name, Willis, known on the

11  street by the black people as "Dog Face."

12  Q.   Were these members and was Willis a member of the

13  narcotics unit?

14  A.   He was in charge of it, sir.  A sergeant.  Yes,

15  sir.

16  Q.   At some point, did it appear to you that Louis

17  Ackal became irritated with the work that internal

18  affairs was doing?

19  A.   Yes, sir.

20  Q.   What was his response?

21  A.   He told me, he says, *Gary and -- Gary Louviere*

22  *and Dean Burley are going at it too hard.  I want you*

23  *to tell them that I'm disbanding IA and that they can*

24  *take a transfer to detective division*.

25  Q.   I'm going to show you what has been previously

1    marked as Government's Number 19 for identification.  I

2    ask you to take a look at that, please, when it comes

3    up on your screen.

4           Are you familiar with that document, sir?

5    A.   Yes, sir, that's the disbandment order on

6    internal affairs issued by Sheriff Ackal.

7    Q.   Does that appear to be an accurate reflection of

8    the memo that you saw in March of 2009 disbanding

9    internal affairs?

10   A.   Yes, sir.

11          MR. BLUMBERG:  Move Government's 19 into

12   evidence, Your Honor.

13          MR. MCLINDON:  No objection.

14          THE COURT:  Without objection, it is

15   received.

16   BY MR. BLUMBERG:

17   Q.   If you could read it out loud, sir.

18          THE COURT:  Well, it's up there.  He doesn't

19   have to read it.

20          MR. BLUMBERG:  All right.

21          THE WITNESS:  March 31st --

22   BY MR. BLUMBERG:

23   Q.   That's okay, Mr. Hebert.  That's fine.  Thank

24   you.

25   A.   Sir?

1    Q.    It's okay.

2          Were you worried about the disbandment --

3          THE COURT:  Wait.  Let them finish reading

4    it.

5          MR. BLUMBERG:  Oh, I'm sorry, Your Honor.

6          (Pause in the proceedings.)

7          THE COURT:  Okay.

8    BY MR. BLUMBERG:

9    Q.    Were you worried about the disbandment of

10   internal affairs?

11   A.    In a way, yes, and in a way, I wasn't because it

12   was a lot of problems.

13   Q.    Well, what were you worried about?

14   A.    I didn't like not doing the job properly.

15   Q.    What do you mean by that?

16   A.    Well, the boys were not writing the reports that

17   they should have been written.  They had to lighten up.

18   And then they reached a point where they wouldn't

19   pursue a lot of the complaints.

20   Q.    Did Burley and Louviere express frustration to

21   you?

22   A.    Yes, sir.

23   Q.    What were you -- were you worried about the

24   message it sent to the narcotics unit and others in the

25   sheriff's office when internal affairs was disbanded?

```
 1    A.    Well, it was unusual for a department that size

 2    not to have an internal affairs section.

 3    Q.    What is the value, based on your experience and

 4    your time at the IPSO, of having an independent unit

 5    dedicated only to internal affairs conduct?

 6    A.    It's essential, sir, in all the policies of good

 7    police management.

 8    Q.    Why not just send internal affairs matters back

 9    to individual commanders of individual units?

10    A.    That's what it evolved to.  After IA was --

11    internal affairs was disbanded, discipline and the

12    handling of complaints was then put in the hands of

13    each of the section commanders.

14    Q.    What was the value of having an independent

15    self-contained internal affairs unit?

16    A.    A self-contained internal affairs unit doesn't

17    play favorites.  Whereas, if you leave it in the hands

18    of the commander --

19              MR. MCLINDON:  Objection.

20              THE WITNESS:  -- of that particular

21    section --

22              THE COURT:  On what basis?

23              MR. MCLINDON:  It sounds like he's giving an

24    opinion now as to how these divisions work.  I don't

25    think this man's been qualified, certainly hasn't been
```

1   qualified as an expert witness in internal affairs.

2            THE COURT:  I think it's within his ability

3   to answer and to opine.  The jury will of course weigh

4   the validity of the opinion.  Proceed.

5   BY MR. BLUMBERG:

6   Q.   What's the problem with sending internal affairs

7   work to the commanders in individual units?

8   A.   That leaves each commander the power and

9   authority to discipline his men as he wishes.

10  Consequently, if he has special pets and special

11  people, he can sit on the complaint or he can handle it

12  however he wants to.  Some commanders rarely are

13  extremely vigorous, and some are very taciturn and give

14  tacit approval.

15  Q.   What happened to the files that existed in

16  internal affairs immediately before IA was disbanded?

17  A.   Those files were brought to the courthouse and

18  stored in the basement office space --

19  Q.   Were they --

20  A.   -- of Lieutenant Fleming, who was in charge of

21  the intelligence gathering.

22  Q.   Did anybody pursue the investigations that were

23  pending when internal affairs was disbanded?

24  A.   Not to my knowledge, sir.

25  Q.   What were Burley and Louviere told by the sheriff

1    when IA was disbanded?

2    A.    He told them they could -- they were transferred

3    to patrol or detectives.   Gary Louviere transferred to

4    detectives.   Dean Burley left the organization.

5    Q.    Did anybody pick up their files that were pending

6    at the time?

7    A.    Yes, sir.   It's my understanding all the files

8    were brought and stored in the basement of the

9    courthouse.

10   Q.    Let me be more specific.   Did anybody pursue the

11   pending investigations at the time that internal

12   affairs was disbanded?

13   A.    I don't know that, sir.

14   Q.    What happened to those files eventually?

15   A.    They were destroyed.

16   Q.    Who destroyed them?

17   A.    Attorney Steve Elledge and myself.

18   Q.    At whose direction?

19   A.    And -- Minos Meyers and an inmate.

20   Q.    At whose direction?

21   A.    I was told directly by Steve Elledge that the

22   sheriff wanted us to go destroy the records.

23   Q.    And did you?

24   A.    Yes, sir.   Myself, Mr. Elledge, Mr. Meyers and an

25   inmate took them out to the rifle range and we burned

1    them.

2    Q.    Mr. Hebert, is it fair to say that you've had a

3    bit of a troubled history with the IPSO?

4    A.    Yes, sir.  I was fired by Sheriff Ackal in

5    September or -- August or September of 2012.

6    Q.    Who hired you back?

7    A.    Sheriff Ackal.

8    Q.    Into what capacity?

9    A.    As captain with a newly formed internal affairs,

10   which was consisted of only me.

11   Q.    Do you expect to be prosecuted for anything that

12   you hid or covered up?

13   A.    Yes, sir, I did.

14   Q.    Do you expect that now as you sit here?

15   A.    No, sir.  It's my understanding that I have

16   immunity.

17   Q.    And what is the condition of your immunity?

18   A.    Well, after my meetings with you, I was never to

19   discuss the case again with any officers or anyone.

20   Q.    My question to you, sir, is:  Are you immunized

21   from any lies that you provide to -- in testimony

22   today?

23   A.    No, sir.

24   Q.    My question is:  Are you immunized from any false

25   statements that you make to the FBI?

```
1   A.    No, sir.
2           MR. BLUMBERG:  That's all the questions I
3   have, Your Honor.
4           THE COURT:  Your witness, Counselor.
5                   CROSS-EXAMINATION
6   BY MR. MCLINDON:
7   Q.    Good morning.
8   A.    Good morning, sir.
9   Q.    Would you agree with me that the sheriff's number
10  one goal was breaking up the gangs and stopping the
11  drug dealers?
12  A.    As I understood it, yes, sir.
13  Q.    He made that clear to you on numerous occasions?
14  A.    Yes, sir.
15  Q.    Okay.  And you agreed with that?
16  A.    Yes, sir.
17  Q.    And there was a bad gang drug problem in New
18  Iberia?
19  A.    It still exists to a certain extent.
20  Q.    Now, you talked about the use of the "N" word.
21  When the sheriff -- you heard the sheriff use it?
22  A.    Yes, sir.
23  Q.    And you used it yourself?
24  A.    Yes, sir.
25  Q.    And everybody at the sheriff's office?
```

1    A.    Everybody, sir.

2    Q.    Everybody used it?

3    A.    Yes, sir.

4    Q.    Now, the sheriff, when he would use it, he would

5    refer -- he would use it to refer to drug dealers, gang

6    bangers and guys like that?

7    A.    Yes, sir, that's an understanding, I want you to

8    understand.

9    Q.    Right.

10   A.    When we use the "N" word, it was directed to

11   those standing on the corner and gang bangers and

12   people of that nature.

13   Q.    Right.  For example, when his friend, the barber,

14   was murdered?

15   A.    Yes, sir, Cliff.

16   Q.    And I'm going to go ahead and use an ugly word

17   here to make an example.  He didn't say, *oh, that*

18   *nigger barber got murdered*, did he?

19   A.    No, sir.

20   Q.    He would never say that?

21   A.    No, sir.  In fact, he was quite affected by it.

22   Q.    He and others use the word to refer to the really

23   bad guys?

24   A.    Most generally, yes, sir.

25   Q.    Okay.  Now, he -- sometimes Sheriff Ackal said, *I*

1    *want the narcotics guys to lean on 'em, lean on the*

2    *drug dealers.*  Do you remember that word?

3    A.    Yes, sir.

4    Q.    Okay.  And when you heard that, you didn't take

5    that to mean go out and beat them, did you?

6    A.    Yes, sir, I did.

7    Q.    Okay.  Well, did you take it to mean -- you

8    thought that meant to scare 'em and harass 'em, but not

9    to beat 'em?

10   A.    No, sir, I never thought that.  *Lean on them* in

11   police work means rough 'em up.

12   Q.    Okay.  Do you remember -- you interviewed with

13   the FBI on several occasions; right?

14   A.    Yes, sir, I did.

15   Q.    Okay.  Do you remember back in the summer of this

16   year you interviewed with them and those questions were

17   asked to you?

18   A.    Yeah, vaguely, sir.

19   Q.    Okay.  Let me ask you, do you remember saying to

20   the FBI that you took that to mean to scare 'em and

21   harass 'em?

22   A.    If I said it, yes, sir.

23   Q.    Okay.  You never told the FBI *I took that to mean*

24   *go out and beat 'em.*  You told the FBI, *I just took*

25   *that to mean get out and scare and harass the drug*

1   *dealers*?

2   A.   Yes, sir.  It is whatever they say I said.  I

3   don't know in what context that was, sir.

4   Q.   Do you remember at that same meeting discussing

5   the -- the meeting that y'all had with the three

6   officers who got drunk off duty?  Do you remember the

7   story of the three officers who got drunk off duty and

8   they attacked some black guys?

9   A.   Yes, sir.

10   Q.   Okay.  And there was a meeting in the sheriff's

11   office to talk about that?

12   A.   Yes, sir.

13   Q.   Okay.  And during that meeting, you said, *they*

14   *were out nigger knocking*?

15   A.   Yes, sir.

16   Q.   You said that.

17   A.   I said that because they were trying to say it

18   was something else, and I said, *no, this is a clear*

19   *case of what they call nigger knocking.*

20   Q.   You never heard the sheriff say that?

21   A.   He might have said it, yes, sir.

22   Q.   But there is no doubt in your mind that you said

23   it?

24   A.   No doubt.

25   Q.   And I'll ask you about internal affairs.  That

1    Exhibit 19 that you saw was a memorandum that -- from

2    the sheriff saying we're disbanding internal affairs?

3    A.    Yes, sir.

4    Q.    That went to everybody; right?  Or to all the

5    important people; right?

6    A.    Yes, sir, all the staff.

7    Q.    Okay.  In other words, the decision to disband

8    internal affairs wasn't like a secret decision made

9    just among the top few people and say, *let's just*

10   *disband this and not tell anybody*?

11   A.    No, sir.

12   Q.    It was broadcast?

13   A.    Well, it was sent to all the section commanders.

14   Q.    Okay.  And there's a lot of sections there;

15   aren't there?

16   A.    Yes, sir.

17   Q.    Okay.  There was never an intent to hide the fact

18   that internal affairs was being disbanded?

19   A.    No, sir.

20   Q.    Okay.  And, in fact, are you familiar with the

21   court cases out of Baton Rouge and New Orleans where

22   the press had filed lawsuits against certain police

23   agencies, saying *we want all your internal affairs*

24   *documents*?

25   A.    Yes, sir.  That occurred during the Katrina

1    hurricane and the officers from Minnesota wanted --

2    they complained about the Baton Rouge officers.  And

3    the Morning Advocate, which is the newspaper, got

4    involved, and they wanted access to IA files of the

5    Baton Rouge Police Department.

6    Q.    And you and the sheriff thought that was a

7    terrible decision?

8    A.    Yes, sir.  Those files are not for public

9    consumption.

10   Q.    That's right.  And as a result, wasn't that a

11   driving force in the sheriff saying, *look, then let's*

12   *just do away with our internal affairs rather than*

13   *comply with that*?

14   A.    I don't know what made him --

15   Q.    Okay.

16   A.    -- disband it.

17   Q.    But did you not discuss this court decision with

18   him?

19   A.    Yes, sir, I did.

20   Q.    Okay.

21   A.    And Attorney Elledge.

22   Q.    Okay.  Now, let's talk about internal affairs for

23   a minute.  When a police officer has allegations made

24   against him, he can't be like a regular citizen and

25   say, *well, I plead the Fifth*.  You know, *I refuse to*

1   *testify*; is that correct?

2   A.    No, sir, nor can he deny a polygraph examination.

3   Q.    That's right.  Are you familiar with the Garrity

4   decision?

5   A.    Yes, sir.  You read it to them before you start

6   interrogating.

7   Q.    That's right.  So unlike all the citizens out

8   here, if a police officer comes up to me and says,

9   *Mr. McLindon, I want to question you about something*, I

10  have a right to remain silent, I don't have to answer

11  any questions; is that correct?

12  A.    Say again, sir, please.

13  Q.    If a police officer comes to my house and says, *I*

14  *want to ask you some questions about something*, I have

15  a Fifth Amendment right to remain silent.  I don't have

16  to answer those questions?

17  A.    Yeah.

18  Q.    We all do?

19  A.    You can lawyer up and just say, *I don't want to*

20  *talk to you*.

21  Q.    That's right.  But a police officer charged in

22  internal affairs does not have that right.

23  A.    No, sir, he doesn't.

24  Q.    He has to talk or else he loses his job.

25  A.    Not necessarily so.  I read 'em the Garrity Act,

```
 1   and in the Garrity Act I tell them if you acknowledge
 2   some criminal behavior, it will stay with me and it
 3   will not be forwarded to anyone for prosecution.  And
 4   that enables them to speak more freely.
 5   Q.   And when you say the Garrity Act, you're actually
 6   referring to a United States Supreme Court case called
 7   Garrity?
 8   A.   Yes, sir.
 9   Q.   And the United States Supreme Court has said if
10   you're a police officer in internal affairs, you cannot
11   lawyer up, you cannot plead the Fifth, you have to go
12   in there and talk?
13        MR. BLUMBERG:  Objection.  That's not what
14   the case says.
15        THE COURT:  That's not exactly what it says.
16   BY MR. MCLINDON:
17   Q.   All right.  You read them the Garrity decision?
18   A.   Yes.
19   Q.   Okay.  And what statements they make in an
20   internal affairs decision cannot be used -- cannot be
21   used against them if there is a subsequent criminal
22   prosecution?
23   A.   That's my understanding of the law.
24   Q.   Okay.  And when this court decision was filed,
25   the result of that would be that those statements would
```

```
 1    now go out to the public; right?
 2              THE COURT:  I'm sorry.  I did not understand
 3    you.
 4    BY MR. MCLINDON:
 5    Q.   When this court decision came out of the Baton
 6    Rouge court and the New Orleans state courts, the end
 7    result of that decision was that now those *Garrity*
 8    statements would be made public?
 9              MR. BLUMBERG:  Objection.
10              THE COURT:  Well, I'm going to sustain the
11    objection.
12    BY MR. MCLINDON:
13    Q.   Would you or did you testify or tell the FBI that
14    about 95 percent of internal affairs complaints are
15    unfounded?
16              MR. BLUMBERG:  Objection.  Relevance.
17              THE COURT:  You may answer.
18              THE WITNESS:  I don't recall the exact
19    number.  Perhaps I said that.  It seems a little high.
20    BY MR. MCLINDON:
21    Q.   Okay.
22    A.   But it could be.
23    Q.   Was that your experience when you did internal
24    affairs?
25    A.   On a state police level --
```

```
 1              THE COURT:  No, no.  Internal affairs at the
 2    Iberia Parish Sheriff's Office.
 3    BY MR. MCLINDON:
 4    Q.   Let's talk about Iberia Parish first.
 5    A.    Iberia Parish, the -- I believe, if I can recall,
 6    we --
 7              MR. BLUMBERG:  Objection, Your Honor, to the
 8    relevance.
 9              THE COURT:  The basis?
10              MR. BLUMBERG:  Relevance as to other
11    investigations, to other people, and what the
12    percentages were in the department.
13              THE COURT:  Well, let's see.  Do you think
14    95 percent of the complaints that you got in internal
15    affairs at the IPSO were valueless?
16              THE WITNESS:  No, sir.
17              THE COURT:  "Yes," "no," or "I don't know."
18              THE WITNESS:  No, sir.  I would think eight
19    out of ten of the complaints that came in were valid,
20    best I can remember.
21              THE COURT:  Okay.  Let's --
22    BY MR. MCLINDON:
23    Q.   Do you remember telling the FBI that it was
24    95 percent during your meeting?
25    A.    No, sir, I don't.  They were asking me for an
```

```
 1   estimate, and I don't --
 2   Q.    Okay.  Fair enough.
 3          Now, you were asked to take some IA files and
 4   destroy them?
 5   A.    Yes, sir.
 6   Q.    Okay.  Were some of those files many, many years
 7   old?
 8   A.    Yes, sir.  I had the file from the previous
 9   administration --
10   Q.    Okay.
11   A.    -- and those that we had accumulated during
12   Sheriff Ackal's tenure.
13   Q.    They were stacked up in boxes taking up room in a
14   storage room of some sort?
15   A.    No, sir.  They were in file cabinets.
16   Q.    Okay.  In file cabinets?
17   A.    Yes, sir.
18   Q.    And they were long since closed files; right?
19   A.    Yes, sir.
20   Q.    Okay.  And so was there really any problem with
21   destroying those?
22   A.    I didn't have a choice.  I was ordered to.
23   Q.    Okay.  But did you see any problem with
24   destroying files that had long since been closed that
25   were just taking up space in a file cabinet?
```

1    A.    I knew I was destroying public property.

2    Q.    Okay.  Now --

3    A.    And it was wrong, Counselor.

4    Q.    Okay.  Now, those were the paper files.  But

5    those files would also be either on a hard drive or on

6    a main server, too, wouldn't they?

7    A.    Yes, sir.

8    Q.    Okay.  So by destroying those paper files, if

9    someone still needed the IA files, they could get to

10   them through the hard drive or the main -- hard drive

11   on a computer or main server?

12   A.    No, sir, they couldn't.  I destroyed those, too.

13   Q.    You destroyed the hard drive?

14   A.    Yes, sir.

15   Q.    Sheriff Ackal never told you to do that.  Did --

16   Sheriff Ackal did not tell you to destroy that hard

17   drive.

18   A.    No, sir.  When I was told by Mr. Elledge to

19   destroy all the files, I took it to mean the hard

20   drives, too, because they contained the cases in the

21   hard drive rather than on paper.  So it was my

22   assumption to destroy it.

23   Q.    So you went into a computer and you pulled the

24   hard drive out?

25   A.    Yes, sir.  You flip the switches, and you lift it

1    out.

2    Q.    And you took it out into a driveway and smashed

3    it with a hammer?

4    A.    With an ax.

5    Q.    With an ax.  Where did you do that?

6    A.    At my home.

7    Q.    Okay.  Who did you tell that you did that?

8    A.    Sir?

9    Q.    Did you tell anybody you did that?

10   A.    Yes, sir.  I told Mr. Elledge.  And my wife

11   thought I was crazy.  She didn't know what I was doing.

12   Q.    Did you tell people that there was another reason

13   you destroyed those hard drives?

14   A.    Yes, sir.

15   Q.    And what was that?

16   A.    I had about 15 or 20 minutes of porn on those

17   computers --

18   Q.    Okay.

19   A.    -- on those hard drives.

20   Q.    Was that the reason that you destroyed the hard

21   drives?

22   A.    No, sir.

23   Q.    Okay.  Was that the reason you told people you

24   destroyed the hard drives?

25   A.    No, sir.  I told Mr. Blumberg everything that was

1    on the hard drives.

2    Q.    You didn't tell anyone else that you had

3    pornography on the -- anyone else at the IPSO that you

4    had pornography on those hard drives?

5    A.    No, sir.

6    Q.    Okay.  Possession of pornography is not a crime.

7    A.    Well, I'm ashamed I did it.  At the time, I

8    suffered a fast-moving prostate cancer that I was given

9    several shots of Lupron and 45 hits of radiation,

10   which, in essence, and to this day has made a eunuch

11   out of me.  And I thought if I looked at a little bit

12   of porn, it would cultivate some interest.  But I have

13   news for you, sir.  It does not.

14   Q.    But you never told anyone else other than

15   Mr. Blumberg that that's why you destroyed the hard

16   drive?

17   A.    Not that I recall, sir.  That's a pretty private

18   thing.  I don't think I said that to anyone.

19   Q.    Ms. Colette Voorhies, could you have told her?

20   A.    Possibly.

21   Q.    Debra Lourde?

22   A.    No, I don't think so.  I don't recall.

23   Q.    Switch subjects a little bit.  Do you know Gerald

24   "Bubba" Savoy?

25   A.    Yes, sir.

```
 1    Q.    You would agree with me that he is a very
 2    dishonest person?
 3    A.    He's a liar, sir.
 4    Q.    Good enough.
 5           THE COURT:  Don't go there.
 6           MR. MCLINDON:  Yes, sir.
 7    BY MR. MCLINDON:
 8    Q.    Now, even though the "N" word was freely tossed
 9    around, you're not aware of any direct racial --
10    attacks on citizens or targeting citizens because they
11    were black unless they were drug dealers?
12    A.    I don't have specific knowledge of that.  I know
13    I didn't do it.  I wasn't in enforcement anymore.  I
14    stayed up in the office.
15    Q.    Mr. Hebert, were there accusations made against
16    you for being responsible for a large amount of money
17    missing from the sheriff's office?
18    A.    No, sir.
19    Q.    You weren't even accused of it?
20    A.    No, sir.  What I recall, two employees went
21    behind my back and looked at the budget and said that I
22    kept saying that we didn't have much money left, and
23    they had said they found 3 or $4 million, and they told
24    the sheriff this.
25           When the sheriff confronted me with this, I
```

1    went berserk.  And I brought in the attorney and the

2    auditor and the audit, and those two employees had made

3    a grave mistake.  We only had 600,000 in the account

4    instead of the 3 or 4 million they purported that was

5    in it.

6    Q.    Well, and that's what I was saying.  Somebody had

7    tried to blame you, but they were wrong.

8    A.    Exactly, sir.

9    Q.    Okay.  Now, did the sheriff believe those people

10   or did he believe you?

11            MR. BLUMBERG:  Objection.  Relevance.

12            MR. MCLINDON:  Well, I'm going towards bias,

13   Your Honor.

14            THE COURT:  Go ahead.

15            THE WITNESS:  He believed the lawyer and

16   myself.  We -- the money was there.  I mean, you

17   know...

18   BY MR. MCLINDON:

19   Q.    All right.

20   A.    And we had passed an audit from the state

21   auditors every year.

22   Q.    But eventually the sheriff fires you?

23   A.    In a way, but I fired myself.  I went home, and I

24   drank two-fifths of wine, and I called up the little

25   sons of bitches that did this to me --

```
1    Q.    The two people --
2    A.    Well, yeah, and all of them I could reach.  There
3    was a gang of them.  And they went to the sheriff and
4    said, That old man has gone off his nut; he's going to
5    kill us.  The sheriff put bodyguards at their home and
6    everything else, which made me feel proud that a
7    75-year-old man could scare young men.
8              But the sheriff would not even let me come in
9    to resign or to quit.  He sent armed officers to my
10   house with all my belongings, that which some of the
11   employees didn't steal.  They brought me what I had in
12   my office.  I had to sign all the papers there, and I
13   was told never to try to contact anyone at Iberia
14   Parish except Mr. Elledge if I needed something,
15   paperwork or validation or something.  And so I was out
16   of a job.
17   Q.    And you told this story to the FBI when you met
18   with them; right?
19   A.    Yes, sir.
20   Q.    And you told the FBI that when Ackal fired you,
21   it was a disgrace.  Did you tell the FBI that when
22   Ackal fired you, it was a disgrace?
23   A.    Well, I left in disgrace.
24   Q.    And you told the FBI that payback is a bitch?
25   A.    Yes, sir.
```

1   Q.    And that day is today.   Today is payback, isn't

2   it?

3   A.    He threw me under the bus and destroyed my

4   reputation, and I'm going to do what I can for him, the

5   truth.

6   Q.    You're going to throw him under the bus, aren't

7   you?

8   A.    I'm going to tell the truth, sir.

9   Q.    Is today payback?

10  A.    If you want to state it that way.

11  Q.    Well, didn't you state it to the FBI?

12  A.    Yes.

13  Q.    Didn't you say --

14  A.    Yeah, yeah.

15  Q.    You've never heard Sheriff Ackal tell anybody to

16  rough people up or beat people up when you were at

17  IPSO.

18  A.    For him to tell someone -- a particular officer

19  to do something?

20  Q.    You've never been present when Sheriff Ackal told

21  an employee to beat somebody up?

22  A.    I've heard him say -- I know to -- to just take

23  care of them, out on the street, generally.   In fact,

24  his original thoughts.   But to say it to a specific

25  officer, I can't recall.

```
1   Q.    He might -- he might say, Hey, take care of this
2   or do that --
3   A.    Yes.
4   Q.    -- but he didn't say, Go beat the hell out of
5   somebody?
6   A.    He never said it in front of me, that I recall.
7   Q.    And you were at that time one of his longest and
8   oldest friends; right?
9   A.    Yes, sir.  But I had my office, and I was not
10  involved in enforcement matters, Mr. McLindon.
11  Q.    Did you do undercover work while you were at the
12  state police?
13  A.    Yes, sir.  Approximately -- I was in deep
14  undercover for about seven years.
15  Q.    And tell us a little bit about what deep
16  undercover means.
17  A.    I was in New Orleans buying heroin.
18  Q.    Okay.  That's risky and dangerous work?
19  A.    Yes, sir.
20  Q.    Okay.  And you have to go in and pose to be
21  somebody that you're really not?
22  A.    Yes, sir.
23  Q.    Okay.  And you have to be able to convince that
24  person that you're a drug dealer and not a cop?
25  A.    Yes, sir.
```

```
1   Q.    Okay.  Now, did you -- in addition to doing that

2   yourself, did you train other officers how to be

3   deceptive and how to lie?

4   A.    Yes, sir.  I extensively trained 12 officers.

5   Q.    On how to go in, lie, fake, complete -- like a

6   completely separate life for a person?

7   A.    Adopt another identity.

8   Q.    Okay.  And you mastered that yourself?

9   A.    Yes, sir.

10  Q.    So you've known Louis Ackal since what year?

11  Since he was 18 years old, you said?

12  A.    Yes, sir.  I recall he and I in conversation.  I

13  remember that.  And then the next time I saw him was

14  when he came to my office and asked to be included in

15  the narcotics squad.

16  Q.    So he has been in law enforcement for, what, over

17  50 years?

18  A.    Yes.  A long time.

19  Q.    Now, are you aware of deputies that were fired by

20  Louis Ackal, while he was sheriff, for improper

21  behavior?

22  A.    Yes, sir.

23  Q.    Okay.  Rough estimate, can you tell us how many?

24       MR. BLUMBERG:  Objection to *improper*

25  *behavior*, Your Honor.  Relevance as to anything other
```

```
 1   than excessive force.
 2            THE COURT:  Sustained.  Rephrase.
 3   BY MR. MCLINDON:
 4   Q.    Are you aware of deputies that were fired for
 5   excessive use of force by Sheriff Ackal?
 6   A.    Yes, sir.
 7   Q.    Okay.  Is it possible for you to give us an
 8   estimate of how many?
 9   A.    When I came back in 2014, the sheriff and I had a
10   discussion, and he says, *If they've used excessive
11   force, you get 'em.*  I had to fire one.  We had body
12   cameras by then.  This guy was -- either the batteries
13   were dead or he had forgotten to turn it on, and he was
14   working over some people.  And when I reported the same
15   to the sheriff, he had me fire him.
16            THE COURT:  It's noon.
17            MR. MCLINDON:  I am about three minutes away,
18   Judge.  I think I can wrap this up.  Okay, Judge.  If I
19   could have just one minute, I might be done, Judge.
20            (Pause in the proceedings.)
21   BY MR. MCLINDON:
22   Q.    Mr. Hebert, real quickly, you testified on direct
23   that when you were in New Orleans as a police officer,
24   you used excessive force?
25   A.    Yes, sir, I did.
```

Q.    Were you investigated for that?

A.    No, sir.

Q.    Okay.  Any -- did you do any -- were you investigated for anything else other than excessive force?

A.    Not while I was undercover, no, sir.

Q.    Or at any time in your law enforcement career, were you investigated for --

A.    Yes, sir.  I dismissed a trooper that was working narcotics, and he alleged that I was a drug abuser, and they made an investigation.  I was completely cleared.

Q.    Nothing -- you were cleared on that.  And -- but the excessive use of force, there was just never an investigation?

A.    On me?

Q.    Yeah.

A.    No, sir.

Q.    Did anyone know about it other than you?

A.    Yes, sir.  I was part of a strike force in New Orleans and in Baton Rouge.  And certainly we -- I was accompanied by federal officers, state officers, and city and sheriff's officers.

Q.    And y'all just kept it amongst yourselves that it happened?

A.    Yes, sir, we did.

1          MR. MCLINDON:  Thank you very much.  That's

2    all I have.

3          THE COURT:  Do you have any redirect?

4          MR. BLUMBERG:  I do, Your Honor.

5          THE COURT:  How long?

6          MR. BLUMBERG:  Maybe 15 minutes.

7          THE COURT:  Well, let's take a break, then,

8    for lunch.  See you at five after 1:00, ladies and

9    gentlemen.

10         THE CSO:  All rise.

11         (The Jury exits the courtroom.)

12         THE COURT:  The Court is in recess until five

13   after 1:00.

14   ( Lunch break recess 12:05 p.m.; to resume 1:05 p.m.)

15                         *    *    *

16

17

18

19

20

21

22

23

24

25

```
1    November 3, 2016                              1:06 p.m.

2                         ---o0o---

3              A F T E R N O O N   S E S S I O N

4                         ---o0o---

5         THE COURT:  Anything before we bring in the

6    jury?

7         MR. BLUMBERG:  No, not from the Government.

8         THE COURT:  Bring them in, please.  Put the

9    witness back up.

10        MR. BLUMBERG:  Yes, sir.

11        THE COURT:  This joint stipulation that you

12   handed me, is it agreed to by counsel?  So you don't

13   know that.

14        MR. JARZABEK:  I do not.

15        THE COURT:  So it's not a joint --

16        MR. JARZABEK:  I believe it is.

17        THE LAW CLERK:  Mr. Blumberg handed it to me.

18        MR. MCLINDON:  That's the stipulation?

19        THE COURT:  You agree to it?

20        MR. MCLINDON:  Yes, sir.

21        THE COURT:  All right.  I'll read it to the

22   Jury at some time.

23             (Pause in the proceedings.)

24             (The Jury enters the courtroom.)

25        THE COURT:  You may all be seated.
```

```
 1              You understand, sir, you are still under
 2   oath.
 3              THE WITNESS:  I do, sir.
 4              THE COURT:  All right.  Redirect.
 5              MR. BLUMBERG:  Thank you, sir.
 6                  REDIRECT EXAMINATION
 7   BY MR. BLUMBERG:
 8   Q.    Mr. Hebert, I want to talk about the disbanding
 9   of internal affairs for a moment, if we can.
10   A.    Yes, sir.
11   Q.    Now, at the time, there were more and more
12   complaints coming from community groups about the
13   policing in the low-income African-American
14   communities; right?
15   A.    That's correct, sir.
16   Q.    And in fact, isn't it true that there were also
17   many articles in the newspaper being written on the
18   topic?
19   A.    Yes, sir, and on the internet.
20   Q.    Do you remember specifically that there were some
21   articles related to the episode that we've described as
22   the N-knocking episode?
23   A.    Yes, sir.
24   Q.    And, in fact, isn't it true that Louis Ackal was
25   quoted in one of those articles?
```

```
1               MR. MCLINDON:  Objection.  Leading.

2               MR. BLUMBERG:  I'll withdraw.

3    BY MR. BLUMBERG:

4    Q.    Do you know whether Louis Ackal was quoted in one

5    of the articles related to the N-knocking episode?

6    A.    I don't remember that, sir.

7    Q.    Would seeing the article refresh your

8    recollection as to whether he was quoted?

9    A.    Yes, sir.

10              (Attorneys conferring.)

11   BY MR. BLUMBERG:

12   Q.    I'm going to show you -- only for you at the

13   moment, Mr. Hebert.  Take a look at that, please.  Take

14   as much time as you need, and I'll turn the page when

15   you're done.

16              (Pause in the proceedings.)

17   BY MR. BLUMBERG:

18   Q.    Tell me when you've finished, sir.  Are you

19   finished?

20   A.    Yeah.  Raise it up.  Okay.

21   Q.    Does that refresh your recollection, sir, as to

22   whether Louis Ackal was quoted about the episode that

23   involved an attack on a couple of young

24   African-American men by narcotics agents?

25   A.    Yes, sir.
```

1    Q.    Now, first, was Louis Ackal honest with the media

2    about what had happened in that episode?

3    A.    Not completely, sir.

4    Q.    No?  Did he indicate at any time that his

5    narcotics agents had gone out and beaten up a couple of

6    African-American kids?

7    A.    No, sir, it didn't say that in the article.

8    Q.    Did the increasing press coverage over

9    allegations of misconduct by the narcotics unit play a

10   role in disbanding the Internal Affairs unit?

11   A.    I don't know that, sir.  I don't know what his

12   reason was.  Perhaps.

13   Q.    Did you have a conversation with Louis Ackal in

14   which he said to you, quote, *It's none of their damn*

15   *business what we do here*?

16   A.    Yes, sir.

17   Q.    Was that conversation in relation to media

18   inquiries about excessive force allegations?

19   A.    Yes, sir.

20   Q.    Was that conversation roughly at the -- take

21   place roughly at the same time that internal affairs

22   was disbanded?

23   A.    As I recall, yes, sir.

24   Q.    When you were on cross-examination, you were

25   asked several questions about your own misconduct when

```
 1    you were at the Louisiana State Police.

 2    A.    Yes, sir.

 3    Q.    Did you reveal your misconduct to people at the

 4    time?

 5    A.    Just those that we worked together.

 6    Q.    Other law enforcement officers?

 7    A.    Yes, sir.

 8    Q.    Did it ever occur to you to go outside and tell

 9    on yourselves at the time?

10    A.    No, sir.

11    Q.    Are you familiar with the phrase code of silence?

12    A.    Yes, sir.

13    Q.    Are you familiar with the phrase thin blue line?

14    A.    Yes, sir.

15    Q.    And what do you understand those phrases to mean?

16    A.    You don't rat out your fellow officers.  You turn

17    the other way, and you just mind your own business.

18    Q.    Were you following a code of silence when you

19    kept the abuses by the narcotics agent and Louis

20    Ackal's encouragement of it secret?

21    A.    Yes.

22    Q.    Were you following the thin blue line at the time

23    that you hid the abuses by the narcotics unit and Louis

24    Ackal's instructions to keep it secret?

25    A.    Yes, sir.
```

Q.    Now, in your decision to get -- your choice to
get payback, are you following the code of silence now?

A.    No, sir.

Q.    Are you following the thin blue line?

A.    No, sir.

Q.    Are you keeping secrets now?

A.    No, sir.  I've told you everything I've done, and
most of it I'm ashamed of.

Q.    Now, are you here because you're just angry at
Louis Ackal?

A.    Yes, that's a part of it, and I want to tell the
truth and just be able to get rid of all this.

Q.    Is it time that you tell the truth about your own
feelings about your own conduct and role in covering
this up?

A.    No, sir.  I was very open with the FBI and with
the federal attorneys.  I told the whole truth, and I
did at the outset completely.

Q.    Tell them about how you feel about your own role
in hiding his abuses.

A.    I'm thoroughly ashamed of my behavior.  I at one
time was a highly-trained officer and a good officer.
And I rose very quickly through the ranks.  I was the
youngest captain in the history of the state police.
And all that legacy is ruined now by my complacency in

```
 1    acts of violence against people.

 2              As I understand, these proceedings are

 3    streaming back to my hometown where my neighbors can

 4    see what I've done.  And I had hoped to finish my

 5    career with the accolades that I received, but I threw

 6    all that away, sir.  And I'm telling the truth.

 7    Q.   The one episode that you described in which you

 8    knew that Louis Ackal had terminated somebody for

 9    excessive force, do you remember talking about that?

10    A.   Yes, sir.  That was officer -- Deputy Albert

11    Babineaux.

12    Q.   Did that episode take place about the time that

13    the federal agents began investigating the allegations

14    of narcotics abuses?

15    A.   When I came back the second time, Ackal told me

16    then, just do what you've got to do, get 'em.

17    Q.   The second time?

18    A.   Yes, sir.

19    Q.   Then he rehired you?

20    A.   Yes, sir.

21    Q.   About the time they started doing business?

22    A.   I think so, sir.  I'm not sure, Mr. Blumberg.

23              MR. BLUMBERG:  Thank you, sir.  That's all I

24    have, Your Honor.

25              THE COURT:  All right.  Is the witness
```

```
 1    excused?

 2              MR. BLUMBERG:  Yes, Your Honor.

 3              MR. MCLINDON:  Yes, Your Honor.

 4              THE COURT:  The witness is excused.  You are

 5    free to go, sir.

 6              Mr. McLindon, you approve this limiting

 7    instruction?

 8              MR. MCLINDON:  Sir?

 9              THE COURT:  You approve this limiting

10    instruction?

11              MR. MCLINDON:  No, sir.  I've asked for more

12    time to look at it.

13              THE COURT:  Okay.  Do you approve this joint

14    stipulation?

15              MR. MCLINDON:  Yes, sir.

16              THE COURT:  Ladies and gentlemen, the parties

17    have agreed and stipulate to the following, and no

18    further evidence need be presented on it:  First,

19    constitutional deprivations under color of law are

20    possible federal offenses.  The Federal Bureau of

21    Investigation is an agency of the United States and

22    investigates allegations of constitutional deprivations

23    under color of law on matters within its jurisdiction.

24              And on or about April 29, 2011, the

25    individuals listed in the indictment as C. O. is Curtis
```

1    Ozenne; S. S., Scott Spears; A. T., Aquilla Thomas; H.

2    G., Harold Guidry; and A. D., Anthony Daye, were

3    pretrial detainees in the Iberia Parish jail in New

4    Iberia, Louisiana, here within the Western District of

5    Louisiana.

6              Okay.  Call your next witness.

7              MR. JARZABEK:  David Hines.

8              THE COURTROOM DEPUTY:  Please raise your

9    right hand.

10             Do you solemnly swear that the testimony you

11   give in this case will be the truth, the whole truth,

12   and nothing but the truth, so help you God?

13             THE WITNESS:  Yes, ma'am.

14             THE COURTROOM DEPUTY:  Could you please spell

15   your first and last name for the Court Reporter?

16             THE WITNESS:  David, D-A-V-I-D.  Last name

17   Hines, H-I-N-E-S.

18             THE COURTROOM DEPUTY:  Thank you.

19                        DAVID HINES,

20    first having been duly sworn by the courtroom deputy,

21             testifies under oath as follows:

22                     DIRECT EXAMINATION

23   BY MR. JARZABEK:

24   Q.   Mr. Hines, where do you live?

25   A.   Sherrington, Louisiana.

```
 1   Q.     And are you currently employed?

 2   A.     Yes, sir.

 3   Q.     Where?

 4   A.     My wife and I own a business, a coffee shop.

 5   Q.     Okay.  Have you previously been employed as a law

 6   enforcement officer?

 7   A.     Yes, sir.

 8   Q.     Where did that career begin?

 9   A.     I began as a reserve officer for Franklin Police

10   Department; that was in 2007.  In 2009, I went full

11   time with the St. Mary Parish Sheriff's Office.  And

12   then in 2010, I went to the Iberia Parish Sheriff's

13   Office.

14   Q.     And how long did you stay there?

15   A.     Until March of 2016.

16   Q.     This year?

17   A.     Yes, sir.

18   Q.     And did you start out as patrol at the Iberia

19   Parish Sheriff's Office?

20   A.     Yes, sir.

21   Q.     And at some point, did you join the narcotics

22   unit?

23   A.     Yes, sir.

24   Q.     And do you remember when that was?

25   A.     I interviewed in October of 2011, and I was
```

1    accepted into the unit in November of 2011.

2    Q.    And what was the last position you held with the

3    Iberia Parish Sheriff's Office?

4    A.    I was a detective in the special investigations

5    unit.

6    Q.    Do you know when you started those duties?

7    A.    September of 2015.

8    Q.    And you kept them until March of the following

9    year?

10   A.    Yes, sir.

11   Q.    Okay.  And did you resign your commission?

12   A.    Yes, sir.

13   Q.    Based on what?

14   A.    The investigation that y'all conducted.

15   Q.    And as a result of that, did you enter a plea of

16   guilty?

17   A.    Yes, sir.

18   Q.    To federal offenses?

19   A.    Yes, sir.

20   Q.    And do you remember a specific event that you

21   pled guilty to?

22   A.    Yes, sir.

23   Q.    What was that event?

24   A.    It was the event with Ray Trosclair.

25   Q.    Okay.  And did you plead guilty to violating

1  Mr. Trosclair's constitutional rights?

2  A.   Yes, sir.

3  Q.   Did that violation involve the use of excessive

4  force?

5  A.   Yes, sir.

6  Q.   Now, when you started with the Iberia Parish

7  Sheriff's Office, was there a contrast to be made

8  between the culture at IPSO and what you had left at

9  the St. Mary Parish Sheriff's Office?

10  A.   Yes, sir.

11  Q.   How would you describe the difference in that

12  culture?

13  A.   It was a bit more heavy-handed.  There was a

14  level of, that I found, arrogance.

15  Q.   Would you include as part of that culture the

16  fact that excessive force was tolerated at the Iberia

17  Parish Sheriff's Office?

18  A.   Yes, sir.

19       MR. BLUMBERG:  Excuse me.  He needs to speak

20  up.

21       MR. JARZABEK:  You have to speak up,

22  Mr. Hines.

23       THE COURT:  You have to speak up, please.

24       THE WITNESS:  Yes, sir.

25  BY MR. JARZABEK:

1    Q.   Now, going back, so let's repeat the last

2    question.

3            Would you describe as part of that culture at

4    the Iberia Parish Sheriff's Office the use of excessive

5    force?

6    A.   Yes, sir.

7    Q.   Okay.  Was there a unit that had a reputation, to

8    your knowledge, that was worse than others?

9    A.   I read in the *Daily Iberian* before starting at

10   Iberia Parish --

11            THE COURT:  Excuse me.

12            MR. MCLINDON:  Objection.

13            MR. JARZABEK:  Nonresponsive.

14   BY MR. JARZABEK:

15   Q.   Did you know of a unit that had a reputation for

16   using more force than any of the other units at the

17   Iberia Parish Sheriff's Office?

18   A.   Yes, sir.

19   Q.   What unit was that?

20   A.   The narcotics unit.

21   Q.   Okay.  Was there a person in that unit that had a

22   reputation for even being more excessive than the

23   others?

24   A.   Yes, sir.

25   Q.   Who was that?

1    A.    Ben Lassalle.

2    Q.    Now, would it be fair to say that before -- you

3    described pleading guilty of the Trosclair incident; is

4    that correct?

5    A.    Yes, sir.

6    Q.    Before the Trosclair incident, would you -- would

7    it be fair to say that you had observed and

8    participated in the use of excessive force before then?

9    A.    Yes, sir.

10   Q.    Now, turning to the Trosclair incident.  Is the

11   date March 14, 2014 about the same time that we're

12   talking about?

13   A.    Sounds correct, yes, sir.

14   Q.    Where were you on that date?

15   A.    I was at my house.

16   Q.    And did you receive a phone call from anybody at

17   the Iberia Parish Sheriff's Office on that date?

18   A.    Yes, sir.

19   Q.    Who?

20   A.    Bret Broussard.

21   Q.    Okay.  Who was Bret Broussard at the time?

22   A.    He was my lieutenant.

23   Q.    Okay.  So we're talking about -- he was the

24   lieutenant of the narcotics unit that you were a member

25   of, and you got a call from him; correct?

```
 1   A.    Yes, sir.

 2   Q.    Now, did he give you any instructions?

 3   A.    He said to go to the sheriff's office.

 4   Q.    Okay.  Did you do so?

 5         THE COURT:  Mr. Jarzabek, maybe you could use

 6   this so that maybe the witness will keep his voice up.

 7         MR. JARZABEK:  Yes, understood.

 8         THE WITNESS:  Sorry.

 9         MR. JARZABEK:  That's okay.

10   BY MR. JARZABEK:

11   Q.    Did you respond to those instructions?

12   A.    Yes, sir.

13   Q.    And what did you do pursuant to them?

14   A.    I drove to the courthouse in Iberia Parish.

15   Q.    And did you meet anybody as you arrived?

16   A.    I met Ben Lassalle in the parking lot.

17   Q.    Okay.  You're talking about Benjamin Lassalle;

18   correct?

19   A.    Yes, sir.

20   Q.    An agent in the narcotics unit; correct?

21   A.    He was a sergeant.  Yes, sir.

22   Q.    Okay.  And after meeting up with him, what did

23   you do?

24   A.    We both walked into the sheriff's office.

25   Q.    Okay.  And who was present in the sheriff's
```

1   office?

2   A.    Sheriff Ackal, Detective Scott Hotard, Mr. Ronald

3   Ackal, and there was another family member there.

4   Q.    Okay.  Now, Scott Hotard, what was his position

5   at the Iberia Parish Sheriff's Office?

6   A.    He was a detective in the elderly abuse program.

7   Q.    And did you understand why he was there?

8   A.    Yes, sir.

9   Q.    Why?

10  A.    He was investigating a case where Mr. Ronald had

11  been injured.

12  Q.    Okay.  And Mr. Ackal -- Ronald Ackal was there;

13  correct?

14  A.    Yes, sir.

15  Q.    Did you understand that Mr. Ronald Ackal was

16  related to the defendant in this case?

17  A.    I don't think it was -- I don't think it was told

18  to me that he was related, but Ackal isn't a common

19  name.

20  Q.    Did you understand that to be the case?

21  A.    Yes, sir.

22  Q.    And did you receive instructions from the sheriff

23  regarding Mr. Trosclair?

24  A.    Yes, sir.

25  Q.    What were those instructions?

1   A.   *You want to arrest him on a warrant.*

2   Q.   Anything else?

3   A.   *Take care of him.*

4   Q.   Did you have an understanding of what that phrase

5   meant?

6   A.   Yes, sir.

7   Q.   What did it mean?

8   A.   I took it to mean to go arrest him and hit him.

9   Q.   Okay.  Did you and Mr. Lassalle carry out those

10  orders?

11  A.   Yes, sir.

12  Q.   Did you locate Mr. Trosclair at the apartment

13  where he shared with Mr. Ackal, Ronald Ackal?

14  A.   No, sir.

15  Q.   Where did you find him?

16  A.   He was in the upstairs apartment.

17  Q.   And did you subdue him?

18  A.   Yes, sir.

19  Q.   Did he offer any resistance?

20  A.   No, sir.

21  Q.   Did you cuff him?

22  A.   Yes, sir.

23  Q.   Was he on the ground?

24  A.   Yes, sir.

25  Q.   After that point, did you use force against him?

1    A.    It was before cuffing him.

2    Q.    And after?

3    A.    I did not, not after he was handcuffed.

4    Q.    Who did?

5    A.    Ben Lassalle.

6    Q.    Now, you stated that you did strike him?

7    A.    Yes, sir.

8    Q.    He was not offering force at the time?

9    A.    No, sir.

10   Q.    Or resistance?  I'm sorry.

11   A.    No, sir.

12   Q.    You've gone through Use of Force training, have

13   you not?

14   A.    Yes, sir.

15   Q.    Did you understand that the force you used

16   against Mr. Trosclair was in compliance with the

17   training you had received?

18   A.    I'm sorry?

19   Q.    Was the force you used against Mr. Trosclair in

20   accordance with the training that you had previously

21   received about using force?

22   A.    No, sir.

23   Q.    Is it in accord with the policies -- of the

24   stated policies of the Iberia Parish Sheriff's Office?

25   A.    No, sir.

1   Q.    What force did you use against Mr. Trosclair?

2   A.    I struck him with my knee several times in his

3   side, and then I struck him two to three times with the

4   baton in the back of his legs.

5   Q.    What kind of baton were you using at the time?

6   A.    It was an expandable baton.

7   Q.    I show you what's been exhibited to the jury as

8   Government's Exhibit 54.  Is this what you're talking

9   about, sir?

10  A.    It was similar.  Yes, sir.

11  Q.    It's a metal baton; right?

12  A.    Yes, sir.

13  Q.    And you struck him with it twice?

14  A.    Yes, sir.

15  Q.    In addition to the blows that you described with

16  your knee; correct?

17  A.    Yes, sir.

18  Q.    After you were finished and he was cuffed, what

19  happened next?

20  A.    We walked him downstairs to the downstairs

21  apartment.

22  Q.    And what happened down there?

23  A.    Ben struck him with a -- with his knee in either

24  his groin or abdomen, somewhere in that area.

25  Q.    Several times?

1    A.    Just one.

2    Q.    Now, and again, Mr. Trosclair at no point was

3    offering any resistance?

4    A.    No, sir.

5    Q.    Was any of the force used by either you or Deputy

6    Lassalle in compliance with what you understood to be

7    the proper use of force?

8    A.    No, sir.

9    Q.    Did you know that what you were doing was wrong?

10   A.    Yes, sir.

11   Q.    Is that why you pled guilty?

12   A.    Yes, sir.

13         MR. JARZABEK:   Approach the witness, Your

14   Honor?

15         THE COURT:   You may.

16   BY MR. JARZABEK:

17   Q.    Mr. Hines, I show you what's been marked for

18   identification purposes as Government's Exhibit 36.

19         Do you recognize that document?

20   A.    Yes, sir.

21   Q.    What document -- what is that, sir?

22   A.    It's my report.

23   Q.    Is that a true report?

24   A.    No, sir.

25   Q.    Does it allege that Mr. Trosclair resisted and

1   that's the reason he got the injuries he did?

2   A.    Yes, sir.

3   Q.    Is that true?

4   A.    No, sir.

5   Q.    So to cover up your actions, you filed a false

6   report; is that correct?

7   A.    Yes, sir.

8   Q.    At the time, did you believe you were following

9   the instructions that you had been given?

10  A.    Yes, sir.

11        MR. JARZABEK:  Move Government's Exhibit 36

12  into evidence.

13        MR. MCLINDON:  No objection.

14        THE COURT:  Without objection.

15  BY MR. JARZABEK:

16  Q.    Now, you've described the culture at the Iberia

17  Parish Sheriff's Office in contrast to the prior

18  employment you had with the Iberia Parish Sheriff's

19  Office -- I mean, the St. Mary's Parish Sheriff's

20  Office; correct?

21  A.    Yes, sir.

22  Q.    Did you hear statements made by the sheriff

23  himself that confirmed in your mind the impression of

24  the difference between those two sheriff's offices?

25  A.    Yes, sir.

```
 1    Q.    On more than one occasion?

 2    A.    Yes, sir.

 3    Q.    Have you heard him use language about the people

 4    that you were dealing with in terms that made them

 5    subhuman?

 6    A.    Yes, sir.

 7    Q.    Did he refer to them as scum?

 8    A.    Yes, sir.

 9    Q.    Animals?

10    A.    Yes, sir.

11    Q.    When you were in the sheriff's office, was there

12    any doubt in your mind at the time that you were

13    receiving your instructions that you and Mr. Lassalle

14    were instructed by the sheriff to go and use excessive

15    force against Mr. Trosclair?

16    A.    I'm sorry.  Can you repeat it, please?

17    Q.    Bad question.  Let me repeat it.

18          At the time you received your instructions

19    from the defendant, Louis Ackal, was there any doubt in

20    your mind what you and Mr. Lassalle were supposed to

21    do?

22    A.    No, sir.

23    Q.    And did you both do exactly what you understood

24    that to be?

25    A.    Yes, sir.
```

1   Q.   And that's why you pled guilty; correct?

2   A.   Yes, sir.

3   Q.   Um, when you were in the sheriff's office

4   receiving your instructions --

5           THE COURT:  Which sheriff's office?

6           MR. JARZABEK:  I'm sorry.  Thank you, Your

7   Honor.

8   BY MR. JARZABEK:

9   Q.   When you were in the defendant's office receiving

10  your instructions regarding Mr. Trosclair, did he tell

11  you that Mr. Trosclair was going to resist being

12  arrested?

13  A.   Yes, sir.

14  Q.   Is there any way for him to have known that,

15  based on what you know?

16  A.   No, sir.

17  Q.   And that he also told you to take care of it;

18  correct?

19  A.   No, sir.

20  Q.   Any doubt in your mind you understood what that

21  to mean?

22  A.   No, sir.

23          MR. JARZABEK:  No further questions, Your

24  Honor.

25          THE COURT:  Your witness.

```
 1                        CROSS-EXAMINATION

 2   BY MR. MCLINDON:

 3   Q.    Mr. Hines, when you were called to the office,

 4   you were called by Bret Broussard; is that right?

 5   A.    Yes, sir.

 6   Q.    And you showed up at the office and it was Bret

 7   Broussard, the sheriff, Ben Lassalle?

 8   A.    No, sir.

 9   Q.    Ben was not there?

10   A.    No, sir, you're wrong.  Bret Broussard was not

11   there.

12   Q.    Okay.  So it was the sheriff, you, Ben Lassalle?

13   Was Hotard there?

14   A.    He was when we went to the office, yes, sir.

15   Q.    Okay.  And the sheriff told you to go arrest

16   Trosclair?

17   A.    Right.

18   Q.    And take care of him?

19   A.    Yes, sir.

20   Q.    Okay.  And Ronald Ackal, the victim of the

21   beating, was there, too?

22   A.    Yes, sir.

23   Q.    And he was an elderly guy?

24   A.    Yes, sir.

25   Q.    His face was all black and blue; is that right?
```

1    A.    Yes, sir.

2    Q.    And his arm was in a sling?

3    A.    That's correct.

4    Q.    Was it apparent from what you saw, he had been

5    beaten pretty badly?

6    A.    Yes, sir.

7    Q.    By Mr. Trosclair?

8    A.    That's what we were told, yes, sir.

9    Q.    Okay.  And you eventually learned Mr. Trosclair

10   was significantly younger?

11   A.    Yes, sir.

12   Q.    Like how old?  40 years old?

13   A.    I would estimate he was in his 40s, late 30s,

14   40s.

15   Q.    And Ronald Ackal is 70?

16   A.    He's elderly, sir.  I'm not sure of his age.

17   Q.    And the sheriff told you that Trosclair had a

18   history of violence?

19   A.    That's correct.

20   Q.    Okay.  So he also told you that there could be

21   prescription drugs or other illegal drugs there?

22   A.    Yes, sir.

23   Q.    You were a narcotics agent; right?

24   A.    That's correct.

25   Q.    So when you went there, were you -- on any

```
 1    arrest, you're a little -- you're on edge, you want to
 2    be careful if you're going to arrest somebody; is that
 3    right?
 4    A.    That's correct.
 5    Q.    But you had been told this guy had a history of
 6    violence; right?
 7    A.    Several times, yes, sir.
 8    Q.    And when you went to arrest him, did he resist a
 9    little bit?
10    A.    No, sir.
11    Q.    Not at all.  But during your arrest, you became
12    very angry because you had pictures of this old man
13    that he had beaten up.
14    A.    Yes, sir.
15    Q.    And that kind of affected you and you got upset
16    and you used excessive force on him?
17    A.    That's correct.
18    Q.    Okay.  Now, when you first interviewed with the
19    FBI, you were not truthful?
20    A.    No, sir.
21    Q.    Okay.  You told them that when you went to arrest
22    Trosclair, he resisted?
23    A.    That's correct.
24    Q.    And that's a lie?
25    A.    That's correct.
```

1    Q.    Okay.  Are you being prosecuted for lying to the

2    FBI?

3    A.    Not that I'm aware of, no, sir.

4    Q.    Now, you said that the sheriff would use names to

5    describe people:  *Scum* and *animals*.  He was referring

6    to drug dealers when he said that; right?

7    A.    Yes, sir.

8    Q.    The narcotics office has its own separate

9    building.  You're not where the sheriff is; right?

10    A.    No, sir.

11    Q.    Is there some type of special key that you guys

12    have to get in there?

13    A.    In -- most the buildings that we had, yes, sir.

14    Q.    Okay.  Did you describe it to the FBI as a covert

15    undercover key fob which narcotics officers would have

16    downloaded to a disk?  Do you remember saying that to

17    the FBI?

18    A.    Referring to...

19    Q.    Referring to getting in and out of the room, I

20    guess.  It's a little confusing.  I can show it to you

21    if it will refresh your memory.

22    A.    If you would like to.

23    Q.    Okay.  So I just want to ask you if you can read

24    this and see if it refreshes your memory.

25          MR. MCLINDON:  This is for the witness only.

```
 1              THE WITNESS:  It will be on this screen here?

 2   BY MR. MCLINDON:

 3   Q.    Yes, sir, it will.  Okay.  If you just -- where I

 4   have highlighted, just read down a few sentences.

 5   A.    Paragraph where it starts with one?

 6   Q.    Yeah, right there.

 7   A.    Utilized --

 8              THE COURT:  No, no, no.  Not aloud.

 9   BY MR. MCLINDON:

10   Q.    No.  Read it to yourself.  Just where it talks --

11   about where my pen is, you can stop there.  Just tell

12   me when you get there.

13   A.    Yes, sir.  I know what he was referring to.

14   Q.    Okay.  Can you explain that to us?

15   A.    That's a camera, a key-fob camera.  It's a covert

16   camera.

17   Q.    So it has nothing to do with you getting in and

18   out of the --

19   A.    No, sir.

20   Q.    Okay.  I just needed some explanation on that.

21   Okay, fair enough.

22              How many times would you estimate you have

23   used excessive force while you --

24   A.    I'm not sure.  I can --

25   Q.    Just an estimate.
```

1    A.    Right.  I don't want to say it too small and you

2    tell me there was more, and I don't want to say too

3    many.

4    Q.    Well, if you said in the grand jury five or six

5    times, does that sound about right?

6    A.    That sounds about right.  Yes, sir.

7    Q.    Now, when you arrest somebody, you fill out an

8    arrest report; right?

9    A.    That's correct.

10   Q.    And you wouldn't always put in the arrest report

11   that you used excessive force?

12   A.    No, sir.

13   Q.    Did you ever fill out a Use of Force form?

14   A.    I don't recall ever filling one out.

15   Q.    And you certainly didn't go bragging and telling

16   everybody that you used excessive force; did you?

17   A.    Usually not outside the unit, no, sir.

18   Q.    Okay.  You would tell your buddies on the

19   narcotics unit?

20   A.    That's correct.

21   Q.    Do you know when your sentencing date is going to

22   be?

23   A.    No, sir.

24   Q.    What do you hope to get out of that?  What do you

25   hope to get at sentencing?

1    A.    I don't know.

2    Q.    You hope to stay out of jail?

3    A.    I would prefer to stay out of jail.

4    Q.    Okay.

5    A.    But to be honest with you, it's not up to me.

6    Q.    It's up to whom?

7    A.    The Judge.

8    Q.    Okay.  But before it gets to the Judge, you

9    understand that the federal prosecutors are going to

10   file a motion and ask for a lesser sentence.  Is that a

11   possibility that could happen?

12   A.    Yes, sir.

13   Q.    Okay.  You certainly hope that that happens?

14   A.    I hope that the Judge is lenient on me.

15   Q.    Okay.  Do you hope that they file the motion,

16   though?

17   A.    Yes, sir.

18   Q.    And if they file that motion, that gives the

19   Judge the vehicle to be lenient on you; right?

20   A.    There is no guarantees in that, no, sir.

21           MR. MCLINDON:  Okay.  Thank you very much.

22           THE COURT:  Redirect?

23           MR. JARZABEK:  Yes, Your Honor.

24                    REDIRECT EXAMINATION

25   BY MR. JARZABEK:

1   Q.   Mr. Hines, you don't know what's going to happen;

2   do you?

3   A.   No, sir.

4   Q.   Has anybody in the federal government promised

5   you anything?

6   A.   No, sir.

7   Q.   Mr. McLindon asked you about use of force in the

8   reports that you filed; correct?

9   A.   Yes, sir.

10   Q.   The report that you previously testified to was

11   filed by you; correct?

12   A.   Yes, sir.

13   Q.   It says that you used force; doesn't it?

14   A.   Yes, sir.

15   Q.   It says the reason you used force was because

16   Mr. Trosclair resisted.

17   A.   That's correct.  Yes, sir.

18   Q.   Are you still confident that that's a lie?

19   A.   Yes, sir.

20   Q.   You made reference during Mr. McLindon's

21   cross-examination to *outside the unit*?

22   A.   Yes, sir.

23   Q.   There was no problem talking about the use of

24   excessive force inside the narcotics unit, was there?

25   A.   No, sir.

1    Q.    In, fact, accepted behavior, wasn't it?

2    A.    Yes, sir.

3    Q.    Did anything Mr. Trosclair say -- I mean,

4    Mr. McLindon say about Mr. Ronald Ackal's condition

5    justify what you did on that day?

6    A.    No, sir.

7    Q.    Anything?

8    A.    No, sir.

9    Q.    When the sheriff told you about his prior

10   history, did you have any doubt about why you were

11   being told that?

12   A.    No, sir.

13   Q.    And why were you being told that?

14   A.    I thought it was going to be to later use it in

15   my report to justify it.

16   Q.    What you did?

17   A.    Yes, sir.

18   Q.    And what Mr. Lassalle did?

19   A.    Yes, sir.

20   Q.    And what you and Mr. Lassalle did was just wrong,

21   wasn't it?

22   A.    Yes, sir.

23            MR. JARZABEK:  No further questions.

24            THE COURT:  All right.  The witness is

25   excused?

```
 1                You're free to go, sir.  Thank you.

 2                Call your next witness.

 3                MR. BLUMBERG:  Your Honor, absent checking

 4     with the court clerk about the admission of all of our

 5     exhibits that we've offered, the Government rests.

 6                THE COURT:  All right.  Subject to that

 7     resting, ladies and gentlemen, if y'all will step out

 8     into the small jury room for just a few minutes.

 9                All rise.

10                (The Jury exits the courtroom.)

11                THE COURT:  You may be seated.  Motion for

12     judgment of acquittal by the defendant on all counts is

13     denied.  There is sufficient evidence, which, if

14     believed by the jury, is sufficient to reach a verdict.

15     And so the motion is denied.

16                Anything -- are you ready for your first

17     witness?

18                MR. MCLINDON:  I am, Your Honor.  My first

19     witness will be Anthony Daye.  But I was wondering if I

20     could have five or ten minutes just to regroup.

21                THE COURT:  Sure.

22                MR. MCLINDON:  And maybe even 15 minutes.

23                THE COURT:  How about ten?

24                MR. MCLINDON:  Ten.  Thank you.

25                THE COURT:  They are in an uncomfortable jury
```

```
 1   room.  Ten minutes.
 2              (Recess taken.)
 3              THE COURT:  We have a couple more minutes
 4   because we have one more juror.  You all can all be
 5   seated until the jury comes back.
 6              (Pause in the proceedings.)
 7              THE COURT:  The opinion testimony by the lay
 8   witness that I allowed in, I allowed in under 701.
 9              MR. BLUMBERG:  Yes, sir.
10              (The Jury enters the courtroom.)
11              THE COURT:  Why don't you all be seated.  If
12   you will raise your right hand and be sworn before you
13   sit down, sir.
14              THE COURTROOM DEPUTY:  Do you solemnly swear
15   the testimony you give in this case will be the truth,
16   the whole truth, and nothing but the truth, so help you
17   God?
18              THE WITNESS:  Yes, ma'am.
19              THE COURTROOM DEPUTY:  Can you please spell
20   your first and last name for the Court Reporter?
21              THE WITNESS:  Anthony, A-N-T-H-O-N-Y, Daye,
22   D-A-Y-E.
23              THE COURTROOM DEPUTY:  Thank you.
24   ***
25   ***
```

ANTHONY DAYE,

 first having been duly sworn by the courtroom deputy,

testifies under oath as follows:

***

***

DIRECT EXAMINATION

BY MR. MCLINDON:

Q.    Good afternoon, Mr. Daye.

Where do you currently live?

A.    Angola, Louisiana, the state penitentiary.

Q.    State penitentiary.  You have to speak up just a

little bit.

A.    Angola, Louisiana, state penitentiary.

Q.    And what kind of sentence are you serving?

A.    A life sentence.

Q.    Okay.  For what?

A.    Possession of marijuana.

Q.    Now, normally people don't get a life sentence

for possession of marijuana.  Why are you doing a life

sentence on possession of marijuana?

A.    Habitual offender.

Q.    Habitual offender?  Does that mean you had

previous felony convictions?

A.    Yes, sir.

Q.    Okay.  Prior to being arrested on the possession

1    of marijuana, were you on the street?

2    A.    Yes, sir.

3    Q.    Okay.  Even though you had prior felonies, had

4    you already done your time on those?

5    A.    Yes, sir.

6    Q.    So you were on the street -- okay.  I want to

7    come back to that.

8            I want to take you to April 29th of 2011.  Do

9    you remember where you were incarcerated at that time?

10   A.    Iberia Parish jail.

11   Q.    Okay.  Something significant happened to you that

12   day?

13   A.    Yes, sir.

14   Q.    Okay.  Was there a shakedown?

15   A.    Yes, sir.

16   Q.    Okay.  Now, at the time of the shakedown, did you

17   get in a fight with another inmate?

18   A.    Yes, sir.

19   Q.    Do you remember his name?

20   A.    Jabrison Lewis.

21   Q.    Okay.  And as a result of that fight, were you --

22   were you disciplined for that fight?

23   A.    Well, I was supposed to be placed on lockdown in

24   J-pod.

25   Q.    In the J-pod lockdown.  But where was the fight?

```
1    A.    In K-2 pod, dormitory.

2    Q.    Okay.

3          MR. MCLINDON:  Can we pull up the map of

4    the --

5          MR. BLUMBERG:  Exhibit 1.

6          MR. MCLINDON:  Yes, number 1 of the -- okay.

7    Can we zoom it?  Thank you, by the way.

8    BY MR. MCLINDON:

9    Q.    Now, do you see where you were -- K-2, is that

10   where the fight was?  Do you see K-2?

11   A.    I don't see it on this -- oh, yeah, I see it

12   right here.

13   Q.    Okay.  Okay.  And you got in a fight there?

14   A.    Yes, sir.

15   Q.    All right.  And so did some guards come to get

16   you?

17   A.    Yes, sir.

18   Q.    Do you remember who it was?

19   A.    I just know his first name was Zach.  I can't

20   pronounce his last name.

21   Q.    Okay.  And did he escort you out?

22   A.    Yes, sir.

23   Q.    And this was because of the fight?

24   A.    Yes, sir.

25   Q.    And where were you going?
```

1    A.    He placed me in the education building.

2    Q.    Is that -- it's not marked on there, but do you

3    know which one the education building is?  Would you

4    know?

5    A.    No, I can't.

6    Q.    Okay.  And you weren't beat in the education

7    building, were you?

8    A.    No, sir.

9           MS. BOYD:  Objection.  Leading.

10   ***

11   BY MR. MCLINDON:

12   Q.    Did you -- did you leave the education building?

13   A.    Yes, sir.

14   Q.    How?  Did somebody escort you?

15   A.    The same guy that escorted me to J-pod.

16          THE COURT:  Okay.  You have to speak up, sir,

17   so they can hear you.

18          And maybe it would be best if you came over

19   here, Mr. McLindon.  It seems to help.

20          MR. MCLINDON:  Yes, sir.

21          THE WITNESS:  The same guy, Zach, that was

22   escorting me to J-pod.

23   BY MR. MCLINDON:

24   Q.    Okay.  And, Mr. Daye, I'm not sure if you know

25   how to use the trace on that screen, but can you try

```
 1   and trace from where --
 2            THE COURT:  Use your finger and touch the
 3   screen.
 4   BY MR. MCLINDON:
 5   Q.   -- where you went?
 6            MR. MCLINDON:  Is it working?
 7            THE COURT:  Just drag it, if you can.
 8            THE WITNESS:  Yeah.  I'm trying to see the
 9   route.  We came from the education building to the
10   chapel.
11   BY MR. MCLINDON:
12   Q.   Well, originally were you going to the J-pod?
13   A.   I was being escorted to J-pod --
14   Q.   Okay.
15   A.   -- from K-2.  We stopped at the chapel for a
16   second.
17   Q.   Let's go a step at a time.  On your way to J-pod,
18   what happened?
19   A.   The sergeant, Zach, he told me to wait in the
20   education building for him to get an okay to see where
21   I was being housed at.
22   Q.   Slow down just a little bit.  Can you say it
23   again?
24   A.   Officer Zach, he told me to stay in the education
25   building for a second while he was going to see where I
```

1    was being housed at.

2    Q.   Okay.

3    A.   And he came back a few minutes later and said I

4    was going to J-pod.

5    Q.   Okay.  So you were on your way to J-pod.  And

6    what happened?

7    A.   We was stopped in front of the chapel along in

8    here.

9    Q.   All right.  Who stopped you?

10   A.   To be honest, I don't really know exactly who it

11   was.  It was a few officers.  Like I say, the only ones

12   I really recognized was Jason Comeaux, Wade Bergeron

13   and Ben Lassalle.  The other officers, I don't know

14   them by name.  It was my first time seeing them.

15   Q.   Do you know what Sheriff Louis Ackal looks like?

16   A.   Yes, sir.

17   Q.   Did you see him there?

18   A.   No, sir.

19   Q.   Okay.  Well, what happened when you got to the

20   chapel?  I thought you were supposed to go to J-pod.

21   A.   Yeah.  They stopped us along the chapel, these

22   officers.  We were being transported to J-pod, but the

23   officers that was in front of the chapel, they stopped

24   Officer Zach and told him that they would escort me

25   instead, and I was led to the chapel.

1   Q.    When you walked to the chapel, do you remember

2   who you saw?

3   A.    Wade Bergeron, Jason Comeaux, and Byron Lassalle.

4   Q.    Did you see Sheriff Louis Ackal?

5   A.    No, sir.

6   Q.    Were there any other inmates in there?

7   A.    Harold Guidry.

8   Q.    Was he being beaten when you walked in?

9   A.    No, sir.

10  Q.    Okay.  Well, what did they do with you when you

11  got in there?

12  A.    I was told to get on my knees.

13  Q.    Okay.

14  A.    And they told the other inmate to step out.

15  Q.    I'm going to slow you down, sir.  You went in and

16  Guidry left?

17  A.    Yes, sir.

18  Q.    What happened to you next?

19  A.    They started beating me with batons.

20  Q.    Who?

21  A.    Wade Bergeron, Jason Comeaux, and Byron Lassalle.

22  Q.    How many total officers were in there, if you

23  know?

24  A.    I couldn't tell you.

25  Q.    Was it more than those three guys?

```
1    A.    To my knowledge, it was.

2    Q.    Okay.  Was the sheriff in there at any time?

3    A.    I didn't see him.

4    Q.    Now, after you got beat, what happened?

5    A.    I was drug -- carried to the J-pod.

6    Q.    Okay.  Can you finish tracing your path to the

7    J-pod?

8    A.    Yeah, it was here.  I was carried along here, up

9    into the J-pod (indicating).

10   Q.    All right.  And who did you see when you got

11   right there?

12   A.    The sheriff.

13   Q.    Okay.  Was somebody standing with him?

14   A.    Ms. Bruno.  There was a few other people.  The

15   one I recognized was Ms. Bruno.

16   Q.    Was that the first time you saw the sheriff?

17   A.    Yeah, that day.  Yes, sir.

18   Q.    And did you say something to him?

19   A.    I just told him that they beat me.  I said, *They*

20   *beat me, Sheriff.*

21   Q.    Okay.  And what did he say?

22   A.    He said, *Nobody beat you.  Get your ass in there.*

23   Q.    Okay.  And you went into the J-pod?

24   A.    Yes.

25   Q.    Okay.  You never at any time saw the sheriff in
```

```
 1   the chapel?

 2   A.    Not to my knowledge.

 3   Q.    And you never -- did you ever see him following

 4   you down that path that you just drew for us up there?

 5   A.    No, sir.

 6   Q.    And he wasn't in front of you as you were

 7   walking?

 8   A.    No.  The only time I seen him was when he was

 9   standing in front of the J-pod door.

10   Q.    When you first went in the chapel, what happened

11   to Guidry?  Did he leave?

12   A.    Yeah.  They escorted him out.

13   Q.    Did they shut the door to the chapel?

14   A.    Yeah, to my knowledge, they did.

15   Q.    It's a big, heavy door?  Is it a heavy door, like

16   a jailhouse door?

17   A.    Not really.

18   Q.    Okay.

19   A.    It got curtains on the windows and stuff.  It's

20   not really a heavy door like that.

21   Q.    Did they cover up the windows?

22   A.    Yeah, they closed the curtains.

23   Q.    And shut the door?

24   A.    Yes, sir.

25   Q.    After you walked in, how quickly did they shut
```

```
 1    that door?
 2    A.    I guess when -- when I was coming in, they was
 3    telling the guy, Harold, to leave.  So upon him
 4    leaving, they must have shut the door at the time
 5    there.
 6    Q.    Okay.  Did you hear anybody yelling while you
 7    were being beat?
 8    A.    They was just saying stuff like calling me
 9    nigger, calling me a murderer, just calling me names
10    and stuff.
11    Q.    Who?  The guys beating you did?
12    A.    Yes, sir.
13    Q.    Did you hear any other yelling in the background,
14    that you remember?
15    A.    Not to my knowledge.
16    Q.    Okay.  Do you know -- prior to that day, did you
17    know Officers Bergeron, Lassalle and Comeaux?
18    A.    Yes, sir.
19    Q.    How?  How did you know them?
20    A.    These were my arresting officers.
21    Q.    Okay.  Arresting officers on what charge?
22    A.    The possession of marijuana charge.
23    Q.    Was -- did that occur after this or before?
24    A.    It occurred before.
25    Q.    Okay.  Before they arrested you, did these
```

```
 1    officers come and talk to you?
 2    A.    Before they arrested me?
 3    Q.    Before you got -- you got arrested on possession
 4    of marijuana.
 5    A.    Yes, sir.
 6    Q.    Before that, did these officers come and have a
 7    discussion with you, a talk with you?  Did they want
 8    you to do something?
 9    A.    Yes, sir.
10    Q.    What did they want you to do?
11    A.    Be a CI.
12    Q.    What's a CI?
13    A.    A confidential informant.
14    Q.    Tell the jury what that is.  What does that mean?
15    A.    I guess to tell on people on the streets and set
16    people up to get them in jail.
17    Q.    And did you do it?
18    A.    No, sir.
19    Q.    You told them you didn't want to do it?
20    A.    Yes, sir.
21    Q.    And what happened shortly after that?
22    A.    They planted a bag of marijuana on me and put me
23    in jail.
24    Q.    Tell us about that.  How did they plant that
25    marijuana on you?
```

1    A.    Well, I was going on my -- to visit my

2    girlfriend; she was at work.  And I was approached by

3    these officers, Byron Lassalle and Wade Bergeron.  And

4    they apprehended me, or whatever, and started talking

5    to me and asked if I wanted to come down and speak with

6    them.  I told them *no*.  They handcuffed me and brought

7    me down anyway and told me for possession of marijuana,

8    for the bag of marijuana.

9    Q.    Any doubt in your mind that they dropped that

10   marijuana down on you?

11   A.    No, there is no doubt in my mind.  I know they

12   did.

13   Q.    And that possession of marijuana charge got you

14   life in Angola?

15   A.    Yes, sir.

16            MR. MCLINDON:  No further questions.

17            THE COURT:  Cross-examination?

18            MS. BOYD:  Yes, Your Honor.

19                     CROSS-EXAMINATION

20   BY MS. BOYD:

21   Q.   Good afternoon, Mr. Daye.

22   A.   Hello.

23   Q.   Make sure you lean in and speak into that

24   microphone; okay?

25   A.    Yes, ma'am.

1   Q.    You were housed at the Iberia Parish jail in

2   April of 2011; is that correct?

3   A.    Yes, ma'am.

4   Q.    And when you were housed there at that time, you

5   were waiting to go to court?

6   A.    Yes, ma'am.

7   Q.    You had not been convicted of anything yet?

8   A.    No, ma'am.

9   Q.    You were taken to the chapel on April 29th of

10  2011 by narcotics officers; is that correct?

11  A.    I think it was an IMPACT officer, the guy, Zach.

12  Q.    And then who ultimately brought you into the

13  chapel?

14  A.    Narcotics.

15  Q.    So it was the narcotics officers that took you

16  inside the chapel?

17  A.    Yes, ma'am.

18  Q.    The day before you were taken into the chapel,

19  you saw the defendant, the sheriff, at the jail; is

20  that correct?

21  A.    Yes.  Yes, ma'am.

22  Q.    And he was there on the rec yard with you and

23  some other inmates; is that right?

24  A.    Yes, ma'am.

25          MR. MCLINDON:  Objection, Your Honor.  The

```
 1    day before is beyond the scope of the indictment and

 2    not clearly 404(b) evidence.

 3           MS. BOYD:  Your Honor, it goes to the state

 4    of mind of the defendant as it relates to this

 5    particular inmate.  I do believe that is at issue in

 6    this indictment.

 7           THE COURT:  Give me just one second.

 8           (Pause in the proceedings.)

 9           THE COURT:  I'm going to sustain the

10    objection.

11           MS. BOYD:  Your Honor, may I offer a proffer

12    of what the testimony would be and its relevance at the

13    bench?

14           THE COURT:  Come over here and tell me.

15           (Sidebar discussion begins.)

16           MS. BOYD:  The defendant was at the jail the

17    day before and singled out Mr. Daye, identified him on

18    the rec yard and targeted him there for some abuses.

19           THE COURT:  How did he do that?

20           MS. BOYD:  He asked who the inmate was who

21    was scratching himself on the yard.  And when he found

22    out it was Anthony Daye, he started to yell about the

23    cameras already being off and to set the dogs on him.

24           At that time in the rec yard, he also made

25    some comments regarding the race of the inmates.  So he
```

```
 1   knew who Anthony Daye was the day before he told those

 2   officers to take him into the chapel.  I think that's

 3   relevant.

 4            MR. MCLINDON:  Your Honor, if that's true,

 5   that's the first time I've heard it.  That's not been

 6   discussed in a 404(b) or any --

 7            MS. BOYD:  That's in actually Anthony Daye's

 8   302.  You have called Mr. Daye as your witness.  It's

 9   in his 302.

10            MR. MCLINDON:  About the cameras being off

11   isn't.

12            MS. BOYD:  He called him as his witness.

13            MR. MCLINDON:  It was beyond the scope and

14   not identified in 404(b) evidence.  I'm being ambushed.

15            THE COURT:  How do you think 404(b) applies

16   here?

17            MR. MCLINDON:  It's not charged in the

18   indictment.  How else should it come in?

19            (Sidebar discussion concludes.)

20            THE COURT:  Let me reverse myself.  You may

21   proceed.

22   BY MS. BOYD:

23   Q.   Mr. Daye, the day before you were taken to the

24   chapel, you saw the defendant at the jail; is that

25   correct?
```

1    A.    Yes, ma'am.

2    Q.    He was in the rec yard with you and some other

3    inmates?

4    A.    Yes, ma'am.

5    Q.    Can you describe to the jury what the defendant

6    was saying on the rec yard that day?

7    A.    He told everyone to stand up against the wall,

8    all strip search to our boxers, the whole dorm.  We was

9    told not to move.  I was in the process of moving

10   because something was on me, and I was scratching.  And

11   he said, *Mother F'er, didn't I tell you don't move?*

12           And he asked -- and I was trying to explain

13   to him the reason I was moving, and he asked the

14   Warden, who was standing beside him, what was my name.

15   And when the Warden said my name, that's when he

16   started calling me a murderer and calling us monkeys

17   and --

18           THE COURT:  Okay.  Next question.

19   BY MS. BOYD:

20   Q.    You were singled out by the defendant that day?

21   A.    Yes, ma'am.

22   Q.    Did he make any comments regarding the cameras in

23   the jail at that time?

24   A.    Yes, ma'am.

25   Q.    What comments did he make about the cameras?

```
 1    A.    Said he would cut the cameras out and he would
 2    let the dogs bite on our ass and stuff like that.
 3    Q.    Now, the day after the defendant singled you out
 4    on the rec yard, you were taken to the chapel by the
 5    narcotics officers?
 6    A.    Yes, ma'am.
 7    Q.    You said initially there was an officer named
 8    Zach who escorted you from the pod?
 9    A.    Yes, ma'am.
10    Q.    And you were being escorted away from the pod
11    because there had been a fight?
12    A.    Yes, ma'am.
13    Q.    Another inmate had tried to come and be
14    aggressive with you?
15    A.    Yes, ma'am.
16    Q.    So it was the other inmate who started that
17    fight?
18    A.    Yes, ma'am.
19    Q.    You weren't injured in any way --
20    A.    No, ma'am.
21    Q.    -- from that altercation?
22    A.    No, ma'am.
23    Q.    One thing I want to remind you is make sure you
24    let me finish my question first because she's taking
25    down what you are saying, and I don't want to get in
```

1    trouble with her; okay?

2    A.    All right.

3    Q.    So you weren't injured in any way by that fight

4    in the dorm, were you?

5    A.    No, ma'am.

6    Q.    So as you were walked away from your pod, you

7    were placed in handcuffs?

8    A.    Yes, ma'am.

9    Q.    And then Officer Zach walked you -- you thought

10   you were going to go to lockdown?

11   A.    Yes, ma'am.

12   Q.    But on the way, that's not what happened?

13   A.    No, ma'am.

14   Q.    You were stopped by those narcotics agents by the

15   chapel; is that correct?

16   A.    Yes, ma'am.

17   Q.    And there were other officers standing around the

18   chapel as well?

19   A.    Yes, ma'am.

20   Q.    And you were taken inside the chapel by those

21   agents?

22   A.    Yes, ma'am.

23   Q.    And when you got inside the chapel, you saw

24   another inmate inside there, didn't you?

25   A.    Yes, ma'am.

1    Q.    And that inmate was being intimidated by

2    narcotics agents?

3    A.    (Nodding in the affirmative.)

4    Q.    Is that correct?

5    A.    Could be.

6    Q.    Well, you saw Mr. Harold Guidry in there?

7    A.    Yes, ma'am.

8    Q.    And those officers were intimidating him?

9    A.    Could be.  They was on him.  I don't know what

10   they was doing.  As soon as I went in, they told him to

11   step out.

12   Q.    Okay.  So Mr. Guidry was in the chapel?

13   A.    Yes, ma'am.

14   Q.    When you got inside the chapel?

15   A.    Yes, ma'am.

16   Q.    And those officers were leaning over him?

17   A.    Yes, ma'am.

18   Q.    And Mr. Guidry looked like he was scared?

19   A.    Yes, ma'am.

20   Q.    And those officers had their batons with them,

21   didn't they?

22   A.    Yes, ma'am.

23   Q.    Now, when you were brought into the chapel, you

24   were placed on your knees?

25   A.    Yes, ma'am.

1    Q.    Now, you said you believed that Mr. Guidry was

2    taken outside of the chapel?

3    A.    Yes, ma'am.

4    Q.    But when you got into the chapel, those officers

5    surrounded you, didn't they?

6    A.    Yes, ma'am.

7    Q.    And they started to hit you with their batons,

8    didn't they?

9    A.    Yes, ma'am.

10   Q.    So it's possible that you didn't actually see

11   what happened to Mr. Guidry after this, isn't it?

12   A.    Yes, ma'am.

13   Q.    Because you were surrounded by those officers?

14   A.    Yes, ma'am.

15   Q.    And at that point, your focus was on your safety?

16   A.    Myself, yes, ma'am.

17   Q.    Okay.  So you don't know actually where

18   Mr. Guidry went?

19   A.    No, ma'am.

20   Q.    So when you were brought into that chapel and

21   placed on your knees, what was it that those officers

22   did?

23   A.    They began beating me with the batons, kicking me

24   and calling me names and stuff.

25   Q.    So as they were striking you with those batons,

1    did you fall over onto the ground?

2    A.    Yes, ma'am.

3    Q.    And when you fell over onto the ground, were your

4    hands still handcuffed?

5    A.    Still handcuffed.

6    Q.    And those officers were striking you with their

7    batons?

8    A.    Yes, ma'am.

9    Q.    Now, you described the three officers you knew by

10   names?

11   A.    I knew by name.

12   Q.    Mr. Lassalle, Mr. Comeaux, and Mr. Bergeron?

13   A.    Yes, ma'am.

14   Q.    But there were other officers there as well?

15   A.    Yes, ma'am.

16   Q.    That you did not recognize?

17   A.    Did not recognize.

18   Q.    And they were surrounding you as well?

19   A.    Yes, ma'am.

20   Q.    So you couldn't see at that point who else could

21   have come into the chapel while you were being hit by

22   batons by those officers?

23   A.    No, ma'am.

24   Q.    It's possible that other people walked into the

25   chapel while you were being beaten?

1   A.   It could be possible.

2   Q.   Now, you said you thought that the door had been

3   closed behind you?

4   A.   Yes, ma'am.

5   Q.   But the truth of the matter is you don't know

6   whether or not the door was closed behind you?

7   A.   No, ma'am.  I was pretty much trying to protect

8   myself.

9   Q.   So at that point, you were trying to protect

10  yourself, but were you actually able to defend yourself

11  from the blows?

12  A.   I was just trying to ball up as much as I can to

13  eliminate the blows.

14  Q.   But were you able to actually eliminate those

15  blows --

16  A.   No.

17  Q.   -- when you balled yourself up?

18        Now, at no time when you were in the chapel,

19  did you ever try to advance on any of those officers.

20  A.   No, ma'am.

21  Q.   Or threaten them?

22  A.   No, ma'am.

23  Q.   Okay.  So while that was occurring, you don't

24  know who came into that chapel, do you?

25  A.   No, ma'am, I don't know.

1   Q.   You don't know whether or not the sheriff, the

2   defendant, walked in while you were being beaten?

3   A.   No, ma'am.

4   Q.   It's possible that he could have?

5   A.   It's possible.

6   Q.   But you wouldn't know that at the time, would

7   you?

8   A.   No, ma'am.

9   Q.   Because you were focused on your safety?

10  A.   Yes, ma'am.

11  Q.   And surviving?

12  A.   Yes, ma'am.

13  Q.   Now, as those officers struck you, you were

14  asking them to stop; weren't you?

15  A.   I was screaming in pain.  I probably maybe asked

16  them to stop.

17  Q.   But you were screaming out in pain?

18  A.   Yes, ma'am.

19  Q.   And nobody responded to your calls of pain?

20  A.   No, ma'am.

21  Q.   Those officers kept hitting you?

22  A.   Yes, ma'am.

23  Q.   And as you were screaming in pain, those officers

24  were also yelling at you?

25  A.   Yes, ma'am.

Q.    It was loud in there?

A.    Yes, ma'am.

Q.    There was a lot of stuff going on?

A.    (Nodding in the affirmative.)

Q.    Is that true?

A.    Yes, ma'am.

Q.    So as a result of that loud environment, could you hear everything that was being said to you in the chapel?

A.    No, ma'am.

Q.    Is it possible that there were other people saying things to you that you didn't hear?

A.    Yes, ma'am, it is possible.

Q.    Is it possible there was a dog in there with you as well and you didn't see them either?

A.    It could be.

Q.    Because you were surrounded by those officers?

A.    Yes, ma'am.

Q.    Now, you said those officers were striking you and you were calling out in pain?

A.    Yes, ma'am.

Q.    Did anybody in that room try to stop any of those people from beating you?

A.    No, ma'am.

Q.    Did anyone ever tell them, *that's enough, stop*?

1    A.    No, ma'am.

2    Q.    They beat you until you weren't able to walk on

3    your own?

4    A.    Yes, ma'am.

5    Q.    You had to be helped out of the chapel that day?

6    A.    Yes, ma'am.

7    Q.    Now, those officers had to go and assist you in

8    getting out of the chapel, didn't they?

9    A.    Yes, ma'am.

10   Q.    And that took a few minutes?

11   A.    Yes, ma'am.

12   Q.    Because they had to pick you up and carry you

13   out?

14   A.    Yes, ma'am.

15   Q.    Actually drag you out of there?

16   A.    Yes, ma'am.

17   Q.    So you don't know who could have left the chapel

18   before you were dragged out, do you?

19   A.    No, ma'am.

20   Q.    It's possible that someone like the sheriff could

21   have left before you were dragged out?

22   A.    Yes, ma'am.

23   Q.    And then when you were dragged out, you were

24   dragged along, and you needed medical care, didn't you?

25   A.    Yes, ma'am.

1    Q.    You needed help because you weren't able to walk?

2    A.    Yes, ma'am.

3    Q.    And you were hurting?

4    A.    Yes, ma'am.

5    Q.    Now, as you were being dragged out, did you pass

6    somebody in the hallway who could have helped you?

7    A.    The sheriff, Louis Ackal, and Miss Bruno.

8    Q.    So you passed the defendant as you were being

9    dragged out of the chapel?

10   A.    Yes, ma'am.

11   Q.    And that was somebody who could have helped you;

12   right?

13   A.    Yes, ma'am.

14   Q.    He could have gotten you medical care?

15   A.    Yes, ma'am.

16   Q.    He could have spoke to those officers?

17   A.    Yes, ma'am.

18   Q.    Could have told them what they did was wrong?

19   A.    Yes, ma'am.

20   Q.    Did he do that?

21   A.    No, ma'am.

22   Q.    Did you ask him for help?

23   A.    Yes, ma'am.

24   Q.    What did you say to him?

25   A.    I said, *Sheriff, they beat me*.

1  Q.    What was the defendant's response?

2  A.    *Nobody beat you.  Get your ass in there.*

3  Q.    Did he ever get you to medical care?

4  A.    No, ma'am.

5  Q.    Did you even get medical care that day?

6  A.    No, ma'am.

7  Q.    It wasn't until the next day that they came to

8  get you medical care?

9  A.    Yes, sir.

10 Q.    And who was it that came to get you care?

11 A.    Ms. Celestine; she was a lieutenant.

12 Q.    Now, at that point, you were in your cell?

13 A.    Yes, ma'am.

14 Q.    And you were unable to walk on your own?

15 A.    Yes, ma'am.

16 Q.    So Ms. Celestine had to get a wheelchair to

17 assist you?

18 A.    Yes, ma'am.

19 Q.    And that's when you finally got medical care?

20 A.    Yes, ma'am.

21 Q.    Now, it wasn't just that day after that you were

22 unable to walk, was it?

23 A.    No, ma'am.

24 Q.    How long after that beating was it before you

25 could walk again on your own?

1    A.    I would say maybe two to three weeks.

2    Q.    And after that, did you have any additional

3    injuries?

4    A.    Just basically emotional.  Besides the pain,

5    that's about it, just emotional.

6    Q.    So the physical pain was with you for a couple of

7    weeks?

8    A.    Yes, ma'am.

9    Q.    But the actual emotional impact of that lasted

10   much longer, didn't it?

11   A.    For the rest of my life.

12   Q.    It's still with you here today?

13   A.    Yes, ma'am.

14           MS. BOYD:  No further questions, Your Honor.

15           THE COURT:  Redirect?

16           MR. MCLINDON:  Yes, sir.

17                   REDIRECT EXAMINATION

18   BY MR. MCLINDON:

19   Q.    Mr. Daye, just following up on some questions

20   with Ms. Boyd.  When you're watching the chapel --

21   well, as you're walking towards the chapel, you did not

22   see the sheriff?

23   A.    Yes, sir.

24   Q.    And when you walked in the chapel, you did not

25   see the sheriff?

1    A.    Yes, sir.

2    Q.    Do you remember the door being shut when you

3    walked in?

4    A.    It could have been.  But like I says, stuff

5    happening so fast and so much going on, I really didn't

6    pay attention.

7    Q.    And when you got up from the beating, did you see

8    the sheriff?

9    A.    I didn't get up.  I was drug.  I was helped up.

10   I didn't see him at that particular time.

11   Q.    Okay.  And like you said earlier, you didn't see

12   him until you got all the way to J-pod?

13   A.    Yes, ma'am -- sir.

14   Q.    Did you hear a dog barking when you were in the

15   chapel?

16   A.    I didn't pay attention.  If I did, I didn't pay

17   attention to it.

18   Q.    Now, you didn't leave the chapel in the

19   wheelchair; did you?

20   A.    No, sir.

21   Q.    Okay.  That was later?

22   A.    Yes, sir.

23   Q.    Okay.  When you saw the sheriff, he was with Miss

24   Bruno.  Did Miss Bruno say anything to you?

25   A.    No, sir.

1    Q.    Okay.  Did the sheriff -- do you remember did the

2    sheriff say anything about you being in that fight?

3    A.    No, sir.

4    Q.    You don't remember him saying that.  Okay.

5            MR. MCLINDON:  Okay.  Thank you very much.

6    That's all I have.

7            THE COURT:  All right.  The witness is

8    excused?

9            MR. BLUMBERG:  From the Government, Your

10    Honor.

11            MR. MCLINDON:  Yes, he is.

12            THE COURT:  My ruling on the reversal of my

13    initial ruling was under 404(b)2(B).  The witness is

14    the defendant's witness, was not on the Government's

15    witness list; and, therefore, if it was 404, prior

16    notice was not given for good cause.

17            MR. MCLINDON:  Well, Your Honor, just for the

18    record, he was on the original Government's witness

19    list and was taken off last Friday.

20            THE COURT:  Well, all right.

21            MR. MCLINDON:  And when I received my 404(b)

22    evidence --

23            THE COURT:  Okay.  I've ruled.  Call your

24    next witness.

25            MR. MCLINDON:  Captain Anthony Green is

```
 1   coming in.

 2            THE COURT:  I guess you should also note that

 3   you did have the 302.

 4            MR. MCLINDON:  I did.

 5            (Pause in the proceedings.)

 6            MR. MCLINDON:  Your Honor, I interviewed this

 7   witness.  I just talked to him.  Can I go look and see

 8   where he is?  I don't know why he's not coming in.

 9            THE COURT:  Yes, please.

10            MR. MCLINDON:  I apologize.  My apologies.

11            THE COURT:  You go around this way, sir.

12            THE COURTROOM DEPUTY:  Please raise your

13   right hand.

14            Do you solemnly swear that the testimony you

15   will give will be the truth, the while truth, and

16   nothing but the truth, so help you, God?

17            THE WITNESS:  I do.

18            THE COURTROOM DEPUTY:  Can you please spell

19   your first and last name for the Court Reporter.

20            THE WITNESS:  A-N-T-H-O-N-Y, G-R-E-E-N.

21            THE COURTROOM DEPUTY:  Thank you.

22                      ANTHONY GREEN,

23    first having been duly sworn by the Courtroom Deputy,

24              testifies under oath as follows:

25   ***
```

```
 1                    DIRECT EXAMINATION

 2   BY MR. MCLINDON:

 3   Q.    Mr. Green, by whom are you employed?

 4   A.    Iberia Parish Sheriff's Office.

 5   Q.    And how long have you been working there?

 6   A.    Eight years.

 7   Q.    Okay.  Give us a little bit of your history.

 8   Let's start with the military.  Have you ever been in

 9   the military?

10   A.    I spent four years in the United States Marine

11   Corps, 13 months in Vietnam.

12   Q.    Okay.  And after that, what did you do?

13   A.    I was employed by the United States Postal

14   Service, spent 34 years with the United States Postal

15   Service.

16   Q.    And retired?

17   A.    I retired as a postmaster.  I reached the rank or

18   the level of executive, spent some years at the

19   headquarters in Washington, D.C.

20   Q.    And what year did you retire there?

21   A.    I retired in 2002.

22   Q.    Anything between then and when you went to work

23   for the sheriff's office?

24   A.    I did some teaching, school teaching.

25   Q.    Okay.  Are you a POST-certified officer?
```

1    A.    Yes, sir, I am.

2    Q.    Okay.  And where did you do that training?

3    A.    I had 2 at correctional academy, at the training

4    center in Lafayette, and I took Level 1 training

5    academy in Lafayette.

6    Q.    Now, you're POST-certified, but are you a patrol

7    officer on the streets at IPSO?

8    A.    Presently, I'm the fleet manager for the Iberia

9    Parish Sheriff's Office.

10   Q.    And what does that mean?

11   A.    I take care of the fleet, the -- we have an auto

12   shop that repair, paint, put -- we take cars that are

13   just raw and make them worthy for police work.

14   Q.    Prior to fleet, what did you do?

15   A.    When I was first hired, I was the purchasing

16   agent for the sheriff's office, spent some time in

17   community policing, and also Neighborhood Watch was a

18   part of my responsibilities.

19   Q.    Does that require you to get onto the streets,

20   Neighborhood Watch, or does that --

21   A.    It required me to get out on the street, yes.

22   And I did spend time doing my FTO, field training

23   officer, where I actually answered calls and did the

24   work that patrol officers do.

25   Q.    Did you ever do public relations?  Were you the

```
 1    public spokesperson?

 2    A.    I was public information officer for about two

 3    months, yes, sir.

 4    Q.    Okay.  How often do you see -- in your job do you

 5    see Sheriff Ackal?

 6    A.    When I was the purchasing agent, I worked in the

 7    courthouse, I saw him almost daily.  I see him now at

 8    staff meetings.  I see him when we service his

 9    automobile.  I see him at staff meetings, and, well...

10    Q.    There has been a lot of talk over the last week

11    about the use of the "N" word.  I'm just going to go

12    and say it, the word nigger.  Is that word used around

13    the sheriff's office?

14    A.    Yes.  I've heard it around the sheriff's office,

15    yes.

16    Q.    I'm going to ask you specifically how often have

17    you heard Sheriff Ackal use it in front of you?

18    A.    Never.

19    Q.    He's never in any sense said that in front of

20    you?

21    A.    Never.  Never heard him say it.

22    Q.    Has he ever disrespected you in any way?

23    A.    No.

24    Q.    Has he ever treated you any differently because

25    you're African-American?
```

1    A.    He treats me as good as a brother.

2    Q.    Do you know much about the narcotics unit?

3    A.    I know they exist.  I hear some of the work they

4    do through the newspaper or sometimes just talking with

5    other officers, so...

6    Q.    Do you socialize with those guys?  Do you hang

7    around with them at work or anything like that?

8    A.    No, I don't.

9    Q.    Are they an exclusive type of group?

10   A.    They're kind of outside the mainstream.  I in-rec

11   (ph) with all the police officers because all the ones

12   that have automobiles come into the shop where I work

13   to get their -- their vehicles serviced.  The narcotics

14   agents don't get their vehicles serviced too often, so

15   I don't even interact with them in that job.

16   Q.    Now, you mentioned something about the media.

17   Did you read something about abuses or something like

18   that in the media?  In the newspaper?  On TV?

19   A.    Yes, I read it in the media.

20         MR. BLUMBERG:  Objection.  Relevance, what he

21   read in the media.

22   BY MR. MCLINDON:

23   Q.    Well, did you -- putting aside the media for a

24   second.

25   A.    Okay.

1  Q.    Did you have knowledge of abuses being conducted

2  by the narcotics agents, without reading the media?

3  A.    I had a parent to tell me that her son was beat

4  in the jailhouse.

5  Q.    Okay.  Other than that?

6  A.    That's about it.

7  Q.    Did the parent say was it a jailer?  Or was it a

8  narcotics agent?  Or was it --

9        MR. BLUMBERG:  Objection.  Hearsay.

10 Relevance.

11 ***

12 BY MR. MCLINDON:

13 Q.    Based on that conversation, don't tell me what

14 the parent told you, can you tell me if the person who

15 did the beating -- do you know the person who did the

16 beating?

17 A.    No.

18 Q.    Okay.  Do you know what division the person

19 worked for, the person that did the beating?

20 A.    Not at the time, no.

21 Q.    Okay.  Do you know now?

22 A.    Only what I read in the newspaper.

23 Q.    Okay.  When you read about this in the newspaper,

24 these uses of excessive force, was that news to you?

25        MR. BLUMBERG:  Objection.  Relevance.  No

```
 1    personal knowledge about the elements of the --
 2              THE COURT:  I'm going to let him answer.
 3              "Yes," "no," or "I don't know."
 4              THE WITNESS:  What?  When I read it in the
 5    newspapers, was it news to me --
 6              THE COURT:  The question was:  When you read
 7    it in the newspaper, was that news to you?
 8    BY MR. MCLINDON:
 9    Q.   The newspaper, about the excessive uses of force?
10    A.   Um, hearsay again.  I've heard.  I've had --
11              THE COURT:  The question is was it news to
12    you?  "Yes," "no" --
13              THE WITNESS:  Yes.
14              THE COURT:  -- "I don't know."
15              THE WITNESS:  Yes, it was news.
16    BY MR. MCLINDON:
17    Q.   It was news to you?
18    A.   Yes.
19              MR. MCLINDON:  Thank you very much, Captain.
20              That's all I have.
21              THE COURT:  Do you have any questions?
22              MR. BLUMBERG:  No, Your Honor, I do not.  I
23    have no questions.
24              THE COURT:  Is the witness free to go?
25              MR. MCLINDON:  Yes, sir.
```

```
 1                  THE COURT:  The witness is free to go.

 2             Thank you.  Thank you, sir.

 3             Call your next witness.

 4             MR. MCLINDON:  Yes, sir.  Coming right now.

 5             THE COURT:  If you'll come up, sir, here.

 6             THE COURTROOM DEPUTY:  Please raise your

 7   right hand.  Do you solemnly swear that the testimony

 8   you will give in this case will be the truth, the whole

 9   truth, and nothing but the truth, so help you God?

10             THE WITNESS:  I do.

11             THE COURTROOM DEPUTY:  Can you please spell

12   your first and last name for the Court Reporter?

13             THE WITNESS:  D-I-C-K-I-E, Dickie, last name

14   Fremin, F-R-E-M-I-N.

15             THE COURTROOM DEPUTY:  Thank you.

16                  DICKIE FREMIN,

17    first having been duly sworn by the Courtroom Deputy,

18             testifies under oath as follows:

19                  DIRECT EXAMINATION

20   BY MR. MCLINDON:

21   Q.    Mr. Fremin, where are you currently employed?

22   A.    Iberia Parish Sheriff's Office.

23   Q.    What is your title?

24   A.    Captain of the patrol command.

25   Q.    How long have you been there?
```

1    A.    Twelve years.

2    Q.    Okay.  You probably know what this trial is

3    about, don't you?

4    A.    Yes, sir.

5    Q.    Okay.  Do you know Gerald "Bubba" Savoy?

6    A.    Yes, I do.

7    Q.    Okay.  Has he had an influence on narcotics

8    officers and their -- and some of the things that they

9    have done?

10   A.    I don't know for a fact, but he controlled them.

11   I mean, they reported directly to him.

12   Q.    Okay.  Did you -- did you interview with the FBI,

13   sir, some time ago?

14   A.    Yes, I did.

15   Q.    About back in September?

16   A.    Yes, sir.

17   Q.    Did you tell the FBI that he has influence on

18   these officers that led to them breaking the law?

19   A.    It appeared that he did.  You know, I don't know

20   for a fact, but --

21   Q.    Your perception was that he did?

22   A.    Yes, sir.

23   Q.    Did you feel like that you were left out of a lot

24   of things?

25   A.    Yes, sir.

1  Q.    Specifically left out of what the narcotics

2  officers did?

3  A.    Correct.

4  Q.    Did you ever feel like Savoy had more authority

5  than he should have had?

6  A.    Yes, sir.

7  Q.    Were you aware that there had been some excessive

8  uses of force by narcotics agents?

9  A.    Yes, sir.

10  Q.    Okay.  Did you bring that to the attention of

11  Mr. Hazelwood or, if --

12  A.    Well, it -- I guess I'm not sure, you know, a

13  particular case, a time.  You know, I know there was an

14  incident back in 2008 that was brought to the attention

15  of, I think, Major Mike Barnett at the time.

16  Q.    Okay.  Well, let me ask you this.  If you heard

17  about an excessive use of force, did you ever bring it

18  directly to Sheriff Ackal's attention?

19  A.    No, I did not.  I would bring it to Chief

20  Hazelwood.

21  Q.    Hazelwood, okay.  Have you ever in your career

22  deleted reports?

23  A.    Yes, I have.

24  Q.    Okay.  Have you ever done it at the direction of

25  Sheriff Louis Ackal?

1   A.    No, I haven't.

2   Q.    Did you ever have trouble getting into the --

3   well, let me rephrase that.

4         Were you able to get into the section of the

5   building where narcotics kept their office?

6   A.    At times, yes; and at times, no.

7   Q.    What prevented you from getting in there?

8   A.    You had to have, um, a key card --

9   Q.    Okay.

10  A.    -- to have access into that part of the building,

11  and I didn't have access to that part of the building.

12  At times, you had to knock on the door for someone to

13  come open the door for you.

14  Q.    Is part of your job to look over Use of Force

15  reports?

16  A.    Yes, sir.

17  Q.    And what's the purpose of that?  Why do you read

18  the Use of Force reports?

19  A.    To see what type of force is used and to make

20  sure that it's in their report and it's not excessive

21  force.

22  Q.    So if you read a Use of Force report and you see

23  something that's questionable, what do you do?

24  A.    Bring it to Chief Hazelwood.

25  Q.    Okay.  And then do you ever bring the officer in?

1    A.    Yes, they do.

2    Q.    Okay.  So if you read a report and there is

3    nothing in there about use of force, then I guess

4    nothing happens?

5    A.    Correct.

6    Q.    Mr. Fremin, sometimes there are things in the

7    department that troubles you that you just chose not to

8    tell the sheriff?

9    A.    There may have been some -- some things.

10   Q.    Do you remember telling that to the grand jury in

11   your grand jury testimony?

12   A.    No, I don't remember that.

13   Q.    Okay.  But you don't deny that you could have

14   said that to the grand jury?

15   A.    I don't deny it.

16   Q.    Okay.  Has the sheriff ever told you to put in

17   your report that the person being arrested resisted

18   arrest?

19   A.    No, sir.

20         MR. MCLINDON:  Thank you, Mr. Fremin.  That's

21   all I have for you.

22         THE COURT:  Cross?  Counselor?

23                   CROSS-EXAMINATION

24   BY MR. JARZABEK:

25   Q.    Good afternoon, Captain.

1    A.    Good afternoon, sir.

2    Q.    We've talked in the past, haven't we?

3    A.    Yes, sir.

4    Q.    Okay.  And it's fair to say, is it not, that you

5    have indicated that the narcotics unit at the Iberia

6    Parish Sheriff's Office has a less than distinguished

7    reputation?

8    A.    That's correct.

9    Q.    It has a reputation for violence, doesn't it?

10   A.    It appears that way, sir.

11   Q.    Well, you were personally aware of that, too,

12   before it became public, weren't you?

13   A.    Correct.

14   Q.    The unit also enjoys a reputation within the

15   department as having special status within the

16   department, does it not?

17   A.    It appears that way, yes, sir.

18   Q.    And it appears that way based on, in part, the

19   way the sheriff treats it; correct?

20   A.    I don't know if it's the sheriff that treats it

21   that way, but it appears --

22   Q.    To have special status?

23   A.    Correct.

24          THE COURT:  Mr. Jarzabek, do not answer for

25   the witness.

1    MR. JARZABEK:  Yes, Your Honor.

2  BY MR. JARZABEK:

3  Q.    Now, Mr. Savoy was at the time and various times

4  the head of the narcotics unit; is that correct?

5  A.    Yes, sir.

6  Q.    And you know of several problems with that unit

7  while he was the head of it; correct?

8  A.    Yes, sir.

9  Q.    He went on to become basically, within the

10  criminal side of the house, the number three man in the

11  Iberia Parish Sheriff's Office, didn't he?

12  A.    It appears that way, yes, sir.

13  Q.    Well, I mean, he was, wasn't he?

14  A.    Yes, sir.

15  Q.    Now, um, when did you tell the sheriff that you

16  had been interviewed by the FBI?

17  A.    I never did.

18  Q.    How did that become known?  Do you know?

19  A.    No, sir, I don't.

20  Q.    Okay.  Do you remember telling the FBI that you

21  weren't going to tell the sheriff or anybody else at

22  the IPSO about being interviewed by them because you

23  were afraid you would lose your job?

24  A.    Yes, sir.

25  Q.    Was that still true up until recently?

1    A.    Yes, sir.

2              (Pause in the proceedings.)

3              (Counsel conferring.)

4          MR. JARZABEK:  No further questions, Your

5    Honor.

6          THE COURT:  Redirect?

7          MR. MCLINDON:  Just one.

8                    REDIRECT EXAMINATION

9    BY MR. MCLINDON:

10   Q.    You still work for the sheriff's office; don't

11   you?

12   A.    Yes, sir.

13         MR. MCLINDON:  That's all I have.  Thank you.

14         THE COURT:  All right.  This witness is free

15   to go?

16         MR. MCLINDON:  Yes, sir.

17         THE COURT:  You're excused, sir.  Thank you.

18         MR. MCLINDON:  Your Honor, with your

19   permission, could we take the afternoon break a little

20   bit early?

21         THE COURT:  Yes.

22         MR. MCLINDON:  My witness situation is a

23   little --

24         THE COURT:  Fifteen minutes, ladies and

25   gentlemen.

```
 1                THE CSO:  All rise for the jury.

 2                (The Jury exits the courtroom.)

 3                (Recess taken.)

 4                THE COURT:  Anything before we bring the Jury

 5      in?

 6                MR. BLUMBERG:  Not from the Government, Your

 7      Honor.

 8                THE COURT:  All right.  Bring them in,

 9      please.

10                Sheriff, are you okay now?

11                THE DEFENDANT:  Well, it's not working, but

12      I'm okay.

13                THE COURT:  No question in either you or your

14      lawyer's mind that you are fit to go on?

15                THE DEFENDANT:  I think I'm fit to go on,

16      yes, sir.

17                THE COURT:  All right.  Thank you.  And I

18      understand we might run out of witnesses.

19                MR. MCLINDON:  I'm trying my best.

20                THE COURT:  That's okay.  We'll utilize the

21      time to --

22                MR. MCLINDON:  Yes, sir.

23                THE COURT:  -- talk about shifts and shoes.

24                All rise for the jury.

25                (The Jury enters the courtroom.)
```

```
 1              THE COURT:  You may all be seated.  If you

 2   will raise your right hand, sir, and be sworn.

 3              THE COURTROOM DEPUTY:  Do you solemnly swear

 4   that the testimony you will give will be the truth, the

 5   whole truth, and nothing but the truth, so help you

 6   God?

 7              THE WITNESS:  I do.  I do.

 8              THE COURTROOM DEPUTY:  Can you please spell

 9   your first and last name for the Court Reporter.

10              THE WITNESS:  P-A-U-L, Paul; Scott,

11   S-C-O-T-T.

12              THE COURTROOM DEPUTY:  Thank you.

13                         PAUL SCOTT,

14    first having been duly sworn by the Courtroom Deputy,

15               testifies under oath as follows:

16                      DIRECT EXAMINATION

17   BY MR. MCLINDON:

18   Q.    Mr. Scott, where are you employed?

19   A.    Iberia Parish Sheriff's Office.

20   Q.    What's your title?

21   A.    Warden at the jail.

22   Q.    You're the head guy at the jail.  You're the

23   chief of the jail?

24   A.    Yes, sir.

25   Q.    Who was your immediate predecessor?
```

1   A.   Jesse Hayes.

2   Q.   Okay.  And before him?

3   A.   I think it was Mark Frederick.  I'm not sure.

4   Q.   Was it Wesley Hayes or Jesse Hayes?

5   A.   Jesse Hayes.

6   Q.   Jesse Hayes was the warden?

7   A.   Yes.

8   Q.   Was Wesley Hayes ever the warden?  Wesley?

9   A.   I'm sorry.  Wesley Hayes was the warden.

10  Q.   Okay, thank you.  So you took over from him?

11  A.   Yes.

12  Q.   Okay.  What kind of condition was the jail in

13  when you took over from him?

14  A.   *Mess* would be an understatement.

15  Q.   Can you give us some examples?

16  A.   Files had never been filed away, stacks of

17  grievances and request forms that had never been

18  answered.

19  Q.   Let me stop you right there.  What's a grievance?

20  A.   A grievance is an ARP process which allows an

21  inmate to --

22       THE COURT:  Wait.  Slowly, please.

23  BY MR. MCLINDON:

24  Q.   Slow down.  Go ahead.  It's an ARP?

25       THE COURT:  Speak more slowly.

1    BY MR. MCLINDON:

2    Q.    Go ahead and tell us what an ARP is.

3    A.    ARP is Administrative Remedy Procedure that

4    allows an inmate to file a grievance against the

5    facility if there is something that affected the inmate

6    personally that he feels needs to be changed.

7    Q.    Okay.  And you found -- did you find stacks of

8    those?

9    A.    Yes, sir.

10   Q.    Where?

11   A.    Some were in the warden's office and some were in

12   an office where one of the other administrative

13   personnel worked under him.

14   Q.    Had they been addressed?

15   A.    There was no responses on them.  Never answered,

16   never checked off, nothing.

17   Q.    If it had been done properly and there was a

18   justified grievance, would that have been brought to

19   the attention of the sheriff?

20   A.    Yes, sir, because the second step of a grievance

21   process goes to the sheriff to respond to.

22   Q.    First step is with the warden?

23   A.    Is with the warden.  Second step would go to the

24   sheriff.

25   Q.    And you found -- can you estimate how many you

1   found?

2   A.   I would say a stack was about this thick

3   (indicating.)

4   Q.   Totally unaddressed?

5   A.   Totally unaddressed.

6   Q.   Was the jail certified?  And can you explain what

7   *certified* means?

8   A.   Certification is something that's required by the

9   State of Louisiana.  If you're housing DOC inmates, you

10  have to fall under their certifications to house those

11  inmates and to be paid for to house them.  I went back

12  as far as 2009 --

13            THE COURT:  Okay, slowly.  Go ahead.

14            THE WITNESS:  I went back as far as 2009, and

15  the jail hadn't been certified.  The first time it was

16  certified was in -- it was June 2014 after I started in

17  December 2013.

18  BY MR. MCLINDON:

19  Q.   And are you currently certified?

20  A.   Yes, sir.

21  Q.   What happens if you're not certified?

22  A.   You could lose all the DOC inmates.

23  Q.   Okay.  How often do you see the sheriff?

24  A.   We probably meet, see each other, run across

25  maybe once every two weeks or something like that.

1   Q.    Okay.  And do y'all discuss what's going on at

2   the jail?

3   A.    Yes, sir, from time to time.  Yes.

4   Q.    Okay.  Does he ever use racial slurs or epithets

5   when referring to the inmates?

6   A.    I've never heard that from him personally, no,

7   sir.

8   Q.    Have you ever heard the sheriff use the phrase,

9   *hey, take care of this*?

10  A.    All the time.

11  Q.    He says that to you?

12  A.    Yes, sir.  He says *take care of it, baby*.

13  Q.    *Take care of it, baby*?

14  A.    Yes.

15  Q.    Or *take care of it*?

16  A.    Yes.

17  Q.    And does that mean, in your mind, to go out and

18  commit some illegal act?

19  A.    No, sir.

20  Q.    What does that mean to you?

21  A.    To me, the problem that we are discussing, find

22  out what the problem was, if there is one, fix it and

23  let him know what was the outcome of the situation.

24  Q.    Has he ever given you an order to do something

25  illegal?

```
1   A.    No, sir.
2               MR. MCLINDON:  Just give me one second.
3               (Pause in the proceedings.)
4               MR. MCLINDON:  No further questions.
5               THE COURT:  Mr. Jarzabek?
6               MR. JARZABEK:  One moment, Your Honor.
7                        CROSS-EXAMINATION
8   BY MR. JARZABEK:
9   Q.    When did you start with the jail, sir?
10  A.    December of 2013.
11  Q.    Shortly after that, it had become known that the
12  Iberia Parish Sheriff's Office was under federal
13  investigation?
14  A.    I want to say maybe in '15, the latter part '14.
15  Q.    And were you part of the Iberia Parish Sheriff's
16  Office in any way prior to December of 2013?
17  A.    I started in the patrol division in January 2013,
18  was when I first started with them; went to patrol and
19  then to the jail.
20  Q.    So you are not familiar with any of the
21  timeframes involved in 2011; are you?
22  A.    No, sir.
23  Q.    Or anything that might have happened up until
24  that time?
25  A.    No, sir.
```

1   Q.    You have no idea what discussions took place

2   between the sheriff and the prior warden; do you?

3   A.    No, sir.

4   Q.    Are there cameras in the chapel now?

5   A.    Yes, there is.

6            MR. JARZABEK:  No further questions.

7            MR. MCLINDON:  And I have no redirect, Your

8   Honor.

9            THE COURT:  The witness is excused.  Thank

10  you.  Thank you, sir.

11           THE WITNESS:  Yes, sir.

12           MR. MCLINDON:  The defendant calls Richard

13  Landry.

14           THE COURT:  If you'll come up, sir.

15           THE COURTROOM DEPUTY:  Please raise your

16  right hand.

17           Do you solemnly swear that the testimony you

18  give will be the truth, the whole truth, and nothing

19  but the truth, so help you God?

20           THE WITNESS:  I will.

21           THE COURTROOM DEPUTY:  Please spell your

22  first and last name for the Court Reporter.

23           THE WITNESS:  R-I-C-H-A-R-D, L-A-N-D-R-Y.

24           THE COURTROOM DEPUTY:  Thank you.

25  ***

```
1                    RICHARD LANDRY,

2     first having been duly sworn by the courtroom deputy,

3               testifies under oath as follows:

4                    DIRECT EXAMINATION

5     BY MR. MCLINDON:

6     Q.   Good afternoon, Mr. Landry.

7     A.   Yes.

8     Q.   Where are you employed?

9     A.   Iberia Parish Sheriff's.

10    Q.   How long have you been there?

11    A.   Eight years.

12    Q.   Do you know Sheriff Louis Ackal?

13    A.   Yes, I do.

14    Q.   How long have you known him?

15    A.   All my life, sir.

16    Q.   Literally?

17    A.   All of my life.  We grew up together.

18    Q.   In New Iberia?

19    A.   Yes.

20    Q.   Is there a part of New Iberia called -- is it

21    called the West End or the West Side?

22    A.   Yes.

23    Q.   Okay.  Is that where you grew up?

24    A.   Yes.  And also the sheriff.

25    Q.   Okay.  Y'all were neighbors?
```

1    A.    No, we were just friends.  I mean, we just -- we

2    worked together, we played together, you know.

3    Q.    And did you remain friends with him as teenagers

4    and all the way through?

5    A.    All the way through, through my life.

6    Q.    When would that have been?  I don't want to ask

7    you your age, but would that have been in the 1950s and

8    the 1960s?

9    A.    I was born in 1943.

10   Q.    Okay.  And you've known him since you were a

11   child?

12   A.    Since we were young boys.

13   Q.    Was that politically correct for a white guy to

14   hang out with a black guy in the Fifties and Sixties?

15   A.    No.  The sheriff got a lot of flack.  Louis got a

16   lot of flack from the white boys about hanging out with

17   us, but he was right in the middle of the West End.  He

18   came up on the corner of Hopkins and Robinson.

19   Q.    Okay.  Now, are there problems with that part of

20   town right now?

21              MR. BLUMBERG:  Objection.  Relevance.

22              THE COURT:  Where are you going with this?

23              MR. MCLINDON:  Let me back up and see if I

24   can do a better job, Your Honor.

25   BY MR. MCLINDON:

1    Q.    Where do you live now, Mr. Landry?

2    A.    I moved in another part of town.

3    Q.    You left?

4    A.    I have children and sisters and brothers that

5    still live on the West Side.

6    Q.    Okay.  As a -- what is your title at the

7    sheriff's office?

8    A.    I'm a lieutenant in special services, fleet

9    service.

10   Q.    Okay.  Do part of your -- part of your job

11   duties, do you ever, you know, hit the streets, for

12   lack of a better word?  Do you ever go out into the

13   neighborhoods in the streets?

14   A.    Yes, sir.  When I first -- when we first took

15   office, I worked in what you call community policing.

16   Q.    Okay.  And in community policing, you would go

17   into the neighborhoods?

18   A.    Yes.

19   Q.    And you would go into the West Side?

20   A.    Yes.

21   Q.    Okay.  Is there a drug problem in the West Side?

22            MR. BLUMBERG:  Objection.  Relevance.

23            THE COURT:  Excuse me.  What's the relevance?

24   What fact at issue would be made more or less probable

25   by the answer to that question?

1    MR. MCLINDON:  Well, Judge, what I hope to

2  lead to is the --

3    THE COURT:  Well, what fact at issue?

4    MR. MCLINDON:  The use of police enforcement

5  in the West Side, the fact that police -- there are

6  more police officers.

7    THE COURT:  How is that affected in this

8  case?

9    MR. MCLINDON:  Well, because of the testimony

10  from the Government's case about the unnecessary use of

11  force.

12    THE COURT:  Well, that's a jury question.

13  Sustained.

14    MR. MCLINDON:  Okay.

15  ***

16  BY MR. MCLINDON:

17  Q.   Does the sheriff -- have you ever heard the

18  sheriff use the phrase *take care of this for me*?

19  A.   Yes.

20  Q.   Is it a common phrase?

21  A.   All the time.  Any time he asks you to do

22  anything, if you tell him *okay*, he says, *well, take

23  care of that for me, baby*.

24  Q.   *Take care of that for me, baby*?

25  A.   Yes.

1    Q.    And when you hear that, do you interpret that to

2    go out and commit some unlawful act?

3    A.    Oh, no.

4    Q.    What do you think that means when he tells you to

5    take care of things?

6    A.    Do what he asks you to do.

7    Q.    Has he ever instructed you to engage in any

8    illegal or unlawful behavior?

9             MR. BLUMBERG:  Objection.  Prior acts.

10            THE COURT:  I'll permit him to answer it.

11            THE WITNESS:  No, sir.

12   BY MR. MCLINDON:

13   Q.    Has Sheriff Ackal ever in your presence used

14   racial slurs, racial epithets, anything like that?

15   A.    No, sir.

16   Q.    Has he ever disrespected you in any way because

17   of your race?

18   A.    By no means.

19   Q.    Are y'all close to each other?

20   A.    Yes.  Always have been.

21            MR. MCLINDON:  Thank you very much.

22            THE COURT:  Your witness, Counselor.

23                      CROSS-EXAMINATION

24   BY MR. BLUMBERG:

25   Q.    Good afternoon, sir.

1    A.    Yes, sir.

2    Q.    You wouldn't engage in any illegal act if he told

3    you to do it, would you?

4    A.    I sure wouldn't.

5    Q.    In fact, if he told you to engage in some illegal

6    act, you would report him, wouldn't you?

7    A.    I would.

8    Q.    You would go outside of your chain of command?

9    A.    Yes.

10   Q.    You would go to the FBI?

11   A.    I would if it's serious enough.

12   Q.    You could go to a court or find a lawyer; right?

13   A.    Yes.

14   Q.    Because that's your character?

15   A.    Yes.

16   Q.    And more importantly, he knows that's your

17   character; right?

18   A.    Yeah, I guess.  Yes.

19   Q.    Because you know each other well?

20   A.    Yes.

21   Q.    It wouldn't make a lick of sense for him to ask

22   you to do something illegal, would it?

23   A.    I don't think so.

24         MR. BLUMBERG:  Thank you, sir.

25         THE COURT:  Redirect?

```
 1              MR. MCLINDON:  I have no redirect, Your

 2    Honor.

 3              THE COURT:  Thank you, sir.  You're free to

 4    go.

 5              MR. MCLINDON:  If I could just have a second,

 6    Judge.  Judge, we might have a witness available, but

 7    more likely than not, we won't.

 8              THE COURT:  You do or you don't?

 9              MR. MCLINDON:  I don't know.  He's checking

10    to see.

11              THE COURT:  Okay.

12              MR. MCLINDON:  Your Honor, I'll tell you my

13    preference is to see if we can break early for the day

14    because my witnesses are coming from so far away and --

15              THE COURT:  I understand that.

16              MR. MCLINDON:  -- this trial has moved a lot

17    faster than we thought it would.

18              THE COURT:  So, what, do you want to quit for

19    the day?  Is that what you're saying?

20              MR. MCLINDON:  Can I have two minutes with my

21    investigator?

22              THE COURT:  Yes.

23              (Pause in the proceedings.)

24              MR. MCLINDON:  Your Honor, with the Court's

25    permission, the defense would like to stop for today.
```

```
 1    And we will have two very brief witnesses in the
 2    morning.
 3            THE COURT:  All right.  Ladies and gentlemen,
 4    we're going to quit early today.  I have, still, high
 5    hopes of finishing this case tomorrow.  We will use
 6    this time to get our jury instructions and so forth
 7    ready.  But you are free to go until nine o'clock
 8    tomorrow morning.
 9            Please don't discuss the case with your
10    nearest and dearest.  Don't read, watch or listen to
11    any news accounts.  And be on time tomorrow, please.
12    Drive carefully.
13            All rise.
14            (The Jury exits the courtroom.)
15            THE COURT:  You may all be seated, and you
16    may all leave except for the lawyers.  I need them, but
17    everybody else is free to go, even the defendant, if he
18    wants to.
19            (Pause in the proceedings.)
20            THE COURT:  Why don't we cut off the
21    streaming.
22            THE LAW CLERK:  Okay.  It's off.
23            THE COURT:  It's off?  Okay.  Are we ready?
24    Would you Sametime Pat and tell him that we've turned
25    it off?
```

1          THE LAW CLERK:  Yes.

2          THE COURT:  Okay.  Do I have everybody's

3  attention now?

4          First, we have redacted the indictment.  I'm

5  going to hand you a copy.  I made one change from the

6  Government, and they left out a couple of ands that I

7  put back in.  And one other change I made.  What was

8  it?

9          THE LAW CLERK:  That was the only one I saw.

10         THE COURT:  That's it, then.

11         THE LAW CLERK:  All I have is the copy that

12  the Government gave me.  I was handing that back for

13  them to make that change.

14         THE COURT:  Oh, okay.  I'll tell you what.

15  You hand it to the Government.  And after you make the

16  changes that I did, would you please email that to

17  Mr. McLindon?

18         MR. BLUMBERG:  Yes, sir.

19         THE COURT:  And tomorrow morning, I'll ask

20  you if everything is all right.

21         Essentially, what we did was take everybody

22  out that is no longer here.

23         MR. MCLINDON:  Right.

24         THE COURT:  And when we refer to the

25  *defendants*, it now says *defendant*, and we've taken

1    their name out.

2            And I think that's about the only changes we

3    made, isn't it?

4            THE LAW CLERK:   (Nodding in the affirmative.)

5            THE COURT:   I think so.   Okay.

6            What about this limiting instruction?   I

7    think you're entitled to the limiting instruction.   Do

8    you not like the language or what?

9            MR. MCLINDON:   And Mr. Blumberg has told me

10   that he thinks it definitely favors me.   Judge, I

11   just -- when I read it, something about it bothered me,

12   and I have not had time to digest it.   Can I give you

13   an answer in the morning?

14           THE COURT:   Yeah.   You're entitled to some

15   limiting instruction that essentially says this -- and

16   if somebody can do it shorter, I'm all for short.

17           MR. MCLINDON:   I would just like the

18   opportunity to review it.

19           THE COURT:   Sure.   Okay.   Tomorrow morning?

20           MR. MCLINDON:   Yes, sir.   Absolutely.

21           THE COURT:   We are going to start early

22   tomorrow morning.   We are going to start at 8:30.

23           MR. BLUMBERG:   Yes, sir.

24           THE COURT:   Caroline is continuing, and we

25   are going to go in the back, and we are going to work

1    on the jury instructions.  I can't believe I'm having

2    this much difficulty with jury instructions on this

3    case.  But, anyway, she will email you copies of the

4    jury instructions.

5            Caroline, can we do that?

6            THE LAW CLERK:  Yes.

7            THE COURT:  And at 8:30 we will be discussing

8    the jury instructions.

9            MR. BLUMBERG:  Tomorrow morning, you mean?

10           THE COURT:  Tomorrow morning, yes.  That's

11   why the 8:30.

12           MR. MCLINDON:  We will get them late this

13   afternoon or tonight?

14           THE COURT:  Yes, as soon as we can.

15           MR. MCLINDON:  Yes, sir.

16           THE COURT:  As I appreciate what's going to

17   happen tomorrow is you've got a couple of witnesses

18   that probably won't take you any longer than that.

19           Do you anticipate any rebuttal?

20           MR. BLUMBERG:  Not based on who I believe

21   they are calling.

22           THE COURT:  Okay.  So we will have closing,

23   instructions, and it is conceivable that I can feed

24   them lunch and they can begin deliberations around

25   then.  Is that conceivable?

```
 1              MR. BLUMBERG:  Yes, Your Honor.  I guess it
 2     depends on how much time you allow for closings.
 3              THE COURT:  I can't see longer than the
 4     45 minutes you each had at opening.  And you can't
 5     reserve more than a third of it.  You can use it all up
 6     to begin with, but no matter how -- if you stand up
 7     there for two minutes, you still have only got 15
 8     minutes.
 9              MR. BLUMBERG:  Could I make a pitch as to why
10     this might require longer than the 45 minutes, Your
11     Honor?  First, to the comment that you just made, and
12     that is I agree with you, the jury instructions in this
13     case are difficult.  I spent a lot of time trying to
14     work through them to make them both comprehensible and
15     comprehensive, more than I typically have to use in
16     cases, because there are multiple theories of liability
17     and different constitutional rights at issue and --
18              THE COURT:  Well, I'm the person that's going
19     to tell them about that, not you.
20              MR. BLUMBERG:  But I have to apply the
21     elements and the facts.  And I do believe that, given
22     the complexity, that more time would be necessary to be
23     able to adequately convey the Government's case.
24              THE COURT:  I'll tell you what I'm going to
25     do.  I'm going to use the *Scheherazade* rule.
```

1    MR. BLUMBERG:  Which is?

2    THE COURT:  You can't reserve more than

3  15 minutes.  And if at the end of 30, you are still

4  entertaining me, I may give you some extra time.

5    MR. BLUMBERG:  Oh, that's the *Scheherazade*

6  rule?

7    THE COURT:  On the other hand, if you're not,

8  I'm going to hold you to the 30 minutes, but I'll give

9  you a one or two-minute warning.

10    MR. BLUMBERG:  I'll ring several bells, Your

11  Honor.

12    THE COURT:  All right.  And whatever time he

13  gets, you get.

14    MR. MCLINDON:  45 minutes?

15    THE COURT:  That's what I'm hoping for.

16  Mr. Blumberg may be more eloquent than -- we'll see.  I

17  really think you can do it in 45 minutes.  I really do.

18  Okay.

19    THE CSO:  All rise.

20    THE COURT:  Anything else, Caroline?

21    THE LAW CLERK:  No, sir.

22    THE COURT:  Okay.  Let's go play with the

23  jury instructions.

24                   (Adjourned at 3:19 p.m.)

25                    *    *    *    *    *

```
 1                  C E R T I F I C A T I O N

 2

 3           I, Gayle Wear, Federal Official Court

 4    Reporter, in and for the United States District Court

 5    for the Western District of Louisiana, do hereby

 6    certify that pursuant to Section 753, Title 28 United

 7    States Code, that the foregoing is a true and correct

 8    transcript of the stenographically reported proceedings

 9    held in the above-entitled matter and that of the

10    regulations of the Judicial of the United States.

11

12                        Dated this 3rd day of November 2016.

13

14                        /s/ Gayle Wear
                          Gayle Wear, RPR, CRR
15                        Federal Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```